FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

2010 MAR 29 P 4: 15

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| EXXON MOBIL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:10CV301 |
| ) | GBL/JFA |
| UNITED STATES OF AMERICA, ) | |
|   Serve:  Neil H. MacBride, Esq. ) | |
|            United States Attorney ) | |
|            Eastern District of Virginia ) | |
|            2100 Jamieson Avenue ) | |
|            Alexandria, Virginia 22314 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Exxon Mobil Corporation ("Plaintiff" or "ExxonMobil") alleges the following against Defendant, the United States of America:

### NATURE OF THE ACTION

1. Plaintiff brings this action for cost recovery and/or contribution under Sections 107 and 113(f)(3)(B) of the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9607, 9613(f)(3)(B), and for declaratory relied under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

2. Pursuant to Sections 107(a) and 113(f)(3)(B) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f)(3)(B), Plaintiff seeks to recover from the Defendant necessary response costs that Plaintiff has incurred consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part

300, caused by the release or threatened release of hazardous substances at Plaintiff's oil refinery and chemical plant located in Baytown, Texas ("Baytown complex") and other nearby areas or surface waters (collectively, the "Baytown Site" or "Site").

3. Pursuant to Sections 2201 and 2202 of the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff also seeks a declaratory judgment of liability that Plaintiff has the right to recover from the Defendant response costs incurred or to be incurred consistent with the NCP caused by the release or threatened release of hazardous substances at the Baytown Site.

4. In the early 1940s the Defendant converted and expanded the Baytown complex into a large manufacturing facility devoted to the production of critical, war-related materials for the United States. Subsequently, throughout World War II ("WWII") and continuing in many respects until shortly after the Korean War, the Defendant assumed ownership and/or substantial operational control of the various production plants at the Baytown complex; the wartime-related operations at these plants resulted in the generation and disposal of a significant amount of waste at the Baytown Site, and these waste disposals caused or substantially contributed to the contamination at the Site for which Plaintiff has incurred and will continue to incur remediation (response) costs.

5. Under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Defendant should be deemed as a person who owned or operated a facility at the time of the disposal of hazardous substances, and a person who by contract, agreement or otherwise arranged for the disposal or treatment of hazardous substances owned or possessed by such person, with respect to the Baytown Site, and therefore, is subject to liability under CERCLA for response costs incurred or

to be incurred by Plaintiff to respond to the release or threatened release of hazardous substances at the Baytown Site arising from such activities.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1331. In addition, the Declaratory Judgment Act, 28 U.S.C. § 2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to grant Plaintiff declaratory relief.

7. Venue in this Court is proper pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the Defendant resides, has its principal office, and may be found in this district.

## PARTIES

8. Plaintiff is a corporation organized under the laws of the State of New Jersey. Its principal place of business is located in Irving, Texas and its fuels marketing division headquarters is located in Fairfax, Virginia.

9. The United States of America has been named as a defendant on the basis of actions undertaken by its departments, agencies and instrumentalities, including but not limited to the following: the War Department and its successor the U.S. Department of Defense; the U.S. Department of the Army; the former U.S. Reconstruction Finance Corporation, including its former subsidiaries such as the U.S. Defense Plant Corporation, U.S. Defense Supplies Corporation, and the U.S. Rubber Reserve Company, and their successor the U.S. General Services Administration; the former U.S. Petroleum Administration for War, including its predecessor agencies the Office of the Petroleum Coordinator for National Defense and the Office of the Petroleum Coordinator for War (collectively, the "U.S. Petroleum Administration

for War"), and their successor the U.S. Department of the Interior; and the former U.S. Petroleum Administration for Defense and its successor the U.S. Department of the Interior.

## FACTUAL BACKGROUND

10. The Baytown complex is located in southeast Texas twenty-five miles east of Houston and is adjacent to the Houston Ship Channel

11. The Baytown complex commenced operations as a small oil refinery in approximately 1920. At that time one of Plaintiff's predecessor companies - Humble Oil & Refining Company ("Humble Oil") - operated the refinery.

12. In the early 1940s the Defendant reconfigured and greatly expanded the Baytown complex into one of the Federal government's ("Government") largest manufacturing facilities for strategic and critical war-related materials, particularly aviation gasoline ("avgas"), toluene and synthetic rubber, in response to the escalation of WWII and in the interest of national defense.

