**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

———————————————————————

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 4:10-CV-02386 (LHR) |
| | ) | 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

———————————————————————

**CONSOLIDATED MEMORANDUM IN SUPPORT OF UNITED STATES'**
**MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

ROBERT G. DREHER
Acting Assistant Attorney General
Environmental & Natural Resources
Division

Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie J. Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044
Tel.:  202.514.3144
Email:  michael.rowe@usdoj.gov

KENNETH MAGIDSON
United States Attorney

Samuel G. Longoria
Assistant United States Attorney
Texas Bar No.: 12545500
1000 Louisiana, Suite 2300
Houston, TX 77002
Tel.:  713.567.9514
Email: sam.longoria@usdoj.gov

Counsel for Defendant the United States

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

NATURE AND STAGE OF THE PROCEEDING...................................................3

STATEMENT OF THE CASE...................................................3

STATUTORY AND REGULATORY BACKGROUND...................................................7

I.      CERCLA COST RECOVERY AND CONTRIBUTION ACTIONS ................................7

II.     OPERATOR LIABILITY...................................................10

STATEMENT OF THE ISSUES...................................................11

STANDARD OF REVIEW ...................................................12

ARGUMENT ...................................................12

I.      THE UNITED STATES DID NOT OPERATE EITHER REFINERY ...........................12

      A.      The World War II Period (1939 – 1945) ................................................14

            1.      The United States did not manage day-to-day Refinery affairs.................14

            2.      The United States did not make decisions about waste disposal or environmental compliance .........................................................20

                  a.      Baytown Refinery ........................................................22

                  b.      Baton Rouge Refinery...................................................24

      B.      The Korean War Period (1950 – 1953) and Later ..................................28

      C.      Conclusion ..........................................................29

II.     EXXON ALONE OWNED AND OPERATED BOTH REFINERIES ..........................30

      A.      The World War II Period (1939 – 1945) ..............................................31

      B.      The Korean War Period (1950 – 1953)...................................................37

III.    EXXON OPERATED THE PLANCORS AND THE BAYTOWN ORDNANCE WORKS...................................................39

A.      The World War II Period (1939 – 1945) and After ...............................................40

B.      The Korean War Period (1950 – 1953) and After ...............................................45

III.    EXXON IS NOT ENTITLED TO A DECLARATORY JUDGMENT ALLOCATING
        UNKNOWN FUTURE COSTS .......................................................................................47

CONCLUSION.............................................................................................................................53

# TABLE OF AUTHORITIES

## CASES

Amoco Oil Co. v. Borden, Inc.,
 889 F.2d 664 (5th Cir. 1990) ........................................................................... 8, 49

Atlanta Gas Light Co. v. UGI Utilities, Inc.,
 No. 3:03-cv-614-J-20MMH, 2005 WL 5660476 (M.D. Fla. Mar. 22, 2005),
 aff'd, 463 F.3d 1201 (11th Cir. 2006) ......................................................... 34, 35, 42

Akzo Coating Inc. v. Aigner Corp.,
 30 F.3d 761 (7th Cir. 1994) ...................................................................................47

Basic Mgmt. Inc. v. United States,
 569 F. Supp. 2d 1106 (D. Nev. 2008) .................................................................... 50

Beazer East, Inc. v. Mead Corp.,
 412 F.3d 429 (3d Cir. 2005) .................................................................................. 49

Boeing Co. v. Cascade Corp.,
 920 F. Supp. 1121 (D. Or. 1996) ........................................................................... 51

Boeing Co. v. Cascade Corp.,
 207 F.3d 1177 (9th Cir. 2000) ................................................................... 49, 50, 51

Brown v. City of Houston,
 337 F.3d 539 (5th Cir. 2003) ................................................................................ 12

Burlington No. & Santa Fe Ry. Co. v. United States,
 556 U.S. 599 (2009) .............................................................................................47

Celotex Corp. v. Catrett,
 477 U.S. 317 (1986) ............................................................................................ 12

City of Wichita, Kansas v. APCO Oil Corp. Liquidating Trust,
 306 F. Supp. 2d 1040 (D. Kan. 2003) .................................................................... 50

Coeur d'Alene Tribe v. Asarco, Inc.,
 280 F. Supp. 2d 1094 (D. Idaho 2003) ............................................... 13, 18, 24, 27, 28

Cooper Indus. Inc. v. Aviall Servs., Inc.,
 543 U.S. 157 (2004) ............................................................................................. 8

Crain v. Board of Police Comm'rs of Metro. Police Dep't,
 920 F.2d 1402 (8th Cir. 1990) .............................................................................. 12

East Bay Mun. Utility Dist. v. United States Dep't of Commerce,
   142 F.3d 479 (D.C. Cir. 1998)............................................................................. 13, 19

F.P. Woll & Co. v. Fifth & Mitchell Street, Corp.,
   No. 96-5973, 2006 WL 2381778 (E.D. Pa. Aug. 16, 2006),
   aff'd, 326 Fed. Appx. 658 (3d Cir. 2009) ............................................................ 50

FMC Corp. v. United States Dep't of Commerce,
   29 F.3d 833 (3d Cir. 1994) ........................................................................ 13, 19, 23

Geraghty & Miller, Inc. v. Conoco, Inc.,
   234 F.3d 917 (5th Cir. 2000) ............................................................. 10, 11, 31, 40

Kelley v. E.I. duPont de Nemours & Co.,
   17 F.3d 836 (6th Cir. 1994) ................................................................................. 48

Litgo N.J., Inc. v. Martin,
   Civ. No. 06-2891 (AET), 2010 WL 2400388 (D.N.J. June 10, 2010)
   aff'd in part & vacated in part on other grounds,
   Litgo N.J. Inc. v. Commissioner N.J. Dep't Envtl. Protection,
   725 F.3d 369 (3d Cir. 2013) ........................................... 13, 16, 17, 20, 23

Matter of Bell Petroleum Servs., Inc.,
   3 F.3d 889 (5th Cir. 1993) ..................................................................................... 7

Maxus Energy Corp. v. United States,
   898 F. Supp. 399 (N.D. Tex. 1995) ...................................................... 14, 18, 44, 45

Miami-Dade County v. United States,
   345 F. Supp. 2d 1319 (S.D. Fla. 2004).................................. 13, 16, 17, 18, 29, 30, 44, 45

New Orleans Public Serv., Inc. v. Council of New Orleans,
   833 F.2d 583 (5th Cir. 1987) ............................................................................... 49

New York v. Solvent Chem. Co.,
   664 F.3d 22 (2d Cir. 2011) ................................................................................... 48

Ohm Remediation Servs. v. Evans Cooperage Co.,
   116 F.3d 1574 (5th Cir. 1997) ............................................................................... 7

Rospatch Jessco Corp. v. Chrysler Corp.,
   962 F. Supp. 998 (W.D. Mich. 1995) ................................................................... 14

Steadfast Ins. Co. v. United States,
   No. CV 06-4686 AHM, 2009 WL 3785565 (C.D. Cal. 2009) ........................... 17, 23

*Uniroyal Chem. Co. v. Deltech Corp.*,
   160 F.3d 238 (5th Cir. 1998) ........................................................................ 8

*United States v. Atlantic Research Corp.*,
   551 U.S. 128 (2007) ...................................................................... 8, 9. 10

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ....................................... 7, 10, 30, 31, 37, 39, 40, 45

*United States v. Dart Industries, Inc.*,
   847 F.2d 144 (4th Cir. 1988) ....................................................................27

*United States v. Davis*,
   261 F.3d 1 (1st Cir. 2001)........................................................................ 50

*United States v. Hardage*,
   982 F.2d 1436 (10th Cir. 1992) ............................................................... 48

*United States v. Iron Mountain Mines, Inc.*,
   987 F. Supp. 1277 (E.D. Cal. 1997) ................................... 13, 16, 24, 28

*United States v. Township of Brighton*,
   153 F.3d 307 (6th Cir. 1998) ..................................................... 11, 14, 27

*United States v. USX Corp.*,
   68 F.3d 811 (3d Cir. 1995) .......................................................................47

*United States v. Vertac Chem. Corp.*,
   46 F.3d 803 (8th Cir. 1995) .................................................................... 17

*United States v. Wash. State Dep't of Transp.*,
   No. 08-cv-5722, 2010 WL 5071277 (W.D. Wash. Dec. 7, 2010)........................................... 27

*United Transp. Union v. Foster*,
   205 F.3d 851 (5th Cir. 2000) .................................................................. 49

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56(a) ................................................................................. 12

Fed. R. Civ. P. 56(c)(1)............................................................................. 12

**STATUTES**

28 U.S.C. §§ 2201-2202 ........................................................................... 46

28 U.S.C. § 2201(a) .................................................................................. 49

42 U.S.C. §§ 6901-92k .................................................................................................. 1

42 U.S.C. §§ 9601-75 ................................................................................................... 1

42 U.S.C. § 9601(9) ..................................................................................................... 7

42 U.S.C. § 9607(a) .................................................................................................. 2, 8

42 U.S.C. § 9607(a)(1)-(4) ........................................................................................... 8

42 U.S.C. § 9607(a)(4)(B) ....................................................................................... 8, 10

42 U.S.C. § 9613(f)(1) ................................................................................. 9, 10, 48, 49

42 U.S.C. § 9613(g)(2) ..................................................................................... 48, 49

## GLOSSARY

| | |
|---|---|
| Avgas | Aviation gasoline |
| BOW | Baytown Ordnance Works |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| Committee | Central Refinery Loss Committee |
| Complex(es) | The Refinery(ies) and chemical plants |
| Corps | United States Army Corps of Engineers |
| Department | Oil Conservation Department |
| DPC | Defense Plant Corporation |
| DSC | Defense Supplies Corporation |
| Exxon | Plaintiff Exxon Mobil Corporation |
| Humble | Humble Oil & Refining Company |
| NCP | National Contingency Plan |
| OPA | Office of Price Administration |
| OPC | Office of Petroleum Coordinator |
| PAD | Petroleum Administration for Defense |
| PAW | Petroleum Administration for War |
| PIWC | Petroleum Industry War Council |
| PRP | Potentially Responsible Party |
| RCRA | Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k. |
| RFC | Reconstruction Finance Corporation |
| RRC | Rubber Reserve Company |

| | |
|---|---|
| Site(s) | The Refinery(ies), chemical plants, and other nearby areas or surface waters |
| Standard | Standard Oil Company of Louisiana |
| Standard NJ | Standard Oil Company of New Jersey |
| WPB | War Production Board |
| WWII | World War II |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Exxon Mobil Corporation ("Exxon" or "the Company") brought this pair of cases seeking reimbursement of environmental costs associated with RCRA[1] compliance at two large oil refineries it has owned for nearly a century.  One refinery is sited at Baytown, Texas and the other at Baton Rouge, Louisiana (collectively, "the Refineries").  Both suits are advanced pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-75, and are predicated upon allegations relating to each Refinery's production of "war products" during World War II ("WWII") and the Korean War (the "wartime periods").  At each site, Exxon also alleges the United States is liable for certain additional plants (referred to as the "Plancors" and the "Baytown Ordnance Works" or "BOW") that it contracted with Exxon's predecessors to build and operate, owned for a period of time during and immediately following the war, and then sold to Exxon's predecessors or to other private entities.  Exxon seeks a portion of its already-incurred cleanup costs ("past costs") and a declaratory judgment that the United States is liable for unspecified costs Exxon alleges it may incur in the future.  The United States has pled counterclaims in both cases, including claims that Exxon is a liable party and, thus, responsible for paying its own fair share of the cleanup costs.

The Court should enter a partial summary judgment in favor of the United States[2] holding, *first*, that the undisputed facts are more than sufficient to demonstrate that the United States did not "operate" either Refinery during the wartime periods for purposes of CERCLA

---

[1] "RCRA" refers to the Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k.

[2] The United States is moving for partial summary judgment both in Case No. 4:10-CV-02386 (pertaining to Exxon's Baytown Refinery) and in No. 4:11-CV-01814 (pertaining to the Baton Rouge Refinery).  The relationships between the United States and Exxon's predecessors at the two sites during WWII and Korea were quite similar, allowing for a single consolidated memorandum and (separate) consolidated statement of undisputed facts in support of both pending motions.

Section 107(a), 42 U.S.C. § 9607(a), and *second*, that Exxon's predecessor companies, measured by the same statutory standard, undeniably did so.  Because Exxon alleges no other statutory ground for holding the United States liable in connection with the Refineries, that portion of Exxon's case will be disposed of entirely if the Court grants these motions.

