**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

_____

EXXON MOBIL CORPORATION,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　)
　　　　　　　v.　　　　　　　　　　)　　4:10-CV-02386 (LHR)
　　　　　　　　　　　　　　　　　　)　　4:11-CV-01814 (LHR)
UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　)
_____)

**UNITED STATES' MEMORANDUM IN OPPOSITION TO EXXON MOBIL
CORPORATION'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

ROBERT G. DREHER
Acting Assistant Attorney General
Environmental & Natural Resources
Division

Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie J. Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C.  20044
Tel.:  202.514.3144
Email:  michael.rowe@usdoj.gov

KENNETH MAGIDSON
United States Attorney

Samuel G. Longoria
Assistant United States Attorney
Texas Bar No.: 12545500
1000 Louisiana, Suite 2300
Houston, TX 77002
Tel.:  713.567.9514
Email: sam.longoria@usdoj.gov

Attorneys for Defendant United States

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

GLOSSARY ..................................................................................................................... xiii

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................1

NATURE AND STAGE OF THE PROCEEDING.............................................................3

STATEMENT OF THE ISSUES.........................................................................................3

STANDARD OF REVIEW .................................................................................................4

ARGUMENT ......................................................................................................................4

I.   EXXON'S SECTION 113(f)(3)(B) CLAIM IS ITS EXCLUSIVE CAUSE
     OF ACTION FOR COSTS INCURRED AT BAYTOWN, AND THAT
     CLAIM IS TIME-BARRED.......................................................................................4

     A.   Exxon Entered Into Administrative Settlements With The State
          That Gave Rise To A Contribution Claim At Baytown Under
          Section 113(f)(3)(B)........................................................................................5

     B.   Because Exxon Had A Section 113(f)(3)(B) Contribution Claim For
          Response Costs At Baytown, It Cannot Bring A Section 107(a)
          Claim For Those Same Response Costs .........................................................10

     C.   The ARC Decision Does Not Foreclose A Holding That Exxon's Section
          113(f)(3)(B) Cause Of Action For Baytown Response Costs Is Exclusive...............13

     D.   Following ARC, The Circuit Courts Addressing The Issue Unanimously Have
          Agreed That PRPs With A Claim Under Section 113(f) Cannot
          Bring A Claim Under Section 107(a) ...........................................................15

     E.   Because Exxon Failed To Bring Its Section 113(f)(3)(B) Claim In A
          Timely Fashion, That Claim Is Barred .........................................................18

          1.   Section 113(g)(3)(B)'s statute of limitations governs Exxon's claim ...........19

          2.   Alternatively, the Court should borrow the statute of limitations in
               Section 113(g)(3)(B)...........................................................................23

3.      Assuming CERCLA provides no applicable limitations period, Exxon's Section 113(f)(3)(B) claim would be barred under 28 U.S.C. § 2401(a) .................................................................26

II.     EXXON IS NOT ENTITLED TO THE RELIEF REQUESTED .........................................27

     A.     Exxon Is Not Entitled To Recover All Of Its Response Costs Through A Judgment Holding The United States Jointly And Severally Liable ....................................................................28

           1.      The common law does not permit Exxon, as a liable party itself, to impose joint and several liability on the United States .................................................29

           2.      The United States' counterclaims for contribution under Section 113(f) require equitable allocation of the cleanup costs between the parties.............................35

     B.     Exxon Is Not Entitled To A Declaratory Judgment Allocating Unknown Future Costs ....................................................38

III.    EXXON'S ASSUMPTIONS REGARDING THE SCOPE OF BAYTOWN AND BATON ROUGE "FACILITIES" ARE WITHOUT FOUNDATION......................43

IV.    THE UNITED STATES DOES NOT CONCEDE PRIOR OWNER LIABILITY AT THE "SITES" .....................................................................51

V.     THE UNITED STATES DID NOT OPERATE THE REFINERIES .................................51

     A.     <u>Bestfoods</u>, Not <u>FMC</u>, Is The Controlling Standard For Operator Liability...............52

     B.     Exxon Has Not Pointed To Any Facts Showing The United States Managed, Directed, Or Conducted The Affairs Of The Refineries.........................55

     C.     Even If <u>FMC</u> Were Good Law, The United States Would Not Be An Operator ......59

VI.    THE UNITED STATES DID NOT OPERATE THE PLANCORS ....................................61

VII.   EXXON'S PROFFERED EXPERT A.J. GRAVEL IS NOT QUALIFIED TO RENDER OPINIONS IN SUPPORT OF EXXON'S MOTION ...................................66

VIII.  THE COURT SHOULD NOT ADOPT EXXON'S ALLOCATION METHODOLOGY ..................................................................69

CONCLUSION.............................................................................74

# TABLE OF AUTHORITIES

**CASES:**

3000 E. Imperial, LLC v. Robertshaw Controls Co.,
  No. CV 08-3985, 2010 WL 5464296 (C.D. Cal. Dec. 29, 2010) ...........................................31

Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,
  483 U.S. 143 (1987)........................................................................................................21

Agere Sys. Inc. v. Advanced Envtl. Tech. Corp.,
  602 F.3d 204 (3d Cir. 2010)............................................................................................15

Akzo Coatings Inc. v. Aigner Corp.,
  30 F.3d 761 (7th Cir. 1994) ............................................................................................32

Akzo Coatings Inc. v. Aigner Corp.,
  960 F. Supp. 1354 (N.D. Ind. 1996), aff'd in part 197 F.3d 302 (7th Cir. 1999) ..................45

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)..........................................................................................................4

Asdar Group v. Pillsbury, Madison & Sutro,
  99 F.3d 289 (9th Cir. 1996) ............................................................................................25

Ashley II of Charleston, L.L.C. v. PCS Nitrogen, Inc.,
  791 F. Supp. 2d 431 (D.S.C. 2011)..................................................................................36

AVX Corp. v. United States,
  518 Fed. Appx. 130 (4th Cir. 2013)..................................................................................17

Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.,
  515 U.S. 687 (1995)........................................................................................................12

Basic Mgmt. Inc. v. United States,
  569 F. Supp. 2d 1106 (D. Nev. 2008) ..............................................................................39

BASF Catalysts LLC v. United States,
  479 F. Supp. 2d 214 (D. Mass. 2007) ..........................................................................21, 22

Beazer East, Inc. v. Mead Corp.,
  412 F.3d 429 (3d Cir. 2005)............................................................................................39

Bedford Affiliates v. Sills,
  156 F.3d 416 (2d Cir. 1998)............................................................................................32

Bernstein v. Bankert,
  702 F.3d 964 (7th Cir. 2012), opinion amended and superceded on reh'g, 733 F.3d
  190 (7th Cir. 2013), petition for cert. filed, 82 U.S.L.W. 3318 (Oct. 29, 2013) (No.
  13-412) .................................................................................................................15

Bd. of County Comm'rs of County of La Plata, Colo. v. Brown Group Retail, Inc.,
  768 F. Supp. 2d 1092 (D. Colo. 2011) .........................................................35, 40

Bd. of Regents v. Tomanio,
  446 U.S. 478 (1980) .............................................................................................23

Boeing Co. v. Cascade Corp.,
  207 F.3d 1177 (9th Cir. 2000) .............................................................................39

Boeing Co. v. Cascade Corp.,
  920 F. Supp. 1121 (D. Or. 1996), aff'd 207 F.3d 1177 (9th Cir. 2000) ................41

Burlington N. & Santa Fe. Ry. Co. v. United States,
  556 U.S. 599 (2009) .......................................................................................29, 30

Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.,
  299 F.3d 1019 (9th Cir. 2002) .........................................................58, 59, 61, 65

Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.,
  No. 83-8034 MRP (Bx) & 83-7996 MRP (Bx), 1997 WL 149196 (C.D. Cal. Feb. 21,
  1997) ..............................................................................................................58, 65

Carrier Corp. v. Piper,
  460 F. Supp. 2d 827 (W.D. Tenn. 2006).............................................................22

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)...............................................................................................4

Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,
  153 F.3d 344 (6th Cir. 1998) ..........................................................................32, 33

Chitayat v. Vanderbilt Assocs.,
  702 F. Supp. 2d 69 (E.D.N.Y. 2010) ...................................................................22

Chubb Custom Ins. Co. v. Space Sys.,
  710 F.3d 946 (9th Cir. 2013), petition for cert. filed, 82 U.S.L.W. (Sept. 30, 2013) ..............17

Clear Lake Prop. v. Rockwell Int'l Corp.,
  959 F. Supp. 763 (S.D. Tex. 1997) ........................................................44, 45, 46

Concrete Sales & Servs., Inc. v. Blue Bird Body Co.,
    211 F.3d 1333 (11th Cir. 2000) ...................................................................13

Consol. Edison Co. v. New York, Inc. v. UGI Utilities, Inc.,
    423 F.3d 90 (2d Cir. 2005)..............................................................................9

Cooper Indus., Inc. v. Aviall Servs., Inc.,
    543 U.S. 157 (2004)..................................................................11, 12, 14, 20, 21

Couer d'Alene Tribe v. Asarco, Inc.,
    280 F. Supp. 2d 1094 (D. Idaho 2003) ....................................................57, 60, 64

DelCostello v. Int'l Bhd. of Teamsters,
    462 U.S. 151 (1983)........................................................................................21

Differential Dev. – 1994, Ltd. v. Harkrider Distrib. Co.,
    470 F. Supp. 2d 727 (S.D. Tex. 2007) ...............................................................8, 9

Dolan v. United States Postal Serv.,
    546 U.S. 481 (2006).......................................................................................10

D'Onofrio Constr. Co. v. Recon Co.,
    255 F.2d 904 (1st Cir. 1958)...........................................................................25

East Bay Mun. Util. Dist. v. Dep't of Commerce,
    142 F.3d 479 (D.C. Cir. 1998)........................................................................54

East Bay Mun. Util. Dist. v. Dep't of Commerce,
    948 F. Supp. 78 (D.D.C. 1996), aff'd 142 F.3d 479 (D.C. Cir. 1998)..............54, 60

E.I. DuPont de Nemours & Co. v. United States,
    508 F.3d 126 (3d Cir. 2007)...........................................................................23

Elementis Chromium L.P. v. Coastal States Petroleum Co.,
    450 F.3d 607 (5th Cir. 2006) ...............................................................32, 34, 35

Evans v. City of Bishop,
    238 F.3d 586 (5th Cir. 2000) ...........................................................................4

FMC Corp. v. United States Dep't of Commerce,
    29 F.3d 833 (3d Cir. 1994)..................................................................52, 53, 55

Fourco Glass Co. v. Transmirra Products Corp.,
    498 U.S. 395 (1991).................................................................................12, 13

F.P. Woll & Co. v. Fifth & Mitchell Street, Corp.,
    No. 96-5973, 2006 WL 2381778 (E.D. Pa. Aug 16, 2006), aff'd 326 Fed. Appx. 658
    (3d Cir. 2009)..................................................................................................................39

Geraghty & Miller, Inc. v. Conoco, Inc.,
    234 F.3d 917 (5th Cir. 2000) ......................................................................................5, 20

Geyen v. Marsh,
    775 F.2d 1303 (5th Cir. 1985) .........................................................................................26

Gill v. Arab Bank, Plc.,
    893 F. Supp. 2d 523 (E.D.N.Y. 2012) .............................................................................67

Gozlon-Peretz v. United States,
    498 U.S. 395 (1991)..........................................................................................................12

Halliburton Energy Servs. v. NL Indus.,
    648 F. Supp. 2d 840 (S.D. Tex. 2009) .............................................................................37

Highland Capital Mgmt., L.P. v. Bank of Am.,
    No. 3:10-CV-1632, 2013 WL 4502789 (N.D. Tex. Aug. 23, 2013) .......................................69

Highland Capital Mgmt., L.P. v. Schneider,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)..............................................................................68

Hobart Corp. v. Waste Mgmt. of Ohio, Inc.,
    840 F. Supp. 2d 1013 (S.D. Ohio 2011) .....................................................................21, 22

Hobart Corp. v. Waste Mgmt. of Ohio, Inc.,
    923 F. Supp. 2d 1086 (S.D. Ohio 2013) ..........................................................................16

Holmberg v. Armbrecht,
    327 U.S. 392 (1946)..........................................................................................................21

Home Pro Constr. Co., Inc. v. Hoelscher Weatherstrip Mfg. Co., Inc.,
    No. H-11-4440, 2013 WL 6491189 (S.D. Tex. Dec. 10, 2013) ...........................................69

In re Bell Petroleum Servs., Inc.,
    3 F.3d 889 (5th Cir. 1993) ..........................................................................................29, 31

ITT Indus., Inc. v. BorgWarner, Inc.,
    506 F.3d 452 (6th Cir. 2007) ...........................................................................................17

John R. Sand & Gravel Co. v. United States,
    128 S. Ct. 750 (2008).......................................................................................................26

*Kotrous v. Goss-Jewett Co.*,
    523 F.3d 924 (9th Cir. 2008) ........................................................................17

*Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*,
    4 F.3d 1209 (3d Cir. 1993)..........................................................................53

*La.-Pac. Corp. v. ASARCO Inc.*,
    24 F.3d 1565 (9th Cir. 1994) ......................................................................13

*La.-Pac. Corp. v. Beazer Materials & Servs., Inc.*,
    811 F. Supp. 1421 (E.D. Cal. 1993)............................................................47

*Litgo N.J., Inc. v. Martin*,
    No. 06-2891, 2010 WL 2400388 (D.N.J. June 10, 2010), aff'd in part & vacated in
    part on other grounds sub nom *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*,
    725 F.3d 369 (3d Cir. 2013)..........................................................55, 63, 64

*Little v. Liquid Air Corp.*,
    952 F.2d 841 (5th Cir. 1992) ........................................................................4

*Lyondell Chem. Co. v. Occidental Chem. Co.*,
    608 F.3d 284 (5th Cir. 2010) ........................................................18, 30, 36

*Maxus Energy Corp. v. United States*,
    898 F. Supp. 399 (N.D. Tex. 1995), aff'd 95 F.3d 1148 (5th Cir. 1996)....................54, 60, 63

*Metro. Water Reclamation Dist. of Greater Chicago v. N. Am. Galvanizing & Coatings, Inc.*,
    473 F.3d 824 (7th Cir. 2007) ....................................................................31, 32

*Miami-Dade County v. United States*,
    345 F. Supp. 2d 1319 (S.D. Fla. 2004) .....................................................52, 63

*Morrison Enters., LLC v. Dravo Corp.*,
    638 F.3d 594 (8th Cir. 2011), cert. denied, 132 S. Ct. 244 (2011) ...................................15, 17

*New Jersey Tpk. Auth. v. PPG Indus., Inc.*,
    197 F.3d 96 (3d Cir. 1999)........................................................................43, 46

*New York v. Solvent Chem. Co.*,
    664 F.3d 22 (2d Cir. 2011)............................................................................39

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010)........................................................7, 9, 16, 17, 22

*North Star Steel Co. v. Thomas*,
    515 U.S. 29 (1995)........................................................................................23

Nurad, Inc. v. William E. Hooper & Sons Co.,
   966 F.2d 837 (4th Cir. 1992) ......................................................................44, 46

Pakootas v. Teck Cominco Metals, Ltd.,
   868 F. Supp. 2d 1106 (E.D. Wash. 2012) ............................................................31

PCS Nitrogen Inc. v. Ashley II of Charleston LLC,
   714 F.3d 161 (4th Cir. 2013) ...............................................................................36

Pinal Creek Group v. Newmont Mining Corp.,
   118 F.3d 1298 (9th Cir. 1997) .......................................................................32, 36

Provident Life & Accident Ins. Co. v. Goel,
   274 F.3d 984 (5th Cir. 2001) ................................................................................69

Reichhold Chems., Inc. v. Textron, Inc.,
   888 F. Supp. 1116 (N.D. Fla. 1995)......................................................................19

Rospatch Jessco Corp. v. Chrysler Corp.,
   962 F. Supp. 998 (W.D. Mich. 1995) ...................................................................54

Shell Oil Co. v. United States,
   108 Fed. Cl. 422 (Fed. Ct. 2013) ..........................................................................74

Solutia, Inc. v. McWane, Inc.,
   672 F.3d 1230 (11th Cir. 2012), cert. denied, 133 S. Ct. 427 (2012) ..............15, 16

Source, Inc. v. SourceOne, Inc.,
   No. 3:05-CV-1414-G, 2006 WL 2381594 (N.D. Tex. Aug. 16, 2006) ....................4

S. Pac. Trans. Co. v. Voluntary Purchasing Groups, Inc.,
   No. Civ. A. 3:94-CV-2477, 1997 WL 457510 (N.D. Tex. Aug. 7, 1997).........................45, 46

Spannaus v. United States Dep't of Justice,
   824 F.2d 52 (D.C. Cir. 1987)................................................................................26

Steadfast Ins. Co. v. United States,
   No. CV 06-4686 AHM (RZx), 2009 WL 3785565 (C.D. Cal. Nov. 10, 2009)................63, 64

Stone v. INS,
   514 U.S. 386 (1995).............................................................................................12

Sun Co., Inc. (R&M) v. Browning-Ferris, Inc.,
   124 F.3d 1187 (10th Cir. 1997) ...............................................................16, 20, 32

Tanglewood East Homeowners v. Charles-Thomas, Inc.,
    849 F.2d 1568 (5th Cir. 1988) ...................................................................44

T H Agric. & Nutrition Co., Inc. v. Aceto Chem. Co.,
    884 F. Supp. 357 (E.D. Cal. 1995)...........................................................35

Tosco Corp. v. Koch Indus., Inc.,
    216 F.3d 886 (10th Cir. 2000) .............................................................40, 41

Town of New Windsor v. Tesa Tuck, Inc.,
    919 F. Supp. 662 (S.D.N.Y. 1996) ...........................................................35

Trinity Indus., Inc. v. Chicago Bridge & Iron Co.,
    735 F.3d 131 (3d Cir. 2013)........................................................................7

Uniroyal Chem. Co. v. Deltech Corp.,
    160 F.3d 238 (5th Cir. 2008) ....................................................................43

United States v. Atchison, Topeka & Santa Fe Rwy. Co.,
    2003 WL 25518047 (E.D. Cal. July 15, 2003), aff'd in part 479 F.3d 1113 (9th Cir.
    2007), 554 U.S. 945 (2008), rev'd on other grounds, 556 U.S. 599 (2009) ..........44, 45, 46, 47

United States v. Atl. Research Corp.,
    551 U.S. 128 (2007)............................................10, 13, 14, 15, 22, 29, 31, 33, 34, 35

United States v. Bestfoods,
    524 U.S. 51 (1998)................................................................52, 56, 64, 65

United States v. Chem-Dyne Corp.,
    572 F. Supp. 802 (S.D. Ohio 1983) ......................................................29, 30

United States v. Colo. & E. R.R. Co.,
    50 F.3d 1530 (10th Cir. 1995) ...............................................................10, 16

United States v. Davis,
    261 F.3d 1 (1st Cir. 2001) .........................................................................39

United States v. E.I. Dupont de Nemours and Co., Inc.,
    432 F.3d 161 (3d Cir. 2005)........................................................................8

United States v. Hardage,
    982 F.2d 1436 (10th Cir. 1992) .............................................................39, 42

United States v. Iron Mountain Mines, Inc.,
    987 F. Supp. 1263 (E.D. Cal. 1997)...........................................................47

United States v. NCR Corp.,
    No. 10-C-910, 2013 WL 1858597 (E.D. Wis. May 1, 2013) .................................................31

United States v. Newmont USA Ltd.,
    Case No. CV-05-020-JLQ, 2007 WL 4856859 (E.D. Wash. Nov. 16, 2007) ........................67

United States v. Rohm & Haas Co.,
    2 F.3d 1265 (3d Cir. 1993)...................................................................................................8

United States v. Shell Oil Co.,
    13 F. Supp. 2d 1018 (C.D. Cal. 1998) .................................................................................58

United States v. Shell Oil Co.,
    294 F.3d 1045 (9th Cir. 2002) .............................................................................................58

United States v. Vertac Chem. Corp.,
    46 F.3d 803 (8th Cir. 1995) .................................................................................................53

United Techs. Corp. v. Browning-Ferris Indus., Inc.,
    33 F.3d 96 (1st Cir. 1994)...........................................................................................25, 32

Vine St., LLC v. Keeling,
    460 F. Supp. 2d 728 (E.D. Tex. 2006)................................................................................40

