**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

_____

EXXON MOBIL CORPORATION,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　)
　　　　　　v.　　　　　　　　　　　　　)　　　4:10-CV-02386 (LHR)
　　　　　　　　　　　　　　　　　　　)　　　4:11-CV-01814 (LHR)
UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　　)
_____)

**UNITED STATES' RESPONSES TO PLAINTIFF'S PROPOSED
<u>FINDINGS OF MATERIAL FACT</u>**

Robert G. Dreher
Acting Assistant Attorney General
Environment and Natural Resources
Division

Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie J. Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044
Tel.:  202.514.3144
Email:  michael.rowe@usdoj.gov

KENNETH MAGIDSON
UNITED STATES ATTORNEY

Samuel G. Longoria
Assistant United States Attorney
Texas Bar Number: 12545500
1000 Louisiana, Suite 2300
Houston, TX 77002
(713) 567-9514
Email: sam.longoria@usdoj.gov
Counsel for Defendant the United States

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant the United States of America responds as follows to the "Proposed Findings of Undisputed Material Fact" submitted by Plaintiff Exxon Mobil Corporation ("ExxonMobil") on September 30, 2013.  See ECF No. 102-1 in Case No. 4:10-CV-02386, and ECF No. 51-1 in Case No. 4:11-CV-01814.  Where the United States identifies a particular "Proposed Finding" ("Exxon PF") as "disputed" or "partially disputed," the United States has:  (1) summarized the grounds supporting the dispute; (2) made reference to a sworn affidavit or a pertinent section of its memorandum of points and authorities that does so; and/or (3) made reference to pertinent paragraphs of the United States' Consolidated Statement of Undisputed Facts ("U.S. SOF"), or to other enumerated Responses within this filing, that show the basis for the dispute.  See ECF No. 103-2 in Case No. 4:10-CV-10-2386, and ECF No. 52-2 in Case No. 4:11-CV-01814.  The two sworn affidavits cited by the United States are the Declaration of Dr. James R. Kittrell (Dec. 20, 2013) and the Declaration of Matthew A. Low (Dec. 20, 2013), both of which are included in the United States' electronic filing with the Court.

In addition, the United States has identified or incorporated by reference below the documents supporting each "dispute" or "partial dispute," which may include:  (a) the aforementioned sworn affidavits; (b) documents submitted with the United States' Consolidated Statement of Undisputed Facts, in which instances the citation below generally identifies the applicable U.S. SOF where the document originally was cited; (c) documents submitted by Exxon with its Proposed Findings, in which instances Exxon's Appendix number for the document ("A#") is given below; and/or (d) other documents that the United States has cited in either in its Responses to Proposed Findings or its Memorandum in Opposition, and is submitting today by CD-Rom as explained in a contemporaneous "Notice of Conventional

Filing."  The documents in the last group are referred to with the designation, "U.S. Opp. Ex,"

and are listed in Part One below.

Finally, certain of Exxon's Proposed Findings constitute legal argument rather than

genuine statements of material "fact" and thus do not necessitate a responsive citation to

documents; the United States has noted such instances below.

### PART ONE:  United States' Exhibits in Opposition to Exxon's Motion for Partial Summary Judgment ("U.S. Opp. Ex.")

1.  Mr. Matthew A. Low's August 2012 Expert Report

2.  Mr. Low's November 2012 Expert Rebuttal Report

3.  Mr. Low's errata sheets for August 2012 Expert Report

4.  Dr. James R. Kittrell's August 2012 Expert Report

5.  Dr. Kittrell's November 2012 Expert Rebuttal Report

6.  Corrected pages for Dr. Kittrell's August and November 2012 Expert Reports

7.  MAA_EM-000213-17

8.  BAYHIS-00023290

9.  BAYHIS-00023014

10. Deposition Transcript of Dr. Jay Brigham, Vol. 2 at 366 to 369

11. BRC-00011620

12. Project approvals cited in response to Exxon PF ¶ 95.

13. US-BT000135

14. BAYHIS00003770-71

15. BAYHIS-00003789

16. BAYHIS-00000797-801

17. US-GEN000706-07

18. BAYHIS-00014042

19. Deposition Transcript of Mr. Jere Johnson, Vol. 1 at 73-74

20. Tolling Agreement between Exxon and the United States dated December 15, 2003.

21. Deposition Transcript of Mr. A.J. Gravel, Vol. 1 at 17-18, 21-22, 26-28, 197-99, 313-14, 339

22. Def.'s Resp. to Pl.'s Request for Admission Nos. 16, 20

23. TPDES Permit No. WQ0000592000 (Baytown Refinery), US-BT015468-15509

24. TPDES Permit No. WQ0001215000 (Chemical Plant), US-BT15510-15531

25. BAYTECH-00045798

26. BAYC-00000658

27. BAYTECH-00027105-10

28. BAYHIS 00010207

29. BAYHIS 00028171, 28185

30. Deposition Transcript of Mr. Jere Johnson, Vol. 2 at 358-60.

**PART TWO:  United States' Numbered Responses to Exxon's Proposed Findings**

The United States has incorporated below the original text of each of Exxon's numbered

Proposed Findings, immediately followed by each United States' Response (in bold).

**I.  The Baytown and Baton Rouge Sites**

1. ExxonMobil currently owns and operates an oil refinery and chemical plant ("Baytown

Facility") in Baytown, Texas which is located 25 miles east of Houston. The Baytown Facility is

adjacent to several surface water bodies, including the Houston Ship Channel, Black Duck Bay,

Mitchell Bay and Scott's Bay (collectively, the Baytown Facility and these adjacent surface

water bodies, the "Baytown Site"). Complaint ⁓ 10 (H-10-2386); Expert Report of AJ. Gravel

(Jun. 18,2012) ("Gravel Rpt.") at 41 (Fig. 4) (Exhibit No.1).

> **Not disputed.**

2. The Baytown Facility commenced operations as an oil refinery ("Baytown refinery") in

approximately. 1920, and at that time Humble Oil & Refining Company ("Humble") - one of

ExxonMobil's predecessor companies - owned and operated the refinery. A0004.

> **Not disputed.**

3. The Baytown Facility remained an oil refinery until the early 1940s when the complex

expanded into a much larger manufacturing facility for the production of war products,

particularly 100-octane aviation gasoline ("avgas"), toluene and synthetic rubber. *See* PF ⁓⁓

134-173 (Government plants at Baytown); Gravel Rpt. at 86 (Table 2 lists refinery conversions,

expansions and new construction during World War II ("WWII"), not including Government

plants).

**PARTIALLY DISPUTED. Exxon's predecessor Humble Oil & Refining Company ("Humble") began developing and installing new technologies at Baytown for the production of high octane avgas and synthetic rubber prior to World War II, beginning in the 1930s. See Consolidated Statement of Undisputed Facts in Support of United States' Motions for Partial Summary Judgment ("U.S. SOF") ¶¶ 52-55, and 57 and the exhibits cited therein. By the start of the war, Exxon's predecessors were already producing or had the capability to produce each of the products they made during WWII. U.S. SOF ¶ 60 and the exhibit cited therein. The United States does not dispute that the Baytown Facility was further expanded during WWII.**

4. ExxonMobil currently owns and operates an oil refinery and chemical plant ("Baton Rouge Facility") in Baton Rouge, Louisiana. The Baton Rouge Facility is adjacent to the Mississippi River and Monte Sano Bayou (collectively, the Baton Rouge Facility and these adjacent surface water bodies, the "Baton Rouge Site"). Complaint ˜ 10 (H-l1-1814); Gravel Rpt. at 138 (Fig. 31).

**Not disputed.**

5. The Baton Rouge Facility commenced operations as an oil refinery ("Baton Rouge refinery") in approximately 1909, and at that time Standard Oil of Louisiana ("Standard Oil") - one of ExxonMobil's predecessor companies - owned and operated the refinery. Complaint ˜ 11 (H-ll-1814).

**Not disputed.**

6. The Baton Rouge Facility remained an oil refinery until the early 1940s when the complex expanded into a much larger manufacturing facility for the production of war products,

particularly avgas and synthetic rubber. *See* PF ˜˜ 174-201 (Government plants); Gravel Rpt at

183 (Table 4 lists refinery conversions, expansions and new construction during WWII, not

including Government plants).

**PARTIALLY DISPUTED.  Exxon's predecessor Standard Oil Company of**

**Louisiana ("Standard") began developing and installing new technologies at Baton Rouge**

**for the production of high octane avgas and synthetic rubber prior to World War II,**

**beginning in the 1930s.  <u>See</u> U.S. SOF ¶¶ 55, 57, and 59, and the exhibits cited therein.  By**

**the start of the war, Exxon's predecessors were already producing or had the capability to**

**produce each of the products they made during WWII.  U.S. SOF ¶ 60 and the exhibit cited**

**therein.  The United States does not dispute that the Baton Rouge facility was further**

**expanded during WWII.**

## II.     Government Authorities/Controls Regarding War Procurement During WWII

### A.     General Government War Procurement Authorities/Controls

7. On September 8, 1939, following Nazi Germany's attack on Poland, President Franklin D.

Roosevelt declared a state of limited national emergency. A0006.

**Not disputed.**

8. During World War I the U.S. Congress enacted the National Defense Act of 1916, Pub. L. No.

64-85, §120, 39 Stat. 166,213 (1916), which remained in effect during WWII, and Section 120 of

this Act authorized the President to "in time of war or when war is imminent, ... in addition to the

present authorized methods of purchase or procurement, to place an order with any [supplier] for

such product or material as may be required." A0055. This authority included the power to seize

plants that did not comply with production orders, and to enforce production under threat of

criminal penalties, but also required that "compensation to be paid to any [private entity] for its products or material ... be fair and just." A0055.

     **Not disputed.**

9. In June 1940 Congress enacted the Selective Training and Service Act of 1940 ("Selective Service Act"), Pub. L. No. 76-783, § 9, 54 Stat. 885 (1940), to further supplement the President's war procurement authorities, and Section 9 of the Selective Service Act granted the President the authority to "take immediate possession of any such plant or plants, and through the appropriate branch, bureau, or department of the Army or Navy to manufacture therein such product or material as may be required, and any individual, firm, company, association, or corporation, or organized manufacturing industry or the responsible head or heads thereof, failing to comply with the provisions of this section shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment for not more than three years and a fine not exceeding $50,000." A0068.

     **PARTIALLY DISPUTED.  The referenced statute was enacted on September 16, 1940, and its stated purpose was not "to further supplement the President's war procurement authorities" as asserted by Exxon.  Rather, it was "to provide for the common defense by increasing the personnel of the armed forces of the United States and providing training."  A0061.**

10. Section 9 of the Selective Service Act further empowered the President to "place an order with any individual, firm, association, company, corporation, or organized manufacturing industry for such product or material as may be required, and which is of the nature and kind usually produced or capable of being produced by such individual, firm, company, association, corporation, or organized manufacturing industry. Compliance with all such orders for products

or material shall be obligatory on any individual, firm, company, association, corporation, or organized manufacturing industry or the responsible head or heads thereof and shall take precedence over all other orders and contracts theretofore placed with such individual, firm, company, association, or organized manufacturing industry ... ". A0068.

**Not disputed.**

11. In 1940 Congress expanded the statutory authorities of the U.S. Reconstruction Finance Corporation ("RFC"), which Congress had created previously as a wholly-owned corporation of the United States, *see* A0075-0082, to empower RFC to create subsidiary corporations to conduct war-related programs "to aid the Government of the United States in its national-defense program." A0085.

**Not disputed.**

12. One of the newly-created subsidiaries of RFC was the U.S. Defense Plant Corporation ("DPC"), which possessed the authority to acquire real property and to finance, own and oversee the design, construction and operation of industrial facilities for the production of war products. A2979-A2980.

**PARTIALLY DISPUTED, to the extent Exxon asserts that the DPC had the authority to "oversee the operation" of industrial facilities.  The cited document makes no reference to oversight of industrial operations and does not support Exxon's statement. See also, e.g., U.S. SOFs 185-88 and the exhibits cited therein.**

13. Another newly-created subsidiary of RFC was the U.S. Defense Supplies Corporation ("DSC"), which possessed the authority to purchase, stockpile and distribute war products for national defense purposes. A2983.

**Not disputed.**

14. Another newly-created subsidiary of RFC was the U.S. Rubber Reserve Company ("RuR"), which possessed the authority to oversee the operation of synthetic rubber plants owned by the DPC for the production of synthetic rubber for national defense purposes. A2976- A2977.

**PARTIALLY DISPUTED, to the extent Exxon asserts that RuR had the authority to "oversee the operation" of synthetic rubber plants. The cited document makes no reference to oversight of industrial operations and does not support Exxon's statement. See also, e.g., US SOFs 185-88 and the exhibits cited therein.**

15. On June 28, 1940 the President designated rubber as a strategic and critical material. A0092.

**Not disputed.**

16. On May 27, 1941, President Roosevelt declared a State of unlimited national emergency. A0099.

**Not disputed.**

17. On December 18, 1941 - less than two weeks after Japan's attack on Pearl Harbor, Congress passed the First War Powers Act of 1941, Pub. L. No. 77-354, § 301, 55 Stat. 838 (1941), that "for the successful prosecution of the war" granted the President broad powers to issue Executive Orders delegating the President's powers and authority to government agencies and corporations in order to facilitate the prosecution of the war. A0101.

**PARTIALLY DISPUTED. The referenced Act does not state that Presidential authority may be delegated to corporations; rather, it states that "the President is hereby**

**authorized to make such redistribution of functions among executive agencies as he may deem necessary," including among "governmental corporations."  A0101.**

18. In January 1942 by issuance of Executive Order 9024 President Roosevelt established the War Production Board ("WPB") in order to "assur[e] the most effective prosecution of war procurement and production" and delegated to it the power to impose mandatory policies and procedures for such production and procurement, including the power to issue mandatory directives concerning "contracting, specifications and construction." Executive Order 9024 further provided that the Chairman of the WPB was authorized to "exercise the powers, authority, and discretion conferred upon him by this Order through such officials or agencies and in such manner as he may determine; and his decisions shall be final." AOI05- AOI06.

        **Not disputed.**

19. A week later by issuance of Executive Order 9040 President Roosevelt empowered WPB with absolute authority over the prioritization and allocation of war products and further delegated to WPB the authority vested in the President by Section 120 of the National Defense Act of 1916, which therefore included the authority to seize privately-owned industrial plants. AO 1 07.

        **PARTIALLY DISPUTED to the extent Exxon refers to "absolute authority," a phrase that does not appear in the cited document.  A0107.**

20. In March 1942 Congress passed the Second War Powers Act, Pub. L. No. 77-507, 56 Stat. 176 (1942), and Section 301 of the Act granted the President priorities powers; specifically, all procurement orders placed by the U.S. Army or Navy had precedence over all deliveries for private account, or for export. Section 301 further provided that whenever the President

determined that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for-private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense. A0111.

**PARTIALLY DISPUTED.  The cited Act does not state categorically and unconditionally that "all procurement orders placed by the U.S. Army or Navy ha[ve] precedence over all deliveries for private account, or for export," as asserted by Exxon, and in fact established several conditions for and exceptions to this priority.  A0111.**

21. In April 1942 by issuance of Executive Order 9125, President Roosevelt delegated to WPB the powers vested in the President by Title III of the Second War Powers Act of 1942, thereby empowering WPB with authority to require a company to produce a good needed for the war effort.  A0121.

**PARTIALLY DISPUTED to the extent Exxon does not accurately characterize the "power of Title II of the Second War Powers Act,"  <u>see</u> Response to Exxon PF ¶ 20, and to the extent Exxon suggests that WBP could require *any* company to produce *any* good needed for the war effort, regardless of whether it had expertise in making that product.**

22. Executive orders are directives by the President of the United States, which may have the force of law when founded on Presidential authority derived from the Constitution or statute. These directives generally govern the actions of officials and agencies of the Federal government. AO 126.

**Not disputed.**

23. The delegation of Presidential powers to various governmental agencies gave such agencies the authority to control industrial production during WWII. AO 156.

**DISPUTED.  The cited document does not state that governmental agencies had "the authority to control industrial production" during WWII.  See also, e.g., U.S. SOF ¶ 36 and the exhibits cited therein (WPB did not participate in industrial operations); U.S. SOF ¶¶ 185-88 and the exhibits cited therein (Plancor operations at Baytown and Baton Rouge controlled by Exxon's predecessors, not the United States);  U.S. SOF ¶¶ 169-84 and the exhibits cited therein (Refinery operations at Baytown and Baton Rouge controlled by Exxon's predecessors, not the United States).**

### B.    Government Authorities/Controls Specifically Directed to the Petroleum Industry and Individual Oil Refineries

24. In 1946 a Government-prepared report titled *"The History of the Petroleum Administration for War,"* stated the following regarding the vital importance of oil to winning WWII and the magnitude of oil production during the war:

> [f]or World War II, from beginning to end, was a war of oil. Almost seven billion barrels of it had to be brought from the ground between December 1941 and August 1945, to meet the requirements of the United States and its Allies, and nearly 6 billion of this enormous total came from the United States. That is *one-fifth of all the oil that had been produced in this country since the birth of the industry in* 1855. A0172.

**Not disputed, except that the quoted document actually refers to "the birth of the industry in 1859 [not 1855]."**

25. While a number of petroleum products became vital war products during WWII, none were more critical to the Allied Forces' victory than avgas; in fact, the Government- prepared report titled *"A History of the Petroleum Administration for War"* stated the following regarding the importance of avgas during WWII:

the superfuel that meant more speed, more power, quicker take-off, longer range, greater maneuverability -- all of the things that meant the victory margin in combat. This was the stuff that carried Doolittle over Tokyo, that winged our fighters over Africa and Europe, that powered our bombers from Midway to Hiroshima. A0180.

**Not disputed that among petroleum products that became vital war products during WWII, none were more critical to the Allied Forces' victory than 100-octane aviation gasoline.**

26. Ralph Davies - PAW's Deputy Petroleum Administrator - stated the following in a hearing before a U.S. Senate Special Committee after WWII: "100-octane is to motor gasoline what the Lincoln is to the Ford. If birds ran on gasoline it would give a hawk the performance of an eagle ... On all counts, 100-octane was the lifeblood of the United Nations in the air." A0235.

**Not disputed.**

27. Geoffrey Lloyd - the British Minister of Fuel and Power - stated the following in regard to the importance of avgas, "I think that without 100-octane we should not have won the Battle of Britain. But we had 100-octane." A0253.

**Not disputed.**

28. However, at the beginning of WWII the Nation's refineries were collectively not equipped for the mass production of avgas required by the United States for use in WWII. In fact, just prior to WWII it was estimated that the Nation's oil refineries could produce only 40,000 barrels of high-octane avgas per day, which was a fraction of the 636,000 barrels of high octane avgas per day that the U.S. military estimated was needed at the height of WWII. A0181.

**Not disputed that in June 1940, the United States' estimated production capacity for 100-octane avgas was 30,000 to 40,000 barrels per day, and that in 1944, the military's estimate of world-wide requirements for 100-octane avgas was 636,000 barrels per day.**

29. In a letter dated May 28, 1941, President Roosevelt stated to then Secretary of the Interior Harold L. Ickes, "[r]ecent significant developments indicate the need of coordinating existing Federal authority of oil and gas and insuring the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program." In the letter President Roosevelt further stated that "[0]ne of the essential requirements of the national defense program . . . is the development and utilization with maximum efficiency of our petroleum resources and facilities, present and future, for making petroleum products available, adequately and continuously, ... ". A0214.

**Not disputed.**

30. In May 1941 President Roosevelt established the Office of Petroleum Coordinator for National Defense ("OPC"), designated Harold L. Ickes as the Petroleum Coordinator for National Defense, and provided it with the authority to issue specific recommendations to the petroleum industry and individual oil refineries regarding necessary actions "to insure the maintenance of a ready and adequate supply of petroleum and petroleum products." A0214.

**Not disputed.**

31. In February 1942 the Chairman of the WPB delegated to OPC the contracting authority for determining the price and technical details of avgas, and delegated to DSC all other contracting authority. A0216-A0218.

**DISPUTED.  The date is incorrect, and the letter does not delegate any authority to OPC or DSC.  A0216-18.**

32. In December 1942 by issuance of Executive Order 9276 President Roosevelt established the Petroleum Administration for War as the successor agency to the OPC (hereinafter collectively with OPC, the "PAW") and a subordinate agency of the WPB. President Roosevelt authorized PAW "to coordinate and centralize the war policies and actions of the Government relating to petroleum with a view toward providing adequate supplies of petroleum for the successful prosecution of the war and for other essential purposes." A0257.

**Not disputed.**

33. Among other things, Executive Order 9276 charged PAW with:

a. establish[ing] basic policies and formulat[ing] plans and programs to assure for the prosecution of the war the conservation and most effective development and utilization of petroleum in the United States ... [and] issu[ing] necessary policy and operating directives to parties engaged in the petroleum industry, and appoint[ing] such general, regional, local, or functional petroleum industry committees or councils as the Administrator finds necessary....

b. [s]erv[ing], as far as practicable, as the liaison and channel of communication between the units of the petroleum industry and the several departments and agencies of the Federal Government on matters directly involving the functions and duties of the [P A W] Administrator ... [and]

d. [s ]ubject to the direction of the [WPB], exercis[ing] the powers, authority, and the discretion conferred upon the [WPB Chairman] by issuing, and taking appropriate action to enforce, such orders or directives to the petroleum industry as the [PAW] Administrator may deem necessary, in order to [ ] provide adequate supplies of petroleum for military, or other essential uses, or [ ] effect the proper distribution of such amounts of materials as the Chairman of the [WPB] may allot for the use of the petroleum industry. A0257-A0258.

**Not disputed.**

34. During WWII PAW issued a series of directives that were published in the *Federal Register* and set forth requirements regarding the production of petroleum products that were to be complied with by specific petroleum refineries and/or the petroleum industry generally. A0219-A0226.

**PARTIALLY DISPUTED to the extent Exxon refers to the issuance of a "recommendation" as synonymous with the issuance of a "directive."  See A0219-22 (listing "recommendations" issued by PAW and its predecessor OPC).  When President Roosevelt established the OPC in May 1941, he authorized it to issue "recommendations," not "directives."  A0214.**

35. Initially, the PAW titled each directive "Recommendation" but in early 1942 began to title each directive "Directive" "as more consistent with their scope and purpose."

**PARTIALLY DISPUTED to the extent Exxon refers to the issuance of a "recommendation" as synonymous with the issuance of a "directive."  See A0219-22 (listing "recommendations" issued by PAW and its predecessor OPC).  When President Roosevelt established the OPC in May 1941, he authorized it to issue "recommendations," not "directives."  A0214.  The first "directive" was not issued until May 1942.  A0222.**

36. On October 2, 1941 , PAW issued Recommendation 8 which increased avgas production by directing oil refineries to "cease to use" various blending components, except for the production of avgas. A0260-A0261.

