# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action Nos.   H-10-2386 (LHR) |
| UNITED STATES OF AMERICA, | ) H-11-1814 (LHR) ) ) |
| Defendant. | ) ) |

# DECLARATION OF JERE M. JOHNSON

I, Jere M. Johnson, declare as follows:

1. I am over 18 years of age, and I am fully competent to make this declaration. I reside at 306 Oak Haven Drive, Baytown, Texas 77520. I have personal knowledge of the facts set forth in this declaration and am competent to testify to them if necessary. All of the facts stated herein are true and correct.

2. I am a self-employed consultant on environmental issues related to the petroleum industry. My primary area of expertise is petroleum refining, especially environmental matters related to petroleum refining. I received my Bachelor of Science in Civil Engineering in 1960 and my Master of Science in Civil Engineering in 1964, both from the University of Arkansas in Fayetteville, Arkansas. The Master of Science degree was entirely in the environmental aspects of civil engineering (*e.g.*, water and wastewater treatment, waste treatment and disposal). I have over thirty-three years of experience in the petroleum industry. This experience includes technical, operational, and environmental, as well as staff and management positions. For twenty-five of those years I was directly involved in environmental aspects of petroleum refining

1

(*e.g.*, wastewater treatment, solid and hazardous waste management, abatement of air emissions, etc.).

3. I will be an expert witness for Exxon Mobil Corporation ("ExxonMobil") in these cases regarding historical and technical issues relating to the processing of crude oil and other raw materials needed to manufacture 100-octane aviation gasoline ("avgas") and other products, and waste generation and disposal activities resulting from the production of these products at ExxonMobil's Baytown Complex and Baton Rouge Complex. On June 18, 2012 I completed an expert report ("Expert Report") and on December 20, 2012 I completed a rebuttal report ("Rebuttal Report").

4. I read the declaration prepared by Dr. James R. Kittrell and disagree with most of the statements that he made in that declaration, and so I prepared this declaration to summarize my rebuttal of those statements made by Dr. Kittrell. My rebuttal concerns issues that I examined in one or both of my prior reports, and so my rebuttal does not go beyond the scope of those reports, although Dr. Kittrell raises two issues - integration and wastes v. byproducts - that he did not address in his prior reports that I reviewed and rebutted. Since I address several issues that I dealt with in my prior reports, I incorporate by reference my Expert Report and my Rebuttal Report into this sworn declaration.

5. I disagree for a number of reasons with Dr. Kittrell's claim in his declaration that the Plancors and the Baytown Ordnance Works ("BOW") were not significantly integrated into the waste processing facilities at the respective Baytown and Baton Rouge refineries. Dr. Kittrell states that these plant operations were not integrated based on his view that the materials sent from the Plancors and BOW to the refineries were really only "byproducts" rather than "wastes" and were not "substantial contributors to the waste load at the Baytown and Baton Rouge

2

Refineries." Kittrell Declaration ¶ 4. To do this, Dr. Kittrell creates his own unique definition of "byproducts" in which he assumes that if any oil was recovered from a wastewater stream and if this oil had value, then it was not a waste but a byproduct. But his definition mischaracterizes how these materials were managed as wastes when they were sent from the Plancors or the BOW to one of the refineries. If his definition were followed, practically the entire oily wastewater flows at both refineries would have been "byproducts" because these wastewater streams contained oil, and some of the oil was recovered, processed through the slop oil systems and then rerun in the refineries. Then, because Dr. Kittrell inaccurately categorizes these waste materials as byproducts, he further concludes that they would not have been substantial contributors to the waste generated and disposed of at the Sites. This obviously would be an absurd conclusion, but it illustrates the flaw in Dr. Kittrell's "byproduct" definition. Under his definition, a wastewater stream containing recoverable amounts of oil would be classified as a byproduct and would not be a substantial contributor to the waste loads at the two refineries. In my many years of refinery experience, I have never heard of a "waste" or wastewater stream being defined as a "byproduct" on this basis.

6. Based on his flawed definition, Dr. Kittrell inaccurately categorized as "byproducts" a number of "wastes" that were generated at one of the Plancors or the BOW and sent to the refinery for treatment or disposal, in an inaccurate attempt by Dr. Kittrell to suggest that these plants were not integrated. So I have explained below why these materials are "wastes" and not "byproducts" to illustrate how these plants were integrated to handle wastes.

