**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

_____

|  |  |  |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 4:10-CV-02386 (LHR) |
| | ) | 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**CONSOLIDATED REPLY MEMORANDUM IN SUPPORT**
**OF UNITED STATES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

ROBERT G. DREHER
Acting Assistant Attorney General
Environmental & Natural Resources
Division

Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie J. Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C.  20044
Tel.:  202.514.3144
Email:  michael.rowe@usdoj.gov

KENNETH MAGIDSON
United States Attorney

Samuel G. Longoria
Assistant United States Attorney
Texas Bar No.: 12545500
1000 Louisiana, Suite 2300
Houston, TX  77002
Tel.:  713.567.9514
Email:  sam.longoria@usdoj.gov

Attorneys for Defendant United States

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii

GLOSSARY ...........................................................................................................................v

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................1

I.      THE UNITED STATES CORRECTLY IDENTIFIED THE STANDARD FOR
        "OPERATOR" LIABILITY .......................................................................................1

II.     EXXON, NOT THE UNITED STATES, OPERATED THE REFINERIES.........................8

        A.      Exxon Ran Its Own Refineries During WWII Based On Consensual Contract
                Terms And Subject To Industry-Wide Regulations......................................9

        B.      Exxon Solely Directed, Managed, And Conducted The Refineries' Waste
                Disposal Operations ...................................................................................16

        C.      Exxon Continued To Run Refinery Operations During The Korean War................18

III.    EXXON OPERATED THE PLANCORS AND BAYTOWN ORDNANCE
        WORKS .....................................................................................................................21

IV.     EXXON CAN SHOW NO FACTS SUFFICIENT TO SUPPORT A DECLARATORY
        JUDGMENT ALLOCATING UNKNOWN FUTURE
        COSTS .......................................................................................................................25

CONCLUSION.........................................................................................................................30

# TABLE OF AUTHORITIES

**CASES:**

Amoco Oil Co. v. Borden, Inc.,
    889 F.2d 664 (5th Cir. 1989) ................................................26

Beazer East, Inc. v. Mead Corp.,
    412 F.3d 429 (3d Cir. 2005)................................................30

Brown v. City of Houston, Tex.,
    337 F.3d 539 (5th Cir. 2003) ................................................15

Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.,
    299 F.3d 1019 (9th Cir. 2002) ................................................4, 5

Coeur d'Alene Tribe v. Asarco, Inc.,
    280 F. Supp. 2d 1094 (D. Idaho 2003) ................................................2, 4, 6

Duplantis v. Shell Offshore, Inc.,
    948 F.2d 187 (5th Cir. 1991) ................................................27

East Bay Mun. Util. Dist. v. U.S. Dep't of Commerce,
    948 F. Supp. 78 (D.D.C. 1996) ................................................2, 6, 10, 12, 18

Favorite v. Marine Pers. & Provisioning, Inc.,
    955 F.2d 382 (5th Cir. 1992) ................................................24

FMC Corp. v. U.S. Dep't of Commerce,
    29 F.3d 833 (3d Cir. 1994)................................................3, 4

GenCorp, Inc. v. Olin Corp.,
    390 F.3d 433 (6th Cir. 2004) ................................................25, 26

Geraghty & Miller, Inc. v. Conoco, Inc.,
    234 F.3d 917 (5th Cir. 2000) ................................................2, 8

In re Bell Petroleum Srvs., Inc.,
    3 F.3d 889 (5th Cir. 1993) ................................................26

Lichter v. United States,
    334 U.S. 742 (1948)................................................7

Litgo N.J., Inc. v. Martin,
    Civ. No. 06-2891 (AET), 2010 WL 2400388 (D.N.J. June 10, 2010)................................................2, 6

Ludolph v. Bechtel Assocs. Prof'l Corp., D. C.,
     542 F. Supp. 630 (D.D.C. 1982) ............................................................24

Maxus Energy Corp. v. United States,
     898 F. Supp. 399 (N.D. Tex. 1995) ......................................3, 6, 7, 12, 15

Miami-Dade Cnty. v. United States,
     345 F. Supp. 2d 1319 (S.D. Fla. 2004) ...................................................7

Morlock v. West Cent. Educ. Dist.,
     46 F. Supp. 2d 892 (D. Minn. 1999)......................................................24

Northern v. McGraw-Edison Co.,
     542 F.2d 1336 (8th Cir. 1976) ..............................................................24

Nu-West Mining Inc. v. United States,
     768 F. Supp. 2d 1082 (D. Idaho 2011) ...................................................4

NYSEG v. FirstEnergy Corp.,
     808 F. Supp. 2d 417 (N.D.N.Y. 2011)..................................................29

Responsible Envt'l Solutions Alliance v. Waste Mgmt., Inc.,
     No. 3:04-cv-013, 2011 WL 382617 (S.D. Ohio Feb. 3, 2011) ...............29

Rospatch Jessco Corp. v. Chrysler Corp.,
     962 F. Supp. 998 (W.D. Mich. 1995) .................................................4, 6

State of Washington v. United States,
     930 F. Supp. 474 (W.D. Wash. 1996)......................................................4

Steadfast Ins. Co. v. United States,
     No. CV 06-4686 AHM (RZx), 2009 WL 3785565 (C.D. Cal. Nov. 10, 2009)..................7, 22

United States v. Atl. Research Corp.,
     551 U.S. 128 (2007)..............................................................................26

United States v. Bestfoods,
     524 U.S. 51 (1998)............................................................................1, 23

United States v. Davis,
     261 F.3d 1 (1st Cir. 2001)................................................................25, 26

United States v. Hardage,
     982 F.2d 1436 (10th Cir. 1992) ............................................................30

United States v. Iron Mountain Mines, Inc.,
    987 F. Supp. 1277 (E.D. Cal. 1997)..................................................................6, 7

United States v. Shell Oil Co.,
    13 F. Supp. 2d 1018 (C.D. Cal. 1998) .............................................................5, 6

United States v. Shell Oil Co.,
    294 F.3d 1045 (9th Cir. 2002) ......................................................................6, 7, 9

United States v. Twp. of Brighton,
    153 F.3d 307 (6th Cir. 1998) ...............................................................................3

United States v. Vertac Chem. Corp.,
    46 F.3d 803 (8th Cir. 1995) .................................................................................7

Vine St., LLC v. Keeling,
    460 F. Supp. 2d 728 (E.D. Tex. 2006)................................................................26

**STATUTES:**

42 U.S.C. § 9607(b)(3) ...............................................................................................23

42 U.S.C. § 9613(f)....................................................................................................23

42 U.S.C. § 9613(g)(2) ...............................................................................................25

**RULES:**

Fed. R. Evid. 801 .......................................................................................................27

Fed. R. Evid. 802 .......................................................................................................27

## GLOSSARY

| | |
|---|---|
| Avgas | Aviation gasoline |
| BOW | Baytown Ordnance Works |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| Companies | Humble and Standard |
| Complex(es) | The Refinery(ies) and chemical plants |
| DPC | Defense Plant Corporation |
| DSC | Defense Supplies Corporation |
| Exxon | Plaintiff Exxon Mobil Corporation |
| FOA | Facility Operations Area |
| Humble | Humble Oil & Refining Company |
| NCP | National Contingency Plan |
| OPC | Office of Petroleum Coordinator |
| PAD | Petroleum Administration for Defense |
| PAW | Petroleum Administration for War |
| Refineries | The Baytown and Baton Rouge Refineries |
| RRC | Rubber Reserve Company |
| Site(s) | The Refinery(ies), chemical plants, and other nearby areas or surface waters |
| Standard | Standard Oil Company of Louisiana |
| TCEQ | Texas Commission on Environmental Quality |
| WWII | World War II |

## <u>INTRODUCTION</u>

The United States submits this reply in support of its motions for partial summary judgment ("United States' Motion" or "U.S. Mot."), <u>see</u> ECF Nos. 103-1 (Baytown) & 52-1 (Baton Rouge).  For the reasons discussed in its opening brief, in its opposition to Exxon Mobil Corporation's ("Exxon") motion for partial summary judgment ("United States' Opposition" or "U.S. Opp."), <u>see</u> ECF Nos. 118 (Baytown) & 67 (Baton Rouge), and below, the United States' Motion should be granted.[1]

## <u>ARGUMENT</u>

## I.   THE UNITED STATES CORRECTLY IDENTIFIED THE STANDARD FOR "OPERATOR" LIABILITY

Exxon's contention that the United States' Motion mischaracterizes the legal standard for CERCLA "operator" liability is a straw man.  Exxon Opp. at 10-11.  The United States never stated that the operator liability standard "required" that United States employees work at the Refineries, supervise the refinery workforce, operate refinery equipment, or be regularly stationed at the Refineries.  Rather, the United States correctly summarized the governing standard set forth in <u>United States v. Bestfoods, 524 U.S. 51, 66-67 (1998)</u>, which "requires that an operator actually conduct the affairs of the facility, including those relating to pollution, or that it direct, manage, or conduct *waste disposal or environmental compliance operations*."  U.S. Mot. at 12; <u>see also</u> <u>id. at 11</u> ("Unequivocally, <u>Bestfoods</u> requires participation sufficient to allow the Court to conclude that a party may be said to have managed or conducted the affairs of a facility in a manner that has a nexus to pollution.").  The United States also stated, and Exxon agrees, that whether the <u>Bestfoods</u> standard is met requires an examination of the totality of

---

[1] The United States incorporates by reference herein the Summary of the Argument, Nature and Stage of the Proceeding, Statement of the Issues, and Standard of Review from its opening brief, except to note that, for the Nature and Stage of the Proceeding, the deadlines for the joint pretrial order and the docket call have been extended to April 15, 2014, and April 24, 2014, respectively.

