# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

———————————————————————

|  |  |  |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 4:10-CV-02386 (LHR) |
| | ) | 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

———————————————————————

## UNITED STATES' RESPONSES TO PLAINTIFF'S SECOND SET OF PROPOSED FINDINGS OF MATERIAL FACT

Robert G. Dreher
Acting Assistant Attorney General
Environment and Natural Resources Div.

Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie J. Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044
Tel.:  202.514.3144
Email:  michael.rowe@usdoj.gov

KENNETH MAGIDSON
UNITED STATES ATTORNEY

Samuel G. Longoria
Assistant United States Attorney
Texas Bar Number: 12545500
1000 Louisiana, Suite 2300
Houston, TX 77002
(713) 567-9514
Email: sam.longoria@usdoj.gov
Counsel for Defendant the United States

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant the United States of America responds as follows to the "Proposed Findings of Undisputed Material Facts" submitted by Plaintiff Exxon Mobil Corporation ("Exxon") on December 20, 2013, in support of Exxon's Response in Opposition to United States' Motions for Partial Summary Judgment.  See ECF No. 117-3 in Case No. 4:10-CV-02386, and ECF No. 66-3 in Case No. 4:11-CV-01814. Where the United States identifies a particular "Proposed Finding" as "disputed" or "partially disputed," the United States has:  (1) summarized the grounds supporting the dispute; (2) made reference to a pertinent paragraph of the sworn affidavit of United States' expert witness Dr. Jay L. Brigham, or a pertinent section of the United States' reply memorandum (both filed today) that does so; and/or (3) made reference to pertinent paragraphs of the United States' Consolidated Statement of Undisputed Facts ("U.S. SOF") (filed in each case on September 30, 2013), the United States' Responses to Plaintiffs' First Set of Proposed Findings of Material Fact (filed in each case on December 20, 2013), or other enumerated Responses within this filing, that show the basis for the dispute.  See ECF Nos. 103-2 and 118-1 in Case No. 4:10-CV-10-2386, and ECF Nos. 52-2 and 67-1 in Case No. 4:11-CV-01814.

In addition, the United States has identified or incorporated by reference below the documents supporting each "dispute" or "partial dispute," which may include:  (a) the aforementioned Brigham affidavit; (b) documents submitted with the United States' Consolidated Statement of Undisputed Facts, in which instances the citation below generally identifies the applicable U.S. SOF where the document originally was cited; (c) documents submitted with the United States' Responses to Plaintiffs' First Set of Proposed Findings of Material Fact, in which instances the applicable Response paragraph is cited; and/or (d)

documents submitted by Exxon in which instances Exxon's Appendix number for the document ("A#" or "RA#"0) is given below.

Along with its reply memorandum and its responses to Exxon's Second Set of Proposed Findings, the United States is electronically filing today a number of newly-cited documents. Some of these are cited in the Brigham Affidavit, while others are cited in the reply. These documents are listed in Part One below.

## PART ONE:  United States' New Exhibits Submitted in Reply to Exxon's Opposition to United States' Partial Summary Judgment

**A.   New exhibits cited in (and attached in order to) Brigham Affidavit:**

1.  Dr. Jay L. Brigham's August 2012 Expert Report

2.  P. Koistinen, State of War, The Political Economy of American Warfare, 1945-2011

3.  H. Baker to O. Chapman, Sept. 7, 1950

4.  B. Brown, Oil Men in Washington

5.  Deputy Administrator to K. Thornbury, June 1952

6.  Report on Potential Production of Benzene, Toluene, and Xylene by the Petroleum Industry

7.  H. Baker to H. Stewart, November 23, 1950

8.  H. Baker to Jay Warren, September 25, 1952

9.  S. Hope to H. Stewart, November 13, 1950

10. J. LaFortune to Secretary of the Interior and Petroleum Administrator for Defense, January 26, 1954

11. Moody's Industrial Manual, 1955

12. Baker to The Goodyear Tire & Rubber Company, October 9, 1943

13. Contract between Rubber Reserve Company and Humble Oil & Refining Company, March 23, 1942

14. Larson and Porter, <u>History of Humble Oil</u>

15. Standard Oil, *18 Dates with Destiny*, US-BT012705-13

16. M. Dobbs, <u>Saboteurs, The Nazi Raid on America</u>

**B.  Other new exhibits cited in United States' Reply:**

17. MAA_EM-000750-54

18. Excerpts of Deposition Transcript of Mr. Richard White, Vol. 1 (June 6, 2013)

19. US-SH057802-17

20. Excerpts of Deposition Transcript of Mr. Robert Nathan in <u>United States v. Shell</u>, Vol. III

   (Oct. 10, 1991)

21. MAA_EM-001774-75

22. BAYHIS-00011927-32

23. Excerpts of Deposition Transcript of Mr. Lincoln Gordon in <u>United States v. Shell</u>, Vol. IV

   & Exhibit W (June 24, 1992)

24. Excerpts of Deposition Transcript of Mr. A.J. Gravel

25. MAA_EM-003812-14

26. MISC-00014987

27. BAYHIS 00007268

**PART TWO:  United States' Numbered Responses to Exxon's
Second Set of Proposed Findings**

The United States has incorporated below the original text of each of Exxon's numbered

Proposed Findings, immediately followed each United States Response (in bold).

## I. Governmental Authorities and the Control Over Refineries During World War II

1. The Government report titled "*The History of the Petroleum Administration for War*" set forth

the following:

> PAW was an agency created by and directly responsible to the President who,
> recognizing the vital character of petroleum in relation to the war, took a keen interest in
> the agency and its program. The Petroleum Administration kept the President informed,
> by correspondence and personal discussion, of significant trends and developments and
> was able to gain the latter's support on vital issues. RA0003.

> **Not disputed that the report states as quoted above.**

2. The Government report titled "*The History of Petroleum Administration for War*" documented

the Nation's need for petroleum products and high-octane aviation gasoline ("avgas") in

particular. A0157-0226. The report stated the following regarding the scarcity of petroleum

products required during the wartime period:

> From the very beginning until the last gun was fired in the Pacific, there was never a time
> when crude supply was not a problem somewhere in the country, with the exception of
> the Rocky Mountain region, which was always in balance. A0201.

> **Not disputed.**

3. The Nation's production of 40,000 barrels of avgas per day was well below later military

estimates that the Government would need 636,000 barrels daily. "Bridging that vast gap,"

reported "*The History of the Petroleum Administration for War*," required overcoming

significant challenges:

[It] constituted a feat which upon more than one occasion seemed impossible of achievement. It required the surmounting of obstacle after obstacle: in the beginning, lack of realization by the services of the great quantities they would need; and, growing out of this, heartbreaking difficulties in getting authorizations for increased plant capacities, in obtaining workable priorities, in getting delivery of materials even after priorities were granted, in maintaining sufficient trained manpower and common labor, in solving all-but-insuperable technical problems, and, above all, in doing all of these things in time. . . . [I]t produced a record that will forever stand to the credit of the industry that achieved it, and to the Government agency that supplied the direction, the coordination, the red-tape slashing, and the encouragement to accomplish the impossible. A0180.