13. In the early 1940s the Defendant possessed the requisite authority and power to unilaterally transform the Baytown complex into a wartime manufacturing facility for the Government because the Defendant had enacted a series of broad, empowering statutes and issued numerous executive orders and regulations that enabled the Government to assume unprecedented control over industries and facilities, such as the Baytown complex, that manufactured materials and products deemed strategic and critical to the national defense. In particular, the Defendant expanded and mobilized the Government so that it possessed the necessary authority and power to do, among other things, the following: (a) exercise direct and pervasive control over the operations of certain key oil refineries in order to require (under the threat of seizure) these refineries to expand and devote all refinery operations to the manufacture

of critical, war-related materials for the Government; (b) construct and assume ownership of new production plants needed for the manufacture of other types of critical, war-related materials for the Government; and (c) control the production, pricing, distribution and use of scarce and essential war-related materials, equipment and supplies.

14. Given the Government's expanded authority and power, in the early 1940s the first key step in the Defendant's transformation of the Baytown complex was to expand and convert the oil refinery at the Baytown complex into a major avgas production plant for the Government.

15. Throughout WWII and also subsequently during the Korean War, the Defendant exercised substantial, day-to-day operational control of the refinery at the Baytown complex in order to ensure that the refinery manufactured maximum quantities of avgas and related components for the Government. The Defendant exercised substantial control over key operational aspects of the refinery, including, for example, the types and specifications of the war-related materials manufactured, the production levels and production processes, the market for and pricing of these war-related materials, the equipment contained in the refinery, and the supply and price of the primary raw materials used to make the required products. The Defendant exercised this operational control over the refinery at the Baytown complex primarily through agencies - the U.S. Petroleum Administration for War during WWII and the U.S. Petroleum Administration for Defense during the Korean War - that Defendant had empowered with broad authority to direct the operations of specific oil refineries, such as the Baytown complex.

16. The second key step in the Defendant's transformation of the Baytown complex was to expand it from a singular oil refinery to a facility that contained five additional war-

related production plants. These additional plants consisted of a hyrocodimer plant, three synthetic rubber plants (*i.e.*, butyl rubber, butadiene and styrene plants), and an Ordnance Works plant (*i.e.*, toluene plant). The Defendant expanded the Baytown complex to include these additional plants in order to accomplish the goal of erecting a fully integrated and self-contained facility for critical, war-related materials that could take advantage of production synergies (*e.g.*, certain byproducts manufactured at one plant would serve as raw materials for another plant and vice versa).

17. In order to expand the Baytown complex to include these five additional production plants, the Defendant acquired in fee simple several large tracts of undeveloped real property adjacent to the refinery, and then arranged, financed and oversaw the design and construction of these five additional production plants on this property.

18. The Defendant retained ownership of all five of these additional production plants throughout WWII and continuing, with respect to the synthetic rubber plants, until the mid-1950s. The hydrocodimer and three synthetic rubber plants were referred to as "Plancors" because the U.S. Defense Plant Corporation was the owner of these plants. The Ordnance Works plant was owned by the War Department.

19. The Defendant exercised substantial, day-to-day operational control of the four Government Plancors. Each Plancor was subject to an "Operating Contract" that designated Humble Oil as the agent of the Defendant. The Defendant exercised substantial control over key operational aspects of these Plancors, including, for example, the types and specifications of the war-related materials manufactured, the production levels, the market for and pricing of these war-related materials, the equipment contained in these plants, the supply of the primary raw materials used to make the required products, and the nature and adequacy of the waste

processing facilities. The Defendant assigned permanent Government officials and representatives at the Baytown complex in order to oversee and supervise the operations of these plants.

20. The Defendant also exercised a similarly substantial degree of day-to-day operational control of the Ordnance Works plant. The plant was subject to a "Construction, Equipment and Operation Contract." The Defendant permanently stationed at the Ordnance Works plant numerous U.S. Army personnel to assume command of the plant, supervise its operations and guard and secure the plant, and also constructed Army barracks at the plant to house these U.S. military personnel.

21. In many instances with regard to the hydrocodimer and Ordnance Works plants, the Defendant provided the hazardous raw materials for processing into the required products, and retained title to both the raw materials during the production process and the finished products

22. During the 1940s and 1950s the operations of the refinery and the other five production plants at the Baytown complex generated substantial hazardous waste (substances) that was treated and/or disposed of (released) at the Baytown Site. The Baytown complex utilized to a large extent a facility-wide network of sewers, earthen separators and open drainage canals for the treatment and disposal of the waste that was generated. Much of the solid waste generated from these operations was treated and/or disposed of at various surface impoundments at the Baytown complex. Most of the treated wastewaters was ultimately discharged into nearby surface water bodies, such as the Houston Ship Channel, Scott's Bay or Mitchell Bay, at the Baytown Site.