The Court should also enter a partial summary judgment holding that Exxon's predecessors "operated" each of the Plancors and the BOW.  The parties' numerous contractual arrangements expressly so provided in each instance, and there can be no genuine dispute that Company personnel were in charge of all day-to-day operations at these plants, including matters pertaining to waste disposal.  Exxon, therefore, is liable as an operator for each of these plants under 42 U.S.C. § 9607(a).[3]

Finally, the Court should decline to grant declaratory relief in this proceeding allocating the future cleanup costs Exxon speculates it "may" incur in connection with water bodies and underlying sediments near the Baytown and Baton Rouge sites.  Any decision rendered now that allocates responsibility for such costs necessarily would be based on multiple layers of unsupported speculation regarding:  (1) whether Exxon will ever be required by regulatory authorities to perform any additional cleanup actions; (2) if so, the nature of such cleanup actions; and (3) the nature of the contamination Exxon may have to address.  Because these hypothetical future costs are so speculative, it will be impossible for the Court to weigh as an equitable matter whether those costs will bear any relationship to the formerly United States-owned facilities or, instead, will be solely associated with operations Exxon and its predecessors have carried out at these sites for generations with no involvement by the United States.  To allocate liability for these hypothetical future costs would thus present an unacceptable risk of

---

[3] The United States acknowledges that it is also a liable party for the Plancors and the BOW as their former owner.

substantial inequity to the United States and, ultimately, the taxpayers.  Any such judgment should be deferred until a later time when Exxon has actually incurred future costs that it can show bear some relationship to the United States' former involvement at these sites.[4]

## NATURE AND STAGE OF THE PROCEEDING

At the parties' joint suggestion, the Court bifurcated the proceedings in these cases. "Phase 1" of the litigation will address liability and allocation issues, while "Phase 2" will address other issues relating to Exxon's alleged costs, including the specific amounts of costs Exxon has incurred or can demonstrate it will incur, whether these costs were "necessary" to respond to releases or threatened releases of hazardous substances, and whether they were incurred in compliance with the National Contingency Plan ("NCP").  See, e.g., Scheduling and Docket Control Order, Dkt. No. 15 in Case No. 4:10-CV-02386.  The cases are not consolidated, but are subject to a coordinated schedule.  Phase 1 discovery formally closed on June 14, 2013, and is complete with certain exceptions not relevant here.[5]  Submission of the joint proposed pretrial order is due on February 20, 2014, and the docket call presently is scheduled for March 4, 2014.  The trial of these cases, if any, would be a non-jury trial.

## STATEMENT OF THE CASE

These cases concern two of the largest and longest-running oil refineries in U.S. history. Exxon's predecessor Humble Oil & Refining Company ("Humble")[6] began operating the

---

[4] The United States reserves its rights with respect to any additional defenses, counterclaims or arguments not addressed by its motions for partial summary judgment.

[5] The parties have continued to supplement certain discovery responses as and when necessary or by agreement.

[6] Exxon admits that it is the successor-in-interest of Humble, Standard Oil Company of Louisiana, and Standard Oil Company of New Jersey.  SOF ¶ 9.

Baytown Refinery in approximately 1920, SOF ¶ 49,[7] and prior to WWII, it already had become the largest and arguably the most advanced oil refinery in the country due to Humble's expansion efforts in the 1920s and 1930s.  SOF ¶ 50.  Humble's Baytown Refinery employed cutting edge refining equipment and technology, and prior to the start of WWII, Humble researched and developed the process to make aviation gasoline ("avgas") in anticipation of increasing commercial and military demand.  SOF ¶ 52.

The Baton Rouge Refinery, then owned and operated by Exxon's predecessor Standard Oil Company of Louisiana ("Standard"), commenced operations in approximately 1909.  SOF ¶ 58.  The Baton Rouge Refinery also was one of the nation's largest oil refineries prior to World War II, and was producing substantial quantities of avgas prior to the United States' entry into the war.  SOF ¶ 59.  Both of Exxon's predecessors were at the forefront of American private industry in developing the technologies and production processes for both avgas and synthetic rubber, another product for which military demand would increase greatly during the war.  SOF ¶¶ 55, 57.

Following its entry into WWII, the United States took a number of measures to facilitate private industrial production to meet the demand for war products, e.g., SOF ¶¶ 27, 34, 37, 45, 82-85, while also putting controls in place to limit the inflation (and perceived profiteering) that had characterized U.S. industry during the first World War, SOF ¶ 40.  Among other actions, President Roosevelt established the War Production Board ("WPB"), which allocated key raw materials that were important to the war effort – such as steel, aluminum, iron, and copper – through a priority system.  SOF ¶¶ 24-25.

---

[7] "SOF" refers to the Consolidated Statement of Undisputed Facts in Support of United States' Motions for Partial Summary Judgment," which is being filed as an attachment to each motion.

Various petroleum products were deemed critical to the war effort, particularly high-octane avgas.  Accordingly, President Roosevelt established another agency, the Petroleum Administration for War ("PAW"), which worked with the petroleum industry to determine how to allocate crude oil and other petroleum feed-stocks to various refineries.  SOF ¶¶ 26-27.  The PAW also facilitated transportation by rail when German U-boats made it difficult for American refineries to ship their products on barges, and it provided for the reimbursement of avgas producers in the event of unusually high shipping costs or other expenditures.  SOF ¶¶ 33-34.  Throughout the war, the PAW "made a practice of first securing the judgment of the industry before making major policy decisions, or launching operating programs, or issuing regulations." SOF ¶ 39.

Humble and Standard Oil Company of New Jersey ("Standard NJ") – the latter a corporate entity related to Standard of Louisiana – entered into contracts during WWII that provided for the Baytown and Baton Rouge Refineries, respectively, to supply finished 100-octane avgas to the Defense Supplies Corporation ("DSC"), another instrumentality of the United States.  SOF ¶¶ 61, 67.  Both companies made significant profits on these contracts, as well as from their sales of motor gasoline and other products to private customers during the war. SOF ¶ 86.  Both companies also applied for and received tax amortization or "necessity" certificates during WWII and the Korean War that, in total, were worth more than $120 million (without adjusting for present-day inflation).  SOF ¶¶ 82-85.

Lease agreements with the Defense Plant Corporation ("DPC"), along with associated supply contracts, were another significant means of providing public money to facilitate expansion of private industrial capacity during WWII.  SOF ¶ 45.  Generally, prior to establishing a DPC contract, officials from the Army, Navy, War Production Board, or some

other federal procurement agency that desired to enter into a supply contract with a private company would meet with company representatives to determine whether additional buildings, machinery, or equipment were necessary to fulfill the order. SOF ¶ 46. If so, the procurement agency would then sponsor the contract with the DPC; the DPC, in turn, would provide the funding for the construction or, in some cases, the purchase of the necessary facilities (*i.e.*, buildings, machinery or equipment), and then lease the facilities to the contractor. SOF ¶ 46. Generally, the DPC lease would include a rent schedule, termination provisions, and language concerning purchase options. SOF ¶ 47. Title to the facilities generally would remain with the DPC unless or until the company exercised its purchase option. SOF ¶ 47.

During WWII, Humble and the DPC implemented lease agreements for three Plancors at Baytown, while Standard implemented lease agreements for six Plancors at Baton Rouge. See generally SOF ¶¶ 89-112 (Baytown Plancors 485, 1082 and 1909); SOF ¶¶ 135-68 (Baton Rouge Plancors 152, 572, 1065, 1355, 1526 and 1868). Many of these Plancors were used to manufacture synthetic rubber, while others made avgas components. See generally id. One other relevant plant at Baytown, known as the "Baytown Ordnance Works" or "BOW" (and not technically a "Plancor") was established pursuant to a contract between Humble and the War Department and accounted for over 40 percent of the nation's production of toluene – a key component of TNT – during WWII. See generally SOF ¶¶ 113-32.

The BOW was the first of these plants to be constructed, and it commenced operations in September 1941. SOF ¶¶ 117-19. Most of the Plancors did not commence operations until 1943 or 1944; for many of the Plancors, even the parties' entry into lease and operating agreements (let alone the actual commencement of operations) did not occur until 1943 or later. See, e.g., SOF ¶¶ 89, 105, 148-49, 151, 155, 158, 160, 163. The majority of these plants, including the

BOW, had been sold to the private sector or dismantled by 1950. E.g., SOF ¶¶ 112, 132, 150, 157, 168 (BOW and four Plancors sold in the late 1940's); SOF ¶ 162 (a fifth Plancor dismantled in 1950). The United States continued to own a few of the Plancors, however, until the mid-to-late 1950s. E.g., SOF ¶ 99 (Baytown Plancors 485 and 102); SOF ¶ 145 (Baton Rouge Plancor 572). Generally, Humble and Standard either purchased the facilities directly from the United States, e.g., SOF ¶¶ 112, 132, 145, 157, or acquired ownership later from private third-parties to whom the United States had previously sold the facilities, e.g., SOF ¶¶ 150, 168.

## STATUTORY AND REGULATORY BACKGROUND

### I.     CERCLA COST RECOVERY AND CONTRIBUTION ACTIONS

CERCLA was enacted in 1980 in response to the serious environmental and health dangers posed by property contaminated by hazardous substances. United States v. Bestfoods, 524 U.S. 51, 55 (1998). "CERCLA's broad, remedial purpose is to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." Ohm Remediation Servs. v. Evans Cooperage Co., 116 F.3d 1574, 1578 (5th Cir. 1997).

CERCLA is a strict liability statute. Matter of Bell Petroleum Servs., Inc., 3 F.3d 889, 897 (5th Cir. 1993). To establish its claims for purposes of Phase 1 of this bifurcated litigation, Exxon must prove by a preponderance of the evidence that: (1) the refinery or other relevant industrial operation is a "facility" as defined in CERCLA Section 101(9), 42 U.S.C. § 9601(9); (2) the United States is a "responsible" or "covered person" as listed and described in CERCLA Section 107(a), id. § 9607(a); (3) there has been a "release" or "threatened release" of "hazardous substances" from the refinery or other relevant industrial operation into the environment; and (4) such release or threatened release has caused Exxon to incur "response

costs." Id. § 9607(a); see also, e.g., Uniroyal Chem. Co. v. Deltech Corp., 160 F.3d 238, 242-43 (5th Cir. 1998).  In Phase 2, Exxon must further prove that it actually incurred its alleged response costs and that those costs are both "necessary" and consistent with the NCP.  42 U.S.C. § 9607(a)(4)(B); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir. 1990).

Section 107(a) further identifies four categories of "covered persons" (colloquially known as "potentially responsible parties" or "PRPs") who are liable for response costs: (1) owners and operators of facilities at which hazardous substances are located; (2) past owners and operators of such facilities at the time when disposal of hazardous substances occurred; (3) persons who arranged for disposal or treatment of hazardous substances; and (4) certain transporters of hazardous substances.  42 U.S.C. § 9607(a)(1)-(4).  Only the first two categories are relevant for purposes of these motions.

CERCLA provides two "clearly distinct" types of legal actions through which parties can be held liable for some or all of the costs incurred in connection with the cleanup of a site: (1) actions for recovery of costs under CERCLA Section 107(a), 42 U.S.C. § 9607(a); and (2) actions for contribution under CERCLA Section 113, id. § 9613.  Cooper Indus. Inc. v. Aviall Servs., Inc., 543 U.S. 157, 161-63 & n.3 (2004); see United States v. Atlantic Research Corp., 551 U.S. 128, 138 (2007).

"Section 113(f) explicitly grants PRPs a right to contribution."  Atlantic Research, 551 U.S. at 138.  As the Supreme Court has found, "[c]ontribution is defined as the tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault."  Id. (citation and internal quotation omitted).  CERCLA Section 113(f) therefore permits a liable party to seek contribution under only two circumstances:  (1) "during or following" a suit under CERCLA

Section 106 or 107, 42 U.S.C. § 9613(f)(1); or (2) after it "has resolved its liability to the United States or a State . . . in an administrative or judicially approved settlement[,]" id. § 9613(f)(3)(B). See Atlantic Research, 551 U.S. at 138-39. Either way, a liable party's right to contribution under Section 113(f) "is contingent upon an inequitable distribution of common liability among liable parties." Id. at 139.

Liable parties who fund and perform a cleanup action themselves, without any administrative or judicial involvement, have "incurred" their "own" costs and may bring an action for recovery of their costs under CERCLA Section 107. "Accordingly, the remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances." Atlantic Research, 551 U.S. at 139 (citation and internal quotation omitted).

Here, Exxon has asserted both Section 107(a) and 113(f) claims in the Baytown case and a Section 107(a) claim in the Baton Rouge case, alleging that the United States is a liable party at both sites. As a precaution,[8] and to "blunt any inequitable distribution of costs," Atlantic Research, 551 U.S. at 140, the United States has asserted Section 113(f) counterclaims against Exxon in both cases, alleging that Exxon is a liable as an owner and operator at both sites. The ultimate result in both cases, therefore, should be an equitable allocation of response costs between Exxon and the United States, with Exxon's recovery limited to the amount of costs, if

---

[8] In Atlantic Research, the Supreme Court declined to clarify whether a liable private party suing under Section 107 may, like the United States, recover on a theory of joint and several liability. 551 U.S. at 140 n.7. This Court need not decide that issue in order to grant relief on the United States' motions for partial summary judgment, but it is the position of the United States that a liable private party cannot do so. See infra at 47 n.27.

any, that it has incurred in excess of its *pro rata* share.[9]  Id. at 140 ("Resolution of a § 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action."); see also 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.").