Walden v. City of Chicago,
    755 F. Supp. 2d 942 (N.D. Ill. 2010) .................................................................................67

Yankee Gas Servs. Co. v. UGI Utilities, Inc.,
    852 F. Supp. 2d 229 (D. Conn. 2012)................................................................................40

Young v. United States,
    394 F.3d 858 (10th Cir. 2005) ............................................................................................16

**STATUTES:**

28 U.S.C. § 2401(a) ................................................................................................................26

42 U.S.C. § 9601(9) ................................................................................................................44

42 U.S.C. § 9601(23) ................................................................................................................8

42 U.S.C. § 9601(24) ................................................................................................................8

42 U.S.C. § 9601(25) ................................................................................................................8

42 U.S.C. § 9605................................................................................................................46

42 U.S.C. § 9607(a) ............................................................................................51

42 U.S.C. § 9607(a)(1)-(4) ................................................................................28

42 U.S.C. § 9607(a)(4)(B) .................................................................................14

42 U.S.C. § 9613(a) ...........................................................................................46

42 U.S.C. § 9613(f)(1) .......................................................................................11

42 U.S.C. § 9613(f)(2) .......................................................................................11

42 U.S.C. § 9613(f)(3)(B) ...........................................................................6, 7, 13

42 U.S.C. § 9613(f)(3)(C) ..................................................................................11

42 U.S.C. § 9613(g)(1) .......................................................................................19

42 U.S.C. § 9613(g)(2) ....................................................................12, 19, 25, 39

42 U.S.C. § 9613(g)(3) ..................................................................................11, 24

42 U.S.C. § 9613(g)(3)(B) ..................................................................................18

42 U.S.C. § 9622(g)(5) .......................................................................................11

42 U.S.C. § 9622(h)(4) .......................................................................................11

Pub. L. No. 96-510, 94 Stat. 2767 (1980)...........................................................12

Pub. L. No. 99-499, 100 Stat. 1613 (1986)..........................................................12

**RULES:**

Fed. R. Civ. P. 56(a) .............................................................................................4

Fed. R. Evid. 702 ................................................................................................66

**LEGISLATIVE MATERIALS:**

H.R. Conf. Rep. No. 99-962 (1986), 1986 U.S.C.C.A.N. 3276 ..................21, 25

126 Cong. Rec. 30,932 (1980) ...........................................................................29

**MISCELLANEOUS:**

Black's Law Dictionary 353 (8th ed. 2004).................................................................................33

Memorandum of Georgia-Pacific in Support of its Motion for Partial Summary
Judgment, No. 405CV04160, 2007 WL 5195530 (S.D. Tex. Nov. 6, 2007) ...............................37

Restatement (Second) of Torts § 433A (1965) ...........................................................................30

Restatement (Second) of Torts § 433B (1965) ...........................................................................30

Restatement (Second) of Torts § 433B cmt. d (1965) ................................................................30

Restatement (Second) of Torts § 886A(2) (1979) ......................................................................31

Restatement (Second) of Torts § 875 (1979) ..............................................................................31

Restatement (Third) of Torts: Apportionment of Liability § 7 (2000) .......................................31

Restatement (Third) of Torts § 10 cmt A (2000) ........................................................................46

# GLOSSARY

| | |
|---|---|
| Avgas | Aviation gasoline |
| BOW | Baytown Ordnance Works |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| Complex(es) | The Refinery(ies) and chemical plants |
| DPC | Defense Plant Corporation |
| DSC | Defense Supplies Corporation |
| Exxon | Plaintiff Exxon Mobil Corporation |
| FOA | Facility Operations Agreement |
| Humble | Humble Oil & Refining Company |
| NCP | National Contingency Plan |
| PAW | Petroleum Administration for War |
| PRP | Potentially Responsible Party |
| RCRA | Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k |
| RRC | Rubber Reserve Company |
| Site(s) | The Refinery(ies), chemical plants, and other nearby areas or surface waters |
| Standard | Standard Oil Company of Louisiana |
| TCEQ | Texas Commission on Environmental Quality |
| WWII | World War II |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Exxon Mobil Corporation ("Exxon") has moved for Partial Summary Judgment and other relief, arguing:  (1) that the United States "operated" both the Baytown and Baton Rouge Refineries, and the adjacent Plancors, during World War II ("World War II") and the Korean War; (2) that Exxon, as a result, is entitled to a judgment of joint and several liability against the United States at both Sites, pursuant to Section 107(a)(2) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); (3) that because Exxon is performing its Baytown cleanup pursuant to "Agreed Orders" that resolved its liability to the State of Texas, Exxon also is entitled to contribution at Baytown under CERCLA Section 113(f)(3)(B); and (4) that the Court should either allocate a specific share of future costs immediately or, alternatively, should summarily adopt Exxon's proposed allocation methodology over all possible alternatives.[1]  The Court should deny Exxon's Motion, both on legal grounds and because it relies on "factual" assertions that are contradicted by the evidence.

First, the United States agrees that Exxon's Motion demonstrates it had an express right under CERCLA Section 113(f)(3)(B) to seek contribution for its Baytown response costs.  That right of action, however, was Exxon's *exclusive* remedy under CERCLA for those costs; a party eligible to sue under Section 113(f)(3)(B) cannot "also" sue under Section 107.  Because Exxon failed to bring its claim under Section 113(f)(3)(B) within the applicable limitations period, Exxon has *no* viable claim under CERCLA to recover its Baytown  costs, and it appears that dismissal of the Baytown complaint is warranted.

---

[1] "Plaintiff Exxon Mobil Corporation's Motion for Partial Summary Judgment as to Phase 1 Liability and Allocation and Supporting Memorandum" ("Exxon's Motion" or "Exxon Mot."), was filed by Exxon on September 30, 2013.  See ECF Nos. 102 (Baytown) and 51 (Baton Rouge).  Exxon also argues that the United States owned the various Plancors during WWII, but that issue is not contested.

Second, although Exxon does have a right of action under Section 107(a)(4)(B) with respect to its Baton Rouge response costs, it cannot obtain the forms of relief it requests. A judgment of "joint and several liability" is not available to a party, such as Exxon, that sues under Section 107(a)(4)(B) but is itself a potentially responsible party ("PRP"). Instead, Exxon's claim is in the nature of contribution and, as such, any judgment against the United States should only be for the United States' pro rata share of liability. Additionally, with regard to off-site contamination that Exxon speculates it "may" someday have to clean up, the Court should decline Exxon's request for a declaratory judgment of liability for future costs in the complete absence of reliable evidence as to any such contamination's origin, existence, or relationship to the United States' wartime activities.

Third, Exxon identifies the wrong legal standard for determining "operator" liability, and relies on "factual" assertions that in many instances are unsupported or even contradicted by the very documents Exxon cites, and in other instances simply fail to demonstrate that the United States was an "operator." Conversely, the United States' opening memorandum correctly described the governing legal framework and demonstrated that, under this framework, the United States cannot be deemed a "past operator" either at the Refineries or at the plants formerly owned by the United States (*e.g.*, the Plancors).

Finally, there is no reason to make, or justification for making, a decision selecting an allocation methodology at this time. Even if the Court were inclined to do so, the method proposed by Exxon is fraught with both crippling technical problems and manifest inequity, and should not be adopted by the Court under any circumstances.

## NATURE AND STAGE OF THE PROCEEDING

The United States incorporates by reference herein the Nature and Stage of the Proceeding set forth in the Consolidated Memorandum in Support of United States' Motions for Partial Summary Judgment ("United States' Motion" or "U.S. Mot."), ECF Nos. 103-1 (Baytown) & 52 (Baton Rouge), except that the deadlines for the joint pretrial order and the docket call have been extended to April 15, 2014, and April 24, 2014, respectively.

## STATEMENT OF THE ISSUES

1.      Whether Exxon's exclusive remedy at the Baytown Site is a CERCLA Section 113(f)(3)(B) claim, and whether such claim is time-barred by the applicable statute of limitations?

2.      Whether Exxon's CERCLA Section 107(a)(4)(B) claim at Baton Rouge is for several liability only, rather than joint and several liability?

3.      Whether Exxon is entitled to a declaratory judgment allocating wholly speculative future costs to address contamination that may or may not exist in adjacent water bodies?

4.      Whether the United States operated the Refineries under the controlling <u>Bestfoods</u> standard?

5.      Whether the United States operated the Plancors under the controlling <u>Bestfoods</u> standard?

6.      Whether Exxon's proposed equitable allocation framework is flawed and should not be summarily adopted by the Court without considering alternatives?

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is "material" if under the applicable substantive law it could affect the outcome of the lawsuit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A "genuine" issue of fact exists when the nonmoving party produces evidence on which a reasonable trier of fact could find in its favor, viewing the record as a whole.  Id. at 248-49; Little v. Liquid Air Corp., 952 F.2d 841, 847 (5th Cir. 1992).  When the party moving for summary judgment will bear the burden of proof on an issue at trial, it has "the responsibility to demonstrate that no reasonable jury, upon consideration of the summary judgment evidence, could return a verdict in favor of [the nonmovant]."  Source, Inc. v. SourceOne, Inc., No. 3:05-CV-1414-G, 2006 WL 2381594, *7 (N.D. Tex. Aug. 16, 2006); see also Anderson, 477 U.S. at 248.  In resolving a motion for summary judgment, the court is to view the evidence in the light most favorable to the non-moving party, and resolve all doubts and draw all reasonable inferences in favor of the non-moving party.  Anderson, 477 U.S. at 255; Evans v. City of Bishop, 238 F.3d 586, 589 (5th Cir. 2000).

## ARGUMENT

**I.     EXXON'S SECTION 113(f)(3)(B) CLAIM IS ITS EXCLUSIVE CAUSE OF ACTION FOR COSTS INCURRED AT BAYTOWN, AND THAT CLAIM IS TIME-BARRED**

Exxon's Motion seeks summary judgment in the Baytown case under two alternate causes of action.  Exxon asserts an entitlement, initially, "to a judgment of joint and several liability under section 107(a) of CERCLA," but Exxon further notes that "it is pleading in the alternative a contribution claim under section 113(f)(3)(B) of

4

CERCLA." Exxon Mot. at 16.[2] The United States concedes that the two 1995 administrative consent orders with the State of Texas that Exxon relies on at Baytown gave rise to a cause of action under Section 113(f)(3)(B). As every Circuit to consider the issue has concluded, the Section 113(f)(3)(B) cause of action that was available to Exxon was its *exclusive* remedy under CERCLA. Moreover, that claim was subject to a statute of limitations that expired long before Exxon filed the complaint in this action. Because the only valid claim Exxon had for Baytown is under Section 113(f)(3)(B), and that claim is now time-barred, Exxon's Baytown complaint is subject to dismissal and Exxon therefore cannot prevail on its summary judgment motion for Baytown.[3]

### A.   Exxon Entered Into Administrative Settlements With The State That Gave Rise To A Contribution Claim At Baytown Under Section 113(f)(3)(B).

CERCLA Section 113(f)(3)(B) provides that a PRP who "has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such

---

[2] Exxon did not plead an alternate cause of action under Section 113(f)(3)(B) in the Baton Rouge case. See Baton Rouge Compl. ¶¶ 30-44 (only causes of action are for cost recovery under Section 107(a) and for declaratory judgment as to future cost liability); compare Baytown Compl. ¶¶ 42-50 (asserting claim under Section 113(f)(3)(B) at Baytown).

[3] The United States' Motion addressed only a narrow set of issues, and thus did not seek a ruling at that time concerning the statute of limitations. The United States' pleadings, however, preserved this defense. See Baytown First Am. Answer & Counterclaims at 9 (The "First Affirmative Defense," which was included in the original as well as the amended answer, states: "All or portions of the claims Exxon advances in the Complaint are barred by the applicable statutes of limitations.") (ECF No. 88-2). For the reasons discussed in this section, the United States would be entitled to judgment on the pleadings or, alternatively, summary judgment dismissing Exxon's Baytown complaint. The United States intends to move for such relief at the earliest appropriate time with the Court's leave. Alternatively, if the Court prefers to construe today's filing as a "cross-motion" for such relief, the United States would consent to a reasonable number of additional pages for Exxon's summary judgment reply brief due January 20, 2014, if necessary for Exxon to have an adequate opportunity to respond to the cross-motion. See Geraghty & Miller, Inc. v. Conoco, Inc., 234 F.3d 917, 922-23, 925 (5th Cir. 2000) (rejecting argument that non-movant lacked notice when district court granted summary judgment the morning before trial based on the statute of limitations, since the defense was raised in the answer and pre-trial order and non-movant had an opportunity to be heard on the issue).

action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in [Section 113(f)(2)]." 42 U.S.C. § 9613(f)(3)(B). Here, the United States agrees with Exxon that the two "Agreed Orders" it entered into with the Texas Natural Resource Conservation Commission (now known as the Texas Commission on Environmental Quality or "TCEQ") in, respectively, March and July of 1995 constituted "administrative settlements" with a State that "resolved liability" within the meaning of Section 113(f)(3)(B). See Exxon Mot. at 37-41; see also A2754-2801 ("Agreed Order 1" dated March 15, 1995); A2802-2811 ("Agreed Order 2" dated July 26, 1995).

Agreed Order 1 expressly acknowledged that Exxon and the State of Texas "had settled all matters in controversy . . . [and] [t]his Agreed Order is entered solely for the purpose of resolving disputed claims between [TCEQ] and Exxon relating to remediations" at Baytown. A2754; see also A2796 ("This Agreed Order constitutes full and final adjudication by [TCEQ] of the violations . . . giving rise to this Agreed Order."). Agreed Order 1 requires Exxon to perform a comprehensive suite of response activities at Baytown, including (among others): (1) "Identification, delineation, containment and remediation of known hydrocarbon plumes," as well as "hydrocarbon plumes discovered after the effective date" of the Agreed Order; (2) submission and implementation of a "groundwater quality assessment plan," to include both a past remedial activities report and a hydrocarbon source study plan; (3) implementation of a semi-annual groundwater monitoring program (to follow the report from the groundwater quality assessment); (4) a soil investigation work plan for potential source identification and investigation; and (5) corrective measures studies and reports for saturated and unsaturated zones, followed by implementation of a corrective measures work plan with provisions to "verify cleanup of contaminated soils . . . and groundwater," including provisions for post-remediation

sampling.  A2766-91.  Exxon asserts that pursuant to this Agreed Order, it "has conducted investigatory, monitoring and remediation activities . . . across the entire Facility" at Baytown. Exxon Proposed Fact ("PF") ¶ 291.  Additionally, under Agreed Order 2, Exxon has conducted investigatory, monitoring and remediation activities relating to a groundwater contamination plume in a specific area now known as Tankfarm 3000.  Exxon PF ¶ 292.  Exxon alleges that it has incurred over $41.7 million in response costs at Baytown through December 31, 2011, and will incur ongoing and future costs.  Exxon PF ¶ 293.

The United States agrees with Exxon that these Agreed Orders were "administrative settlements" that "resolved Exxon's liability" to the State "for some or all of a response action," thus giving rise to a contribution claim under Section 113(f)(3)(B).  As Exxon contends—and consistent with the position the United States has taken in other courts—the fact that the Agreed Orders do not expressly refer to resolution of "CERCLA" liability does not preclude Exxon from proceeding under Section 113(f)(3)(B).  See Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131, 136 (3d Cir. 2013); Exxon Mot. at 40-41 (urging this Court to follow Trinity). This conclusion is consistent with the plain text of Section 113(f)(3)(B), as the Third Circuit explained in Trinity:

> The statutory language of § 113(f)(3)(B) requires only the existence of a settlement resolving liability to the United States or a state 'for some or all of a response action.'  Section 113(f)(3)(B) does not state that the 'response action' in question must have been initiated pursuant to CERCLA—a requirement that might easily have been written into the provision.

735 F.3d at 136 (quoting 42 U.S.C. § 9613(f)(3)(B)); see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 126 n.15 (2d Cir. 2010) (noting that "there is a great deal of force to this argument given the language of the statute," but that it was not necessary to decide

the issue in that case).[4]  This conclusion is consistent with the United States' own prior use of CERCLA to recover costs EPA incurred under the Resource Conversation and Recovery Act ("RCRA").  United States v. Rohm & Haas Co., 2 F.3d 1265, 1274 (3d Cir. 1993) (if a government action meets the CERCLA definition of "remedial action," its costs are recoverable under CERCLA "regardless of what statutory authority was invoked … in connection with its action"), overruled on other grounds, United States v. E.I. Dupont De Nemours and Co. Inc., 432 F.3d 161 (3d Cir. 2005).

The United States further agrees with Exxon that this Court's decision in Differential Development – 1994, Ltd. v. Harkrider Distributing Co., 470 F. Supp. 2d 727, 742-43 (S.D. Tex. 2007), is distinguishable on its facts.  That case involved a voluntary cleanup program agreement which, unlike the Agreed Orders here, expressly "d[id] not resolve any claim by or against the participating parties."  Id. at 740.  Rather, no release of liability was given to the voluntary cleanup program participants unless and until they obtained from the State a certificate of completion of the cleanup.  Id.  Moreover, the parties in that case were not subject to any binding obligation to perform response actions, as Exxon is here; rather, they could withdraw from the voluntary cleanup program at any time.  Id.; compare Exxon PF ¶ 290 and A2762 ("TCEQ may 'refer this enforcement matter to the Office of the Attorney General of the State of Texas for further enforcement proceedings . . . if [it] determines that Exxon is noncompliant with or in violation of any of the terms or conditions set forth in this Agreed Order.").  In short, the

---

[4] The phrase "liability . . . for some or all of a response action" describes a broad, not narrow, range of administrative or judicially approved settlements that authorize a contribution claim. CERCLA defines the operative term "response" (and hence "response action") by referring to other terms—"remove, removal, remedy and remedial action"—each of which has its own broad, all-encompassing definitions.  See 42 U.S.C. § 9601(25); id. § 9601(23) (defining "removal"); id. § 9601(24) (defining "remedial action").  Together, these statutory definitions encompass a broad array of actions.  Accord Exxon Mot. at 39 (citing cases holding that "RCRA compliance costs may also be considered 'response costs' under CERCLA").

voluntary cleanup program agreement could not give rise to a claim under Section 113(f)(3)(B) because it was not a "final settlement" and did not "resolve" any liability to the State; "Section 113(f)(3)(B) does not provide a basis to seek contribution for a settlement that has not yet been reached." Differential Development, 470 F. Supp. 2d at 742. Here, conversely, the Agreed Orders conclusively "resolved liability" to the State for "some or all" of the response actions Exxon is performing at Baytown.

This Court also concluded in Differential Development that the voluntary cleanup program agreement could not support a Section 113(f)(3)(B) claim in part because it did not expressly state that it released CERCLA liability. Id. Since there was no release of *any* liability at all under the voluntary cleanup program agreement, however, that conclusion was not necessary to the Court's decision. Moreover, the Court relied heavily on the Second Circuit's analysis in Consolidated Edison Co. v. New York, Inc. v. UGI Utilities, Inc., 423 F.3d 90 (2d Cir. 2005) (discussed in 470 F. Supp. 2d at 739-40 and 742), which also involved a voluntary cleanup program agreement and similarly held that an express resolution of CERCLA liability was required in order to give rise to a Section 113(f)(3)(B) claim. The Second Circuit's more recent opinion in Niagara Mohawk at least calls into question whether the Second Circuit itself would still follow Consolidated Edison on the issue of whether CERCLA liability must be addressed directly. See Niagara Mohawk, 596 F.3d at 126 n.15 (noting that the United States "understandably takes issue with our holding in Consolidated Edison" but that "we need not resolve the Consolidated Edison . . . problem as the language of [the order at issue in Niagara Mohawk] clearly encompasses CERCLA liability and our cases have never precluded the state agency from resolving CERCLA claims").

Like Exxon, the United States urges this Court to follow instead the Third Circuit's more recent decision in Trinity and to hold that the Agreed Orders gave rise to a valid Section 113(f)(3)(B) claim.  That holding is consistent with the plain language of the statute, as demonstrated above.

### B. Because Exxon Had A Section 113(f)(3)(B) Contribution Claim For Response Costs At Baytown, It Cannot Bring A Section 107(a) Claim For Those Same Response Costs.