**PARTIALLY DISPUTED.  The cited document did not "direct" oil refineries, but "recommended" that they cease to use "blending agents of a petroleum origin," "except for the production and manufacture of 100 octane aviation gasoline or such other aviation gasolines as may hereafter be recommended by [OPC]."  A0260-61.**

37. On August 27,1941 the Army and Navy Munitions Board declared avgas to be a critical war material. A0226.

**PARTIALLY DISPUTED.  The cited document does not support the statement. The United States does not dispute that 100 octane avgas was listed as a critical war product as of August 2, 1941.**

38. Two days after Japan's attack on Pearl Harbor on December 9, 1941, PAW issued Recommendation 16 which allowed PAW to control the following:

> ... allocation, exchange, license, pooling, loan, sale, or lease of crude oil, base stocks, blending agents, processes and patents, and production, transportation and refining facilities ... whenever and to whatever extent may be necessary to facilitate the maximum production of all grades of aviation gasoline or to reduce the time required to produce such gasoline. A0272.

**PARTIALLY DISPUTED to the extent Exxon refers to "control," a term that does not appear in the cited document.  The United States does not dispute that Recommendation 16 called for "plans for the use of all sources of the components of" aviation gasoline, and that it stated such plans "may provide for" the above-listed actions. A0271-72.**

39. On December 18, 1941 , PAW issued Recommendation 23 to require oil companies to exchange information, prepare and enter into license agreements and agree to reduced patent royalty fees for sulfuric acid alkylation production, in order to increase the production of alkylate, which was a key blending component in the production of avgas. A0273- A0274.

**DISPUTED.  The cited Recommendation nowhere "requires" or mandates that oil companies take the above-noted actions.  It does state, "it is essential that the most complete technical data with respect to the 'sulfuric acid alkylation process' and all necessary patent licenses . . . be offered at once to all petroleum refiners under such terms**

and conditions as will facilitate the participation of such refiners in the expanded 100 octane aviation gasoline production program referred to above."  A0274.  The Recommendation then states, "[OPC] has been advised by the companies named above that the said companies *are willing* to revise the terms of the existing licenses issued by them covering the use of the 'sulfur acid alkylation process' . . . ."  Id. (emphasis added).  Any suggestion by Exxon that these companies were involuntarily required to take such action is not supported.

40. According to the 1946 Government-prepared report titled *"The History of the Petroleum Administration for War,"* PAW recognized that the production of avgas was a very complicated technological process that required the systematic coordination and use of various processing units. AO180-A0206.

> **Not disputed.**

41. According to the 1946 Government-prepared report titled *"The History of the Petroleum Administration for War,"* in the early 1940s the Government sought for various oil companies to drastically increase and maximize their production of avgas and other war products, but in order to do so, it would be necessary for such oil companies to make substantial financial investments in the construction of additional processing facilities for making avgas, avgas components and other petroleum products, such as additional alkylation units, which were necessary for making blending agents for avgas, and catalytic cracking units (known as "cat crackers") which were necessary for producing avgas base stock. A0181-A0189.

> **PARTIALLY DISPUTED.  Exxon's statement inaccurately summarizes the cited report by omitting relevant portions of its content.  The report states:  "the industry felt that, in order to commit itself to huge expenditures, it had to have firm commitments by**

**the Government to buy the product for a sufficient period of years to justify the investment. PAW shared this feeling, and set out to find a solution, which it did a few months later." A0182. The report also describes the Aviation Gasoline Reimbursement Plan, under which the United States paid oil companies more than $126 million to reimburse them for instances in which they incurred losses on government supply contracts for avgas. A0189. The cited report thus contradicts any suggestion by Exxon that the United States sought to have oil companies "make substantial financial investments" without first taking measures either to offset the risks to private industry of any such investments, or to assume those risks itself in place of private industry.**

42. According to the 1946 Government-prepared report titled *"The History of the Petroleum Administration for War,"* in the early 1940s oil companies were reluctant to make substantial financial investments in new production facilities unless the Government was willing to enter into long-term avgas procurement contracts. AO 182.

      **Not disputed.**

43. According to the 1946 Government-prepared report titled *"The History of the Petroleum Administration for War,"* the Government recognized that "if a company were to build a plant, it faced the possibility, especially if there were a short war, or no war at all, of finding itself with a multi-million dollar installation, and nobody to buy the product." A0182.

      **Not disputed.**

44. According to the 1946 Government-prepared report titled *"The History of the Petroleum Administration for War,"* in November 1941 RFC provided DSC with the authority to enter into long-term avgas supply contracts with private oil companies. AO 184.

**Not disputed that in November 1941 RFC provided DSC with the authority to enter into long-term supply contracts with private oil companies for 100-octane avgas.**

45. In the 1942 "Four Party Purchase Agreement" DSC, U.S. Army, U.S. Navy and PAW agreed that DSC would act as the sole purchaser of avgas from the Nation's petroleum industry and would resell it to the U.S. Armed Forces as needed. A0212-A0213.

**PARTIALLY DISPUTED.  The "Four Party Purchase Agreement" was dated December 19, 1942, and applied specifically to 100-octane aviation gasoline manufactured after January 1, 1943.  A0212; see also MAA_EM-000213-17 (U.S. Opp. Ex. 7).**

46. DSC was the federal agency that contracted for the purchase of all of the avgas produced during WWII. DSC entered into avgas supply contracts with various oil companies and under the contract DSC would purchase the refinery's entire production of avgas for one or more years. A0212.

**PARTIALLY DISPUTED.  The referenced purchase authority of DSC applied specifically to 100-octane aviation gasoline manufactured after January 1, 1943.   A0212; see also MAA_EM-000213-17 (U.S. Opp. Ex. 7).**

47. According to the 1946 Government-prepared report titled *"The History of the Petroleum Administration for War,"* PAW knew that the production of avgas and the production of other petroleum products, such as motor gasoline, were not mutually exclusive but inextricably intertwined and therefore it was not possible to increase avgas production by decreasing motor gasoline production, stating that "there were many in authority who failed to understand the nature of the production problem involved and who clung to the view that 'gasoline is gasoline,'

apparently believing that the refineries had only to cease shipments to civilians in order to turn

out an ocean of 100-octane." AO 182.

**The United States does not dispute the accuracy of the quoted language. The**

**remainder of Exxon's statement – including its characterization of "the production of**

**avgas and the production of other petroleum products, such as motor gasoline, [as] not**

**mutually exclusive but inextricably intertwined" – is not established by the cited document**

**excerpt and therefore is PARTIALLY DISPUTED.**

48. The 1946 Government-prepared report titled *"The History of the Petroleum*

*Administrationfor War"* stated as follows:

> A fifth difference in the 100-octane program, as compared with others, is the fact
> that 100-octane cannot be produced alone. Its production is essentially a
> procedure for extracting by-products of petroleum refining operations. The by-
> products are of great value, but they are still by-products of petroleum in various
> forms, caught as the crude oil goes through the refinery in process of being
> broken down into its parts, purified and concentrated. A0195.

> **Not disputed.**

49. The 1946 Government-prepared report titled *"The History of the Petroleum Administration*

*for War"* stated that if, for example, PAW ordered a particular refinery to modify the crude oil

yield to make 513 additional barrels per day of an avgas component that was desperately needed,

the modification would also result in "1,500 barrels more of residual fuel oil, which was in

surplus supply at the time, and 12,000 barrels less of home heating oil and 5,700 barrels less of

gasoline, both of which were seriously scarce." A0206.

**PARTIALLY DISPUTED. The cited report refers specifically to 513 additional**

**barrels per day of an "urgently needed *100-octane* [not 'avgas'] component"; Exxon also**

omits the report's observation that this would "permit the making of 1400 additional barrels daily of 100-octane gasoline."  A0206.

50. According to a Government reported titled *The History of the Petroleum Administration for War,"* for administrative purposes PAW divided the United States into five districts and both the Baytown and Baton Rouge refineries were in District 3 (sometimes referred to by PAW as "District III"). AO 173.

> **Not disputed.**

51. Pursuant primarily to Recommendations 16 and 33 and OPC Plan 15 *(i.e.,* "Basis for the Formulation of a Refinery Operating Program"), PAW established the "Planned Blending Program". One of the key components of this program was that PAW on a monthly basis determined how much crude oil and other raw materials each refinery would be allocated, and also dictated the amount of avgas and other war products that the refinery was to produce from this allotment of crude oil and other raw materials. A0187, A0205, A0271-A0272 and A0275-82.

> **Not disputed except for Exxon's use of the term "dictated," which is Exxon's subjective characterization and is not supported by the cited documents.  See also, e.g., U.S. SOF ¶¶ 27 and 38-39 and the exhibits cited therein.**

52. In fact, each month PAW would issue a planned blending schedule for the succeeding month that was formally titled (for District III refineries) "Report of the Operations Subcommittee of the Refining Committee, District III on Minimum Crude Runs for Maximum War Products for [specific month] of Gulf Coast War Plants," and in this report after summarizing any relevant new refinery operations information *(i.e.,* PAW stated that "[t]he operation of each refinery was investigated carefully") and noting any requests made by specific refineries regarding some

aspect of their monthly crude allotment and war products production requirements, PAW set

forth in detail the allotment of crude oil and other raw materials, and the required production

amount of avgas and other war products, for each refinery (including the Baytown and Baton

Rouge refineries) for the upcoming month. *E.g.*, A0283-A0293.

      **Not disputed.**

53. A Government report set forth the following regarding the nature of the PAW's

activities during WWII:

> [i]n order to augment the national productivity for [avgas] this Office took over
> practical effective control of its manufacture, even prior to the war. Refiners were
> instructed to send and ship available components in such a manner as to squeeze
> out the last barrel of product, regardless of commercial and economic
> considerations. A0299.

      **PARTIALLY DISPUTED because Exxon's quotation of the referenced report is**

**materially incomplete.  The paragraph from which the quote is drawn continues:**

> **The services gave 100% cooperation in purchasing their requirements in
> accordance with our suggestions . . . . The point here to be stressed is that,
> because the current procurement situation was well handled, we decided no
> effort would be made immediately to place the output of the then operating
> plants under long term contract with the government.  Instead, we
> concentrated our efforts on the arrangement of those contracts necessary to
> augment production by the creation of new facilities.  A0299-300 (emphasis
> in original).**

**Additionally, the document refers specifically to procurement of 100-octane avgas,**

**not "avgas" generically as asserted by Exxon's statement.  A0299.**

54. The Government report titled *"The Role of Defense Supplies Corporation in the Wartime*

*Aviation Gasoline Program"* set forth the following regarding the nature of the PAW's activities

during WWII: "activities of private companies were coordinated and supervised by [PAW]"

because "PAW viewed the various companies' refineries as units of one enterprise and directed

their operations so as to produce the maximum quantities of aviation gasoline at the earliest possible time." A0305.

**PARTIALLY DISPUTED because Exxon's quotations of the referenced report are materially incomplete. Immediately prior to the quoted language, the report states, "The construction of new aviation gasoline facilities and the production of this material was done by the oil industry." A0305.**

55. The Government report titled *"A History of the Petroleum Administration for War"* set forth the following: [O]ne of the wartime conditions which served to harass the refiners as much, perhaps, as anything else was the frequent need to change yields so as to produce, at all times, the maximum quantities of most-needed products. One day, refiners would have instructions from PAW to increase their yields of gasoline and cut down their yields of fuel oil. On another occasion, the ever-shifting requirements of war might call for exactly the opposite. And, adding to the difficulty, the orders often had to be dispatched in the form of telegrams, calling for the changes to be made virtually overnight. A0206.

**No dispute that the excerpted portion of the report is accurately quoted.**

56. The Government report titled *"The History of the Petroleum Administration for War"* set forth that PAW was "the virtual czar of 100-octane in the United States," further noting that PAW "called upon the industry to devise plans for using all facilities and raw materials as though they all belonged to one company ... [i]n a word, 'forget economic considerations-- forget everything except getting out more and more 100-octane as quickly as you can '". AO 186.

**No dispute that the excerpted portion of the report is accurately quoted.**

57. The Government report titled *"The History of the Petroleum Administration for War"* set forth the following: "[y]ields of products were frequently changed [by PAW] at the Nation's refineries, almost overnight, despite the effect upon earnings; the single test was, did the war program necessitate the change?". AOI77.

**No dispute that the excerpted portion of the report is accurately quoted.**

58. The Government report titled *"The History of the Petroleum Administration for War"* set forth the following: [i]nsofar as products for war and for essential civil use were concerned, PAW told the refiners what to make, how much of it to make, and what quality. Nobody wanted it to be that way - neither PAW nor the refiners. It just happened to be the only way to do it in wartime. A0206.

**No dispute that the excerpted portion of the report is accurately quoted.**

59. In a 1943 PAW "Handbook" for the avgas program, PAW itself acknowledged that as part of PAW's mission it took control of the Nation's refineries and treated them as "one vast national refinery," stating as follows: [e]very refining facility was closely examined to the end that 100 octane supply be supplemented ... Inter-plant movement of component parts of 100 octane was effected by a "planned blending" schedule for refiners. Expert juggling of these components and elimination of bottlenecks in transportation insured maximum quality and quantity of the blended fuel. Under this plan the nation's refineries were all treated as units in one vast national refinery. A0325 (emphasis added).

**DISPUTED.  The cited excerpt does not use the term "control," let alone state that PAW either "took control" of the Nation's refineries "acknowledged taking control" of them.  The document does state that the Nation's refineries were "treated as units in one vast national refinery," but it does not attribute this "treatment" to PAW, nor does it**

**describe any actions by PAW that would suggest PAW "took control" of each individual refinery.  The document also distinguishes the earlier portion of World War II from the latter portion when, "by the fall of 1943," situation the document describes "had begun to change."  A0326.  The United States further incorporates here its response to Exxon PF ¶ 78.**

60. In a 1943 PAW report regarding the avgas program, PAW laid out its seven-step program for maximizing avgas production at individual oil refineries, stating as follows: [t]here are seven physical ways to expand production.

These are: 1. Change the specifications for the product in such a way as to augment production;

2. Regulate the operation of refining units in such a way as to conserve all raw materials that may be used in the product, i.e., to prevent the diversion of valuable components to other uses;

3. Blend (mix) all of the components (ingredients) available in the United States in such a way as to assure maximum production;

4. Force each refining operating unit to its maximum output;

5. Remove "bottlenecks" in operating units by the judicious use of small amounts of construction materials ... ;

6. Adapt existing refining facilities to 100 octane production .. ; and

7. Build new 100 octane units. A0332 (emphasis added).

**PARTIALLY DISPUTED.   The referenced methods of increasing avgas production are accurate, but the report does not describe them as a "seven-step program" or otherwise suggest that they are necessarily interdependent.  A0332-33.**

61. Louis R. Goldsmith - a PAW Refinery Division official from 1942 to 1944 - testified in deposition on June 9, 1992 in the case of *United States* v. *Shell Oil Co,)* Civ. A. No. CV 91-

0589-RJK (C.D. Cal.) *("US.lShell Litigation")* regarding PAW's mandatory approval process for new construction as follows:

Q. Did PAW approve the -- have approval over industry proposals for construction.

A. Oh, indeed. Absolutely. Nobody could build anything without PAW's concurrence and approval because, for one thing, you couldn't get any raw materials to build anything with unless PAW certified that it was essential. A0338-A0339.

**PARTIALLY DISPUTED because Exxon's quotation of the referenced testimony is materially incomplete. Immediately prior to the quoted question and answer, Mr. Goldsmith testified, "It was completely a cooperative effort in which everybody said: "We've got a war to fight and let's get on with it, providing what's needed." A0338.**

62. J. Howard Marshall, Chief Legal Counsel for the PAW during much of WWII, testified in deposition on August 8, 1991 in the *US./Shell Litigation* about PAW's use of the threat of coercive measures to compel an oil company's compliance and cooperation:

Q. . .. [B]ut you said that PAW didn't use a club, but it had a big club, didn't it?

A. It had a big one. It had all the powers of the President of the United States under the Second War Powers Act. And they are about as broad and comprehensive of any statute that was ever written, that I know about.

Q. You said before, "and they knew it." What did you mean by that? Who was the "they"?

A. Whoever wasn't going to do what we wanted them to do.

Q. Was that something that was spoken of from time to time in your dealings?

A. Oh, of course it was. I spoke of it. If I ran into a recalcitrant member of the business. I remember once I said to Colonel Drake, of the Gulf Oil Company, "Colonel, have you figured out how long your refinery can operate without priority on critical supplies?"

Q. What did he say? A. He mumbled, but then he did what I wanted him to do. A0344.

**Not disputed that Mr. Marshall testified as quoted above.**

63. At the same deposition J. Howard Marshall testified further as follows: Q. Okay. You once mentioned a company up in Ventura, California that showed some reluctance to go along with the program.

A. Not some, everything he could muster.

Q. What ... was the problem there?

A. Well, we had a series of quotas for each company in the field. And all of them, with this one exception, obeyed the quotas and lived by them. And they said, "To heck with you. We're going to run our business and you keep your hands off of it. It took me a day to take his material priorities away from him. He came, with his tail between his legs about a week later, said "All right. I want to make peace." I said, "You better."

Q. Explain what you mean by materials priority.

A. To run a refinery, or an oil well, you have to have a constant supply of materials and maintenance. Just run-of-the-mill stuff to keep the thing on - in operation. And you take those essential parts away and the fellow goes down. He can't operate without it. Now, only one part will stop him. He might have enough of five but lack the sixth. Down he goes. A0350-A0351.

**Not disputed that Mr. Marshall testified as quoted above.**

64. According to historian John H. Ohly in his treatise titled *Industrialists in Olive Drab - The Emergency Operation of Private Industries During World War II,* the Government seized at least 938 private industrial facilities during WWll and these seizures affected over 1.8 million private sector employees at these facilities. These facilities were seized by the

Government in furtherance of the war effort and for reasons as specious as "labor-management issues" and "dissatisfaction with the management." A0353-A0365.

**DISPUTED.  The cited treatise excerpt does not identify the figure of "938 private industrial facilities" seized during WWII, as asserted by Exxon.  Other sources indicate that the United States issued a total of sixty-four executive orders during WWII authorizing an agency of the federal government to seize facilities."  U.S. SOF ¶ 29 and exhibits cited therein; <u>accord</u> A0356 (identifying "sixty separate seizures" in the period from June 1941 to V-J Day, plus four additional seizures "during the remainder of 1945").  Exxon's assertion that the reasons given for such seizures were "specious" also is not supported by the cited treatise.  The treatise states that "the cause of every War Department seizure during World War II was a labor dispute."  A0356.  These seizures were "on paper" and employees of the seized facilities would generally continue to operate the facilities."  U.S. SOF ¶ 31 and exhibit cited therein.  Moreover, the Connally-Smith Act, passed in June 1943, required that a seized property be returned to its owner within 60 days after normal productive efficiency has been restored.  A0371.**

65. PAW seized a number of oil refineries, including Humble's oil refinery in Ingleside, Texas, during WWII. A0365, and A0367-A0368.

**PARTIALLY DISPUTED to the extent Exxon suggests that the seizure of Humble's Ingleside Refinery was a threat to Humble.  When Humble's Ingleside Refinery was seized, Humble acknowledged that "[t]he seizure was merely a token one, since the company continued to operate the Refinery for its own account under the superintendency of Frank Gross."  U.S. SOF ¶ 32 and exhibit cited therein.**

66. The Government's plant seizures during WWII were well publicized in widely available national publications; for example, in December 1943 *Business Week* listed the plants seized to that date and described the Presidential seizure power as "the big stick," stating that ""[e]xistence of the club has made it comparatively easy to assure compliance in other cases without resorting to seizure." A0370.

**Not disputed.**

## III. Baytown and Baton Rouge Refineries

### A. Productivity During WWII

67. During WWII the crude oil throughput capacity increased by approximately 36% at the Baytown refinery and by approximately 30% at the Baton Rouge refinery. Expert Report of Jere M. Johnson (June 18, 2012) ("Johnson Rpt.") (Exhibit No.2) at 38-39.

**DISPUTED**. **The cited report of Mr. Johnson does not accurately measure the increase in crude throughput capacity "during WWII."  Mr. Johnson uses 1940 and 1945 as his starting and end-points for comparison.  Exxon Exhibit No. 2 at 38-39.  United States did not enter WWII, however, until December 1941.  Moreover, United States' expert Dr. James R. Kittrell has calculated that the incremental increase in crude throughput during the actual period of WWII was approximately 8.4% at Baytown and 8.7% at Baton Rouge. See Expert Report of Dr. Kames R. Kittrell (Nov. 16, 2012) ("Kittrell 2d Rpt.") at 21-23 and Table 22 (U.S. Opp. Ex. 5).**

68. The Baytown refinery and the Baton Rouge refinery were two of only three refineries to manufacture over one billion gallons of avgas during WWII on behalf of the Government; in fact, the Standard-affiliated companies produced approximately 20 percent of the avgas consumed by the Allied Forces during WWII. A0381 and A0393.

**PARTIALLY DISPUTED.  The cited documents refer to production of "100-octane aviation gasoline," not "avgas" generally.  A0381 and A0393.  The Standard-affiliated companies produced approximately one-fifth of the 100-octane avgas consumed by the Allies, "not including Russia," during WWII.  A0393.  Also, Exxon's use of the phrase "on behalf of the Government" is not supported by the cited documents.**

69. The production of avgas at the Baytown refinery resulted in the production of other products and byproducts. A0395 and A0482.

**Not disputed.**

70. A Humble memorandum dated February 25, 1943 stated the following: "[t]he current production of war products [at the Baytown refinery] represents essentially 100% conversion since all of the crudes and other raw materials taken into the refinery are run specifically for the production of one or more war products." A0395.

**DISPUTED.  The same document states:  "On the basis of current refinery input . . . the output of war products is 31.1%."  A0395; see also A0396.  Furthermore, according to the document, that 31.1% figure may be overstated because it includes figures for "special Navy fuel oil" and "asphalt" that only represent "potential" production; "actual production of these items is dependent on the results of competitive bidding."  A0396. Another document identifies an even smaller percentage output of war products at Baytown:  "Our total war products aggregate 47,000 barrels per day, or 29.7% of the total feed to the refinery."  BAYHIS-00023290 (U.S. Opp. Ex. 8).  Moreover, the language Exxon quotes regarding an alleged "100 percent conversion" is at odds with typical oil refinery cost allocation practices, in which refineries distribute crude oil costs in proportion to the amount of each product being produced.  See Kittrell 2d Rpt. at 14-15.**

## B. The Government's Operational Control of the Refineries During WWII

### 1. Products and Production Levels

71. PA W directed Humble and Standard Oil to maximize the production of avgas for the Government at the Baytown and Baton Rouge refineries during WWII.  A0410, A0411-A0413, A0414-A0415, A0431, A0432-A0435, A0436-A0437, A438-A0440, A0441-A0442, A0443-A0446 and A0593-A0595; *see also* PF ˜˜ 41, 53-54, 56 and 60.