- Waste Stream Containing Naphtha. Dr. Kittrell categorizes a wastewater stream containing naphtha from Baytown's Butyl Rubber Plancor as a "byproduct" because it was sent back to the refinery for "recovery and reuse as a finished product". Kittrell Declaration ¶ 4.b.vii. This stream, however, was actually floating material skimmed from the "oil polymer recovery basin" at the Plancor, and while it contained some naphtha, it would have also included substantial

3

wastewater and other wastes, and was routed to the refinery's slop oil system. Expert Rpt. 72. In the slop oil tanks, some of the naphtha would have been recovered but some of it would have remained in the wastewater, which would have been routed to the refinery's separators and would have contributed to soil and groundwater contamination under and in the vicinity of the separators.

- Spent Acid Sludge. Dr. Kittrell categorizes spent acid sludge as a "byproduct". While the acid sludge generated at the BOW was burned as fuel in the BOW boilerhouse, the acid treatment process generated wastes that entered the Baytown refinery's sewer system and were treated in the refinery's wastewater treatment system, thereby contributing to the waste materials in various historic waste units at the Baytown Site, and associated soil and groundwater contamination impacting the Site. In addition, the transfer of the acid sludge through the piping system would have resulted in spills and leaks of the acid sludge that would have also entered the refinery's sewer system and waste treatment/disposal facilities. Expert Rpt. 64-65 and 73; Expert Rpt of A. J. Gravel 51.

- Spent Alumina Catalyst. Dr. Kittrell categorizes this waste as a "byproduct" but it was certainly disposed of in waste sites (*i.e.,* solid waste management units ("SWMUs")) at the Baytown Site. The catalyst would have been commingled with wastes that are now considered hazardous, and the cleanup work at these waste disposal sites would contribute to past and future cleanup costs at the Site. Expert Rpt. 69, 77 and 80.

- Wash Oil. "Wash oil" would be more accurately categorized as a "sponge oil" than a "byproduct" or a "waste material"; it contributed wastes that were sent from the BOW and integrated with waste managed at the refinery. The wash oil, after being used in the $SO_2$ Plant unit of the BOW and passing through the Acid Treater, Caustic Wash, Hydrolyser, and Product Rerun Unit - all of which were part of the BOW - was then sent to unnamed units in the refinery, probably including tankage, fractionation, and other facilities to remove unwanted materials from the wash oil before it was returned to the BOW for reuse. However, there would have been wastes associated with the wash oil from leaks, spills, processing through acid treating, caustic washing, storage and fractionation, and these wastes would have entered the sewer system, would have been treated in the refinery's wastewater treatment system, and would have contributed to the oily wastes disposed at the refinery. Expert Rpt. 24 and 64-74.

- Slop Oil. Dr. Kittrell's statement that slop oil from the Baytown Butadiene Plant (Plancor 485) was a "byproduct" that did not contaminate the refinery site is inaccurate. The slop oil was sent to refinery slop oil tanks where some of the oil was removed and reprocessed in refinery units, but some of the oil would have remained in the wastewater associated with the slop oil and would have entered refinery earthen separators and contributed to the contamination associated with these separators. Expert Rpt. 113.

4

- Quench Oil Emulsion. Dr. Kittrell acknowledges that the quench oil emulsion sent from the Baytown Butadiene Plant (Plancor 485) to the refinery was a waste, but his claim that this waste "did not appreciably contaminate the refinery site" is incorrect. Kittrell Declaration ¶ 4.b.v. This plant generated 740 gallons per minute ("gpm") of this waste stream - an amount that equates to 1.07 million gallons per day - and consisted of a very stable emulsion of water and oil, containing 3,000 to 5,000 parts per million ("ppm") of oil (*i.e.,* 0.3 to 0.5% oil). This quench oil emulsion was sent to the refinery slop oil tanks where some of the oil would have been removed and reprocessed, but some of the oil would have remained in the wastewater associated with the quench oil emulsion and this oily wastewater (still amounting to approximately 1.07 million gallons per day) would have entered refinery earthen separators and contributed to the contamination associated with these separators. Expert Rpt. 70 and 113; Powell, Sheppard. Report to Reconstruction Finance Corporation on Industrial Wastes: RuR SR-10 (July 26, 1946) 234 (BAYHIS-00006435).