1

circumstances.  U.S. Mot. at 10; Exxon Opp. at 14.  The United States simply showed that an examination of the totality of circumstances here—*i.e.*, no United States involvement in running the Refineries' day-to-day operations, or in their management, supervision, work force, or waste disposal operations—establishes that the requisite nexus between the United States' prior relationship to the Refineries and the Refineries' pollution is lacking.  U.S. Mot. at 12-38.  Thus, whether in the "mechanical sense" or the "organizational sense," Exxon Opp. at 12, the undisputed facts demonstrate that the United States did not "manage, direct, or conduct operations specifically related to pollution" at the Refineries, as <u>Bestfoods</u> requires.[2]

Exxon similarly misapprehends the United States' argument concerning the imposition of CERCLA operator liability based on its wartime regulatory activities.  Exxon Opp. at 11.  The United States does not contend that it is immunized from operator liability any time it acts in a regulatory capacity during war—only that the United States' regulatory actions *in this case* are an insufficient basis for imposing operator liability.  Indeed, when confronted with the same type of wartime regulatory actions at issue in this case—and even regulatory conduct far more significant than here—numerous courts have declined to hold the United States liable as an operator.  See, e.g., <u>Litgo N.J., Inc. v. Martin, Civ. No. 06-2891 (AET), 2010 WL 2400388, at *25 (D.N.J. June 10, 2010)</u> (no operator liability for regulating distribution of critical war material); <u>Coeur d'Alene Tribe v. Asarco, Inc., 280 F. Supp. 2d 1094, 1127-29 (D. Idaho 2003)</u> (no operator liability for regulating price, profits, and labor; requiring approval under priority system, submission of monthly operating reports, and military security oversight; and threatening seizure for noncompliance); <u>East Bay Mun. Util. Dist. v. U.S. Dep't of Commerce, 948 F. Supp.</u>

---

[2] Exxon argues, in a footnote, that the United States is an operator under the "authority to control" test acknowledged by the Fifth Circuit in the post-<u>Bestfoods</u> case, <u>Geraghty & Miller, Inc. v. Conoco, Inc., 234 F.3d 917 (5th Cir. 2000)</u>.  Exxon Opp. at 12-13 n.7.  As explained, any "authority to control" test is, on its face, inconsistent with the operator standard set forth in <u>Bestfoods</u> and is therefore insufficient to establish operator liability.  U.S. Mot. at 11.

78, 89-93 (D.D.C. 1996) (no operator liability for providing financial assistance and imposing

labor, price, and output regulations); Maxus Energy Corp. v. United States, 898 F. Supp. 399,

402-403 (N.D. Tex. 1995) (no operator liability for stationing of inspectors to determine contract

compliance and issue directives to accelerate production).  Essentially, the relationship between

the United States and the Refineries was either based on the application of nationwide

regulations or guided by the provisions of avgas contracts with the United States that Humble

and Standard voluntarily sought out, negotiated, and entered into.  In either case, the United

States' action is not sufficient to support operator liability.

        None of Exxon's cited cases on this issue compels a different result.  Both <u>FMC</u> and

<u>Brighton</u> held that the United States could be subject to CERCLA liability for engaging in

activities, including some regulatory activities, that were "extensive enough" to make it an

operator of a facility, but the United States' regulatory activities at the Refineries were hardly

"extensive enough."  FMC Corp. v. U.S. Dep't of Commerce, 29 F.3d 833, 840 (3d Cir. 1994);

United States v. Twp. of Brighton, 153 F.3d 307, 315 (6th Cir. 1998).  The "dispositive

question" is "whether the government entity was running the facility or merely regulating it,"

because "mere regulation does not suffice to render a government entity liable."  Brighton, 153

F.3d at 316, 316 n.11.  Here, the United States' wartime regulatory conduct affected profits,

allocation of critical materials and labor, and military security presence at the Refineries—but

these regulations applied nationwide to virtually all businesses during the war and do not, by any

means, amount to "running" the Baytown and Baton Rouge Refineries in particular.  U.S. SOF

¶¶ 25, 40.  In contrast, the United States in <u>FMC</u> was found to be an operator based on conduct

that was exponentially more pervasive than at the Refineries—having required a private factory

to convert from making textile rayon to high tenacity rayon, provided the equipment necessary

for the conversion, maintained significant control over the production process, managed and supervised the work force, and stationed full-time representatives on site.  29 F.3d at 836-37.[3]

Exxon also takes issue with the assertion that the Third Circuit's decision in "FMC was an outlier and does not survive Bestfoods."  Exxon Opp. at 11.  Yet, the United States was hardly breaking new ground.  See, e.g., State of Washington v. United States, 930 F. Supp. 474, 485 (W.D. Wash. 1996) ("Application of the 'actual control' test in FMC appears to have been somewhat tainted by reliance on elements evidencing unexercised 'authority to control' certain aspects of the business."); see also U.S. Mot. at 13-14 n.11, 19 n.17; U.S. Opp. at 52-55.  Should the Court nevertheless find FMC instructive, the United States still would not be an operator of the Refineries because the FMC's "leading indicia of control" are plainly lacking.  The parties' consensual avgas contracts—not any "substantial control" exercised by the United States, Exxon Opp. at 33—determined "the level of production" and "the price of the product"; an exception was even made for "to whom the product would be sold," infra 10-11.  FMC, 29 F.3d at 843; see also U.S. Opp. at 59-61.  And the United States did not "twist [Exxon's] arm," forcing Humble or Standard to produce avgas.  See Rospatch Jessco Corp. v. Chrysler Corp., 962 F. Supp. 998, 1005 (W.D. Mich. 1995); Coeur d'Alene, 280 F. Supp. 2d at 1129 (noting that the "mines and mills were not forced to produce," but instead "elected to produce to aid the war effort").  The Companies wanted to participate in the wartime programs, and did so, producing the same kinds of products at the Refineries during the wars as they had produced before the wars.  U.S. SOF ¶ 60; U.S. Reply Ex. 1, MAA_EM-000750-754 (July 1941 Humble letter informing the OPC of

---

[3] Moreover, the Cadillac Fairview appellate decision cited by Exxon on this issue, Exxon Opp. at 16, offers no meaningful guidance, as it did not even address operator liability, let alone discuss the United States' exercise of its nationwide regulatory authority.  See Cadillac Fairview/Cal., Inc. v. Dow Chem. Co., 299 F.3d 1019, 1021-22, 1025-26 (9th Cir. 2002).  Nor does the Nu-West decision, also cited by Exxon, Exxon Opp. at 17, support Exxon's argument, since it did not even involve any Government wartime or nationwide regulatory conduct.  See Nu-West Mining Inc. v. United States, 768 F. Supp. 2d 1082, 1085-86 (D. Idaho 2011).

4

Baytown's present production of avgas and various grades of fuel products, lubricants, special naphthas, and aviation products); U.S. SOF ¶ 59 at MIS-00005039-044 (July 1941 Standard letter re same).

Exxon further asserts that "courts in numerous wartime cases—including FMC, Cadillac Fairview and Shell—have already ruled that the Government's actions result in CERCLA liability." Exxon Opp. at 19. As shown above, FMC's facts are distinguishable and its legal significance in doubt. Exxon's repeated reliance on Cadillac Fairview is also misplaced. The Ninth Circuit's Cadillac Fairview opinion dealt solely with the allocation of cleanup costs in connection with a WWII styrene plant that *the United States owned*. 299 F.3d at 1022. Notably, Dow Chemical Company had operated the plant pursuant to a contract expressly providing that the United States assumed "the expense and risk" of the operation and was *also* found to be a CERCLA operator. 299 F.3d at 1022-24. Cadillac Fairview, therefore, offers no meaningful guidance on the Court's operator analysis concerning the *Exxon-owned and operated* Refineries. Exxon also erroneously cites Cadillac Fairview in asserting that the "Ninth Circuit found that because avgas was 'critical' to the war effort, the United States government exercised significant control over the means of its production during World War II." Exxon Opp. at 35. The case involved rubber production, not avgas production.