**With respect to the first sentence of Paragraph 3, the United States does not dispute that in June 1940, the United States' estimated production capacity for 100-octane avgas was 30,000 to 40,000 barrels per day, and that in 1944, the military's estimate of world-wide requirements for 100-octane avgas was 636,000 barrels per day.  The second sentence is not disputed.**

4. The Nation's initial avgas capacity was in fact only enough to fly one or two missions a day, as Harold L. Ickes, Petroleum Administrator for War, noted:

Our ability to produce at the time out of the plants then built and those about to be completed was estimated at about 40,000 barrels a day, and 1,000 two-engine bombers, each burning 5.5 barrels an hour would, we knew, lick that up in 7.3 hours. On a 400-mile ride into Europe from England, 1,000 two-engine bombers were estimated to burn approximately 925,000 gallons, or a little more than 22,000 barrels, of aviation fuel. It all made our capacity for making it look pretty thin and sickly. RA0011.

**PARTIALLY DISPUTED to the extent Exxon subjectively paraphrases Mr. Ickes' statement as referring to "one or two missions."  Otherwise not disputed.**

5. Several days after the attack on Pearl Harbor, PAW issued Recommendation No. 16 and stated that "it is essential, in the national interest, that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses be increased immediately to the maximum." A0271.

6. Throughout the war, PAW issued directives to all refineries. For instance, Bruce Brown, Assistant Deputy Petroleum Administrator, issued the following order on June 21, 1944:

> (1) Those facilities contributing in any way to 100 octane gasoline production should be kept on stream maximum possible time.
> (2) Postpone shutdowns for routine inspection and maintenance as long as possible and minimize down time by every means at your disposal[.] RA0016.

**DISPUTED, except that the United States does not dispute the cited telegram is accurately quoted.  <u>See</u> U.S. Response to Exxon PF ¶ 78 and the exhibits cited therein.**

7. According to the Government report titled "*The History of the Petroleum Administration for War*," PAW regulated and directed refinery operations for increasing production of other key "products for war" that were needed by the U.S. military or the Government for the war effort, and these "products for war" included 80-octane all-purpose gasoline, Navy Special Fuel Oil, residual fuel oil, distillates, lubricants, toluene, and a wide range of others, including asphalt. A0206–A0209.

**PARTIALLY DISPUTED to the extent Exxon asserts that PAW "directed refinery operations."  <u>See</u> U.S. SOF ¶¶ 169-84, U.S. Responses to Exxon PF ¶ 78, and the documents and testimony cited therein.  Also PARTIALLY DISPUTED to the extent Exxon asserts that "residual fuel oil" was a "product for war."  <u>See</u> U.S. Response to Exxon PF ¶ 79 and the exhibits cited therein.**

8. The Government report titled "*The History of the Petroleum Administration for War*" stated that "[i]f 100-octane aviation gasoline was the war's No. 1 glamor product, there is no question that 80-octane all-purpose gasoline was the No. 1 'jack of all trades'." A0206. This gasoline was specifically tailored for military use after "in March 1942, the Army made it known that it must have a very special kind of 80-octane, usable in all climates and temperatures." A0206.

**Not disputed.**

9. The Government report titled "*The History of the Petroleum Administration for War*" described Navy Special Fuel Oil's role as follows: "[j]ust as 80-all-purpose was the work horse of the Army, so did Navy Special fuel oil bear the brunt of the burden at sea. The larger, heavier Navy boats operated almost entirely on this product." A0207.

**Not disputed.**

10. According to the Government report titled "*The History of the Petroleum Administration for War*," new schedules for crude shipments to refineries had to be set whenever "PAW would add new products to its military 'essential' list." A0202. "It was no fault of anyone that this was the case; it was simply one of the inevitable complexities of war." A0206.

**Not disputed.**

11. According to the Government report titled "*The History of the Petroleum Administration for War*," Recommendation 16 prevented oil refineries from taking action independent of PAW approval:

> Except where in accordance with the provisions of an approved plan . . . no action shall be taken by any producer or refiner of any grade of aviation gasoline, aviation gasoline base stocks or aviation gasoline blending agents with respect to the production, storage, use, sale, or other disposition[.] A0272.

**PARTIALLY DISPUTED.  Recommendation 16 did not prevent oil refineries from taking *any* action, without limitation; moreover, Exxon's quotation of the Recommendation is materially incomplete, as it states that the specified actions should not be taken "without giving antecedent advice [i.e., prior notice] to the Petroleum Coordinator for National Defense."  A0272.**

12. Louis R. Goldsmith - a high-ranking PAW Refinery Division official from 1942 to 1944, testified in deposition on June 9 and June 10, 1992 in the case of *United States v. Shell Oil Co.*, Civ. A. No. CV 91-0589-RJK (C.D. Cal.) ("*U.S./Shell Litigation*") regarding the Government's relationship with the petroleum industry during WWII:

> In war time, specifically during World War II as I saw it in PAW, all of this sort of thing was laid aside and instead we were motivated, the whole industry was motivated primarily by the necessity of producing the products needed to fight the war so that . . . *the government came in and said: Thou shalt produce. If you're going to produce at all, you've got to produce these kinds of products.* And -- and it you're going to invest money, and most particularly going to use up strategic materials in the construction of facilities, thou shalt have them designed to make optimum quantities of 100 octane aviation gasoline, butadiene feed stocks and such other materials as the government may require. RA0039 (emphasis added).

**Not disputed that Mr. Goldsmith testified as quoted.**

13. Louis R. Goldsmith further testified that "PAW would be in command of how much the crude oil would be allocated as between refiners, for example, giving preference, naturally, to those . . . who needed it to increase the supply of aviation gasoline or other desired products." RA0042.

**Not disputed that Mr. Goldsmith testified as quoted.**

14. PAW and its Refining Committees regularly dispatched telegrams containing orders to maximize certain critical petroleum products, increase or reduce certain inputs, or implement other requirements. *See*, *e.g.*, A0608, A0609–A0611, A0612, A0613–A0616, A0617, A0618, A0619, A0620–A0621.

**PARTIALLY DISPUTED to the extent Exxon characterizes telegrams as "orders."**
**<u>See</u> U.S. Response to Exxon PF ¶ 78 and the exhibits cited therein.**

15. On March 6, 1943 PAW's Refining Division dispatched a telegram to Standard Oil

containing the following orders:

> Until further advised and in accordance with Plan 15, Revised, you are now directed to
> limit the total input including crude, casing head, condensate and other raw materials for
> your Baton Rouge plant to 105,674 barrels per calendar day. *From the total input you
> should extract maximum quantities of whichever of the following products are produced
> at your plant: 100 and 91 octane number aviation gasoline and components thereof,
> toluene, butadiene, petroleum synthetics and petroleum coke.*
> Military lubricating oils and heavy duty oils should be manufactured in quantities
> sufficient to fulfill actual commitments. Asphalt production, except those grades
> excluded by Recommendation 45, Amended, and Recommendation 41, is to be limited
> by intra District consumption plus box car shipments to District I and official exceptions
> to P.D.O. # 3 when and if granted. *It is absolutely essential that the above instructions be
> followed in order to use available transportation effectively, to guarantee the greatest
> volume of the products named above and to prevent a serious inventory build up of other
> products which if not controlled will adversely affect the war program.*
> Kindly acknowledge receipt of this wire and your complete understanding of the above
> instructions. RA0044 (emphasis added).