23. During the 1940s and 1950s the treatment and disposal of the substantial quantities of waste generated by the operation of the refinery and the other five production plants caused contamination of much of the soils, sediments, groundwater and surface waters at the Baytown Site.

24. The Defendant knew that these wartime-related operations at the Baytown complex involved the generation and disposal of wastes at the Baytown Site that resulted in significant environmental contamination. Shortly after WWII, for instance, the Defendant acknowledged that the synthetic rubber plants were designed with inadequate facilities for the handling and disposal of waste in order to save time and money during their construction.

25. Despite its knowledge of the inadequacy of the waste processing facilities, during WWII the Defendant generally did not approve or permit the use of manpower or the expenditure of funds to further investigate any waste disposal problems or to correct them through the implementation of appropriate waste processing improvements.

26. The Defendant continues to operate the Baytown complex as an oil refinery and chemical plant.

27. In order to fully address this contamination at the Baytown Site, Plaintiff has undertaken a series of ongoing response actions to investigate and remediate this contamination in accordance with various cleanup obligations set forth in two Agreed Orders ("Agreed Orders") issued by the State of Texas Natural Resources Conservation Commission, which subsequently became the State of Texas Commission on Environmental Quality (collectively, "TCEQ") pursuant to TCEQ's authority to implement the hazardous waste management requirements under the federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992, for operating industrial facilities located in the State of Texas.

28. In accordance with the Agreed Orders and a subsequent TCEQ corrective action plan setting forth specific corrective action requirements for the Baytown Site, Plaintiff has incurred to date approximately $45,000,000 in response costs, and expects to incur substantial additional response costs in the future, to investigate and remediate the contamination at the Site.

29. Plaintiff has incurred approximately $200,000 in additional response costs to pay for fees and costs charged by an investigate consulting firm to conduct a Potentially Responsible Party ("PRP") search investigation that identified the Government as a PRP at the Baytown Site.

30. On July 15, 2004, Plaintiff served upon the Defendant a confidential written demand for payment of its past response costs, and specified the amount of response costs for which payment was sought, with respect to the Baytown Site and the parties subsequently engaged in confidential settlement negotiations, but the Defendant has not reimbursed Plaintiff to date for any of its past response costs related to the Site.

31. On March 18, 2009, Plaintiff filed a civil action in the U.S. Court of Federal Claims against the United States in which Plaintiff asserted that the United States was contractually obligated to reimburse Plaintiff for its past and future environmental cleanup costs at the Baytown Site pursuant to a cost reimbursement provision in certain WWII avgas supply contracts entered into by several of Plaintiff's predecessor companies and the former U.S. Defense Supplies Corporation. *Exxon Mobil Corporation v. United States*, Case No. 09-165C (Ct. Fed. Cl.). The contract action remains pending.

## COUNT I
### (Cost Recovery Pursuant to Section 107(a) of CERCLA)

32. Paragraphs 1 through 31 are restated and re-alleged as though fully set forth herein.

33. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, in relevant part, the following:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
>
> (1) . . . ,
>
> (2) any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) . . . , shall be liable for--
>
>> (A) . . . ;
>>
>> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; . . . . 42 U.S.C. § 9607(a).

34. The Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

35. The Baytown Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

36. There have been releases and/or threatened releases of hazardous substances into the environment at the Baytown Site within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

37. Plaintiff has been conducting, and will continue to conduct, response actions at or in connection with various portions of the Baytown Site that are in response to the releases and/or threatened releases of hazardous substances at the Baytown Site.

38. Plaintiff has incurred necessary response costs in a manner consistent with the NCP, and will continue to incur response costs, in response to such releases and/or threatened releases of hazardous substances at the Baytown Site.

39. In regard to the Baytown Site, the Defendant is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), as a person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of.

40. In regard to the Baytown Site, the Defendant is liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as a person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances.

41. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Defendant is liable to Plaintiff for the necessary response costs that Plaintiff has incurred and will incur consistent with the NCP in connection with the Baytown Site, plus appropriate pre-judgment interest accruing from the date of Plaintiff's written demand for payment made upon the Defendant.

### COUNT II
### (Contribution Pursuant to Section 113(f)(3)(B) of CERCLA)

42. Paragraphs 1 through 41 are restated and re-alleged as though fully set forth herein.

43. Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), provides, in pertinent part, that:

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to [such] a settlement.