## II.   OPERATOR LIABILITY

In United States v. Bestfoods, the Supreme Court considered the definition of "operator" under Section 107 of CERCLA and instructed that it should be given its "ordinary and natural meaning":

> And in the organizational sense more obviously intended by CERCLA, the word ordinarily means "[t]o conduct the affairs of; manage: *operate a business.*" American Heritage Dictionary, *supra,* at 1268; see also Webster's New International Dictionary, *supra,* at 1707 ("to manage"). So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.

524 U.S. at 66.   The Court then went on to explain:

> To sharpen the definition for the purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

Id. at 66-67; see also Geraghty & Miller, Inc. v. Conoco, Inc., 234 F.3d 917, 928 (5th Cir. 2000) (quoting same and further explaining, "[f]or one to be considered an operator, then, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility"); id. ("A court must decide whether a contractor is an operator after considering the totality of the circumstances concerning its involvement at the site.").

---

[9] As noted above, any such recovery would be further limited by the requirement that any response costs Exxon seeks from the United States must be "necessary" within the meaning of the statute and "consistent with the NCP."  42 U.S.C. § 9607(a)(4)(B).

In the present context, the <u>Bestfoods</u> definition refers to a party that is, in common parlance, running the various industrial sites at issue in the litigation, including any necessary waste-handling work.  See also United States v. Township of Brighton, 153 F.3d 307, 316 & n.11 (6th Cir. 1998) ("the dispositive question . . . [i]s whether the government entity was running the facility or merely regulating it," because "mere regulation does not suffice to render a government entity liable").  Under this test, there may be multiple operators.  See Geraghty & Miller, 234 F.3d at 928 ("a facility may have more than one operator").  Unequivocally, <u>Bestfoods</u> requires participation sufficient to allow the Court to conclude that a party may be said to have managed or conducted the affairs of a facility in a manner that has a nexus to pollution.  Notwithstanding *dicta* from the Fifth Circuit arguably acknowledging the "authority to control" test previously adopted by some courts,[10] mere authority, real or apparent, is no longer enough to establish operator liability.

## STATEMENT OF THE ISSUES

1.      Should the Court grant a partial summary judgment holding that the United States did not operate the Refineries, and therefore is not liable for them since no other statutory basis for U.S. liability with respect to the Refineries is alleged?

2.      Should the Court grant a partial summary judgment holding that Exxon's predecessors operated each Refinery during the wartime periods, thus making Exxon liable?

3.      Should the Court also grant a partial summary judgment holding that Exxon's predecessors operated the Plancors and the BOW, making Exxon liable for those plants as well?

4.      Should the Court decline to enter a declaratory judgment allocating Exxon's speculative future response costs, given the complete absence of evidence regarding the

---

[10]  See, e.g., Geraghty & Miller, 234 F.3d at 928 (referring to a 'well-settled rule' that "'operator' liability . . . only attaches if the defendants had authority to control the cause of the contamination").

existence, source, magnitude, geographic extent or other parameters of any pertinent contamination for which Exxon hypothetically may one day incur such costs?

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute of material fact and judgment should be granted as a matter of law.  Fed. R. Civ. P. 56(a).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also Fed. R. Civ. P. 56(c)(1).  The court must view the facts and any permissible inferences drawn from them in a light most favorable to the opposing party.  Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003).  Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.  Crain v. Board of Police Comm'rs of Metro. Police Dep't, 920 F.2d 1402, 1405-06 (8th Cir. 1990).  On appeal, the Court's ruling on a motion for summary judgment is reviewed de novo.  Brown, 337 F.3d at 540.

## ARGUMENT

### I.    THE UNITED STATES DID NOT OPERATE EITHER REFINERY.

The crux of Exxon's "operator" claim is its theory that the United States' broad authority during WWII and the Korean War and its procurement of war products through contracts with the oil industry in general somehow made the United States an operator of the Refineries.  Exxon's argument fails to recognize, however, that Bestfoods requires that an operator actually conduct the affairs of the facility, including those relating to pollution, or that it direct, manage, or conduct *waste disposal or environmental compliance operations*.  Here, the undisputed facts show that the United States' wartime activities did not meet this standard at either Refinery.

Courts have repeatedly rejected arguments that the United States' general procurement activities to support national defense during wartime are sufficient to impose operator liability. See, e.g., Miami-Dade County v. United States, 345 F. Supp. 2d 1319, 1342-43 (S.D. Fla. 2004) (no United States operator liability arose from its WWII contracts with aircraft maintenance companies, as there was no evidence that contractor "consulted federal personnel on waste disposal matters or that federal inspectors had any duties or responsibilities for waste disposal matters"); Litgo N.J., Inc. v. Martin, Civ. No. 06-2891 (AET), 2010 WL 2400388, *24-25 (D.N.J. June 10, 2010), aff'd in part & vacated in part on other grounds sub nom Litgo N.J. Inc. v. Commissioner N.J. Dep't of Envtl. Protection, 725 F.3d 369 (3d Cir. 2013) (no United States operator liability arose from its WWII contracts to purchase aircraft parts because the United States did not "manage, direct, or conduct any of the day-to-day operations," even though it regulated the distribution of the raw material (trichloroethylene) that contaminated the groundwater, and conducted quality control inspections of the facility).  To be sure, during WWII and the Korean War, the United States "played the role of a very interested consumer." United States v. Iron Mountain Mines, Inc., 987 F. Supp. 1277, 1284 n.14 (E.D. Cal. 1997).  Yet, "entering into an output contract does not make the government an operator."  East Bay Mun. Utility Dist. v. United States Dep't of Commerce, 142 F.3d 479, 486 (D.C. Cir. 1998); Coeur d'Alene Tribe v. Asarco, Inc., 280 F. Supp. 2d 1094, 1128-29 (D. Idaho 2003) (concurring with East Bay where mines and mills voluntarily entered into government contracts, and finding that the imposition of price and labor restrictions, the requirement of United States approval for capital improvements, and other regulatory controls did not make the United States an operator); Litgo, 2010 WL 2400388 at *24 ("The mere existence of a contract between the government and a private business . . . does not make the United States Defendants an 'operator' of [the site].").[11]

---

[11] Compare FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833 (3d Cir. 1994).  In

### A.     The World War II Period (1939 – 1945)

The undisputed facts do not support any claim that Exxon's predecessors handed over management of the Refineries to the United States – either on a voluntary or involuntary basis – for the duration of WWII.  At the outset of the war, both the oil industry and the United States understood that the Refineries could *not* be run by the United States.  The United States recognized that "a high degree of flexibility" would be required to achieve production and approached negotiations with the oil industry with a "hands off operations, not hands on" philosophy.  SOF ¶¶ 35-36.  As Lincoln Gordon, the vice chairman of the WPB, explained, "[t]he idea was that we would regulate what could be done in the flow of materials, the conservation of materials, but operations were for individual businesses to carry on . . . ."  SOF ¶ 36.  The historical record indicates that the United States generally was content to purchase avgas and to leave the manufacturing to the experts.

### 1.     The United States did not manage day-to-day Refinery affairs.

The WWII avgas contracts did not give the United States authority to run the Refineries. For example, the Baytown Avgas Contract provided that Humble was "currently enlarging its

---

FMC, the United States was found to be an operator of a factory that made high tenacity rayon for WWII because, among other things, the United States forced it to convert from the manufacture of conventional textiles and provided both the equipment and labor to make the significant modifications to the physical plant necessary to accomplish the conversion.  29 F.3d at 836-37, 843-45.  FMC was an outlier and does not survive Bestfoods.  But even if FMC is still good law, decisions applying that court's "actual control" test have held that federal involvement at an industrial plant will render the United States liable under CERCLA *only* where that involvement goes beyond generally applicable regulation or exceeds normal oversight of the operations of a contractor.  See, e.g., Township of Brighton, 153 F.3d at 316 n.11; Rospatch Jessco Corp. v. Chrysler Corp., 962 F. Supp. 998 (W.D. Mich. 1995) (holding the United States not liable as an operator even though it provided specifications and on-site quality control inspectors at aircraft engine manufacturing plant); Maxus Energy Corp. v. United States, 898 F. Supp. 399, 402 (N.D. Tex. 1995) (no United States operator liability despite stationing federal inspectors at facility to determine compliance with contract specifications and issuing directives to accelerate production).

refinery so as to enable it to further increase its production of 100 octane aviation gasoline" for sale to both the United States and Standard NJ. SOF ¶ 69. Title to the avgas remained with the companies until delivery of the finished product to the United States. SOF ¶ 70. The negotiated contracts contained a number of provisions concerning prices and production terms that allowed Humble and Standard considerable flexibility. SOF ¶¶ 75-76, 79. For example, Humble wanted to continue selling avgas to its Texas customers and ultimately obtained, through its negotiations with the United States, a provision in the Baytown Avgas Contract addressing Humble's concerns. SOF ¶ 73. The contracts did not give the United States any decision-making authority over or role in production; the United States simply agreed to buy 100-octane avgas. SOF ¶ 80. Moreover, nothing in the historical record indicates that the parties ever discussed during their negotiations how Humble and Standard would manage waste disposal at the Refineries, and the contracts themselves are silent on this issue. SOF ¶¶ 198-99.

Consistent with the terms of the contracts Humble and Standard negotiated with the United States, the undisputed facts regarding the actual performance of those contracts show that the companies ran their Refineries at all times during WWII. There is simply no evidence of United States involvement in the day-to-day management of the Refineries' affairs.

First, there is no evidence that any United States employees ever worked at either Refinery. Exxon's predecessors owned the Refineries. SOF ¶¶ 2, 6. The Baytown Refinery was run entirely by Humble employees, and the Baton Rouge Refinery entirely by Standard personnel. SOF ¶ 169. Even the avgas contracts referred to the companies' existing labor contracts. SOF ¶ 81. No federal employees personally operated any Refinery equipment, supervised operations, or made decisions about how to conduct such operations. SOF ¶¶ 174, 177. Indeed, the United States lacked the requisite expertise to take over these responsibilities,

as evidenced by its recruitment of private industry to lead the PAW and other agencies and advisory committees that focused on petroleum procurement during the wars.  SOF ¶¶ 27, 38. The United States also lacked the manpower to step in even if it wanted or had the capability to do so.  SOF ¶ 183.  Exxon's own proffered expert acknowledged that the United States had only "two remedies . . . if [it] really wanted to go in and run day-to-day operations":  the United States either could require existing personnel to continue working, or it could lease the facility to another company to operate.  SOF ¶¶ 182-83.[12]  It is undisputed that neither event occurred at the Baytown or Baton Rouge Refineries.  SOF ¶ 184.  Consistent with <u>Bestfoods</u>, courts have held the United States is not liable as an operator where, as here, federal employees did not operate facility equipment or supervise operations.  See <u>Miami-Dade County, 345 F. Supp. 2d at 1342</u> (holding the United States was not liable as an operator in part because "federal personnel did not operate the engine work assembly line or direct [the contractor's] employees in their daily work"); <u>Iron Mountain Mines, 987 F. Supp. at 1285</u> (finding no operator liability in part because the "United States did not participate in 'day-to-day' management nor did it have the right to do so"); <u>Litgo N.J., Inc., 2010 WL 2400388</u> at *24 (finding no operator liability where "[t]he United States defendants did not manage, direct, or conduct any of the day-to-day operations" at an aircraft manufacturing plant).

     Even where, as here, the United States as a buyer of goods inspects facilities occasionally to ensure the products it contracted to buy are up to standard (SOF ¶¶ 179, 181), courts have not

---

[12] When the United States seized a plant during WWII, it had the authority to replace personnel to ensure the uninterrupted production of war products.  SOF ¶ 28.  In the course of the war, the United States issued a total of 64 executive orders authorizing seizures for labor unrest and plant management issues.  SOF ¶¶ 29-30.  But these seizures were "on paper" and the employees of the seized facilities generally would continue to operate those facilities.  SOF ¶¶ 31-32.  More importantly here, the United States *never* actually seized, threatened to seize, or even perceived any need to seize the Baytown or Baton Rouge Refineries, because no labor or management issues arose there.  SOF ¶ 184.

found operator liability.  For example, an Army or Navy representative inspected each of the

approximately 55 high-octane avgas manufacturing refineries throughout the country in

September 1945 with the sole purpose being "that if all specifications were complied with the

inspector would be authorized to accept the entire volume available."  SOF ¶ 180.[13]  It is well-

established that occasional inspections to assess product quality and contract compliance do not

give rise to operator liability.[14]

In <u>Miami-Dade County</u>, for example, the court found United States not liable as a

past operator, noting that "[f]ederal government employees . . . *including those actually*

*stationed at the . . . plant*, had no objective, duty, or responsibility other than to enforce the price,

schedule, and other contract provisions by ensuring the delivery of quality products in

accordance with the terms of the contract . . . ."  345 F. Supp. 2d at 1343 (emphasis added).