Consistent with CERCLA's plain text and structure, the Section 113(f)(3)(B) contribution claim triggered by Exxon's entry into the Agreed Orders was the *exclusive* cause of action available to Exxon at least for purposes of seeking recovery for any portion of the response costs incurred pursuant to those Agreed Orders.  Numerous structural and textual signals in the statute indicate that when Congress amended CERCLA to include an express right to contribution in Section 113(f), it intended PRPs in circumstances addressed by that provision to use it exclusively, rather than to have an option to recover response costs instead under Section 107(a) and thereby evade the limitations Congress imposed on such contribution actions.  A different reading would render the specific terms of Section 113(f) "meaningless."  E.g., United States v. Colo. & E. R.R. Co. ("CERC"), 50 F.3d 1530, 1536 (10th Cir. 1995).

Interpretation of CERCLA, like all statutory interpretation, "depends upon reading the whole statutory text [and] considering the purpose and context of the statute."  Dolan v. United States Postal Serv., 546 U.S. 481, 486 (2006); see also United States v. Atl. Research Corp. ("ARC"), 551 U.S. 128, 135 (2007) ("Statutes must be read as a whole.") (internal quotation omitted).  Here, the text of Section 107(a) must be read in the context of Congress' later enactment of Section 113, which provides precise (and limited) mechanisms for PRPs falling into particular procedural circumstances to recover an equitable share of their response costs

from other PRPs.  See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 163 (2004) ("In short, after [the Superfund Amendments and Reauthorization Act of 1986 ("SARA")], CERCLA provided for a right to cost recovery in certain circumstances, § 107(a), and separate rights to contribution in other circumstances, §§ 113(f)(1), 113(f)(3)(B)."); see also U.S. Mot. at 8-10 (describing the two "clearly distinct" types of legal actions in Sections 107(a) and 113(f), respectively).  Congress would not logically have enacted a statute that establishes an express, although limited, claim for contribution for PRPs either:  (1) during or following a civil action under Sections 106 and 107, 42 U.S.C. § 9613(f)(1); or (2) subject to an administrative or judicially approved settlement with the United States or a State, id. § 9613(f)(3)(B), only to simultaneously allow those same PRPs to bring claims independently under Section 107(a).

Permitting PRPs to recover costs under Section 107(a) even though they fall into a circumstance covered by Section 113(f) could permit circumvention of the various limitations Congress imposed on contribution actions.  For example, in Section 113(f), Congress expressly allowed courts to use equitable factors in allocating response costs among liable parties.  See 42 U.S.C. § 9613(f)(1).  Congress also encouraged parties to settle with the United States by creating a bar against bringing contribution actions against persons that previously settled with the government.  42 U.S.C. § 9613(f)(2); see also id. § 9622(g)(5), (h)(4).  In addition, Congress granted priority to the CERCLA rights of the United States over the rights of those persons who settle with the United States or a State.  See 42 U.S.C. § 9613(f)(3)(C).  Finally, Congress established a specific statute of limitations for contribution actions that is shorter than the limitations period for some actions under Section 107(a).  Compare 42 U.S.C. § 9613(g)(3) ("No action for contribution for any response costs or damages may be commenced more than 3 years after (A) the date of judgment in any action under this chapter for recovery of such costs or

damages [*i.e.*, for claims under Section 113(f)(1)], or (B) the date of an administrative order . . . or entry of a judicially approved settlement [*i.e.*, for claims under Section 113(f)(3)(B)]"), with id. § 9613(g)(2) (six-year statute of limitations for initial actions to recover "the costs referred to in section 9607").  Were PRPs permitted to choose to bring claims under Section 107(a) even though they fall within the ambit of Section 113(f), those limitations could be rendered superfluous.  Since it must be presumed that Congress did not intend to enact restrictions without effect, CERCLA must be read to distinguish between those PRPs that can proceed with contribution claims under Section 113(f)(1) or 113(f)(3)(B) and those that can bring claims under Section 107(a)(4)(B).  See Aviall, 543 U.S. at 167 (rejecting construction of CERCLA that would "violate the settled rule that we must, if possible, construe a statute to give every word some operative effect").

The general presumption against surplusage has even greater weight here because Section 113 was enacted after Section 107.  Congress included Section 113 in the 1986 SARA amendments to CERCLA, whereas Congress enacted Section 107 in 1980 as part of the original Superfund statute.  See Pub. L. No. 99-499, 100 Stat. 1613 (1986); Pub. L. No. 96-510, 94 Stat. 2767 (1980).  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  Stone v. INS, 514 U.S. 386, 397 (1995); see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 701 (1995).

Furthermore, Section 113(f) specifically addresses suits by PRPs in particular procedural circumstances.  "The law is settled that [h]owever inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment."  Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 228–29 (1957) (internal quotations omitted); see also Gozlon-Peretz v. United States, 498 U.S. 395, 407

(1991) ("A specific provision controls over one of more general application.").  As a result, the general language of Section 107(a) must give way to the later-enacted, more specific provisions of Section 113(f) that apply to the particular circumstances at issue here.  See Fourco, 353 U.S. at 228-29 ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.") (internal quotation omitted).

These textual signals demonstrate that PRPs in procedural circumstances addressed by Section 113(f)—including PRPs, like Exxon, that have entered into "administrative settlements" that "resolve liability to a State" for "some or all of a response action or for some or all of the costs of such action," 42 U.S.C. § 9613(f)(3)(B)—may only seek contribution under that provision.  See ARC, 551 U.S. at 139 (Sections 107(a) and 113(f) provide "causes of action to persons in different procedural circumstances") (internal quotation omitted).  Had Congress intended to provide those same PRPs with an alternative remedy under Section 107(a), "it easily could have done so."  La.-Pac. Corp. v. ASARCO Inc., 24 F.3d 1565, 1573 (9th Cir. 1994); cf. Concrete Sales & Servs., Inc. v. Blue Bird Body Co., 211 F.3d 1333, 1339 (11th Cir. 2000) ("If Congress wishes to impose CERCLA liability on parties who contract for services that produce hazardous waste, it, not us, has the authority to do so.").  Because it did not, the Court should hold that Section 113(f) provides the exclusive CERCLA remedy for those PRPs to which it applies and, therefore, was the exclusive remedy available to Exxon to recover the response costs incurred pursuant to the Agreed Orders at Baytown.

### C.    The **ARC** Decision Does Not Foreclose A Holding That Exxon's Section 113(f)(3)(B) Cause Of Action For Baytown Response Costs Is Exclusive.

The Supreme Court's decision in ARC allows PRPs outside the procedural circumstances addressed by Section 113(f)(1) and 113(f)(3)(B) to sue under Section 107(a).  See 551 U.S. at 135.  ARC thus permits Exxon's Section 107(a) claim at the Baton Rouge Site, where there is no

13

comparable "administrative settlement" that "resolved liability," and no other procedural circumstance occurred that could have triggered a Section 113(f) claim.  ARC does not, however, foreclose the logical conclusion that Section 113(f)(3)(B) is the exclusive remedy for the response costs Exxon incurred under the Agreed Orders at Baytown.

In ARC, the Supreme Court held that Section 107(a) permits a PRP to recover costs it has incurred in cleaning up a site, but "[w]hen a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response." 551 U.S. at 139 (citing 42 U.S.C. § 9607(a)(4)(B)).  Instead, a PRP that "pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution." 551 U.S. at 139.  Of particular relevance here, however, is that the Court expressly did not reach the further question of whether a PRP that incurs "compelled costs of response"—such as those allegedly incurred by Exxon pursuant to the Baytown Agreed Orders—"are recoverable under § 113(f), § 107(a), or both."  Id. at 139 n.6.

While not reaching that issue, the Supreme Court elsewhere in the ARC opinion strongly indicated that, had it done so, it would have restricted PRPs that incur "compelled costs of response" to  bringing contribution claims under Section 113.   The Court stressed that the remedies under Sections 107(a) and 113(f) are "clearly distinct."  Id. at 138 (quoting Aviall, 543 U.S. at 163 n.3).  The two provisions "complement each other by providing causes of action to persons in different procedural circumstances." 551 U.S. at 139 (internal quotations omitted). The Court further affirmed that a PRP "eligible to seek contribution under § 113(f)(1) . . . cannot simultaneously seek to recover the same expenses under § 107(a)." 551 U.S. at 139; see also id. at 140 ("[A] PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under § 107(a).  The choice of remedies simply does not exist.").  Finally, the Court cited

14

with approval the Eighth Circuit's view that to harmonize Sections 107(a) and 113(f), and to ensure the "vitality" of the latter, a PRP falling under Section 113(f) must proceed under that section.  See 551 U.S. at 134 (internal citation omitted).  In short, ARC not only does not foreclose but in fact appears to support the conclusion that the United States advocates here.

**D.      Following ARC, The Circuit Courts Addressing The Issue Unanimously Have Agreed That PRPs With A Claim Under Section 113(f) Cannot Bring A Claim Under Section 107(a).**

In the wake of ARC, five federal appeals courts have directly considered whether a PRP eligible to pursue contribution under Section 113(f) nonetheless may instead elect to bring a claim under Section 107(a).  These five Circuits uniformly have confirmed that such a PRP has no such choice.  See Bernstein v. Bankert, 702 F.3d 964, 978–80 (7th Cir. 2012) (where plaintiffs entered into an administrative settlement with EPA and therefore possessed a contribution action under Section 113(f)(3)(B) but also had incurred "necessary costs of response" under Section 107(a)(4)(B), "we agree with our sister circuits that a plaintiff is limited to a contribution remedy when one is available"), opinion amended and superceded on reh'g, 733 F.3d 190 (7th Cir. 2013), petition for cert. filed, 82 U.S.L.W. 3318 (Oct. 29, 2013) (No. 13-568); Solutia, Inc. v. McWane, Inc., 672 F.3d 1230, 1235-37 (11th Cir. 2012) (per curiam), cert. denied, 133 S. Ct. 427 (2012) (upholding dismissal of PRPs' Section 107 claims where PRPs had entered into consent decree imposing cleanup obligations); Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 602–04 (8th Cir. 2011), cert. denied, 132 S. Ct. 244 (2011) (PRP that had entered into administrative settlements imposing cleanup obligations and had been sued by EPA under Sections 106 and 107 was barred from bringing Section 107(a) claims against other PRPs); Agere Sys. Inc. v. Advanced Envtl. Tech. Corp., 602 F.3d 204, 227-29 (3d Cir. 2010) (PRPs that entered consent decrees with EPA limited to seeking contribution under Section 113(f)); Niagara

Mohawk, 596 F.3d at 127-28 (Second Circuit held PRP that entered into consent order with the State was limited to Section 113(f)(3)(B) contribution claim). A sixth federal court of appeals, the Tenth Circuit, held prior to ARC that PRPs who possess, or at one time possessed, a claim under Section 113(f) cannot assert a claim under Section 107(a), and that decision remains controlling in the Tenth Circuit. See CERC, 50 F.3d at 1536; accord Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005) (a PRP is "unable to assert a cost-recovery claim under the rule in this Circuit that a Plaintiff-PRP must proceed under the contribution provisions of CERCLA § 113(f) when the Plaintiff-PRP sues another PRP for response costs"); see also Hobart Corp. v. Waste Mgmt. of Ohio, Inc., 923 F. Supp. 2d 1086, 1093 (S.D. Ohio 2013) (appeal pending) ("Notably, [ARC] did not overrule decisions holding that claims for costs incurred in performing a cleanup pursuant to a judicial or administrative settlement are limited to a contribution action under §113(f).") (internal quotation omitted).

These circuit courts reason that if a PRP "could simply repackage its § 113(f) claim for contribution as one for recovery under § 107(a), then the structure of CERCLA remedies would be completely undermined." Solutia, 672 F.3d at 1236; cf. CERC, 50 F.3d at 1536 ("[W]ere PRPs . . . allowed to recover expenditures incurred in cleanup and remediation from other PRPs under § 107 . . . , § 113(f) would be rendered meaningless."). "For example, parties could circumvent the different statutes of limitations that attach to § 113(f) contribution claims and § 107(a) recovery claims." Solutia, 672 F.3d at 1236; see also Sun Co., Inc. (R&M) v. Browning-Ferris, Inc., 124 F.3d 1187, 1193 (10th Cir. 1997) ("[I]f a PRP were allowed to seek contribution under § 107, the contribution defense of § 113(f)(2) could be circumvented or read out of the statute."). Allowing a PRP to elect a claim under Section 107(a) "would in effect nullify the SARA amendment" providing for CERCLA contribution claims. Niagara Mohawk,

16

596 F.3d at 128.  In contrast, limiting the availability of Section 107(a) to those PRPs that lack a

113(f) claim (including Exxon in the Baton Rouge case) "ensure[s] the continued vitality of the

precise and limited right to contribution Congress set forth in § 113."  Morrison Enters., 638 F.3d

at 603.

   In addition, three other circuits that have not directly decided the issue have signaled they

are likely to follow their sister circuits in ruling that a PRP may not pursue a Section 107 remedy

where a Section 113(f) contribution claim is or was available to it.  See AVX Corp. v. United

States, 518 Fed. Appx. 130, 135 (4th Cir. 2013) (noting that other circuits have "uniformly held

that an action for contribution under § 113(f) is the exclusive remedy for a PRP [that has a cause

of action under section 113(f)]" and that "we doubt whether AVX, a PRP who entered into a

[State] consent order resolving its environmental liability, may sue under CERCLA § 107(a)");

Kotrous v. Goss-Jewett Co., 523 F.3d 924, 932 (9th Cir. 2008) ("A PRP cannot choose remedies,

but must proceed under § 113(f)(1) for contribution if the party has paid to satisfy a settlement

agreement or a court judgment pursuant to an action instituted under § 106 or § 107."); ITT

Indus., Inc. v. BorgWarner Inc., 506 F.3d 452, 458 (6th Cir. 2007) ("To maintain the vitality of

§ 113(f), however, PRPs who have been subject to civil action pursuant to §§ 106 or 107 or who

have entered into a judicially or administratively approved settlement must seek contribution

under §113(f).");[5] see also Chubb Custom Ins. Co. v. Space Sys., 710 F.3d 946, 963–64 (9th Cir.

2013), petition for cert. filed, 82 U.S.L.W. (Sept. 30, 2013) (No. 13-412) (contrasting availability

of actions under CERCLA Sections 107(a) and 113(f)).  The United States is not aware of any

Fifth Circuit decision addressing this issue.  Cf. Lyondell Chem. Co. v. Occidental Chem. Co.,

---

[5] The United States disagrees with the Sixth Circuit's holding that the administrative order on
consent involved in ITT did not qualify as an "administrative settlement" for purposes of Section
113(f)(3)(B).  506 F.3d at 460-61.  However, the ITT court understood correctly that a PRP
afforded a right to contribution under Section 113(f) may not proceed under Section 107(a).

608 F.3d 284, 291 n.19 (5th Cir. 2010) (noting parties on appeal did not challenge district court's decision dismissing Section 107 claims but allowing parties to recover costs under 113(f)).

In short, federal courts overwhelmingly have agreed that where a Section 113(f) claim is or was available to a PRP, the text and structure of CERCLA make clear that such a claim is the exclusive statutory remedy available to the PRP.  The Court should hold that Exxon's Section 113(f)(B) claim was, accordingly, the exclusive CERCLA claim available to it for recovery of any portion of the costs incurred pursuant to the Agreed Orders at Baytown.

**E.      Because Exxon Failed To Bring Its Section 113(f)(3)(B) Claim In A Timely Fashion, That Claim Is Barred.**

Exxon's contribution claim under Section 113(f)(3)(B) is barred by the three-year statute of limitations set forth in Section 113(g)(3)(B).  See 42 U.S.C. § 9613(g)(3)(B).  Exxon originally filed its Baytown complaint in March 2010; by then, 15 years had passed since Exxon entered into Agreed Order 1 in March 1995, and more than 14 years since it entered into Agreed Order 2 in July 1995.  Even if the Court were to conclude that the CERCLA limitations period established in Section 113(g)(3)(B) does not apply to Exxon's claims, it would nonetheless be barred by the general six-year statute of limitations applicable to claims against the United States.  Because Exxon's claim was filed well outside of the statute of limitations, it is subject to dismissal.[6]

---

[6] Although Exxon entered into tolling agreements with the United States, the first such agreement was signed in 2003 long after the limitations period for claims based on the 1995 administrative orders had already expired, and the agreements expressly reserved the United States' right to raise a statute of limitations defense based on Exxon's failure to file a complaint prior to the beginning of the tolling period.  See U.S. Opp. Ex. 20 (Dec. 15, 2003 tolling agreement).  Thus, the tolling agreements do not save Exxon's claim.

1.      **Section 113(g)(3)(B)'s statute of limitations governs Exxon's claim.**

CERCLA Section 113(g)(3)[7] expressly refers to "action[s] for contribution," which indicates that it provides the applicable statute of limitations for contribution claims brought under Section 113(f).  Indeed, there are two other subsections within Section 113(g) that contain different statutes of limitation—Section 113(g)(1) and (g)(2)—and neither of those provisions refers to "actions for contribution."  42 U.S.C. § 9613(g)(1), (g)(2).

Section 113(g)(3)(B) does not expressly state that its limitations period is triggered by entry into an administrative consent order issued pursuant to State law, such as the Agreed Orders in this case.  Instead, Section 113(g)(3)(B) refers to three other events that trigger the running of its limitations period:  (1) the issuance of an administrative order under Section 122(g); (2) the issuance of an administrative order pursuant to Section 122(h); and (3) the entry of a judicially approved settlement, *i.e.*, a consent decree.  See 42 U.S.C. § 9613(g)(3)(B).  Prior to the Supreme Court's decision in Aviall, some courts held that CERCLA contribution claims based on administrative settlements not expressly identified in Section 113(g)(3)(B) were subject to no statute of limitations at all.  See, e.g., Reichhold Chems., Inc. v. Textron, Inc., 888 F. Supp. 1116, 1125-26 (N.D. Fla. 1995).  Others, including the Fifth Circuit, held that the six-year statute of limitations in Section 113(g)(2) should be applied to such claims.  See Geraghty & Miller, 234

---

[7] CERCLA Section 113(g)(3) reads, in full:

**(3) Contribution**

No action for contribution for any response costs or damages may be commenced more than 3 years after—

**(A)**  the date of judgment in any action under this chapter for recovery of such costs or damages, or

**(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

F.3d at 924-25 (following the Tenth Circuit's reasoning in Sun Co., 124 F.3d at 1192).  After the

Supreme Court's decisions in Aviall and ARC, however, these approaches are no longer viable.

In Aviall, the Supreme Court analyzed the structure of CERCLA Sections 113(f) and

113(g)(3) together and concluded that the limitations period in Section 113(g)(3)(B)

"correspond[s]" to actions for contribution brought under Section 113(f)(3)(B).  543 U.S. at 167.

The question presented in Aviall was whether a private responsible party that had not been sued

under Section 106 or 107 to undertake or pay for a cleanup of hazardous substances could

nevertheless seek contribution under Section 113(f)(1) from other liable parties.  Id. at 160-61.

In concluding that Section 113(f)(1) contribution claims could not be brought except "during or

following" a Section 106 or 107 civil action, id. at 166-68, the Court noted that its "conclusion

follows not simply from § 113(f)(1) itself, but also from the whole of § 113."  Id. at 167.  The

Court explained that CERCLA contains "two express avenues for contribution"—Section

113(f)(1) and 113(f)(3)(B)—and "two *corresponding* 3-year limitations periods for contribution

actions, one beginning at the date of judgment, § 113(g)(3)(A), and one beginning at the date of

settlement, § 113(g)(3)(B)."  Id. (emphasis added).  This parallel structure had significant

implications, as the Court explained:

> Notably absent from § 113(g)(3) is any provision for starting the limitations
> period if a judgment or settlement never occurs, as is the case with a purely
> voluntary cleanup.  The lack of such a provision supports the conclusion that, to
> assert a contribution claim under § 113(f), a party must satisfy the conditions of
> either § 113(f)(1) or § 113(f)(3)(B).

Id.  Thus, the comparison of Section 113(g)(3)'s structure to that of 113(f)(1) and 113(f)(3)(B)

was relevant to the question presented in Aviall and a necessary basis for the Court's decision.

It is also significant that the Aviall Court's analysis started from the premise that *all*

contribution claims arising under Section 113(f) are governed by *some* statute of limitation set

forth in CERCLA—specifically, by either Section 113(g)(3)(A) or Section 113(g)(3)(B).