**PARTIALLY DISPUTED to the extent Exxon characterizes the cited telegrams as "directing" Humble and Standard.  The United States incorporates here its response to Exxon PF ¶ 78, as well as its responses to Exxon PF ¶¶41, 53-54, 56 and 60.**

72. Consistent with the PAW directive to maximize avgas production, three avgas supply contracts (collectively, "Avgas Contracts") were entered into during the early stages of WWII regarding the production of avgas at the Baytown and/or Baton Rouge refineries. First, on January 13, 1942 DSC and the Standard Oil Company of New Jersey ("SONJ") entered into an avgas supply contract ("Master "Suppliers" Contract"). A0471-A0496. This contract provided that both Humble and Standard Oil were two of SONJ's "Suppliers" and therefore the avgas manufactured at both the Baytown and Baton Rouge refineries under contract with SONJ would be supplied by SONJ to DSC. A0472. The term of the contract was the time period of January 13, 1942 to February 28, 1946. A0484.

**PARTIALLY DISPUTED.  The referenced contract was for "100-octane aviation gasoline," not for all grades of avgas.  A0471-500.**

73. Second, effective February 4, 1942, DSC and Humble entered into an avgas supply contract regarding the production of avgas at the Baytown refinery for sale to DSC. A0501-A0518. This

contract provided that Humble was one of SONJ's "Suppliers" of avgas for ultimate sale to DSC and further provided that Humble would make direct sales to DSC of avgas produced at the Baytown refinery. A0502. The term of the contract was the time period of February 4, 1942 to February 28, 1946. A0509.

**PARTIALLY DISPUTED.  The referenced contract was for "100-octane aviation gasoline," not for all grades of avgas.  A0501-18.**

74. Third, on February 16, 1943 SOL and DSC entered into a contract, which expressly incorporated by reference the terms and provisions in the Master "Suppliers" Contract, regarding the production of avgas at the Baton Rouge refinery for sale to DSC. A0519-A0520.

**PARTIALLY DISPUTED.  The referenced contract was for "100-octane aviation gasoline," not for all grades of avgas.  A0519-20.**

75. The Avgas Contracts dictated the specifications for the avgas to be produced.

**DISPUTED.  The referenced contracts were for "100-octane aviation gasoline," not for all grades of avgas.  See Resps. to Exxon PF ¶¶ 72-74.  The terms of the contracts were not "dictated," but rather were negotiated with the United States by Standard and Humble until the terms were mutually satisfactory to all of the contracting parties.  See U.S. SOF ¶¶ 64-65 and 72-73 and the exhibits cited therein.**

76. The Avgas Contracts specifically noted that motor fuel and other products were necessarily produced in connection with the production of avgas; for example, Section XII of the Master "Suppliers" Contract specifically set forth the following: [N]ormal operation of said refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. A0482 and A0507.

**Not disputed.**

77. PAW used telegrams to communicate day-to-day operational directives and instructions to Humble and Standard Oil, such as, for example, to maximize or modify production levels for avgas and other war products at the Baytown and Baton Rouge refineries, to prioritize the use of the allocated crude oil for the production of avgas and specific war products over other products, or to implement other production-related activities at the refineries. *E.g.,* A0408-A0409, A041O, A0411-A0413, A0414-A0415, A0431, A0432-A0435, A0436- A0437, A438-A0440 and A0593-A0595.

**PARTIALLY DISPUTED to the extent Exxon characterizes the telegrams as "directives."  The United States incorporates here its response to Exxon PF ¶ 78.**

78. PAW dictated specific production procedures, such as the production processing procedures that needed to be followed, the final actual composition of the avgas, and the specific color to dye the different types of avgas that the Baytown or Baton Rouge refineries were manufacturing. A0502-A0504, A0399-A0400, A0564-A0582, A0332 and A0852-A0866.

**DISPUTED.  The United States did not "dictate" production procedures.  With respect to the first document Exxon cites (a contract to supply 100-octane avgas), the United States incorporates here its response to Exxon PF ¶ 75.  The second document Exxon cites does not discuss the PAW on the refenced pages, other than referring to OPC's initial request for private industry proposals to produce 100-octane avgas.  The third document cited by Exxon sets forth a specification for 91-octane avgas, but does not support the assertion that production procedures were "dictated."  A0564-82; see also, e.g., U.S. SOF ¶ 80 and the exhibits cited therein ("The Avgas Contracts did not confer on the United States any decision-making authority over or role in production.  The United States**

simply agreed to buy 100-octane Avgas."); BAYHIS-00023014 (U.S. Opp. Ex. 9) (operating agreement between Humble and DSC for Baytown Plancor 1909; states that in "operation and maintenance of the plant, in the processing of raw fee stocks therein, and in the performance of all services hereunder, however, Humble shall act as an independent contractor, it being understood that Supplies shall not have the right to direct the details of such operation but is interested only in the results obtained therefrom."). The fourth document Exxon cites does not discuss the United States' role, if any, in determining production procedures. A0332. The last document Exxon cites contradicts Exxon's assertion because it refers to steps taken to expand 100-octane avgas production "in cooperation with industry," and further states that "successively higher quality specifications" were "requested" – not "dictated" – by the United States. A0866; see also Kittrell 2d Rpt. at 9-13 (U.S. Opp. Ex. 5) (disagreeing with Mr. Jere Johnson's opinion "that Exxon was forced to respond to directives from the U.S. Government in implementing the new refining technologies").

Moreover, the United States' expert World War II historian, Dr. Jay Brigham, testified about PAW's of telegrams to communicate with refineries, including Baytown and Baton Rouge, during World War II. When Dr. Brigham was asked whether he considered PAW's telegrams "as engaging in a production or management decision" at the refinery, he answered, "No, I really don't." Dr. Brigham further explained that the telegrams were a means of "encouraging greater production, in a sense rallying the troops. They're not saying do it this way or do it that way . . . ." Deposition Transcript of Dr. Jay Brigham, Vol. 2 at 367-68 (U.S. Opp. Ex. 10).

79. While PAW always required Humble and Standard Oil to maximize the production of avgas at the Baytown and Baton Rouge refineries, PAW also periodically directed Humble and Standard Oil by telegram to maximize the production of one or more other war products (without reducing maximum quantities of avgas), depending on the specific requirements of the U.S. military at the time the telegram was issued, because various other petroleum products were vital to the war effort and required by the U.S. military as well, A0206- A0209 and A0216-A0218, and these other war products included the following:

a. Asphalt, *e.g.,* A0408-A0409 and A0593-A0595;

b. Navy fuel oil / other lubricating oils, *e.g.,* A0411-A0413 and A0593- A0595;

c. Diesel fuel, *e.g.,* A0596, A0597-A0598 and A0599;

d. Residual fuel oil, *e.g.,* A0600-A0605 and A0606;

e. Kerosene, *e.g.,* A0591-A0592, A0606 and A0607;

f. Toluene, *e.g.,* A0591-A0592, A0593-A0595 and A0606; and

g. Motor gasoline, *e.g.,* A0521-A0522, A0608, A0609-A0611, A0612, A0613-A0616, A0617, A0618, A0619 and A0620-A0621.

**PARTIALLY DISPUTED**.  **With respect to Exxon's characterization of telegrams as "directing" Humble and Standard, the United States incorporates here its response to Exxon PF ¶ 78.  Additionally, Humble's own memorandum entitled "Production of War Products at Humble Oil & Refining Company's Baytown Refinery" does not list "diesel fuel," "residual fuel oil," "kerosene," or "motor gasoline" as a "war product."  A0395-96. Standard similarly did not include any of these products on its list of "critical war products" made at the Baton Rouge refinery.  BRC-00011620 (U.S. Dep. Ex. 11).**

## 2. Price and Market

80. The price paid by DSC for the avgas manufactured at the Baytown and Baton Rouge refineries was established under the Avgas Contracts and any price adjustments for the avgas had to be officially approved by DSC. *E.g.,* A0625-A0628.

**Not disputed.**

81. The Government report titled "The Role of Defense Supplies Corporation in the Wartime Aviation Gasoline Program" set forth the following regarding the types of costs that DSC took into account in determining the prices paid for avgas by DSC under the avgas supply contracts during WWII:

> [t]he essence of these contracts for the purchase by DSC of aviation gasoline was the price to be paid. This price included cost of materials and cost of operations, royalties payable by the manufacturer to patent holders, certain allowances for depreciation, obsolescence, amortization and taxes, a profit factor, and the interest payable on their investment. A0643.

**Not disputed.**

82. The Government report titled "The Role of Defense Supplies Corporation in the Wartime Aviation Gasoline Program" further set forth the following:

> [t]he annual profit or management fee *allowed by DSC* in the price it paid for aviation gasoline in the [standard avgas] contract was approximately six per cent of the capital investment. How the Government negotiators arrived at the six percent figure is not clear. It might be explainable on a historical basis as the amount of profit usually allowed manufacturers making goods under Government contract. A0647 (emphasis added).

**Not disputed.**

83. During WWII DSC set prices for high-octane avgas that were below the pre-WWII prices for such products. A0552.

**PARTIALLY DISPUTED.  The cited document refers specifically to "100-octane" avgas.  It also describes the prices as having been "agreed to" by the United States and the oil producing companies.  A0551-52.**

84. A 1943 PAW report titled "Report of the Petroleum Administration for War on the 100 Octane Aviation Gasoline Program as of September 1, 1943" set forth the following regarding the pricing of 100-octane avgas: [w]hile prices agreed to are well below pre-war prices our objective has always been to recognize real differentials in estimated costs and *to concern ourselves, primarily with keeping down profits* rather than establishing uniform prices which hurt a high cost producer and benefit a low cost producer. A0552 (emphasis added).

**Not disputed.**

85. In 1942 Congress passed the Renegotiation Act of 1942, Pub. L. No. 77-528, § 403, 56 Stat. 226, 245-46 (1942), to provide the statutory framework by which the President through his agencies could determine whether a war contractor had obtained excess profits on a government contract and to require a war contractor to refund to the Government any excess profits; in essence, the Act was passed expressly to provide the Government with a method of profit limitation in order to ensure that companies did not receive excess profits under their contracts. A0672-A0673; *see also* A0675-A0732.

**Not disputed.**

86. At the height of WWII and pursuant to the Renegotiation Act of 1942 PAW conducted a determination as to whether excess profits were being realized by the ExxonMobil predecessor companies based on the prices being paid by DSC for the production and sale of avgas, and PAW determined that no excess profits were being realized. A0733-A0752.

**PARTIALLY DISPUTED.  The inquiry described in the cited document was only for 100 octane aviation gasoline, not avgas generally.  A0733-52.**

87. The entire amount of avgas manufactured at the Baytown and Baton Rouge refineries during WWII was purchased by DSC. *E.g.,* A0625-A0628. 88. According to Government historical expert Dr. Jay L. Brigham, the Government possessed a monopsony over avgas during WWII, testifying as follows in deposition on February 8,2013:

Q. Did the federal government purchase all the avgas produced by the Bayt - Baytown and Baton Rouge refineries and preclude other buyers during World War II?

A. You're thinking of the 100 octane?

Q. Mm-hmm.

A. Yes.

Q. And -- that's why the government had a monopsony with respect to hundred octane avgas?

A. Yes. A0755 (p. 306 of the transcript).

**PARTIALLY DISPUTED.  The quoted testimony refers specifically to "100-octane" avgas, not all grades of "avgas" generally.**

### 3. Supply and Price of Raw Materials

89. PAW controlled the type and amount of crude oil and other raw materials sent to the Baytown and Baton Rouge refineries under the Planned Blending Program. *E.g. ,* A0283-

**Not disputed.**

90. DPC supplied the primary raw materials - light, catalytically cracked naphtha and hot acid copolymer - for the production of hydrocodimer at the Hydrocodimer Plancor at the Baytown

refinery and the hydrocodimer was subsequently used in the production of avgas. A0523-A0524 and A0540.

**DISPUTED. Under the cited Operating Contract, Humble was to acquire raw feed stocks either from third parties or from its own supplies on behalf of DSC. A0525-56 and A0540. DPC did not supply the raw materials. Id.**

91. DPC retained title to the light, catalytically cracked naphtha and hot acid copolymer throughout the hydrocodimer production process and the resulting hydrocodimer at the Hydrocodimer Plancor at the Baytown refinery. A0523-A0524 and A0540.

**DISPUTED. Under the cited Operating Contract, DSC (not DPC) retained title to the raw feed stocks. A0540. However, Humble took title to the by-products generated in Plancor 1909, which were used as fuel in the Baytown Refinery, and credited DSC for such products. A0535-38, A050. Additionally, under the avgas supply contract for Baytown, Humble had title to the 100-octane avgas that the hydrocodimer was used to produce, until the point of delivery of the finished avgas to DSC. See A0509.**

### 4. Construction or Installation of Facilities, Machinery or Equipment

92. In a mid-1944 PAW memorandum "To All Petroleum Refiners", PAW acknowledged that its policy was to permit only very limited construction work at refineries that was directly related to increasing the supply of war products, stating as follows:

> [u]p to the present time the Refining Industry has been essentially restricted to new construction work which represented the barest minimum which would achieve the end of supplying the most critical war products. This policy has been necessitated by the extreme demands for construction materials and construction labor which the war had placed upon the entire country's economy. A0781.

**PARTIALLY DISPUTED. The quotation is accurate but materially incomplete and therefore lacks context. The cited document explains that opportunities for construction**

work previously had been limited not simply by "PAW policy" as Exxon asserts, but by "the extreme demands for construction materials and construction labor which the war has placed upon the entire country's economy." A0781. The cited document announced that "a relaxation in the use of construction materials might be feasible" due to the imminent completion of the 100-octane construction program, and invited companies to propose new construction projects "which appear particularly advantageous to your Company and to the Refining Industry." A0781-82.

93. PAW required Humble and Standard Oil to submit a PAW Form No. 30 - "Application for Authority to Use Material/Application for Preference Rating or Allotment of Controlled Materials" - and obtain the PAW's approval prior to and with respect to any proposed construction of a new facility or other structure at the Baytown or Baton Rouge refineries that would involve steel, copper or other materials that the Government deemed "controlled materials" during WWII. *E.g. ,* A0783, A0784, A0785 and A0786.

      **Not disputed.**

94. For example, Humble had to obtain PAW's approval to, at the company's own cost, install a steam line for the propane deasphalting and dewaxing units, construct an employee training facility, install a small vertical drum in the reactor charge line for the isomerization unit, install a storage tank to store muriatic acid, install a lighting fixture in an instrument repair shop, and install repair and maintenance equipment for repairing diesel engine equipment, at the Baytown refinery. *E.g.,* A0787, A0788, A0789, A0790, A0791 and A0792.

      **Not disputed.**

95. Given PAW's policy regarding restrictions on any new construction, in most instances where

Humble or Standard Oil requested PAW's permission to conduct a construction or installation

project at the Baytown or Baton Rouge refineries, PAW denied approval. *E.g. ,* A0783, A0784,

A0786, A0789, A0790, and A0793-A0794. For example, in July 1944 Humble asked PAW's

permission for "installation of additional concrete surfacing on streets and the installation of

extensions to the existing concrete road system within the ... refinery." A0793. PAW reviewed

the request and recommended ˜hat  the WPB deny the preference rating for the needed materials

stating: "[w]hile it is recognized that some alterations and extensions may be desirable ... it is

considered that these facilities are not required to maintain or increase the production of any

essential wartime products. Therefore, it is recommended that this project be denied at the

present time." A0794.

**DISPUTED.  The fact that a handful of denials occurred as shown in the cited**

**documents is not evidence that "most" such requests were denied.  There are numerous**

**examples of project approvals in the record.  E.g., BRHIS-0006332-34, BRHIS-00006337-**

**38, BRHIS-00006349-50, BAYHIS-00004512-13, BAYHIS-00012675-76, and BAYHIS-**

**00012693-94 (collectively, U.S. Opp. Ex. 12).  U.S. Opp. Ex. 12 contains just a sample of**

**such approvals and is by no means exhaustive.  In addition, regarding Exxon's reference to**

**"PAW's policy," the United States further incorporates its response to Exxon PF ¶ 92.**

96. In contrast, when PAW desired the construction of facilities at a refinery, PAW tended to

pressure the oil company to acquiesce. For example, PAW pressured Humble to allow the

Hydrocodimer Plancor to be sited and operated in the middle of the Baytown refinery; however,

Humble was "not receptive" to the siting of the hydrocodimer plant at the refinery because

Humble believed the hydrocodimer plant would add further complications to an already

congested refinery, and had no prospective post-war utility for Humble, particularly because one of its key raw materials - hydrogen - was dependent upon the operation of other war-related materials production units at the Baytown Facility. A0795-A0796, A0801, A0806-A0807, A0808-A0812 and A0813-A0816.

**DISPUTED.  The first cited document does not indicate that PAW "pressure[d]" Humble "to acquiesce" in the siting of the hydrocodimer plant, as Exxon asserts; rather, "Humble agreed" because it "realiz[ed] the urgent need for such an installation in the interest of maximum 100 octane aviation gasoline production."  A0795-96.  The third cited document directly contradicts Exxon's assertion; in it, PAW representative Mr. George. L. Parkhurst states, "I have a great deal of trepidation about asking Humble or any other oil company to undertake the construction of facilities which it does not feel are desirable." A0807.  Mr. Parkhurst also observed that Humble was more difficult to deal with than the other oil companies and particularly insistent on having its way, thus showing there is no validity in Exxon's speculation that Humble felt "pressured" by PAW:  "Humble is completely unwilling to handle this or any other major 100 octane project which we have had under discussion in recent months on either an approximately normal private ownership basis or on a Defense Plant basis.  Humble insists on a type of arrangement that would give it all of the advantages of private ownership without any of the risk or other disadvantages."  A0807.  The fourth cited document communicated Humble's positive recommendation for proceeding with the hydrocodimer plant, while indicating that other projects previously considered are being abandoned due to infeasibility.  A0808-12.  The remaining documents also fail to support Exxon's assertion.**

97. In regard to the Hydrocodimer Plancor, PAW pressured Humble until it acquiesced to PAW's

demands, as ExxonMobil historical expert Mr. Gravel testified to at his deposition on March

1,2013 as follows:

"Well, I think - - I think the chain of correspondence reflects that Humble did not want this

particular plant to be built within its facility for a number of reasons. .. And the way I read the

correspondence is that Humble basically said in the correspondence, we want to make it clear

that we're not for this project. But if the government feels like this is a project that really needs to

be done for the war effort, then will basically acquiesce and do it. A0821-A0822.

**DISPUTED.   The United States incorporates here its response to Exxon PF ¶ 96.**

**Although the testimony of Mr. Gravel is accurately quoted, his opinion is not supported by**

**the relevant documents as shown in response to Exxon PF ¶ 96.  Furthermore, Mr. Gravel**

**has no first-hand knowledge of the facts and is not qualified to give opinion testimony on**

**this topic for the reasons explained in the United States Memorandum in Opposition to**

**Exxon's Summary Judgment Motion.  See United States Memorandum in Opposition to**

**Exxon's Motion for Partial Summary Judgment ("U.S. Opp.") at Argument VII.**

### 5. Waste Processing

98. PAW approval was required before any significant waste processing improvements could be

undertaken at the Baytown and Baton Rouge refineries. *See* PF ~~ 61, 92 and 99-108.

**PARTIALLY DISPUTED.  Exxon's statement is true only to the extent it refers to**

**the WWII period and only to the extent such waste processing improvements required the**

**use of construction materials.  Additionally, the United States incorporates here its**

**responses to Exxon PF ¶¶ 61, 92, and 99-108.**

99. According to the testimony of Government's historical expert, Dr. Jay Brigham, at his deposition on February 8, 2013, the Government was involved in virtually all aspects of waste operations - it made decisions regarding the construction and maintenance of the waste units and facilities, decisions regarding the adequacy or inadequacy of the waste units or facilities, and decisions regarding improvements to the waste units or facilities, as he testified as follows:

Q. Did the government make any decisions regarding the design of waste processing units or waste processing facilities at the Baytown or Baton Rouge Facil- -refineries? A. Yes.

Q. Did the government make any decisions regarding the construction of waste processing units or waste processing facilities at the Baytown or Baton Rouge Refineries?

A. Yes. They made - they made decisions about allocation of materials that would impact that, that - those things.

Q. Did the government make decisions regarding the timing of the construction of new or modified waste processing units or waste processing facilities at the Baytown or Baton Rouge refineries?

A. Yes. Again, through the allocation of process of material.

Q. Did the government make decisions regarding the availability of critical materials necessary for the construction of waste processing units or waste processing facilities at the Baytown and Baton Rouge refineries?

A. Yes. Again, as the - as the government's indu- -- nationwide war program, that did occur.

Q. Did the government make decisions regarding the maintenance of waste processing units or waste processing facilities at the Baytown and Baton Rouge Facilities - refineries?

A. Again, through the allocation of materials, that could impact that type of activity.

Q. Did the government make decisions regarding the adequacy or inadequacy of the waste processing units or waste processing facilities at the Baytown or - and Baton Rouge refineries?

A. Well, the - the decisions on the allocation material would have impacted the - the adequacies or the capabilities.

Q. SO is that a yes?

A. I will say yes, answer yes, I should say.

Q. Did the government make any decisions re- -- regarding the enlargement or other upgrades of the waste processing units and waste processing facilities at the Baytown and Baton Rouge refineries?

A. Yes. A0756-A0757 (pp. 357-59 of transcript).

**DISPUTED.  Although the testimony is accurately quoted, Exxon's characterization of the testimony is inaccurate.  Dr. Brigham did not testify that the United States was "involved in virtually all aspects of waste operations."  He testified that the United States was involved *one* type of decision – allocation of materials that were nationally scarce during WWII – that indirectly had an effect on Humble's and Standard's waste processing activities.  A0756-57.  See also U.S. SOF ¶¶ 179, 187-89, 191, 193, 195, and 197-205 and the exhibits cited therein.**

100. However, given PAW's policy of restricting new construction to only projects that directly increase wartime production, it was general knowledge that PAW would not divert resources for waste processing improvements; for example, a Humble engineer stated the following in this regard: [d]uring the war it was not possible to devote much technical manpower to the problem of effluent improvement since it was obvious that saving surface waters was secondary to saving men. A0824. And Standard Oil echoed these sentiments, as *The Slanoeolan* - the Baton Rouge

refinery's newsletter - stated the following after the construction of the Master Separator: [a]s far back as 1943 a master separator was proposed as part of the Refinery's program to reduce river pollution. But in the government's desperate fight to divert all available materials for use in the war effort, approval of the project could not be obtained at that time. A2652.

**PARTIALLY DISPUTED with respect to Exxon's use of the phrase "PAW's policy of restricting new construction," in response to which the United States incorporates its response to Exxon PF ¶ 92.**

101. In the "early part" of WWII Standard Oil sought to install a large concrete master separator, but due to material shortages Government approval could not be obtained. A0829.

**PARTIALLY DISPUTED to the extent Exxon suggests that the early part of WWII was the first time Standard had considered installing the referenced separator, and that the failure to obtain Government approval is the reason the separator was not ultimately installed until the 1950s.  In fact, Exxon considered implementing the separator proposal several years *before* the onset of the war, but did not do so; nor did it implement the proposal immediately after restrictions on formerly scarce materials were lifted near the end of the war.  Instead, it waited until the 1950s – long after WWII ended -- to implement the project.  See U.S. SOF ¶¶ 238-43 and 279-93 and the exhibits cited therein.**

102. The purpose of such a Master Separator was to separate and remove oil and oily silt from the process wastewaters before their discharge into Callaghan's Bayou and ultimately the Mississippi River. A0829.