- Steam Condensate. Dr. Kittrell neglects to mention that the "steam condensate", which he inaccurately describes as "simply water," contained 1% to 2% tertiary butyl alcohol. Kittrell Declaration ¶ 4.b.vi. Tertiary butyl alcohol was often referred to as TBA. This waste stream, which totaled 15 to 20 gpm, or about 25,000 gallons per day, was pumped to the refinery where it was discharged through the refinery's earthen separators and earthen outfall canal. The TBA would not have been removed and most of it would have been discharged, but some of the TBA would have contaminated the soils and groundwater underlying the separators and the Outfall Canals. Powell, Sheppard. Report to Reconstruction Finance Corporation on Industrial Wastes: RuR SR-10 (July 26, 1946) 234 (BAYHIS-00006435).

- Floating Rubber Polymer. Dr. Kittrell acknowledged that floating rubber polymer skimmed from the oil polymer recovery basin of the Baytown Butyl Rubber Plant (Plancor 1082) was sent to the "North Landfarm" for burning and disposal on the refinery site. Kittrell Declaration ¶ 4.b.ix. The North Landfarm was part of a 50-acre waste disposal facility (*i.e.,* SWMU 62) located at the current site of the Main Office Building. A RCRA Facility Investigation has been completed for SWMU 62 and a Response Action Plan is in progress. Additional cleanup costs are likely to be incurred in the future. Expert Rpt. 89.

7. Related to this point also, I strongly disagree with Dr. Kittrell's statement that Plancor wastes are not a factor in remediation costs at Baytown and Baton Rouge. Kittrell Declaration ¶ 6. As I discussed above, a number of Plancor-generated wastes entered the refineries' respective sewer systems, commingled with the refinery-related wastes, and contributed to the contamination at the historic waste units and soil and groundwater

5

contamination throughout much of the Sites that requires remediation. The Butadiene Plant (Plancor 877) and Butyl Rubber Plant (Plancor 1082) at Baytown, and the Butadiene Plant (Plancor 152) and the Butyl Rubber Plant (Plancor 572) at Baton Rouge, generated some wastewater streams that were sent to the respective refinery and commingled with the refinery's wastewater stream. In addition, some solid wastes generated by the Butyl Rubber Plant at Baton Rouge were burned and disposed of in the North Batture Burning Pit/Landfill (*i.e.,* SWMU 33) and were, in fact, commingled with refinery wastes, such as filter clays and tank bottoms. Expert Rpt. 107. Other Plancors - the Hydrocodimer Plant (Plancor 1909) at Baytown and the Avgas Blending Components Plant (Plancor 1068) and the Hydrogenation Plant (Plancor 1868) at Baton Rouge - were located within the refineries' petroleum products area and their wastes would have entered the refinery's sewer system for treatment and disposal in the refinery waste processing facilities. Lastly, a number of Plancors at both Sites discharged most of their process wastewaters directly into nearby surface waters (*e.g.,* the Baytown Butyl Rubber, Butadiene and Copolymer Plants discharged most of their process wastewaters into Scott's Bay, and the Baton Rouge Butyl Rubber, Butadiene and Catalyst Plants discharged most of the their process wastewaters into Monte Sano Bayou). Expert Rpt. 26, 64-65, and 94-95.

8. I also strongly disagree with Dr. Kittrell's initial suggestion itself that materials which he identified as "byproducts" did not contribute to the refinery waste loads at all. Kittrell Declaration ¶ 5. Although many of these wastewater streams contained some recoverable and reuseable materials, these streams also contained significant amounts of materials in the wastewater that either contaminated soil and groundwater or contained materials requiring disposal at the Sites. I have further described some examples below (in addition to my comments in paragraph 6 above).

6

- <u>Hydrocodimer-Related Wastes</u>. Dr. Kittrell's statement that specific oily wastes, in particular, from the Baytown Hydrocodimer Plant (Plancor 1909) would have consisted of "small amounts of highly volatile codimer producing a sheen on the water" and would place only a *de minimis* waste load on the overall refinery wastewater system is also inaccurate. Kittrell Declaration ¶ 5.b. Oily wastewater generated by this Plancor would have entered the west branch of the central sewer system and would have been commingled with oily wastes from both upstream and downstream of this Plancor. This commingled wastewater was routed to Separator 10, and the oily waste would have contributed to the generation of separator sludge requiring disposal and to the contamination of the soil and groundwater in the vicinity of Separator 10 and at downstream impoundments and the Outfall Canals. Expert Rpt. 81.