In addition, the district court in Shell did *not* "expressly rule[]" that the United States controlled the avgas industry, as Exxon contends. Exxon Opp. at 20. The Shell opinion that Exxon repeatedly cites did not even grapple with operator liability, but dealt only with allocating response costs between the United States and the Oil Companies after both were already found to be CERCLA "arrangers." United States v. Shell Oil Co., 13 F. Supp. 2d 1018, 1019 (C.D. Cal. 1998). In dicta, the district court remarked on the "pervasive oversight by the WPB, PAW and

other agencies of the federal Government," but also noted that, despite this "attendant oversight," "the relationship between the Government and the Oil Companies was a contractual one."  Id. at 1022.  And, more importantly, while the district court allocated all of the response costs to the United States, that ruling was partly reversed on appeal where the Ninth Circuit found that the United States had *no* CERCLA liability *at all* for the disposal of hazardous waste *from WWII avgas production*, despite its allocation of crude oil and scarce materials and purchase of 100-octane avgas pursuant to long-term contracts.  United States v. Shell Oil Co., 294 F.3d 1045, 1054-59 (9th Cir. 2002).[4]

Courts in numerous other wartime cases with facts far closer to those here also declined to find the United States liable as an operator.  See U.S. Mot. at 12-29; U.S. Opp. at 52-61.  Exxon proffers that the United States' cited cases are distinguishable and "do not satisfy the FMC test," Exxon Opp. at 34—as if FMC, and not Bestfoods, governs the operator analysis.  In any event, many of the cases the United States cited *do* discuss FMC, and the Court should reject Exxon's attempt to downplay their significance.  They also involve precisely the same kinds of Government wartime activity at issue here, in each instance held insufficient to impose operator liability:  namely, (1) federal regulatory activity applied industry-wide to protect scarce resources and avoid inflation, profiteering, and other societal ills (*e.g.*, Litgo, Iron Mountain Mines, Maxus, Coeur d'Alene); (2) government incentives to encourage maximum production by private companies based on their expertise and pursuant to their plant operation (*e.g.*, East Bay, Coeur d'Alene, Rospatch Jessco); and (3) written contracts memorializing the terms of

---

[4] The Ninth Circuit upheld the district court's allocation to the United States, after a "full-scale trial with respect to allocation," of 100 percent of cleanup costs for a small portion of wastes that were *unrelated to the avgas program* and for which the United States had conceded arranger liability.  Id. at 1048, 1060; Shell, 13 F. Supp. 2d at 1023.

agreements actively sought out by private companies and freely entered into by the parties (*e.g.*,

Vertac, Iron Mountain Mines, Maxus, Steadfast, Miami-Dade).

    The Ninth Circuit in <u>Shell</u> used similar reasoning to reject the notion, advanced by Exxon

here, that the United States controlled every oil refinery that produced avgas during the war:

> Although the WPB, PAW, and other government agencies had the authority to
> require production of goods at refineries owned by the Oil Companies, and even
> to seize refineries if necessary, in fact they relied almost exclusively on
> contractual agreements to ensure avgas production.  In particular, the government
> entered into long-term contracts to purchase avgas, and offered low-cost loans to
> refineries to help finance the construction of avgas-producing plants.
> …
>    Throughout the war, the Oil Companies designed and built their facilities,
> maintained private ownership of the facilities, and managed their own refinery
> operations.  The Oil Companies affirmatively sought contracts to sell avgas to the
> government, and the contracts were profitable throughout the war.  After the war,
> the Oil Companies retained ownership of the facilities they had built with the help
> of government loans.

Shell, 294 F.3d at 1049-50; see also U.S. Reply Ex. 2, White Dep. Tr. 403:14 – 407:7 (Vol. I,

June 6, 2013) (Exxon's proffered allocation expert testifying that "general thrust" of Ninth

Circuit's factual background in <u>Shell</u> "is consistent with my understanding").  Three years after

WWII ended, the Supreme Court described a similar relationship between the United States and

private industry during the wartime climate:

> Laying aside as undesirable the complete governmental ownership and operation
> of the production of war goods of all kinds, many alternative solutions were
> attempted.  Often these called for capital expenditures by the Government in
> building new plant facilities.  Adhering, however, to the policy of private
> operation of these facilities Congress and the Administration sought to promote a
> policy of wide distribution of prime contracts and subcontracts, even to
> comparatively high cost marginal producers of unfamiliar products.  Congress
> sought to do everything possible to retain and encourage individual initiative in
> the world-wide race for the largest and quickest production of the best equipment
> and supplies.  It clung to its faith in private enterprise.

Lichter v. United States, 334 U.S. 742, 767-68 (1948); see also id. at 766 (Congress did not

choose to "mobiliz[e] the productive capacity of the nation into a governmental unit on the

totalitarian model," but rather regulated to "reach[] unequalled productive capacity and yet

retain[] the maximum of individual freedom consistent with a general mobilization of effort.").

These themes apply here, where Exxon's predecessors actively sought to sell avgas and

other products to the United States and, in fact, did so based on terms that they negotiated with

the United States and voluntarily agreed to—all the while remaining firmly in charge of their

own operations.  It defies both logic and the historical record for Exxon to now use the same

contractual provisions that it willingly entered into as a basis for finding that the United States

"controlled" the Refineries and thus should be subject to operator liability.  And while the United

States' regulatory authority may have *affected* the Refineries' operations—as regulations affect

almost every business nationwide—that authority was never "extensive enough" to amount to

running the operations of the Refineries.  Exxon, and Exxon alone, did that.

## II.    EXXON, NOT THE UNITED STATES, OPERATED THE REFINERIES

The United States has already described how Humble and Standard retained full

management and control of the Refineries at all times during WWII and the Korean War,

maintaining both "mechanical" and "organizational" control of the Refineries' day-to-day

operations, including actively investigating pollution problems, developing programs to resolve

those problems, and executing those programs.  U.S. Mot. at 30-39.  Exxon has offered no

argument to rebut the United States' showing, instead arguing again that nationwide regulatory

actions justify United States' operator liability at the Refineries—as if such an argument would

excuse Exxon from liability.  Because Exxon has failed to contest either that a facility may have

more than one operator, Geraghty & Miller, 234 F.3d at 928, or the evidence that Exxon's own

activities during the wars make it an operator of the Refineries under Bestfoods, the United

States is entitled to summary judgment that Exxon is liable as an operator of both Refineries

during WWII and the Korean War.

8

The discussion below is devoted to rebutting Exxon's additional arguments for imposing operator liability on the United States—arguments that do not address, much less contest, Exxon's own status for purposes of operator liability.

**A.    Exxon Ran Its Own Refineries During WWII Based On Consensual Contract Terms And Subject To Industry-Wide Regulations.**

Exxon discusses various PAW actions and authorities, trying to prove that PAW controlled the operations of the Refineries during WWII. Exxon Opp. at 20-33. But Exxon continues to come up short.

*First*, once again, Exxon's reliance on the district court's <u>Shell</u> opinion to prove the United States "controlled" the avgas industry during WWII, and hence "ran" the Refineries, is misplaced. <u>Id.</u> at 21. On appeal, the Ninth Circuit found the exact opposite, explaining that the oil refineries "managed their own refinery operations." 294 F.3d at 1050. Even as to Exxon's claim that, under the Planned Blending Program, the PAW "unilaterally" determined the allotment of crude oil and other raw materials to the Refineries, Exxon Opp. at 22-23, the Ninth Circuit in <u>Shell</u> disagreed:

> The government sought to maximize avgas production through the Planned Blending Program. Under this program, the government assisted the refineries operated by the Oil Companies in exchanging and blending various avgas components in order to maximize production of avgas. The government could, and sometimes did, direct that specific exchanges be made, but *it usually accepted what was proposed by the refineries. … The program did not exercise direct control over the production of avgas components*; rather, it controlled only their exchange and blending after they had been produced.