**PARTIALLY DISPUTED to the extent Exxon subjectively characterizes the cited**

**telegram as an "order."** **See** **U.S. Response to Exxon PF ¶ 78 and the exhibits cited therein.**

16. On November 7, 1943, PAW's Refining Division Headquarters dispatched a telegram to the

District III Office that listed both Humble and Standard Oil as oil companies to whom this

telegram applied, and noting the following:

> The military procurement services cannot obtain commitments to supply more than a
> small portion of their requirements for 80-octane all-purpose gasoline under specification
> 2-103B. Accordingly, it is necessary that you check immediately with each refiner who
> indicated ability to manufacture this product . . . No compromise can be made with the
> requirements of the ground forces, since in the last analysis, *it is just as important that the
> ground forces have motor fuel as it is for the air services to have aviation gasoline.* You
> should establish procedures immediately for reporting 80 all purpose gasoline by
> refineries, stating whether it is 2-103A or 2-103B grade, showing the quantity
> manufactured during the month, the amount shipped to the Armed Forces, and the
> amount in inventory the first of each month. RA0047–RA0049 (emphasis added).

**Not disputed.**

17. In May 1943, Government officials from PAW and other agencies conducted an inspection of the Baton Rouge refinery and Plancors, and in conjunction with this inspection a lengthy and detailed pamphlet was prepared by Standard Oil that was titled "Major War Projects - Baton Rouge Refinery - Standard Oil Company of Louisiana - Prepared for War Agencies Joint Inspection Trip." A0894–A0927.

      **Not disputed.**

18. Between May 1943 and April 1944, PAW and the War Production Board ("WBP") authorized and approved at least eight new construction projects to increase the production of avgas and other war products at the Baton Rouge refinery. Expert Report of A.J. Gravel ("Gravel Rpt") at 183 (Table 4) (Attachment 2 to Declaration of A.J. Gravel ("Gravel Decl.") (**Exhibit No. 1**)).

      **DISPUTED because Mr. Gravel lacks first-hand knowledge of the facts and is not qualified to give opinion testimony on this topic for the reasons explained in the United States' Memorandum in Opposition to Exxon's Summary Judgment Motion.  See U.S. Opp. at Argument VII.**

19. In June 1943, Governmental officials from PAW and other agencies conducted an inspection of the Baytown refinery and Plancors, and in conjunction with this inspection a lengthy and detailed pamphlet was prepared by Humble that was titled "Data On War Projects - Baytown Refinery - Humble Oil & Refining Co. - Prepared for War Agencies Joint Inspection Trip." A0872–A0893.

      **Not disputed.**

20. Between June 1943 and August 1944, PAW and WPB authorized and approved over a dozen new construction projects to increase the production of avgas and other war products at the Baytown refinery. Gravel Rpt. 86 (Table 2)

**DISPUTED because Mr. Gravel lacks first-hand knowledge of the facts and is not qualified to give opinion testimony on this topic for the reasons explained in the United States' Memorandum in Opposition to Exxon's Summary Judgment Motion.  See U.S. Opp. at Argument VII.**

21. Louis R. Goldsmith testified as follows regarding PAW's role in refinery construction:

Q. What, if in the construction of a facility . . . a heat exchanger was needed to complete the facility or to progress with the production . . . would PAW have any role in that issue or that problem?
A. Yes . . . they would certainly be looking at construction products and these plants all over the country, it was obvious they didn't all move at exactly the same pace, so within PAW there was an understanding as to the relative progress of various plants. And if there were some plant getting close to completion that still lacked a few critical items, then there would be, first of all, an attempt to move critical facilities that might have been programmed to go to Refinery A, and instead divert it to Refinery B in order to complete their job sooner. And then the other plant would have to be taken care of later.
But this whole process was going on continuously between PAW and the refiners that were trying to build facilities and the War Production Board that had the ultimate control over . . . the rationing of all critical supplies.
Q. So in our example of the heat exchange, if that was needed at Facility A, and at Facility B, and there was only one available, what role would PAW have there?
A. Well, PAW would be working with the refiner and with the supplier of the heat exchanger and . . . PAW would be the one to say: Let's have the supplier of the heat exchanger ship it to Plant A rather than Plant B so as to get on with it. *PAW was very much in the middle of all of this process of getting things built*. RA0030–RA0031 (emphasis added).

**Not disputed that Mr. Goldsmith testified as quoted.  PARTIALLY DISPUTED as to relevance because Exxon cites no evidence that the quoted testimony accurately describes PAW's role in the construction of facilities at the Baytown and Baton Rouge Sites specifically, and other evidence indicates that the government's role in construction at**

those Sites was limited.  See US SOF ¶¶ 90-91, 94-95, 102-03, 114, 135-36, 140-41, 146-47, 153-54, 158-59, 163-64, and 175 and the exhibits cited therein.

22. PAW admitted that Plancor 1909, the hydrocodimer plant constructed at Baytown, was constructed over Humble's reluctance and at PAW's "insistence." A0806. PAW took the position that "on several occasions that . . . we should not permit Humble to withdraw its priority application on this hydrogenation unit." A0806. Ultimately, Humble "realiz[ed] the urgent need for such an installation in the interest of maximum 100 octane aviation gasoline production [and] agreed to the construction of such a plant later known as Plancor 1909[.]" A0795-A0796.

23. In August 1943 PAW instructed Humble via telegram to increase the production of motor gasoline and distillate fuel (i.e., heating oil) by 2 to 3%, provided that such increases in yields did not result in a decrease in production of avgas and other critical war products. RA0051–RA0056.

   PARTIALLY DISPUTED.  The cited document states that PAW "requested" the referenced changes.  RA0051.

24. In response, Humble informed PAW that compliance with these product yields would result in a minor reduction (about 0.03% or 50 barrels per day) in the production of codimer, an avgas blending component and a critical war product. Humble also noted that the production increase should be adopted because otherwise, the refinery would eventually run out of excess storage tank capacity for residual fuel oil, and if this occurred, it might be necessary to curtail crude oil processing as a whole at the refinery. RA0051–RA0052.

   Not disputed.