44. Plaintiff and the Defendant are "persons" within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

45. Plaintiff and the Defendant are "covered persons" within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Further, the Defendant is liable or potentially liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

46. Plaintiff has previously entered into administrative settlements with the State of Texas in which Plaintiff agreed to conduct specific response actions at the Baytown Site in order to resolve the liability of Plaintiff to the State with respect to the Baytown Site.

47. Pursuant to these administrative settlements Plaintiff has been conducting, and will continue to conduct, the response actions required under such administrative settlements.

48. Plaintiff has incurred necessary response costs in a manner consistent with the NCP, and will continue to incur response costs, in performing the response actions required under such administrative settlements.

49. The costs incurred and to be incurred by Plaintiff exceed its proportionate share of potential responsibility at the Baytown Site.

50. Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), Plaintiff is entitled to contribution from the Defendant for all or a part of Plaintiff's necessary

response costs incurred or to be incurred in performing the response actions required under such administrative settlements.

## COUNT III
### (Declaratory Judgment Pursuant to Sections 2201 and 2202 of the Declaratory Judgment Act and Section 113(g)(2) of CERCLA)

51. Paragraphs 1 through 50 are restated and re-alleged as though fully set forth herein.

52. Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides that in any action brought under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Court shall enter a declaratory judgment on liability for future "response costs" or "damages" as those terms are defined in CERCLA Sections 101(23), (24) and (25), 42 U.S.C. §§ 9601(23), (24) and (25) and CERCLA Section 101(6), 42 U.S.C. § 9601(6), respectively.

53. An actual controversy, within the meaning of 28 U.S.C. § 2201, exists between Plaintiff and the Defendant regarding their respective obligations and legal liabilities for response costs and damages that have been or may be incurred by Plaintiff in connection with the release and/or threatened release of hazardous substances at the Baytown Site.

54. Plaintiff requests a declaration pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) that the Defendant is strict, jointly and severally liable to Plaintiff under Section 107 of CERCLA for the costs that Plaintiff has incurred and may incur in responding to the release and/or threatened release of hazardous substances at the Baytown Site.

55. Plaintiff further requests a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Defendant is required to provide contribution to Plaintiff pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a), and/or CERCLA Section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), for all costs in excess of Plaintiff's fair and equitable share of costs that Plaintiff has incurred and

may incur in responding to the release and/or threatened release of hazardous substances at the Baytown Site.

56. The Court is empowered by 28 U.S.C. §§ 2201 and 2202 to make a judicial determination of the rights, duties and obligations of the parties to resolve the controversy between Plaintiff and the Defendant, and to grant such further relief as is necessary and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Exxon Mobil Corporation prays for judgment in its favor and against the Defendant as follows:

a. Enter judgment pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), in favor of Plaintiff against the Defendant holding the Defendant strictly, jointly and severally liable for the response costs incurred or to be incurred, including appropriate pre-judgment interest, by Plaintiff in connection with the release and/or threatened release of hazardous substances at the Baytown Site;

b. Enter judgment pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and/or Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), in favor of Plaintiff and against the Defendant holding the Defendant liable for all response costs in excess of Plaintiff's fair and equitable share of the response costs incurred or to be incurred by Plaintiff, plus all pre-judgment interest, in connection with the release and/or threatened release of hazardous substances at the Baytown Site;

c. Enter a declaratory judgment in favor of Plaintiff pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), decreeing the Defendant strictly, jointly and severally liable for all additional response costs, plus interest, incurred or to be incurred by Plaintiff in connection with the release and/or threatened release of

hazardous substances at the Baytown Site and that such judgment is binding on any subsequent action or actions by Plaintiff against the Defendant to recover response costs with respect to the Baytown Site;

d. Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 decreeing the Defendant liable for all response costs in excess of Plaintiff's respective fair and equitable share of the response costs, plus interest, incurred or to be incurred by Plaintiff in connection with the release and/or threatened release of hazardous substances at the Baytown Site and that such judgment is binding on any subsequent action or actions by Plaintiff against the Defendant to recover response costs with respect to the Baytown Site;

e. Award Plaintiff interest and costs of suit, including reasonable attorneys' fees and consultant fees as permitted by law; and

f. Order any such other relief as the Court may deem just and proper.

Respectfully submitted,

*Michael McGovern*
Daniel M. Steinway
Joe R. Caldwell, Jr.
Mark A. Miller (Va. Bar No. 44354)
Michael McGovern (Va. Bar No. 31848)
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Tel.:   (202) 639-7700
Fax:   (202) 639-7980
michael.mcgovern@bakerbotts.com

*Counsel for Exxon Mobil Corporation*