Numerous other courts have held likewise.  <u>See</u> United States v. Vertac Chem. Corp., 46 F.3d

803, 809 (8th Cir. 1995) (federal inspections to ensure compliance with worker safety

requirements at Agent Orange manufacturing facility were "insufficient bases for imposing

CERCLA liability on the United States as an operator"); Litgo, 2010 WL 2400388 at *24

(finding no operator liability where the United States "conduct[ed] periodic inspections to ensure

that the site was maintained in compliance with industry standards"); Steadfast Ins. Co. v. United

 States, No. CV 06-4686 AHM, 2009 WL 3785565, *8 (C.D. Cal. 2009) ("[I]nspectors were

---

[13] The avgas contracts required Humble and Standard to obtain certificates of inspection from
licensed inspectors as to the "quantity and quality of each shipment of gasoline," but the United
States could waive this requirement and inspect the shipments upon delivery.  SOF ¶ 172.

[14] That the United States at one time "stationed" an inspector at the Baton Rouge Refinery to
"inspect C-S," a blending agent for avgas, similarly does not trigger operator liability, since the
purpose was only to ensure product quality and coordinate the shipping of the finished product.
SOF ¶ 178.  By contract, the United States agreed to transport the finished avgas from the
Refinery, but making such shipping arrangements did not involve the United States in the day-to-
day affairs of the Refinery itself.  SOF ¶ 66.

only at the Site to monitor . . . contractual performance and to ensure that the products . . . manufactured met USA's specifications."); Maxus Energy, 898 F. Supp. at 402 (granting summary judgment to United States despite federal inspections at contractor's facility to determine compliance with contract specifications).  The same result should follow here, as federal inspectors visiting the Refineries during the war took no part in running them.

Second, just as the United States did not provide federal personnel to run the Refineries, the United States did not hire, fire, or otherwise manage the Refineries' employees.  At all times, Humble and Standard made decisions about personnel and labor-related issues.  SOF ¶ 169.  No contract provision allowed the United States to make personnel or labor decisions at the Refineries, and nothing in the record suggests that the United States actually made, or even tried to make, any such decisions.  SOF ¶¶ 170-71, 179.  In similar circumstances, courts have held the United States not liable as an operator under CERCLA where, as here, "[n]o one from the federal government was involved with the hiring or firing of [the] employees" running the facility.  See, e.g., Miami-Dade County, 345 F. Supp. 2d at 1342.  Likewise, the United States' authority to regulate the labor force on a national scale and to allocate industry-wide labor in times of war does not make it the "operator" of any *particular* facility for purposes of CERCLA.  For example, although the PAW had no real jurisdiction in the field of manpower, it could allocate labor along with raw materials as necessary to ensure the uninterrupted production of critical war products.  E.g., SOF ¶¶ 37, 260.[15]  As courts have reasoned, however, this broad authority over industry-wide allocation of labor did not make the United States an operator of the Refineries.  See, e.g., Coeur d'Alene Tribe, 280 F. Supp. 2d at 1127, 1129 (United States not

---

[15] For example, as discussed *infra*, PAW denied Standard's application to build a master separator not only because of steel and copper shortages, but also because the labor needed for construction could not be spared from Standard's production of avgas and other critical war products.  SOF ¶¶ 272-73.

deemed the operator of a facility based on its regulation of wages, the length of the work week and other labor conditions, or based on the allocation of labor); East Bay, 142 F.3d at 485 (the United States' regulation of labor mobility and hours did not equate to "direct managerial or supervisory authority" over a particular facility's workforce).

Third, there is no evidence that the United States designed or provided any equipment at either Refinery.[16]  Humble and Standard – owners of two of the largest and most sophisticated refineries in the country – designed and constructed their own processes and equipment.  SOF ¶¶ 50-53, 55, and 59.  There was no need for the United States to significantly modify the facilities as in some other industries.[17]  Their existing infrastructure and capacity to make war products made both Refineries particularly valuable to the war effort "as is."  SOF ¶ 60.  Indeed, by WWII, both Refineries were well advanced due to Humble's and Standard's own expansion efforts and technological innovations in the 1920s and 1930s, and both Refineries had dramatically increased their refining capacity prior to the onset of war.  For example, from 1925 to 1930, Baytown's refining capacity grew from 30,000 barrels of crude oil per day to 125,000; similarly, Baton Rouge's capacity expanded from 81,800 barrels per day in 1935 to 103,100 barrels in 1937.  SOF ¶ 50, 59.  With respect to avgas, Humble had researched and developed cutting-edge production processes before the war in anticipation of commercial and military demand (SOF ¶¶ 51-52), and by 1941 both companies already manufactured and sold appreciable amounts of avgas.  SOF ¶¶ 54, 59.  Indeed, the DPC even asked to visit the Baytown

---

[16] Even equipment for Plancor 1909, which was physically located within the Baytown Refinery, was designed and provided by Humble, although the United States held title.  SOF ¶¶ 100, 103.

[17] See, e.g., FMC, 29 F.3d at 836-37, 843-45.  Although FMC was decided before Bestfoods and is no longer good law, it is also distinguishable from this case on the facts.  The United States did not design or provide equipment to the Baytown or Baton Rouge Refineries as it did to create a high tenacity rayon facility in FMC.  The Refineries already had the facilities, equipment, and processes in place to make avgas and other desirable war products.

Refinery to learn from Humble how to maintain, test, and inspect 100-octane avgas equipment. SOF ¶ 56.  Even when (as discussed further below) Humble and Standard applied to the PAW for materials to construct or modify waste disposal facilities, the companies designed their own systems.  SOF ¶¶ 201, 203.  The United States never provided engineering or design expertise, raw materials, equipment, or construction labor at either Refinery.  SOF ¶ 175.

Overall, the undisputed facts demonstrate that the United States' role was merely that of a regulator deciding whether critical materials could be diverted from war-related endeavors, and courts repeatedly have held that wartime regulatory activity of this type does not give rise to liability.  See, e.g., Litgo, 2010 WL 2400388, at *25 (finding no operator liability where the United States regulated distribution of critical war material).  In the simplest terms – as Mr. Gordon explained with respect to the WPB's role – the United States did not "participate in the actual manufacturing operations at individual plants" such as the Baytown and Baton Rouge Refineries.  SOF ¶ 36.

### 2.   The United States did not make decisions about waste disposal or environmental compliance.

The undisputed facts also show that the United States did not manage, direct, or conduct waste disposal or environmental compliance operations at either Refinery during WWII.  In Bestfoods, the Court noted that "provid[ing] active, daily supervision and control over hazardous waste disposal activities" was an example of evidence that could support a finding of operator liability.  524 U.S. at 66 n.12.  As shown above, the United States was not involved *at all* in running the Refineries, let alone supervising or controlling waste disposal activities on an "active, daily" basis.  The avgas contracts indisputably were silent on how Humble and Standard would dispose of waste at their Refineries, and Exxon's proffered expert, Mr. Gravel, was not aware of any evidence that the parties considered environmental impacts when entering into

those contracts.  SOF ¶¶ 198-99.  There also is no evidence that United States personnel ran either Refinery's waste disposal equipment, designed their waste disposal systems, or made routine decisions at about waste treatment or handling at either Refinery.  SOF ¶¶ 174-75, 195, 200.

Exxon may argue, nonetheless, that the United States should be held to have directed waste disposal operations at the Refineries because it "*generally* did not approve or permit the use of manpower or the expenditure of funds to further investigate any waste disposal problems or to correct them through the implementation of appropriate waste processing improvements." Baytown Compl. ¶ 25 (emphasis added); Baton Rouge Compl. ¶ 23 (same).  This argument refers not to actual participation in waste disposal design or in day-to-day operational matters, but instead to the United States' role in deciding whether to approve the allocation of steel or other scarce materials for use in proposed Exxon projects.  However, in the entire span of WWII, Exxon's proffered expert historian has identified a total of just *two* instances, both in 1944, when either Refinery requested materials to construct waste processing facilities and was not allocated the materials.  See SOF ¶ 202.  As explained further below, in both instances, the United States determined that the amount of raw materials (mainly steel) and labor that the company requested could not be spared from other projects crucial to the nation's defense.  In making these decisions, however, the United States did not "direct waste disposal operations," contrary to Exxon's contention.  See SOF ¶ 203.  Moreover, even if that characterization were somehow accurate, two isolated examples from 1944 are wholly insufficient to find that the United States attained the status of an "operator" under Bestfoods – let alone that it operated both Refineries for the entirety of WWII.

a.   Baytown Refinery

First, Exxon points to the United States' denial of Humble's request to build an acid sludge burning facility at the Baytown Refinery in 1944.  SOF ¶¶ 202, 218.  Previously, Humble had applied for and received approval to receive materials not only to construct a new acid concentration facility,[18] but also to overhaul its existing acid concentration facility.  SOF ¶ 220. Humble then asked for approval to use an additional 2,400 feet of 4-inch steel pipe, a steel tank, and other assorted equipment to make a new acid sludge burning facility that would serve as back-up until the other two projects were completed.  SOF ¶ 219.  In its one-page memorandum recommending denial of Humble's request, the PAW stated that the acid sludge burning facility would "only serve to tide [Humble] over" while the new acid concentration facility was being built and that delaying the modifications to Humble's existing acid concentration facility would obviate the need for the acid sludge burning facility altogether.  SOF ¶ 221.

This denial was consistent with the United States' responsibility, pursuant to the Controlled Materials Plan, to prioritize the allocation of scarce raw materials for projects important to the war effort.  SOF ¶ 222.  Even Humble recognized that its waste disposal problems were "secondary" to the war effort.  SOF ¶ 265.  The PAW did not manage or run Humble's waste disposal processes, conclude that any acid facilities were needed in the first

---

[18] Sulfuric acid was used to treat motor and aviation gasoline.  Following such treatment, a layer of sulfuric acid containing hydrocarbons and other sludge would settle to the bottom of a tank. The sulfuric acid mixture would further separate until the sludge could be removed and burned in a boiler to generate steam.  The sulfuric acid was recycled for further gasoline treatment until it became too diluted, at which time it went to an acid concentration facility to be concentrated for reuse (*i.e.*, by boiling off water).  The incineration of acid sludge for steam would have resulted in sulfuric dioxide air emissions and ash.  The concentrating process, however, would *not* have generated wastes.  SOF ¶ 223.  Exxon has not claimed that it had to clean up ash generated from the incineration process, and there is no evidence that the back-up acid sludge burning facility would have affected the amount of ash generated or its ultimate disposition.  SOF ¶¶ 224-25.

instance, or determine how the proposed interim facility would fit within those processes.  The

PAW simply determined, based on Humble's own representations, that the purpose of the

interim facility could be achieved in ways that did not require diverting steel from important

war-related projects.  The PAW's limited role thus concerned the allocation of scarce materials,

not whether, when, or how Humble should dispose of wastes at Baytown.

Such facts do not give rise to operator liability.  This is not the sort of decision-making

that courts have generally found supports liability, and it certainly does not meet the standard

described by the Supreme Court in Bestfoods.  In Litgo, for example, the court held that the

United States' regulation of the distribution of an important chemical during WWII,

trichloroethylene ("TCE"), did not make the United States an "operator" of an aircraft

manufacturing plant.  2010 WL 2400388 at *25.  The court reasoned that the regulation of TCE

"did not give [the United States] control of what the [aircraft maker] would produce, how much

it would produce, the manner of operation, the price at which products would be sold, or who

they would be sold to."  Id. (citing FMC, 29 F.3d at 843).

Another instructive case is Steadfast, where the court rejected the argument that the

"basic safety guidance" in a Department of Defense safety manual gave rise to United States

operator liability because it allegedly "directed" a defense contractor to burn its perchlorate

waste.  2009 WL 3785565, at *7.  The court noted that the company "alone obtained the permits

necessary for burning waste, its safety personnel chose the burn location and decided how often

burns would be conducted in the burn pit, and there is no evidence that [the company] was

required to obtain permission from USA or report the amount of waste it was burning at the

Site."  Id.  Here, too, the undisputed facts show that it was entirely Humble's responsibility to

conduct and supervise day-to-day waste disposal at the Baytown Refinery, and there is no

evidence that the PAW took on those responsibilities in its limited role of deciding whether to allocate scarce materials for Humble's proposed project.[19]

Finally, even if the PAW's denial of allocated materials for Humble's temporary facility could conceivably support liability, an isolated event in 1944 fails to establish the United States' involvement in waste disposal operations at the Refinery during the entire duration of WWII, as alleged by Exxon.  Coeur D'Alene Tribe, 280 F. Supp. 2d at 1128 ("any one single action taken by the federal government would arguably not be sufficient to make the federal government an operator under CERCLA"); Iron Mountain Mines, 987 F. Supp. at 1287 (same).[20]

b.      Baton Rouge Refinery

The only other claimed example of federal involvement in waste disposal matters during WWII involves the PAW's denial of Standard's request for allocation of steel, copper, and labor to build a master oil-water separator at the Baton Rouge Refinery in August 1944.  SOF ¶¶ 202, 260.  Standard first considered building a new separator in 1931, long before the events of WWII.  SOF ¶ 238.  Standard continued to study the adequacy of its waste disposal facilities, and conducted at least two studies in 1939 on the topic.  SOF ¶¶ 240-42.  Standard initially planned "changes in the separators" in 1939, upon discovering the "escape of oil to the river."  SOF ¶ 243.