Accord, e.g., Hobart Corp. v. Waste Mgmt. of Ohio, Inc., 840 F. Supp. 2d 1013, 1034 (S.D. Ohio 2011) ("Hobart I") ("The Supreme Court has also indicated that the fairest reading of Section 113 is that the entirety of limitations periods for CERCLA contribution claims can be found in Section 113(g)(3).") (citing Aviall, 543 U.S. at 167; BASF Catalysts LLC v. United States, 479 F. Supp. 2d 214, 222 (D. Mass. 2007) ("[T]he Supreme Court's reasoning does indicate that the Court saw that the universe of § 113(f) limitations periods could be found in § 113(g)(3)."). Aviall is thus fully consistent with the general body of law pertaining to federal statutes of limitations, which "do[es] not ordinarily assume that Congress intended that there be no time limit on actions at all" for express federal causes of action. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 146-47 (1987); DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 158-59 (1983); Holmberg v. Armbrecht, 327 U.S. 392, 395 (1946).

Moreover, as courts subsequent to Aviall have observed, the legislative history for the SARA amendments confirms that Congress did, in fact, intend Section 113(g)(3) to supply the limitations periods for all claims under Section 113(f). Specifically, "the conference report noted that [Section 113(g)(3)] 'prohibits the commencement of *any action for contribution* more than three years after the date of judgment in any civil action under this Act for recovery of costs or damages or more than three years after the date of entry of administrative or judicially approved settlements.'" BASF Catalysts, 479 F. Supp. 2d at 224, quoting and adding emphasis to H.R. Conf. Rep. No. 99-962 at 223 (1986), reprinted in 1986 U.S.C.C.A.N. 3276, 3316.

The ARC decision reinforced Aviall's understanding regarding the parallel structure of Section 113(f) and 113(g)(3) and the applicability of 113(g)(3)'s statute of limitations to claims under 113(f). There, the Supreme Court determined that, when a PRP "pays money to satisfy a

21

settlement agreement or a court judgment" requiring that it reimburse other parties' response costs, and thereby acquires an express right of contribution against other PRPs under Section 113(f), such PRP "cannot simultaneously seek to recover the same expenses under § 107(a)" and therefore "cannot choose the 6-year statute of limitations for cost recovery actions over the shorter limitations period for § 113(f) contribution claims." ARC, 551 U.S. at 139.

Although the Fifth Circuit has not yet had the occasion to revisit Geraghty & Miller's statute of limitations analysis in light of the subsequent Supreme Court decisions, other courts have concluded that "the decisions in [Aviall] and [ARC] eliminate the availability of the six-year statute of limitations set forth in section 113(g)(2) as an option for contribution cases," and that, instead, the three-year limitations period of Section 113(g)(3)(B) applies. Chitayat v. Vanderbilt Assocs., 702 F. Supp. 2d 69, 82 (E.D.N.Y. 2010) (holding that the three-year limitations period applied to a contribution claim based on an administrative settlement with the State of New York entered pursuant to state environmental law authority); accord, e.g., Niagara Mohawk, 596 F.3d at 128 n.19 ("Claims under § 107 do enjoy a six-year statute of limitations while claims under §113 have a three-year statute of limitations."); Hobart I, 840 F. Supp. 2d 1032-35 (rejecting argument that no limitations period applied to the plaintiffs' administrative settlement—which was not one of the types listed in Section 113(g)(3)(B)—and holding that it was time-barred under the three-year limitations period); BASF Catalysts, 479 F. Supp. 2d at 220-24 (contribution claim based on RCRA administrative settlement, if viable, was time-barred under Section 113(g)(3)); Carrier Corp. v. Piper, 460 F. Supp. 2d 827, 842-43 (W.D. Tenn. 2006) (Section 113(g)(3)(B), not 113(g)(2), supplies the limitations period for a 113(f)(3)(B) claim).

For these reasons, the Court should hold that the Section 113(g)(3)(B)'s three-year limitations period governs Exxon's 113(f)(3)(B) contribution claim for its Baytown costs, and

that the claim is time-barred.  Any contrary interpretation—*i.e.*, that there is no limitations period

or that Section 113(g)(2)'s limitations period applies under the now-superceded analysis in

Geraghty & Miller—would be plainly at odds with the Supreme Court's analysis of CERCLA

Section 113's structure and with Congress' clear intent when it enacted SARA.

> ### 2.    Alternatively, the Court should borrow the statute of limitations in Section 113(g)(3)(B).

Congress's failure to provide express statutes of limitation for express federal causes of

action is "a void which is commonplace in federal statutory law."  Bd. of Regents v. Tomanio,

446 U.S. 478, 483 (1980); see North Star Steel Co. v. Thomas, 515 U.S. 29, 33 (1995).  The

Supreme Court has explained that courts should borrow and apply a federal statute of limitations

> when a rule from elsewhere in federal law clearly provides a closer analogy than
> available state statutes, and when the federal policies at stake and the practicalities
> of litigation make that rule a significantly more appropriate vehicle for interstitial
> lawmaking.

North Star Steel, 515 U.S. at 35 (citations omitted).

Here, Section 113(g)(3)(B) provides the most closely analogous statute of limitation,

advances the federal policies at stake, and serves the practicalities of litigation.  First, a uniform

rule should apply to CERCLA contribution claims, but statutes of limitation for contribution

actions under state law vary from state to state.  It would make little sense to have limitation

periods vary depending upon the state law applicable to the federal judicial district in which the

actions are filed, particularly since federal agencies may be sued under Section 113(f)(3)(B) in

every federal judicial district.  Moreover, some CERCLA contribution cases against the United

States "package" multiple claims arising from separate hazardous waste sites located in different

states.  E.g., E.I. DuPont de Nemours & Co. v. United States, 508 F.3d 126, 130 & n.3 (3d Cir.

2007) (involving contribution claims at fifteen sites located in nine different states).  There is no

sound practical or policy reason to apply different limitations periods to different sites for the exact same type of federal claim in the same case.

Second, Section 113(g)(3)(B) clearly provides the most closely analogous statute of limitation for Section 113(f)(3)(B) contribution claims.  Section 113(g)(3)(B) specifically addresses contribution claims under Section 113(f)(3)(B) of CERCLA, including those based on administrative orders issued by EPA to PRPs.  The limitations period in Section 113(g)(3)(B) is designed to balance interests identical to those at issue in *any* action for contribution arising under Section 113(f)(3)(B), whether or not the action is based on a type of settlement expressly identified in Section 113(g)(3)(B).

The only other possible CERCLA statute of limitation is that set forth in Section 113(g)(2).[8]  A direct comparison of the language of Section 113(g)(2) and 113(g)(3)(B) shows that 113(g)(3)(B) is the most closely analogous provision for any contribution claim filed under Section 113(f)(3)(B).  Section 113(g)(3) is specifically entitled "Contribution" and its text states that "*[n]o action for contribution*" may be commenced more than three years after the events listed in that section.  42 U.S.C. § 9613(g)(3) (emphasis added).  Section 113(g)(2), by contrast, is entitled "Actions for recovery of costs" and makes no reference at all to contribution actions.

---

[8] Section 113(g)(2) provides, in relevant part:

**(2)  Actions for recovery of costs**

An initial action for recovery of the costs referred to in section 9607 of this title [42 U.S.C. § 9607] must be commenced—

**(A)** for a removal action, within 3 years after completion of the removal action, * * *; and

**(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

Id. § 9613(g)(2); see, e.g., United Techs. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 100 (1st Cir. 1994) (Section 113(g)(2)'s reference to actions for "'recovery of the costs'" is "reiterative of the subsection heading 'Actions for recovery of costs'"); see also H.R. Conf. Rep. No. 99-962, at 223 (1986), reprinted in 1986 U.S.C.C.A.N. 3276, 3316 (stating that "section 113(g)(2) of CERCLA" is "the statute of limitations for civil actions for the recovery of response costs"). Thus, by its terms, Section 113(g)(2) expressly does not apply to "contribution" claims arising under Section 113(f); as such, it could hardly offer the most "closely analogous" limitations provision for such claims.

In addition, it is a well-established rule that statutes of limitation for contribution actions begin to run when the would-be contribution plaintiff's cause of action accrues.[9]  Actions for contribution under Section 113(f)(3)(B) accrue upon entry into an administrative or judicially approved settlement that resolves a party's liability for response costs or response actions.  This rule is significant, because while the limitations provision in Section 113(g)(3)(B) expressly refers to several events that mark the accrual of a right to contribution under 113(f)(3)(B)— namely, entry of specified administrative or judicially approved settlements—Section 113(g)(2) refers to events that do *not* mark the accrual of a right to contribution under Section 113(f)(3)(B). See 42 U.S.C. § 9613(g)(2) (the limitation periods begin to run upon completion of removal action or initiation of on-site physical construction of a remedial action).  This indicates that, for a Section 113(f)(3)(B) contribution claim, Section 113(g)(3)(B) is a more closely analogous limitations provision than 113(g)(2).

---

[9] See D'Onofrio Constr. Co. v. Recon Co., 255 F.2d 904, 907-08 (1st Cir. 1958) (discussing established rule and an "unusual" exception to established rule under Rhode Island law); Asdar Group v. Pillsbury, Madison & Sutro, 99 F.3d 289, 295 (9th Cir. 1996) ("Given the timing of the accrual of the right to contribution, the general rule for limitation of contribution claims is that 'the statute of limitations governing claims for contribution runs from the discharge of the obligation . . . .'").

For the foregoing reasons, even if the Court disagrees that Section 113(g)(3)(B) directly supplies the limitations period applicable to Exxon's contribution claim under Section 113(f)(3)(B), the Court should borrow that three-year limitations period because it is the most closely analogous federal statute of limitations.  The end result is the same—Exxon's 113(f)(3)(B) claim, which is its exclusive remedy under CERCLA for the costs it incurred under the Agreed Orders at Baytown, is time-barred and therefore subject to dismissal.

> **3.      Assuming CERCLA provides no applicable limitations period, Exxon's Section 113(f)(3)(B) claim would be barred under 28 U.S.C. § 2401(a).**

Even if Exxon were to persuade the Court that Section 113(g)(3)(B) does not apply to its Section 113(f)(3)(B) claim, that claim would still be time-barred.  "*[E]very* civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a); see Geyen v. Marsh, 775 F.2d 1303, 1306-07 (5th Cir. 1985); Spannaus v. United States Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987).  This statute of limitations operates as a condition on the United States' waiver of sovereign immunity, eliminating jurisdiction over untimely claims.  John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753-54 (2008) (statute of limitations for claims against United States is jurisdictional in nature, setting forth "absolute" limitations period).  As explained above, Exxon's Section 113(f)(3)(B) claim regarding Baytown first accrued upon its entry of the administrative orders on consent in 1995.  Because Exxon did not file suit against the United States until far more than six years thereafter, its claim is barred.

## II.   EXXON IS NOT ENTITLED TO THE RELIEF REQUESTED

In its Baton Rouge case, Exxon has only pled a claim for relief under CERCLA Section 107(a)(4)(B) and, for purposes of this Motion, the United States does not contest the timeliness of that Baton Rouge claim (but, as noted above, Exxon cannot proceed under Section 107(a)(4)(B) in its Baytown case).  However, Exxon overreaches in two respects as to the relief it requests.  Exxon erroneously contends that under Section 107(a)(4)(B) it is entitled to a "judgment imposing joint and several liability against the United States for all costs incurred and to be incurred by [Exxon] in connection with its oil refineries and chemical plants located in Baytown, Texas and Baton Rouge, Louisiana."  Exxon Mot. at 33; see also Baton Rouge Compl. ¶ 1; Baytown Compl. ¶ 1.  Exxon also seeks "a declaratory judgment of the Government's future liability . . . [and] a declaration of the Government's specific allocable share of future costs as determined equitable in accordance with the allocation methodology adopted by this Court." Exxon Mot. at 41; see also Baton Rouge Compl. 11-12; Baytown Compl. 14-15.  First, consistent with the common law, Exxon cannot recover *all* of its response costs from the United States under a theory of joint and several liability.  Second, for the reasons discussed in the United States' Motion and below, the Court should decline to enter a declaratory judgment allocating unknown, and entirely speculative, future costs for the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, and the Monte Sano Bayou.  Instead, any declaratory judgment allocating future costs should be limited to the specific cost components at the Baytown and Baton Rouge Complexes.[10]

---

[10] In the United States Motion, the United States refers to the Refineries and chemical plants at Baytown and Baton Rouge as "Complexes," and the Refineries and chemical plants and the nearby areas and surface waters for which Exxon seeks a declaratory judgment for future costs as "Sites."  See U.S. Mot. at 47.

### A.      Exxon Is Not Entitled To Recover All Of Its Response Costs Through A Judgment Holding The United States Jointly And Severally Liable.

In its answers to the complaints, the United States asserted counterclaims for contribution against Exxon under CERCLA Section 113(f)(1) alleging that Exxon is liable under CERCLA as current owner and operator of the Baytown and Baton Rouge Complexes, owner and operator of the Baton Rouge Complex when the disposal of hazardous substances occurred, and owner and operator of the Baytown Refinery when the disposal of hazardous substances occurred.  Baytown First Am. Answer & Counterclaims ¶¶ 22-25 (ECF No. 88-2); Baton Rouge First Am. Answer & Counterclaims ¶¶ 25-31 (ECF No. 37-2).  Exxon has admitted that it is the current owner and operator of the Complexes, and that it owned both Refineries at a time when hazardous substances were disposed of.  See U.S. Proposed Statement of Facts ("SOF") ¶¶ 1-2, 5-6, 14-15, 20-21.  Additionally, as established in the United States' Motion, Exxon also operated the Complexes at a time when hazardous substances were disposed of.  See U.S. Mot. at 30-46. Thus, Exxon is itself a liable party under CERCLA.  See 42 U.S.C. § 9607(a)(1)-(4).

Notwithstanding its own status as a liable party, Exxon argues that imposing joint and several liability on the United States for Exxon's entire response costs is appropriate because the hazardous substances disposed of at the Sites are so commingled that they are "incapable of being apportioned among the responsible parties."  Exxon Mot. at 34.  As explained infra note 20, the United States may seek at trial to show that the harm in these cases is divisible to some degree.  Regardless, as a liable party, Exxon may not use CERCLA to impose the entire cost of cleaning up the two Complexes or Sites on the United States; instead, its Section 107(a) claims against the United States are claims to allocate response costs between liable parties.

Moreover, even if Exxon were entitled to impose joint and several liability, the counterclaims that the United States has asserted against Exxon under CERCLA Section

113(f)(1) would, in the words of the Supreme Court, "blunt any inequitable distribution," ARC, 551 U.S. at 140, and return the parties to the principles of equitable allocation that have governed CERCLA disputes among liable parties for more than two decades.  Accordingly, the Court should short-circuit procedural inefficiency by ruling at the outset that, as a liable party, Exxon can recover no more than the United States' equitable share of costs under its Section 107(a)(4)(B) claims.

> **1.      The common law does not permit Exxon, as a liable party itself, to impose joint and several liability on the United States.**

CERCLA Section 107(a) does not expressly mandate the imposition of joint and several liability.  In re Bell Petroleum Servs., Inc., 3 F.3d 889, 901 (5th Cir. 1993) (specifying that "joint and several liability is not mandated under CERCLA").  "Congress intended that the federal courts impose joint and several liability only in appropriate cases, applying common-law principles."  Id. at 901.  Indeed, the Supreme Court recently affirmed that Congress intended the scope of liability under CERCLA Section 107 to "'be determined from traditional and evolving principles of common law[.]'"  Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 613 (2009) (quoting United States v. Chem-Dyne Corp., 572 F. Supp. 802, 808 (S.D. Ohio 1983)).[11]

---

[11] Senator Randolph, a principal sponsor of the compromise bill that led to CERCLA's enactment, explained:

> It is intended that issues of liability not resolved by this act, if any, shall be governed by traditional and evolving principles of common law.  An example is joint and several liability.  Any reference to these terms has been deleted, and the liability of joint tort feasors will be determined under common or previous statutory law.

126 Cong. Rec. 30,932 (1980).

At common law, liable parties are held jointly and severally liable to an *innocent* party unless they can show that the harm is divisible.  Restatement (Second) of Torts, §§ 433A, 433B, at 875, 881 (1965); Chem-Dyne, 572 F. Supp. at 810-11.  The Restatement explains:

> The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. . . . *As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former*.

Restatement (Second) of Torts § 433B cmt. d at 444 (1965) (emphasis added).  Thus, as between the United States as plaintiff (which Congress has tasked with rapidly cleaning up contaminated sites and recovering its response costs to apply those funds to additional problems) and liable parties (whose waste is responsible for the problems in the first place), liable parties should bear the risk of any shortfall or difficulty of proof.  Accordingly, the courts have long held that liability under CERCLA Section 107(a) is joint and several where the United States or a State Government performs site cleanup, or where an *innocent* private party seeks to recover the costs of responding to contamination to which it did not contribute.  See, e.g., Lyondell Chem. Co., 608 F.3d at 289 (citing Burlington N., 556 U.S. at 613–14 and Chem-Dyne, 572 F. Supp. at 810).

Indeed, many of the cases Exxon cites in support of its contention that joint and several liability is appropriate here are cases brought by government entities or innocent private parties to recover response costs under CERCLA Section 107(a)(4)(A) or (B).  See Exxon Mot. at 33-36.  In Burlington Northern, the Court considered "whether [liable parties] were properly held jointly and severally liable for the full cost of the *Governments'* response efforts."  556 U.S. at 613 (emphasis added).  Likewise, in Bell Petroleum, "[t]he *EPA* [sought] to recover its response

costs . . . ."  3 F.3d at 892 (emphasis added).  See also United States v. NCR Corp., No. 10-C-910, 2013 WL 1858597, *1 (E.D. Wis. May 1, 2013) ("This is an action brought by the United States and the State of Wisconsin . . . ."); Pakootas v. Teck Cominco Metals, Ltd., 868 F. Supp. 2d 1106, 1109 (E.D. Wash. 2012) ("In sum, it will be determined if Defendant is liable for response costs incurred by the Tribes and the State."); 3000 E. Imperial, LLC v. Robertshaw Controls Co., No. CV 08-3985, 2010 WL 5464296, *12 (C.D. Cal. Dec. 29, 2010) (current owner plaintiff was not liable under CERCLA because it was a "bona fide prospective purchaser" under 42 U.S.C. § 9607(r)); Metro. Water Reclamation Dist. of Greater Chicago v. N. Am. Galvanizing & Coatings, Inc., 473 F.3d 824, 827 n.3 (7th Cir. 2007) (describing the "only exception to joint liability"—divisibility—as rare in the context of describing *EPA's* ability to "recover its costs in full from any responsible party").

In contrast to actions involving recovery of response costs by a government entity or innocent private party, common law precludes one tortfeasor from recovering in joint and several liability against another tortfeasor.  See Restatement (Second) of Torts § 875 at 314 (1979) ("Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability *to the injured party* for the entire harm." (emphasis added)).  Rather, at common law, a tortfeasor's recovery against a joint tortfeasor is limited to the amount the tortfeasor has paid in excess of his or her "equitable share of the common liability," or several liability.  Id. § 886A(2) at 337 ("No tortfeasor can be required to make contribution beyond his own equitable share of the liability"); see also ARC, 551 U.S. at 141 (quoting § 886A(2)); Restatement (Third) of Torts: Apportionment of Liability § 7 at 65 (2000) ("Plaintiff's negligence . . . that is a legal cause of an indivisible injury to the plaintiff

reduces the plaintiff's recovery in proportion to the share of responsibility the factfinder assigns to the plaintiff . . . .").