**Not disputed.**

103. Later during WWII in mid-1944 Standard again sought Government approval for the installation of a master separator, A0833-A0835 and A0836, as well as the installation of a silt treating system, A0837-A0839, and construction of an office and laboratory for Standard's newly-formed Oil Conservation Department. A0840-A0841.

     **Not disputed.**

104. At that time the U.S. Engineer Office had made the following determination regarding the Baton Rouge refinery: "[t]he enormous operations and rapid expansion of the plant have overloaded the waste disposal system to the extent that pollution of the Mississippi is a daily occurrence", A0842, and further stated "[w]ar activity has caused rapid expansion in plant facilities for production with no increase in waste disposal facilities. This has caused, as stated before, daily pollution of the Mississippi River." *Id.* To solve this problem, the U.S. Engineer Office recommended the construction of a master separator, noting that the proposed master separator was the "key unit" necessary to prevent pollution of the Mississippi River, *id.,* and further stating the following:

> [t]he project, including the separator, appears adequate to end pollution of the Mississippi River. It is believed that the urgency of construction is sufficiently necessary for the war effort that endorsement for approval by the P.A.W. and W.P.B. for the use of materials and labor for construction of the separator be given as requested. *Id.*

     **Not disputed.**

105. On August 22, 1944 PAW notified Standard Oil that the agency was denying the company's request to construct the master separator on the grounds that "this project is not of sufficient essentiality to the war program to warrant its installation at the present time and should be considered as a post-war project." A0844.

**PARTIALLY DISPUTED** because the quotation, while accurate, is materially

incomplete.  Immediately following the quoted sentence, PAW continued:

> The Facility Security Division [of PAW] has also contacted the Army
> Engineers as to the urgency of these facilities and it was the opinion of the
> Army Engineers that this was a desirable project and should be installed as
> soon as manpower and material conditions would permit but did not
> consider it so important that it could not wait until a post-war program was
> available.  However, it is the opinion of the Army Engineers and also the
> Facility Security Division that the silt treating system . . . is urgently needed
> and should be installed as soon as possible.  BRHIS-00015128; see also U.S.
> SOF ¶273 (citing same).

Thus, PAW's response indicated recognition of the importance of making feasible

improvements in waste processing, and regarded the installation of the "silt treating

system" as "urgent."  This contradicts any suggestion in Exxon PF ¶ 105 that PAW simply

disregarded such considerations; however, PAW relied on Standard to determine, in the

first instance, whether such projects were desirable and technically feasible.  This

demonstrated, in the cited example, by Standard's own internal correspondence at the

time, which stated that the silt treating system "should be given preference, since [it] could

be installed more quickly" than the separator "and more could be accomplished in

correcting pollution problems with a smaller investment."  BRHIS-00014044; see also U.S.

SOF ¶272 (citing same).  Thus, the reason quoted above by Exxon was not the *only*

justification PAW had for denying the master separator project at that time, contrary to

Exxon's assertion; and, it was Standard's own evaluation (as quoted above in BRHIS-

00014044) that supported PAW's decision.

106. PA W did approve Standard Oil's request to construct the silt treating unit, A0844, noting

that the silt treating unit would recover oil that could be reused as industrial fuel for the Baton

Rouge refinery. A0846.

**Not disputed.**

107. In regard to the Baytown refinery, in 1944 Humble submitted two PAW Form 30s to request PAW's approval for additional waste processing facilities to treat acid sludge waste generated by the production of avgas. Humble was concerned that its existing acid reconcentration facilities were inadequate to manage all the acid sludge waste being generated, and therefore, Humble did the following: (1) in the first PAW Form 30 Humble requested PAW's permission to construct new acid reconcentration facilities, and (2) in the second PAW Form 30 Humble requested PAW's permission to construct temporary acid burning facilities due to the possibility that the existing acid reconcentration facilities, which Humble planned to overhaul, would be inadequate to treat all the acid until the new acid reconcentration facilities were constructed. While it is unclear whether PAW approved construction of the new acid reconcentration facilities requested in the first PAW Form 30, PAW denied Humble's request for the temporary acid burning facilities in the second PAW Form 30, stating that if Humble delayed upgrading its existing acid reconcentration facilities, the refinery should not need the temporary acid burning facilities. A0783.

**PARTIALLY DISPUTED because this statement fails to fully describe PAW's reasons for denying the request for the temporary acid burning facilities.  See U.S. SOF ¶¶ 218-22 and the exhibits cited therein.**

108. In 1944 Humble had to obtain the PAW's approval to modify the sewer lines that were connected to the West Drainage Ditch and used for the conveyance of wastewaters from certain areas of the Baytown refinery. A0849.

**Not disputed.**

### 6. Other Operational Aspects

109. According to a Government report titled "The Role of the Defense Supplies Corporation in the Wartime Aviation Gasoline Program," PAW organized special governmental technical committees and periodically dispatched DSC engineers and U.S. military personnel to various oil refineries for reviews and inspections for the following purposes: (1) U.S. military officers reviewed and inspected the production schedules, (2) DSC engineers evaluated and resolved production process problems in order to optimize production levels, and (3) other DSC officials reviewed and examined invoices and accounting records concerning the refinery's operational costs for raw materials, labor costs and overhead. A0870-A0871.

    **Not disputed.**

110. PAW and other Government war agencies conducted periodic onsite inspections of the Baytown and Baton Rouge refineries (as well as the Government Plancors) to review the performance of the refineries in meeting PAW directives for maximum production of avgas and other requirements. A0870-A0871, A0872-A0893 and A0894-A0927.

    **Not disputed.**

111. Some of the Government's periodic onsite inspections of the Baytown and Baton Rouge refineries were particularly elaborate and exhaustive; for example, some onsite inspections would continue over one or two full days and involve formal inspection itineraries and detailed materials specially-prepared for the purpose of the inspection of the refinery's operations. *E.g.,* A0872-A0893 and A0894-A0927.

    **The phrase "particularly elaborate and exhaustive" is simply Exxon's subjective characterization," not a "fact."  Otherwise, not disputed.**

**C. The Government's Operational Control of the Refineries During the Korean War**

112. Shortly after WWII ended the demand for avgas nationwide decreased dramatically; for example, in 1946 a Government report projected that total, nationwide demand for avgas would be only approximately 72,000 barrels per day that year. A0933.

**PARTIALLY DISPUTED.  The cited document reports that nationwide demand for avgas in the first half of 1946 was expected to average 72,000 barrels per day, rising to an average of 116,00 barrels per day during the second half of 1946 due to the depletion of military storage.  A0933.**

113. Then a few years later the Government's demand for avgas once again increased substantially beyond existing production capacities because the more advanced U.S. military aircraft being manufactured required higher grades of avgas and the Government's military need for greater avgas supplies increased with the Korean War looming. A0940.

**Not disputed.**

114. On September 9, 1950 by issuance of Executive Order 10161 President Truman delegated to the Secretary of the Interior the authority to "exercise his priorities and allocations powers in such manner as will in his judgment promote adequate supplies and their proper distribution," A0944, as well as the authority to requisition "any equipment, supplies ... or materials or facilities necessary for the ... national defense." *Id.* This Order also delegated authority to the Secretary of Commerce to exercise the President's authority under the Defense Production Act of 1950, Pub. L. No. 81-774,64 Stat. 798 (1950), to set priorities and to allocate all materials and facilities needed for production of war materials that were not otherwise delegated to other cabinet secretaries. *Id.; see also* A0948-A0972.

**Not disputed.**

115. In 1950 the Military Petroleum Advisory Board's Aviation Fuels Committee recommended that an organization be established that would impose the same type of restrictions on the petroleum industry that were imposed by PAW during WWII, stating as follows:

> [i]t is a drastic recommendation. It is a recommendation that will put the petroleum industry under the same type of restrictions as it operated under during World War II.  It is almost inevitably going to transpire.
>
> If and when such an agency is set up, it will almost certainly go into more and more activities as it goes along. There is no such thing as a little bit of control. However, that does not alter the fact that the Aviation Fuels Committee, after full consideration, has felt and does feel that such controls are necessary if the Military is to be supplied with aviation gasoline. A0940.

**The United States does not dispute the accuracy of the quotes, but PARTIALLY DISPUTES Exxon's statement because the organization subsequently established ("PAD") did not, in fact, "impose the same type of restrictions on the petroleum industry that were imposed . . . during WWII."  See U.S. SOF ¶ 41 and the exhibits cited therein.**

116. On October 3, 1950, the Department of the Interior established the U.S. Petroleum Administration for Defense ("PAD"). A0943.

**Not disputed.**

117. On December 16, 1950 by issuance of Executive Order 10193 President Truman created the Office of Defense Management ("ODM"). The order delegated to the ODM the President's authority under the Defense Production Act of 1950 to "direct, control and coordinate all mobilization activities of the Executive Branch of the Government including but not limited to production, procurement, manpower, stabilization and transport activities." A0973. PAD and the National Security Resources Board were placed under the authority of the Chairman of the ODM. A0973; *see also* A0944-A0947 and A0974.

**Not disputed.**

118. On January 3, 1951 by issuance of Executive Order 10200 President Truman established the Defense Production Administration ("DPA") which operated under the direction of the Chairman of the ODM. DPA was authorized to set priorities, make allocations, requisition materials and enter into agreements with industry and to "perform the central programming functions incident to the determination of the production programs required to meet defense needs." A0975. DPA was consolidated with the ODM by President Eisenhower under Executive Order 10433 on February 4, 1953. A0978.

      **Not disputed.**

119. The organizational structure of PAD bore a striking resemblance to the structure of the PAW as shown in a July 1952 PAD organization chart. The agencies shared the same functional divisions including production, natural gas, refining, supply and transportation, and distribution and marketing. District offices were established in New York, Chicago, Houston, Denver and Los Angeles. A0982.

      **Not disputed except for Exxon's use of the term "striking resemblance," which is not a "fact" but rather Exxon's subjective characterization.**

120. According to a news article in *The Oil* & *Gas Journal,* during the Korean War PAD possessed the authority to do the following:

• Issue orders or directives to the petroleum and gas industry;

• Establish programs and policies relating to the operation of the petroleum and gas industries;

• Determine the requirements of various claimant agencies;

• Allocate petroleum and gas among said claimants, and under certain circumstances, to the public and industry in general;

 • Develop and arrange for industrial operations, materials, manpower, procurements,

financing, loans or other forms of assistance;

• Claim and arrange for the distribution of facilities and commodities as needed; and

• Requisition property as necessary. A0984.

    **Not disputed.**

121. By early 1951 the *National Petroleum News* reported that "PAD now stands on a footing virtually identical with that enjoyed by the last war's PAW." A0988.

    **PARTIALLY DISPUTED because the quoted excerpt is materially incomplete.  In the previous paragraph, the article reported that PAD had been elevated to the status of an autonomous agency operating "separately from, independently of, and outside the jurisdiction or authority of any officer of the Department of Interior except the Secretary." A0988.  It was specifically for this reason that the article reported "PAD now stands on a footing virtually identical with that enjoyed by the last war's PAW."  Id.**

122. In an October 1950 letter, Humble acknowledged the authority of PAD to require adjustments to the operations of the Baytown refinery stating,

> [t]he entire increase of finished aviation gasoline has been committed either directly or indirectly to government. Our Alkylation Plant is running at capacity, and during September manufactured an average of 8,440 B/D of alkylate as compared to the peak monthly production average of 7,257 B/D during February, 1945 of World War II. This production required alkylation of all available propylene, butylenes, and amylenes after segregation of maximum catalytic butylenes for operation of the Baytown Butyl and Butadiene Plants at capacity. A0989.

    **DISPUTED.  The quoted letter excerpt does not contain any language "acknowledg[ing] the authority of PAD" to "require adjustments" to operations at the Baytown refinery.  A0989.**

123. According to an article in the *National Petroleum News,* by 1951 PAD exercised direct control over the production of avgas and avgas blending components, and assumed authority over the distribution and use of tetra ethyl lead ("TEL"), oil cracking catalysts, special inhibitors for gasoline, and lube oil additives. A0986.

**PARTIALLY DISPUTED.  The cited document does not refer at all to PAD authority over the production of avgas or avgas blending components, let alone describe PAD as "exercis[ing] direct control" over such production.  A0986.**

124. In January 1951 PAD ordered oil companies to limit octane ratings for automobile gasoline. A0991.

**Not disputed.**

125. In 1951 PAD issued Order No. l, limiting TEL in automotive gasoline in order to make the chemical available for avgas, the military, and the needs of the national defense. A0992-0995.

**Not disputed.**

126. In mid-1951 PAD issued PAD Order No.3 that restricted the use of blending agents and feed stocks by oil companies so that PAD could ensure the use of these raw materials in the manufacture of avgas "to the maximum extent practicable." A0996.

**Not disputed.**

127. Other PAD directives in PAD Order No.3 included the following:

No refiner shall use any aviation quality blending agent, or deliver or receive any aviation quality blending agent for use, other than in the manufacture of finished aviation gasoline, except as expressly permitted by PAD .. .. No refiner shall use any other blending agent, or deliver or receive any other lending agent or use, other than the manufacture of an aviation quality blending agent, except as expressly permitted by PAD .... Every refiner shall use reasonable diligence to make use of aviation quality blending agents available to him in such manner as

to assure manufacture of the maximum quantity of finished aviation gasoline of
the grade or grades being manufactured. A0997-A0998.

**Not disputed.**

128. P AD issued the following answers to questions regarding the degree of oil refineries'

compliance to PAD Order No.3 that would be required by PAD:

Q. If I am currently using any alkyl ate in the manufacture of a fuel other than finished aviation

gasoline, must I stop doing so?

A. Yes ... .

**PARTIALLY DISPUTED because the quotation of PAD's answer is materially**

**incomplete. PAD answered, "Yes, unless an exception is obtained from PAD."  A1000.**

Q. If am currently polymerizing any feed stocks and the polymer is not going to the manufacture

of blending agents and I have available alkylation capacity, must I reduce the polymerization

operation to the extent necessary to fill up my alkylation capacity?

 A. Yes .... .

**PARTIALLY DISPUTED because the quotation of PAD's answer is materially**

**incomplete.  PAD answered, "Yes, if you are not relieved of that obligation under any of**

**paragraphs b, c, d or e of Section 4 or have not obtained an exception from PAD."  A1001.**

Q. Am I required to manufacture aviation gasoline from the alkylate I produce?

A. No, but if you do not manufacture aviation gasoline, you may not make any other use

except to sell the alkylate to another refiner who will manufacture finished aviation

gasoline from it .... **PARTIALLY DISPUTED  because the quotation of PAD's**

**answer is materially incomplete.  PAD's answer continued,**

**unless an exception has been granted by PAD.  However, the refiner presumably will find it to his economic advantage to continue the operation and either provide facilities required for finishing his blending agent to aviation quality or sell the blending agent to another refiner who will manufacture an aviation quality blending agent.  A1002.**

129. Later in 1951 PAD issued PAD Order No.4, which established the amount of TEL that could be used in the manufacture of avgas. Al004-A1005.

　　　　**Not disputed.**

130. The purpose of PAD Order No.4 was to set forth minimum quantities of TEL, which increases the octane level of gasoline, that may be used in commercial aviation gasoline so that greater quantities of high-octane blending stocks would be available for use in manufacturing military-grade avgas, and therefore, would "result in an increase in total supplies of aviation gasoline needed immediately for military and other essential uses." A 1006.

　　　　**Not disputed.**

131. In November 1951 PAD circulated a letter to all U.S. refineries producing avgas. This letter contained the military's requirements for avgas for the last half of fiscal 1952, but cautioned that, "the overall situation has deteriorated ... the overall aviation gasoline supply situation will continue to be critical. ASPP A's [Armed Services Petroleum Purchasing Agency] requirements for Grade 115/145 are considerably above the current level of production of this grade. You are requested to increase production of this grade to the extent of these requirements." Al009.

　　　　**Not disputed.**

132. PAD directed the Baton Rouge refinery to produce 750,000 barrels of "abnormal cost" avgas from October through December 1951, and in internal Government correspondence explained the purpose of this directive as follows, "[t]hese activities are being resorted to, at the

request of this office, in an effort to cover the current critical demand for aviation gasoline. The operating changes required to accomplish this incremental production are extremely complicated, involving large refineries in Baton Rouge, La., Baytown, Texas, Baltimore, Md., and Bayway, N.J." A1010.

**DISPUTED because the cited document is not legible.**

133. In December 1953 - a few months after the Korean War ended - the Baytown refinery's newsletter - *Baytown Briefs* - reported that "[u]ntil recently, practically all aviation gasoline production has been under Government control.. .. Now that the controls have been lifted, Humble can produce both top grades of aviation to meet a growing demand from commercial airlines." A 1013.

**Not disputed.**

## IV. Baytown and Baton Rouge Government-Owned Plants

### A. Baytown

#### 1. Baytown Ordnance Works ("BOW")

134. In February 1941 the War Department acquired from Humble a parcel of land that was adjacent to the Baytown refinery for the construction and operation of the BOW. A1016 and A1072.

**Not disputed.**

135. Under an operating contract Humble constructed the BOW based on designs and specifications approved by the U.S. Army Ordnance Department on this parcel of land and the plant was operated for the production of toluene. A1017.

**PARTIALLY DISPUTED.  Humble itself developed or arranged for subcontractors to develop all of the designs and specifications for the BOW, using a process developed by Standard Oil of New Jersey.  See U.S. SOF ¶ 114 and US-BT010077 (cited therein) (Humble contractually agreed to furnish "all architectural and engineering services covering the design, preparation of drawings, plans, specifications and field engineering and supervision necessary for the efficient execution and coordination of the work provided for"); U.S. SOF ¶120 and BAYHIS-00018144 (design and construction of BOW were based on "a process developed by Standard NJ").  Thus, the United States does not dispute that Humble's furnishing of designs and specifications was contractually "subject to the approval of" the United States' contracting officer, A1017, but DISPUTES that the United States had either the technical expertise or contractual responsibility for furnishing the designs and specifications.**

136. The BOW contained toluene-producing process facilities, numerous aboveground tanks, military barracks, a mess hall, air raid shelters, perimeter fencing and four guard watchtowers. A1073 and A1074-A1097.

**Not disputed that the above-listed items were among the structures and equipment that made up the BOW, though the list is not comprehensive.  See, e.g., US-BT000135 (U.S. Opp. Ex. 13).**

137. During the time period of approximately 1941 to January 1946 the War Department was the owner of the BOW. A1016, A1105, A1106-A1109, A1111 and A1126.

**Not disputed.**

138. During the time period of September 1941 to August 1945 the U.S. Army leased the BOW to Humble, and the plant operated under the management of Army Ordnance officials stationed at the plant. AI016, Al127-AlI28, A1133, A2036-A2037 and A2055.

**PARTIALLY DISPUTED to the extent Exxon asserts that the BOW "operated under the management of Army Ordnance officials stationed at the plant."  Under the terms of the operating agreement, and in actual practice, Humble conducted and managed the operation of the BOW.  See U.S. SOF ¶¶ 122-25, 189-91, and 193-94 and the exhibits cited therein.  The United States does not dispute that Humble conducted and managed the operations pursuant to a lease from the United States, nor does the United States dispute that the time period of operation was approximately September 1941 to August 1945.**

139. During WWII the BOW accounted for over 40 percent of the Nation's toluene production. A1152-A1153.

**PARTIALLY DISPUTED to the extent Exxon may imply that on-site crude oil distillation and cracking at the Baytown refinery supplied all of the feedstocks for the BOW's output of toluene.  A significant portion of those feedstocks were shipped, instead, from other refineries for use in making toluene at Baytown.  See Declaration of Dr. James R. Kittrell dated Dec. 20, 2013 ("Kittrell Decl.") ¶ 7.**

140. The wastes generated by the BOW operations included spent acid sludge, spent alumina catalyst, and acidic wastewater effluent. A1024, A1150, A1155, A1157-A1158 and Al166.

**PARTIALLY DISPUTED to the extent Exxon may imply that the cited wastes contributed to the Baytown Refinery's wasteload during the period of United States ownership of the BOW.  See Kittrell Decl. ¶ 4.b.i., 4.b.ii.**

141. The wastewaters generated by the BOW were processed in the refinery's waste processing facilities; specifically, these wastewaters were conveyed by a 36-inch concrete sewer line to the refinery sewer system, which emptied into an earthen ditch - called the West Drainage Ditch - which transported the wastewaters to the refinery's separators system for treatment. AI078 and A2030.

> **Not disputed.**

142. The spent alumina catalyst waste was disposed of in at least three dumps at or adjacent to the BOW - a "West Side Dump," "South Dump" and a disposal area along the railroad tracks at the BOW. Al156, Al157-A1158 and A1166.

> **PARTIALLY DISPUTED.  Humble disposed of the spent alumina catalyst in the manner described, but it is more likely than not that the spent alumina catalyst periodically was removed by an outside vendor.  Moreover, such disposal did not contribute to the wasteload of the Baytown Refinery.  <u>See</u> Kittrell Decl. ¶ 4.b.ii.**

143. The Ordnance Department of the U.S. Army knew that some, if not most, of the spent alumina catalyst waste generated at the BOW was disposed of in open dumps at the Baytown Facility. AI157-A1158, Al159, A1160-A1161, Al162-A1164, A1165 and A1166.

> **Not disputed that the Ordnance Department was aware of Humble's disposal of spent alumina catalyst.  PARTIALLY DISPUTED for the reasons stated in response to Exxon PF ¶ 142.**

144. The War Assets Administration sold the BOW to Humble in October 1946. A1106-A1109, A1112 and A1126.

**PARTIALLY DISPUTED.  According to the deed and bill of sale, the sale of real property associated with the BOW from the United States to Humble was "effective as of February 1, 1946," and certain specified personal property was conveyed to Humble earlier, "effective as of August 25, 1945."  A1108.**

### 2. Butadiene Plancor

145. In 1942 DPC acquired a parcel of land adjacent to the BOW from Humble for the construction and operation of a butadiene plant identified by DPC as "Plancor 485" or "SR-10" ("Butadiene Plancor"). A1167.

**Not disputed.**

146. As the designated "agent" for DPC, Humble constructed the Butadiene Plancor based on designs and specifications approved by the DPC on this parcel of land. A 1167 and Al181.

**PARTIALLY DISPUTED.  Humble itself developed or arranged for subcontractors to develop all of the designs and specifications for the Butadiene Plancor.  See U.S. SOF ¶ 90 and BAYHIS-00005756 (cited therein).  The United States does not dispute that Humble's designs and specifications were submitted for approval by DPC, A1167, but DISPUTES that the United States had either the technical expertise or contractual responsibility for developing the designs and specifications.  In addition, the Humble was designated "agent" for DPC only during construction of the Butadiene Plancor, not for purposes of operating the plant.  A1181.**

147. During the time period of 1942 to April 1955 DPC was the owner of the Butadiene Plancor and leased it to Humble. A1170, A1216, AI217-AI250, A1251-A1253 and AI286-AI288.