    i. Dr. Kittrell's statement that hydrocodimer is "highly volatile" (and the implication that most of the hydrocodimer waste would have been highly volatile and evaporated) is also inaccurate. Hydrocodimer, which is essentially an iso-octane used to increase the octane level of the avgas, has a boiling point of approximately $211^o$ F and a vapor pressure of approximately 0.8 psi at $70^o$ F. In comparison, water has a boiling point of $212^o$ F and a vapor pressure of approximately 0.4 psi at $70^o$ F. In other words, hydrocodimer is only slightly more volatile than water. In addition, Dr. Kittrell provides no basis for the implication that the wastewaters generated by the production of the hydrocodimer would have evaporated into thin air. In fact, the plant's sewer lines were configured to convey the plant's wastewater to the Baytown refinery's wastewater processing facilities. Gravel Expert Rpt. 57.

- <u>TBA</u>. Dr. Kittrell's claim that the TBA waste would be highly subject to evaporation is inaccurate. TBA has a boiling point of $180^o$ F and a vapor pressure of 0.6 pounds per square inch ("psi") at $68^o$ F, and would not be highly subject to evaporation.

- <u>Plancor 1355 Wastes</u>. Dr. Kittrell's statement that the Baton Rouge Butadiene Conversion Plant (Plancor 1355) made only a *de minimis* waste contribution to the Baton Rouge refinery waste processing system is based on a number of inaccurate findings. Kitrell Declaration ¶ 5.c. This plant, which was located in the refinery itself, had a capacity of 18 to 20 short tons of butadiene per *day*, not 18 to 20 short tons per *year* as Dr. Kittrell notes. The approximate capacity stated in the report cited by Dr. Kittrell was 18.8 short tons of recoverable butadiene per calendar day (*i.e.,* 6,850 tons per year). In addition, the Baton Rouge crude capacity was approximately 120,000 B/D during WWII, *not* 170,000 B/D as Dr. Kittrell notes. Lastly, Dr. Kittrell's conversion of the short tons of butadiene produced to equivalent crude oil barrels, and then comparison of this amount to the total crude oil barrels processed by the refinery is irrelevant because all of the crude oil processed contributed to the feedstocks used at this plant. Given this, the wastes attributable to Plancor 1355 should include a fair share of wastes

generated by the processing of the crude oil in the earliest stage of refinery operations that was necessary to provide the feed to Plancor 1355. Defense Plant Corporation. Engineer's Final Report as of April 30, 1944 for Plancor 1355, Part C [BRHIS-00004377]; Expert Rpt. 39.

9. ExxonMobil has accurately characterized the contribution of the Baytown Ordnance Works ("BOW") to the overall generation of waste at the Baytown Site. Dr. Kittrell's statement that much of the BOW's key raw material - naphtha - was from off-site sources is based on the same erroneous findings and conclusions that he asserted in his August 2012 expert report. Kittrell Declaration ¶ 7. I described in detail the inaccuracies in Dr. Kittrell's findings and conclusion in my Rebuttal Report. Reb. Rpt. 24-28. In summary, I determined that only 27 percent of the nitration-grade toluene produced at the BOW was derived from raw materials obtained from other refineries. The remaining 73 percent of the nitration grade toluene was derived from naphtha streams produced by the processing of crude oil, natural gasoline and condensate at the Baytown refinery, and this latter processing was a major source of the waste and contamination generated by the refinery operations. In addition, the BOW's production operations substantially contributed to this waste and contamination by generating wastewater requiring treatment and disposal in the refinery's waste processing facilities.

10. Dr. Kittrell's attempt to discredit Sheppard Powell simply lacks any historical support. Kittrell Declaration ¶ 8. Mr. Powell was retained by the U.S. Reconstruction Finance Corporation ("RFC") in 1946 to conduct inspections of the wastes and waste processing facilities at the Government synthetic rubber Plancors shortly after WWII, and memorialize these inspections in reports submitted to the RFC. The RFC apparently believed that Mr. Powell was qualified for this work, and Dr. Kittrell points to no historical information suggesting that Mr. Powell was not qualified to conduct this work.