294 F.3d at 1050 (emphasis added).

*Second*, Exxon claims that the United States "imposed regulatory requirements" on the Refineries' product yields, production levels, and specifications, Exxon Opp. at 23; yet, those issues were not the result of federal regulatory requirements but were all expressly covered by

9

the Companies' consensual avgas contracts with the United States.  U.S. SOF ¶¶ 61-76.  Indeed, the United States undoubtedly had a requirement for large amounts of avgas, but Standard was a willing participant in the program.  Standard agreed initially to sell to the United States its "full capacity of 100-Octane aviation gasoline" and thereafter "the entire requirements of the United States Government."  Id. ¶ 61 at MIS-00022189; see also East Bay, 948 F. Supp. at 90 (noting that, to the extent the Government affected mine's production level, "it was the result of a consensual, contractual agreement").  Avgas product specifications were attached to the avgas contract and any other specifications could also be attached by "mutual agreement."  U.S. SOF ¶ 61 at MIS-00022189.  Standard's avgas contract further provided that "[t]he prices, specifications and quantities of [100-octane avgas of specifications other than those originally attached to the contract] shall be determined by *negotiation between the parties*, and [Standard] shall not be required to deliver such products unless and until an agreement has been reached."  Id. at MIS-00022190 (emphasis added).  Humble's avgas contract with the United States contained virtually identical provisions, allowing the United States to purchase from Humble as much avgas as the United States "may require" pursuant to specifications attached to the contract, and permitting the details of other avgas specifications to be determined "by mutual agreement" and negotiation.  U.S. SOF ¶ 67 at BAYHIS-00010204.

Avgas prices were also covered by the parties' contracts and, at least with respect to Humble, appeared to be based on the Companies' initial proposal, U.S. SOF ¶ 72—not any "detailed regulatory system," as Exxon claims, Exxon Opp. at 30.  In any event, prices were set forth in the avgas contracts, which were negotiated by the parties on terms that did allow for price increases.  U.S. SOF ¶¶ 75-78.  Exxon also argues that the United States "precluded" Humble or Standard from marketing any of the avgas to other buyers, Exxon Opp. at 30, a

10

position that overlooks the United States' agreement in the contract to Humble's request for an accommodation for its existing Texas customers.  U.S. SOF ¶ 73.  And, despite profit controls, Humble and Standard undoubtedly made significant profits under their avgas contracts with the United States, as well as profits from private customers—so much so, that they continued to pay dividends to their shareholders throughout the war.[5]  U.S. SOF ¶ 86.

*Third*, Humble and Standard voluntarily agreed to enlarge their own Refineries, where needed, to participate in the war effort, as expressly noted in the avgas contracts.  U.S. SOF ¶ 69 (Baytown); id. ¶ 61 at MIS-00022186-187 (Baton Rouge).  In fact, the Refineries were already substantial before WWII and both Companies were eager to capitalize on their prior investments, research, and unparalleled expertise in avgas production.  Id. ¶¶ 50-59.  This eagerness is illustrated in one of Standard's necessity certificates, where it stated that its construction of facilities for avgas production "was begun shortly after the start of the war in Europe" (*i.e.*, September 1939) and was undertaken by Standard "because of the realization by the industry as a whole that the future conduct of the war would require tremendous quantities of 100 octane gasoline."  Id. ¶ 84 at US-BR001158.  Standard had further observed that, in the aftermath of Munich (*i.e.*, Fall 1938), "government money in unprecedented amounts was being poured into military aircraft production and development."  Id.; see also U.S. Reply Ex. 1 at MAA_EM-000753-754 (July 1941 letter from Humble to OPC—predating the 1942 execution of avgas contract—describing Baytown's present refining capacity and Humble's "[p]lans for expansion

---

[5] During WWII, a study was conducted on capital flow in the oil industry for an eight-year period between 1934 and 1941 based on data from thirty oil companies, including Standard.  The study found that the average rate of return for this pre-war period was 6.4%—slightly more than the 6% cap on profits during the war.  U.S. Reply Ex. 3 at US-SH057807.  According to Robert Nathan, a WPB employee, "6 percent is an appropriate limitation" and "a modest one," and "seemed a reasonable upper limit."  U.S. Reply Ex. 4, Nathan Dep. Tr. in United States v. Shell Oil Co., at 459:6-12 (Vol. III, Oct. 10, 1991).

of [its] facilities"). Exxon's assertion that *PAW* "substantially expand[ed] and reconfigur[ed]" the Refineries, Exxon Opp. at 25-26, is thus belied by the historical record. See Maxus, 898 F. Supp. at 408 ("Diamond chose to bid for the Agent Orange government contracts, and to the extent Diamond had to change its operations ... those changes resulted from its own decision to seek the government's wartime business"); East Bay, 948 F. Supp. at 91 ("The changes Shawmut made to the mine resulted from its desire to meet its contractual obligations, not from a direct government order.").

Also at odds with the historical record is Exxon's characterization that "PAW unilaterally decided" to build Plancor 1909 within the Baytown Refinery and that "Humble acquiesced" under "significant pressure from the PAW." Exxon Opp. at 27-28. While Humble expressed some initial reluctance about Plancor 1909, it was about the *nature* of the project, not its existence. Historical documents show that Humble filed a priority application covering a low pressure hydrogenation unit, but later wished to withdraw it, believing that a "naphthenic route" was the better way to proceed and because of uncertainty as to whether the unit could be used for the hydrogenation of codimer. U.S. Reply Ex. 5, MAA_EM-001774-775. Contrary to Exxon's claim, Exxon Opp. at 28, PAW did not "always" refuse to permit Humble to withdraw its priority application. Internal PAW correspondence demonstrates that PAW sought to "convince" Humble to proceed with the hydrogenation unit, but would not force it to do so:

> I am entirely sympathetic with your views and have been endeavoring to *convince* Humble of the desirability of going forward with this hydrogenation unit but without success. In view of the uncertain status of this project it was not included in our recent Program Determination and on May 29, 1943 Mr. Baker wired our Construction Section *withdrawing the priority application*. I must confess that while I am sympathetic with your views, *I am also very sympathetic with Humble's since Humble has every expectation of using naphthenic gas oil and since it has been unable to obtain data which indicate with any degree of assurance that the low pressure hydrogenation unit can be used for the manufacture of either hydrocodimer or C-S.*

> Furthermore, I know of no company with which it would be more difficult to work out a satisfactory business arrangement covering a unit which it is reluctant to install. … I have no doubt that on a unit which Humble was really interested in installing we could work out satisfactory arrangements, but frankly I would hesitate to tackle the necessary business arrangements in the case of a unit which Humble itself did not feel to be sound. Furthermore, quite aside from these difficulties, *I have a great deal of trepidation about asking Humble or any other oil company to undertake the construction of any facilities which it does not feel are desirable*.

U.S. Reply Ex. 5 (emphasis added).  The PAW correspondence also noted that Humble was still doing experimental work on the possibility of low pressure hydrogenation for manufacturing hydrocodimer or C-S and that, if the work was successful, Humble would be willing to submit a proposal.  Id.  Humble later agreed to the hydrocodimer project, and the parties negotiated the terms of the Plancor 1909 agreement.  See U.S. Reply Ex. 6, BAYHIS-00011927-932.

*Fourth*, Exxon overstates PAW's authority in asserting that PAW "retained approval authority over *all* upgrades, installations, and maintenance at the Baytown and Baton Rouge refineries."  Exxon Opp. at 27 (emphasis added).  PAW approval was required only when scarce raw materials or construction labor were sought.  U.S. SOF ¶¶ 25, 37.  As noted in the United States' Motion, Humble and Standard implemented a number of modifications to the Refineries during both wars—all without *any* indication that PAW approval was ever requested or required.  See U.S. Mot. at 34-36, 38-39.

*Fifth*, the United States acknowledged that various federal representatives periodically visited the Refineries during the war.  U.S. SOF ¶ 179.  Yet, even Exxon's proffered forensic historian, A.J. Gravel, testified at deposition that none of those inspections involved any federal representatives directing production or waste disposal decisions.  Id.  Directly contradicting that prior testimony, Exxon now claims that federal representatives visited "various oil refineries" to, among other things, "evaluate and resolve production process problems in order to optimize

13

production levels." Exxon Opp. at 26.  Yet, the documents on which Exxon relies refer only to a general Government report that never mentions any particular inspection at either of the Refineries, and two inspection trip reports (that appear to be written by the Companies) offering narratives for the United States' visits to the Refineries where officials simply toured the plants and observed plant operations.  See A00872-893 & A00894-927.  The documents do not suggest, much less demonstrate, involvement in evaluating or resolving production issues.  As explained in the United States' Motion, inspections at the Refineries primarily concerned contract compliance and product quality, matters insufficient to give rise to operator liability.  See U.S. Mot. at 17-18.

Sixth, Exxon relies on the PAW's use of telegrams as a means of communicating with the oil refineries as purported evidence of United States control over production.  Exxon Opp. at 23-25, 28-30.  Telegrams were indeed used as informal means of advising the oil industry of developments in wartime circumstances and changes in the United States' needs—always reiterating that maximum avgas production was top priority.  They did not, however, force Humble or Standard to do anything that they were not willing to do.  Lincoln Gordon, vice chairman of the WPB, referred to a similar wartime telegram to oil refineries as "urging" or "jawboning," but not imposing any "legal obligation."  According to Mr. Gordon, telegrams were "not at all an unusual type of communication to an industry, telling them about an important wartime need and asking them to let the authorities know if there is anything that is likely to interfere with it."  U.S. Reply Ex. 7, Gordon Dep. Tr. in United States v. Shell Oil Co., at 948:20 – 953:20 (Vol. IV, June 24, 1992) & Exhibit W discussed therein.