25. PAW rejected Humble's proposal to cut back the production of codimer, and in fact, PAW directed Humble to not decrease codimer production by 50 barrels per day but to make certain operational changes to increase codimer production by 50 additional barrels per day, or an overall increase of 100 barrels per day. RA0057, RA0058 and RA0059. An internal PAW memorandum detailed the effect of this directive on the Baytown refinery production output as follows:

> According to Mr. Sauer [PAW's Assistant Director of Petroleum Supply] these items are additive and the net effect is that, to produce one hundred barrels more of 100 octane gasoline components, Humble is going to produce 15,000 barrels per day of residual fuel oil, which we do not need, and sacrifice 8,000 barrels of automotive gasoline, which we do need, and 7,000 barrels of distillate heating oil, which we do need. RA0058.

> **Not disputed.**

26. Bruce Brown, PAW's Assistant Deputy Petroleum Administrator, responded to Humble's concerns regarding the imminent lack of storage capacity for the additional residual fuel oil being produced as a result of PAW's instructions as follows: "I am not a bit worried about that because there is plenty of storage available in the Gulf Coast, and until storage approaches the danger mark of fullness I think we should produce maximum 100 octane gasoline." RA0058.

> **Not disputed.**

27. Louis R. Goldsmith - former PAW Refinery Division official - testified as follows regarding PAW's ability to cut off crude oil supplies to refiners:

> The industry really had no - - no choice in the matter. They either produced - - - the products in accordance with the instructions and directives of PAW or they would probably be denied an allocation of crude oil. And they'd pretty much cut [the oil company] off at the pockets, they wouldn't have any business to operate, so the industry was not only willing but anxious to comply with government directives[.] RA0034.

> **Not disputed that Mr. Goldsmith testified as quoted.  PARTIALLY DISPUTED as to relevance because Exxon cites no evidence that the testimony accurate describes the**

viewpoint or perception of Humble or Standard, specifically.  Moreover, other evidence indicates that refiners generally, and Humble and Standard specifically, willingly cooperated with the United States' wartime requests and were not coerced.  See [add cite to Jay's first report] (Exhibit 1 to Declaration of Jay L. Brigham dated Jan. 21, 2014 ("Brigham Decl.")).

28. Louis R. Goldsmith further testified that "the government expected that there would be 100 percent cooperation from the industry" in assisting the wartime effort through maximum production of avgas. RA0028.

> **Not disputed that Mr. Goldsmith testified as quoted.**

29. J. Howard Marshall, Chief Legal Counsel for the PAW during much of WWII, testified on August 9, 1991 in the *U.S./Shell Litigation* about PAW's relationship with the petroleum industry:

> Q. And so you viewed PAW's role, in one respect, as a partnership with the industry?
> A. We called it that.
> Q. Do you have a view as to who the senior partner in that arrangement was?
> A. The government.
> Q. No question about it?
> A. No question of it and we always made that clear. RA0064–RA0065.

> **Not disputed.**

30. Louis R. Goldsmith testified about PAW's relationship with the petroleum industry:

> So PAW's objective was to make sure that the whole petroleum industry was operated just as if it were one company which, of course, meant that the antitrust restrictions that had always governed the industry had to be set aside so that there could be total cooperation. And I can assure you that the government was the controlling force in all of this because the government's objectives were laid out very clearly to optimize what the industry can do and to monitor and control it in whatever way was possible to maximize the production of critical components. RA0023–RA0024.

**Not disputed that Mr. Goldsmith testified as quoted.  PARTIALLY DISPUTED to the extent Exxon relies on his testimony as evidence that the United States "controlled" operations or waste disposal at the Baytown or Baton Rouge sites; Mr. Goldsmith did not testify specifically about such facts, and other evidence contradicts Exxon's assertion.  See U.S. SOF ¶¶ 169-205 and the exhibits cited therein.**

## II. Government Control Over Waste Processing

31. On August 4, 1944, the U.S. Engineer Office ("USEO") informed the Chief of Engineers, U.S. Army that the Baton Rouge refinery was in violation of the River and Harbor Act, and further recommended that PAW and WPB approve the construction of the Master Separator, which USEO characterized as the "key unit" to prevent the "daily pollution of the Mississippi River." A0842.

**Not disputed.**

32. Standard Oil was able to implement parts of the waste management program that apparently did not require the use of critical materials and therefore did not require PAW approval. For instance, the company established an Oil Conservation Department to supervise implementation of the program, inspected the refinery area for oil leaks, and cleaned up a number of leaks during the wartime period. RA0067–RA0068.

**Not disputed.**

33. Considering the need for a silt treatment unit at Baton Rouge, PAW made the following finding:

The facilities in this application will remove this oil from the silt before it is released to the Mississippi River and the oil will be utilized as an individual fuel after further

processing. *Laboratory data indicates that this untreated silt contains 10 to 20 percent by volume of oil. This volume of oil discharged into the river is a hazard* not only to the cities and other installations along the Mississippi River before the applicant's refinery but is also a fire hazard to the boats navigating in the Mississippi River. A0846 (emphasis added).

**PARTIALLY DISPUTED, because other evidence shows that PAW relied on Standard to determine, in the first instance, desirability and technical feasibility of the silt treatment unit.  See U.S. Response to Exxon PF ¶ 105 and the exhibits cited therein.**

34. PAW reviewed the proposed design of the silt treating unit and made the following recommendations:

The size of the facilities are also considered warranted because it would be impracticable not only from the standpoint of economics but also from the standpoint of the construction of materials and manpower to install silt treating equipment only for the existing water separators when it is apparent that the applicant will have to expand its oil water separators after the war. A0846.

**PARTIALLY DISPUTED, because other evidence shows that PAW relied on Standard to determine, in the first instance, desirability and technical feasibility of the silt treatment unit.  See U.S. Response to Exxon PF ¶ 105 and the exhibits cited therein. Moreover, Standard had considered implementing a master separator several years *before* the onset of World War II, but did not do so; nor did it implement the proposal immediately after restrictions on formerly scarce materials were lifted near the end of the war.  Instead,  it waited until the 1950s – long after WWII ended – to implement the project.  See U.S. SOF ¶¶ 238-43 and 279-93 and the exhibits cited therein.**

**III. Governmental Authorities and Control Over Refineries During the Korean War**

35. The Defense Production Act of 1950 ("DPA"), Pub. L. No. 81-774, 64 Stat. 798 (1950) was modeled after the Second War Powers Act of 1942 and granted President Truman "robust legal

authority . . . to force industry to give priority to national security production" and to seize or requisition facilities and equipment. RA0070 and RA0072.

**PARTIALLY DISPUTED as to relevance, because other evidence indicates that the actual experience during the Korean War was not comparable to World War II and that the United States did not substantially use the referenced authority.** <u>See</u> **Brigham Decl. ¶ 4.**

36. A legal historian of the Korean War period described the enactment and impact of the DPA as follows:

> The [DPA] of 1950 became law on September 8, 1950. This statute was modelled on the Second War Powers Act which had evolved during World War II. It granted to the President complete power to regulate every phase of industry and commerce, through the authority to allocate materials and facilities. No such authority has ever previously been granted by Congress except in time of all-out war. Emergency agencies, based largely on World War II models were speedily organized. RA0079.