---

[19] Moreover, here there is no evidence that the United States even provided the type of "basic safety guidance" at issue in Steadfast, though by itself such action would not be enough to create operator liability, as the Steadfast court held.

[20] There is also no evidence that the United States was involved in any environmental compliance decisions at the Baytown Refinery.  Indeed, the undisputed facts show that Humble alone designed (and greatly publicized in the trade press) a series of measures to reduce waste, conserve oil, and improve the quality of effluent leaving the Baytown Refinery, in part due to concerns about pollution in the adjacent Houston Ship Channel.  SOF ¶¶ 228-36.

Standard did not take any significant action to improve its waste disposal practices, however, until after a high-profile oil spill from a barge at the Baton Rouge Refinery in January 1944.  Upon investigating the discharge, the United States Army Corps of Engineers ("the Corps"), responsible then as now for inland navigation, discovered a number of ongoing problems with defective refinery equipment and employee practices that were causing pollution of the Mississippi River.  SOF ¶¶ 245-47.  The Corps found Standard to be in violation of the River and Harbor Act and said "it is expected that the next [Corps] investigation will show that proper action has been taken" or else the Corps would refer the matter to the U.S. District Attorney.  SOF ¶ 248.  Standard's own engineers and an outside expert studied the problems in February 1944 and recommended several measures to control pollution of the Mississippi River, including:  (1) "[i]mmediate establishment of definite responsibility for waste water quality and waste disposal"; (2) creating new departments with personnel focused on addressing the problem, namely a Waste Disposal Department and an Oil Conservation Department; (3) constructing a master oil-water separator to more effectively capture waste oil; and (4) constructing a silt cleaning plant to reduce oily emulsions.  SOF ¶¶ 249-52.

In July 1944, Standard applied to the PAW for permission to use steel, copper, and labor to build the master separator and silt treating system.  SOF ¶ 260.[21]  Standard recognized, however, that the projects required a significant amount of scarce materials and therefore might not be approved.  SOF ¶ 267.  Thus, Standard determined that the two projects could be constructed separately, and decided that it preferred the silt treating system to the master separator because the former offered a better return on the company's investment:

---

[21] Standard also applied for and was granted approval to obtain materials to construct offices to house its new waste management team, the Oil Conservation Department.  SOF ¶ 276.

> We believe that you are fully aware that *our* two projects covering the master separator and the mud washing and emulsion treating facilities can be handled separately.  Although we think the installation of both projects is very desirable, if in the interest of conservation of materials and manpower it is necessary to postpone at least part of those projects, *we believe* that the installation of mud washing and emulsion treating facilities should be given preference, since they could be installed more quickly and more could be accomplished in correcting pollution problems with a smaller investment.

SOF ¶ 272 (quoting Standard's internal correspondence; emphasis added).

After consulting with the Corps,[22] the PAW determined that constructing the master separator would divert too much steel and labor from high priority war projects, particularly since the PAW already planned to approve the construction of the silt treating system.  On August 18, 1944, the PAW approved the silt treating unit, consistent with Standard's preference. SOF ¶ 276.  Four days later, the PAW denied Standard's request to build the master separator, explaining:

> This application for the water separator has been reviewed by the Facility Security Division of the Petroleum Administration for War and it is their opinion that this project *is not of sufficient essentiality to the war program* to warrant its installation at the present time and should be considered for a post-war project. That Division has also contacted the Army Engineers as to the urgency of these facilities and it was the opinion of the Army Engineers that this was a desirable project and should be installed as soon as manpower and material conditions would permit but did not consider it so important that it could not wait until a post-war program was available.  However, it is the opinion of the Army Engineers and also the Facility Security Division that the silt treating system . . . is urgently need and should be installed as soon as possible . . . .

SOF ¶ 273 (quoting letter from the PAW to Standard; emphasis added).

Standard completed the silt treating system at the Baton Rouge Refinery in September 1945. SOF ¶ 277.  Even though WWII ended and the restrictions on availability of raw materials

---

[22] The Corps initially recommended that both the master separator and silt treating unit be constructed (SOF ¶ 266) but, when informed by the PAW that the raw materials to construct both could not be spared, agreed that the silt treating unit would be the more effective of the two (SOF ¶ 271).

were lifted in 1945, Standard did not begin operating the master separator until October 1952 –

nearly seven years after the war.  SOF ¶¶ 292-93.

When the Corps reviewed Standard's pollution problem at the Baton Rouge Refinery, it

was acting as the regulator in charge of enforcing the River and Harbor Act, not as director of

Standard's environmental compliance decision-making.  SOF ¶¶ 246-48.  Such action by an

environmental regulator does not give rise to CERCLA operator liability.  See, e.g., United

States v. Wash. State Dep't of Transp., No. 08-cv-5723, 2010 WL 5071277, *7 (W.D. Wash.

Dec. 7, 2010) (holding that the Corps' permitting activities "do not give rise to operator liability"

without evidence that the Corps "managed, directed, or controlled" the waste producing

operations or "had hands-on, day-to-day control of the management of the [facility]"); Township

of Brighton, 153 F.3d 307 at 316 ("[M]ere regulation does not suffice to render a government

entity liable, but actual operation (or 'macromanagement') does."); United States v. Dart Indus.,

Inc., 847 F.2d 144, 146 (4th Cir. 1988) (state environmental agency not liable as operator where

it did not engage in "any 'hands on' activities . . . that contributed to the release of hazardous

wastes").  Indeed, were courts to hold otherwise, the United States might be considered to

"operate" virtually every major industrial facility in the country that has been regulated under

any federal environmental statute.  Bestfoods cannot countenance such an absurd result.

Nor was the Corps' knowledge regarding the Baton Rouge Refinery's waste disposal

system a basis to hold the United States liable as an operator.  See, e.g., Coeur d'Alene Tribe,

280 F. Supp. 2d at 1128 (the standard for operator liability was not satisfied even when United

States "knew how the waste material was disposed of").  As noted, the Corps acquired this

information in its law enforcement capacity, not to conduct or supervise waste disposal

operations.  Moreover, in each Corps communication with Standard or visit to the Refinery, the

Corps relied on Standard to provide a solution to the problem based on its expertise, rather than the Corps offering one of its own.  E.g., SOF ¶¶ 246-48, 258, 262-63.

Finally, even if the denial of materials to construct the master separator could somehow support operator liability, a single example does not demonstrate the United States' involvement in waste disposal operations at the Refinery for the entire four-year duration of WWII, as Exxon alleges.  Coeur d'Alene Tribe, 280 F. Supp. 2d at 1128; Iron Mountain Mines, 987 F. Supp. at 1287.  Just as the undisputed facts at Baytown showed, the United States did not direct, manage, or conduct waste disposal operations at the Baton Rouge Refinery during WWII and therefore cannot be held liable as an operator under Bestfoods and its progeny.

## B.    The Korean War Period (1950 – 1953) and Later

When asked to describe the basis of its Korean War operator claims, Exxon merely pointed to the Petroleum Administration for Defense's ("PAD's") authority over the allocation of scarce resources and then described at length the Refineries' waste treatment systems.  See SOF ¶ 205.  Yet, Exxon did not identify a *single instance* during the Korean War of the United States' involvement in the Refineries' daily affairs or any involvement with waste disposal or environmental compliance operations in particular.

As it had done before, during, and after WWII, Exxon continued to run the Refineries during and after the Korean War.  There is no evidence that United States representatives operated the Refineries' equipment, supervised Humble or Standard employees in their day-to-day operations, made personnel or labor-related decisions, or provided equipment for the Refineries' use in manufacturing war products.  SOF ¶¶ 169, 171, 176.  Nor is there evidence that any United States representative inspected the Refineries during the Korean War or made any decisions about their daily affairs.  SOF ¶ 173.  As discussed above, courts repeatedly have

held (e.g., in Coeur d'Alene, Miami-Dade and Litgo) that the United States is not deemed an operator of a facility merely because it contracted with industry to procure war products or regulated the distribution of scarce resources.

Moreover, contrary to Exxon's assertions, nothing indicates that the United States "operated" the Baytown or Baton Rouge Refineries by coercion or threat of seizure.  As during WWII, the parties' business relationship during the Korean War stemmed from voluntary negotiations, bolstered by various financial incentives that enabled Exxon to perform under its contracts with the United States with minimal economic risk and at a significant profit.  E.g., SOF ¶¶ 82-86.  Although the PAD's authority superficially was similar to the PAW's, avgas production was not regulated as stringently during the Korean War as it had been during WWII and war materials were not subject to allocation to anywhere near the same extent that they had been during the earlier war.  Thus, the PAD issued only 6 orders affecting the oil industry, far fewer than the PAW's 81 orders during WWII.  SOF ¶ 41.

Finally, the United States is unaware of any evidence Exxon could point to indicating that the United States regulated or denied waste disposal projects of any kind during the Korean War at either Refinery.  There are no examples comparable even to the PAW's denial of requests to allocation of steel and other raw materials or to the Corps' enforcement activity at Baton Rouge. In short, evidence that the United States managed, directed, or conducted waste disposal or environmental compliance operations at either Refinery is wholly lacking for the Korean War period.

### C.    Conclusion

The undisputed facts establish that the United States neither ran the Refineries nor managed waste disposal or environmental compliance operations at the Refineries during WWII

or the Korean War.  Therefore, Exxon cannot sustain its operator claims against the United States with respect to either Refinery.

## II.   EXXON ALONE OWNED AND OPERATED BOTH REFINERIES.

Exxon concedes both that it currently owns each Refinery and that it owned them during WWII and the Korean War when hazardous substances were released or disposed of.  SOF ¶¶ 1-2, 5-6.  Accordingly, there is no dispute that Exxon, as the current and former owner of the Refineries, is a "covered person" under CERCLA Section 107(a)(1) and (2).

Exxon largely has declined, however, to make similar concessions regarding its apparent status as operator of its own Refineries, and it relies heavily on this denial of operator status in the allocation context.[23]  In particular, Exxon admits that it currently operates each of the Refineries and that its predecessors operated them between 1939 and 1940, but *denies* that its predecessors operated them during 1941 to 1945 and 1950 to 1953.  SOF ¶¶ 1, 3, 5, 7.  This contorted stance regarding the extent of Exxon's CERCLA liability is not supported by the evidence.  Given the undisputed evidence already cited above – which shows that Exxon's predecessors and their employees had all hands-on management and performance-related duties at the Refineries relating to pollution during the war years – Exxon's position simply cannot be reconciled with Bestfoods, which made clear that the exercise of such duties renders one a liable "operator" under CERCLA.  524 U.S. at 66-67.  Thus, aside from its acknowledged owner status, Exxon's current and former operator status makes it a "covered person" pursuant to CERCLA Sections 107(a)(1) and (2) as well.

Even if the Court were to find that the United States was *also* an "operator" of the Refineries, such a finding would not relieve Exxon of its own operator liability; "a facility may

_____

[23] Indeed, Exxon's proffered expert on allocation, Richard White, has developed an allocation model that, as a starting point, assigns a 20% liability share to owners and an 80% share to operators.

have more than one operator."  Geraghty & Miller, 234 F.3d at 928.  In fact, however, the undisputed evidence shows that Exxon *alone* ran both Refineries and managed, directed, and conducted all operations at the Refineries specifically related to waste disposal and compliance with environmental regulations during both war periods.

A.      The World War II Period (1939 - 1945)

The totality of the circumstances reveals that Exxon's predecessors alone ran both Refineries and directed all waste disposal and environmental compliance operations at the Refineries during WWII.  See Bestfoods, 524 U.S. at 66-67; Geraghty & Miller, 234 F.3d at 928.

First, at all times during the war, Humble and Standard ran the Refineries, staffed the Refineries with their own employees, provided and operated the Refinery equipment, and supervised the Refinery workforce – just as they had done before the war.  See supra at 14-20; SOF ¶¶ 169-71, 174-75.  No government employees were ever stationed at the Baytown Refinery, and the single federal employee stationed at the Baton Rouge Refinery was there only to handle C-S inspection and avgas shipment.  SOF ¶¶ 177-78.