Thus, before <u>ARC</u>, the courts consistently held that the remedy of one liable party under CERCLA against another liable party is several liability.  See <u>Elementis Chromium L.P. v. Coastal States Petroleum Co., 450 F.3d 607, 613 (5th Cir. 2006)</u> ("[W]hen one liable party sues another liable party under CERCLA . . . *the imposition of joint and several liability is inappropriate*.") (emphasis added) (quotations and citation omitted); <u>Metro. Water Reclamation Dist., 473 F.3d at 828 & n.4</u> (numerous citations omitted) (a claim by a party that itself is liable in some measure for contamination giving rise to costs that it argues should be apportioned among those responsible "sounds in contribution."); <u>Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 351 (6th Cir. 1998)</u> (plaintiffs seeking the apportionment of costs attributable to contamination for which all parties are liable have a "'quintessential' action for contribution") (citation omitted); <u>Bedford Affiliates v. Sills, 156 F.3d 416, 424 (2d Cir. 1998)</u> ("[It] is a quintessential claim for contribution, where a party seeks to apportion liability for an injury for which it is also directly liable."); <u>Sun Co., 124 F.3d at 1190-91</u> ("The contours of all CERCLA claims by and between PRPs who contributed waste to a site are thus governed by the equitable contribution principles of § 113(f) . . . ."); <u>Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1301, 1302-03 (9th Cir. 1997)</u> ("CERCLA simply does not provide [liable parties] who incur cleanup costs with a claim for the joint and several recovery of those costs from other [liable parties]"); <u>Akzo Coatings Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994)</u> (describing the claim of a liable party subject to an EPA order against another liable party as "a quintessential claim for contribution"); <u>United Techs. Corp., 33 F.3d at 99 n.8, 100-01</u>

("bearing in mind that appellants are by their own admission liable parties, their claim against Browning must be classified as an action for contribution").

Moreover, although the Supreme Court established in ARC that liable parties, in certain procedural circumstances, may sue under CERCLA Section 107(a)(4)(B), the Supreme Court explicitly declined in that case to decide whether a liable party is entitled to joint and several liability under that provision. 551 U.S. at 140 n.7 (assuming "without deciding that § 107(a) provides for joint and several liability"). ARC, thus, did not overrule those portions of the significant body of case law that treated liable party claims under Section 107(a)(4)(B), in a variety of fact patterns, as claims for several liability. See cases cited supra; see also Centerior Serv. Co., 153 F.3d at 349 (collecting decisions by the First, Third, Seventh, Ninth and Tenth Circuits precluding liable parties from seeking joint and several liability under Section 107(a)).

Describing Exxon's claims as fundamentally in the nature of contribution is also consistent with the Supreme Court's definition of contribution in ARC. In ARC, the Supreme Court defined "contribution" in its "traditional sense" as the "'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'" 551 U.S. at 138-39 (quoting Black's Law Dictionary 353 (8th ed. 2004)). The Supreme Court explained further that a liable party's right to contribution is "contingent upon an inequitable distribution of common liability among liable parties." Id. at 138-39.

Recognizing that Exxon's claims are in the nature of contribution is also consistent with ARC more generally. The Supreme Court did not define the contours of the Section 107(a)(4)(B) claim available to a liable party. While the Supreme Court did say that "§ 107(a) permits recovery of cleanup costs but does not create a right to contribution," it was

distinguishing the procedural posture of a Section 107(a)(4)(B) plaintiff from a Section 113(f) plaintiff, not the *nature* of liability in the Section 107(a) claim.  Id. at 139 ("A private party may recover under § 107(a) without any establishment of liability to a third party.").  Further, the Supreme Court expressly stated that it was *not* deciding whether the claim was for joint and several liability.  Id. at 140 n.7.  In contrast to the well-settled rule that governmental claims to recover "all" costs under Section 107(a)(4)(A) are claims for joint and several liability, there is no consensus among the courts as to the nature of liability under Section 107(a)(4)(B) after ARC. An action to equitably allocate the costs a liable party has incurred is in the nature of contribution, but it is also undeniably a "cost recovery" action.[12]

In short, whether Exxon's claims are asserted under Section 113 or 107, the rationale that limits Exxon to an equitable allocation remains viable because the dynamic between the liable parties is the same.  At bottom, Exxon's Section 107(a)(4)(B) claims against the United States are claims asserted by a liable party, against another liable party, to equitably allocate response costs between those two parties.  Consequently, the claims are for several liability only and Exxon is precluded from recovering all of its response costs under a theory of joint and several liability.  See Elementis Chromium, 450 F.3d at 613.

---

[12] While Section 107 does not use the word "contribution," the language of Section 107(a)(4)(B) comfortably accommodates both claims for joint and several liability by innocent private parties, and claims for several liability among liable parties, which courts have found Section 107(a)(4)(B) authorized both before and after an express contribution cause of action was added to Section 113(f) in 1986.  The ARC statement that Section 107 itself does not "create" a right of contribution only distinguishes it from the express right in Section 113(f) and is not dispositive that such a right does not otherwise exist (*e.g.*, as developed by courts through federal common law principles).  Further, it does not rule out the fact that Section 107(a)(4)(B) claims are for several liability for certain purposes or in some contexts.  Thus, even though Exxon's claim is not expressly one for contribution, this Court should nevertheless find that it shares sufficient attributes of common law contribution claims to preclude joint and several liability.

2.      **The United States' counterclaims for contribution under Section 113(f) require equitable allocation of the cleanup costs between the parties.**

In any event, the United States' counterclaims for contribution under Section 113(f) will require the Court to allocate cleanup costs between the parties using such equitable factors as the Court determines are appropriate under CERCLA Section 113(f)(1).  The Court in <u>ARC</u> mentioned in dicta the ability of a defendant to use Section 113(f) counterclaims to "blunt any inequitable distribution of costs," but did not establish this as the sole means of ensuring equity. <u>551 U.S. at 140</u>.  In fact, the cost-recovery-buffered-by-a-counterclaim approach has the potential for burdening the litigants and courts with the unnecessary step of arguing and determining divisibility, which is not a defense to, and irrelevant in, a contribution action.  <u>See</u> <u>Elementis Chromium, 450 F.3d at 613</u> ("[T]o allow for the imposition of joint and several liability in contribution actions under CERCLA is to invite inefficiency, potential duplication, and prolongation of the litigation process.") (quotation and citation omitted); <u>Town of New Windsor v. Tesa Tuck, Inc., 919 F. Supp. 662, 681 (S.D.N.Y. 1996)</u> (explaining that limiting liable parties to contribution claims reduces "sequential, piecemeal litigation").  All that the approach of allowing a liable party to impose joint and several liability on others and then requiring those parties to counterclaim "actually accomplishes is another round of litigation—as defendant [liable parties] counterclaim against the plaintiff [liable party] to effectuate their recovery.  Such an approach guarantees inefficiency, potential duplication, and prolongation of the litigation process in a CERCLA case." <u>T H Agric. & Nutrition Co., Inc. v. Aceto Chem. Co., 884 F. Supp. 357, 361 (E.D. Cal. 1995)</u>.  <u>See, e.g.</u>, <u>Bd. of County Comm'rs of County of La Plata, Colo. v. Brown Group Retail, Inc.</u> ("<u>La Plata</u>"), <u>768 F. Supp. 2d 1092, 1117-22 (D. Colo. 2011)</u> (concluding that liability was joint and several because the harm was indivisible, but then

proceeding to determine an equitable allocation between liable parties under a Section 113(f)(1) counterclaim); Ashley II of Charleston LLC v. PCS Nitrogen, Inc., 791 F. Supp. 2d 431, 481-504 (D.S.C. 2011) (engaging in a lengthy divisibility analysis but then proceeding to allocate costs equitably under a Section 113(f) counterclaim), aff'd, PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161 (4th Cir. 2013).

Furthermore, a determination that the United States is jointly and severally liable for Exxon's future costs could unfairly saddle the United States with the "orphan shares" of parties responsible for polluting the water bodies near the Complexes who are now defunct, in the event that Exxon incurs costs to address the water bodies.  See Restatement (Third) of Torts § 10 cmt. a (2000) ("Joint and several liability imposes the risk that one or more tortfeasors liable for the plaintiff's damages is insolvent on the remaining solvent defendants[.]"); see also Pinal Creek Group, 118 F.3d at 1303 ("If a group of defendant-[liable parties] is held jointly and severally liable for the total response costs incurred by a claimant-[liable party], reduced by the amount of claimant-[liable party's] own share, those defendant-[liable parties] would end up absorbing all of the cost attributable to 'orphan shares' . . . .").  The Court, therefore, should short-circuit wasteful procedural wrangling that could lead to potentially unfair results by simply holding from the outset that Exxon's Section 107(a)(4)(B) claims are for several liability, that past and known future costs will be equitably allocated among the responsible parties in this action, and that, in any future action regarding any costs Exxon incurs to address nearby water bodies, costs will likewise be equitably allocated under the facts of that action.  See, e.g., Lyondell Chem. Co., 608 F.3d at 303 (recognizing that orphan shares can be equitably allocated to "all available responsible parties").

Indeed, this Court has already taken the procedural shortcut of determining allocation between liable parties without first determining the nature of Section 107(a)(4)(B) liability and engaging in a divisibility determination.  See Halliburton Energy Servs. v. NL Indus., 648 F. Supp. 2d 840 (S.D. Tex. 2009) (Rosenthal, J.).  In Halliburton, Halliburton brought claims under Sections 107(a)(4)(B) and 113(f) against Georgia-Pacific and a number of other parties.  Id. at 845.  Georgia-Pacific conceded for the purposes of its summary judgment motion that it was liable under CERCLA Section 107(a), id. at 861, but argued that "under Atlantic Research, both the Halliburton Plaintiffs' claim under 107(a), as blunted by Georgia Pacific's Section 113(f) counterclaim, and the various claims of all parties under § 113(f) ultimately call[ed] for § 113(f)'s equitable distribution of reimbursement costs among the [liable parties]." Memorandum of Georgia-Pacific in Support of its Motion for Partial Summary Judgment, No. 405CV04160, 2007 WL 5195530 (S.D. Tex. Nov. 6, 2007).  Thus, Georgia-Pacific argued that it should be allocated zero responsibility for response costs under the equitable considerations applicable to Section 113(f) contribution claims.  Id.

This Court agreed that "Georgia-Pacific ha[d] 'blunted' Halliburton's claim for cost recovery under section 107(a) with a counterclaim under section 113(f), and Halliburton ha[d] also asserted a claim for contribution under section 113(f)."  Halliburton, 648 F. Supp. 2d at 861-62.  The Court further cited cases supporting the proposition that a defendant may be found liable but ultimately allocated zero responsibility under equitable principles applicable to determining each liable party's fair share of response costs under Section 113(f).  Id. Accordingly, the Court proceeded to analyze the parties' comparative fault to determine whether Georgia-Pacific was entitled to summary judgment without analyzing whether Georgia-Pacific's liability was joint and several or whether the harm was divisible.  Id. at 862-75.

Just as in <u>Halliburton</u>, the United States has "blunted" Exxon's Section 107(a)(4)(B) claims by asserting Section 113(f) counterclaims for contribution against Exxon.  Thus, the Court should reject Exxon's invitation to engage in an exercise that, at best, is procedurally inefficient and has the potential to subject the United States to an unfair allocation of orphan shares for unknown future costs.  Instead, the Court should hold that Exxon's Section 107(a)(4)(B) claims are for several liability only and proceed to allocate the past costs and known future costs Exxon has incurred or will incur between the two parties using such equitable factors as the Court determines are appropriate under CERCLA Section 113(f)(1).

**B.    Exxon Is Not Entitled To A Declaratory Judgment Allocating Unknown Future Costs.**

Exxon also argues that it is entitled to a declaratory judgment as to the United States' liability for all future costs Exxon may incur and that the Court should allocate future costs in accordance with the allocation method Exxon advocates.  <u>See</u> Exxon Mot. at 41-46.  Exxon's Motion makes no distinction between known future costs to be incurred to address specific cost components at the Baytown and Baton Rouge Complexes, and future costs that may or may not be incurred to address contamination that may or may not exist in the water bodies and underlying sediments near the Complexes.  <u>See id.</u>  Instead, Exxon asks the Court to lump any and all future costs together and assign an equitable share to the United States.  <u>Id.</u>  As set forth in the United States' Motion, Exxon is not entitled to such relief.  <u>See</u> U.S. Mot. at 47-53.  Rather, if the Court determines that a declaratory judgment is appropriate in this matter, the Court should enter the declaratory judgment as to liability only for unknown future costs, and defer any equitable allocation of those costs until they are actually incurred and sufficient facts are established to determine what allocation would be equitable.

As explained in the United States' Motion, CERCLA Section 113(g)(2) requires a declaratory judgment *for liability only* in actions brought under CERCLA Section 107.  42 U.S.C. § 9613(g)(2); United States v. Hardage, 982 F.2d 1436, 1545 (10th Cir. 1992).  Section 113(g)(2) does not similarly require that declaratory judgments for liability be entered in contribution actions brought under CERCLA Section 113(f), but courts have held that declaratory judgments are available in such actions "wh[ere] declaratory relief is appropriate"— *i.e.*, where the facts relevant to the declaratory judgment are ripe for review.  See Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1191-92 (9th Cir. 2000); New York v. Solvent Chem. Co., 664 F.3d 22, 25-27 (2d Cir. 2011).

Contrary to Exxon's argument that courts "consistently issue declaratory judgments assigning responsible parties the equitable percentage share of future costs," Exxon Mot. at 44, courts have consistently endorsed putting off allocation of unknown or speculative future costs until they are incurred "down the road" or allowed the parties to challenge allocation in light of new events or new evidence.  See New York, 664 F.3d at 26-27; Beazer East, Inc. v. Mead Corp., 412 F.3d 429, 449 (3d Cir. 2005); United States v. Davis, 261 F.3d 1, 45 n.41 (1st Cir. 2001); Basic Mgmt. Inc. v. United States, 569 F. Supp. 2d 1106, 1126 (D. Nev. 2008); F.P. Woll & Co. v. Fifth & Mitchell Street, Corp., No. 96-5973, 2006 WL 2381778, *8-9 (E.D. Pa. Aug. 16, 2006), aff'd 326 Fed. Appx. 658, 661 (3d Cir. 2009).

Exxon's cited cases do not contradict this point and can be distinguished from this case on the facts.  Most notably, in none of the cases on which Exxon relies did a party seek an allocation of future costs that might never be incurred to address contamination that might not exist outside the boundaries of the specific cost components at issue in the cases.  In Vine Street, LLC v. Keeling, for example, one of the parties had begun a removal action at two specific

properties under an agreement with, and with the oversight of, the TCEQ.  460 F. Supp. 2d 728, 733-34, 755 (E.D. Tex. 2006).  The court allocated future costs under a declaratory judgment "for the contamination at issue," but specifically declined to enter a declaratory judgment of liability for future costs that could arise under facts that had not yet occurred, such as "governmental fines or penalties," because they were not ripe for judicial review.  Id. at 767. Likewise, in La Plata, a private party conducted a cleanup of contamination at a specific property under the supervision of the Colorado Department of Public Health and the Environment.  768 F. Supp. 2d at 1097, 1105.  The court allocated future costs under a declaratory judgment, id. at 1122-23, but also explained that "La Plata's proposed remediation plans are limited to the Property.  La Plata is not proposing any remediation at offsite properties."  Id. at 1107.  In Yankee Gas Services Company v. UGI Utilities, Inc., a private liable party studied contamination at a specific property over a number of years, and eventually retained a consultant to determine "the extent and degree of soil and groundwater impact" that would form the basis of a remedial action plan for the property.  852 F. Supp. 2d 229, 238-39 (D. Conn. 2012).  In allocating future response costs, the court specifically stated the costs to be allocated were those that "have been or will be incurred at [the property.]"  Id. at 256.  Finally, in Tosco Corporation v. Koch Industries, Inc., a party entered into an agreement with the Oklahoma Department of Environmental Quality ("ODEQ") to complete a remedial investigation and feasibility study, prepare a remedial design, and take certain interim remedial actions at a specific site that ODEQ had already studied.  216 F.3d 886, 890-91 (10th Cir. 2000).  The Tenth Circuit merely affirmed the district court's allocation of future costs to be "incur[red] while investigating and remediating environmental contamination at the [property]," id. at 889, based on a liable party's relative duration of ownership and control of the property, explaining that "where, as here, a responsible

40

party chooses to go to trial and future response costs are likely to be incurred, *but the exact amount remains unknown*, a judgment on proportional liability is an appropriate remedy." Id. at 897; see also U.S. Mot. at 50-51 (discussing the allocation of future costs in Boeing Co. v. Cascade Corp., 920 F. Supp. 1121 (D. Or. 1996), aff'd 207 F.3d 1177 (9th Cir. 2000)).

Here, the issue is not that the exact *amount* of future costs is unknown, the issue is that Exxon has pointed to no evidence that would allow the Court to determine what allocation would be equitable for future costs that may or may not be incurred to address contamination that may or may not exist in the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, or the Monte Sano Bayou. Indeed, as the United States explained in its Motion, Exxon has not studied the water bodies and their underlying sediments to determine the existence, source, magnitude, geographic extent or other parameters of any contamination. See U.S. Mot. at 51 (citing SOF ¶ 307). And, most importantly, there is no evidence at this time to guide the Court in determining what portion, if any, of any contamination in those water bodies may have a relationship to the United States' alleged wartime activities.

In support of Exxon's argument that unknown future costs should be allocated, Exxon cites its Proposed Facts ¶¶ 291-92, and 294, as well as the report by its proffered expert historian, Mr. Gravel. See Exxon Mot. at 45. The Proposed Facts and Mr. Gravel's report describe the specific cost components at the Complexes at which Exxon has done or is doing work. See Exxon PF ¶¶ 291-92, 294; Exxon Mot. at Ex. 1, Attach. 1 (hereinafter "Gravel Rep.") at 109, 100-35, 209-25. Despite Exxon's assertion in its Statement that Exxon is also "currently conducting . . . investigations of sediments in adjacent surface waters" at Baytown, see Exxon PF ¶ 291, the only evidence of such investigations is the evidence discussed in the United States' Motion involving a few sediment samples taken along the shoreline of Mitchell Bay. See U.S.

Mot. at 51 (citing SOF ¶ 307); see also Exxon PF ¶ 291 (citing A2812-14, a 2011 TCEQ Interoffice Memorandum discussing the 2008 refinery pore water investigation work plan for Mitchell Bay).  Although the TCEQ Interoffice Memorandum states the TCEQ's support of Exxon's determination of "the need for interim remedial measures," the Memorandum does not require such measures, or specify what those measures should or will be.  See Exxon PF ¶ 291 (citing A2812-14).  Indeed, the Memorandum notes "areas of uncertainty" that require further study.  See id.  Furthermore, Exxon has not studied whether contaminants exist in other areas of the Bay, or whether the sediments of any of the other water bodies contain contaminants that can be attributed to the production of war products.  See U.S. SOF ¶¶ 306-11.  Accordingly, the facts relevant to an equitable allocation of future costs that may someday be incurred to address contamination in sediments underlying the water bodies near the Complexes are not ripe for review.

Additionally, as the United States explained in its Motion, Exxon will not be prejudiced by waiting for an allocation of any future costs associated with the water bodies in question, since such costs will be subject to challenge based on necessity and consistency with the National Contingency Plan ("NCP") in a subsequent action anyway.  See Hardage, 982 F.2d at 1445.  Allocation can be determined at the same time as recoverability, if Exxon actually incurs any future costs to address the water bodies.  Thus, in the event the Court determines that a declaratory judgment is appropriate in this matter, the Court should enter it as to liability only and defer any allocation of potential future costs until such future costs are actually incurred and sufficient facts are established to support an equitable allocation.

### III. EXXON'S ASSUMPTIONS REGARDING THE SCOPE OF BAYTOWN AND BATON ROUGE "FACILITIES" ARE WITHOUT FOUNDATION[13]

The United States argued in its Motion that it neither "owned" nor "operated" the two Refineries at issue (U.S. Mot. at 12-30), acknowledging at the same time that CERCLA liability may attach with regard to the various "Plancor" properties (managed as government owned/contractor operated properties during WWII), see U.S. Opp. Ex. 22 at 6-8 ("U.S. Opp. Exs." are attached hereto).  While Exxon does not move for summary judgment on the issue, Exxon seeks to circumvent the distinction between the Plancors and the Refineries by simply assuming throughout its Motion that there is one CERCLA "facility" at Baytown and one at Baton Rouge, and that each includes not only the entire integrated oil refinery, but also the separate properties on which various government-owned Plancors conducted operations during the war periods.[14]  The Court should not blindly accept this assumption, which is inconsistent with the treatment state regulators and Exxon itself have given the Refineries and adjoining chemical plants in the RCRA permitting and corrective action process.