**Not disputed that the United States owned the Butadiene Plancor from 1942 to April 1955. DPC was dissolved by Act of Congress effective July 1, 1945.  See U.S. SOF ¶ 48 and BAYHIS-00008853-56 (cited therein).**

148. Under an operating contract the Butadiene Plancor operated as a Government owned Plancor during the time period of August 1943 to April 1955 and RuR determined that the plant would be used for the production of butadiene - a key raw material in the production of synthetic rubber - at specifications, productions levels and prices set by the RuR. A1180-A1214, A1291, A1293-A1294, A1217 and A1221.

**PARTIALLY DISPUTED.  RuR did not unilaterally "determine" that the plant would be used for the production of butadiene; the initial design and construction of the plant is what determined how it could and would be used.  RuR also did not unilaterally "set" the specifications, production levels and prices of butadiene; they were contractually negotiated with Humble.  E.g., A1180-1214.  The Operating Contract included an arbitration clause in the event of disagreements, contradicting Exxon's assertion that its terms could be unilaterally "set" by RuR.  A1204  (Section 27 of Operating Contract). Moreover, if the United States were to unilaterally change the agreed-upon prices for raw materials or the finished product, Humble had the right to withhold further performance until either the agreed-upon price was reinstated or other action was taken.  See A1205 (Section 29 of Operating Contract).  The United States does not dispute that the Butadiene Plancor was operated by Humble and owned by the United States between August 1943 and April 1955.**

149. The wastes generated by the operation of the Butadiene Plancor included oil slop, quench oil emulsion and steam condensate, which contains tertiary butyl alcohol, caustic acids, copper ammonium acetate, and boiler blowdown waste. A1295-A1304, A1305-AI309 and A131O-A1316.

**PARTIALLY DISPUTED, to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baytown Refinery's wasteload. <u>See</u> Kittrell Decl. ¶¶ 4.a, 4.b.ii-iv, 5.a, 6.a.**

150. According to an industrial waste audit report prepared by Sheppard Powell - a consultant retained by the RuR, most of the wastewaters generated by the Butadiene Plancor were discharged into Scott's Bay, but some specific waste streams, including quench oil emulsions, steam condensate containing tertiary butyl alcohol, slop oil and separator sludge, were conveyed to the refinery waste processing facilities for treatment and disposal. A 1295- A1304, A1305-A1309 and A1310-A1316.

**PARTIALLY DISPUTED, to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baytown Refinery's wasteload. <u>See</u> Kittrell Decl. ¶¶ 4.a, 4.b.ii-iv, 4.b.viii, 5.a, 6.a.**

151. The Government sold the Butadiene Plancor to Humble in April 1955. A1251- A1285 and A1289-A1292.

**Not disputed that the United States, acting through the Rubber Producing Facilities Disposal Commission, sold the Butadiene Plancor to Humble in April 1955.**

### 3. Butyl Rubber Plancor

152. In 1942 DPC acquired a parcel of land adjacent to the BOW from Humble for the construction and operation of a butyl rubber plant identified by DPC as "Plancor 1082" or "SR-43" ("Butyl Rubber Plancor").  A0553.

**Not disputed.**

153. As the designated "agent" for DPC, Humble constructed the Butyl Rubber Plancor based on designs and specifications approved by DPC on this parcel of land. A0553 and A1318.

**PARTIALLY DISPUTED.  Humble itself developed or arranged for subcontractors to develop all of the designs and specifications for the Butyl Rubber Plancor.  See U.S. SOF ¶ 94 and US-BT008057 (cited therein).  The United States does not dispute that Humble's designs and specifications were submitted for approval by DPC, A0553, but DISPUTES that the United States had either the technical expertise or contractual responsibility for developing the designs and specifications.  In addition, the Humble was designated "agent" for DPC only during construction of the Butyl Rubber Plancor, not for purposes of operating the plant.  A1318.**

154. During the time period of 1942 to April 1955 DPC was the owner of the Butadiene Plancor and leased it to Humble. A0556, A1215 and A1287.

**Not disputed that the United States owned the Butyl Rubber Plancor and leased it to Humble from 1942 to April 1955.  DPC was dissolved by Act of Congress effective July 1, 1945.  See U.S. SOF ¶ 48 and BAYHIS-00008853-56 (cited therein).**

155. Under an operating contract the Butyl Rubber Plancor operated as a Government owned Plancor during the time period of February 1944 to April 1955 and RuR determined that the

plant would be used for the production of butyl rubber at specifications, productions levels and prices set by the RuR. A1317-A 1346, A1350-A1354 and A1355-A1364.

**PARTIALLY DISPUTED.  RuR did not unilaterally "determine" that the plant would be used for the production of butyl rubber; the initial design and construction of the plant is what determined how it could and would be used.  RuR also did not unilaterally "set" the specifications, production levels and prices of butyl rubber; they were contractually negotiated with Humble.  E.g., A1317-46.  The Operating Contract included an arbitration clause in the event of disagreements, contradicting Exxon's assertion that its terms could be unilaterally "set" by RuR.  A1338  (Section 28 of Operating Contract).  Moreover, if the United States were to unilaterally change the agreed-upon prices for raw materials or the finished product, Humble had the right to withhold further performance until either the agreed-upon price was reinstated or other action was taken.  See A1338 (Section 27 of Operating Contract).  The United States does not dispute that the Butyl Rubber Plancor was operated by Humble and owned by the United States between February 1944 and April 1955.**

156. The wastes generated by the Butyl Rubber Plancor operations included tertiary butyl alcohol, caustic soda, sulphuric acid, aluminum chloride, rubber polymer, naphtha, zinc stearate and lubricating oils. A1399-A1408.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baytown Refinery's wasteload.  See Kittrell Decl. ¶¶ 4.a, 4.b.vii, 4.b.ix, 5.a, 6.a.**

157. According to an industrial waste audit report prepared by Sheppard Powell - a consultant retained by the RuR, most of the wastewaters generated by the Butyl Rubber Plancor were

discharged into Scott's Bay, but some specific waste streams, including naphtha waste, slop oil and floating rubber polymer, were either conveyed to the refinery waste processing facilities for treatment and disposal or disposed of in waste units at the refinery. A1399-A1408.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baytown Refinery's wasteload.  See Kittrell Decl. ¶ 4.a, 4.b.iv, 4.b.vii, 4.b.ix, 6.a.**

158. The Government sold the Butyl Rubber Plancor to Humble in April 1955. A1409-A1416 and AI286-AI288.

**Not disputed that the United States, acting through the Rubber Producing Facilities Disposal Commission, sold the Butyl Rubber Plancor to Humble in April 1955.**

### 4. Copolymer (Styrene) Plancor

159. In late 1942 DPC acquired a parcel of land adjacent to the site of the Butadiene Plancor from Humble for the construction and operation of a copolymer (styrene) synthetic rubber plant identified by DPC as "Plancor 877" or "SR-40" ("Copolymer Plancor"). A 1417- A1419 and A1467.

**Not disputed.**

160. The Goodyear Tire & Rubber Company constructed the Copolymer Plancor at the site acquired by DPC from Humble. A1467-A1474.

**Not disputed.**

161. The Copolymer Plancor had an initial capacity of 30,000 long tons of synthetic rubber per year but its capacity subsequently increased to 44,000 long tons of synthetic rubber per year. A1479.

**Not disputed.**

162. During the time period of February 1943 to May 1955 DPC was the owner of the Copolymer Plancor and leased it to The General Tire & Rubber Company. A1215, A1479, A1481 and A1492.

**Not disputed that the United States owned the Copolymer Plancor from February 1943 to May 1955 and leased it to General Tire & Rubber Company during that time period. DPC was dissolved by Act of Congress effective July 1, 1945. See U.S. SOF ¶ 48 and BAYHIS-00008853-56 (cited therein).**

163. The Copolymer Plancor operated as a Government-owned Plancor during the time period of July 1943 to May 1955. A1479 and A1494.

**Not disputed that General Tire & Rubber Company operated the Copolymer Plancor from July 1943 to May 1955 and that it was a United States-owned plant during this time period.**

164. The wastes generated by the Copolymer Plancor operations included boiler blow down waste and sludge, sludge from brine purification, spent caustic containing TB.C. from butadiene purification, wastewater from the carbon black plant, liquid wastes containing mercaptans, salts, antioxidants, caustic soda, fatty acids, latex, styrene, oil, decanter water, rubber crumbs, carbon black, and sulphuric acid. A 1489-A1509.

**PARTIALLY DISPUTED to the extent Exxon suggests that any wastes generated by the Copolymer Plancor contributed to the Baytown Refinery's wasteload. See Kittrell Decl. ¶ 6.b.**

165. According to an industrial waste audit report prepared by Sheppard Powell - a consultant retained by the RuR, the wastewaters generated by the Copolymer Plancor were discharged into Scott's Bay. A1489-A1509. *See also* A1495-A1497.

**Not disputed.**

166. In May 1955 DPC sold the Copolymer Plancor to the United Carbon Company. A1492.

**Not disputed that the United States sold the Copolymer Plancor to the United Carbon Company in May 1955. DPC was dissolved by Act of Congress effective July 1, 1945. See U.S. SOF ¶ 48 and BAYHIS-00008853-56 (cited therein).**

### 5. Hydrocodimer Plancor

167. In 1943 DPC leased a parcel of land within the Baytown refinery from Humble for the construction and operation of a hydrocodimer production plant identified by DPC as "Plancor 1909" ("Hydrocodimer Plancor"). A1512.

**Not disputed.**

168. As the designated "agent" of DPC, Humble designed and constructed the Hydrocodimer Plancor on this parcel of land within the Baytown refinery. A1512-A1513 and A1533.

**PARTIALLY DISPUTED to the extent Exxon suggests that all facilities making up the Hydrocodimer Plancor were located within a single contiguous parcel of land. See A1512-14. Further, Humble was the designated "agent" of DPC only for purposes of construction, not subsequent operation of the plant. A1514. Otherwise not disputed.**

169. The purpose of the Hydrocodimer Plancor was to manufacture hydrocodimer - an avgas blending stock. A1533.

**Not disputed that the primary purpose of Plancor 1909 was to manufacture hydrocodimer, an avgas blending stock.**

170. During the time period of June 1944 to October 1946 DPC was the owner of the Hydrocodimer Plancor's facility and equipment, including the process units, buildings and an intricate network of pipelines interspersed throughout the refinery. A1512-A1516; Gravel Rep. at 59 (Fig. 12).

**PARTIALLY DISPUTED.   The red highlights used on Figure 12 to depict "DPC-owned" pipelines were added by Mr. Gravel, who has no first-hand knowledge of the facts and is not qualified to give opinion testimony on this topic for the reasons explained in the United States Memorandum in Opposition to Exxon's Summary Judgment Motion.  See U.S. Opp. at Argument VII.  The other cited document fails to establish that the United States owned process units, buildings or equipment "interspersed throughout the refinery." Furthermore, Humble purchased some of the facilities and equipment from the United States, including the Girbotol Unit, Cooling Tower, Lab and other facilities, in July 1946. See BAYHIS00003770-71, BAYHIS-00003789, and BAYHIS-00000797-801 (U.S. Opp. Exs. 14, 15 and 16).**

171. The Hydrocodimer Plancor operated as a Government-owned Plancor during the time period of August 1944 to August 1945. A1533 and A1560-A1561.

**Not disputed that the Hydrocodimer Plancor operated from August 1944 to August 1945 and was owned by the United States during that time period.  See also U.S. SOF ¶ 106 and BAYHIS-00023013 (cited therein) ("Pursuant to an Operating Contract, Humble agreed to operate Plancor 1909.").**

172. The wastes generated by the Hydrocodimer Plancor included oily wastewaters, and they were treated in the refinery's waste processing facilities, but only after PAW approved Humble's request to modify the sewer lines in the vicinity of the Plancor so that these wastewaters could be conveyed to the West Drainage Ditch which in turn conveyed them to the refinery's separators system. A1562-A1565.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes the extent to which any wastes from the Hydrocodimer Plancor contributed to the Baytown Refinery's wasteload.  See Kittrell Decl. ¶ 5.b.**

173. The Government sold the Hydrocodimer Plancor to Humble in October 1946. A1566, A1567-A1586 and AI587-A1588.

**PARTIALLY DISPUTED.  Humble purchased some of the facilities and equipment from the United States, including the Girbotol Unit, Cooling Tower, Lab and other facilities, in July 1946.  See BAYHIS00003770-71, BAYHIS-00003789, and BAYHIS-00000797-801.  The United States does not dispute that Humble purchased additional facilities and equipment in October 1946.**

**B. Baton Rouge**

**1. Butadiene Plancor**

174. In 1941 DPC acquired a parcel of land near the Baton Rouge refinery for the construction and operation of a butadiene plant identified by OPC as "Plancor 152" or "SR-29, SR-397 and SR-486") ("BR Butadiene Plancor"). A1591 and A1642.

**Not disputed.**

175. As the designated "agent" for DPC, Standard Oil constructed the BR Butadiene Plancor based on designs and specifications approved by DPC on this parcel of land. A1610 and A1642-A1643.

**PARTIALLY DISPUTED.  Standard itself developed or arranged for subcontractors to develop all of the designs and specifications for the BR Butadiene Plancor.  See U.S. SOF ¶ 135 and BRHIS-00001165-66 (cited therein).  The United States does not dispute that Humble's designs and specifications were submitted for approval by DPC, A1642-43, but DISPUTES that the United States had either the technical expertise or contractual responsibility for developing the designs and specifications.  In addition, Standard was the designated "agent" for DPC only during construction of the BR Butadiene Plancor, not for purposes of operating the plant.  A1610.**

176. During the time period of 1942 to April 1955 DPC was the owner of the BR Butadiene Plancor and leased it to Standard Oil. A1644, A1651-A1654 and A1655-AI674.

**Not disputed that the United States owned the BR Butadiene Plancor from 1942 to April 1955.  DPC was dissolved by Act of Congress effective July 1, 1945.  See U.S. SOF ¶ 48 and BAYHIS-00008853-56 (cited therein).  Also not disputed that the United States leased the BR Butadiene Plancor to Standard until September 1950, at which time custody was transferred to Copolymer Corp.  A1595.**

177. Under an operating contract the BR Butadiene Plancor operated as a Government owned Plancor during the time period of April 1943 to August 1947 and again from September 1950 to April 1955 and RuR determined that the plant would be used for the production of butadiene. A1644, A1651-A1654 and A1655-A1674. The BR Butadiene Plancor produced at least 149,000 short tons of butadiene during its period of operation. A1675 and A1676-A1678.

**PARTIALLY DISPUTED.  RuR did not unilaterally "determine" that the plant would be used for the production of butadiene; the initial design and construction of the plant is what determined how it could and would be used.  The United States does not dispute that the BR Butadiene Plancor was operated by Standard between April 1943 and August 1947 and then by Copolymer Corp. between September 1950 and April 1955, and that it was owned by the United States during both of those time periods; however, Standard also leased portions of the plant for its private commercial business at times during the post-WWII period.  A1661.  The United States does not dispute that the BR Butadiene Plancor produced at least 149,000 short tons of butadiene during its periods of operation.**

178. The wastes generated by the BR Butadiene Plancor operations included oil emulsions, sulphuric acid esters, copper ammonium acetate, ammonium hydroxide, oily water, and other wastewaters containing oil emulsions and soluble copper. A 1679-A 1686.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baton Rouge Refinery's wasteload.  See Kittrell Decl. ¶¶ 4.a, 4.b.v, 6.c.**

179. According to an industrial waste audit report prepared by Sheppard Powell - a consultant retained by the RuR, the process wastewaters generated by the BR Butadiene Plancor were discharged into Monte Sano Bayou, A1679, but some specific waste stream, including slop oil and oil emulsions, were sent to the Baton Rouge refinery for treatment; specifically, these wastes were collected from process flows as well as the gravity oil/water separator in Tank 1988 at the Plancor tank farm, AI680-A1683, and then conveyed by pipeline to a slop oil line northwest of Tank 783 at the refinery. AI687-AI689. Then, beginning in late 1946 an emulsion treating unit

was constructed in the refinery's waste processing facilities to further treat these wastes from the Plancor and the treated wastewaters from this unit were discharged to Callaghan's Bayou. A 1703-A 1720, 2562 and A2565-A2566 ..

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baytown Refinery's wasteload.  <u>See</u> Kittrell Decl. ¶¶ 4.a, 4.b.iv-v, 6.c.  Additionally, Mr. Sheppard Powell's report is not an authoritative source for identifying the disposition of any wastes and by-products from the Plancors within the refinery.  Kittrell Decl. ¶ 8.**

180. The Government sold the BR Butadiene Plancor to the Copolymer Corporation in April 1955. A1671.

**Not disputed.**

## 2. Butyl Rubber Plancor

181. In 1942 DPC acquired an unfinished plant on a parcel of land adjacent to the Baton Rouge refinery for the construction and operation of a butyl rubber plant identified by DPC as "Plancor 572" or "SR-15" ("BR Butyl Rubber Plancor"). A1721 and A1733.

**Not disputed, except that the specific month of acquisition was April 1942.  <u>See</u> U.S. SOF ¶ 140 and BRHIS-00015859 (cited therein).**

182. As the designated "agent" for DPC, Standard Oil constructed the BR Butyl Rubber Plancor on this parcel of land. Al733.

**PARTIALLY DISPUTED.  Standard had begun constructing the plant prior to any United States involvement. A1773 ("This project was begun as a privately-owned plant in the early months of 1941 . . . .").  In addition, Standard was the designated "agent" for**

**DPC only during construction of the BR Butyl Rubber Plancor, not for purposes of**

**operating the plant.  A1733.**

183. During the time period of 1942 to April 1955 DPC was the owner of the BR Butyl Rubber

Plancor and leased it to Humble. A 1721 and A1764-A1786.

> **No dispute that from April 1942 to April 1955 the United States owned the BR Butyl**
>
> **Rubber Plancor and leased it to Standard, not Humble.  DPC was dissolved by Act of**
>
> **Congress effective July 1, 1945.  See U.S. SOF ¶ 48 and BAYHIS-00008853-56 (cited**
>
> **therein).**

184. Under an operating contract the BR Butyl Rubber Plancor operated as a Government-owned

Plancor during the time period of December 1942 to April 1955 and RuR determined that the

plant would be used for the production of butyl rubber at specifications, productions levels and

prices set by the RuR. A1732-A1763.

> **PARTIALLY DISPUTED.  Early production was on an experimental basis, and full**
>
> **production at this plant did not begin until June 1944.  A1773-74.  There were also**
>
> **shutdowns of various parts of the Plancor particularly in the post-WWII and post-Korean**
>
> **War periods, and at times Standard used portions of the plant for its private commercial**
>
> **business.  See A1768-73.  RuR did not unilaterally "determine" that the plant would be**
>
> **used for the production of butyl rubber; the initial design and construction of the plant is**
>
> **what determined how it could and would be used.  RuR also did not unilaterally "set" the**
>
> **specifications, production levels and prices of butyl rubber; they were contractually**
>
> **negotiated with Standard.  E.g., A1732-63.  Moreover, if the United States were to**
>
> **unilaterally change the agreed-upon prices for raw materials or the finished product,**
>
> **Humble had the right to withhold further performance until either the agreed-upon price**

was reinstated or other action was taken.  <u>See</u> A1756 (Section 27 of Operating Contract). The United States does not dispute that the Butyl Rubber Plancor was operated by Humble and owned by the United States between February 1944 and April 1955.

185.  The BR Butyl Rubber Plancor produced approximately 315,000 long tons of butyl rubber and limited amounts of several other war products during its period of operation. A1787-A188 and A1789-A1791.

> **Not disputed.**

186. The wastes generated by the BR Butyl Rubber Plancor operations included sulphuric acid waste, caustic wastes, acetone and isoprene wastes, rubber polymer crumbs, aluminum chloride, undissolved oily rubber waste, other solid wastes containing zinc stearate, phenol beta naphthaline, and wastewaters containing sulphuric acid, caustic wastes, oils, acetone, tertiary butyl alcohol, and rubber crumbs. A1792-A1802.

> **PARTIALLY DISPUTED to the extent Exxon inaccurately suggests that wastes from this Plancor contributed to the Baton Rouge Refinery's wasteload.  <u>See</u> Kittrell Decl. ¶ 6.d.**

187. According to an industrial waste audit report prepared by Sheppard Powell - a consultant retained by the RuR, the wastewaters generated by the BR Butyl Rubber Plancor were discharged into Monte Sano Bayou and much of the solid waste was treated and/or disposed of in landfills, burning pits and other land-based waste disposal units in the western part of the refinery. A1792-A1802.

> **PARTIALLY DISPUTED to the extent Exxon inaccurately describes the degree to which wastes from this Plancor contributed to the Baton Rouge Refinery's wasteload.  <u>See</u>**

**Kittrell Decl. ¶ 6.d.  Additionally, Mr. Sheppard Powell's report is not an authoritative source for identifying the disposition of any wastes and by-products from the Plancors within the refinery.  Kittrell Decl. ¶ 8.**

188. The Government sold the BR Butyl Rubber Plancor to Standard Oil in April 1955. A1782.

      **Not disputed.**

### 3. Catalyst Plancor

189. In 1943 DPC acquired a parcel of land that was within the confines of Plancor 572 for the construction and operation of a catalyst plant identified by DPC as "Plancor 1526" or "SR-158". The dehydrogenation catalyst was to be used in the production of butadiene at Plancor 152. A1814 and A1828.

      **Not disputed.**

190. DPC was the owner of this Plancor, which operated during the time period of December 1943 to March 1944. A1814, and A1828-A1838.

      **PARTIALLY DISPUTED.  The Plancor was operated from October 1943 to March 1944 for demonstration purposes only.  A1828.   Not disputed that the DPC owned the Plancor and Standard operated it.**

191. In 1950 the plant was dismantled and the land was transferred back to the account of Plancor 572. A1924-A1929.

**Not disputed.**

### 4. Butadiene Conversion Plancor

192. In 1943 DPC arranged for the construction of a butadiene conversion plant within the Baton Rouge refinery on land owned by Standard Oil and using facilities and equipment owned by DPC. DPC identified the plant, which was used for the production of butadiene, as "Plancor 1355" or "SR-123". A1839-A1876.

**PARTIALLY DISPUTED.  DPC did not "arrange for construction" of this plant; rather, existing facilities in Standard's refinery were converted to produce butadiene, and Standard performed the conversion work under a letter of intent dated August 15, 1942. A1855.  In addition to the land, Standard owned the buildings that comprised this Plancor, as well as a portion of the machinery and equipment.  A1850.  DPC also owned a portion of the machinery and equipment.  A1850.**

193. This Plancor operated during the time period of April 1943 to December 1948. A1878 and Al924-A1929.

**Not disputed that Plancor 1355 operated from March (not April) 1943 to December 1948.  A1858.**

194. The operation of this Plancor was dependent on the refinery for raw materials, utilities and sewers for conveyance of wastewaters, and used the refinery waste processing system for the treatment and disposal of its wastes, A1886-A1923; in fact, DPC's "Engineer's Final Report" stated the following, "Plancor 1355 effluent water enter[s] the refinery storm sewer and oil sewer systems at several points." A 1906.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes the degree to which wastes from this Plancor contributed to the Baton Rouge Refinery's wasteload.  <u>See</u> Kittrell Decl. ¶ 5.c.**

195. The Government sold the facilities and equipment comprising this Plancor to Standard Oil in January 1949. Al 924-AI 929.