11. It is fully appropriate to take into account the effect of the waste reduction and waste processing improvements that occurred at the Baytown and Baton Rouge refineries shortly after WWII for the purpose of allocating waste-related remediation costs between ExxonMobil and the Government. In his declaration Dr. Kittrell criticizes a number of the waste processing factors used by expert allocator Richard White, Kittrell Declaration ¶¶ 9-12, but before discussing why Dr. Kittrell's criticisms are not valid, it makes sense to first explain why it is appropriate to take into account these types of factors in the allocation of remediation costs at the Sites. I found no historical information regarding any significant waste reduction improvements implemented at the Sites during WWII, and this is understandable given that the Government required that the materials and manpower of the refineries and other plants be devoted to manufacturing avgas and other war products. But shortly after the end of WWII when Government controls ended, both refineries implemented extensive programs to improve production efficiencies and waste processing facilities to reduce sludge, slop oils and other wastes and also to reduce the oil content in the wastewaters. In my initial expert report, I devoted entire sections to describing the numerous post-wartime production and waste processing improvements at Baytown and Baton Rouge, and some of these improvements were elimination of once-through cooling water to decrease the generation of silty, oil-laden waters; segregation of the sanitary sewer system from the process wastewater sewer system to improve separator efficiency; installation of pre-separators to remove substantial oils from the wastewater; replacement or modernization of the primary separators to further improve oil separation from the wastewaters; installation of piping systems to segregate and collect spent caustics and other chemicals that tended to reduce the efficiency of the separators; installation of hydrofining process units to replace acid treating and thereby reduce acid sludge generation;

9

improved leak and spill detection and controls; and many other improvements. Expert Rpt. 110-137.

12. While implementing the waste processing improvement programs, Humble and Standard Oil compiled contemporaneous data regarding these programs' effects on waste and oil reduction. Taking Baytown as an example, the historical data included the following: (1) between 1948 and 1951 Humble achieved a nearly 60% reduction in overall oil losses at the refinery; (2) between 1947 and 1957 Humble achieved a 70% reduction in overall separator sludge generation; (3) between 1948 and 1958 Humble achieved a 94% reduction in the oil content in the wastewater effluent; (4) Humble achieved a 90% reduction in oil content in the wastewater entering Separator 10 by the installation of three pre-separators and many waste reduction steps throughout the complex during the period of 1951 to 1958; and (5) between 1947 and 1964 Humble achieved a 98.5% reduction in oil and other contaminants in the wastewater effluent and projected an additional 70% improvement in the late 1960s through the installation and use of aeration lagoons to further treat the wastewater. Rebuttal Rpt. 44-45 and 53-55; Gravel Rpt. 96-97. The validity and reliability of this historical data is bolstered by the fact that the data was only compiled internally by the company to monitor the effects of its waste processing improvement program and so the company had no reason to manipulate the data results, the data is internally consistent, and the trend of improving data over time correlates with the implementation of additional waste processing improvements over time.

13. In my opinion, it is appropriate and reasonable for Mr. White to have used both the 70% separator sludge reduction factor and the 90% oil reduction factor as independent and supplementary factors for Baytown because these factors are accurate and supportable. The historical information confirmed the validity of this data, expert Peter Gagnon confirmed the

validity of using crude oil throughput adjusted for the impacts of processing efficiencies as a surrogate for waste contribution over different time periods, and I concur with Mr. Gagnon's opinions from a refinery operations standpoint. In fact, Mr. White's use of these factors is conservative because he certainly could have used more favorable data that was equally accurate and supportable (*e.g.,* the 98.5% oil reduction data was more favorable than the 90% oil reduction data). These factors - 70% reduction in separator sludge generation and a 90% reduction in oil in the wastewater - represent across-the-Site waste and oil contaminant reduction resulting from the post-wartime waste processing improvements because sludge has always been the predominant type of waste resulting from crude oil processing and oil has been the predominant contaminant in the wastewaters generated by refinery operations. Therefore, I believe that the conclusion that these factors reflect overall waste processing improvements at the Baytown refinery is both reasonable and logical.