Seventh, Exxon hypothesizes that "the Government was able to exercise this degree of day-to-day operational control over these two refineries … because PAW had at its disposal a

14

number of enforcement authorities, or coercive measures, that it threatened or deployed to ensure the 'cooperation' of the oil industry." Exxon Opp. at 30-31 (emphasis added). Hypothesizing even further, Exxon purports that "[t]he threat of seizure was no idle threat to Humble or Standard Oil." Id. at 31. This is pure speculation. See Brown v. City of Houston, Tex., 337 F.3d 539, 541 (5th Cir. 2003) ("unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment"). Mr. Gravel acknowledged numerous times at deposition that he was unable to determine the mindset of company executives at Humble or Standard; similarly, Exxon's counsel has no basis to infer the state of mind of either company's executives based solely on the existence of Governmental authority. U.S. Reply Ex. 8, Gravel Dep. Tr. 197:11-20, 313:16 – 314:9 (Vol I, Feb. 28, 2013). What may be discerned from the historical record, however, is the utter lack of *any* documents evidencing that the United States ever threatened to seize the Refineries, cut off their crude oil supplies, or jail or fine any company executives at either of the Refineries. U.S. SOF ¶ 184; U.S. Reply Ex. 8 at 197:11 – 199:17, 339:14-22; see also Maxus, 898 F. Supp. at 408 (finding that plaintiff's claim that "'the United States effectively seized the [plant] to obtain use of [its] output,' sounds compelling, but is not supported by the summary judgment evidence").

Mr. Gravel also admitted that he had not seen a single document suggesting that either company ever sought to "opt out" of the wartime program. U.S. Reply Ex. 8 at 208:4-9, 209:4-22. Rather, he believed that Humble and Standard were both "patriotic" and did not want to "sit on the sidelines." Id. at 313:3-15. In fact, after Pearl Harbor, Humble told the United States that it "[r]ecogniz[ed] the urgency for conserving supplies of aviation gasolines," and avowed that its "earnest desire [was] to comply with any program which will have the effect of improving the general situation" and "evidenced [its] willingness to cooperate in any program which will have

15

the effect of further increasing supplies of [100 and 91 octane aviation gasolines]."  U.S. Reply

Ex. 9, MAA_EM-003812-814.  Exxon's speculation that the Companies' actions were coerced

thus lacks any factual or reasoned basis, and should be given no weight.

**B.    Exxon Solely Directed, Managed, And Conducted The Refineries' Waste Disposal Operations.**

Exxon has done nothing to undermine the United States' demonstration in its opening

brief that the United States did *not* direct, manage, or conduct any waste disposal or

environmental compliance operations at the Refineries.  See U.S. Mot. at 20-39.  Exxon's

Opposition contains several inaccurate characterizations of the historical record, however, that

warrant a brief response.

As an initial matter, Exxon asserts that there were "numerous instances" where the

United States was involved in waste disposal decisions at the Refineries.  Exxon Opp. at 39.  But

Mr. Gravel previously identified only two instances:  (1) the master separator at Baton Rouge

and the alternative silt treating unit project, and (2) new and temporary acid burning facilities at

Baytown.  U.S. SOF ¶ 202.  And, in fact, those two projects—through subdivision—make up the

five instances that Exxon now refers to in its brief.  In all instances, the Companies designed the

proposed projects on their own and, if approved, carried them out[6]; the United States'

involvement was limited solely to determining whether Standard and Humble had justified the

need for the scarce materials sought based on information submitted by the applicant.  See, e.g.,

U.S. SOF ¶¶ 203, 218, 220, 260.

---

[6] On at least one occasion, the United States had approved Standard's request for materials
related to waste disposal projects at Baton Rouge, but Standard unilaterally determined *not* to
proceed with them due to alterations and additions it had made, all on its own, that rendered the
projects "unnecessary."  U.S. SOF ¶¶ 279-80.  Again, regardless of the United States' allocation
of materials, the companies had the final say in the Refineries' waste disposal decisions.

16

Second, the United States acknowledges that its principal wartime objective was to win the war, not to abate pollution.  Yet, Standard's own choices, not United States policy, resulted in Standard's failure to complete a master separator at Baton Rouge, which was first considered in 1931, until 1952.  U.S. SOF ¶¶ 238-243, 267, 272, 277, 293.  Thus, regardless of how many times during WWII that Standard requested approval for resources to construct the separator,[7] the project was one that Standard considered and chose not to undertake *before* the war and failed to complete until years *after* the war.[8]  Id. ¶¶ 292-93; U.S. Resp. to Exxon PF ¶¶ 100-101.

Moreover, Exxon describes the proposal for the master separator as if the Corps invented the idea and only PAW thought it should be a post-war project.  Exxon Opp. at 37-38.  The Corps initiated investigation at the Baton Rouge Refinery and warned Standard of potential prosecution.  U.S. SOF ¶¶ 245-48.  Standard—not the Corps—then hired a consultant to study the issue who, just as others had suggested years before, recommended a master separator, which Standard adopted as part of *its* "definite program" for abating the pollution and avoiding

---

[7] The earliest documentation of Standard's request to the United States for resources to construct a master separator at Baton Rouge is dated 1944.  U.S. SOF ¶ 260.  Exxon cited two post-war documents alleging a prior 1943 request, one a 1946 company memorandum and the other a 1953 company newspaper.  Exxon PF ¶ 100-101.  There is no record of a 1943 request made by Standard regarding a master separator at Baton Rouge.

[8] Citing Brighton, Exxon maintains that once a party's affirmative acts render it an operator, it is also liable for any subsequent contamination arising from its failure to act.  Exxon Opp. at 13.  "Under this rule," Exxon contends, "the Government's scope of responsibility should extend to its failure to address the environmental issues that were brought to its attention at key points during the wartime."  Id.  As previously addressed in the United States' briefs, however, Humble and Standard investigated the disposal problems at the Refineries and alone designed, proposed, and carried out any solutions to those problems.  See U.S. Mot. at 31-39.  Even using Exxon's own logic, its undisputed liability as an operator of the Refineries during peacetime should extend to its years-long failure to implement the master separator at the Baton Rouge Refinery, both before WWII began and long after it ended.  U.S. SOF ¶¶ 238-243, 292-293.  Likewise, if the waste controls used at the Plancors operated by Exxon were "inadequa[te]," as it contends, then liability should extend to Exxon, which designed and constructed them, based on its own failure to include adequate controls.  U.S. SOF ¶ 87.

17

prosecution.  Id. ¶¶ 249-53, 258, 262-63, 266.  And while Standard sought approval for materials

to construct the master separator, it had "hope[d] that the master separator would not be

necessary" and "[w]ith this in mind the silt unit was built and put in operation [in 1945]."  Id. ¶

277.  Indeed, Standard itself had concluded that the silt treating unit "should be given

preference" over the master separator and "could be installed more quickly and more could be

accomplished in correcting pollution problems with a smaller investment."  Id. ¶ 272.

Finally, Exxon asserts in a footnote that the United States' expert historian, Jay Brigham,

Ph.D., acknowledged at deposition that the Government made various decisions regarding waste

processing facilities at the Refineries.  Exxon Opp. at 37 n.15.  To the contrary, Dr. Brigham

only testified that the United States was involved in *one* type of decision—allocating scarce

materials—that *indirectly had an effect* on Humble's and Standard's waste processing activities.

See U.S. Resp. to Exxon PF ¶ 99.  The Government's allocation of scarce materials nationwide

undoubtedly affected many aspects of the Refineries, but the Refineries were not "unique," as

wartime allocation of materials affected all businesses and even private citizens during the war.

See East Bay, 948 F. Supp. at 92.  But *affecting* the Refineries' operations does not equate with

*running* them, and therefore cannot be a basis for imposing operator liability.

### C.    Exxon Continued To Run Refinery Operations During The Korean War.

Exxon again relies on nationwide regulatory conduct and allegedly "coercive measures"

that were never utilized at either refinery in an attempt to shore up its allegation that the United

States controlled the Refineries during the Korean War.  Exxon Opp. at 40-44.  In the same way

that the United States' activities affecting the Refineries during WWII should not impose

operator liability, its Korean War conduct should not result in liability either.

18

For starters, the United States' regulatory activities during the Korean War were much less pervasive and in no way comparable to those during WWII.  There was no program similar to the DPC, and no DSC-like arrangement to purchase 100-octane avgas.  PAD's authority during the Korean War was similar to PAW's WWII authority, yet it is quite telling that PAD issued only six orders affecting the oil industry compared to the approximately 80 orders issued by PAW.  U.S. SOF ¶ 41.  And, while the country experienced some material shortages during the Korean War, the United States did not allocate war materials to the degree that it did during WWII and *did not allocate crude oil supplies*.  Id.; Brigham Decl. ¶¶ 3-5.