**PARTIALLY DISPUTED as to relevance, because other evidence indicates that the actual experience during the Korean War was not comparable to World War II and that the United States did not pervasively exercise the referenced authority.** <u>See</u> **Brigham Decl. ¶ 4.**

37. Pursuant to Executive Order 10161 the Department of Commerce created the National Production Authority ("NPA"), which carried out functions "relating to priorities and allocations" to meet defense needs. RA0091.

**Not disputed.**

38. According to a "*History of PAD*," when the Department of Interior established the Petroleum Administration for Defense ("PAD") pursuant to Executive Order 10161, it modelled the new agency after PAW. RA0110 and RA0117.

**PARTIALLY DISPUTED as to relevance, because other evidence indicates that the actual experience during the Korean War was not comparable to World War II and that PAD did not exercise powers as broad as the PAW's.  <u>See</u> Brigham Decl. ¶¶ 4, 5.c-d.**

39. According to a contemporary legal writer, the NPA re-established the "Controlled Materials Plan" to control the allocation and use of critical materials, such as steel and copper:

> NPA, drawing heavily on the experiences of World War II, decided to adopt the Controlled Materials Plan, a quantitative scheduling plan designed to match up needs with supplies on an over-all basis to obtain balanced production. The control is exercised through three metals—steel, copper and aluminum—on the underlying assumption that by controlling the use of these key metals you can in fact control practically all production. RA0100.

**PARTIALLY DISPUTED as to relevance, because other evidence indicates that the actual experience during the Korean War was not comparable to World War II and that the United States did not pervasively exercise the referenced authority.  Moreover, the United States did not allocate crude oil supplies during the Korean War.  <u>See</u> Brigham Decl. ¶¶ 4, 5.c-d.**

40. According to a PAD memorandum, Sun Oil Company reported to PAD an "inadvertent violation of PAD Order No. 3," which involved an employee mistakenly turning "a valve on alkylate line and permitt[ing] 1500 barrels of alkylate to be diverted into motor gasoline." RA0120.

**PARTIALLY DISPUTED as to relevance, because the cited document does not pertain to the Baytown or Baton Rouge Site.**

41. According to a PAD letter dated May 18, 1953, PAD permitted Esso Standard Oil "an exception to PAD Order No. 3 which would allow [it] to supply the Standard Oil Development Company with alkylate for research work[.]" RA0121.

**Not disputed.**

42. Esso Standard Oil ("Standard Oil") sent the following telegram request to PAD:

> [The] excess costs material is supplied by us with the greatest reluctance . . . . All of our negotiations regarding cost and volumes of abnormal cost avgas have been carried out with your people and evaluations have been discussed in whatever detail your people have deemed it necessary. We do not believe it should be necessary, nor desirable from your standpoint, for us to deal with more than one Government Agency regarding detailed economics of abnormal costs avgas manufacture. We shall continue to supply necessary economic background information . . . as long as you believe it is necessary to request that we manufacture abnormal cost avgas, but respectfully suggest that requests for such information be channelled through your agency in the future. RA0123–RA0125.

**Not disputed.**

43. U.S. military demands to for avgas increased as the Korean War progressed, prompting J. Ed Warren - PAD's Deputy Administrator - to formulate a plan to compel Humble, Standard Oil, and other companies to further increase the production of avgas and avgas components. The plan indicated an intent by PAD to employ its seizure authority if necessary to ensure adequate military supplies of avgas, avgas components and other petroleum products. RA0126–RA0128.

**DISPUTED.  First, Exxon's summary of the cited document is materially incomplete, as it fails to quote or refer to the document's statement that "PAD, of course, does not wish to see [the seizure of plants] happen."  RA0126.  Second, Exxon cites no evidence that Humble and Standard, specifically, were "compelled" to further increase the production of avgas and avgas components during the Korean War, and other evidence indicates to the contrary.  See Brigham Decl. ¶¶ 5.a-b, 7, and 8.**

44. Under the plan, PAD Deputy Administrator J. Ed Warren contacted by telephone the heads of major oil companies, including Humble, Standard Oil, to inform them that PAD would be

contacting industry operating personnel to increase alkylate (i.e., an avgas component) and avgas production over these companies' then-current Government commitments. RA0126–RA0128.

**DISPUTED.  Exxon cites no evidence showing that PAD actually carried out the referenced plan.  Moreover, other evidence indicates that PAD did not force any individual or company to make investments they did not feel were prudent.  <u>See</u> Brigham Decl. ¶8.**

45. According to J. Ed Warren, PAD preferred the oil companies to "'take the bull by the horns'" and determine ways to increase production. RA0127–RA0128. But, PAD also developed refinery operational changes to increase production and then would contact refinery operations personnel "through our usual channels" to review and implement such operational changes. In this regard, PAD stated as follows:

> PAD will also be developing ways and means of increasing production and we will be contacting industry's operating people through our usual channels. We will need the utmost cooperation from these people and the ways must be cleared for quick action. RA0127.

**DISPUTED.  Exxon cites no evidence showing that PAD actually carried out the referenced plan.  Moreover, the cited document makes no reference to PAD "implement[ing] . . . operational changes."  RA0127.**

46. PAD was prepared to seize refineries if necessary. J. Ed Warren stated as follows:

> The only other alternatives to increase production are to allocate aviation gasoline to commercial consumers of aviation gasoline or for the Military to make the same gasoline available to them by exercising their rights of seizure. RA0126.

**DISPUTED.  Exxon's quotation of the cited document is materially incomplete, as it fails to quote Mr. Warren's statement that "PAD, of course, does not wish to see [the seizure of plants] happen."  RA0126.   Moreover, other evidence shows that there was no**

**need for the United States to resort to coercive measures, and that in fact it did not exercise the power to seize plants during the Korean War.  See Brigham Decl. ¶¶ 5.b, 7.**

47. PAD also had the authority to requisition avgas from oil refineries. RA0132. According to one scholar, this allowed PAD to control and limit the price charged for avgas because the threat prevented oil companies from "driving hard bargains." RA0143.

**DISPUTED.  Other evidence contradicts the assertion that oil companies could not negotiate fairly with the United States as a consequence of PAD's authority.  See Brigham Decl. ¶¶ 6, 8-11.**

48. J. Ed Warren stated in PAD's "plan of operation" that "[i]ndustry will have to 'stick its neck out' to get production started" in conformance with PAD's plan; otherwise, "[i]f industry fails to come through, PAD will have to take appropriate action." RA0127–RA0128.