And there is simply no denying that the same was true with regard to waste disposal matters.  At its Baton Rouge Refinery, for example, Standard had focused on pollution issues since the early 1930s, recognizing that it had a serious pollution problem due to oil, silt, and other effluent being discharged from the Refinery into the Mississippi River.  Suggestions had been made for an earthen separator as early as 1931 and, by 1937, Standard had engineering estimates for a new master separator that would effectively separate oil from refinery wastewaters being disposed into the river.  SOF ¶¶ 238-39.  Standard conducted a study of the Refinery's sewer and separator facilities in 1938; a year later, Standard openly acknowledged that its existing waste treatment systems remained ineffective at preventing pollution and

discussed proposals for remedying the problem.  SOF ¶¶ 240, 242.  Despite the glaring deficiencies in its then-existing system, however, in 1939 Standard concluded that it was better to modify its system rather than install a new separator "if the necessary changes could be economically justified over a new installation."  SOF ¶ 242.

The onset of war did not alter the companies' control over day-to-day Refinery operations.  Standard, for instance, continued to exercise exclusive control over pollution issues and environmental compliance efforts at its Baton Rouge Refinery into the 1940s and following the United States' entry into the war.  Numerous leaks and spills of oil from the Refinery into the Mississippi River eventually led to investigation by the Corps in early 1944.  SOF ¶¶ 244-45.  The Corps found "oil in considerable quantity" escaping into the river from the Refinery and readily identified Standard's personnel, defective equipment, and insufficient drainage – matters all within Standard's exclusive purview – as an obvious source of that pollution problem.  SOF ¶¶ 246-47.  Unless Standard abated the river pollution, the Corps warned that the matter would be referred to the U.S. District Attorney for prosecution.  SOF ¶ 248.

Standard recognized its sole responsibility when it acted alone to alleviate this pollution problem.  In February 1944, two Standard employees studied discharges from the Refinery and Plancors in search of a solution and recommended, *inter alia*, that the company create a Waste Disposal Department.  SOF ¶ 249-50.  Standard accepted this recommendation and, in April 1944, formed the Oil Conservation Department at its Baton Rouge Refinery.  SOF ¶ 254.  Comprised *solely* of Standard Baton Rouge employees, the Department's purpose was to:  (1) prevent river and air pollution; (2) reduce product loss to the sewers; and (3) coordinate the refinery loss reduction programs.  SOF ¶¶ 254-56, 283.

Standard also enlisted W. B. Hart, an outside authority on oil refinery waste disposal, to further survey the Refinery's pollution problems in 1944. SOF ¶ 251. Mr. Hart made various additional recommendations, including the "immediate establishment of definite responsibility for waste water quality and waste disposal," which Standard implemented by appointing W. C. Clark, a Standard employee, as head of the Oil Conservation Department and coordinator of the Refinery's entire waste disposal program. SOF ¶¶ 252-53. Mr. Hart also recommended the construction of a master separator and a silt cleaning plant near the main separators. SOF ¶ 252. Standard again unilaterally took steps to implement these recommendations, having completed process designs for the silt cleaning plant and accepted bids for construction of the master separator and attendant facilities. SOF ¶ 267.

Consistent with nationwide regulations, in July 1944, Standard submitted a request to the PAW for allocation of the steel and labor necessary to build the new master separator; materials for the silt cleaning system were requested in a separate application. SOF ¶ 260. Steel was a scarce, allocated material; had Standard not sought to use allocated materials, no governmental approval would have been required. SOF ¶¶ 25, 261, 264. Nonetheless, there is no genuine dispute that the requests to the PAW were based on Standard's own assessment of its river pollution problem and the proposed solution that Standard determined would best resolve it. SOF ¶¶ 262-63. To be sure, the Corps endorsed the master separator as a key component of a "definite program" to abate the pollution, but that program was developed by *Standard* – not by the Corps, and not by the PAW. SOF ¶¶ 258, 262-63, 266.

Although Standard requested that the PAW allocate materials for both the master separator and silt treating system, Standard itself believed that the projects could proceed separately and had in fact "hope[d] that the master separator would not be necessary." SOF ¶¶

272, 277.  Accordingly, on August 12, 1944, Standard expressed its preference for the silt treating system since it "could be installed more quickly and more could be accomplished in correcting pollution problems with a smaller investment."  SOF ¶ 272.  Ten days later, on August 22, the PAW denied without prejudice Standard's request for priority assistance to construct the master separator because, while desirable, the project would divert steel from avgas plants and thus should be considered a post-war project.  SOF ¶¶ 273-75.  Materials for the silt treating system project, however, were approved, and Standard completed that project in September 1945.  SOF ¶ 277; cf. Atlanta Gas Light Co. v. UGI Utilities, Inc., No. 3:03-cv-614-J-20MMH, 2005 WL 5660476, *11 (M.D. Fla. Mar. 22, 2005) (records showing that defendant-parent "approved" or "authorized" plaintiff-subsidiary's "purchases for certain items related to pollution" were insufficient to establish operator liability), aff'd, 463 F.3d 1201 (11th Cir. 2006). Thus, the PAW's allocation decision was consistent with Standard's stated preference, which Standard had determined based on its own expertise and understanding of waste disposal issues at the Baton Rouge Refinery.

Even while its priority requests for scarce materials were pending before the PAW, Standard was actively controlling aspects of other waste disposal measures at the Refinery, all without any approval or involvement by the United States.  In July 1944, for example, Standard directed that temporary emulsion treatment facilities be constructed, made certain improvements in preventing waste oil from reaching plant sewers, and in trapping and disposing of waste from certain areas of the Refinery.  SOF ¶¶ 268-70.  During the same time period, the historical record shows that Standard alone was making decisions regarding the use and storage of spent acid at its Refinery.  SOF ¶ 278.  And, far from the excessive governmental control that Exxon alleges, it

was only after the United States' "offer of assistance" that Standard specifically requested that the United States *suggest* – not mandate – a solution to Standard's "acid problems."  Id.

Standard proceeded to implement numerous other pollution control measures during WWII.  Between 1944 and 1950, Standard spent nearly $1,000,000 on pollution control efforts and had proposed to spend an additional $346,390 in 1950 – data that Standard's Oil Conservation Department believed it could show to State regulatory agencies as evidence that "the Refinery [was] serious in its attitude toward pollution control."  SOF ¶ 257. Notwithstanding the United States' regulatory activities *external* to the Refinery in conducting nationwide allocation of scarce materials during the war, Standard's own documents detail its exclusive direction and control of waste disposal efforts at its Baton Rouge Refinery without *any* mention of governmental involvement.

Humble exerted similar control over environmental compliance and waste disposal decisions at its Baytown Refinery during WWII.  While Humble did not focus on air and water conservation at the Baytown Refinery until 1946, SOF ¶¶ 228-30, it nevertheless had exclusive control and direction over the Refinery's waste disposal operations during the war.  Just as Standard and other businesses did nationwide, Humble requested that the United States allocate scarce materials for Humble's use in various projects, some including waste disposal, at its Baytown Refinery.  SOF ¶ 25.  Again, these requests involved pollution control projects that Humble alone designed, proposed, and, if its requests for allocated materials were granted, carried out.  The United States' interest was not in the projects themselves, but only in conserving and prioritizing the use of scarce materials that the projects purportedly required.  Cf. Atlanta Gas Light Co., 2005 WL 5660476 at *11.

This distinction was equally significant with respect to Humble's 1944 request for priority assistance in acquiring materials to build an acid burning facility at its Baytown Refinery.  SOF ¶ 218.  The request was based on Humble's independent assessment that the Refinery might encounter insufficient acid disposal capacity and its unilateral determination that acid burning facilities would solve the problem.  Id.  The United States was concerned with only the "approximately 2400′ of 4″ steel pipe," "9′ x 12″ secondhand steel tank," "two available steam pumps, necessary instruments," and "fuel piping" that Humble requested and whether Humble had justified its need for those materials.  SOF ¶ 219.  In this instance, the PAW determined that Humble had not justified the request because it was for a project that, by Humble's own admission, would be mooted by new acid concentration facilities that were being constructed at the Refinery.  SOF ¶¶ 220-21.

Even where the United States in fact allocated materials for a waste disposal project as Humble or Standard requested, ultimately the company made the decision whether or not to proceed with that project.  In July 1945, for example, the United States approved Standard's requests for materials to use for new sulphuric acid facilities and a sewer project at the Baton Rouge Refinery, but Standard later unilaterally concluded that "conditions ha[d] changed so that [it] did not wish to proceed with either of the projects at the present time."  SOF ¶¶ 279-80.  All on its own, Standard had made modifications to its existing acid plant that, in its opinion, rendered new acid facilities unnecessary.  Id.

As these undisputed facts plainly demonstrate, Humble and Standard alone had hands-on management and control of waste disposal operations at the Refineries during WWII.  Indeed, the historical record is replete with indisputable evidence showing that the companies actively assessed pollution control issues at their Refineries and determined whether, when, and how

certain waste disposal problems would be handled; if the companies then opted to proceed with disposal projects, they implemented those projects on their own.  And, notably, Standard created a department whose express purpose was to direct and manage its pollution control efforts at the Baton Rouge Refinery.  Given these undeniable facts, Exxon cannot credibly deny its liability as a former operator during WWII.  See Bestfoods, 524 U.S. at 67-68 (analysis of whether a party is an operator rests on relationship between that party and the facility); Atlanta Gas Light, 2005 WL 5660476, at *7 (granting summary judgment on operator liability where "there [wa]s just not enough for a reasonable jury to conclude that [defendant] managed or directed the facility's operations specifically related to the leakage or disposal of hazardous waste or its decisions about compliance with environmental regulations").

### B.    The Korean War Period (1950 - 1953)

Humble's and Standard's sole direction of Refinery operations related to pollution control and environmental compliance also continued after WWII and throughout the Korean War, including the disputed years of 1950 to 1953.  In 1950, Standard's Oil Conservation Department was still active at the Baton Rouge Refinery, and was "planning for the design and improvement to" facilities for the "prevention of river pollution."  SOF ¶ 285.  According to Standard, such planning had not necessitated the United States' participation or direction, but rather had "required a large amount of time and study on the part of the technical groups in the refinery as well as the personnel of the department."  Id.  The historical record further evidences that, in 1950, Standard was thoroughly analyzing the applicability of key state and federal pollution laws to the Refinery and was determining how it would ensure compliance with those laws through the implementation of various projects – again, without any control or management from the United States.  SOF ¶¶ 286-87.  As of May 1950, Standard still had not built the master

separator at the Baton Rouge Refinery, although it projected no further delay in carrying out this project unless the "cost is excessive." SOF ¶ 292. Ultimately, it was not until 1952 – seven years after WWII ended, but still during the subsequent 1950 to 1953 period when Exxon also denies operator status – that Standard finally completed the master separator at the Baton Rouge Refinery. SOF ¶ 293. Standard, not the United States, dictated the timing of completion of this project.

At Baytown, Humble developed an effluent improvement program in the years following WWII and, as part of that program, modernized the Refinery's main separator (Separator 10) in 1950 and placed in operation an effluent filtration unit in September 1951. SOF ¶¶ 232, 234. In 1951 and 1952, Humble constructed various sewers to connect the Refinery's drainage system to Separator 10. SOF ¶¶ 233, 235. By April 1952, Humble had completed numerous waste disposal projects pursuant to the effluent improvement program and had several additional projects either under construction or identified for future consideration. SOF ¶¶ 229, 234, 236. During the same time period, Humble was also implementing a cathodic protection program at the Refinery. SOF ¶ 295. Aimed at reducing corrosion leaks in, and replacement of, underground lines at the Refinery, this program had been created by Humble alone in 1948 and was expected to be completed in June 1952. SOF ¶ 295. Nowhere does the documentary record show that the United States had a hand in creating or carrying out these programs and projects.

Throughout the early 1950s, the company's Central Refinery Loss Committee held meetings attended by representatives from the Baytown and Baton Rouge Refineries to discuss detailed methods to reduce refinery oil losses and advance the company's conservation and pollution abatement programs. SOF ¶¶ 294-300. There is no evidence that United States

representatives ever attended these meetings or provided any input on the committee's recommendations.

Nor is there evidence that, during the Korean War, anyone other than Exxon's predecessors and their employees ran and staffed the Refineries, provided or operated any Refinery equipment, or supervised the Refinery workforce.  See supra at 28-29; SOF ¶¶ 171, 176, 196.  There is also no evidence that United States employees were ever stationed at the Refineries or conducted visits to direct production or waste disposal activities.  SOF ¶¶ 173, 197.

Just as during WWII, the undisputed facts reveal that Humble and Standard exclusively handled all operations at the Refineries relating to waste disposal and environmental compliance throughout the Korean War.  During the same period in which Exxon contests operator liability, its predecessors were completing waste disposal projects years in the making, upgrading old disposal systems, and designing new pollution control projects – all on their own and without any United States involvement.  Given these incontrovertible facts, Exxon's status as a former operator during the Korean War is undeniable, and summary judgment must be granted.