The existence of a "facility" is an element of Exxon's *prima facie* claim.  Uniroyal Chem. Co. v. Deltech Corp., 160 F.3d 238, 242 (5th Cir. 1998) (regarding Section 107(a) claims); New Jersey Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 104 (3d Cir. 1999) (regarding Section 113

---

[13] To respond fully to Exxon's Motion, the United States addresses Exxon's arguments as to "owner," "operator," and "arranger" liability at Baytown and Baton Rouge.  A finding that Exxon's Baytown claim is untimely, however, could resolve that case without the need for the Court to decide the further issues discussed below.

[14] See, e.g., Exxon Mot. at 1 ("These two cases involve claims for cost recovery . . . at two ExxonMobil facilities:  the Baytown refinery and chemical plant ('Baytown Facility') and the Baton Rouge refinery and chemical plant ('Baton Rouge Facility')."); id. at 2 ("[T]he United States exercise its war powers to transform and convert both Facilities and their refineries into major war production facilities . . ." and "specifically integrated and directed the operations of the refineries and chemical plants at each Facility . . . .").

claims).  CERCLA's definition of the term "facility," which Exxon nowhere addresses, is quite

broad, in keeping with the remedial design of the statute.  Section 101(9) defines the term as:

> (A) any building, structure, installation, equipment, pipe, or pipeline (including
> any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon,
> impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or
> aircraft, or (B) any site or area where a hazardous substance has been deposited,
> stored, disposed of, or placed, or otherwise come to be located…"

42 U.S.C. § 9601(9).  Courts have generally given the definition a practical construction, largely

dependent on the facts of each case.  See, e.g., Clear Lake Prop. v. Rockwell Int'l Corp., 959 F.

Supp. 763, 768 (S.D. Tex. 1997) (citing Tanglewood East Homeowners v. Charles-Thomas, Inc.,

849 F.2d 1568, 1573 (5th Cir. 1988)) ("[T]he Fifth Circuit has given this literal definition wide

breadth in its interpretation of the statutory language.").  One particularly thorough treatment

notes at least five possible constructions, all approved by various courts.  See United States v.

Atchison, Topeka & Santa Fe Ry. Co., Nos. CV-92-5068, -96-6226 & -96-6228, 2003 WL

25518047, *45-49 (E.D. Cal. July 15, 2003), aff'd in part 479 F.3d 1113 (9th Cir. 2007), 554

U.S. 945 (2008), rev'd on other grounds, 556 U.S. 599 (2009).[15]

    Property boundaries are generally disregarded when it comes to defining a CERCLA

facility.  Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 842-43 (4th Cir. 1992)

(rejecting plaintiff's contention that facility logically confined to leaking storage tanks and

---

[15] The conclusions of law in Atchison, Topeka note that the definition is subject to "several
different concepts or applications," including: (1) "a container-like object that is the source of a
release or threatened release such as a 'pipe,' 'rolling stock' or a 'storage container'" (¶ 300); (2)
"a geographic area that is the source of a release or threatened release such at a 'landfill,' a 'pit'
or a 'lagoon'" (¶ 301); (3) a "geographic area wherever a hazardous substance 'has come to be
located' by passive spreading such as groundwater migration, surface runoff, wind dispersal or
by active human channeling . . ." (¶ 302); (4) "a general geographic area (a 'site') within which
there has been some storage or placement of a hazardous substance, such as a general plant area
where different waste streams, spills and incidents historically have led to contamination in
different areas" (¶¶ 303-04 (noting "[t]he contamination within a geographic facility need not be
continuous")); or even (5) a geographic area expanded as work continues and "investigation
shows a greater spread of contaminants that originally anticipated" (¶ 309(a)).

associated plume should be expanded to property line associated with defendant's tenancy);

Atchison, Topeka, 2003 WL 25518047 at *46-47 (¶¶ 305-06: "The scope of a geographic facility

is not limited by the fiction of property lines . . . EPA need not designate one facility per owner

. . . ."); Clear Lake, 959 F. Supp. at 768 (same); S. Pac. Trans. Co. v. Voluntary Purchasing

Groups, Inc., No. Civ. A. 3:94-CV-2477, 1997 WL 457510, *5 (N.D. Tex. Aug. 7, 1997)

("VPG") ("The relevant 'facility' for purposes of this CERCLA case need not be defined in

terms of legal property boundaries.").  Various means that regulatory agencies may resort to in

order to organize work at a complex site, or to subdivide and resolve liability for portions of the

environmental problem, whether they be "operable units," administrative orders, or consent

decrees, likewise do not restrict the scope of CERCLA facilities.  See, e.g., VPG, 1997 WL

457510 at *5 ("facility" not defined by boundaries associated with three separate administrative

orders on consent).

      Courts not only routinely defer to EPA's designation of "facility" boundaries, but will

often at least refer to them as a reference in private party disputes regarding the same issue.  See,

e.g., VPG, 1997 WL 457510 at *5 ("Although the EPA has entered into separate administrative

orders concerning different parcels, the Agency has concluded that the entire area constitutes one

CERCLA 'facility.'"); Atchison, Topeka, 2003 WL 25518047 at *48 (¶ 309: "EPA's decision to

conduct a unified response action with respect to a particular geographic area, such as a plant

area, consisting of noncontiguous patches of contamination, supports a finding that such a

geographic area is a facility for liability purposes"); Akzo Coatings v. Aigner Corp., 960 F.

Supp. 1354, 1358-59 (N.D. Ind. 1996) (EPA placed site on National Priorities List as a whole

and consent decree "clearly defines the relevant facility to encompass the entire Fisher-Calo

Site"), aff'd in part 197 F.3d 302 (7th Cir. 1999).  And, if EPA conducts a rulemaking to add a

facility to the National Priorities List, that decision may be challenged by a petition for review filed within 90 days, but cannot be challenged in an enforcement action. 42 U.S.C. §§ 9605, 9613(a); Atchison, Topeka, 2003 WL 25518047 at *17 (¶¶ 105-07: Railroads' failure to challenge designation of entire site as one facility "forecloses the . . . ability to object to EPA's designation . . . .").

Because the definition is so broad, and because of the flexibility required to meet the multiplicity of factual circumstances that may surround a CERCLA response, courts have consistently been on guard to prevent clever constructions by private litigants who may seek to take advantage—either to limit the scope of their joint and several liability under the statute (in the case of defendants), or to expand the scope of liability beyond what would otherwise be provided (in the case of plaintiffs).  For example, defendants have unsuccessfully argued that property lines and borders referenced in administrative orders should define separate facilities despite EPA's determination that the entire contaminated area was one facility, VPG, 1997 WL 457510 at *5; that the relevant facility should be limited to a defendant's surface structures, as distinguished from "hazardous substances that have come to be located throughout the soil and groundwater underlying its laboratory building," Clear Lake, 995 F. Supp. at 767; and that two contiguous parcels are separate despite a lessor's operation of "the two parcels as a single facility" and the relative homogeneity of soil and groundwater contamination, Atchison, Topeka, 2003 WL 25518047 at *49 (¶¶ 310-15).

Attempts by private plaintiffs to manipulate facility definition are less common, but no less result-oriented.  See, e.g., PPG Indus., 197 F.3d at 105 ("allowing the 'facility' to be the entire eastern spur, where the Turnpike's claim seeks costs relating to seven specific sites, would result in an unwarranted relaxation of the 'nexus' required"); Nurad, 966 F.2d at 842-43 ("in this

46

case, the only 'area' where hazardous substances have 'come to be located' is in and around the storage tanks, so the relevant 'facility' is properly confined to that area," rather than a larger parcel as to which a tenant would have had liability); United States v. Iron Mountain Mines, Inc. 987 F. Supp. 1263, 1270-71 & n.14 (E.D. Cal. 1997) (rejecting proposal to define entire watershed as the relevant facility because "all of the response costs incurred to date on Iron Mountain address [Acid Mine Drainage] from Iron Mountain alone").[16]

Exxon's attempt to simply presume a broader facility definition than the evidence supports falls neatly within this troublesome tradition.  Yet the evidence overwhelmingly supports the idea that there are two "facilities" present at each site.  That is how both Exxon and the United States have treated them since the parties agreed to commence construction of the various Plancors in WWII.  The Refineries already existed, and were to make aviation gasoline ("avgas") and other "war products" under a "Master AvGas Contract," and various "supply contracts" negotiated between Exxon's predecessors and the Defense Supplies Corporation ("DSC").  See U.S. SOF ¶¶ 61-76.  Changes were made to the existing Refineries to increase each refinery's capacity to produce avgas, but they operated largely as they had always done, distilling crude oil to make various products.

Most Plancors, on the other hand, were part of ongoing projects to increase the output of other products—notably toluene (a precursor of the explosive TNT) and synthetic rubber.  At Baytown, Plancors 877, 485, and 1082 were devoted to rubber projects, and the Baytown Ordnance Works ("BOW") to toluene production.  The BOW was located on land purchased by

---

[16] But see Louisiana-Pacific Corp. v. Beazer Materials & Servs., Inc., 811 F. Supp. 1421, 1431 (E.D. Cal. 1993) (rejecting defendant's argument that the "facility" was too broadly defined because, "[a]s a master of its complaint, [the plaintiff] has the discretion to formulate the legal theories on which it will base its claim"); Atchison, Topeka, 2003 WL 25518047 at *47 (¶ 307: noting that, while "courts defer to a plaintiff's definition of the facility . . . [a] plaintiff's choice to define the facility is not without limits") (citations omitted).

the United States from Humble Oil & Refining Company ("Humble") in 1941, and built by Humble under a contract with the Army Ordnance Department.  U.S. SOF ¶ 113-14.  Humble managed the BOW under a cost-plus-fixed-fee contract during WWII and purchased the plant in May 1946.  U.S. SOF ¶¶ 117-18.

Rubber plants adjacent to both Refineries were built on federal real estate, with Humble and Standard Oil Company of Louisiana ("Standard") both building and managing the day-to-day operations.  Humble managed two plants under contract at Baytown, Plancors 485 and 1082, while General Tire and Rubber ran the third, Plancor 877.  See Gravel Rep. at 60, 63, 66; U.S. SOF ¶¶ 92, 96, 133.  At Baton Rouge, various Plancors relating to synthetic rubber and toluene production were located on a parcel north of the refinery.  See Gravel Rep. at 140, 143, 147, 150, 153, 157, 184.[17]  Each rubber Plancor at Baytown was constructed under separate contracts between Humble and the Defense Plant Corporation ("DPC"), and production was undertaken pursuant to Rubber Reserve Corporation ("RRC") contracts.  See U.S. SOF ¶¶ 90-92, 94-96.  Waste products were generally handled in separate systems.  Although at least one relatively small, emulsified waste stream from Plancor 485 was treated at a Baytown Refinery separator beginning in February 1944, Gravel Rep. at 62, the basic waste streams from all three Baytown rubber Plancors were routed through their own separators and down a common sewer towards Scott Bay, some distance upstream of the refinery outfalls.  Gravel Rep. at 62, 65, 67; Kittrell Decl. ¶ 6(a)-(b).  Baton Rouge rubber Plancors were similar, generally having their own waste

---

[17] There were a few exceptions.  Baton Rouge had a hydrogenation expansion Plancor (1868) located within the refinery boundary and logically included, to the extent it may have contributed meaningful waste streams, in the Baton Rouge Refinery.  Gravel Rep. at 159, 184.  Baton Rouge also had the true outlier—a butadiene plant converted from existing equipment within the boundaries of the refinery in order to quickly provide product until the larger Plancors could be brought online.  Wastes were handled by the refinery's system, and again, this unit is logically treated as part of the refinery "facility."  Gravel Rep. at 154-55, 184.

treatment systems, and discharging to the Monte Sano Bayou well north of the refinery outfall. Gravel Rep. at 140, 147, 150, 153; Kittrell Decl. ¶ 6(c)-(e).[18]

Wastes from the BOW appear to have been minimal. The plant produced waste acid sludges that were burned in on-site boilers, and various process by-products were returned to refinery (from which the BOW received its primary feedstock) for use by the refinery—not as waste. Gravel Rep. at 54-55; Kittrell Decl. ¶ 4(a), 4(b)(i)-(iii). The exchange of feedstocks and by-products admittedly suggests somewhat greater "integration" of the operation of the refinery and the BOW at the time, but the BOW wastes do not appear to have been consequential in terms of the various refinery-related response costs Exxon has advanced in this litigation. Mr. Gravel states that a sewer line at the BOW routed to the refinery's "West Ditch," but not that it conveyed any BOW-related wastes. See Gravel Rep. at 55.[19]

Humble purchased the BOW in June 1946, and Plancors 485 and 1082 in the spring of 1955. Gravel Rep. at 51, 60, 66. Humble apparently purchased Plancor 877, operated by General Tire & Rubber, in a subsequent private transaction, and that property appears today within the boundaries of Exxon's present-day chemical plant. See Gravel Rep. at 41, 43 (aerials depicting locations of WWII Plancors and current chemical plant).

Today, the Baytown Refinery and chemical plant are each subject to regulation by the State of Texas pursuant to RCRA and have separate permits. E.g., U.S. Opp. Ex. 23, US-BT015468-15509; U.S. Opp. Ex. 24, US-BT15510-15531. Each has its own proposed Facility

---

[18] Several of Mr. Gravel's charts mention slop oil, but slop oils recovered from waste streams generally are returned for further processing and incorporation as a part of some future product. They are more akin to by-products than to waste, and cannot fairly be said to be returned "for disposal" in most instances.

[19] An additional Plancor (1909) hydrogenated codimer for avgas at Baytown, and was located on refinery property and integrated into refinery operations. See Gravel Rep. at 50, 57. The United States does not dispute including this unit in a Baytown Refinery "facility."

49

Operations Agreement ("FOA"), in which it proposes to prevent contaminated groundwater from migrating offsite. Gravel Rep. at 43 (aerial overlay showing FOA boundaries). Separate corporate entities own and operate the sites today, and Texas has issued separate administrative orders to each regarding various aspects of soil and groundwater investigations at each plant. A2754-A2801; A2802-A2811. Indeed, in one instance, Exxon actually asked a remediation contractor to allocate separate shares associated with a groundwater plume to the refinery and the chemical plant. U.S. Opp. Ex. 25, BAYTECH-00045798. Similarly, at Baton Rouge, Standard purchased what remained of Plancors 572 (inclusive of property associated with Plancor 1526), 1065, and 1868 (Gravel Rep. at 150, 153, 157, 159; U.S. SOF ¶¶ 145, 150, 162, 168), and appears to have incorporated them into a distinct chemical plant.

In short, Exxon's predecessors ran the Refineries and most of the Plancors separately during the war, and Exxon has subsequently combined the Plancors into integrated chemical manufacturing facilities that remain distinct for all purposes—including most environmental remediation purposes—from the adjacent oil refineries. In these circumstances, the Court should not follow Exxon's presumption, but should examine the issue independently after trial.[20]

---

[20] The discussion above is related to, but conceptually distinct from arguments relating to "divisibility." Proper treatment of the "facility" question would effectively preclude the need to decide whether the harms at the Refineries are divisible from the harms at the chemical plants, but leaves open the possibility that some divisibility issues may still be considered. For example, Exxon's investigation of the Tank Farm 3000 groundwater plume at Baytown appears to have concluded that the sources of contamination were likely facilities operated almost entirely *after* any period of federal involvement. See, e.g., Kittrell Decl. ¶ 14 (opining that, based on Exxon's own investigation, it is "more likely than not that the contaminants located within the plume . . . were deposited well after the end of World War II"); U.S. Opp. Ex. 26, BAYC-00000658; U.S. Opp. Ex. 27, BAYTECH-00027108-27110. Thus, that plume could arguably be divisible, and the Unites States should not bear any of the costs for its remediation. Furthermore, Exxon's suggestion that the United States "has failed to even assert an affirmative defense based on divisibility or apportionment," Exxon Mot. at 35, is simply incorrect. See Baytown First Am. Answer & Counterclaims at 10, Defense No. 8 ("The United States is not a liable party with respect to portions of the hazardous substance contamination described in the Complaint."); Baton Rouge First Am. Answer & Counterclaims at 6, Defense No. 8 (same).

## IV.   THE UNITED STATES DOES NOT CONCEDE PRIOR OWNER LIABILITY AT THE "SITES"

Contrary to Exxon's assertion, the United States does *not* concede "that it is subject to CERCLA 'prior owner' liability" at the Baytown and Baton Rouge Sites. See Exxon Mot. at 19. The United States does not dispute that it owned the various Plancors and the BOW at Baytown and Baton Rouge during WWII and, in some cases, the Korean War.  Nor does the United States dispute that it is a "covered person" under Section 107(a) as to the Plancors and BOW by virtue of being their prior owner. See U.S. Mot. at 39.  But, as discussed above, the United States *does* dispute that it is a covered person with respect to all of both "Sites" as so broadly defined by Exxon.

Even if the Court adopted Exxon's overbroad definition of "Sites" and found the United States a "covered person" as a prior owner, that fact alone does not mean the United States is *liable* under CERCLA.  Under Section 107(a), the United States would be liable only if Exxon demonstrates that it incurred response costs that were both necessary and consistent with the NCP as a result of releases from the facilities during the war years.  See 42 U.S.C. § 9607(a). These issues are undeveloped, as they have been reserved for Phase 2 of this case.  See ECF No. 15 (Baton Rouge).

## V.   THE UNITED STATES DID NOT OPERATE THE REFINERIES

The United States' Motion explains in detail why the United States did not "operate" the Refineries under the governing standard set forth in the Supreme Court's 1998 Bestfoods decision.[21]  See U.S. Mot. at 12-29.  Exxon argues in its Motion that the United States should be

---

[21] The United States did not move for summary judgment on—and this Court need not decide— whether the United States was an operator of the Plancors and BOW, because the United States concedes that is a "covered person" as a prior owner of those facilities.  For the same reason, this Court need not decide whether the United States was an arranger at Plancor 1909 at Baytown. See Exxon Mot. at 32 n.14.

held liable as a former operator of the Refineries because the United States "fully directed and

controlled refinery operations" at not only the Baytown and Baton Rouge Refineries, but also

refineries across the country.  Exxon Mot. at 19.  To accept Exxon's position, this Court would

have to find that the United States' prioritization and allocation of scarce raw materials across

the oil industry (as well as other industries) constitutes "operating" each oil refinery in the

country—contrary to controlling precedent.  Exxon misinterprets the controlling legal standard

for operator liability and inaccurately characterizes the historical record.

### A.      Bestfoods, Not FMC, Is The Controlling Standard For Operator Liability.

As explained in the United States' Motion, the Supreme Court articulated the standard for

operator liability in United States v. Bestfoods:

> [U]nder CERCLA, an operator is simply someone who directs the workings of,
> manages, or conducts the affairs of a facility.  To sharpen the definition for
> purposes of CERCLA's concern with environmental contamination, an operator
> must manage, direct, or conduct operations specifically related to pollution, that
> is, operations having to do with the leakage or disposal of hazardous waste, or
> decisions about compliance with environmental regulations.

524 U.S. 51, 66-67 (1998).  While acknowledging Bestfoods as a "well-established CERCLA

authorit[y]," Exxon inexplicably asks this Court to apply factors considered by the Third Circuit

in its 1994 decision on operator liability in FMC Corp. v. United States Department of

Commerce, 29 F.3d 833 (3d Cir. 1994), to the facts of this case.  Exxon Mot. at 24-28.  FMC is

no longer good law.  The Supreme Court in Bestfoods not only rejected the "actual control" test

applied in FMC as improperly "fus[ing] . . . direct and indirect liability," but also created a new

test focused on direct involvement in the running of a specific facility.  See Bestfoods, 524 U.S.

at 67-68; see also Miami-Dade County v. United States, 345 F. Supp. 2d 1319, 1341-42 (S.D.

Fla. 2004) ("[T]he Third Circuit's reasoning in FMC does not assist this Court, because FMC is

inconsistent with <u>Bestfoods</u>.").  But even if the <u>FMC</u> factors were applied to the facts of this case, the United States would not be liable as an operator.