     **Not disputed.**

### 5. Avgas Blending Components Plancor

196. In 1942 DPC acquired a parcel of land that was near the Baton Rouge refinery for the construction and operation of a plant that ultimately was used to manufacture avgas blending components and was identified by DPC as "Plancor 1065". A1930-A1932.

     **Not disputed.**

197. DPC was the owner of the plant and it operated from approximately May 1944 to May 1945. A1930-A1932 and A1933-A1938.

     **No dispute that Standard operated the plant from approximately May 1944 to May 1945 and that DPC was the owner of the plant during this time period.**

198. In 1950 Standard Oil bought the underlying parcel of land but not the plant itself which a third party dismantled and unsuccessfully attempted to sell to other parties. A 1939-A1954.

     **PARTIALLY DISPUTED to the extent Exxon's statement is vague regarding when the United States' ownership ended; the United States sold Plancor 1065 to Samuel C. Rudolph & Associates, Inc., in July 1949. Furthermore, Standard acquired the facilities formerly comprising Plancor 1065 from another private third party in September or October 1950.** See **U.S. SOF ¶150 and the exhibits cited therein.**

### 6. Hydrogenation Plancor

199. In 1943 DPC arranged for the construction of a hydrogenation plant within the

Baton Rouge refinery on land owned by Standard Oil and using facilities and equipment owned by DPC.  This plant, which was used for the production of hydrogenation products (i.e., avgas components), was identified by DPC as "Plancor 1868". A1955-A1958, A1959-A1960 and A1961-A1985.

**PARTIALLY DISPUTED.  Standard already had begun construction prior to entering into a lease agreement with DPC, and that agreement was dated November 1943. See U.S. SOF ¶ 163 and the exhibit cited therein.**

200. This Plancor operated during the time period of December 1943 to September 1945. AI955-A1958, 1959-A1960 and A1961-A1985.

**DISPUTED.   See A1957-58 (noting that the "supply contract for C-S was cancelled after the plant was in operation about 80 days," and that "[n]aturally, the cancellation of the manufacture of C-S immediately obsoleted a considerable portion of the plant"); MIS-00014691 (at the time, "C-S" was a new specification for avgas) (cited in U.S. SOF ¶ 178).**

201. In October 1949 Standard Oil purchased the plant. A1986-A1990.

**Not disputed.**

### C. The Integration of the Government-Owned Plants and the Refineries

#### 1. Sharing of Products and Byproducts for Use as Raw Materials

202. At both Facilities the refinery manufactured various products or byproducts that were used as raw materials at one or more of the Government-owned plants, and vice versa. *See infra* PF ¶¶ 203-04.

**Not disputed.**

203. Examples of the sharing of products and byproducts at the Baytown Facility include the following: (a) the Ordnance Department purposely sited the BOW adjacent to the Baytown refinery so that the BOW could rely upon the refinery to supply the primary raw material - naphtha - that was necessary for the processing of most of the toluene manufactured at the BOW, A401, AI078 and A1140; (b) the refinery supplied the Butadiene Plancor with gas oil that was used as an oil quench for the production of butadiene, A1305-A1309 and Gravel Rpt. at 88 (Fig. 19); (c) the refinery supplied the Butyl Rubber Plancor with a butane-butylene stream, which had been produced in the refinery'S catalytic cracking operations, that was processed in the Butyl Rubber Plancor's isobutylene extraction unit for the removal of the isobutylene and then sent to the Butadiene Plancor for processing into butadiene, A1305-A1309, A1223 and A1361; (d) most of the bypro ducts resulting from the toluene production operations at the BOW were sent back to the refinery for various uses, A040 1; (e) the Butyl Rubber Plancor supplied the refinery with spent butane and an isobutylene dimer stream for use in the production of avgas, A1361; (f) the Butadiene Plancor supplied the refinery with a mixture of polymer, butanes and nbutylene for use in the production of avgas, A1223; and (g) the Hydrocodimer Plancor supplied the refinery with hydrocodimer for the production of avgas. A0795-A0796.

**PARTIALLY DISPUTED to the extent Exxon implies that the sharing of products and byproducts contributed to the Baytown Refinery's wasteload.  See Kittrell Decl. ¶ 5.**

204. Examples of the sharing of products and byproducts at the Baton Rouge Facility include the following: (a) the refinery supplied crude pentane, butylene, and butane-butylene to the BR Butyl Rubber Plancor and the Plancor supplied the refinery with spent Cs fractions and butane-butylene fractions, A2002; (b) the refinery supplied naphtha feedstock to the Butadiene Conversion Plancor, A2006-A2007; and (c) the refinery supplied virgin naphtha to the Avgas

Blending Components Plancor, which in turn supplied the refinery with some avgas components. A2009-A2021 and A2022-A2026.

**PARTIALLY DISPUTED to the extent Exxon implies that the sharing of products and byproducts contributed to the Baton Rouge Refinery's wasteload.  See Kittrell Decl. ¶ 5.**

## 2. Reliance Upon the Refinery's Waste Processing Facilities

205. A number of waste streams generated by the BOW or the Plancors at Baytown were treated and disposed of in the Baytown refinery waste processing facilities, including the following: (a) BOW - its wastewaters were processed in the refinery's waste processing facilities; specifically, these wastewaters were conveyed by a 36-inch concrete sewer line to the refinery sewer system, which emptied into an earthen ditch - called the West Drainage Ditch - which transported the wastewaters to the refinery'S separators system for treatment, A1078 and A2030; (b) Butadiene Plancor - its quench oil emulsions, steam condensate containing tertiary butyl alcohol, and slop oil waste, were conveyed to the refinery waste processing facilities for treatment and disposal, A1295-A1304, A1305-A1309 and A1310-A1316; (c) Baytown Butyl Rubber Plancor - its naphtha waste, slop oil and floating rubber polymer, were either conveyed to the refinery waste processing facilities for treatment and disposal or disposed of in waste units at the refinery, A1399-A1408; and (d) Hydrocodimer Plancor - its oily wastewaters were conveyed to the refinery's separators system. A1562-A1565.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baytown Refinery's wasteload.  See Kittrell Decl. ¶¶ 4-7.**

206. A number of waste streams generated by the Plancors at Baton Rouge were treated and disposed of in the Baton Rouge refinery waste processing facilities, including the following: (a) Baton Rouge Butadiene Plancor - its slop oil and oil emulsions were sent to the refinery for treatment, A1295-A1304, A1687-A1689, A1703-Al720, A2562 and A2565-A2566; (b) Baton Rouge Butyl Rubber Plancor - much of its solid waste was treated and/or disposed of in landfills, burning pits and other land-based waste disposal units in the western part of the refinery, A1399-A1408; and (c) Baton Rouge Butadiene Conversion Plancor - its wastes and wastewaters were processed in the refinery's waste processing facilities. A 1906.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes certain by-products as "wastes" or the extent to which any actual wastes contributed to the Baton Rouge Refinery's wasteload.  See Kittrell Decl. ¶¶ 4-6.**

### 3. Reliance Upon the Refinery's Other Infrastructure

207. A significant part of the BOW's infrastructure was located within the refinery itself; for example, the BOW equipment for treating naphtha with acid and caustic was located in the refinery, and approximately a dozen of the BOW's large aboveground storage tanks were located at the refinery's tank farms in and around the refinery. A2027-A2029.

**Not disputed.**

208. Several of the Plancors, including the Hydrocodimer Plancor at Baytown and the Butadiene Conversion Plancor at Baton Rouge, were constructed in the middle of the refinery and were dependent on the refinery's infrastructure, such as sewers and utilities, for their operation. Al186-A1923, A1562-A1565 and Gravel Rpt. at 57-59.

**PARTIALLY DISPUTED because Exxon fails to identify which other Plancors, if any, besides the Hydrocodimer Plancor at Baytown and the Butadiene Conversion Plancor**

at Baton Rouge allegedly were "constructed in the middle of the refinery and were dependent on the refinery's infrastructure."

### D. The Government's Operational Control of the BOW and Plancors

#### 1. Products and Production Levels

209. Throughout WWII the U.S. Army Ordnance Department required the BOW to produce as much toluene as possible for the U.S. military. A2053.

**Not disputed.**

210. Under the operating contracts for the Plancors, the Government possessed the authority to determine the products to be manufactured and their production levels at the Plancors at both Facilities, and pursuant to this authority directed Humble or Standard Oil to increase production levels as necessary. *See* PF ¶¶  148, 155, 169, 177 and 184; A2073.

**DISPUTED.  <u>See</u> Responses to Exxon PF ¶¶ 148, 155, 169, 177 and 184 and exhibits cited therein; <u>see also</u> US-GEN000706-07 (U.S. Opp. Ex. 17)  (example of how Humble and Standard told the United States what they were capable of producing, in the course of negotiating contracts with the United States).**

211. For example, in one RuR telegram to Humble, Humble was directed to triple the amount of butyl rubber manufactured at the Butyl Rubber Plancor, stating the following in a telegram to Humble: "take all necessary steps including those related to the purchase of materials, machinery and equipment to effect an increase in the capacity of the above butyl rubber project from 20,000 tons per annum to 60,000 tons per annum." A2073.

**PARTIALLY DISPUTED to the extent Exxon cites this telegram as an example of the United States "unilaterally" directing Humble to increase production, as distinct from**

consulting with Humble cooperatively to determine what level of production is feasible. **See** Response to Exxon PF ¶ 210.

### 2. Price and Market

212. The operating contracts for the synthetic rubber plants at both Facilities provided that RuR was the sole purchaser of the manufactured products at prices established under the contracts or would designate that the product be shipped to another Plancor *(e.g.,* butadiene manufactured at the Butadiene Plancor at Baytown was required to be sent to the adjacent Copolymer Plancor for processing into synthetic rubber). *See* PF ¶¶ 148, 155, 169, 177 and 184.

**Not disputed.**

### 3. Supply and Price of Raw Materials

213. DPC arranged for the processing of light, catalytically cracked naphtha and hot acid copolymer into hydrocodimer at the Hydrocodimer Plancor at Baytown, and retained title to these raw materials throughout the process. A0523-A0524 and A0540.

**PARTIALLY DISPUTED.  Under the operating contract, Humble arranged for the purchase of the feed stocks for hydrocodimer production as agent of DSC (not DPC). However, Humble acted as an independent contractor in "the operation and maintenance of the plant, in the processing of raw feed stocks therein, and in the performance of all other services hereunder . . . ."  A0526.  Title to raw materials remained with DSC, not DPC.  Title to any byproducts returned to Humble's refinery, for which Humble gave credit to DSC, vested in Humble.  A0540.**

214. The United States arranged for the purchase of toluene concentrate for processing at the BOW on its own account, and paid for and retained ownership of the alumina catalyst *(i.e.,*

caustic soda) used or partially used as a raw material at the hydro former reactor processing unit at the BOW. Al156, Al157-Al158, Al159, Al160-Al161, Al162-Al164, Al165, Al166 and A2279.

**PARTIALLY DISPUTED.  Although unused or partially used catalyst was RFC property, completely used catalyst was not.  A1159; see also A1157-58, A1160-61 and A1166 (Humble explored a possible arrangement with a private third party to recycle used catalyst).  Humble arranged for the purchase of toluene concentrate as an agent of the United States, but the title to this feedstock was Humble's; the title did not vest in the United States until delivery of the finished toluene product.  Title to prime cut naptha supplies and byproducts vested in Humble once they were transported back to the refinery. A1054.**

### 4. Construction or Improvement of the Facilities and Equipment

215. Humble had to obtain the approval of the Ordnance Department of the U.S. Army for any modifications to the facilities at the BOW that were necessary to remove production bottlenecks and maintain prior production capacities. A0276-A0279.

**DISPUTED.  The cited document discusses transportation plans in District 3; as such, it does not support Exxon's statement.**

216. Any capital improvements of the facilities or equipment at the synthetic rubber Plancors at the Baytown complex required the approval of the RuR. A2108-A2114, A2115- A2127, A2128-A2142, and A2194-A2203.

**Not disputed that most capital improvements over a specified cost threshold required RuR's approval.  See A3030.**

### 5. Waste Processing

217. In 1946 RuR acknowledged that at the time the various synthetic rubber Plancors were

designed and constructed, the RuR directed that only minimal "industrial wastes treatment and

disposal facilities" be installed at these Plancors, stating as follows: "[m]any of these facilities

were designed to meet only the minimum requirements because the more comprehensive

programs in many instances could not be justified in the war emergency and the scarcity of

critical materials." A2143-A2144.

**PARTIALLY DISPUTED.  Some of the Plancors were designed and at least**

**partially constructed by Humble or Standard prior to involvement by RuR.   See, e.g.,**

**Responses to Exxon PF ¶¶ 192, 199 (Baton Rouge Plancors 1355 and 1868).**

218. RuR had to approve the construction of any "special waste disposal facilities" at the

synthetic rubber Plancors. A2110, A2123, A2126 and A2194-A2203.

**No dispute that RuR's approval was required for constructing waste disposal**

**facilities that required the use of critical materials and were over a specified price**

**threshold.  See A3030.**

219. In 1946, RFC arranged for a comprehensive audit report regarding the waste processmg

facilities and operations at each synthetic rubber Plancor nationwide. The 1946 comprehensive

audit report set forth that during WWII the United States declined to authorize necessary

improvements to the waste processing facilities at the synthetic rubber Plancors, stating as

follows:

> [d]uring this period, it was recognized that some raw and partially processed
> materials were lost into waste waters leaving the plants, and that some of these
> substances were causing a stream pollution problem. However, personnel could
> not be diverted from more pressing objectives to study the complex problems

related to waste prevention or treatment - nor could construction materials be secured for such purposes. A2147; *see generally* A2145-A2174.

**Not disputed.**

220. In 1946, RFC retained an environmental consultant - Sheppard Powell - to conduct audits of the production operations and waste processing facilities at the synthetic rubber Plancors at the Facilities and for the consultant to provide RFC and RuR with recommendations for waste processing modifications and improvements. A 1295-A 1304, A 1399-A 1408, A 1498- A1509, A1679-A1686, A1792-A1802, A2143-A2144 and A2175-A2182.

**PARTIALLY DISPUTED because the documents do not support Exxon's characterization of Mr. Powell's assignment as an "audit."  See A2143-44 (characterizing his assignment as a "report").  Moreover, both the scope of Mr. Powell's assignment and his expertise in refinery operations was limited.  Kittrell Decl. ¶ 8.**

221. During WWII the Ordnance Department of the U.S. Army knew that some, if not most, of the spent alumina catalyst waste generated at the hydroformer reactor processing unit at the BOW was disposed of in open dumps at or in the vicinity of the BOW. AI157-A1158, A1159, A1160-AI161, Al162-Al164, Al165 and A1166.

**Not disputed that the Army was aware; however, it was Humble that disposed of the spent catalyst.  See, e.g., A1157-58, A1160-61 and A1166.**

222. In the late 1940s Humble had to obtain the Government's approval to install an effluent treating system for the treatment of the condensate oil emulsion wastewater generated at the Butadiene Plancor at Baytown. A2194-A2203 .

**Not disputed.**

223. In April 1947 Standard Oil requested the RuR's permission to replace a temporary separator with a "General Separator" at the outlet of the 72-inch sewer serving the BR Butyl Rubber Plancor and the other plants in the Chemical Products area at Baton Rouge, but the RuR denied the request, A2204-A2207, although several years later RuR granted permission. A2208-A2209.

**PARTIALLY DISPUTED.  Both Standard and RuR initially were concerned that implementation of the project would cause degradation of the river bank.  After careful study, Standard concluded that the project could safely proceed, and RuR then approved. See generally BRHIS-00013937-89.**

224. In the late 1940s RuR officials conducted meetings with Texas State environmental officials regarding the issues of water pollution and the effects of the wastewater discharges from the synthetic rubber Plancors at Baytown into nearby surface water bodies and then would inform plant-level employees of the outcome of such meetings. A2210.

**PARTIALLY DISPUTED.  The cited memorandum instructs that "[a] letter should be prepared informing the Texas plants of the above visit" with the Texas State Game, Fish and Oyster Commission, which indicates that RuR planned to send a written communication addressed to multiple refineries in Texas.  The cited memorandum does not, however, state that RuR officials would "inform plant-level employees" about the meeting with the State, and Exxon cites no other evidence that this occurred.**

225. The requirement to obtain RuR's permission for any significant construction or installation, including waste processing improvements, at the synthetic rubber Plancors continued in the 1950s. For example, in late 1952 Humble, which had been described by RuR as its "agent" in regard to the extension of a steel sewer pipe at the Butyl Rubber Plancor at Baytown, recommended that a 24-inch steel sewer pipe replace a drainage ditch that was conveying

wastewaters from the synthetic rubber Plancors to Scott's Bay. RuR wanted a much shorter steel pipe to be installed and to continue to use the drainage ditch to convey the wastewaters to Scott's Bay. However, after Humble informed RuR that the open drainage ditch was adjacent to residential housing, and therefore, the wastewater was passing through residences via an open ditch, RuR approved the length of steel sewer pipe recommended by Humble. A2211-A2224 and A2238-A2270.

**Not disputed.**

### 6. Other Operational Aspects

226. Pursuant to the operating contracts and as supplemented by RuR's issuance of a "Manual of Administrative Procedures", RuR imposed a myriad of additional operational requirements and procedures upon the operation of each synthetic rubber Plancor at Baytown and Baton Rouge; specifically, this manual required Humble or Standard Oil to comply with, for example, the following requirements: (1) submit daily and monthly production and product quality reports to RuR; (2) obtain RuR approval of most plant-related expenditures; (3) obtain RuR approval for the disposal of waste, scrap, byproducts and surplus materials and equipment; (4) obtain RuR approval, and comply with detailed procedures, regarding any additions to, alterations, or improvements to the plant; and (5) obtain RuR approval of employee salaries and benefits above a relatively low threshold amount. A2985-A3087.

**DISPUTED to the extent Exxon refers to any period after World War II. PARTIALLY DISPUTED to the extent Exxon refers to World War II and subjectively characterizes the referenced procedures as a "myriad" without providing contextual evidence to support such a characterization.**

227. The Ordnance Department of the U.S. Army had a permanent staff and detachment stationed at the BOW to command and supervise its operation. A1133, A2036- A2037 and A2055.

**DISPUTED. U.S. Army personnel were stationed at the BOW to secure and protect the plant, and personnel from the Army Ordnance Department inspected and accepted deliveries of finished toluene at the BOW. These personnel did not "command and supervise [the BOW's] operation." U.S. SOF ¶¶ 189, 191, and 193-94 and the exhibits cited therein.**

228. In the early 1940s the U.S. Army stationed an infantry company (which was replaced by a U.S. military police unit in 1943) at the BOW to secure and protect the plant. A2061.

**Not disputed.**

229. The BOW contained two Army barracks buildings and a mess hall for the U.S. Army personnel stationed at the plant. A1073, A1074-A1097, A2061, A2226 and A2228.

**Not disputed.**

230. According to Humble, the U.S. Ordnance Department supervised the operation of the BOW during WWII, stating as follows in a report regarding the BOW:

> [o]perations of the plant were and are under the supervision of the Ordnance Department of the United States Army and representatives of such department were stationed upon the site prior to the commencement of operations, and a complete staff has been maintained on the site since that time. A1133.

**DISPUTED. Exxon's assertion is contradicted by the "History of the Baytown Ordnance Works," a contemporaneous report which states: "Since the beginning of operations, the Contractor has been charged with primary responsibility for production**

**planning, control and engineering, process inspection, plant safety and plant protection."**

**A2038.**

231. According to a 1943 Humble memorandum, the Ordnance Department of the U.S. Army

managed the operations of the BOW in numerous respects, stating as follows:

> [t]he administrative load in connection with operations has been abnormal
> because of the Ordnance Department's efforts to administer many affairs which,
> under the terms of the Contract appear to be the Contractor's prerogative .... We
> are subjected to a steady stream of orders from this office stating how various
> phases of the business should be conducted and specifying numerous reports to be
> submitted daily, weekly, and monthly to St. Louis covering personnel,
> absenteeism, average hourly rates, overtime payments, production quotas,
> maintenance costs, warehouse inventories on a dollar basis (including catalyst as a
> spare part), etc. The latest order, for example, states that no equipment of any kind
> or cost other than regular warehouse items may be acquired by the BOW without
> prior approval of that office . . . . Hence, we are subjected to inspections by
> representatives from this office who have had negligible knowledge of refining
> operations but who recommend numerous changes in our safety, fire fighting, and
> plant protection procedures and equipment. Likewise, inspectors from the Eighth
> Service Command regularly check our sanitary facilities and require a monthly
> report from us as to the adequacy of our water supply and sewage facilities.
> A2230.

**PARTIALLY DISPUTED.  Although quoted correctly, the memorandum does not**

**support Exxon's assertion that the Ordnance Department "managed the operations of the**

**BOW."  By contractual agreement, Humble, not the United States, was responsible for**

**operations.  See U.S. SOF ¶¶ 123-25 and the exhibits cited therein.  The memorandum**

**corroborates this fact, noting the author's view that some matters about which the**

**Ordnance Department had inquired "appear to be the Contractor's prerogative."  A2230.**

**The memorandum also states that the Ordnance Department had "negligible knowledge of**

**refining operations."  A2230.  In addition, the "History of the Baytown Ordnance Works"**

**states that the main function of Ordnance Department inspectors at the BOW was to**

**ensure that "finished toluene accepted by the Ordnance Department meets U.S. Army**

**specifications and that the quantities of toluene billed to the government are correct."**
**A2041; see also A2041 ("Activities of the local Ordnance staff in connection with safety**
**have generally been confined to occasional inspections, recommendations and forwarding**
**of required reports to higher echelon.").  Furthermore, due to "the Contractor's excellent**
**product quality record," by 1943 the frequency of Ordnance Department product**
**inspections had declined to the point that only 10 percent of all product tests were attended**
**by Ordnance Department inspectors.  A2042.**

232. DPC maintained an office and permanent staff at the Baytown Facility. A2237.

**Not disputed that DPC had at least one official stationed in an office at the Baytown**
**Facility.  The cited memorandum does not establish that there were any other "permanent**
**staff" besides the author.**

233. In a 1944 DPC memorandum, a DPC official stationed at the Baytown Facility stated as
follows in a memorandum regarding an employees workplace issue at one of the Plancors: [o]n
numerous occasions I sit in my office looking out of the window along about a quarter to five
and can see the men gathering up through the aisles of the boiler house section and lining up to
make a rush for the time clocks at five o'clock. Since this matter has not just occasionally
happened, but has been constant for weeks, it is running into a considerable loss of time. . . .
Please take steps with the general contractor to see that the condition is eliminated or the matter
will have to be taken up with Washington, where I am sure we can get results. A223 7.
**Not disputed.**

### 7. Government Designates Humble and Standard Oil As Its "Agent"

234. Humble and Standard Oil were designated as an "agent" of DPC in various operating contracts regarding the construction of the Plancors at both Facilities. *See supra* PF ¶¶ 146, 153, 168, 175 and 182.