14.  In addition, Dr. Kittrell did not raise any valid criticisms of these factors. Dr. Kittrell provides no basis in support of his criticism of the 70% separator sludge reduction factor; instead, he merely states that "Mr. White is incorrect when he states" that Humble achieved a 70% reduction in the amount of separator sludge generated at the Baytown refinery by 1957. Kittrell Declaration ¶ 9. In a prior rebuttal report Dr. Kittrell suggested that both he and Government allocator Matthew Low had made calculations that established that the 70% sludge reduction figure was inaccurate. However, in my Rebuttal Report I detailed at length the significant errors that Dr. Kittrell and Mr. Low had made in their calculations and, that once these errors were corrected, the underlying historical data fully supported the 70% sludge reduction factor. Rebuttal Rpt. 53-54. Mr. Low's calculations, which Dr. Kittrell also relied upon, are erroneous because Mr. Low apparently does not understand that "separator sludge" and

11

"separator sediment" are not synonymous - "separator sediment" is dewatered "separator sludge" - and if Mr. Low had properly accounted for the water content that is in "separator sludge" but is not in "separator sediment" in his calculations, Mr. Low's "corrected" calculations would have fully supported the 70% separator sludge reduction figure.

15. Dr. Kittrell's criticism of the 90% pre-separators oil reduction factor also is not accurate. Kittrell Declaration ¶ 10. Dr. Kittrell suggests that the covered pre-separators were only removing oil from the wastewaters that would have otherwise evaporated into the air in the downstream, uncovered Separator 10. A simple illustration shows how illogical Dr. Kittrell's criticism is. If Dr. Kittrell is correct, then if you left a bucket of oily water outside in the open air, 90% of the oil in the bucket would evaporate in a few hours. In addition, Dr. Kittrell ignores all the other historical, contemporaneous data - that I listed above - that similarly confirmed at least a 90% reduction to as much as a 98.5% reduction in oil in the wastewaters resulting from numerous waste processing improvements. Rebuttal Rpt. 52-53.

16. Dr. Kittrell also criticizes what he refers to as the "multiplication" of the 70% separator sludge reduction factor and the 90% oil reduction factor, but his criticism shows a lack of understanding of the differences between the two factors and why their effects are cumulative. Kittrell Declaration ¶ 11. The 70% factor indicates that the volume or amount of separator sludge generated by the refinery operations therefore decreased by 70% after the implementation of numerous waste reduction steps in the actual refinery operations. On the other hand, the 90% factor indicates that the oil content in the wastewater was reduced by 90% after the implementation of these waste processing improvements. The separator sludge has a very high water content - wastewater content - and therefore, the cumulative effect of the waste processing improvements was that the volume of sludge was reduced by 70% and the oil content in this

12

sludge was reduced by a separate 90%. This combination of waste volume reduction and oil content reduction translates to a cumulative waste reduction factor of approximately 97%. This cumulative effect is further confirmed by the additional historical data that showed as much as a 98.5% reduction in oil and other contaminants in the wastewater after implementation of the waste processing improvements. Rebuttal Rpt. 54-55.

17.     Lastly, Dr. Kittrell criticizes the 60% waste improvement factor that was employed by Mr. White with respect to the Baton Rouge Site, but this factor is also accurate and supportable. Kittrell Declaration ¶ 12. I disagree with Dr. Kittrell's suggestion that a 60% reduction in separator slop oil at the Baton Rouge refinery would not directly result in any waste reductions at the refinery. Reductions in separator slop are very relevant to waste material reductions because the separator slop is the amount of oil recovered in the separators. As a result, if post-wartime waste processing improvements resulted in a 60% reduction in separator slop oil, then there would be a similar 60% reduction in the amount of oil in the wastewater effluent sent through the separators. In addition, similar to Baytown, the Baton Rouge refinery implemented an extensive waste processing improvements program after WWII that included many of the same types of improvements, such as, for example, installation of a spent caustic collection system, leak and spill controls and prevention, and an improved oil emulsion treating system, to name a few. These types of waste processing improvements would have resulted in waste volume reduction and oil content reductions in the wastewater, and the historical data showing a 60% reduction in separator slop oil reduction confirms this. I therefore believe that this factor should be used as a reasonable basis for the type of pollution reductions achieved refinery-wide at Baton Rouge. Rebuttal Rpt. 55-56.

18. A full copy of my Expert Report and Rebuttal Report were attached to my prior declaration filed with the Court in late September 2013. My Expert Report includes my resume on pages 139-45.

19. I declare that the foregoing is true and correct to the best of my knowledge, information and belief under penalty of perjury of the laws of the United States. Executed on January 21, 2014.

_____
Jere M. Johnson