As respects the relationship between Exxon's predecessors and the United States during the Korean War, the documents produced show that the parties' relationship was governed by contractual terms that Exxon voluntarily agreed to, just as it did during WWII.  U.S. SOF ¶ 43; Brigham Decl. ¶ 6.  The documents further demonstrate that the Companies proposed to increase its avgas production at the onset of the war, voluntarily maximized production as the war progressed, and alone ran the Refineries' operations, subject to federal regulations that spanned the nation.  Brigham Decl. ¶¶ 9-10, Exs. 8 & 9; U.S. Reply Ex. 10, MISC-00014987.  And, most importantly, the documents show that Exxon's predecessors actively directed and managed the Refineries' waste disposal operations without *any* United States involvement.  See U.S. Mot. at 37-39 & U.S. SOFs cited therein.

In an attempt to manufacture some dispute of fact, Exxon has cited new documents from the Korean War era that prove only that the United States was "request[ing]," not forcing, Exxon's predecessors to increase production (Exxon Opp. at 43 (citing A1009)); that stress the Government's desire for the industry's "utmost cooperation" in increasing production (Exxon Opp. at 44 (citing RA0127); that show that Exxon's predecessors voluntarily "conducted various

special operations at their respective refineries" to increase avgas production "consistent with

outstanding contracts" (Exxon Opp. at 45 (citing RA0148-162)); and that do not even involve the

Baytown or Baton Rouge Refineries (Exxon Opp. at 43 (citing RA0123-125 concerning the

Bayway Refinery) & Exxon Opp. at 46 (citing RA0189-191 concerning a third-party oil

refiner)).  None of the documents Exxon cites show anything other than Exxon's predecessors'

eager and willing participation in supplying the United States' wartime needs.

Nor does Exxon present any documentary evidence of United States involvement in—let

alone control over—the Refineries' waste disposal operations.  Exxon cites a *single* document to

support its assertion that *PAD* "controlled" the Refineries' pollution operations.  Exxon Opp. at

45.  Yet, a "study" of the Baton Rouge Refinery's liquid wastes that the *U.S. Public Health

Service* conducted as "part of an overall program which [it] has been carrying out for a number

of years to gather data on the *nationwide* pollution load of all industrial wastes" cannot support

Exxon's claim.  See RA0163 (emphasis added).

Moreover, contrary to Exxon's characterization, Exxon Opp. at 44, PAD did not indicate

it "intended" to seize refineries if avgas production did not increase.  The document on which

Exxon relies was an outline for PAD's discussion with oil company heads, and very plainly

states under the heading "Tell Them What the Problem Is":

> The only other alternatives to increase production are to allocate aviation gasoline
> to commercial consumers of aviation gasoline or for the Military to make the
> same gasoline available to them by exercising their rights of seizure.  *PAD, of
> course, does not wish to see this happen* and we are sure that the petroleum
> industry would understand the political implications of such an occurrence.

RA0126 (emphasis added).  PAD's outline also indicated that PAD wanted the oil industry to let

it know "if they need help and want them to advise [PAD] as soon as anything is worked out."

RA0127.  Exxon again speculates that "any threat of seizure … of oil refineries" by PAD "was

20

surely taken seriously by the oil companies," Exxon Opp. at 44, but there is no documentary evidence that the United States ever threatened the Refineries with seizure.  Brigham Decl. ¶¶ 7-8; U.S. SOF ¶ 184; U.S. Reply Ex. 8 at 197:11-20, 313:16 – 314:9, 339:14-22.  As in WWII, Exxon's predecessors willingly participated in the wartime program and, in fact, at the start of the Korean War, Humble expressly told the United States that it "can be assured of [its] cooperation in industry efforts to meet military demand for aviation products."  RA0160.

## III.   EXXON OPERATED THE PLANCORS AND BAYTOWN ORDNANCE WORKS

Despite the existence of contractual agreements expressly calling for the Companies to "operate" the Plancors and BOW, once more Exxon completely disavows operator liability and contends that the United States unilaterally controlled the plants' operations.  Exxon Opp. at 46-55.  As already shown, Exxon's position is untenable in light of the historical record and Exxon again declines to confront the facts pertaining to its own operator status, risking a prompt adverse judgment.  See U.S. Mot. at 39-46, U.S. Opp. at 61-65.  Only a few points require a response.

As discussed, Humble and Standard voluntarily entered into contracts with the United States where the Companies willingly agreed to design, construct, equip, and "operate" the Plancors at Baytown and Baton Rouge, as well as the BOW.  U.S. SOF ¶¶ 87-168.  Even though the United States held title, Exxon's predecessors treated these plants as if they owned them and each was fully run and managed by the Companies and staffed with the Companies' employees. See, e.g., U.S. SOF ¶¶ 89, 185-86.  Indeed, federal ownership was simply a form of subsidization, in which the United States assumed the risk that the plants would become excess capacity when the wartime emergency ended.  Brigham Decl., Ex. 1 at 14-19.

Exxon nevertheless points to a RRC "Manual of Administrative Procedures" in arguing that the United States exercised control over virtually all aspects of these plants' operations.

Exxon Opp. at 50.  As its title implies, the manual dealt with a myriad of "administrative matters," but did not contain any instructions on substantive matters concerning plant operation, production, or waste disposal.  In fact, the Manual's provision concerning waste disposal only instructs the Operator to request prior approval for contracts to dispose "of all types of property," to sell "scrap," and to sell "by-products, intermediates, and co-products" at a "price acceptable to Operator."  A2985-3087 at A3023-25; see also Steadfast Ins. Co. v. United States, No. CV 06-4686 AHM (RZx), 2009 WL 3785565, at *7 (C.D. Cal. Nov. 10, 2009) (finding that Safety Manual "provides nothing more than basic safety guidance" and "in no way did it direct Whittaker's employees as to their actions regarding waste disposal").  The United States maintained approval authority, but, as Operator, Humble and Standard either made the plants' underlying waste disposal decisions or proposed the pollution-related course of action for them to take.  See U.S. Mot. at 41-44, 46.

Exxon also lacks documentary support for its assertion that the United States "made decisions regarding environmental compliance issues" at the plants.  Exxon Opp. at 52.  Exxon's cited document only describes a 1948 meeting between RRC officials, employees of a third party company unrelated to either Standard or Humble, and a Texas State Game, Fish and Oyster Commission official to "determine in a general way the policy of the Commission on stream pollution."  A2210.  On its face, the document does not sustain Exxon's claim.

Exxon's suggestion that the United States "approached" Standard about toluene production for the BOW is also belied by the historical record.  Exxon Opp. at 52-53.  In 1933, Standard informed the War Department of its toluene production; Standard continued to provide the United States with toluene samples throughout the 1930s; and, in 1940, Standard told the United States that it could produce "any desired amount" of toluol and "offered" to build what

eventually became the BOW.  Brigham Decl. ¶¶ 18-20.  Furthermore, the military personnel
stationed at the BOW did not "control all aspects of [BOW] operations," as Exxon argues.
Exxon Opp. at 54.  Even Mr. Gravel acknowledged that Exxon's cited correspondence (A2230)
shows the military's concern with only "administrative" issues and that he could not recall any
document showing the military's involvement in production at the BOW.  U.S. SOF ¶ 194;
Brigham Decl. ¶¶ 21-22.  This distinction was confirmed in March 1944, when the Ordnance
Department wrote Humble:  "you[r] advice, based on your knowledge and experience, is what is
sought, since you, and not the Ordnance Department, are the expert in this field."  U.S. Reply Ex.
11, BAYHIS-00007268.

        Finally, Exxon argues that its predecessors "managed these war plants only as the
Government's agent," and thus all costs from the plants' operations should be allocated to the
United States.  Exxon Opp. at 55-58.  This argument has absolutely no bearing on Exxon's
CERCLA liability.  See 42 U.S.C. § 9607(b)(3) (exempting from liability "an act or omission of
a third party *other than an employee or agent of the defendant*, …") (emphasis added);
Bestfoods, 524 U.S. at 65 ("Under the plain language of the statute, *any* person who operates a
polluting facility is directly liable for the costs of cleaning up the pollution.") (emphasis added).
This issue might be relevant, if at all, to allocation, which involves the Court's consideration of
numerous equitable factors, 42 U.S.C. § 9613(f).