**Not disputed that Mr. Warren is accurately quoted.  DISPUTED as to relevance because Exxon cites no evidence that the plan was actually carried out, and because other evidence indicates that PAD did not compel industry to produce avgas.  See Brigham Decl. ¶¶ 5.a-b, 6-10.**

49. A PAD internal memorandum detailed how its directives necessitated operations changes at refineries:

> In order to increase the supply of aviation gasoline, the Esso Standard Oil Company and its subsidiary, the Humble Oil Refining Company, have conducted various special operations at their respective refineries that have resulted in the production of additional Grade 100/130 and 115/145 avgas at higher than normal market prices. RA0148.

**DISPUTED.  The cited document does not refer to any "directives" issued by PAD.**

50. In a telegram, Humble acknowledged PAD's authority to require adjustments and modifications to refinery operations:

Adjustment[s] of operations at our Baytown Refinery to maximize production of high-octane aviation gasoline consistent with outstanding contracts for lower quality grades was initiated as soon as increased military demand was indicated. Alkylation facilities are being operated at maximum capacity. Other aviation facilities, including aromatic producing equipment, are being operated at full rating in [order to] supply blending agents to other refineries [for avgas production for the government]. RA0160.

**DISPUTED as to relevance.  Other evidence contradicts any assertion that Humble undertook the referenced operations involuntarily or because of coercion by the United States.  See Brigham Decl. ¶ 6.**

51. PAD required the Baytown and Baton Rouge refineries to increase alkylate production, as Humble details in a letter to PAD:

The entire increase of finished aviation gasoline has been committed either directly or indirectly to government. Our Alkylation Plant is running at capacity, and during September manufactured an average of 8,440 B/D of alkylate as compared to peak monthly production average of 7,257 B/D during February, 1945 of World War II. This production required alkylation of all available propylene, butylenes, and amylenes after segregation of maximum catalytic butylenes for operation of the Baytown Butyl and Butadiene Plants at capacity. RA0161.

**DISPUTED as to relevance.  The document does not support any assertion that Humble or Standard increased alkylate production unwillingly or due to coercion by the United States.  See Brigham Decl. ¶ 6.**

52. In 1953 the U.S. Public Health Service stationed a team of Government engineers and analysts in a mobile laboratory at the Baton Rouge facility for eight weeks to investigate and evaluate refinery operations and waste caused by those operations. This investigation resulted in a report over 100 pages long titled "A Study of Liquid Wastes From a Gulf Coast Petroleum Refinery," which was summarized by the U.S. Public Health Service. RA0163–RA0167.

**Not disputed.**

53. A few months after the Korean War ended the Baytown refinery's newsletter - *Baytown Briefs* - reported that "[u]ntil recently, practically all aviation gasoline production has been under Government control." RA0188.

**Not disputed that the document is accurately quoted.  DISPUTED as to relevance to the extent Exxon relies on this document as evidence that the United States controlled operations or waste disposal at Baytown during World War II or the Korea War.  Other evidence contradicts that assertion.  <u>See</u> Brigham Decl. ¶ 9; U.S. SOF ¶¶ 169-205 and the exhibits cited therein.**

54. According to PAD Deputy Administrator J. Ed Warren in the "plan of operation" that PAD would require the refineries to use more quality base stock for the production of avgas, but acknowledged that this program would hurt the quality of motor gasoline produced by these refineries, stating the following:

> We know that this program will hurt the motor gasoline quality. We do not want anyone to get hurt any worse than anyone else. We will do everything we can to equitably allocate this burden. RA0127.

**Not disputed that the document is accurately quoted.  DISPUTED as to relevance because Exxon does not cite any evidence that the plan was carried out.**

55. Correspondence from refiners to PAD demonstrated their frustration with the effect of PAD's directives on refinery operations, such as, for example, the following statement by one refiner in a letter to PAD:

> It is simply unbelievable that we would be "pushed around" (and I can't think of any other term) in this manner. . . . We have cooperated fully with P.A.D. in every way possible. Therefore, the situation as it exists today is simply beyond comprehension. RA0189.

**PARTIALLY DISPUTED.  The cited document does not refer to any "directives."**

**IV. Governmental Authorities and Control Over the Plancors and the BOW**

56. Shortly after the attack on Pearl Harbor, the Nation was cut off from 90% of the world's natural rubber supplies. The Government designated rubber as a critical and strategic material, established a synthetic rubber industry, and created the Governmental entity the U.S. Rubber Reserve Company ("RuR") to oversee the Government's synthetic rubber program. RA0198 and RA0201.

> **PARTIALLY DISPUTED to the extent Exxon asserts that the United States "established [the] synthetic rubber industry."  Other evidence shows that Exxon's predecessors were pioneers in the development of synthetic rubber production.  See Brigham Decl. ¶¶ 12-14.**

57. Numerous synthetic rubber plants were constructed and then operated by RuR during WWII and continuing through the Korean War; in fact, in 1945 the RuR acknowledged that "[o]ne of the most important activities of the Rubber Reserve Company at the present time is the supervision of the operation of fifty-one government-owned plants in the synthetic rubber program." RA0206.

> **PARTIALLY DISPUTED to the extent Exxon asserts that the RuR "constructed" and "operated" synthetic rubber plants at Baytown or Baton Rouge.  See U.S. Responses to Exxon PF ¶¶ 89-92, 140-43, 153-55, 185-88 and the exhibits cited therein.**

58. In the "Lease Agreements" and/or "Contracts" regarding the Government-owned plants ("Plancors") under this program at the Baytown and Baton Rouge Sites, the Government stated that ExxonMobil would design and construct the Plancor "as agent" of the Defense Plant Corporation ("DPC") and "submit to [DPC] for its approval, or arrange for such submission of,

such plans, designs, specifications, and schedules that may be required for the construction and equipment of the plant." *See, e.g.,* A1167–A1168, A1180–81, A1318, A1733 and A1610.

**PARTIALLY DISPUTED for the reasons stated in U.S. Responses to Exxon PF ¶¶ 146, 153, 175 and 182. Furthermore, Exxon was not an agent of the United States for purposes of operating the Plancors. <u>See</u> Brigham Decl. ¶¶ 15, 17.**

59. The Government's Report on the Rubber Program indicated that the Government only required that the synthetic rubber Plancors meet minimum waste handling requirements:

> In common with many of the war-built facilities, the plants of the rubber program were constructed with the least possible expenditure in time, labor and money. As a natural consequence of this approach, adequate facilities for handling trade waste disposal were not, in all cases, provided. RA0204.

**DISPUTED as to relevance. Exxon cites no evidence that this was true at the Baytown or Baton Rouge synthetic rubber Plancors specifically.**

60. Another Government report discussed the initial selection of the Baytown and Baton Rouge refineries (and another refinery) as three sites for butadiene plants:

> The three plants were to use butylene feedstocks which were to be supplied by their operating companies from nearby refineries. The butylenes were produced along with a number of other products in the refineries. RA0214.
> The initial plant locations were selected because of their proximity to the manufacturing facilities and personnel of the respective companies[.] RA0217.

**Not disputed.**

61. The Plancor "Contracts" and/or "Agreements" required Humble or Standard Oil to pay liquidated damages if the Plancor did not meet its annual production requirements under such contract. *See, e.g.*, A1182, A1611 and A1734.