Bestfoods, 524 U.S. at 67-68.

## III.  EXXON OPERATED THE PLANCORS AND THE BAYTOWN ORDNANCE WORKS.

The United States does not dispute that it once held title to the Plancors and BOW, or that this status as their prior owner makes it a "covered person" under CERCLA Section 107(a)(2).  But because Exxon's allocation model rests heavily on Exxon's denial of its status as operator of those same facilities, the question whether Exxon bears operator liability is an important one.[24]

---

[24] Specifically, the United States seeks a partial summary judgment that Exxon operated both the BOW and all but one of the Baytown and Baton Rouge Plancors.  The exception is Plancor 877 at Baytown, which was designed and constructed by Goodyear Tire and Rubber Company and managed by The General Tire and Rubber Company (both companies unrelated to Humble or Exxon).  SOF ¶ 133.  One other Plancor project, 1384 at Baton Rouge, also is not the subject of

Exxon denies that it operated any of these plants, despite the fact that it contractually agreed to do so and designed, built, and ran all of them.  Notwithstanding Exxon's denials, the undisputed facts again unequivocally establish Exxon's operator liability.

### A.    The World War II Period (1939 - 1945) and After

The undisputed facts plainly show that Exxon's predecessors met the statutory standard for "operator" status at the Plancors and the BOW.  See Bestfoods, 524 U.S. at 66-67; Geraghty & Miller, 234 F.3d at 928.  As an initial matter, each of these plants was in one way or another related to the production of toluene, synthetic rubber, or avgas; by the onset of WWII, Humble and Standard were national leaders in developing the technologies and production processes for all three products.  SOF ¶¶ 50-57, 120.  It is for this key reason that the United States wholly relied on the companies' expertise to run these plants.

First, Humble and Standard designed and constructed each of the nine Plancors[25] pursuant to lease agreements with the DPC.  SOF ¶¶ 87, 90-91, 94-95, 102-03, 135-36, 141-42, 146-47, 153-54, 158-59, 165-66.  In fact, Standard had already started building two of the Plancors (572 and 1868) on its own before entering into agreements with the United States to complete construction.  SOF ¶¶ 140, 163.  Exxon's predecessors' design and construction of the Plancors necessarily included their design and construction of each plant's waste disposal system as well.  Indeed, they submitted all plans, designs, specifications, and schedules related to plant construction; as owner of the plants, the United States had approval authority, but there is no evidence that it was ever directly involved in designing waste disposal systems at any of the

---

these motions because the project was never implemented; this Plancor project was terminated before its design was even completed, and accordingly, the DPC never acquired any land, property, or machines for the plant.  SOF ¶ 134.

[25] These include Plancors 485, 1082, and 1909 at Baytown, and Plancors 152, 572, 1065, 1355, 1526, and 1868 at Baton Rouge.

Plancors during WWII.  SOF ¶¶ 127, 187, 200-01.  And while periodic visits to the Plancors by

United States inspectors, engineers, and financial personnel did occur during the construction

phase, on none of those visits did any United States employees direct waste disposal decisions.

SOF ¶ 187.

Second, once the Plancors commenced production, Humble and Standard had all hands-

on management of the Plancors' production and mechanisms for waste disposal.  This cannot

seriously be disputed, because in nearly all cases Humble and Standard expressly agreed to

"undertake *all* preparations necessary for the subsequent operation" of the Plancors in their

operating agreements.  SOF ¶¶ 92, 96, 137, 143, 155, 160 (emphasis added).  In the 1909

Operating Contract, Humble even agreed that:

> In the operation and maintenance of the Plant, in the processing of raw feed
> stocks therein, and in the performance of all other services hereunder, however,
> *Humble shall act as an independent contractor, it being understood that [Defense
> Supplies Corporation] shall not have any right to direct the details of such
> operation but is interested only in the results obtained therefrom.*

SOF ¶ 109 (emphasis added).  Additionally, the operating agreements for Plancors 485, 1082,

152, 572, 1355, and 1526 explicitly allowed Exxon's predecessors to include in their "costs" the

"cost of disposing of all waste solids, by-products, liquids and gases resulting from

manufacturing operations at the Plant and the cost of disposing of worn-out or obsolete

equipment, junk and debris."  SOF ¶¶ 93, 97, 138, 144, 156, 161.  Thus, Humble and Standard

plainly assumed responsibility for running the Plancors' day-to-day operations and conducting

the requisite waste disposal activities at each plant.

Consistent with their role as defined in these contracts, Humble and Standard submitted

various requests to the United States for approval to incur costs to modify waste disposal systems

at the Plancors.  In each instance, Humble or Standard prepared the authorization request on

company letterhead and submitted it to the Rubber Reserve Company for approval, along with its independent assessment of the plant's waste disposal system, its detailed justification for the modification, and the estimated cost.  SOF ¶¶ 206-08; cf. Atlanta Gas Light Co., 2005 WL 5660476 at *11.

In June 1944, for example, Humble requested authorization to modify Plancor 485's sewer system, having unilaterally determined that the present system was unable to pump out a copper bearing solvent solution from the sewer system.  SOF ¶¶ 207-09.  Humble concluded that "[a]ny moderate losses of this solvent through the sewer system might result in killing marine life in Scott's Bay," and further remarked that state regulations were "quite stringent" regarding petroleum or chemical pollution of waterways.  SOF ¶ 209.  "Therefore," in Humble's view, it was "imperative that all reasonable steps be taken to prevent such pollution with its subsequent detrimental effect on the marine life in the waterways where the effluent from this plant is discharged."  Id.  Humble opined on the precise steps that should be taken:

> It is felt that the use of the pumpout system as outlined above will largely eliminate any possibility of copper bearing solvent solution from the GF Section reaching Scott's Bay and it is, therefore, requested that this estimate be approved.

Id.  Thus, Humble not only identified a pollution control issue with Plancor 485's waste disposal system, but also evaluated compliance with environmental regulations, proposed a solution to the waste-disposal problem, and agreed to perform the work it deemed necessary to solve the problem.

Even decisions regarding what to do with Plancor waste were made by Humble and Standard.  Plancor 1909 and several other Plancors were designed such that their wastes and byproducts were sent to the Refineries, where Humble and Standard determined their use, processing, and disposal.  See, e.g., SOF ¶¶ 107, 129.  In fact, during WWII, Humble was giving a credit to the Rubber Reserve Company for spent acid delivered from Plancor 1082 to the

Baytown Refinery.  SOF ¶ 213.  Humble had at times used the spent acid at its Refinery, and in other instances sold the acid to third parties.  SOF ¶¶ 214, 226.

Furthermore, Humble and Standard – not the United States – provided and installed all Plancor machinery and equipment.  SOF ¶¶ 91, 95, 103, 136, 142, 147, 154, 159, 166.  And, as in the Refineries, Humble and Standard employees ran and staffed the Plancors, ran the machinery and equipment, and carried out the daily operations.  SOF ¶ 185-86.  Not a single employee of the United States supervised the Plancor workforce or was stationed at any of the Plancors on a daily basis.  SOF ¶¶ 185-86, 188.  In Humble's own words, "[f]rom the point of view of corporate powers, there is no difference between the operation of the plants by Humble while they were owned by a Government agency and its operation of them after they became its property."  SOF ¶ 89.  Indeed, considering the absence of any federal workers at these plants, there was no one *but* Humble and Standard who could have operated them.

The contractual arrangement for the BOW was slightly different, but the factual circumstances at this plant equally support Exxon's operator status.  In August 1940, the Army authorized Humble to build and operate for the Army a toluene plant (which eventually became the BOW) using a process that Standard had developed in the early 1930s.  SOF ¶¶ 114, 120.  As with the Plancors, Humble contractually agreed to submit all architectural and engineering designs for the BOW and to furnish the requisite labor, materials, tools, machinery, equipment, facilities, and supplies to construct and equip the plant.  SOF ¶ 114.

Once the BOW was completed, the BOW Contract called for Humble to again step in to act "as an independent contractor, [and] proceed to *operate* it for the production of toluol."  SOF ¶ 124 (emphasis added).  Operation of the BOW included "training key men," "setting up an efficient and going operating force," and having complete authority over the "employment or

discharge of all persons engaged in the work." SOF ¶¶ 123-25.  Basically, except for "major extensions of or additions," the BOW Contract gave Humble the authority to do "all things necessary or convenient in and about the maintenance, operation, [and] alteration" of the plant. SOF ¶ 125.

During Humble's operation of the BOW, various Army personnel were stationed at the plant.  SOF ¶¶ 189-90, 193.  Yet, their main concern was plant protection, contract compliance, and administrative personnel and wage issues; there is nothing in the historical record to support an inference that any Army personnel were involved in production at the BOW.  SOF ¶¶ 191-94; see also Miami-Dade County, 345 F. Supp. 2d at 1343 (no operator liability would result from government personnel actually stationed at plant, as they "had no objective, duty, or responsibility other than to enforce the price, schedule, and other contract provisions by ensuring the delivery of quality products in accordance with the terms of the contract . . . ."); Maxus Energy, 898 F. Supp. at 402 (same).  Nor is there any documentary evidence to suggest that anyone other than Humble made waste disposal decisions at the BOW.  Humble alone directed how the BOW's byproducts and wastes would be handled, and, in fact, during WWII it was Humble that negotiated contract terms for the sale of spent catalyst from the BOW on the open market.  SOF ¶¶ 129-31, 212.

The United States held title to the Plancors and BOW, but there is no question that Exxon's predecessors operated them.  The contracts between the United States and Exxon's predecessors expressly called for Exxon to operate each of the plants and Exxon did in fact exercise full reign over the day-to-day operations of the Plancors and BOW, including waste disposal decisions.  Accordingly, the undisputed facts demonstrate that Exxon is liable pursuant to CERCLA Section 107(a)(2) as a former operator of each of the government-owned plants

during and after WWII.  See Bestfoods, 524 U.S. at 67-68; Maxus, 898 F. Supp. at 402; Miami-Dade, 345 F. Supp. 2d at 1342.

**B.    The Korean War Period (1950 - 1953) and After**

Despite Exxon's denials, it also operated the few Plancors that the United States continued to own during and after the Korean War.  It is important to note that, by the start of the Korean War in 1950, the BOW and the majority of the Plancors already had been dismantled, sold to Humble or Standard, or sold to other private sector companies and then acquired by Standard.  SOF ¶¶ 112, 132, 150, 157, 162, 168, (BOW and Plancors 1065, 1355, 1526, 1868 and 1909 were all sold or dismantled in the late 1940s or in 1950).  Certainly, having operated these plants during the period when the United States owned them, Exxon cannot credibly dispute that Humble and Standard *continued* to operate the plants once they acquired ownership.  Moreover, even the few Plancors that the United States continued to own beyond 1950 (*i.e.*, Plancors 485 and 1082 at Baytown and Plancor 572 at Baton Rouge) were operated by Humble and Standard during and after the Korean War.

To be sure, the historical record concerning activities at the plants during the Korean War is considerably less complete than during WWII, but several pertinent facts are not in dispute.  First, although the operating agreements for the Plancors originally were set to expire prior to 1950, Humble and Standard agreed to continue operating the plants pursuant to extensions of the original agreements.  See, e.g., SOF ¶ 98.  Thus, the same contractual provisions explicitly calling for the virtually unfettered operation of the plants by Exxon's predecessors during WWII remained in effect during and after the Korean War for any Plancors that were still active.

Second, while the country experienced some material shortages during the Korean War, the United States did not have to allocate war materials in any degree comparable to the WWII

45

experience.  SOF ¶ 41.  Therefore, the undisputed facts concerning the United States' role in allocating scarce materials – which, as shown above, do not support Exxon's denial of operator status for WWII – provide even *less* credence to Exxon's denial of operator status during the Korean War.  For those plants that Exxon's predecessors owned during the Korean War, the companies continued to run the daily plant operations and exclusively made all waste-related decisions without ever requesting priority assistance from the United States to obtain scarce materials for a disposal project.  And, for those few plants that the United States continued to own during the Korean War, Exxon's predecessors likewise operated the plants and made recommendations to the Rubber Reserve Company for approval a variety of waste-disposal projects that, if approved, were then implemented by Humble and Standard.  See, e.g., SOF ¶¶ 237, 301.  In both scenarios, Humble and Standard had the first-hand knowledge of the plants' waste systems, exercised their own judgment on which projects to recommend, and ultimately carried them out, if approved.  Again, according to Humble, there was "no difference between the operation of the plants by Humble while they were owned by a government agency and its operation of them after they became its property."  SOF ¶ 89.

Finally, the day-to-day operations of the plants continued to be carried out solely by Exxon's predecessors' personnel who made up the workforce and were on the ground operating the equipment and making production and disposal decisions.  SOF ¶¶ 185-86.  Wholly absent from the historical record is any evidence that the United States played a role in instructing Humble and Standard on how to operate the plants, manufacture products, or dispose of any resulting waste.  SOF ¶ 176.  Given these undisputed facts, and consistent with the caselaw cited above, summary judgment that Exxon is liable as the operator of the plants during and after the Korean War is in order.