In <u>FMC</u>, the Third Circuit found the United States liable as an operator of a high tenacity rayon facility during WWII where, among other things, the United States required a private factory to convert from making textile rayon to high tenacity rayon, provided the factory with equipment for the conversion, maintained significant control over the production process, and stationed numerous representatives on site.  <u>29 F.3d at 836-37, 843-45</u>.  The "leading indicia of control" that the <u>FMC</u> court considered included whether "the government determined what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold."  <u>Id. at 843</u>.  The court identified these factors from prior case law applying the "actual control" test, under which "a corporation will be liable for the environmental violations of another corporation if there is evidence that it exerted 'substantial control' over the other corporation."  <u>Id.</u> (quoting <u>Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir. 1993)</u>).[22]

<u>FMC</u> is an outlier.  Even before <u>Bestfoods</u>, courts applying the <u>FMC</u> "indicia of control" or a variation on the actual control test generally did not find the United States liable as an operator for exercising its regulatory authority over an industry, even expanded authority during wartime, absent actual, substantial involvement in the running of the operations generating waste.  <u>See, e.g.</u>, <u>United States v. Vertac Chem. Corp., 46 F.3d 803, 809 (8th Cir. 1995)</u> (the United States not liable as an operator for wastes generated by manufacturer of Agent Orange during Vietnam War despite government directives and specifications requiring prioritization

---

[22] Even though <u>FMC</u> did not examine the relationship between two corporate entities, the court adopted its actual control test from a case that did.  Any argument that <u>FMC</u> is controlling after <u>Bestfoods</u>, a case involving two corporate entities, is therefore unpersuasive.

because the United States "was not sufficiently involved, directly or indirectly, in the activities

that took place at" the facility); East Bay Mun. Util. Dist. v. Dep't of Commerce, 948 F. Supp.

78 (D.D.C. 1996), aff'd 142 F.3d 479 (D.C. Cir. 1998) (the United States not liable as an

operator for wastes generated during WWII despite pervasive regulatory involvement at a mine

because of a lack of managerial control over the mine); Maxus Energy Corp. v. United States,

898 F. Supp. 399, 402 (N.D. Tex. 1995) (no operator liability even though federal inspectors

were stationed at facility to ensure compliance with contract specifications and issued directives

to accelerate production), aff'd 95 F.3d 1148 (5th Cir. 1996); Rospatch Jessco Corp. v. Chrysler

Corp., 962 F. Supp. 998 (W.D. Mich. 1995) (United States not liable as operator even though it

provided specifications and on-site quality control inspectors at aircraft engine manufacturing

plant).  In East Bay Municipal Utility District, for example, the court distinguished FMC on the

basis that the United States' regulatory activities were not directed only at the mine at issue but

at the entire industry.  948 F. Supp. at 90.  The United States did not order the mine to produce a

new product or dictate the level of production.  Id.  Rather, the mine was already producing zinc

and then entered into contracts to ensure an adequate supply of zinc to aid the war effort.  Id.

The court also distinguished FMC in that the United States did not influence the mining process,

provide equipment, or control the facility's workforce.  Id.  The court concluded:

> Plaintiff attempts to turn government regulation aimed at an entire industry during
> wartime into a virtual seizure of [a particular facility].  However none of the
> government's involvement rises to the level of day to day government interaction
> with the on-going business of the [facility].

Id.  In affirming the district court's ruling, the D.C. Circuit agreed that such facts did not support

a finding of hands-on managerial control.  142 F.3d at 485-86.

In short, Exxon's attempt to revive FMC by citing a handful of cases in which courts

have considered the FMC factors in analyzing operator claims after Bestfoods, cannot withstand

scrutiny. [23]  Citing FMC, Exxon then pleads that "environmental cleanup costs [a]re a cost to society that the Government should *rightly pay* as a result of wartime conditions."  Exxon Mot. at 29 (emphasis added) (citing FMC, 29 F.3d at 846).  This argument is irrelevant to the legal standard for operator liability.  Which party should "rightly pay" is a question of equity and belongs only in an allocation determination, not a liability analysis.

> ### B. Exxon Has Not Pointed To Any Facts Showing The United States Managed, Directed, Or Conducted The Affairs Of The Refineries.

Under Exxon's theory, the United States operated virtually every oil refinery in the country during both WWII and the Korean War by regulating the allocation of construction and other scarce raw materials.  The historical record and applicable case law do not support such a conclusion.  The United States did not operate the Refineries.

Citing nothing but Mr. Gravel's deposition, Exxon first argues that the United States "fully directed and controlled refinery operations both at individual plants and across the country, and had pervasive control over these refineries during the wartime period, with the goal of forcing and maximizing the production of avgas and other war products to meet our Nation's wartime needs."  Exxon Mot. at 20.  Mr. Gravel's conclusory opinions are inadmissible and should not be considered.  See infra Part VII.  Exxon further argues that "the demands of war

---

[23] Exxon also overstates the courts' reliance on the FMC criteria after Bestfoods.  In Litgo N.J., Inc. v. Martin, for example, the court only cited FMC in its analysis of whether the United States was liable as an operator for regulating the supply of a contaminant and—upon applying FMC— held the United States was not an operator.  See No. 06-2891, 2010 WL 2400388, *25 (D.N.J. June 10, 2010), aff'd in part & vacated in part on other grounds sub nom Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot., 725 F.3d 369 (3d Cir. 2013) ("The United States' regulation of [the contaminant] did not give them control of what Columbia Aircraft would produce, how much it would produce, the manner of operation, the price at which products would be sold, or who they would be sold to").  The court then applied the Bestfoods standard to hold the United States not liable as an operator where, as here, the United States' role "was limited to purchasing aircraft parts from the company and conducting periodic inspections to ensure that the site was maintained in compliance with industry standards."  Id. at *24.

imposed by the Government" made the United States liable as an operator, and increased waste generation at the Refineries due to increased production and the construction of Plancors. Exxon Mot. at 22-23. These factors might be relevant as equitable factors in an allocation analysis but have no bearing on whether the United States "direct[ed] the workings of, manage[d], or conduct[ed] the affairs" of the Refineries during the war years. See Bestfoods, 524 U.S. at 66. As explained in the United States' Motion, courts following Bestfoods have generally held that the United States' procurement activities to support national defense during wartime do not alone give rise to operator liability. See, e.g., U.S. Mot. at 13.

Exxon next argues that the United States' "specific regulatory control over the allocation and use of construction materials directly affected the construction or expansion of waste treatment facilities" at the Refineries. Exxon Mot. at 23. Exxon claims the Petroleum Administration for War ("PAW") "*often* denied ExxonMobil the permission to construct at the company's own expense much-needed improvements. . . ." Exxon Mot. at 27 (emphasis added). Yet, Exxon can point to just *one* example at each refinery: the PAW's 1944 denials of (1) Standard's request to construct a master separator at Baton Rouge and (2) Humble's request to build a temporary acid sludge burning facility at Baytown. See Exxon Mot. at 23-24.[24] The United States' Motion contains a detailed discussion of these two examples and explains why they do not rise to the level of involvement in the day-to-day running of the Refineries under the Bestfoods standard. See U.S. Mot. at 21-28. Simply put, the United States exercised its

---

[24] Exxon cites the deposition of the United States' expert historian, Dr. Jay Brigham, for the proposition that "the Government made decisions regarding the construction and maintenance of the waste units and facilities, decisions regarding the adequacy or inadequacy of the waste units or facilities, and decisions regarding improvements to the waste units or facilities." Exxon Mot. at 23 (citing PF ¶ 99). Exxon inaccurately characterizes Dr. Brigham's testimony; Dr. Brigham actually testified that the United States was involved in *one* type of decision—nationwide allocation of scarce materials during WWII—that only indirectly had an effect on Humble's and Standard's waste processing activities. See U.S. Resp. to Exxon PF ¶ 99.

56

regulatory authority to deny the allocation of steel or other scarce materials for use in two proposed Exxon projects—just as it approved numerous other projects.  See, e.g., U.S. SOF ¶ 276; U.S. Resp. to Exxon PF ¶ 95.  Exxon does not explain how these two examples from 1944 make the United States an operator for the entirety of WWII.  Moreover, Exxon does not point to any facts suggesting the United States had any involvement in waste disposal activities at the Refineries during the Korean War.  See Exxon Mot. at 13; U.S. SOF ¶ 205.

Exxon finally argues that the Refineries were "constantly subject to . . . the threat of seizure."  Exxon Mot. at 26.  The United States does not dispute that it had the authority to seize plants during the wars or that some plants were seized because of labor unrest or management issues affecting production.  See U.S. SOF ¶¶ 28-30; but see U.S. SOF ¶ 28 (noting that the United States had to compensate any plant seized).  But the United States disputes Exxon's characterization of the seizures and that the Baytown and Baton Rouge Refineries actually felt threatened.  See U.S. Opp. Ex. 21, Gravel Dep. Vol. I at 197:11-20, 198:15-199:17, 313:16-314:9, 339:4-22 (Feb. 28, 2013).  The evidence shows that the Refineries were uniquely positioned as two of the largest and most sophisticated oil refineries in the country to be significant producers of avgas; they had no reason to be worried.  See, e.g., U.S. SOF ¶¶ 50-51, 55.  When seizures did occur, they were described as "token" and "on paper."  See U.S. SOF ¶¶ 31-32.  Operator liability cannot reasonably be imposed based on a subjective analysis of whether the Refineries felt "threatened."  See Coeur d'Alene Tribe v. Asarco, Inc., 280 F. Supp. 2d 1094, 1129 (D. Idaho 2003) ("[T]he threat of seizure does not support a finding of liability where such a threat was never triggered.").

In support of its argument that the United States should be held liable as an operator of the Refineries, Exxon cites two cases that it claims are "seminal" from "an 'operator'

perspective." Exxon Mot. at 19.  In the first, United States v. Shell Oil Company, 294 F.3d 1045 (9th Cir. 2002), the Ninth Circuit addressed arranger liability, not operator liability, and therefore has no bearing on Exxon's operator claims.  Moreover, the Ninth Circuit found the United States was *not* liable as an arranger for the disposal of hazardous waste[25] from WWII avgas production despite allocating crude oil and scarce materials and purchasing 100-octane avgas during the war.[26]  Id. at 1054-59.  Thus, the Shell case is not instructive for purposes of this Court's operator liability analysis.

The second, Cadillac Fairview/California, Inc. v. Dow Chemical Company, 299 F.3d 1019 (9th Cir. 2002), concerned the allocation of cleanup costs for former U.S.-owned rubber plants.  The Ninth Circuit's decision upholding the trial court's allocation of 100 percent of cleanup costs to the United States remains an outlier and does not, contrary to Exxon's implication, address operator liability.  Rather, although the district court held the United States liable as an operator in 1997 (before Bestfoods was decided), the issue was not analyzed by the Ninth Circuit on appeal.  See Cadillac Fairview/Cal. Inc. v. Dow Chem. Co., No. 83-8034 MRP (Bx) & 83-7996 MRP (Bx), 1997 WL 149196 (C.D. Cal. Feb. 21, 1997).  The facts of that case are also distinguishable from the facts here.  The WWII styrene plant at issue in Cadillac Fairview was owned by the United States and operated by the Dow Chemical Company pursuant

---

[25] The disposed wastes included spent alkylation acid and acid sludge, which Exxon claims the PAW prevented it from properly disposing of at Baytown.  See, e.g., Exxon Mot. at 24.  As explained in the United States' Motion, the PAW denied Exxon's request to build an acid burning facility because the steel and other construction materials could not be spared from higher priority war-related projects.  See U.S. Mot. at 22-24.

[26] The Ninth Circuit did affirm the district court's allocation to the United States of 100 percent of the cleanup costs for a small portion of wastes at the site known as the "benzol" wastes.  Id. at 1060-61.  But the United States had conceded that it was an arranger as to the benzol wastes; the court did not make a liability determination.  Id. at 1048, 1060.  And the benzol wastes were generated when Shell manufactured benzol for the United States pursuant to a contract independent of the avgas program.  See United States v. Shell Oil Co., 13 F. Supp. 2d 1018, 1023 (C.D. Cal. 1998).

to a contract.  299 F.3d at 1022.  Furthermore, in contrast to the Plancor contracts in this case, the contract governing Dow's operation of the styrene plant expressly provided that the United States assumed "the expense and risk" of the operations.  Id. at 1022-23.  Exxon's Refineries, on the other hand, were at all times owned and operated by Exxon and its predecessors.  U.S. SOF ¶¶ 1-2, 5-6, 9; Exxon PF ¶¶ 1-2, 4-5.  The United States entered into supply contracts for the purchase of 100-octane avgas and other war products manufactured at the Refineries, but these contracts did not provide for the operation of the Refineries.  See, e.g., U.S. SOF ¶¶ 61, 67.  In short, Cadillac Fairview simply has no bearing on any analysis concerning operation of the Refineries.

## C.   Even If FMC Were Good Law, The United States Would Not Be An Operator.

Even applying the indicia of control test set forth in FMC ("determin[ing] what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold"), see Exxon Mot. at 25, the United States would not be an "operator" of the Refineries.

In contrast to the complete revamping of FMC's production from one product to another, both Refineries already had the technology in place to produce avgas before WWII.  U.S. SOF ¶ 60.  Humble voluntarily developed the process and even started selling avgas commercially as early as 1939.  U.S. SOF ¶¶ 52-55.  Both Humble and Standard negotiated and entered into supply contracts to produce 100-octane avgas to the United States.  U.S. SOF ¶¶ 61, 64-65, 67.  In the contracts, the companies agreed to produce the quantities of avgas specified at the prices specified.  U.S. SOF ¶¶ 65, 74, 80.  To be sure, the PAW sometimes issued nationwide directives seeking readjustment of production levels as WWII progressed.  See, e.g., U.S. Resp. to Exxon PF ¶ 34.  But Exxon's claim that "the Government could 'cut off' [Exxon's] crude supply and

put the company out of business in a 'heartbeat'" is unfounded (and unsupported by any citation).  See Exxon Mot. at 26.  In fact, the 100-octane avgas contracts allowed price increases, and the United States assisted the oil industry in the event of unforeseen expenses or difficulties in many ways.  See, e.g., U.S. SOF ¶¶ 33-34, 75-78.  Moreover, it is undisputed that Humble and Standard made a profit on their sales of avgas to the United States, even if it was only a "modest 6%" according to Exxon.[27]  See Exxon Mot. at 28; U.S. SOF ¶ 86.

Courts applying the FMC factors have not found the United States liable as an operator of facilities producing war products even where the United States was more involved in the terms of production than in this case.  In Maxus Energy Corp., for example, the U.S. District Court for the Northern District of Texas held that the United States was not the operator of an Agent Orange manufacturing facility during the Vietnam war even where the United States issued directives to "accelerate delivery" of the product, "specified the manner in which the product was to be identified and shipped, and specified what information was or was not to be placed on the Agent Orange drums."  898 F. Supp. at 402-03.  The court rejected the argument that the United States had "effectively seized" the facility, finding that "the United States simply exercised its wartime powers to assist [the manufacturer] in obtaining the necessary raw materials and equipment needed for the plant's expansion."  Id. at 408.  The court in East Bay Municipal Utility District also declined to hold the United States liable as an operator for unilaterally setting the price it would pay for mined zinc, finding that such price controls were applicable to the entire mining industry and not targeted at any particular company.  948 F. Supp. at 90; compare Coeur d'Alene Tribe, 280 F. Supp. 2d at 1127-28 (post-Bestfoods case finding no operator liability even where United States set product prices through premium price plans and

---

[27] Price controls were deemed necessary across all industries in light of the extreme inflation and profiteering that characterized World War I.  See U.S. SOF ¶ 40.

quota system because "both sides understood that the time and demand did not allow for the typical arms length transaction and negotiation that would normally go on between business entities").  Accordingly, while <u>FMC</u> is no longer good law, even applying its "indicia of control," the United States would not be an operator of the Baytown and Baton Rouge Refineries.

## VI.   THE UNITED STATES DID NOT OPERATE THE PLANCORS

As discussed, the United States concedes that it is a "covered person" with respect to the Plancors and BOW as their prior owner.  Accordingly, this Court need not decide whether the United States also operated those plants during the period of U.S. ownership.  Exxon nonetheless points to government inspectors at the plants, price setting, and the United States' nationwide allocation and prioritization of raw materials to argue that the United States should be liable as an operator of the Plancors.  <u>See</u> Exxon Mot. at 30-32.  Exxon claims that these facts make "[t]his case . . . identical to the situation in both *FMC* and prior instances where the Government controlled the operations of other Government-owned synthetic rubber plants."  Exxon Mot. at 29 (citing <u>Cadillac Fairview, 299 F.3d at 1023-25</u>).  This case is far from "identical" to <u>Cadillac Fairview</u> (and <u>FMC</u> if it were still good law).  And under the applicable <u>Bestfoods</u> standard, the evidence shows that the United States did not operate the Plancors or BOW.

Humble and Standard designed and constructed the BOW and all but one of the Plancors[28] at Baytown and Baton Rouge pursuant to lease agreements with the DPC.  U.S. SOF ¶¶ 87-88, 90-91, 94-95, 102-03, 114, 122, 135-36, 141-42, 146-47, 153-54, 158-59, 165-66.[29]

---

[28] The remaining Plancor was Plancor 877, the styrene plant at Baytown, which was designed, constructed, and operated by the Goodyear Tire Company.  U.S. SOF ¶ 133.

[29] Standard had even started building the facilities that became Plancors 572 and 1868 before entering into its agreement with the United States to complete the construction.  <u>See</u> U.S. SOF ¶¶ 140, 163.

Humble and Standard voluntarily entered into contracts to operate these plants.  See U.S. SOF

¶¶ 92, 96, 98, 106, 118, 123-25, 137, 143, 149, 155, 160.  The operating contracts recognized

that the United States would have no role in operations.  For example, the Operating Contract for

Plancor 1909 stated "[i]n the operation and maintenance of the Plant, in the processing of the raw

feed stocks therein, and in the performance of all other services hereunder . . . Humble shall act

as an independent contractor, it being understood that [DSC] *shall not have the right to direct the*

*details of such operation* but is interested only in the results obtained therefrom."  U.S. SOF

¶ 109 (emphasis added); see also U.S. SOF ¶ 124 (provision in BOW contract stated "[Humble]

shall, acting as an independent contractor, proceed to operate [the BOW] for the production of

toluol in the quantity set forth in this article").

　　　Exxon first argues that the United States "stationed permanent Government personnel at

many of these Government-owned plants to direct and oversee plant operations and conduct

plant inspections."  Exxon Mot. at 30.  Exxon's assertion that United States personnel were

stationed on a "permanent" basis at "many" of the Plancors is unfounded.  Exxon does not cite

any examples of United States personnel being stationed at any Plancor at Baton Rouge for any

period of time, let alone permanently.  And the only examples Exxon cites pertaining to Baytown

are documents concerning staff stationed at the BOW, Exxon PF ¶¶ 227-31, and a single

document authored by a U.S. engineer working out of an office "at Baytown" (the document

says Plancor 1082) who refers to having been there for "weeks," Exxon PF ¶¶ 232-33.  See

Exxon Mot. at 30-31.  The United States acknowledges that various Army personnel were

stationed at the BOW—while Humble operated it.  But their main concern was plant protection,

contract compliance, and administrative personnel and wage issues; there is nothing in the

historical record to support an inference that any Army personnel were involved in production or

waste disposal operations at the BOW.  U.S. SOF ¶¶ 189-94.  In the single document regarding

Plancor 1082, the U.S. engineer did not consult with Humble as to waste disposal or direct

operations; he merely indicated frustration with observing Humble employees leaving work early

(a reasonable concern given that the United States was paying Humble to operate the BOW) and

requested that Humble management fix the problem.  A2237.  Courts have repeatedly held that

the presence of inspectors, even those stationed at the facility, does not give rise to operator

liability.  See Miami-Dade County, 345 F. Supp. 2d at 1343 (no operator liability would result

from government personnel actually stationed at plant, as they "had no objective, duty, or

responsibility other than to enforce the price, schedule, and other contract provisions by ensuring

the delivery of quality products in accordance with the terms of the contract . . . ."); see also

Steadfast Ins. Co. v. United States, No. CV 06-4686 AHM (RZx), 2009 WL 3785565, *8 (C.D.

Cal. Nov. 10, 2009) ("[I]nspectors were only at the Site to monitor . . . contractual performance

and to ensure that the products . . . manufactured met USA's specifications."); Maxus Energy

Corp., 898 F. Supp. at 402 (same); Litgo N.J., Inc., 2010 WL 2400388 at *24 (same).

　　　　Exxon next reiterates arguments that it made with respect to the Refineries—namely that

the United States "exercised stringent controls over the supply of raw materials and the

allocation and use of equipment, supplies, and construction materials" and "controlled the

pricing and the marketplace for the war products" manufactured at the Plancors and BOW.