**Not disputed that Humble and Standard were designated as an "agent" of DPC for purposes of construction of several Plancors at Baytown and Baton Rouge.  <u>See</u> Responses to Exxon PF ¶¶ 146, 153, 168, 175 and 182.**

235. Humble was described as the "agent" of the RuR in "Service Order Contract No. 629-1" in 1953 regarding the installation of a 24-inch cement-lined steel pipe sewer from the south end of the synthetic rubber Plancors' sewer to Scott's Bay at the Baytown Facility. A2238-A2270.

**PARTIALLY DISPUTED, because Humble itself did not construct this project and thus did not act as an agent of RuR "regarding the installation" of the project.  Instead, Humble obtained the services of a contractor, John G. Holland, who performed the actual construction of the project; in doing so, Mr. Holland acted as an "independent contractor" and held both Humble and the United States harmless.  A2246-50; <u>see also</u> A2250 ("Contractor shall follow the desires of Agent in the results of the work only and not in the means whereby the work is to be accomplished . . . .").**

236. Humble was described as the "agent" of the Government in a "Service Order No. 2" to investigate and prepare recommendations concerning the treatment and disposal of wastes from the Butadiene and Butyl Rubber Plancors at the Baytown Facility. A2271-A2278.

**PARTIALLY DISPUTED because Humble itself did not perform any of the work. Rather, it obtained the services of a company called Metcalf &Eddy, which acted as an "independent contractor" in doing the work and held both Humble and the United States**

harmless.  **A2272-75;** see also **A2274** ("Contractor shall follow the desires of Agent in the results of the work only and not in the means whereby the work is to be accomplished . . . .").

237. While naphtha obtained from the processing of crude oil at the Baytown refinery was the source of most of the toluene produced at the BOW, to the extent raw materials from elsewhere were used, the Ordnance Department of the U.S. Army required that Humble serve as its "agent" for the purchase of such materials for use at the BOW, A2279, A2046-A2049, and 2076-A2079, and similarly directed Humble to cease purchases of such materials when they were no longer necessary. A2280, A2281-A2282 and A2283-A2285.

**PARTIALLY DISPUTED.   Over half of the feedstocks used to make toluene at the BOW were *not* obtained from the distilling and cracking of crude oil at the Baytown refinery but, instead, were shipped to Baytown from other refineries.  See Expert Report of Dr. James R. Kittrell dated Aug. 10, 2012 ("Kittrell 1st Report") at 25-28; Supplemental Rebuttal Report of Dr. James R. Kittrell dated Apr. 12, 2013 ("Kittrell 3rd Report) at 11-12.  The United States does not dispute that Humble served as the "agent" of the Ordnance Department for the purpose of purchasing such materials for use at the BOW.**

238. Humble and Standard Oil were instructed to act as the "agent" of RuR in the shipment of synthetic rubber products from the synthetic rubber Plancors at the Baytown and Baton Rouge Facilities; for example, on numerous shipping orders of products from these Plancors to various other purchasers and destinations, RuR designated them as the "agent" of the Government in arranging the shipment. A2286-A2340.

**DISPUTED.  EXXON's assertion is directly contradicted by a letter from Humble to Goodyear stating as follows:**

> May I call your attention to the fact that in our contract with Rubber
> Reserve Company, Humble Oil and Refining Company is not in the legal
> position of 'Agent" for Rubber Reserve Company but rather in the legal
> position of 'Vendor.'  Hence, any steps we take are as independent contractor
> and not as an agent for Rubber Reserve Company.

**BAYHIS-00014042 (U.S. Opp. Ex. 18).**

239. Humble was the designated "agent" of DSC in purchasing some limited amounts of feed

stocks for Plancor 1909; for example, a PAW "Memorandum of Recommendation" for Plancor

1909 stated that "insofar as the purchase and acquisition of feed stocks and the disposition of the

final product is concerned Humble acts solely as agent for Defense Supplies Corporation .... "

A2343.

**Not disputed that Humble was an "agent" for the limited purposes described above;**

**but PARTIALLY DISPUTED to the extent Exxon may imply that Humble was an agent**

**for other purposes.  For all purposes relevant to plant operation Humble was an**

**independent contractor, as the Operating Contract for Plancor 1909 made clear:**

> [I]n the operation and maintenance of the plant, in the processing of raw feed
> stocks therein, and in the performance of all services hereunder, however,
> Humble shall act as an independent contractor, it being understand that
> [DSC] shall not have the right to direct the details of such operation but is
> interested only in the results obtained therefrom.

**BAYHIS-00023014 (U.S. Opp. Ex. 9).**

**V. Wastes, Waste Processing Facilities and Waste Processing Improvements**

**A. Baytown Facility**

**1. Wastes**

240. The Baytown refinery operations generated approximately 30 million gallons per day of

wastewater during WWII and the wastes generated included once-through cooling water, oily

slop, oil emulsion, spent acid sludge and other sludges, boiler blowdown waste, suspended coke, waste catalyst and oily silt. A2350-A253.

**PARTIALLY DISPUTED to the extent Exxon inaccurately describes byproducts as "wastes." Kittrell Decl. ¶¶ 4-5.**

241. The BOW and Plancors generated a considerable amount of numerous types of wastes as well during their periods of operation. *See supra* PF ¶¶ 140, 149, 156, 164 and 172.

**PARTIALLY DISPUTED. The United States incorporates here its responses to Exxon PF ¶¶ 140, 149, 156, 164 and 172.**

### 2. Waste Processing Facilities

242. During the approximate time period of 1941 to the early 1950s the Baytown refinery contained three wastewater processing systems - the "central disposal system," the "north disposal system" and the "southwest disposal system" - that managed the wastewater effluent generated by the refinery (including both the operating units and the tankage/tank farm areas), the Hydrocodimer Plancor (located within the refinery), and the BOW, and managed certain wastewaters generated by the Butyl Rubber and Butadiene Plancors. Al 078, A 1295- A1304, A1305-A1309, A1310-A1316, A1399-AI408, A 1562-AI565, A2030, A2352-A2353, A2391 and A2364. *See also* Gravel Rpt. at 93 (Fig. 20 - Humble 1952 depiction of the wastewater processing system in the mid-1940s).

**PARTIALLY DISPUTED. The United States incorporates here its responses to Exxon PF ¶¶ 140-42, 149-50, 156-57, 164-65, 172 and 205. Additionally, Mr. Gravel has no first-hand knowledge and is not qualified to offer expert opinion testimony on this topic. <u>See</u> U.S. Opp. at Argument VII.**

243. The "central disposal system" collected wastewater from "essentially all of the operating units and the greater portion of the tankage in the refinery proper," which included the avgas production unit and the Hydrocodimer Plancor, the BOW, certain waste streams generated by the Butyl Rubber and Butadiene Plancors, and most of the tankfarms and tankage area at the refinery. This system had a west branch and an east branch. The west branch of this system transported the wastewater effluent successively through the following waste units to a specific surface water body: (a) an open ditch, which was called the West Drainage Ditch; (b) the monolithic sewer; (c) Separator 10; (d) an open ditch, which was called the Outfall Canals; and finally into (e) the Houston Ship Channel. The east branch of this system transported the wastewater effluent successively through the following waste units to a specific surface water body: (a) Separator 1; (b) the monolithic sewer; (c) Separator 10; (d) the Outfall Canals, and finally into (e) the Houston Ship Channel. The "central disposal system" also processed wastewater effluent from the southern dock area of the refinery by transporting this effluent successively through the following waste units to a specific surface water body: (a) Separator 12; (b) the Outfall Canals; and finally into (c) the Houston Ship Channel. A2352, A2364 and A2392-A2393.

**PARTIALLY DISPUTED.  The lack of any time period definition makes it impossible to confirm the accuracy of Exxon's contentions, as wastewater processing and disposal systems at Baytown changed over time.  The United States further incorporates here its responses to Exxon PF ¶¶ 140-42, 149-50, 156-57, 164-65, 172 and 205.**

244. The "north disposal system" collected wastewater and drainage from the crude oil tank farms, such as the North Tank Farm, and the area north of the refinery's operating units. This system transported this wastewater effluent successively through the following waste units to a

specific surface water body: (a) open ditches *(i.e.,* the Velasco Street Ditch); (b) Separator 9; and finally into (c) Goose Creek, which ultimately flowed into the Houston Ship Channel. A2353 and A2364.

**The United States does not dispute that Exxon PF ¶ 244 accurately describes how the "north disposal system" functioned at Baytown for a period of time.**

245. The "southwest disposal system" collected wastewater and drainage from the refinery'S tankage and other areas southwest of the refinery. This system transported the wastewater effluent successively through the following waste units to a specific surface water body: (a) an open ditch; (b) Separator 2; and finally into (c) Mitchell Bay. A2352 and A2364.

**The United States does not dispute that Exxon PF ¶ 245 accurately describes how the "southwest disposal system" functioned at Baytown for a period of time.**

246. The three synthetic rubber Plancors - Butadiene, Butyl Rubber and Copolymer - had a separate dedicated wastewater processing system. All three Plancors disposed of most of their wastewater effluent through a common main sewer line that discharged the effluent into Scott's Bay. A1295-A1304, A1399-A1408 and A1489-A1509.

**PARTIALLY DISPUTED to the extent Exxon uses the vague phrase "most of their wastewater effluent." The United States does not dispute that all three referenced Plancors disposed of their wastewater effluent through a common main sewer line that discharged the effluent into Scott's Bay.**

247. Some of the wastes generated by the synthetic rubber Plancors were treated and/or disposed of in the Refinery's wastewater processing system and other solid waste units, including the following: (a) Butyl Rubber Plancor - naphtha waste, slop oil and floating rubber polymer,

A1399-AI408; and (b) Butadiene Plancor - slop oil, quench oil emulsion, steam condensate (containing tertiary butyl alcohol and caustic acids), and separator sludge. A1295-A1304, A1305-A1309 and A1310-A1316.

**PARTIALLY DISPUTED. The United States incorporates here its responses to Exxon PF ¶¶ 149-50 and 156-57.**

### 3. Post-WWII Waste Processing Improvements

248. In 1947 Humble conducted a comprehensive study of the refinery's waste processing systems. This study determined that the existing waste processing systems for managing wastewater effluents were "badly overloaded" due to both the significant amount of wastewaters generated by refinery operations - approximately 30 million gallons per day - and the undesirable effects of specific types of wastes in the wastewaters. A0823-A0828, A2350- A2353 and A02397 For example, one of the findings of the comprehensive study was that the separators' efficacy in removing oil and sediment from the wastewater effluent was reduced because "serious difficulties are encountered when emulsions and large quantities of finely divided solids enter the separator with the waste water," resulting in the discharge of effluent that was of "unsatisfactory quality." A2353.

**Not disputed.**

249. In 1948 Humble created the "Refinery Loss Committee." The purpose of the Committee was to identify, evaluate and implement specific waste processing improvements to reduce oil losses and improve wastewater effluent quality. A2410.

**PARTIALLY DISPUTED to the extent Exxon's description of the Committee's purpose differs from that in the cited document. The Committee "functioned as a clearinghouse for ideas and suggestions for reducing oil losses, publicizing the oil**

**conservation program, improving further the refinery effluent, and seeing that proper attention is given to the provision of new equipment and facilities that might be required to help employees achieve these goals." A2410. Contrary to the impression given by Exxon's description, the Committee was "not staffed to determine and control each individual source of loss in the refinery," and "[wa]s therefore dependent on each and every member of the refinery organization for assistance in making a success of the program." A2410.**

250. In 1948 Humble through the Refinery Loss Committee's stewardship commenced an "effluent improvement program" that included a series of waste processing improvements and modifications - a number of which are described below - to "reduce the quantity of effluent and segregate and treat undesirable wastes at the source." A2353; *see also* A0823-A0828, A2397-A2399, A2413-A2419 and A2420-A2424. *See also* Gravel Rpt. at 95 (Fig. 21 - Humble 1952 depiction of then current wastewater processing system after various post-WWII improvements).

      **Not disputed.**

251. In 1949 Humble installed and subsequently expanded a sanitary sewer system and treatment plant. The company had determined that segregation of the sanitary sewer wastewaters from the process wastewaters would improve the efficiency of the separators in the wastewater processing system because the presence of sewage solids in the separators tended to cause formation of oil-coated solid waste that were carried through the separator system with the effluent. A0824-A0825, A2351-A2361, A2398-A2399 and A2417.

      **Not disputed.**

252. In 1950 Humble modernized Separator 10 by installing continuous oil skimming and sediment removal devices in the separator. Previously, Separator 10 had been operating at

reduced efficiency due to a continual buildup of wet sediment slurry at the bottom of the separator and the accumulation of excessive amounts of oil emulsions near the surface of the wastewater in the separator. The upgrading of Separator 10 was important because shortly thereafter, Separator 10 became the primary separator in the refinery's wastewater processing system. A0825, A2354, A2398-A2399 and A2465.

**PARTIALLY DISPUTED with respect to Exxon's description of the "importance" of upgrading Separator 10. A significant purpose of upgrading Separator 10 was to reduce the loss of oil by evaporation to the atmosphere. <u>See</u> A2354 and A2465.**

253. In 1951 Humble constructed Preseparator 13 on the central sewer system immediately upstream from Separator 10. The purpose of Preseparator 13 was to provide additional oil-water separation processing of the wastewater effluent before such wastewater effluent was further treated in Separator 10. The addition of Preseparator 13 also allowed the company to cease the use of obsolete Separator 1. A0827, A2354 and A2398.

**PARTIALLY DISPUTED. A significant purpose of Preseparator 13 was to reduce or eliminate losses of oil to the atmosphere through evaporation. <u>See</u>, <u>e.g.</u>, A2399 ("The preseparator flumes were covered to minimize oil loss by evaporation . . . ."); A2354.**

254. In 1951 Humble commenced operation of a new effluent filtration unit in the refinery. This unit removed, treated and disposed of certain solid wastes from the wastewater effluent that contained high concentrations of undesirable waste materials which were reducing the effectiveness of the sewer and separator system. A0825-A0827, A2355-A2361, A2400- A2401, A2408-A2410 and A2419.

**Not disputed.**

255. By 1951 Humble had instituted measures to prevent leakage from the numerous piping valves throughout the refinery. A02431-A2434.

**PARTIALLY DISPUTED.  The United States does not dispute that by 1951 Humble had instituted measures to minimize or reduce leakage from various piping valves throughout the Baytown refinery.  The phrase "prevent leakage" inaccurately suggests, however, that these measures completely eliminated *all* leaks from pipes at the refinery during all subsequent operations.**

256. By 1952 Humble modified the "north disposal system" by installing additional sewer lines (*i.e.,* east trunk sewer) on the northern side of the refinery to collect drainage collected from the tankage north of the refinery for transport by these sewer lines to Separator 10 for oil-water separation. These additional sewer lines allowed Humble to shut down old Separator 9 on the northern edge of the refinery and to cease wastewater discharges to Goose Creek, so that such drainage wastewaters could be treated in the modernized Separator 10. A0827-A0828, A2354 and A2398-A2399.

**Not disputed.**

257. By 1952 Humble modified the "southwest disposal system" by installing sewer lines (*i.e.*, west branch sewer) to divert to Separator 10 all wastewater effluent that had previously been transported to Separator 2. These additional sewer lines allowed Humble to cease to use Separator 2, except for the treatment of surface drainage in the vicinity of Separator 2, and to cease process wastewater discharges to Mitchell Bay. A0827-A0828, A2354 and A2398-A2399.

**Not disputed.**

258. By 1952 Humble eliminated the once-through, cooling water generated by the refinery operations by installing additional, permanent cooling water towers. The elimination of the once-through water in the effluent resulted in lowering the temperature of the effluent, reducing the suspended solids and oil content, increasing the retention time in the separators, and increasing the dissolved oxygen content. A0825, 2354, A2415 and A2417.

      **Not disputed.**

259. In 1954, Humble installed Preseparator 14 on the west branch sewer immediately upstream of Separator 10. The purpose of Preseparator 14 was to provide additional oil-water separation of the wastewater effluent before such wastewater effluent was further treated in Separator 10. The addition of Preseparator 14 also allowed the company to cease the use of obsolete Separator 4. A2415 and A2429.

      **Not disputed.**

260. In 1958 Humble installed Preseparator 15 on the east trunk sewer line immediately upstream of Separator 10. The purpose of Preseparator 15 was to provide additional oil-water separation of the wastewater effluent before such wastewater effluent was further treated in Separator 10. A2430, A2415 and A2451-A2453.

      **Not disputed.**

261. In 1964 Humble constructed a 380-acre reservoir with three stabilization ponds or lagoons to further treat the wastewater effluent before discharge to the Houston Ship Channel. The ponds employed the technique of biological aeration, which involved holding the wastewater in the ponds for a number of weeks so that the aerobic and anaerobic bacteria could decompose residual oils and chemicals in the wastewater and algae in the lagoons could increase the

wastewater's biological oxygen content, so as to complete a water purification process of the wastewater effluent before discharge to the Houston Ship Channel. A2406, A2504, A2437-A2438 and A2513.

**Not disputed.**

262. In 1969 Humble ceased the discharge of wastewater effluent generated by the butyl rubber and butadiene plants into Scott's Bay. A2437, A2453 and A2461.

**Not disputed.**

263. By 1951 Humble determined that its initial post-WWII waste processing improvements had already achieved nearly a 60% reduction in overall oil losses at the refinery; in fact, the company determined that oil losses at the refinery were reduced from 1,869 barrels of oil per day in the latter part of 1948 to an estimated 781 barrels of oil per day in the latter part of 1951 - a 58 percent reduction in oil losses. A2425-A2428 and A2466.

**DISPUTED because the document is illegible.**

264. By 1957 Humble further determined that it had achieved a 70% reduction in the amount of separator sludge generated at the refinery. Specifically, according to a Humble study in 1947 the Baytown refinery generated approximately 0.067 pounds of separator sludge per barrel of crude oil run, but by 1957 the refinery generated only 0.017 pounds per barrel of crude oil run. A2483-A2485 and A2488-A2491.

**The United States DISPUTES the foundation for, accuracy and relevance of the reported 70% reduction. See Dr. Kittrell's 2d Report at 38-39 (U.S. Opp. Ex. 5); Kittrell Decl. ¶ 9; Declaration of Matthew A. Low ("Low Decl.") ¶¶ 23-26.**

265. Based on inspections of the oil content in the refinery wastewater effluent that were taken by Humble between 1948 and 1958, the oil content in the effluent had decreased by at least 94% during this time period; specifically, the inspections of the wastewater effluent determined that the effluent contained on average 700 parts per million of oil in 1948, but the effluent contained on average between 24.5 and 40.5 parts per million of oil in 1958. A2415.

**The United States DISPUTES the accuracy and relevance of the reported 94% reduction.  See Low Decl. ¶ 34 (Exxon's allocation expert "Mr. White assumes, without explanation," that a similar report of a reduction of oil content in effluent "translates into a reduction in response costs for each of the units for which Exxon is claiming past costs.").**

266. By 1964 at the very latest, Humble determined that it had also achieved a 90% reduction in the oil content in the wastewater prior to its further treatment in Separator 10. According to a 1964 Humble engineering report attached to a Texas Water Commission industrial wastewater permit, the three preseparators upstream of Separator 10 resulted in a 90% reduction in the oil content entering Separator 10. A2499.

**The United States DISPUTES the foundation for, accuracy and relevance of the reported 90% reduction.  See Dr. Kittrell's 2d Report at 33-34, 36-38 (U.S. Opp. Ex. 5); Kittrell Decl. ¶ 10; Low Decl. ¶¶ 30-31.**

267. By 1964 Humble determined that it had achieved a 98.5% reduction in the contaminant levels in the wastewater discharged from the refinery into the Houston Ship Channel when compared to 1948 contaminant levels in such wastewater. Specifically, Humble determined that the effluent improvement program and subsequent waste processing improvements dramatically improved the quality of the wastewater effluent discharged from the Baytown refinery, specifically stating that "[a]nalyses of volumes of each component contaminant found in effluent

at the end of the program were compared with corresponding values for the beginning of the program and showed a 98.5% improvement", A2504; in fact, the study concluded that "the effluent quality at this point was generally of better quality than that of its receiving body, the Houston Ship Channel." A2513.

**The United States DISPUTES the foundation for, accuracy and relevance of the reported 98.5% reduction.  See Dr. Kittrell's 2d Report at 39-42 (U.S. Opp. Ex. 5); Low Decl. ¶ 34.**

268. In 1964 Humble further estimated that the operation of the lagoons or stabilization ponds should result in an additional 70% reduction in any residual contaminants remaining in the wastewater effluent (after the 98.5% reduction in residual contaminant levels noted above) before the effluent was discharged to the Houston Ship Channel. A2504.

**The United States DISPUTES the accuracy and relevance of the reported reduction. See Dr. Kitrell's 2d Report at 39-42 (U.S. Opp. Ex. 5); Low Decl. ¶ 34; Kittrell Decl. ¶ 13.**

269. The amount of wastewater effluent generated per day by the refinery had decreased to 17 million by 1958, A2415, and to 13.5 million by 1970. A2449.

**Not disputed.**

**B. Baton Rouge Facility**

**1. Wastes**

270. The wastes generated by the Baton Rouge refinery operations during WWII included once-through cooling water, oil-laden silt, oily slop, oil emulsion, tank bottoms, spent caustics, spent acid sludge and other sludges. A2521-A2532.

**PARTIALLY DISPUTED  to the extent Exxon inaccurately describes byproducts as**

**"wastes."  Kittrell Decl. ¶¶ 4-5.**

271. The Plancors generated a considerable amount of numerous types of wastes as well during

their periods of operation. *See* PF ~~  178 and 186.

**PARTIALLY DISPUTED.  The United States incorporates here its responses to**

**Exxon PF ¶¶ 178 and 186.**

### 2. Waste Processing Facilities

272. During the 1940s and 1950s, the main components of the Baton Rouge refinery waste

processing facilities were located beneath the bluff line in the "batture" area of the Facility. A

1943 refinery plan depicting the layout of Baton Rouge shows the location of this system in

relation to the bluff line boundary. A2568.

**Not disputed.**

273. During the wartime period most of the stormwaters, sanitary wastes and liquid process

wastes generated at the Baton Rouge refinery were collected in local and regional catch basins

and impoundments and conveyed by regional sewer systems to ten main refinery sewers which

generally ran east to west and conveyed the wastes to oil/water separators at the western edge of

the refinery, in and along the batture area and to Callaghan's B~you.   A2568 and A2569- A2570.

**Not disputed.**

274. The refinery's sewer system that conveyed the wastewaters to the separators was

described as follows shortly before WWII:

Seven large mains fed by smaller laterals and feeder lines which connect them with various units,

buildings, and tanks in their areas. The growth of the Refinery and the resulting addition of new

sewers to serve the new units [has] made it necessary to interconnect and re-route existing sewers. These changes have resulted in a complex sewer system of immense proportions. A2572.