        In any event, Exxon's contention that the parties consented to an agency relationship for
the management and operation of the Plancors and BOW is erroneous.  Exxon Opp. at 56.  While
the Plancor lease agreements called for the Companies to proceed "as an agent" for the DPC in
certain aspects in constructing and equipping the Plancors and employing subcontractors related
to the same tasks, the operating agreements expressly disavowed any agency relationship.  See,

e.g., U.S. SOF ¶ 92 at US-BT008548 ("Nothing contained in this Section 1, or elsewhere in this contract, shall be construed as appointing Contractor as agent of or for Reserve."); id. ¶ 109; Brigham Decl. ¶¶ 15-17.  The BOW Contract even provided that Humble would act "as an independent contractor" in designing, constructing, equipping, *and* operating the BOW.  U.S. SOF ¶ 113 at BAYHIS-00018139, 145.  In a 1943 letter to a third party, Humble's CEO, Hines Baker, affirmed that it was "not in the legal position of 'Agent' for the Rubber Reserve Company but rather in the legal position of 'Vendor'" and that its actions were those of "an independent contractor and not as an agent."  Brigham Decl. ¶ 12.[9]

Exxon's remaining arguments, Exxon Opp. at 56-57, should also be rejected, because, as explained, the United States did not exercise pervasive control over the plants' operations.  Nor can Exxon credibly claim that its predecessors' activities "entirely" benefitted the United States. Humble and Standard certainly gained the benefit of trial and error in running these plants and

---

[9] Exxon argues from both sides of the same coin, maintaining that certain contract language "expressly acknowledged" agency status, and then labeling other contract language that disclaimed agency status as "in no way dispositive."  Exxon Opp. at 56.  Regardless, the terms of the operating agreements and day-to-day activities at the plants demonstrate that Exxon's predecessors operated the plants as their own and without any "pervasive control" exercised by the United States.  Thus, Exxon's cited cases are not instructive.  See Favorite v. Marine Pers. & Provisioning, Inc., 955 F.2d 382, 388 (5th Cir. 1992) (vessel operator was "agent" of the United States under Suits in Admiralty Act's exclusivity provision where operator "act[ed] as a fiduciary of the government" and contract provisions and admiralty law supported finding); Northern v. McGraw-Edison Co., 542 F.2d 1336, 1342-45 (8th Cir. 1976) (contract characterizing dealer as "independent contractor" was not dispositive where "sufficient evidence" was presented that franchisor exerted "influence and control" over "significant aspects" of dealer's activities); Ludolph v. Bechtel Assocs. Prof'l Corp., D. C., 542 F. Supp. 630, 631-33 (D.D.C. 1982) (construction consultant was "agent" of WMATA where procedures prescribed by the contract identified consultant as "authorized representative," WMATA had "pervasive control" over consultant, and WMATA did not dispute agency status); Morlock v. West Cent. Educ. Dist., 46 F. Supp. 2d 892, 901-02 (D. Minn. 1999) (education district (WCED) was "agent" of independent districts (ISDs) that formed it, because ISD members were permitted to serve on WCED board, and WCED acted "expressly on behalf" of ISDs and "explicitly under the control of the ISDs and with the ISDs' consent").

achieving full scale operation—without having to pay for the learning experience and, in fact, being fully compensated for it.  Exxon's "agency" argument thus should be rejected.

## IV.    EXXON CAN SHOW NO FACTS SUFFICIENT TO SUPPORT A DECLARATORY JUDGMENT ALLOCATING UNKNOWN FUTURE COSTS[10]

Exxon spends pages of its Opposition arguing points that the United States does not dispute regarding the general availability of a declaratory judgment.  The United States has never contested that once a party has demonstrated a prima facie case under CERCLA Section 107(a), a declaratory judgment *for liability* is mandatory under Section 113(g)(2), or that courts have held that declaratory judgments *for liability* are also available for claims brought under Section 113(f).  Furthermore, the United States does not contend that the entire amount of future cleanup costs must be known, or even that the entire scope of future cleanup actions must be known, before a declaratory judgment allocating a share of future costs can be entered.  Instead, the United States argues that a declaratory judgment allocating certain future costs should not be entered where, as here, *no* facts exist to support an equitable allocation of those costs because they are entirely speculative at this time.  In other words, Exxon is not entitled to a declaratory judgment allocating unknown future costs to address the water bodies and underlying sediment adjacent to the Complexes, the contamination of which Exxon has not investigated and knows essentially nothing about.  See U.S. SOF ¶¶ 306-311; U.S. Resp. to PRF ¶¶ 69-76.[11]

---

[10] Additionally, as a liable party, Exxon is not entitled to a judgment holding the United States jointly and severally liable.  See U.S. Opp. at 28-38.

[11] Contrary to Exxon's statement, the United States' summary of the law regarding the availability of declaratory judgments for Section 113(f) claims is not contrary to "numerous appellate courts and courts within the U.S. Court of Appeals for the Fifth Circuit."  Exxon Opp. at 63.  The plain language of the statute requires declaratory judgments only for "actions[s] described in this subsection"—*i.e.*, "action[s] for recovery of the costs referred to in section [107]."  42 U.S.C. § 9613(g)(2).  United States v. Davis and GenCorp, Inc. v. Olin Corporation both acknowledged this fact, but applied Section 113(g)(2) to Section 113(f) claims in order to accomplish the goals of the Act.  See Davis, 261 F.3d 1, 46-47 (1st Cir. 2001); GenCorp, 390

Courts have "considerable latitude" when performing a CERCLA allocation.  Amoco Oil

Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir. 1989).  The non-exhaustive list to which courts

typically look includes:

> the amount of hazardous substances involved; the degree of toxicity or hazard of
> the materials involved; the degree of involvement by the parties in the generation,
> transportation, treatment, storage, or disposal of the substances; the degree of care
> exercised by the parties with respect to the substance involved; and the degree of
> cooperation of the parties with government officials to prevent any harm to public
> health or the environment.

Id. at 672-73 (quotation and citation omitted); see also In re Bell Petroleum Servs., Inc., 3 F.3d

889, 899-900, 901 n.12 (5th Cir. 1993).  Typically, an allocation of costs for sediment

contamination requires information regarding the type of contaminants present in the sediment at

various depths and locations, a determination of which contaminants pose the greatest risk such

that they drive the selected remedy, and the source of the various contaminants—which in this

case may or may not include wartime operations.  See Low Decl. ¶ 8 (adopting reports as

testimony); U.S. Opp. Ex. 2, Nov. 16, 2012 Expert Rebuttal Report by Matt Low at 28-31.

Nothing regarding any of these issues is known at present with respect to contamination

that may or may not prove to be present in the Houston Ship Channel, Black Duck Bay, Scott's

Bay, and Mitchell Bay at Baytown, and the Monte Sano Bayou and Mississippi River at Baton

Rouge, and therefore no case or controversy exists with respect to wholly speculative future

---

F.3d 433, 450-51 (6th Cir. 2004).  Both courts also held that a case or controversy must exist in
order to warrant a declaratory judgment, as the United States argued in its Motion.  Davis, 261
F.3d at 47; GenCorp, 390 F.3d at 451.  Indeed, in GenCorp, the court specifically held that it was
unable to find sufficient evidence of future costs to satisfy the "case or controversy" requirement.
390 F.3d at 451.  Vine Street, LLC v. Keeling is inapplicable, as it preceded the Supreme Court's
holding in United States v. Atlantic Research Corporation, 551 U.S. 128 (2007), that liable
parties may pursue actions under CERCLA Section 107, and thus involved a claim brought
under Section 107 "through an implied right of contribution under CERCLA Section 107(a)."
460 F. Supp. 2d 728, 735 (E.D. Tex. 2006).  It did not involve a Section 113 action as Exxon
asserts.  In any event, Exxon's 113(f) claim for the Baytown Site is time-barred, and Exxon did
not plead a Section 113(f) claim for the Baton Rouge Site.  See U.S. Opp. 4-26, 5 n.2.

costs to address those water bodies.  For Baytown, Exxon offers reports regarding the study of

Mitchell Bay sediments immediately adjacent to the shoreline discussed in the United States'

Motion and Opposition, Exxon's Step 2 Assessment Reports for its Baytown Facility Operation

Area ("FOA") applications, and the Agreed Orders Exxon entered into with the State of Texas.[12]

See Exxon PRF ¶¶ 69-73.  Notably, Exxon does not contend that any of these reports contain any

meaningful information regarding the existence, type, source, magnitude, or geographic extent of

any contamination in Mitchell Bay, the Houston Ship Channel, Black Duck Bay, and Scott's

Bay.  See id. ¶¶ 69-73.  In fact, with the exception of the Mitchell Bay shoreline reports, none of

Exxon's documents include studies of contamination *in* the water bodies or underlying sediments

at issue.  See U.S. Resp. to Exxon PRF ¶¶ 69-73.  And the Mitchell Bay shoreline reports do not

include any study of contamination beyond the shoreline of Mitchell Bay.  See id. ¶ 69.