**Not disputed.**

62. The Report on the Rubber Program described the Plancor agreements and contract fees as follows:

> All of the contracts covering operations conducted in government-owned facilities are on a "cost-plus-a-management-charge" basis . . . [.] The management charge in each case is in lieu of reimbursement for expenses for executive management and general overhead not susceptible of being allocated to the direct costs of operation. . . . Each of the management charges is graduated downward based upon incremental production so that *all companies operating the same type of plants receive the same fee for equal tonnage*. RA0223 (emphasis added).

> **Not disputed.**

63. The Report on the Rubber Program acknowledged that "[i]n 1942 Rubber Reserve Company likewise became the sole distributor of all synthetic rubber produced in Government-owned facilities." RA0223–RA0224.

> **Not disputed.**

64. Following WWII, the Government began to address the pollution resulting from the operation of the Plancors by first centralizing RuR's authority in air and water pollution matters with respect to these plants, as an RuR official noted in an internal memorandum:

> In view of the increasing importance of active attention to problems concerned with air and water pollution in our operating plants, it is deemed advisable to centralize the contacts and work on such projects under Reserve's direction in a single office. RA0227.

> **Not disputed.**

65. In 1946 RuR correspondence to Sheppard Powell - an industrial waste management expert retained to inspect waste generation, processing and disposal issues at the Plancors, the RuR noted as follows:

> We would like to ask our Agent companies to provide us with the reports [audits of waste processing facilities] concerning their singular installations but we feel in the main the organizations operating plants for us do not have the specialized personnel necessary for such work. A2143.

**PARTIALLY DISPUTED.  The cited document does not support Exxon's characterization of Mr. Powell's report as an "audit."  <u>See</u> A2143-44 (characterizing his assignment as a "report").  Moreover, both the scope of Mr. Powell's assignment and his expertise in refinery operations was limited.  <u>See</u> Kittrell Decl. ¶ 8.**

66. In conducting industrial waste audits of a number of the Plancors at each Site, Sheppard Powell - the industrial waste management expert retained by the Government - recommended a number of waste processing improvements. Examples of such recommendations include: (1) at the Baytown Butadiene Plancor Mr. Powell made four recommendations, including frequent skimming of the final separator and effluent sampling to test for oil and other hydrocarbons; (2) at the Baytown Butyl Rubber Plancor Mr. Powell made six recommendations, including draining oil into small sumps to ease the burden on the master separator and implementing a plan to "reduce the pH of the boiler blowdown water"; (3) at the Baton Rouge Butadiene Plancor Mr. Powell made two recommendations, including identifying a method to break down two oil emulsions and studying how to remove copper from plant effluent; and (4) at the Baton Rouge Butyl Plancor Mr. Powell made two recommendations, including installing adequate equipment to remove rubber crumbs and polymer from entering into waste waters and designing "gravity separators for efficient removal of small rubber crumbs." A1295–A1304, A1399–1408, A2175–2182, A2183–A2193.

**PARTIALLY DISPUTED.  The cited document does not support Exxon's characterization of Mr. Powell's report as an "audit."  <u>See</u> A2143-44 (characterizing his assignment as a "report").  Moreover, both the scope of Mr. Powell's assignment and his expertise in refinery operations were limited.  <u>See</u> Kittrell Decl. ¶ 8.**

67. Humble's History of the Baytown Ordnance Works reports that the Ordnance Department in 1939 "approached" Standard about producing toluene. Wartime developments had "made it appear that the nitration grade toluene requirement would far exceed the quantity that could be made available from coke production" as of 1938. A1138. This led to the ultimate design and construction of the Baytown Ordnance Works ("BOW"). *Id.*

**DISPUTED.  Other evidence shows that Exxon's predecessors pioneered the development of processes for producing synthetic toluene from petroleum, and actively sought contracts with the United States to produce toluene.  See Brigham Decl. ¶¶ 18-20.**

68. The contract for the construction and operation of the BOW provided for "the accomplishment of the above-described work under a cost-plus-a-fixed-fee contract[.]" A1015.

**Not disputed.**

**V. Wartime-Related Response Actions and Costs**

69. In response to a May 30, 2007 request by the Texas Commission on Environmental Quality ("TCEQ"), ExxonMobil completed two investigations and reports to evaluate the "groundwater/surface water interface" and determine the appropriate "interim remedial action (both onshore and offshore)" to take in the Mitchell Bay area. RA0228. The reports included an on-shore investigation and analysis, RA0285–RA0358, and a subsequent off-shore investigation and analysis. RA0228–RA0284. The off-shore report concluded that some if not all of the contamination was historic in nature. RA0280–RA0282.

**PARTIALLY DISPUTED.  The United States does not dispute that Exxon completed an onshore, September 2011 report entitled, "Assessment of Petroleum Hydrocarbon Extent, Northwest Dock Area, ExxonMobil Baytown Refinery" ("Onshore Report"), and an offshore October 2011 report entitled, "Offshore Report  - ExxonMobil**

Baytown Refinery, Mitchell Bay – Docks 2 to 7" ("Offshore Report").   The United States disputes any implication that these reports include any study of contamination in the Houston Ship Channel, Black Duck Bay, Scott's Bay, or contamination beyond the shoreline of Mitchell Bay.

The United States further disputes that the Offshore Report establishes that the production of war products during WWII and the Korean War caused the contamination found along the shoreline of Mitchell Bay.  The report does not conclusively determine the source or timing of the contamination.  See RA0280 (noting the discovery of VOCs in the porewater samples, which is a compound that "rapidly migrate[s] away from the sediment and therefore [is not] expected [to come from] historic sources"); id. (noting the lack of mobility of non-aqueous phase liquid onshore "suggests that the separate phase hydrocarbon offshore is the result of historic placement versus migration" without defining historic); RA0281 (noting that that "the hydrocarbons observed in porewater are potentially associated with the material contained in SWMU 59" because the petroleum residues in the porewater samples is "similar to but more weathered than NAPL found in four upland monitoring wells proximal to Mitchell Bay") (emphasis added).

In any event, as Exxon appears to acknowledge, the source of the contamination along the shoreline of Mitchell Bay will be a subject of Phase 2 discovery.  See Exxon Opp. at 73.  The United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether Exxon's costs were incurred consistent with the National Contingency Plan.  Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.

70. Pursuant to direction from TCEQ, ExxonMobil has also conducted pore water-based risk assessments for the Houston Ship Channel and Black Duck Bay. RA0236.