## IV.    EXXON IS NOT ENTITLED TO A DECLARATORY JUDGMENT ALLOCATING UNKNOWN FUTURE COSTS.

Exxon's Complaints seek "cost recovery and/or contribution under Sections 107 and 113(f)(3)(B) of [CERCLA] . . . and … declaratory relief under Section 113(g)(2) of CERCLA . . . and the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202" for past and future costs that Exxon allegedly has incurred or will incur to address hazardous substances at the Baytown and Baton Rouge Refineries and chemical plants ("Complexes"), as well as any costs to be incurred at "other nearby areas or surface waters" (collectively, "Sites").  SOF ¶ 302.[26] Exxon also seeks a judgment pursuant to Section 107(a) of CERCLA holding the United States "strictly, jointly and severally liable for the response costs incurred or to be incurred" by Exxon at the Baytown and Baton Rouge Sites.  SOF ¶ 303.[27] Notwithstanding these requests for relief, when the Court proceeds to allocate costs equitably between the United States and Exxon – *i.e.*, to actually assign allocation "shares" to each party – the Court should do so for known past

---

[26] Despite this introductory language, only the Baytown Complaint contains a count alleging a Section 113(f) contribution claim in addition to a Section 107(a) cost recovery claim; the Baton Rouge Complaint does not include a Section 113(f) claim.

[27] If this Court decides that Exxon may bring some or all of its claims pursuant to Section 107, such claims would not impose joint and several liability on the United States.  While the United States may recover jointly and severally from any liable party under Section 107 (subject to a potential divisibility of harm defense), see Burlington No. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 613 (2009), liability is of a different character when one liable party sues another. That is because "Congress intended the scope of CERCLA liability to be determined from traditional and evolving principles of common law[.]" Id. (quoting United States v.Chem-Dyne Corp., 572 F. Supp. 802, 808 (D. Ohio 1983)); see also United States v. USX Corp., 68 F.3d 811, 824 (3d Cir. 1995) ("Congress anticipated that issues of liability not resolved by [CERCLA] shall be governed by traditional and evolving principles of common law.") (internal quotation marks and alteration omitted). Common law principles do not indicate that a liable party, which is a tortfeasor with respect to contamination at a site, has a claim for joint and several liability against another liable party, which is a co-tortfeasor.  Rather, such a claim under Section 107(a) is in the nature of contribution.  Cf. Akzo Coating Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994) (describing the claim of a PRP subject to an EPA order against another PRP as "a quintessential claim for contribution").  The Court need not resolve that question on this motion, however.

and future costs only, and reject any request by Exxon to enter a declaratory judgment allocating speculative future costs for nearby areas or surface waters.

Under CERCLA Section 113(g)(2), in an action for cost recovery under CERCLA Section 107(a), "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).  Thus, once a court finds that the prima facie elements of a CERCLA Section 107(a) claim for past costs have been established, a declaratory judgment that a responsible party is liable for future costs is mandatory, United States v. Hardage, 982 F.2d 1436, 1445 (10th Cir. 1992), even when future costs are "somewhat speculative."  Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 844 (6th Cir. 1994). However, CERCLA Section 113(g)(2) requires a declaratory judgment *only* as to liability, Hardage, 982 F.2d at 1445; parties subject to a declaratory judgment must be allowed to challenge the recoverability of future costs under CERCLA.  See Hardage, 982 F.2d at 1446 ("This [declaratory judgment] is reversible error, because . . . a declaratory judgment under CERCLA . . . determines liability for future response costs, not recoverability, and therefore, a challenge to the recoverability of future response costs – *i.e.,* that the response actions giving rise to the costs are inconsistent with the NCP – must be allowed.").  Additionally, Section 113(g)(2) does not require that speculative future costs be allocated among PRPs at the time the declaratory judgment is entered.  See New York v. Solvent Chem. Co., 664 F.3d 22, 26-27 (2d Cir. 2011) (noting that the district court could consider new facts "in allocating costs down the road" and explaining that "[a] declaratory judgment with respect to liability saves the litigants and courts substantial time and money, leaving for the future only the need to fix the amount of contribution and affording the court flexibility with respect to the time and manner for doing so").

CERCLA does *not* require declaratory judgments for Section 113(f) contribution claims, in which response costs must be allocated among PRPs according to equitable factors.  See 42 U.S.C. § 9613(f)(1), (g)(2).  Accordingly, courts have held that declaratory judgments are available for Section 113(f) contribution claims "where declaratory relief is appropriate." Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1191-92 (9th Cir. 2000); Solvent Chem., 664 F.3d at 25-26 (applying criteria for a declaratory judgment under the Declaratory Judgment Act to a Section 113(f) contribution claim).

Under the Declaratory Judgment Act, a declaratory judgment is appropriate "in a case of actual controversy[,]" see 28 U.S.C. § 2201(a); in other words, a declaratory judgment is appropriate when a case is ripe for review.  United Transp. Union v. Foster, 205 F.3d 851, 857 (5th Cir. 2000).  "The key considerations are the 'fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'  A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."  Id. (quoting New Orleans Public Serv., Inc. v. Council of New Orleans, 833 F.2d 583, 586-87 (5th Cir. 1987)).

In Section 113(f) contribution cases, the court has "considerable latitude in determining each party's equitable share[,]" Amoco Oil Co. v. Borden, 889 F.2d at 672; however, courts generally consider a nonexclusive list of fact-intensive factors.  Id. at 672-73. Consequently, where the facts related to equitable allocation of future costs have not been sufficiently developed, courts have refrained from allocating future costs in the initial action or have provided an allocation with the caveat that parties in subsequent actions could challenge the equity of the allocation with new evidence not available in the initial action.  See, e.g., Beazer East, Inc. v. Mead Corp., 412 F.3d 429, 449 (3d Cir. 2005) (holding that the judgment on remand

49

should "contain some kind of provision authorizing the parties to re-litigate the allocation . . . for good cause shown in response to *new events* or *new evidence* that would reasonably bear on the equity of the allocation") (emphasis in original); United States v. Davis, 261 F.3d 1, 45 n.41 (1st Cir. 2001) (quoting contingency provision imposed by district court); Basic Mgmt. Inc. v. United States, 569 F. Supp. 2d 1106, 1126 (D. Nev. 2008) (holding that declaratory relief was not appropriate because the future costs were speculative); F.P. Woll & Co. v. Fifth & Mitchell Street, Corp., No. 96-5973, 2006 WL 2381778, at **8-9 (E.D. Pa. Aug. 16, 2006) (issuing a declaratory judgment on liability only, and stating that the court would determine allocation of future costs if incurred), aff'd, 326 Fed. Appx. 658, 661 (3d Cir. 2009).

　　　In contrast, where sufficient facts have been established in the initial action to support an equitable allocation of future costs, courts have issued a declaratory judgment applying the allocation for past costs to future costs as well.  See Boeing, 207 F.3d at 1191-92 (holding that sufficient facts had been developed to award declaratory judgment allocating future costs); City of Wichita, Kansas v. APCO Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1117 (D. Kan. 2003) (noting that the court spent almost 100 pages determining liability for groundwater remediation and allocating future groundwater remediation costs on the same basis as past costs). In Boeing, for example, the Ninth Circuit concluded that a declaratory judgment allocating future costs in a CERCLA Section 113(f) contribution claim was appropriate because "[t]he pollution has been carefully studied, the parties litigated a genuine controversy about millions of dollars they had already spent, and the facts bringing about their relative responsibility have already occurred." 207 F.3d at 1192.  Notably, in both Boeing and City of Wichita, the parties had already litigated issues concerning liability and equitable allocation of past costs for specific cost components, and the declaratory judgment was limited to future costs for those specific

50

components.  See Boeing, 207 F.3d at 1192, aff'g Boeing Co. v. Cascade Corp., 920 F. Supp.

1121, 1141 (D. Or. 1996) (in issuing a declaratory judgment allocating future costs relating to

contaminated groundwater plume, the district court explained, "[t]he parties agree that the two

sides of the plume are completely divisible, and evidence presented at trial indicates that the

relative responsibility for the contaminants in the plume can be determined through groundwater

flow data, chemical analysis, and hydrogeologic study."); City of Wichita, 306 F. Supp. 2d at

1106-18 (allocating past and future costs for groundwater and soil contamination at site after an

extensive discussion of allocation methods).  Neither case allocated future costs for unknown

remediation activities that might someday be conducted outside the boundaries of the sites.  Id.

Here, Exxon's alleged future costs are not merely "somewhat speculative"; they are

*entirely* speculative.  While Exxon claims it has spent and will spend millions of dollars

addressing specific cost components at Baytown and Baton Rouge, SOF ¶¶ 304-05, Exxon

concedes that it "does not know the extent of contamination" of the water bodies and underlying

sediments near the Complexes – namely, the Houston Ship Channel, Black Duck Bay, Scott's

Bay, Mitchell Bay, and the Monte Sano Bayou – that it may (or may not) have to address in the

future.  SOF ¶ 306.  Peter Gagnon, one of Exxon's consultants hired to handle compliance

projects at Baytown, testified that the only sediment samples taken by Exxon in any water body

were collected in response to the State of Texas's request that Exxon determine whether

contaminated groundwater from the Baytown Complex has migrated into certain water bodies.

SOF ¶ 307.  In contrast to the facts in Boeing, Mr. Gagnon admitted that Exxon has not

conducted any generalized sampling of the underlying sediments in order to determine the

existence, source, magnitude, geographic extent or other parameters of any contamination.  SOF

¶ 307.  There is no evidence, therefore, that contaminants – let alone contaminants related to the

production of war products by Exxon's predecessors during the 1940s and 1950s – are present in the underlying sediments of the Houston Ship Channel, Black Duck Bay, Scott's Bay, or the Monte Sano Bayou.  SOF ¶ 308.  Furthermore, there is no evidence that contaminants present along the shoreline of Mitchell Bay extend further into the Bay such that they will drive any future required response action. SOF ¶ 308.

Additionally, because Exxon has not incurred any costs remediating the underlying sediments of the water bodies, SOF ¶¶ 309-11, there is not yet any genuine "case or controversy" concerning Exxon's expenditure of such funds.  Equally important, while the events bearing on the United States' responsibility for any contamination in those sediments have already occurred, the facts establishing the United States' *relative* responsibility for sediment contamination attributable to each Complex are indeterminate, and have not been the subject of discovery in these combined lawsuits.  Indeed, given the number of other PRPs in the area, not involved in this litigation, who themselves have discharged and currently discharge into the water bodies, SOF ¶¶ 312-13, even Exxon's share relative to those of the third parties cannot be meaningfully examined in the absence of evidence. Thus, Exxon's future costs with respect to the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, and the Monte Sano Bayou are entirely abstract and hypothetical.

Moreover, Exxon will not suffer any hardship if this Court withholds entry of a declaratory judgment allocating future costs at this time.  There is no evidence that Exxon has been required to investigate the extent of contamination of the water bodies and underlying sediment by EPA or a State agency, or that any kind of investigation is even contemplated.  SOF ¶ 314.  In the event Exxon is required to remediate the water bodies and underlying sediment in the future, Exxon may be able to sustain a claim against the United States at that time.  Because

the United States' status as a liable party at the Complexes will have already been litigated and decided, there will be no need to re-litigate that threshold issue.  However, the parties will be free in subsequent proceedings – if there are any – to examine the evidence that will then be available and discover facts sufficient to determine an equitable allocation between themselves and any additional PRPs, as well as to challenge the recoverability of such costs under the NCP.

Accordingly, in the event the Court determines that a declaratory judgment is appropriate in this matter, the Court should enter the declaratory judgment as to liability only, and defer any allocation of potential future costs until such future costs are actually incurred and sufficient facts are established to support an equitable allocation of those as yet unknown costs.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motions for partial summary judgment and enter the attached Proposed Order granting partial summary judgment:  (1) holding that Exxon is a current and former operator under CERCLA Sections 107(a)(1) and (2) with respect to the Baytown and Baton Rouge Refineries; (2) holding that Exxon is a former operator under Section 107(a)(2) with respect to the Baytown Ordnance Works and the Baytown and Baton Rouge Plancors; (3) holding that the United States is not a former operator under Section 107(a)(2), and has no liability under CERCLA, with respect to the Baytown and Baton Rouge Refineries; and (4) declining to enter a declaratory judgment allocating any unknown future costs.

Dated:  September 30, 2013

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

By:      /s/ Brian H. Lynk

53

Michael D. Rowe (Attorney in Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Tel.:  202.514.3144
Fax:  202.514.8865

*Attorneys for Defendant United States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 30, 2013, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the Electronic Case Filing System of this Court, which will send notification of such filing to the attorneys of record who have registered ECF email addresses with this Court.

/s/ Brian H. Lynk_____