Exxon Mot. at 31.  In support, Exxon cites nothing but Mr. Gravel's declaration which, as

explained infra Part VII, does not contain admissible evidence.  Moreover, Exxon again does not

establish actual participation by the United States in waste disposal design or in day-to-day

operational matters, but instead focuses on the United States' role in deciding whether to allocate

steel or other scarce materials for use in proposed Exxon projects.  This activity does not give

rise to operator liability.  See, e.g., Litgo N.J., 2010 WL 2400388 at *25 (holding that the United

States' regulation of the distribution of an important chemical during WWII did not make the

United States an "operator" of an aircraft manufacturing plant contaminated by the chemical);

Steadfast, 2009 WL 3785565 at *7 (holding that the united States was not an operator where the

company chose the manner of waste disposal and there was no evidence "that [the company] was

required to obtain permission from USA or report the amount of waste it was burning at the

Site").  Nor does Exxon explain how the United States' setting the price for products made by

Exxon at the United States' own plants gives rise to operator liability.  Certainly, nothing in the

Bestfoods standard encompasses such activity.  Indeed, courts have declined to hold the United

States liable as an operator based on similar pricing and market regulation.  See, e.g., Coeur

d'Alene Tribe, 280 F. Supp. 2d at 1127-28 (finding no operator liability even where United

States set product prices through premium price plans and quota system).

Exxon finally claims that the United States "was directly involved in waste control

decisions" at the Plancors.  Exxon Mot. at 31.  In support, Exxon asserts that it was "widely

acknowledged" that "many" plancors "were constructed with inadequate waste treatment

facilities *at the Government's direction* . . . ."  Exxon Mot. at 31 (emphasis in original).  The

United States disputes Exxon's characterization of the evidence used to support its argument.

E.g., U.S. Resp. to Exxon PF ¶¶ 217, 220-21, 223-24.  The adequacy of Plancor waste treatment

systems and the United States' involvement in waste control decisions are really two separate

issues, and only the latter would have any bearing on an operator analysis.  See Bestfoods, 524

U.S. at 66-67.  Relevant to both issues, though, is that Humble and Standard—not the United

States—designed and constructed the Plancors and BOW.  See supra p. 61.  As owner of the

plants, the United States had approval authority, but there is no evidence that it was ever directly

involved in designing waste disposal systems at any of the Plancors.  See U.S. SOF ¶¶ 127, 187, 200-01.  Moreover, Exxon cites three instances in the late 1940s (in between WWII and the Korean War) and in 1952 where Humble and Standard requested—and received—permission to install waste treatment facilities that the companies had designed.  See Exxon PF ¶¶ 222-23, 225.  Thus, to the extent the waste disposal systems were inadequate, the inadequacy was the responsibility of Humble and Standard.

The Cadillac Fairview appellate decision cited by Exxon, as explained, did not address operator liability.  Rather, the district court had held the United States liable as an operator (before Bestfoods was decided), and operator liability was not raised on appeal.  See Cadillac Fairview/Cal. Inc., 1997 WL 149196.  Even so, different facts are present here.  In Cadillac Fairview, the court found that the United States "participated in the decision about how to dispose of the sulfur tars . . . and decided that disposal in pits was the best way to do it."  299 F.3d at 1023.  The court also found that Government inspectors "studied" the sludge pits at issue and approved them.  Id.  As shown, Exxon has not pointed to any comparable facts suggesting that the United States participated in the waste disposal decision making process other than by simply adopting what Humble or Standard recommended.  Also, in contrast to the contracts governing the Plancors in this case, the contract governing Dow's operation of the styrene plant provided that the United States assumed "the expense and risk" of the operations.  Id. at 1022-23.  The Ninth Circuit relied heavily on these contract provisions in upholding the trial court's allocation.  Id. at 1025-27.  While indemnification agreements may be a consideration in an equitable allocation, they do not factor into an operator liability analysis.  See Bestfoods, 524 U.S. at 66-67.  Thus, the Ninth Circuit's decision in Cadillac Fairview is not instructive in this Court's operator analysis.

**VII.    EXXON'S PROFFERED EXPERT A.J. GRAVEL IS NOT QUALIFIED TO RENDER OPINIONS IN SUPPORT OF EXXON'S MOTION**

In deciding Exxon's Motion, the Court should not consider the opinions of Exxon's proffered historian, A.J. Gravel, because his testimony is inadmissible under the Federal Rules of Evidence.  Mr. Gravel purports to offer "an analysis of the historical record" and "opinions regarding the Federal government's involvement" at the Sites, Exxon Mot. at Ex. 1 ¶ 3, but he is not "qualified as an expert [historian] by knowledge, skill, experience, training, or education" and will not "help the trier of fact to understand the evidence or to determine a fact in issue."[30] Fed. R. Evid. 702.

Mr. Gravel has a Bachelor's degree in Health Sciences and a Master's degree in International Business Management.  Exxon Mot. at Ex. 1, Attach. 1.  He did not take any classes in American history, forensic history, government procurement policies, or any aspects of WWII.  U.S. Opp. Ex. 21, Gravel Dep. Vol. I at 17:19-18:20.  He did not author any research papers on the role of the United States during WWII in college or graduate school, or serve as a research assistant for a history professor.  Id. at 21:15-22:14.  He has not published any articles in peer-reviewed journals, see Gravel Rep., and has not attended any lectures, seminars, or conferences examining the role of the United States during the Korean War, see U.S. Opp. Ex. 21, Gravel Dep. Vol. I at 26:3-6.  He has spoken at CLE events for lawyers and made presentations to law firms, but those speaking engagements focused on "research and how the research methodology takes place"—not the substantive history of WWII and the Korean War. U.S. Opp. Ex. 21, Gravel Dep. Vol. I at 27:20-28:14.  In short, Mr. Gravel lacks the training and education that an expert historian must have to be qualified to offer opinion testimony, particularly testimony on the United States' involvement during WWII and the Korean War.

---

[30] The United States plans to file a separate Daubert motion.

See, e.g., Walden v. City of Chicago, 755 F. Supp. 2d 942, 948-51 (N.D. Ill. 2010) (finding history PhD candidate with a Master's degree in history and undergraduate degree in anthropology qualified to testify as expert historian because of his undergraduate and graduate degrees, his experience as teaching assistant and instructor, and his research and writing on related topics); Gill v. Arab Bank, Plc., 893 F. Supp. 2d 523, 542 (E.D.N.Y. 2012) (finding historian with a Master's degree in history qualified to testify as expert because his "background and professional experience qualify as 'specialized knowledge' gained through 'experience, training, or education'" and because he authored books that were "the products of extensive study of [the topic] through research of news and academic articles").

Because Mr. Gravel lacks training and education in history, he will not be able to assist the Court in understanding the context of the WWII and Korean War time periods.  See, e.g., United States v. Newmont USA Ltd., Case No. CV-05-020-JLQ, 2007 WL 4856859 (E.D. Wash. Nov. 16, 2007) (explaining that historian's training and education were what made his opinions on context of historical events helpful to the court).  In Newmont USA, the court explained:

> This case demands the evaluation of events which occurred decades ago. The fact-finder must necessarily rely on the testimonial narratives of other people . . . Historians are trained to recover "facts" and, through selecting certain facts from the universe of available facts, construct narratives that explain a historical issue. Through the application of his expertise as a historian Dr. Quivik may be able to assist the court. . . .

Id. at *3.  Mr. Gravel lacks the requisite academic training to construct such a narrative and therefore cannot assist this Court in understanding the historical documents.  For example, in his declaration, Mr. Gravel states

> [t]he nation's industries were well aware of the implications of the President's seizure powers, as they were much publicized in 1940 as Congress debated passage of the Selective Service and Training Act.  The national press commonly referred to these powers as "drafting" industry for war work.  It was clear that any threat to maximum production of war products, whether arising from labor unrest

> or from management's refusal to accept war orders, could result in the Federal
> government's seizure of one or more of a company's plants.

Exxon Mot. at Ex. 1 ¶ 7.  Mr. Gravel is not in a position to opine that industry during WWII

"was aware of the implications of the President's seizure power" or "that any threat to maximum

production of war products" could result in seizure due to his lack of academic coursework,

research, and publications concerning American history and WWII in particular.  See U.S. Opp.

Ex. 21, Gravel Dep. Vol. I at 197:11-20, 198:15-199:17, 313:16-314:9, 339:4-22.  He also does

not cite any documents to support his opinions.  The only document cited by Exxon on this

subject was a single Business Week article dated December 25, 1943, in which the author

reported that 17 plants—none of which were oil refineries—were seized due to labor strikes or

management problems.  See Exxon PF ¶ 66 (citing A0369-71).  To the extent that document

provides any support for Exxon's contention that the oil industry felt threatened by seizures, Mr.

Gravel cannot provide any additional historical context to assist the Court beyond what the

document says.  Thus, his opinions are inadmissible.  See Highland Capital Mgmt., L.P. v.

Schneider, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (excluding expert's testimony where it

"simply rehash[ed] otherwise admissible evidence" and "include[d] [his] own speculation

regarding the state of mind and motivations of certain parties who were involved in the relevant

transaction, often without citation to any record evidence").  In short, this Court should not

consider Mr. Gravel's proffered opinions in deciding the parties' motions for summary

judgment.[31]

---

[31] Similarly, the Court should view the three "expert" declarations attached to Exxon's Motion
with appropriate skepticism.  Each declarant claims to have "personal knowledge of the facts set
forth in [his] declaration" and to be "competent to testify to them if necessary," Exxon Mot. at
Exs. 1 ¶ 1, 2 ¶ 1, 4 ¶ 1, yet none actually have "personal knowledge" of the WWII or Korean
War era events to which they refer.  Thus, the United States objects to Exxon's reliance on these
declarations to support statements of fact.  Exxon also relies on several of its proffered experts'
reports, all of which are attached to expert declarations, but none incorporated by reference into

## VIII.   THE COURT SHOULD NOT ADOPT EXXON'S ALLOCATION METHODOLOGY

Finally, Exxon asks the Court to adopt Mr. White's "production-based" allocation methodology.  Exxon Mot. at 47.  This request has no place in a summary judgment motion because, rather than resting on undisputed fact, it rests on one expert's opinion of the proper equitable lens through which to view particular facts, and indeed his opinion of what facts are relevant.  Exxon is effectively asking the Court to adopt Mr. White's judgments about the implications of certain facts, about what is equitable, and about how to make the calculations that flow from those judgments—and to do so without having heard the opinion of the United States' expert on CERCLA allocation, Matt Low, as to other ways the Court could balance the equities in this case.

Moreover, flaws in Mr. White's methodology should preclude the Court from adopting it at any time.  Mr. White's methodology is not based solely on production volumes, but rather, as Mr. Low explains, encompasses a series of contested adjustments that produces a very large allocation to the United States, despite there being no dispute that:  (1) the Refineries have been

---

the declarations.  While the Court previously indicated that it "will consider the expert reports in conjunction with the summary judgment motion," see ECF Nos. 86 (Baytown) & 35 (Baton Rouge), Exxon's expert reports—all unsworn—would constitute inadmissible hearsay at trial and thus do not constitute competent summary judgment evidence.  See Provident Life & Accident Ins. Co. v. Goel, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment.") (alteration in original) (citation omitted); Highland Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n, No. 3:10-CV-1632, 2013 WL 4502789, at *5-10 (N.D. Tex. Aug. 23, 2013) (declining to consider plaintiff's unsworn expert reports in ruling on summary judgment motion because they "fall outside the scope of competent summary judgment-type evidence"); see also Home Pro Constr. Co., Inc. v. Hoelscher Weatherstrip Mfg. Co., Inc., No. H-11-4440, 2013 WL 6491189, at *7 (S.D. Tex. Dec. 10, 2013) ("An expert may rely on materials that are hearsay to form the basis of his opinion, but only the expert's opinion, not the hearsay evidence or report, is admitted into evidence.").  Accordingly, where Exxon's Motion cites an expert report as the basis for a statement, such statement should be deemed unsupported.

operated more or less continuously for nearly a century, while pertinent federal involvement—
even by Exxon's reckoning—covers at most approximately 10-15 percent of that period; and (2)
production volumes significantly increased in the post-war period, suggesting that a production
volume approach would yield a smaller share for the United States than a straight time-of-
involvement approach.  Low Decl. ¶ 19.

For example, for Baytown, Mr. White makes a very large reduction—97 percent or
more—in the crude capacity (effectively his production figures) he assigns to each year after
1959 on the basis of a series of unfounded conclusions:  *first*, that there was a 70 percent
reduction in separator sludge inflows at Baytown, relying on two articles by the same author that
flatly contradict one another regarding whether *any* reduction was actually achieved, id. ¶ 23,
Kittrell Decl. ¶ 9; *second*, that Mr. White can derive a composite sludge reduction figure by
multiplying that 70 percent reduction by an additional 90 percent reduction he attributes to the
installation of pre-separators at Baytown that contemporaneous documents characterized as
recapturing oil that had previously evaporated, Low Decl. ¶¶ 30-31, Kittrell Decl. ¶¶ 10-11;
*third*, that these sludge reductions directly affect the costs associated with excavating
contaminated soil beneath the Baytown oil/water separators, and that the relationship between
sludge reductions and costs is linear (both conclusions being offered without further technical
explanation), Low Decl. ¶¶ 24-27, Kittrell Decl. ¶ 13; and *fourth*, that the composite sludge
reduction calculation may then be used as a fair surrogate for contamination throughout the
Baytown Refinery, much of which had no meaningful connection to the plant wastewater
system, Low Decl. ¶¶ 31-32.  As to Baton Rouge, Mr. White assumes that a projected reduction
in slop oil at Baton Rouge during the 1950's (61 percent) can be applied to all other waste
streams to conclude they too were similarly reduced during the same period, and that those

reductions are directly and linearly related to Exxon's response costs, id. ¶ 33, Kittrell Decl.

¶ 12; and that an additional reduction should be applied plant-wide based on a predicted 98

percent reduction of oil in Baton Rouge effluent, and that this factor may be multiplied by the

slop oil factor (again, without explanation).  The net result for Baton Rouge is that less than one

percent of refinery throughput is actually accounted for in Mr. White's allocation after 1972,

Low Decl. ¶¶ 34-35.  Nor does Mr. White ever explain his selection of different waste reduction

factors at Baytown and Baton Rouge.

Even this cursory examination of his methodology suggests a multitude of difficulties—

difficulties that could be made even clearer to the Court through the cross-examination of Mr.

White at trial.  Mr. White makes adjustments based on contradictory evidence and applies the

results to multiple units to which they have no relationship.  He does not establish the relevance

of his multipliers to the wastes and costs in question, and then combines them to produce

implausible reductions in refinery waste load—without any meaningful attempt to relate them to

actual conditions on the refinery properties.  See, e.g., id. ¶ 21 (Baytown: "this means that

Exxon's methodology effectively assumes that the impact on all of the response costs of a barrel

of crude oil processed at Baytown in 1944 is over 33 times greater than the impact of a barrel of

crude processed in any year after 1959"); id. ¶ 35 (Baton Rouge: "if crude throughput in 1972

was 100 million barrels, the amount counted for allocation purposes would be 780,000 barrels").

Yet another major difficulty with Exxon's proposed allocation is the assumption that the

entire crude stream processed at the Refineries during WWII is attributable to the production of

aviation gasoline, known as "avgas" (or at least "war products").  See Exxon Mot. at 52

(Exxon's allocation "reflects the fact that both refineries were directly and essentially one

hundred percent committed during the wartime period to the production of avgas and other war

products"). In fact, they were not. First, oil refineries have for a very long time produced a mix of products from any given barrel of oil, and items Exxon would now label as mere byproducts were in fact important products, as confirmed by Exxon's own environmental engineer. U.S. Opp. Ex. 30, Johnson Dep. Vol. II at 358:12-59:23 (May 2, 2013) ("[A]s far as I know, there was never a time … during the war that you just threw … whatever's left from making gasoline and threw it away"). Second, using the term "byproduct" for every item made from a barrel of gasoline that is not the "primary" product—as Exxon would have it—does not mean that the other products were not valuable, or that they were not regularly sold for profit before, during, and after WWII. Mr. Johnson readily acknowledged this reality:

> Q. Did the – thinking of the late 1960s period, some of those products you mentioned besides gasoline, did the company at that point consider them byproducts?
>
> A. You know byproducts is a – is a tricky term. And in my definition a byproduct is anything that's not your main product from that particular unit. So it's not to say that they're useless, they're used somewhere else. So what was a byproduct for one unit may be – is a primary feed for another unit.
>
> Q. So byproducts generally would still have some use?
>
> A. Absolutely.
>
> Q. And – and generally would have some commercial value?
>
> A. Yes.

Id. at 360. More importantly, the avgas contracts recognized that Exxon's predecessors would manufacture and sell any number of products for their own account even as they ramped up their avgas manufacturing. For example, an April 1943 contract between Humble and the DSC set a price for avgas from the Baytown Refinery, and then provided for a series of price escalators. U.S. Opp. Ex. 28, BAYHIS-00010207. Potential grounds for price adjustments under the contracts included changes in crude prices, transportation costs, and labor costs, as well as

reduction in the demand for motor fuel and other non-avgas petroleum products.  Also included

is the following statement:

> The prices hereinabove set forth are based upon . . . *a normal operation of said refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold* in connection with the production of 100 octane aviation gasoline. . . . if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of the refinery at which the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased . . . Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline from the refinery so affected will . . . be reduced in an amount sufficient in the judgement [sic] of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for the 100 octane aviation gasoline by an amount sufficient to offset such increased cost.

U.S. SOF ¶ 67 (citing BAYHIS-00010208-09) (emphasis added).  This language demonstrates

that the price of avgas was set based on the contracting parties' mutual assumption that the

Baytown Refinery would continue to make *and sell* a routine mix of other products for its own

account, and if it could not do so, Exxon could ask for a higher price and, if necessary, seek it

through arbitration.  Id.

Finally, contemporaneous records establish that, during the war years, the Refineries' non

war-related production was dominant, that avgas accounted for only a small portion of overall

production (approximately 15 percent at Baytown), and that all items Exxon now designates as

war products accounted for 20 percent to 40 percent of overall production during that period.

Exxon, therefore, is effectively asking the Court to allocate to the United States the present-day

impacts of ordinary commercial production that operated in much the same manner before,

during, and after the periods of federal involvement.

These two problems, alone, are sufficient to suggest that Mr. White's work, however sophisticated it may appear, does not "do equity" in any real sense.  But they are by no means the only difficulties with his approach.  For example, contrary to the evidence, Mr. White's methodology assigns almost the entire "operator" share to the United States for the war years, assuming that, despite having entered into contracts to "operate" the Plancors for the United States, Exxon was not operating its own Refineries at the time.  In addition, Mr. White allocates, at counsel's instruction, a 100 percent share of WWII production to the United States based on a claimed indemnity agreement that has been firmly rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  Shell Oil Co. v. United States, 108 Fed. Cl. 422 (Fed. Ct. 2013); see Exxon Mot. at Ex. 4, Attach. 2 ("White Rep.") at 20 ("I have been asked, at the direction of counsel . . .").  A final example of the problematic nature of Mr. White's work is his overvaluing of the impact of government purchasing on the Refineries during the Korean War.  Low Decl. ¶ 42 (indicating that Exxon allocates 100 percent of refinery production to the United States although production of avgas for the Korean War effort amounted to approximately one percent of total refinery output).

These above weaknesses in Mr. White's approach should compel the Court to reject Exxon's premature proffer of his allocation methodology.

## CONCLUSION

For the foregoing reasons, Exxon's Motion should be denied.

74

Dated:  December 20, 2013          Respectfully submitted,

ROBERT G. DREHER

Acting Assistant Attorney General
Environment & Natural Resources Division

By:   /s/ Brian H. Lynk
       Michael D. Rowe (Attorney-in-Charge)
       Brian H. Lynk
       T. Monique Peoples
       Stephanie Talbert
       Erica M. Zilioli
       United States Department of Justice
       Environmental Defense Section
       P.O. Box 7611
       Washington, D.C.  20044
       Tel.:  202.514.3144
       Fax:  202.514.8865

*Attorneys for Defendant United States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 20, 2013, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the Electronic Case Filing System of this Court, which will send notification of such filing to the attorneys of record who have registered ECF email addresses with this Court.

/s/ Brian H. Lynk