**Not disputed.**

275. At that time the refinery primary separators consisted of the Knox Field Separator, Old and New Main Separator, and Storm Separators. All compartments of these four separators were equipped with skimmers for collecting some of the oil in the wastewaters and transferring the oil to slop tanks prior to being reprocessed in the refinery. A2572-A2573 and A2536.

**Not disputed.**

276. There was also a large natural impoundment known as the Impounding Basin located in the southwest portion of the refinery. Flows from the impounding basin were directed through a large, lengthy sewer line to a ditch that transported flows through the southern portion of the batture area. A2568 and A2569-A2570.

**Not disputed.**

277. During the wartime period the refinery utilized Mississippi River water for cooling purposes on a once through basis in its processing units. This water contained large amounts of silt which settled out in the oil/water separators, trapping oil in the separator sludge. This oily silt or sludge was periodically washed out of the separators and into Callaghan's Bayou which travels through the batture area to an outfall on the Mississippi River. A0829 and A2575.

**Not disputed.**

278. The silt treating unit was installed and operating by October 7, 1945. A2584 and A2587.

**Not disputed.**

279. The silt treating unit "removed the necessity of washing the silt from the separators into the Canal." A2587.

     **Not disputed.**

280. The silt recovered from the silt treating unit was deposited in a 20-acre silt pond - known as the Old Silt Pond - located on the batture near the silt treating unit. A2526, A2564 and A2566.

     **Not disputed.**

### 3. Post-WWII Waste Processing Improvements

281. Shortly after WWII ended, Standard Oil embarked on an effluent improvement program coordinated by its new Oil Conservation Department ("OCD") and involved numerous improvements to the waste processing facilities. A2515-A2537.

     **Not disputed.**

282. In this program the key waste processing improvement was the construction of a large, state-of-the-art Master Separator in 1952. A2652-A2653. According to refinery operations expert Jere M. Johnson the operation of the Master Separator, coupled with the operation of the silt treating unit and the disposal of the treated silt into the Old Silt Pond, "essentially eliminated the discharge of oily silt to the Mississippi River" because prior to the operation of these waste units "approximately 240,000 cubic yards per year of oily silt was discharged" and after all of these waste units commenced operations, "this discharge of oily silt was reduced to near zero." Johnson Rpt. at 129.

     **Although Mr. Johnson's testimony is accurately quoted and that the referenced Master Separator reduced discharges of oily silt, the United States PARTIALLY**

**DISPUTES Mr. Johnson's opinion that the Master Separator "essentially eliminated" *all*
discharges of oily silt to the Mississippi River due to lack of foundation.**

283. As part of the program, Standard Oil conducted a number of other post-WWII waste
processing improvements during the late 1940s and early 1950s, and some of the more
significant ones included the construction of the following: (a) additional thermal and chemical
demulsification units to treat oil emulsions and prevent their discharge into the separator system;
(b) a spent caustic collection system to reduce the amount of caustic discharged into the
separator system; (c) a tank bottoms collecting system to reduce the discharge of emulsions from
the tank bottoms entering the separator system; and (d) a slop oil collection system at the asphalt
loading rack to prevent thick asphalt from entering the separator system. A2515-A2537.

> **Not disputed.**

284. These waste processing improvements increased the efficiency of the separators system and
reduced separator slop generation; in fact, in 1949, OCD determined that 34 percent less
separator slop oil was generated than in 1946 on a per barrel of crude oil basis, and in 1950 OCD
projected that refinery operations would generate about 61 percent less separator slop oil in 1951
as compared to 1946. A2534.

> **The United States PARTIALLY DISPUTES the relevance of the estimated slop oil
> reduction.  See Dr. Kittrell's 2d Report at 33-34 (U.S. Opp. Ex. 5); Kittrell Decl. ¶ 12.**

285. During the late 1950s and 1960s Standard Oil implemented additional waste processing
improvements to further reduce oil content in the refinery's wastewater effluent, and these
improvements included, for example, the following: (a) removal of much of the silt from the
once through cooling waters before their use to cool the refinery process units to reduce the oily

silt in the cooling waters discharged to the separators system; (b) construction of a phenol retention lagoon to provide biological treatment of the wastewater before discharge; and (c) enlargement of the Master Separator to increase its capacity and efficiency at processing the refinery wastewaters. A2675-A2680.

**The United States PARTIALLY DISPUTES the relevance of this statement  See Responses to Exxon PF ¶¶ 265, 282.**

286. These additional waste processing improvements significantly reduced the oil content of the wastewater effluent discharged from the refinery; in fact, according to Standard Oil wastewater discharge data, these improvements reduced the amount of oil by 75 percent and the amount of phenol by 85 percent in the wastewater effluent discharged from the refinery. A2676.

**The United States PARTIALLY DISPUTES the relevance the reported reductions in wastewater effluent oil content.  See Low Decl. ¶ 34 (Exxon's allocation expert "Mr. White assumes, without explanation," that a similar report of a reduction of oil content in effluent "translates into a reduction in response costs for each of the units for which Exxon is claiming past costs.").**

287. During the late 1960s Standard Oil implemented the "River Water Replacement Project" that involved the construction of ten, large cooling water towers. These towers allowed the recirculation of cooling waters in the refinery, and eliminated the use and discharge of oncethrough cooling water. According to Standard Oil wastewater discharge data in the early 1970s, this and other improvements resulted in an additional, approximate 70% reduction in oil and phenol in the wastewater, as compared to the oil and phenol content in the wastewaters in the late 1960s. A2676.

**The United States PARTIALLY DISPUTES the relevance the reported reductions in wastewater effluent oil and phenol content.  See Low Decl. ¶ 34 (Exxon's allocation expert "Mr. White assumes, without explanation," that a similar report of a reduction of oil content in effluent "translates into a reduction in response costs for each of the units for which Exxon is claiming past costs.").**

288. In 1974 the U.S. Environmental Protection Agency determined that there is a direct correlation between a refinery's crude oil throughput capacity and the amount of wastes generated by the refinery's operations. A2746-A2752.

**The United States DISPUTES the relevance of this statement, its accuracy and its foundation as applied to determining waste generation by wartime operations and the resulting impact on response costs at the Baton Rouge or Baytown sites.  See Deposition Transcript of Mr. Jere Johnson, Vol. 1 at 73-74 (admitting that this EPA study examined 137 refineries nationwide, was not a specific analysis of the Baytown or Baton Rouge refinery, and was conducted decades after World War II).**

## VI. Wartime-Related Response Actions and Past Costs

289. In 1995 ExxonMobil entered into two Agreed Orders with the Texas Natural Resources Conservation Commission (now known as the Texas Commission on Environmental Quality (collectively, the "TCEQ") in which ExxonMobil resolved and settled certain liability and cleanup obligations related to the Baytown Site. *Agreed Order, In The Matter of Exxon Company US.A., (SWR No. 30040, Docket No. 95-0282-IHW-E), March* 15, 1995 ("Agreed Order I"), A2754-A2801; and *Agreed Order, In The Matter of Exxon Chemical Americas, (SWR No. 33880, Docket No. 95-1078-IHW-E), July* 26, 1995, ("Agreed Order 2"). A2802-A2811.

**Not disputed.**

290. Agreed Order 1 expressly acknowledges (on page 1) that the parties "had settled all matters in controversy .... [and] [t]his Agreed Order is entered solely for the purpose of resolving disputed claims between the Commission and Exxon relating to remediation .... " at the Baytown Site. A2754.  Agreed Order 1 further provides (on pages 8 to 10 and 41) that ExxonMobil agreed to make a monetary payment and comply with numerous "ordering provisions" set forth in the Agreed Order that obligated the company to perform various response actions at the Baytown Site. A2761-A2763 and A2794.  For example, ExxonMobil has agreed under one of the Agreed Order's "ordering provisions" (on pages 12-13) to conduct a RCRA Facility Investigation ("RFI") to characterize the nature and extent of the waste and other contamination at each solid waste management unit ("SWMU") in order to determine whether any of the SWMUs should be subject to corrective action.  A2765-A2766.   For this consideration TCEQ agreed to "dispense[] with all claims and allegations set forth in the Executive Director's original petition against Exxon."  A2794.  In addition, Agreed Order 1 provides that ExxonMobil may not withdraw from the Order; otherwise, as the Order provides (on page 9), TCEQ may "refer this enforcement matter to the Office of the Attorney General of the State of Texas for further enforcement proceedings as provided by law if the Executive Director determines that Exxon is noncompliant with or in violation of any of the terms or conditions set forth in this Agreed Order." A2762.

**Not disputed.**

291. Exxon Mobil has conducted cleanup actions for wartime-related Separators 3M and 10, and conducted investigatory, monitoring and remediation activities with respect to wartime-related, contaminated drainage canals, such as the Outfall Canals, solid waste management units ("SWMUs"), and other areas of contamination at the Baytown Site under Agreed Order 1, and is currently conducting, for example, groundwater remediation and monitoring, an RFI and

possible remediation of SWMUs, investigations of sediments in adjacent surface waters, and is also applying for a Facility Operating Area permit that covers remediation, assessment, monitoring, and other response actions across the entire Facility. *See* Gravel Rpt. at 109-120 and 124-136 (sets forth detailed summary of these wartime-related past and ongoing response actions at the Baytown Site); A2812-A2814.

**The United States DISPUTES the accuracy of Exxon's characterization of Separators as solely "wartime-related" -- as they were used both before as well as after World War II -- and the foundation for Exxon's unexplained reference to "currently conducting . . . possible remediation of SWMUs." The United States further DISPUTES Exxon's statement because the United States has not yet had the opportunity for discovery concerning the nature of Exxon's claimed response costs and whether Exxon's alleged response actions are consistent with the National Contingency Plan. Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

292. Exxon Mobil has conducted investigatory, monitoring and remediation activities with respect to wartime-related groundwater contamination at the former BOW area (now known as the Tankfarm 3000 Area) at the Baytown Site under Agreed Order 2. *See* Gravel Rpt. at 120- 24 (sets forth detailed summary of this wartime-related past and ongoing response action at the Baytown Site).

**The United States DISPUTES the accuracy of Exxon's characterization of groundwater contamination at former BOW area as "wartime-related." See Kittrell Decl. ¶ 14; Low Decl. ¶ 32. The United States further DISPUTES Exxon's statement because the United States has not yet had the opportunity for discovery concerning the nature of Exxon's claimed response costs and whether Exxon's alleged response actions are**

**consistent with the National Contingency Plan. Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

293. ExxonMobil has incurred over $41.7 million in past response costs at the Baytown Site through December 31, 2011, additional past costs since that date, and will incur ongoing and future costs. *See* Gravel Rpt. at Appendix C, Table 1.

**DISPUTED because the United States has not yet had the opportunity for discovery concerning the nature of Exxon' alleged response actions and costs and whether Exxon's costs were incurred consistent with the National Contingency Plan. Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

294. ExxonMobil has conducted investigatory, monitoring and remediation activities with respect to wartime-related soils and groundwater contamination at the Baton Rouge Site, and is currently conducting various response activities, such as, for example, groundwater remediation and monitoring of the contaminated "batture lands" known as the Shallow Fill Zone, an RFI and possible remediation of various SWMUs, and post-closure activities at the Old Silt Pond and Rice Paddy Landfarm under a Corrective Action Order and/or the oversight and approval of the LDEQ. *See* Gravel Rpt. at 207-225; A2815-A2818.

**DISPUTED because the United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether Exxon's accosts were incurred consistent with the National Contingency Plan. Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

295. ExxonMobil has incurred over $30.5 million in past response costs at the Baton Rouge through December 31, 2011, additional past costs since that date, and will incur ongoing and future costs. *See* Gravel Rpt. at Appendix C, Table 2.

**DISPUTED because the United States has not yet had the opportunity for discovery concerning the nature of Exxon's claimed response costs and whether Exxon's alleged response actions are consistent with the National Contingency Plan.  Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

## VII. The Government's Contractual Obligations Under the Avgas Contracts

296. Under the A vgas Contracts the price paid by DSC for the avgas was to cover all costs related to the production of the avgas, including, for example, the cost of all materials, all cost of operations, royalties payable to patent holders, allowances for depreciation, obsolescence, amortization and taxes, a profit factor, and the interest payable on the investment. A0315, A2826-A2827 and A0505.

**PARTIALLY DISPUTED.  None of the cited documents state that the price paid by DSC for avgas was to "cover all costs related to production of the avgas."  To the extent this assertion represents a conclusion of law, no responsive citation to evidence is required. Moreover, Exxon's arguments on this issue were rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  Shell Oil Co. v. United States, 108 Fed. Cl. 422 (Fed. Ct. 2013).  The United States does not dispute that the price paid by DSC was to include the specific costs listed above.**

297. In Section XII of the Avgas Contracts DSC agreed to bear the risk of increased costs that the contractor might be required to pay under federal or state law "by reason of" the performance

of the contracts; for example, Section XII of the Master "Suppliers" Contract specifically

provided the following:

> Buyer shall pay in addition to the price as established in Section IV and V hereof,
> any new or additional taxes, fees, or charges, other than income, excess profits, or
> corporate franchise taxes, which Seller or its Suppliers may be required to pay by
> any municipal, state, or federal law in the United States or any foreign country to
> collect or pay by reason of the production, manufacture, sale or delivery of the
> [avgas]. A0541 ; *see also* A0513 .

> **DISPUTED.  The quoted language is not from the Master Contract.  Additionally,**
> **Exxon's quotation is materially incomplete because it omits relevant qualifying language**
> **that contradicts Exxon's interpretation of the quoted language.  See, e.g., A0513**
> **(subsections (b) and (c) of Section XII).  To the extent Exxon's assertion represents a**
> **conclusion of law, no responsive citation to evidence is required.  Moreover, Exxon's**
> **arguments on this issue were rejected by the Court of Federal Claims in what Exxon**
> **characterizes there as a related case.  Shell Oil Co. v. United States, 108 Fed. Cl. 422 (Fed.**
> **Ct. 2013).**

298. The Avgas Contracts used the terms "charges" and "costs" synonymously. For example, in

the Master "Suppliers" Contract, the parties explicitly used the term "charges" to mean "costs" in

several provisions (aside from Section XII). In Section IV titled "Price and Payment" of this

contract, the parties used the term "charges" to refer to additional costs that DSC was required to

pay whenever the company delivered avgas into tank cars or trucks furnished by DSC, as that

provision states in relevant part: [d]eliveries shall be made into tank cars or tank trucks furnished

by Buyer f.o.b. point of manufacture at an additional *charge* of fifteen-hundredths of a cent

($0.0015) per gallon. A0528 Similarly, in Section I titled "Expansion of Seller's Refinancing

Facilities" the parties used the term "charges" to refer to several types of potential, employee-

related costs that DSC was required to pay for, as that provision states in relevant part: [a]s used

above, the term "bonus payments" shall include any *charges* for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments. A0524.

**DISPUTED.  The United States disagrees that the avgas contracts used the terms "charges" and "costs" synonymously.  Because Exxon's assertion constitutes a conclusion of law, no responsive citation to evidence is required.  Moreover, Exxon's arguments on this issue were rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  Shell Oil Co. v. United States, 108 Fed. Cl. 422 (Fed. Ct. 2013).**

299. DSC and SONJ hastily entered into the Master "Suppliers" Contract a month after Japan's attack on Pearl Harbor and due to the hastily conducted contract negotiations PAW acknowledged that the avgas prices set forth in the contract were based on only rudimentary cost data provided by SONJ, and therefore, over a subsequent two-year period SONJ developed (at the Government's direction) detailed cost estimates regarding the production and delivery of the avgas. After PAW's careful review of SONJ's detailed cost estimates, the Government and SONJ negotiated an amended version of the Master "Suppliers" Contract which reflected revised avgas prices (based upon the detailed cost estimates) and price adjustment provisions and also revised the Section XII reimbursement provision to conform with the Section XII provision in avgas supply contracts with other oil companies. A2825-A2827, A2840-A2859 and A2918.

**Not disputed.**

300. The Government maintained an extensive file titled "100 Octane Aviation Gasoline Cost Analysis and Breakdown" *("Government Cost Analysis File")* for SONJ (that also expressly applied to Humble and Standard Oil) containing the correspondence between the parties regarding the contract cost and price negotiations, including SONJ's submissions containing the

detailed cost estimates, and various PAW memoranda regarding the review of the cost estimates and recommendations as to the costs of avgas production and delivery. A2860- A2970.

**Not disputed.**

301. In the detailed cost estimates SONJ attempted to account for a wide-range of various types of charges or costs, such as, *e.g.,* costs or charges for "raw materials", "materials and supplies", "production", "transportation", "wages" and "salaries", "overhead", "research and development", "investment", "interest" and "contingencies." A2861-A2886.

**PARTIALLY DISPUTED.  The United States disagrees that the terms "charges" and "costs" are synonymous.  Because Exxon's assertion constitutes a conclusion of law, no responsive citation to evidence is required.  Moreover, Exxon's arguments on this issue were rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  <u>Shell Oil Co. v. United States</u>, 108 Fed. Cl. 422 (Fed. Ct. 2013).**

302. SONJ's detailed cost estimates also reflected the full costs and plant depreciation associated with the operation of the crude oil distillation and cat cracker units, even though these units also produced other products and byproducts simultaneously with the production of avgas. A2871 and A2875.

**PARTIALLY DISPUTED.  The first cited document indicates that the full value of all costs was not included in Standard NJ's estimates.  <u>See</u>, <u>e.g.</u>, A2863 (the excessive costs of certain avgas production operations were not included in developing the estimates).  The second cited document fails show to which facilities received accelerated amortization.**

303. In the correspondence between the Government and SONJ and related Government documents contained in the *Government Cost Analysis File,* the two parties used the term

"charges" to mean "costs" in numerous instances. For example, in SONJ's December 21, 1943 submission of detailed cost estimates to PAW, SONJ used the term "charges" to refer to the following various types of costs reflected in the company's estimated costs of the production and delivery of the avgas to DSC: (1) "transportation charges", A2875; (2) "the estimated charge for raw materials", A2868; (3) "investment charges", A2868, A2869 and A2872; (4) "processing charges", A2872; (5) "interest charges", A2868, A2869 and A2873; (6) "overhead charges", A2867, and (7) "[a] charge of 0.426¢/gal. has been included for contingencies: this charge being made up of 0.25¢/gal. on production from existing facilities (approximately 31,000 B/D*)* and 0.50¢/gal. on production from new facilities (49,531 B/D*)".* A2868. Then in a subsequent March 14, 1944 letter to PAW, SONJ used the term "charge" interchangeably with "cost" in referring to the Section IV contractual provision, which was quoted above, as SONJ stated: "this proposed additional charge for tank car or tank truck shipping reflects quite accurately the additional cost to Seller and its Suppliers of tank car or tank truck shipping as compared with barge and tanker shipping." A2911.

**DISPUTED.  The United States disagrees that the terms "charges" and "costs" were used synonymously.  Because Exxon's assertion constitutes a conclusion of law, no responsive citation to evidence is required.  Moreover, Exxon's arguments on this issue were rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  <u>Shell Oil Co. v. United States</u>, 108 Fed. Cl. 422 (Fed. Ct. 2013).**

304. Based on the documents in the *Government Cost Analysis File,* PAW also employed the term "charge" and "cost" interchangeably to refer to specific types of costs; for example, in a June 1944 internal PAW "Memorandum of Recommendation" to DSC, PAW referred to the additional "charge" for loading a tank car with avgas as an "actual increased cost" when

compared to the lesser "charge" for loading a tank barge with avgas, A2835, and also referred to

an additional "charge" under the contract for "Research and Development Expense." A2837.

Then in PAW's internal September 1944 memorandum titled "Reasonableness of Price Quoted",

in which PAW confirmed the reasonableness of avgas prices under the amended Master

"Suppliers" Contract, PAW used the terms "charge" and "cost" interchangeably, stating: (1) that

the "Petroleum Materials Cost" included a "charge for net petroleum materials", A2922; (2) that

the "[m]aintenance costs ... appear to be a reasonable charge on an over-all basis", A2924; (3)

that "[i]n any event the charge is minor" for one of the types of "[t]ransportation costs", A2924;

(4) that the"[fJacilities charge" referred to "the cost of which facilities are charged against 1 00

octane gasoline", A2926; (5) a "research and development expense" is referred to as "this

charge", A2926; (6) "[a]dditional amortization is referred to as "this charge", A2927; (7)

"[s]pecial investment loss" is referred to as "a charge", A2928; (8) the "inclusion of certain

elements of costs ... , namely the charge for diesel oil, the charge for butylenes ... ", A2929; and

(9) a summary of the estimated costs that included both a "Facilities Charge" and a "Capital

Charge." A2935.

     **DISPUTED.  The United States disagrees that the terms "charges" and "costs" were**

**used synonymously.  Because Exxon's assertion constitutes a conclusion of law, no**

**responsive citation to evidence is required.  Moreover, Exxon's arguments on this issue**

**were rejected by the Court of Federal Claims in what Exxon characterizes there as a**

**related case.  <u>Shell Oil Co. v. United States</u>, 108 Fed. Cl. 422 (Fed. Ct. 2013).**

305. In 1942, given the burgeoning number of wartime supply contracts between the

Government and private companies, the War and Navy Departments issued a policy document

titled *Explanation of Principles for Determination of Costs Under Government Contracts* that

informally became known as the *"Green Book",* and the *Green Book* set forth that its purpose was to "present in basic outline the principles according to which costs may be determined under contracts with the United States Government for supplies for the War and Navy Departments." A2973.

**PARTIALLY DISPUTED to the extent Exxon asserts that the *Green Book* controls the interpretation of the Master avgas contract and the avgas supply contracts signed with Humble and Standard.  Because Exxon's assertion constitutes a conclusion of law, no responsive citation to evidence is required.  Moreover, Exxon's arguments on this issue were rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  Shell Oil Co. v. United States, 108 Fed. Cl. 422 (Fed. Ct. 2013).**

306. The overall standard established by the *Green Book* was that costs are allowable if (a) the costs incurred by the war contractor were incident to and necessary for the performance of the work under the wartime supply contract, and (b) the costs were properly chargeable to the Government under the contract; specifically, the *Green Book* states that, "[t]he total costs under a contract is the sum of all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable thereto." A2974.

**PARTIALLY DISPUTED to the extent Exxon legally interprets language in the Green Book and further asserts that the Green Book establishes the standard for interpreting the contracts at issue in this case.   Because Exxon's assertions constitute a conclusion of law, no responsive citation to evidence is required.  Moreover, Exxon's arguments on this issue were rejected by the Court of Federal Claims in what Exxon characterizes there as a related case.  Shell Oil Co. v. United States, 108 Fed. Cl. 422 (Fed. Ct. 2013).**

Respectfully submitted,

Dated:  December 20, 2013

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

By:   Brian H. Lynk
Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C.  20044
Tel.:  202.514.3144
Fax:  202.514.8865

*Attorneys for Defendant United States*