Furthermore, Exxon repeatedly implies, but is careful not to actually state, that the

available reports establish a connection between any contamination and the production of war

products during WWII and the Korean War.  See Exxon Opp. at 61 (stating that "there are

indications that areas may have been historically impacted" without defining "historically");

Exxon PRF ¶ 69 (stating that "[t]he off-shore report concluded that some if not all the

contamination was historic in nature" but again providing no definition of "historic"); Exxon

Resp. to SOF ¶ 308 ("[T]he company has produced evidence that historical, war-related

---

[12] Exxon also states that "[p]ursuant to direction from TCEQ, ExxonMobil has also conducted pore water-based risk assessments for the Houston Ship Channel and Black Duck Bay."  Exxon PRF ¶ 70.  This statement should be deemed unsupported because it simply cites one of the Mitchell Bay reports summarizing the studies that have been done.  As such, it is hearsay, and therefore would not be admissible at trial.  Fed. R. Evid. 801-02.  Accordingly, Exxon cannot rely on this statement in support of its Motion.  See Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 192 (5th Cir. 1991) ("Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial… .").  In any event, Exxon does not contend that the "pore-water risk assessments" produced a single sample that would tend to establish the presence or nature of contamination in the Houston Ship Channel or Black Duck Bay.  See Exxon PRF ¶ 70.

contamination *is or might be* impacting the surface waters . . . .") (emphasis added); see also U.S. Resp. to Exxon PRF ¶ 69.  Without some indication of whether there is any nexus between contamination, if any, that may someday be addressed in those water bodies and the facts that the Court may find give rise to liability for the United States, there is no rational way for the Court to determine what allocation of these classes of future costs would be appropriate—as there surely will be once Exxon has conducted an investigation and initiated any required remedy.

There is even less evidence to support Exxon's claim with respect to Baton Rouge. Exxon offers three reports—a 2007 report on the Baton Rouge Chemical Plant Area, a 1987 Corrective Action Monitoring Plan for the Baton Rouge Refinery, and a 2011 Quarterly Report regarding work at eleven solid waste management units at Baton Rouge.[13]  See Exxon PRF ¶¶ 74-76.  Again, Exxon does not contend that these reports contain studies of the existence, type, source, magnitude, or geographic extent of any contamination in the Monte Sano Bayou or Mississippi River.  See id.  Indeed, unlike the reports regarding the shoreline of Mitchell Bay, none of the Baton Rouge reports conclude that contamination has migrated from the Complex into the water bodies or underlying sediments.  See U.S. Resp. to Exxon PRF ¶¶ 74-76.

Furthermore, the reports do not establish a connection between any contamination that *may* exist in the water bodies or sediments and the production of war products.  See id. Accordingly, Exxon is wrong when it contends that "all of the facts relevant to the Government's relative responsibility are before the Court at this stage."  Exxon Opp. at 64.  Without some evidence of the specific type, location, extent, and source of contamination, the Court has no rational basis to evaluate the United States' equitable responsibility for any such contamination in relation to that of Exxon and to that of third parties who likely have been discharging into the

---

[13] Exxon also states that it conducted assessments of the Baton Rouge Site in 1997, 2003, 2004. See Exxon PRF ¶ 74.  This fact should also be deemed unsupported because Exxon cites the 2007 report as support for that fact, which is hearsay.

water bodies for decades.  Thus, an allocation of wholly speculative future costs for those water bodies is not ripe.

In such circumstances, other courts have declined to allocate unknown future costs through a declaratory judgment, or allowed the parties later to re-litigate the allocation with new facts and evidence.  <u>See</u> U.S. Mot. at 49-50; U.S. Opp. at 39.  The cases Exxon cites do not contradict this sensible approach because they all involve reasonably foreseeable future costs for specific cost components rather than a class of wholly speculative future costs like those at issue here.  <u>See</u> U.S. Opp. at 39-40 (discussing cases cited by Exxon).[14]

Nor do Exxon's claims of hardship provide a reason to allocate unknown future costs at this phase of the litigation.  There is no merit to Exxon's claim that it would suffer "undue burden" and "incur unnecessary expenses" and that evidence will grow stale and litigation will be protracted if the Court does not allocate the unknown future costs at this time.  <u>See</u> Exxon

---

[14] <u>New York State Electric & Gas Corporation v. FirstEnergy Corporation</u> ("<u>NYSEG</u>") and <u>Responsible Environmental Solutions Alliance v. Waste Management, Inc.</u>—newly cited in Exxon's Opposition—are also distinguishable.  <u>NYSEG</u> involved sixteen specific sites associated with manufactured gas plant operations which were covered, or expected to become covered, by a Consent Order with the New York Department of Environmental Conservation that required a specific process for investigating and remediating contamination at the sites.  <u>808 F. Supp. 2d 417, 446-52 (N.D.N.Y. 2011)</u>.  With the exception of one site—the Corning site—the liable party "ha[d] incurred substantial costs in responding to the release of hazardous substances."  <u>Id. at 446</u>.  Although the liable party had spent less than $600 on the Corning site as of the date of the decision, both the liable party and the State expected to find the kind of hazardous substances typically generated by manufactured gas plant operations at the site "given the nature of the [manufactured gas plant operations] conducted there."  <u>Id. at 446 n.12, 452</u>; <u>see also</u> 445 (explaining that coal tar is the contaminant of concern that drives response actions at manufactured gas plant sites); 531 n.66 (noting that the type of waste generated by the parties was of the same character and thus it was unnecessary to determine relative toxicity of the waste produced by each).  Thus, the presence of a specific kind of contamination, its source, and its likelihood to drive a future response action were established as a practical matter in <u>NYSEG</u>.  Likewise, <u>Responsible Environmental Solutions</u> involved a declaratory judgment for future costs to address a specific site under an administrative consent order with EPA.  <u>Responsible Envtl. Solutions Alliance v. Waste Mgmt., Inc., No. 3:04-cv-013, 2011 WL 382617, at *1 (S.D. Ohio Feb. 3, 2011)</u>.

Opp. at 61, 74-75.  The United States has already acknowledged that the threshold issue of the United States' status as a liable party for contamination related to the production of war products by Exxon's predecessors during WWII and the Korean War would not be re-litigated, and therefore there is no real threat that evidence related to that issue and available now (most of which is decades old anyway) would grow stale.  Moreover, Exxon appears to acknowledge that there will be litigation regarding such matters as necessity of future costs and their consistency with the NCP—by which time, Exxon can be expected to supply meaningful information about the contamination and any possible connection with wartime operations—as well as an opportunity to challenge any allocation of future costs based on new facts or new evidence.[15] See Exxon Opp. at 73-74 (citing United States v. Hardage, 982 F.2d 1436, 1445 (10th Cir. 1992) and quoting Beazer East, Inc. v. Mead Corp., 412 F.3d 429, 449 (3d Cir. 2005)).

Given the complete absence of *any* information regarding the extent of contamination in the water bodies and underlying sediment adjacent to the Complexes, this Court should deny Exxon's request to enter a declaratory judgment allocating unknown future costs at this time. Instead, the Court should reserve the allocation of unknown future costs until Exxon can demonstrate that it actually has incurred costs to address the water bodies and underlying sediment, and can supply at least a critical mass of pertinent information.  Otherwise, the Court is being asked to allocate out of thin air.

## CONCLUSION

For the foregoing reasons, the United States' Motion should be granted.

---

[15] Exxon claims that it has "demonstrated that is has already incurred at least $41.7 million in cleanup costs for specific costs components at the Baytown Site" and "about $31 million in past cleanup costs" at Baton Rouge.  Exxon Opp. at 60 n.30.  The United States does not dispute that Exxon has incurred some response costs at each Complex for liability purposes, but Exxon has not "demonstrated" any specific amount at this phase of the litigation.  The amount and recoverability of any past costs are Phase 2 issues, as Exxon readily concedes.  See Exxon Resp. to U.S. SOF ¶¶ 304-305; see also U.S. Resp. to Exxon PPF ¶¶ 291-95.

Dated:  January 23, 2014     Respectfully submitted,

            ROBERT G. DREHER
            Acting Assistant Attorney General
            Environment & Natural Resources Division

       By:   /s/ Brian Lynk
            Michael D. Rowe (Attorney-in-Charge)
            Brian H. Lynk
            T. Monique Peoples
            Stephanie Talbert
            Erica M. Zilioli
            United States Department of Justice
            Environmental Defense Section
            P.O. Box 7611
            Washington, D.C.  20044
            Tel.:  202.514.3144
            Fax:  202.514.8865

            *Attorneys for Defendant United States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 23, 2014, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the Electronic Case Filing System of this Court, which will send notification of such filing to the attorneys of record who have registered ECF email addresses with this Court.

/s/ Brian Lynk

32