**DISPUTED because Exxon PRF ¶ 70 cites to the Mitchell Bay Offshore Report as support for the fact that pore water-based risk assessments have been done for the Houston Ship Channel and Black Duck Bay.  Such support is hearsay.  In any event, the cited page appears to discuss preliminary studies that recommend sampling locations, not studies providing porewater or sediment sampling data or discussing the source of any contamination in the water bodies and sediment.  Additionally, the United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether Exxon's costs were incurred consistent with the National Contingency Plan.  Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

71. As part of Baytown's Facility Operation Area ("FOA") applications for the Baytown refinery and the Baytown chemical plant, ExxonMobil has completed Step 2 Assessment Reports. RA0359–RA0437 and RA0438–RA0502. These reports detail the facilities' "lateral and vertical boundaries; geology and hydrology; ground water quality and horizontal and vertical groundwater flow pathways; and areas of ecological impact." RA0361 and RA0439.

**PARTIALLY DISPUTED because the United States disputes any implication that the FOA Step 2 Assessment Reports include any study of contamination in the Houston Ship Channel, Black Duck Bay, Scott's Bay, or Mitchell Bay, or establish any connection between contamination in those water bodies and the production of war products. Additionally, the United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether Exxon's costs were**

**incurred consistent with the National Contingency Plan.  Under the Court's scheduling**
**orders in this bifurcated litigation, these issues are reserved for Phase 2.**

72. The FOA Step 2 Assessment Reports analyze groundwater migration within the FOA as well
as across FOA boundaries. RA0486-RA0492, RA0420-RA0427.

  **PARTIALLY DISPUTED because the United States disputes any implication that**
**the FOA Step 2 Assessment Reports include any study of contamination in the Houston**
**Ship Channel, Black Duck Bay, Scott's Bay, or Mitchell Bay, or establish any connection**
**between contamination in those water bodies and the production of war products.**
**Additionally, the United States has not yet had the opportunity for discovery concerning**
**the nature of Exxon's alleged response actions and costs and whether Exxon's costs were**
**incurred consistent with the National Contingency Plan.  Under the Court's scheduling**
**orders in this bifurcated litigation, these issues are reserved for Phase 2.**

73. ExxonMobil has two Agreed Orders with the State of Texas in which ExxonMobil resolved
certain liability and cleanup obligations related to the Baytown Site. A2754-A2801, A802-
A2811. These Agreed Orders require ExxonMobil to identify, delineate, contain, and remediate
all known hydrocarbon plumes and any hydrocarbon plumes discovered after the effective date
of the Agreed Orders. A2766, A2805–A2806.

  **PARTIALLY DISPUTED because the United States disputes any implication that**
**the Agreed Orders include any study of contamination in the Houston Ship Channel, Black**
**Duck Bay, Scott's Bay, or Mitchell Bay, or establish any connection between contamination**
**in those water bodies and the production of war products.  Additionally, the United States**
**has not yet had the opportunity for discovery concerning the nature of Exxon's alleged**
**response actions and costs and whether Exxon's costs were incurred consistent with the**

National Contingency Plan.  Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.

74. In 1997 and again in 2003 and 2004, ExxonMobil initiated assessments of the Baton Rouge Site and reported the results to the Louisiana Department of Environmental Quality. RA0510–RA0511. In 2007 ExxonMobil issued a report detailing contamination issues at the Baton Rouge Chemical Plant Area. RA0503–RA0560. This report outlined next steps, which include measures to "reduce the potential for [light non-aqueous phase liquid] migration towards the Monte Sano Bayou." RA0531.

**PARTIALLY DISPUTED because, in the first sentence of Exxon PRF ¶ 74, Exxon cites a 2007 report entitled, "P4-25 Area Assessment," as support for the fact that Exxon conducted studies in 1997, 2003, and 2004, which is hearsay.  Additionally, the 2007 P4-25 Area Assessment Report states that a release of light non-aqueous phase liquid ("LNAPL") "was finite and occurred at least 30 years ago;" that the "LNAPL has not been observed discharging into the Monte Sano Bayou[,]" RA0519, and that "the existing  LNAPL plume . . . is generally stable, is not migrating, and is not contributing constituents to soil [or groundwater] at levels exceeding [applicable standards] . . . ."  RA0530.  The report states that groundwater "*may . . . potentially* discharge" into the Monte Sano Bayou.  RA0523 (emphasis added).  Thus, the United States disputes any implication that the P4-25 Area Assessment Report includes any study of contamination in the Monte Sano Bayou, or establishes any connection between contamination in that water body and the production of war products.  Furthermore, the United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether**

**Exxon's costs were incurred consistent with the National Contingency Plan.  Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.**

75. In 1987 ExxonMobil entered a Corrective Action and Monitoring Plan (Shallow Fill Zone) for the Baton Rouge refinery. RA0561–RA0582. The objectives of this plan include the following:

> 1. Determine the extent of free-phase hydrocarbons along the Mississippi River levee within the shallow fill zone.
> 2. Provide additional protection from the potential migration of free phase hydrocarbons to any environmental receptors such as the Mississippi River and uppermost aquifer.
> 3. Provide for recovery of free-phase hydrocarbons from the shallow ground water table at the site. RA0566.

**PARTIALLY DISPUTED because the United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether Exxon's costs were incurred consistent with the National Contingency Plan.  Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.  Additionally, the 1987 Corrective Action Monitoring Plan includes an "orderly and phased approach for determining the extent of free-phase hydrocarbons *in the shallow fill zone*."  RA0566 (emphasis added).  The shallow fill zone is an area adjacent to the Mississippi River.  Gravel Rpt. 211.  The Plan states that "a review of all existing data indicates that vertical migration of free-phase hydrocarbon constituents to the upper-most aquifer is not occurring" and that "there is no data which would substantiate that free phase hydrocarbons or soluble organic constituents are migrating horizontally toward the Mississippi River."  RA0565.  Thus, the United States disputes any implication that the 1987 Corrective Action Monitoring Plan includes any study of contamination in the Mississippi River, or establishes any connection between contamination in that water body and the production of war products.**

76. ExxonMobil reported to the LDEQ in October 2011 that it is engaged in "ongoing recovery of hydrocarbons in [the Shallow Fill Zone]." RA0587.

**PARTIALLY DISPUTED because the United States has not yet had the opportunity for discovery concerning the nature of Exxon's alleged response actions and costs and whether Exxon's costs were incurred consistent with the National Contingency Plan. Under the Court's scheduling orders in this bifurcated litigation, these issues are reserved for Phase 2.  Additionally, the cited report, a 2011 Quarterly Report for Baton Rouge, states that Exxon will "continue ongoing recovery of hydrocarbons in the [shallow fill zone]."  RA0587.  The report does not mention any contaminants in the Mississippi River, or any plans to investigate the Mississippi River.  Id.  Thus, the United States disputes any implication that the 2011 Quarterly Report includes any study of contamination in the Mississippi River, or establishes any connection between contamination in that water body and the production of war products.**

Respectfully submitted,

Dated:  January 23, 2014

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

By:    Brian H. Lynk_____
Michael D. Rowe (Attorney-in-Charge)
Brian H. Lynk
T. Monique Peoples
Stephanie Talbert
Erica M. Zilioli
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C.  20044
Tel.:  202.514.3144
Fax:  202.514.8865

*Attorneys for Defendant United States*