```
 1                     UNITED STATES DISTRICT COURT

 2                     SOUTHERN DISTRICT OF TEXAS

 3                          HOUSTON DIVISION

 4   EXXONMOBIL CORPORATION              .
                                         .
 5                Plaintiff,             .
                                         .  Civil Action
 6   VS.                                 .  No. H-10-CV-2386
                                         .
 7   UNITED STATES OF AMERICA,           .  Houston, Texas
                                         .  March 11, 2014
 8                Defendant.             .  4:28 p.m.
 9   . . . . . . . . . . . . . . . . . . .

10                     TRANSCRIPT OF PROCEEDINGS

11              BEFORE THE HONORABLE LEE H. ROSENTHAL

12                        MOTION HEARING

13
     APPEARANCES:
14
     FOR THE PLAINTIFF:
15
             Mr. Tynan Buthod
16           BAKER BOTTS, LLP
             ONE SHELL PLAZA
17           910 Louisiana Street
             Houston, Texas 77002
18           713.229.1912
             FAX:  713.229.2712
19           ty.buthod@bakerbotts.com

20           Mr. Daniel M. Steinway
             BAKER BOTTS, LLP
21           The Warner
             1299 Pennsylvania Avenue, NW
22           Washington, DC  20004-2400
             202.639.7902
23           FAX:  202.585.1003

24
             PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25        TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

```
 1                          APPEARANCES

 2                           (continued)

 3  FOR THE DEFENDANT:

 4          Mr. Michael D. Rowe
            Mr. Brian H. Lynk
 5          UNITED STATES DEPARTMENT OF JUSTICE
            Environmental and Natural Resources Division
 6          601 D Street NW, Suite 8000
            Washington, DC 20004
 7          202.514.3144
            202.514.6187
 8          FAX:  202.514.8865
            michael.rowe@usdoj.gov
 9          brian.lynk@usdoj.gov

10          Mr. Samuel G. Longoria
            Assistant United States Attorney
11          UNITED STATES ATTORNEY'S OFFICE
            1000 Louisiana Street
12          #2300
            Houston, Texas  77002
13          713.567.9000
            FAX:  713.718.3300
14

15

16
    COURT REPORTER:
17
            GAYLE L. DYE, CSR, RDR, CRR
18          515 Rusk, Room 8016
            Houston, Texas  77002
19          713.250.5582

20

21

22

23

24

25
```

```
 1                         PROCEEDINGS
 2                       March 11, 2014
 3              THE COURT:  Go ahead and state your appearances,
 4    please.
 5              MR. STEINWAY:  Dan Steinway for ExxonMobil
 6    Corporation, your Honor.
 7              MR. BUTHOD:  Ty Buthod for ExxonMobil.
 8              MR. ROWE:  Michael Rowe for the United States.
 9              MR. LYNK:  Brian Lynk for the United States.
10              MR. LONGORIA:  Samuel G. Longoria for the United
11    States.
12              THE COURT:  All right, thank you.
13                  And I believe there's someone on the telephone?
14              THE CASE MANAGER:  They're just listening.
15              MR. ROWE:  Yes, your Honor.  We have several lawyers
16    that worked on the recent cases that are just listening.
17              THE COURT:  That's fine.  Thank you.  We have two
18    major facilities; plus, the other facilities.  We have the legal
19    issues that surround both World War II and Korea.  We have some
20    legal arguments based on the relationship of 113 and 107.  And
21    we have a huge number of factual disputes.  Whether they are
22    material and genuine in ways that preclude summary judgment is a
23    -- obviously, a critical question.
24                      But what is the best way -- given that interplay
25    of issues, sites, time period, factual issues, and legal issues,
```

04:28:31
04:28:41
04:28:51
04:29:10
04:29:35

1    what's the best way to structure this time?

2           MR. STEINWAY:  Your Honor, we think the best way is to

3    go through some of the issues that ExxonMobil has laid out in

4    their motion for summary judgment and requests that we made to

04:29:57  5    the Court regarding potential rulings on the various issues.

6           THE COURT:  All right.  Let me ask one question just

7    sort of at the outset, and it may not -- please don't

8    misunderstand this as indicating how I intend to rule.  If I

9    were to find that there is not a basis for saying that either

04:30:31  10   ExxonMobil or the government is wholly responsible and that

11   instead what is required is both a percentage assessment and

12   then a trial of the dollar consequence, is there -- would it be

13   an appropriate case at the assessment stage to have a special

14   master?

04:31:02  15           Have the parties discussed that at all?

16           MR. STEINWAY:  Your Honor, through the years of this

17   litigation, we have had mediation, as you know, on various

18   issues; and --

19           THE COURT:  I'm not suggesting it for mediation

04:31:18  20   purposes.  This is not a mediator.

21           MR. STEINWAY:  Yes, your Honor.

22           THE COURT:  This is a special master to whom I would

23   refer specific issues under the rule and who would make

24   recommendations to me, make a report, that -- that, obviously,

04:31:39  25   the parties would have a chance to review.

1        MR. STEINWAY:  Often these cases, your Honor, do have

2  special masters involved; and this may be a very appropriate

3  case for that to happen.

4        MR. ROWE:  Your Honor, the --

04:31:58   5        THE COURT:  Of course, that assumes I find that -- the

6  parties' arguments are somewhat curious because you are, on the

7  one hand, telling me -- both of you are telling me that, as a

8  matter of law, undisputed facts entitle each of you to a finding

9  that you have no responsibility as an operator or -- otherwise

04:32:21  10  but operator liability is, obviously, critical here; and at the

11  same time, you are telling me that there are disputed facts

12  material to deciding whether the other side has any

13  responsibility -- whether the other side can avoid

14  responsibility.

04:32:38  15        It's a somewhat odd mixture; and it is, in fact,

16  recognizing both the large and detailed rejection as disputed of

17  many of the points that the other side's expert makes in support

18  of summary judgment.  It's -- to put it crudely and at its most

19  basic, there are so many disputed facts that both sides

04:33:14  20  identified that seem to be so basic to characterizing and

21  understanding the parties' respected roles that finding, as a

22  matter of law, that undisputed facts entitle either side to a

23  finding -- to a judgment that they have no responsibility seems

24  a stretch.  That is not a ruling, that is a comment on the

04:33:47  25  nature of the task that lies ahead.

1          MR. BUTHOD:  Understood, Judge.  I would just offer

2    one -- assuming the premise that the Court gave us, we

3    understand the notion of the applicability of a special master,

4    especially, for sort of an allocation conversation.

04:34:01  5          THE COURT:  Right.

6          MR. BUTHOD:  Where we may differ --

7          THE COURT:  Well, the assessment of percentage.

8          MR. BUTHOD:  Absolutely.

9          THE COURT:  Right.

04:34:07  10          MR. BUTHOD:  Where we may differ is we do think it

11   appropriate by summary judgment for the Court to make a

12   determination of the government's status as an operator.

13          THE COURT:  Sure, sure.  And whether ExxonMobil has --

14   you know, owner of various plants and other roles.  If the

04:34:32  15   government is determined to have a role as an operator, then the

16   question would arise about involving a special master to assist

17   me in determining the extent of that role and how it would

18   translate, with equitable factors taken into account, to a

19   finding of allocation percentages for the various facilities and

04:35:04  20   various war periods alleged.

21          MR. BUTHOD:  But we do think a threshold determination

22   about summary judgment would be appropriate.

23          THE COURT:  Sure.  I'm not suggesting that a special

24   master would be appropriate for that.  Tempting but not

04:35:18  25   appropriate.

1          MR. ROWE:  Your Honor, from the Government's side, the

2     answer with respect to the special master is that we have a lot

3     of rules about that that I have to abide by.  I will not mislead

4     you.  I think most of them push more in the direction with

04:35:35  5     regard to prejudgment, otherwise --

6          THE COURT:  Well, part of it is expense and I

7     understand that.

8          MR. ROWE:  We haven't spoken about it and we can

9     certainly talk about it.  I understand the point you're making.

04:35:45 10     I would also like to --

11          THE COURT:  It would be helpful if we get to that for

12     you to identify -- I found lots of cases in which special

13     masters are used for CERCLA PRP allocation determinations, but I

14     have not stopped to parse which one of those involved the United

04:36:03 15     States as the -- as the -- one of two significant parties.

16          MR. ROWE:  Certainly, it's not something the Court

17     should have to do.  It's certainly something we could do and

18     look and see what we've done.

19          THE COURT:  That's exactly my question.

04:36:19 20          MR. ROWE:  As far as the operator status goes, I think

21     one of the things the parties agree about is that that makes a

22     difference in the case.

23          THE COURT:  Sure.

24          MR. ROWE:  And I think your Honor already understands

04:36:31 25     it but I just want to be sure going in:  That I don't think

1  either side at this point in the proceeding thinks that either

2  side can get all the way out of the case.  For example, even if

3  you were to determine that the United States was not an operator

4  of the refinery during wartime, we still owned all of the --

04:36:49  5           THE COURT:  That's right.

6           MR. ROWE:  Everybody is --

7           THE COURT:  Some of them.  And that's why I started

8  out by saying there's a different analysis, obviously, for

9  various categories of facility.

04:37:03  10           MR. ROWE:  I thought -- there was something you said

11  that made we wonder.

12           THE COURT:  No, no, no, no.  I certainly agree.  But

13  for some of the facilities that the government didn't ever own,

14  I think you are trying to say --

04:37:12  15           MR. ROWE:  Yes.

16           THE COURT:  -- "We're out of here completely."

17           MR. ROWE:  Yes, we are.

18           THE COURT:  For other facilities where the contractual

19  and other arrangements were different --

04:37:23  20           MR. ROWE:  We're saying "What were we thinking when we

21  decided to own those plants as a subsidy during World War II?"

22           THE COURT:  That may be true.  But I think with that

23  distinction recognized for at least some of the facilities --

24           MR. ROWE:  Yes.

04:37:38  25           THE COURT:  -- very significant facilities in terms of

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   the remediation issues presented, you are saying --

2          MR. ROWE:  Absolutely.

3          THE COURT:  -- no PRP liability here.

4          MR. ROWE:  Absolutely.

04:37:50  5          MR. BUTHOD:  Minor point, Judge:  My friend,

6   Mr. Steinway, has issues with his back.  Do we have your

7   permission --

8          THE COURT:  Absolutely.

9          MR. BUTHOD:  -- to proceed seated?

04:38:02  10          THE COURT:  Absolutely.  I feel your pain.

11       So we're back to my first question:  What's the

12   best way to parse these issues to present an argument that would

13   be helpful to walking through what we have to decide?  Do you

14   want to start with World War II?  Do you want to start with --

04:38:15  15   and just march through, as you did sort of in the briefing, with

16   Baytown and then moving on to the other major refinery and then

17   moving on to the other facilities ending with BOW.  Does that

18   work?

19          MR. STEINWAY:  Yes, your Honor.  We can march you

04:38:35  20   through fundamental issue of operator liability with respect to

21   the refinery.  It's, obviously, pretty much one of the key

22   issues.

23          THE COURT:  Right.

24          MR. STEINWAY:  It might be useful to go through that.

04:38:46  25          THE COURT:  All right.  I tried to go through as much

1  of the case law as I could in the time and volume available.

2  For -- when we get to the interplay between 113 and 107 which

3  kind of faded in the briefing at various times, the Government

4  submitted notice of supplemental authority; but it appears to me

04:39:11  5  that to some extent what I'm looking at is a bunch of

6  conflicting district court cases.

7          Is that the best I can do for guidance here?  Not

8  that I don't have great faith in my colleagues.  But is that

9  where we are?  I take it that was your job?

04:39:25  10          MR. ROWE:  That was Mr. Lynk's job, your Honor.

11          MR. LYNK:  I am prepared during the portion of the

12  Government's presentation to further address the issues we've

13  raised about 107, 113, and the interplay.

14          THE COURT:  My first question is going to be what's

04:39:40  15  your best case and what's your worst case?

16          MR. LYNK:  You are -- you are certainly, I will

17  explain, better representing it; but there are issues on which

18  you may find there's not controlling law and there's a question

19  of what to follow.  There are some issues as to which the

04:39:55  20  parties may somewhat disagree on whether there is a controlling

21  precedent.

22          THE COURT:  What do you define as controlling

23  precedent other than Fifth Circuit and Supreme Court?

24          MR. LYNK:  Well, I'm thinking of an issue on which

04:40:05  25  we're going to --

1          THE COURT REPORTER:  I'm sorry, I cannot hear you.

2          MR. LYNK:  There is -- one of those issues is one on

3    which we will try to persuade you today that there is Fifth

4    Circuit law that you can follow, but we will recognize certainly

04:40:21  5    there that there is a lot division in the case law --

6          THE COURT REPORTER:  I'm sorry, I'm having a really

7    hard time hearing you.

8          THE COURT:  You need to use the mike.  Standing or sit

9    down and use the mike, I really don't care which

04:40:31  10          MR. LYNK:  We will certainly -- we will certainly be

11   honest about the fact that these issues are still in flux

12   throughout the Courts, and I think what we can try to do in our

13   oral presentation today is maybe at least give you a better

14   picture of how confident you are about what direction the

04:40:56  15   jurisprudence has taken on some of those issues.

16          THE COURT:  Okay.  And I'm going to hear from both

17   sides on that, obviously.

18               Is that your division of the case, Mr. Buthod?

19          MR. BUTHOD:  You're giving us too much credit.  I

04:41:08  20   don't know yet what my division on the case is yet.

21          THE COURT:  Okay.  So are we going to start with

22   Baytown and World War II.

23          MR. STEINWAY:  Yes, your Honor.  We've handed out a

24   couple of demonstratives.  I don't know if that would be helpful

04:41:22  25   for you, your Honor.

1              THE COURT:  I think I got my own copy, Brian.  Or did

2    I?

3              Yes, I did.  Thank you.

4              Here, this is for you.

04:41:34   5              I have a wonderful law clerk helping me on this.

6    So thank you for providing materials for him as well as for me.

7              MR. STEINWAY:  Yes.  We thought it would be useful,

8    your Honor, to take a look at Exhibit Number 1 in the

9    demonstrative or Demonstrative Number 1 because that is a --

04:41:51   10   just a map of the layout of the Baytown refinery; and I'll be

11   brief about this, your Honor.

12             But I thought it would be helpful just to point

13   out a couple of the key highlights about the facility.  One, as

14   you will note, there on the right-hand side of Demonstrative

04:42:12   15   Number 1 is a red outline area.  That identifies the refinery,

16   and I'll just point out a couple of terms there for your

17   information.

18             In the middle you will see "Refinery FOA."  And

19   that stands for the refinery Facility Operations Area.  And that

04:42:33   20   is a regulatory term that connotes right now the fact that Exxon

21   at Baytown is going through a review of the facility on a full

22   refinery operational basis.  And that's connoted in red.

23             If you look, your Honor, to the left in blue, you

24   will see in a box "Chemical Plant FOA."  That connotes the

04:43:03   25   Facility Operations Area review undertaken under Texas

1  environmental regulatory authorities for the chemical portion of
2  the facility.

3           The chemical portion of the facility includes the
4  Plancor facilities you will see; and the Plancors, we refer to
5  that term, your Honor, as the Defense Plant Cooperation
6  facilities that were built during the war.  And there are three
7  Plancors there located on the left-hand side, and I'll just move
8  up from the bottom to the top.

9           Plancor 1082 was the old butyl rubber plant, and
10 that was a federal Plancor.

11          Plancor 485 is a butadiene plant.  Both of those
12 Plancors are the subject of this litigation.

13          The third Plancor, 877, is what is referred to as
14 a copolymer plant.  It's where they manufactured different types
15 of rubber, buna-S rubber, a higher value rubber during the war.
16 That Plancor is not the subject of this litigation.

17          And I'll just point out --

18          THE COURT:  Which one is not?

19          MR. STEINWAY:  Plancor 877, your Honor, at the top.

20          THE COURT:  Okay.

21          MR. STEINWAY:  And I'll just point out to you a couple
22 of the water bodies because we'll refer to them throughout the
23 course of the litigation.  You'll see Scott's Bay there on the
24 left-hand side; and to the right -- moving to the right, you'll
25 see Mitchell Bay, you'll see the Houston Ship Channel, and Black

1   Duck Bay.

2                   And one of the interesting features, just

3   generically, that I would like to point out to you, your Honor,

4   is that the operational part of the plant is generally located

04:44:41   5   at the top and the flow of refinery wastewaters generally move

6   from north to south throughout the plants.  And as I -- as we go

7   to a couple more of these demonstratives, it will be helpful for

8   you to see how the waste streams function throughout the

9   facility.

04:44:59   10                  If you don't mind, your Honor, if you could turn

11   to Demonstrative Number 2 for a second --

12                  THE COURT:  Sure.

13                  MR. STEINWAY:  -- and I'll be brief about this as

14   well -- the purpose of this demonstrative was really to show you

04:45:10   15   one additional Plancor.  We will refer throughout the course of

16   litigation to Plancor 1909.  That Plancor was built in the

17   middle of the refinery at great reluctance by Humble and Exxon

18   at the time.

19                  THE COURT:  Why don't you just call it Exxon's

04:45:30   20   predecessor or something like that, and then -- nobody is

21   disputing predecessor status for the -- for Humble or Standard.

22                  MR. STEINWAY:  Yes, your Honor.

23                  THE COURT:  All right.

24                  MR. STEINWAY:  This Plancor, just by way of a little

04:45:44   25   background, is what we call a hydrocodimer plant.  And that

1  plant was built very late in the war -- or in the middle -- in

2  the 1944 time frame in order to make codimer.

3              Codimer is a fundamental octane enhancer that was

4  used to boost the octane of crude oil up to the hundred octane

04:46:10  5  level for avgas.  There are two ways to make high octane,

6  100-octane, avgas.  One way is through addition of codimer, and

7  this plant was built by the United -- owned by the United

8  States; and we submit, your Honor, directed by the United States

9  to be built there.

04:46:28  10              The other way to make octane -- high octane avgas

11  is through the alkylate process, and there were already alkylate

12  facilities there at Baytown.  That was used as another way to

13  enhance crude oil and boost the octane level up to hundred.

14         THE COURT:  So the Plancor was owned by the United

04:46:46  15  States and built within the plant that was owned by Exxon's

16  predecessor?

17         MR. STEINWAY:  Yes, your Honor.  And so since we're

18  just going to focus in right now on Baytown, I'll just point out

19  a couple more of the demonstratives regarding Baytown that I

04:47:07  20  thought would be useful -- that we thought would be useful for

21  you.

22              THE COURT:  That's fine.

23         MR. STEINWAY:  If you don't mind turning to

24  Demonstrative Number 4.  The purpose of this demonstrative is to

04:47:18  25  show you the various outfalls of where the wastewaters from the

1  plant deposit into the water bodies.  And here, your Honor,

2  we'll point out to you three outfalls.  The first outfall is in

3  the upper left quadrant.  You'll see it marked by a green arrow

4  with the word "outfall."

04:47:40  5           This is to refer -- and you'll see a box to the

6  right of the green outfall identified "Rubber Plancors Common

7  Sewer."  That outfall was the sewer that handled the common

8  wastewaters from the Plancors themselves, the three Plancors;

9  and that discharged directly into Scott's Bay.

04:48:00  10          THE COURT:  Okay.

11          MR. STEINWAY:  The second outfall that we would like

12  to point out to you is the one right near Mitchell Bay there.

13  And you'll see an outfall with -- and then to the right, the

14  arrow pointing into Mitchell Bay.  That outfall was terminated

04:48:19  15  in the late '50s.  That outfall is near a separator that you see

16  in the box identified by Separator 2.

17          THE COURT:  Is that the separator that you allege the

18  government prevented you from building earlier and was only

19  built later?

04:48:35  20          MR. STEINWAY:  Your Honor, that separator is a

21  different separator.  That's at Baton Rouge.

22          THE COURT:  Okay.  That's right.  I got them mixed up.

23          MR. STEINWAY:  That's called the master separator.

24          THE COURT:  You're right.  And I apologize.  Keeping

04:48:45  25  them straight has been interesting.

1          MR. STEINWAY:  We understand, your Honor.

2          MR. ROWE:  There are quite a few separators.

3          MR. STEINWAY:  Yes.

4          THE COURT:  Yes.  All right.

04:48:50    5          MR. STEINWAY:  That separator --

6          THE COURT:  That was a bad question.  Okay.  So that

7  separator was built in the '50s?

8          MR. STEINWAY:  It was terminated in the late '50s,

9  your Honor.

04:49:00   10          THE COURT:  When was it built?

11          MR. STEINWAY:  In the late 1920s.

12          THE COURT:  Okay.  So it predates the war?

13          MR. STEINWAY:  It predates the war, your Honor.

14          THE COURT:  All right, thank you.

04:49:08   15          MR. STEINWAY:  I believe it was 1929.

16               And the main outfall that we would like to point

17  your attention to was on the bottom there really at 6:00

18  o'clock.  You'll see it there in the bottom, right in the

19  middle; and it's labeled "outfall."  And that outfall --

04:49:22   20          THE COURT:  Is that the one that's going into Black

21  Duck Bay?

22          MR. STEINWAY:  Yes, your Honor.  Right there between

23  the Houston Ship Channel and Black Duck Bay.

24          THE COURT:  I got it.

04:49:33   25          MR. STEINWAY:  It actually really goes into the

1  Houston Ship Channel.

2          THE COURT:  I see it.

3          MR. STEINWAY:  And that outfall is the result of the

4  lower and upper outfall canal.  You will see -- right before the

04:49:42  5  outfall to the right and you'll see the label "Outfall Canal."

6          THE COURT:  I see it.

7          MR. STEINWAY:  The lower portion is the portion that's

8  directly adjacent to the outfall.  The upper portion is the part

9  that goes vertically.

04:49:54  10          THE COURT:  All right.

11          MR. STEINWAY:  And you'll hear reference throughout to

12  upper and lower outfall canal.

13              And then the key separator for purposes of

14  Baytown is Separator 10.  When Exxon modernized the wastewater

04:50:13  15  refinery treatment system at Baytown, eventually the separators

16  eventually were directed into the modernized Separator 10.  So

17  we think it would be useful --

18          THE COURT:  When eventually?

19          MR. STEINWAY:  -- to point that out to you, as well.

04:50:29  20          THE COURT:  When eventually?  What was the -- what was

21  the date that it was -- the separator was modernized?

22          MR. STEINWAY:  I'm sorry, your Honor?

23          THE COURT:  What was the date of which you've just

24  described?

04:50:40  25          MR. STEINWAY:  The separator was modernized between

1   1947 and 1957 as part of a waste processing improvement.  We

2   believe it's probably in the mid '50s when it was modernized.

3             THE COURT:  All right.  So it was not modernized

4   during World War II?

04:50:58   5             MR. STEINWAY:  No, your Honor.

6             THE COURT:  Was there any request to modify it during

7   World War II?

8             MR. STEINWAY:  No, your Honor.  In 1950 -- that's the

9   demarcation date.  The modernization is, in a sense, the

04:51:09   10   installation of skimming equipment so that you could skim the

11   water off the top of the separator.  Prior to that date, there

12   was not sufficient skimming technology employed at Separator 10.

13   The date of -- that really employed the skimming technology is

14   either 1950 or shortly thereafter.

04:51:31   15             THE COURT:  Okay.

16             I assume the Government will tell me if it

17   disagrees with any of the statements that are presented via

18   these exhibits, demonstratives, or described in the explanation

19   of them?

04:51:48   20             MR. ROWE:  I will certainly do that, your Honor.  You

21   should be happy we are saving time because we skipped my first

22   demonstrative when we get there.  I have just a few small

23   things, not worth --

24             THE COURT:  Good, good, good, good.

04:51:59   25             MR. ROWE:  I will certainly let you know.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Okay, thank you.

2          MR. ROWE:  This is mostly things that are --

3          THE COURT REPORTER:  I'm sorry, I'm having trouble

4    hearing you, too.

04:52:08    5          MR. ROWE:  I'm sorry.  These are mostly issues that

6    are agreed upon between the parties.

7          THE COURT:  All right, thank you.

8                Go ahead.

9          MR. STEINWAY:  Your Honor, since you have said we

04:52:22   10    should focus in on the Baytown --

11          THE COURT:  First.

12          MR. STEINWAY:  -- plant first, we'll leave for further

13    deliberation Demonstrative Number 5.  That deals with the layout

14    of Baton Rouge, and we can postpone that.

04:52:35   15          THE COURT:  That's fine.

16          MR. STEINWAY:  But we feel these three demonstratives

17    sort of give you a good overview just fundamentally of how the

18    system works at Baytown in the wastewater refinery.

19                With that, your Honor, I'm going to turn to our

04:52:50   20    pending motion before the Court.  In our motion, your Honor,

21    ExxonMobil has requested that the Court make the following six

22    rulings:

23                We requested that the Court find that the United

24    States was an operator of the refinery and the Plancors and

04:53:14   25    subject to CERCLA liability under Section 107(a)(2).

1          We requested -- I'll just limit this to Baytown

2    right now, your Honor.

3          THE COURT:  Okay.

4          MR. STEINWAY:  We requested that the Court find that

04:53:35   5    the government is liable as an arranger at Baytown with respect

6    to wastes that were handled, transported, and generated at the

7    Plancor 1909, the hydrocodimer plant; and that's Issue Number 2.

8          Issue Number 3 is we've requested that the

9    government be subject to joint and several liability under

04:54:08   10   107(a) with respect to the Baytown facility.

11          Issue Number 4, we've requested from --

12          THE COURT:  As an operator?  And is that --

13          MR. STEINWAY:  An arranger.

14          THE COURT:  For just the Plancor?

04:54:22   15          MR. STEINWAY:  Well, the operator for the refinery --

16          THE COURT:  Right.

17          MR. STEINWAY:  -- and the Plancors.

18          The arranger liability is just with respect to

19   the hydrocodimer Plancor facility.

04:54:32   20          THE COURT:  That's what I thought.  That's 1909?

21          MR. STEINWAY:  Yes.

22          THE COURT:  All right.

23          MR. STEINWAY:  The fourth issue is we seek a

24   declaration, your Honor, that the government -- we seek

04:54:47   25   declaratory judgment relief that the government should be

1    subject to future costs with respect to those -- with respect to

2    any response costs that Exxon incurs regarding the Baytown plant

3    and facility.

4                    The fifth issue that we've sought relief on is

04:55:13    5    we've, as an alternative, pled that the government should be

6    subject to contribution under Section 113(f)(3)(B) of Superfund

7    with respect to solely the costs incurred regarding the

8    administrative order on consent covering that facility.

9                    And the final issue, your Honor, in the event

04:55:45    10   that the Court finds the United States liable but not joint and

11   severally liable, we request that the Court adopt the allocation

12   methodology that Exxon has presented as part of its summary

13   judgment motion.

14                    We recognize that the Government has already

04:56:10    15   admitted liability as an owner for the Plancors -- the two

16   Plancors at Baytown; and we also recognize that many of these

17   issues, as you've pointed out already, your Honor, will be

18   subject to the allocation in Phase 2 deliberations.  And we

19   recognize that.  So those are -- that's what we seek from the

04:56:38    20   Court today.

21                    And with that, your Honor, if I could turn to the

22   first issue, the operator liability issue with respect to the

23   refineries.

24                    THE COURT:  Am I understanding you correctly that for

04:56:53    25   -- to the extent you have asked me to rule that the Government

1  is the only liable party, are you now saying that you recognize

2  that that is unlikely?

3          MR. STEINWAY:  We have pled, your Honor, alternatively

4  why we seek joint and several liability; and we believe the case

04:57:22  5  law is very strong on that point.  We have pled alternatively in

6  the event that the Court finds that the United States is liable

7  but not joint and several liability --

8          THE COURT:  All right.

9          MR. STEINWAY:  -- we felt since Phase 1 of this

04:57:35  10  litigation -- the litigation was bifurcated to address two

11  issues in Phase 1 liability and allocation methodology.

12          THE COURT:  Right.

13          MR. STEINWAY:  We felt it would be helpful to present

14  to the Court some points that we feel are very important with

04:57:48  15  respect to the allocation methodology.

16              Frankly, your Honor, as you have noted, there are

17  many issues of disputed fact.  But in our papers, what we've

18  tried to do is lay out what we think, your Honor, are some

19  fundamental principles that we think might help guide the Court

04:58:06  20  in terms of developing an allocation methodology.  We think --

21          THE COURT:  Although you put them into the liability

22  portion as opposed to the allocation portion.

23          MR. STEINWAY:  Well, your Honor, in our papers, since

24  Phase 1 deals with liability as allocation methodology --

04:58:20  25          THE COURT:  Right.

1          MR. STEINWAY:  -- we felt it incumbent to address not

2     only the liability issues but to give you our views and our

3     motion on the allocation methodology.

4          THE COURT:  I'm not criticizing you for that.  I'm

04:58:36    5     just trying to understand the relationship between the two sets

6     of arguments.

7          MR. STEINWAY:  Yes, your Honor.  We -- I think the

8     fairest way to look at that, your Honor, is we are alternatively

9     pleading both sides of the coin recognizing there are a lot of

04:58:52   10     important facts here in this case to consider.

11          THE COURT:  All right, thank you.

12          Go ahead.

13          MR. STEINWAY:  Your Honor, if I may, I turn to the

14     first issue which we would like to call the operator liability

04:59:05   15     issue with respect to the refinery at Baytown.  Your Honor, we

16     think it's important to set a little bit of historical context

17     as to what happened during the war.

18          At the beginning of World War II, it was

19     recognized that the United States was incapable of having a --

04:59:28   20          THE COURT:  Well, I'm going to cut this short a little

21     bit.  Do you agree with Willie Fletcher's -- Judge Fletcher's

22     description, which is fairly broad brush, of the historical

23     background of the petroleum organization and administrative

24     structure that the government imposed in response to World War

04:59:57   25     II?

 1              MR. STEINWAY:  We agree.  I mean, that is a very fair

 2    statement.

 3              THE COURT:  All right.  So let's start there.  It's a

 4    well presented and very eloquently written description.

 5              MR. STEINWAY:  Yes, your Honor.

 6              THE COURT:  All right.  So you don't need to repeat

 7    that.  I'm going to assume that you just said what he said

 8    there, okay?

 9              MR. STEINWAY:  Yes, your Honor.

10              THE COURT:  Although he was dealing with -- the case

11    he dealt with was an arranger case, as I recall, and didn't

12    really deal with where we are now.

13              MR. STEINWAY:  Yes, your Honor.  In a nutshell, your

14    Honor, the PAW, the Petroleum Administration for War, basically,

15    controlled everything about this critical industry, aviation

16    gasoline.  There were two critical industries that had to be

17    developed and enhanced in order for the United States to

18    successfully prosecute the war.  The first was to develop

19    adequate 100 octane -- high octane avgas capability.  And the

20    second key component was to develop a rubber industry.

21              From the inception, the government created the

22    rubber industry, albeit there was some development of -- there

23    was already some manufacture of 100 octane avgas but not at all

24    on the levels that needed to be developed and produced in order

25    for us to prosecute the war.

1                    Just to give you some figures, your Honor, before

2    the war, there were about 44,000 barrels per day capacity of

3    avgas; and we needed, the estimates were, about 636,000 barrels

4    per day of avgas.  And during the war, at Baytown, the Baytown

05:01:33   5    production capacity itself for increase in avgas production

6    increased over 3800 percent, from 1939 to 1944.

7                    This was all at the behest of the Petroleum

8    Administration for War, an agency that was developed

9    specifically under executive orders at the behest of President

05:01:58   10   Roosevelt to centralize and help us develop the avgas capacity.

11                   I would like to point out to you, your Honor, the

12   three key points that we think are important from the

13   perspective of the PAW controlling the avgas industry.

14                   First, it's very clear in the documentation that

05:02:13   15   PAW treated the refinery industry in the United States as one

16   unit.  They did this -- the PAW was run, albeit --

17                   THE COURT:  It's all laid out in what Judge Fletcher

18   describes.

19                   MR. STEINWAY:  Sorry, your Honor.

05:02:29   20                   THE COURT:  No, I'm not being critical.  I just want

21   to be sure that we get to the points that I think are more

22   opaque.

23                   MR. STEINWAY:  Yes, Judge.  The point that's important

24   to make is the PAW treated the refinery industry as one unit.

05:02:41   25   They looked at it as components of one refinery rather than

1    separate refineries.  They controlled -- the regulatory program

2    was such that they made sure that this one unit operated

3    effectively and efficiently.

4                  The second key point is the PAW had a wide range

05:03:01   5    of very significant authorities.  They had regulatory

6    authorities and coercive authorities.  The regulatory

7    authorities -- as we cite in our papers, your Honor, there were

8    two fundamental regulatory authorities that the PAW had.  They

9    were embodied in Recommendation Number 8 and Recommendation

05:03:20   10   Number 16.

11                  Later on, these recommendations actually were

12   transferred and called by the PAW Directives.  Directive Number

13   8 was a directive that required the industry only to use octane

14   enhancers for military purposes for avgas.  That's Directive

05:03:40   15   Number 8.

16                  Directive Number 16 was a far-reaching directive

17   that, essentially, covered the broad range of petroleum use

18   throughout the country, from producing -- from drilling for oil

19   to manufacturing avgas; to allocation of crude oil supplies; to

05:04:03   20   transport, shipment, and sale of avgas and crude oil.  That was

21   covered by Directive Number 16.  These directives were far, far

22   greater than anything that was ever implemented during a peace

23   time period.

24                  At the same time, another set of regulatory

05:04:22   25   authorities that the PAW had were coercive in nature.  There

1  were two types of regulatory authorities along those lines.  The

2  first -- the first are --

3                THE COURT:  I understand about these coercive

4  measures.  But my understanding is also that certainly there

05:04:40   5  were no seizures in this case -- plant seizures, correct?

6                MR. STEINWAY:  Your Honor, there was one plant seizure

7  that we feel was important to bring to your attention.

8                THE COURT:  Of Baytown properties?

9                MR. STEINWAY:  Not at Baytown.  But at Ingleside which

05:04:58  10  is another Humble facility owned by the same -- well, it was run

11  by the same management group, Hines Baker, who was the president

12  of Humble.

13                THE COURT:  But it's none of the facilities that are

14  at issue in this case?

05:05:08  15                MR. STEINWAY:  Not at that --

16                THE COURT:  And it's undisputed that everybody knew

17  that those powers were out there; but as Judge Fletcher said in

18  his opinion, it's also clear that by far the great majority of

19  the production that occurred was done through contracts that

05:05:22  20  were voluntarily assumed, private contractual arrangements with

21  the government.

22                MR. STEINWAY:  Your Honor, we would dispute the notion

23  that they were voluntarily assumed because they were,

24  essentially, required cooperation.  If the government didn't get

05:05:42  25  -- if the companies had not entered into those contracts,

1  clearly --

2          THE COURT:  Everybody knew -- I don't mean to

3  interrupt you.  But everybody knew those coercive powers were

4  out there, and I will take as undisputed that there -- and it

05:05:55  5  was already addressed in the materials you filed -- that there

6  were some instances of seizure.  And the one that you're talking

7  about, obviously, would have been known to the party because it

8  was the same party.

9          MR. STEINWAY:  Yes.

05:06:07  10          THE COURT:  That's the point you were looking for.

11  What was the date of that seizure?

12          MR. STEINWAY:  1945.  Twice in 1945.

13          THE COURT:  But that's way after the contracts were

14  entered into, right?

05:06:18  15          MR. STEINWAY:  Yes, your Honor.

16          THE COURT:  Okay.  Keep going.

17          MR. STEINWAY:  We would dispute, your Honor, the

18  categorization that they were voluntarily assumed contracts.

19          THE COURT:  They were contracts.

05:06:25  20          MR. STEINWAY:  Yes.

21          THE COURT:  They weren't seizures.

22          MR. STEINWAY:  Yes, your Honor.

23          THE COURT:  And nobody is arguing the legal defense of

24  duress, right?

05:06:34  25          MR. STEINWAY:  Yes, your Honor.

1          THE COURT:  Okay.

2          MR. STEINWAY:  The third -- the third point that we

3    think is important from a PAW-controlled perspective to bring to

4    your attention is, generally speaking, the record shows that the

05:06:49  5    PAW was viewed as sort of a czar of octane enhancement.

6          They fundamentally controlled not only the crude

7    oil supplies themselves but they dictated the processes and how

8    the facilities themselves would be operated.  Not only was 100

9    octane a war product that was covered by the PAW's authorities,

05:07:18  10   your Honor; but the PAW had virtual authority over a wide range

11   of other war products.

12          And I'll just point out to you two other war

13   products that were very significant that were developed as part

14   of the PAW's authority.  The first was 80 octane military

05:07:35  15   gasoline.  Just as 100 octane avgas was the warhorse for flying

16   our airplanes faster, farther, and higher, AD octane military

17   gasoline was the jack-of-all-trades, the power of the Army and

18   land-based operations.

19          That is another war product that the government

05:08:01  20   imposed requirements on Exxon and their predecessors to produce,

21   and the other important war product to bring to your attention

22   is Navy special fuel oil.  That was the product that would power

23   our ships that was required to be produced under the PAW's

24   authorities.

05:08:22  25          We think, your Honor, that this issue of control

1   over the industry has already been established by Judge Kelleher

2   in his opinion.  In the Ninth Circuit in the Shell case dealing

3   with the avgas industry, Judge Kelleher wrote "As a factual

4   matter that the United States controlled the avgas industry

05:08:44   5   during the war."  That decision, albeit, was overturned by the

6   Ninth Circuit on appeal; but none of his factual findings were

7   disturbed.

8            In my view, your Honor, the Ninth Circuit

9   decision was really more a legal technicality.  It was a

05:09:02   10   question of whether or not the United States should be

11   considered an arranger and the Ninth Circuit ruled, well, the

12   United States did not own and possess -- or possess the crude

13   oil supplies that were processed at the Shell refinery.

14           So for that reason alone as a legal matter, the

05:09:21   15   Ninth Circuit overturned the decision; but the Ninth Circuit did

16   not at all disturb the factual findings that Judge Kelleher made

17   at trial court level regarding the control.

18           In fact, your Honor, in the Ninth Circuit

19   decision, again, the Ninth Circuit specifically affirmed in its

05:09:40   20   -- in its findings that the United States substantially

21   controlled the avgas industry during World War II and in the

22   wartime period.

23           The Plancors are very important, your Honor,

24   because they were sited right next to the refinery; and they

05:09:58   25   were sited next to the refinery so that the whole complex could

1  be looked at as a war product manufacturing complex.  They were

2  not sited coincidentally.  They were sited because of the

3  integration between the Plancors and the refinery.

4           For example, the raw materials that went to power

05:10:19  5  the butadiene Plancor plant or the butyl rubber Plancor plant or

6  another government-owned facility called the Baytown Ordinance

7  Works where 40 percent of the toluene manufactured during the

8  war was manufactured at that nearby federal facility, those

9  plants took advantage of the raw materials that were generated

05:10:42  10  by the refinery and used as the power to make the toluene; and

11  the naphtha, for example, that was generated as a byproduct from

12  the refinery was transported over the short range over to the

13  Baytown Ordinance Works and used to make the toluene that was

14  used to make the TNT for explosives and other military

05:11:03  15  applications.

16           In return, those Plancor facilities used to some

17  extent the refinery wastewater systems to handle a number of the

18  wastewaters that those Plancors themselves could not take.  It

19  was clear, your Honor, that during the war, these Plancor

05:11:23  20  facilities were built very quickly and very hastily.

21           And the record -- the historical record says,

22  your Honor, that those Plancors were built with minimal concern

23  to waste consideration and waste handling capabilities.  In my

24  view, your Honor, I sort of categorize them as Model Ts.  These

05:11:50  25  were built as plants to make the material and there was a policy

 1   that was codified by the Cadillac Fairview case in the Ninth

 2   Circuit that the -- there was a general policy that the Court

 3   recognized in the Ninth Circuit that scarce materials were

 4   devoted specifically to the construction of products, facilities

05:12:08   5   to make products, and were not used to make waste handling or

 6   handle environmental pollution matters.  We will go into this in

 7   great detail later on, as you know, your Honor.

 8           So these Plancors were sited intentionally to

 9   make this all an integrated function.  One of the disputes we

05:12:32  10   have with the United States, your Honor, is over the Plancor,

11   the hydrocodimer plant; and that plant, as we pointed out

12   earlier in the demonstrative, was put right in the middle of the

13   Baytown refinery.

14           The Baytown folks didn't want the refinery -- the

05:12:48  15   Plancor there.

16           THE COURT:  Why?

17           MR. STEINWAY:  They didn't want it for two reasons:

18   First, the plant was already over-congested; and by building

19   this plant in the middle, they felt it would detract

05:13:00  20   substantially from the efficiency of the overall refinery

21   operations.

22           Second reason was they didn't want the

23   hydrocodimer plant there because they didn't feel it would have

24   any utility after the war.  Hydrocodimer made, as I mentioned

05:13:16  25   earlier, your Honor, codimer; and codimer was -- the codimer

1  octane enhancing practice was viewed as less efficient than the

2  alkylate practice that Baytown already used.

3          So, the feeling of the Humble folks at the time,

4  your Honor, was that we -- that they would not -- this plant

05:13:36  5  would have very little utility after the war.  There is a great

6  debate between the United States and Exxon over whether or not

7  Exxon voluntarily consented to build the plant.

8          Admittedly, the plant is there.  Yes, we did --

9  Humble did concede and build the plant; but we can tell you,

05:13:57  10  your Honor, the record is replete with notations saying that

11  Humble folks adamantly resisted and protested to the utmost; and

12  in the end, yes, the plant was built there; but going back to

13  the categorization of voluntary contracts, your Honor, I like

14  the term "essentially required cooperation."

05:14:22  15          Required cooperation, that is, if we didn't do

16  it, they would have seized the facility and make us do it.  So,

17  yes, there was a -- there's no doubt there was a patriotic

18  aspect to everything that Humble did.  Humble, Baton Rouge, and

19  another facility, Marcus Hook, were the three biggest refineries

05:14:39  20  in the United States; and if Humble and Baton Rouge did not make

21  the avgas, we wouldn't have been able to fly the airplanes

22  overseas.  We knew we had to fly the airplanes overseas.

23          THE COURT:  Is there any indication of any kind of

24  threatened seizure or other action by the United States to

05:14:57  25  require the construction of the Plancor?

```
 1              MR. STEINWAY:  It's my view, your Honor -- no, your
 2    Honor.  It's my view, your Honor --
 3              THE COURT:  Your view was that everybody knew it was
 4    lurking out there?
 5              MR. STEINWAY:  There was a lot of -- in my view, your
 6    Honor, nasty correspondence, very strong correspondence in very
 7    military bureaucratic terms that we needed to build this; and
 8    the record is very clear, in our view, your Honor, that Humble
 9    did everything possible to show the United States the
10    disadvantages of building that hydrocodimer plant there.
11              THE COURT:  Okay.
12              MR. STEINWAY:  So with that background, your Honor, I
13    thought it would be helpful to lay out to you our legal
14    underpinnings for operator control.
15              THE COURT:  All right.
16              MR. STEINWAY:  And --
17              THE COURT:  Now you want me to turn to Tab 7?
18              MR. STEINWAY:  I believe that's correct, your Honor.
19                   Yes, your Honor.
20              There was no doubt that the Supreme Court in the
21    Bestfoods case set forth the test for operator liability.  By
22    way of background, it might be useful to mention that the
23    Bestfoods case came out of a situation dealing with corporate
24    parent subsidiary liability.
25              THE COURT:  I understand.  I understand the Bestfoods
```

05:15:06
05:15:27
05:15:42
05:15:57
05:16:16

1  case, of course.

2          MR. STEINWAY:  And in fact, your Honor, we have toyed

3  with the concept that, perhaps, there should be a special rule

4  for wartime cases and operator liability.

05:16:29  5          THE COURT:  But there's not.

6          MR. STEINWAY:  There's not, your Honor.

7              We feel that the case law suggests that there

8  should be, and I will point out some of the recent cases where I

9  think it's started -- well, where it has evolved.

05:16:46  10          THE COURT:  Well, Congress is free to make any such

11  rule any time Congress chooses, but Congress hasn't so chosen,

12  right?

13          MR. STEINWAY:  Yes, your Honor.

14          THE COURT:  Is that a fair statement?

05:16:55  15          MR. STEINWAY:  Yes, your Honor.

16          THE COURT:  Okay.

17          MR. STEINWAY:  Under the test of Bestfoods, if we look

18  at the language of the test in dealing with the sentence where

19  we're sharpening the definition for environmental purposes, the

05:17:09  20  standard operator liability is that an operator must manage,

21  direct, or control operations relating to pollution.

22              Here in this place, it's very clear.  The

23  manufacturing operations were the sources of the pollution.

24  There's a direct nexus between the operations related to

05:17:29  25  pollution in the Best -- Bestfoods and the operations that

1    caused the pollution here at Baytown.

2                    We think that is the overriding test that needs

3    to be made; and by example, Judge -- Associate Justice Souter in

4    the decision points out a couple of examples, that is,

05:17:49  5    operations having to do with waste disposal or environmental

6    compliance.

7                    We think those are examples of the fundamental

8    overriding standard that operations causing pollutions would

9    subject a party to operator liability under 107(a).

05:18:12  10                    Here in this case -- and I would like to point

11    out one of the other demonstratives, I think.  In Demonstrative

12    Number 7, your Honor --

13                    THE COURT:  Yes, sir.  That's what I'm looking at.

14                    MR. STEINWAY:  -- the number four, it's very clear

05:18:37  15    that the war demands caused a great deal of pressure on these

16    refineries clearly resulting in an overtaxing of the waste

17    handling resources of the facilities, both Baytown and Baton

18    Rouge.

19                    MR. BUTHOD:  That's Tab 9, excuse me.

05:18:57  20                    MR. STEINWAY:  Oh, I'm sorry.

21                    THE COURT:  All right.  Yes, I'm there.

22                    MR. STEINWAY:  I'm sorry, your Honor.

23                    THE COURT:  I got it.  Thank you.

24                    MR. STEINWAY:  In Tab 9, if you don't mind taking a

05:19:04  25    look at Number 4.  We've highlighted that for you.

1           THE COURT:  Yes.

2           MR. STEINWAY:  And it says, "War activities caused a

3    rampant expansion of plant facilities for production with no

4    increase in waste disposal facilities.  This has caused, as

5    stated before, daily pollution of the Mississippi River."

6    That's describing the Baton Rouge refinery, your Honor; but the

7    same situation, obviously, resides with Baytown, as well.

8              So, the record, in our view, your Honor, is very

9    clear.  Operations did result in pollution.  Let's take a look

10   at even the examples that are set forth in the Bestfoods

11   standard, whether or not waste disposal decisions were made.

12   And the Government would have you look, your Honor, just at

13   whether or not there were waste disposal decisions made and that

14   would be the end of the story.

15             Well, there were waste disposal decisions made by

16   the government; and for example, as you've mentioned, one of the

17   clearest examples is the master separator.  Here at the master

18   separator, that was to be installed at the Callahan Bayou at

19   Baton Rouge; but it's a very clear example of how a waste

20   disposal decision was made at Baton Rouge.

21             At Baytown there were other waste disposal

22   decisions made; and one that we pointed out deals with the acid

23   burning facilities.  Let's take for a moment a look at the

24   master separator issue at Baton Rouge because that's a very good

25   example.

1            The United States engineer, the predecessor to

2  the Corps of Engineers, had said to Baton Rouge during the war

3  we needed to install a master separator to address the

4  increasing pollution problems emanating from the Baton Rouge

05:20:54  5  facility.  The problem was the War Production Board, the

6  umbrella organization that oversaw the PAW activities, had

7  authorities over steel, iron, and other scarce materials.

8            The War Production Board denied the construction

9  of a master separator on the grounds that those materials should

05:21:19  10  be used elsewhere and not for pollution saving purposes.

11  Regardless of -- the point of the matter is the government made

12  a decision -- they told us not to install the master separator

13  and they made a decision about waste disposal.

14            There are other repeated denials of other waste

05:21:42  15  handling equipment that were made by Exxon and their

16  predecessors; but that is a very good example.  In fact, I would

17  submit, your Honor, that that example of denial of the master

18  separator not only is a very good example of waste disposal but

19  of a decision regarding compliance with environmental

05:22:02  20  requirements, the other prong of the Bestfoods standard, because

21  the Army engineer had alleged that Baton Rouge was violating

22  Section 7 of the Rivers and Harbors Act of 1899 and that if they

23  did not stop discharging into the Mississippi River, the Army

24  Engineer -- the Army Corps of Engineers, the regulatory

05:22:24  25  authority at the time, would have brought an enforcement action

1    against Baton Rouge for non-compliance with the Rivers and

2    Harbors Act.

3              But having discussed this with the War Production

4    Board and with the PAW, they decided not to continue on with

05:22:41    5    their enforcement action.  So we maintain, your Honor, that that

6    example not only shows a waste disposal decision made by the

7    United States but actually a decision relating to environmental

8    compliance issues, the other prong that's pointed out in the

9    Bestfoods standard under the case.

05:23:01    10              At the same time, I've mentioned --

11              THE COURT:  Is there any example of anything like that

12    occurring at Baytown?

13              MR. STEINWAY:  The closest example, your Honor, is the

14    acid burning facilities where Exxon or Humble wanted to burn --

05:23:17    15    to construct an acid burning facility to handle the sludge that

16    is generated from avgas production; and they needed to build

17    this facility, albeit as an interim step, while they were

18    building some new acid concentration facilities; but again, the

19    government denied Exxon's request to build the acid burning

05:23:40    20    facility.

21              THE COURT:  And what was the year?

22              MR. STEINWAY:  1943, your Honor, I believe.  I may be

23    off a year or two.  It may be '42.

24              THE COURT:  All right.

05:23:49    25              MR. STEINWAY:  I'm not hundred percent positive.

1          THE COURT:  I do have a question about the Baton Rouge

2 facility and the decision you've been talking about with respect

3 to that facility, and that is, the Government points out in its

4 responsive arguments on this point that after the war ended

05:24:09   5 Exxon didn't do anything to build this separator that had been

6 refused during the war until the -- sometime in the 1950s.

7          And the Government points out that that delay

8 suggests that the decision on whether to build it was not one

9 that Exxon was -- had forced upon it.  And certainly, Exxon did

05:24:33  10 not rush to build it as soon as the restrictions on its ability

11 to do so, the government-imposed restrictions, were lifted.

12          How do you respond to that?

13          MR. STEINWAY:  Your Honor, first point is the master

14 separator was proposed at two times during World War II.  The

05:24:51  15 first time was during the earlier part of the war.  And so the

16 master separator was proposed and advocated by Baton Rouge on

17 several occasions.

18          As a practical matter, yes, indeed, it was built

19 after the war; yes, indeed, it was built after restrictions were

05:25:14  20 lifted.  But it did take several years to construct this plant.

21 We've tried to do a timeline, your Honor, of how much time it

22 takes to go through process, design, feasibility study analysis

23 to build a major unit.  And this was a very major capital

24 expenditure.

05:25:34  25          And so it did take a lot of time to build it, but

1    the fact of the matter is that there was a lot of talk during

2    the war, and Exxon wanted to build this during the war, and it

3    was denied by the PAW and the War Production Board.

4              MR. BUTHOD:  Could I briefly -- Judge, could I address

05:25:52  5    the Court's prior question?  The Court was asking about whether

6    there is a parallel example, if you will --

7              THE COURT:  Yes.

8              MR. BUTHOD:  -- from Beaumont as opposed to Baytown.

9              THE COURT:  Right.

05:26:00  10             MR. BUTHOD:  Or pardon me, Baytown as opposed to Baton

11   Rouge.  I would submit, Judge, in a sense I think the Government

12   is being too granular with what the suggestion is about the

13   standard for Bestfoods.  I think the Fifth Circuit agrees with

14   that.

05:26:12  15             If you look at what the Fifth Circuit said in

16   Geraghty & Miller and if you look at the discussion of Bestfoods

17   itself where the Court says "The definition of operator must be

18   more than just a mechanical activation of promise and values" --

19             THE COURT:  I understand.

05:26:26  20             MR. BUTHOD:  -- it includes the exercise of

21   direction --

22             THE COURT:  No, I understand that, too.

23             MR. BUTHOD:  -- or activity.

24             And the same way with Geraghty & Miller, they

05:26:31  25   talk about a nexus and control over the facility operation and

1  not some narrow description of control over specific waste

2  control operation.  I mean, it's a --

3          THE COURT:  To oversimplify the arguments, you guys

4  are accusing the Government of being too granular and insisting

05:26:53  5  on something amounting to physical operation.  The Government is

6  accusing you of being too global and generalized and jumping

7  from the undeniable characterization that the Government had

8  certain powers under the war regulations and it exercised them

9  and it made certain directives that -- either through contract

05:27:21  10  or other incentives were required to be followed.

11          And the Government is accusing Exxon of moving

12  from those facts to the proposition that specific facilities

13  were, therefore, operated by the government; and there's -- I

14  mean, I think those are the bookends of the positions.

05:27:46  15          MR. BUTHOD:  Understood.  I would just submit,

16  Judge, that that --

17          THE COURT:  The battle is over where the details

18  disclosing the factual records lead us to land.

19          MR. BUTHOD:  And to be clear, we satisfy Bestfoods.

05:27:58  20  We talk about it's a different relationship between a parent and

21  a sub --

22          THE COURT:  No, I understand.

23          MR. BUTHOD:  -- and between the government and an oil

24  company during the war.

05:28:03  25          THE COURT:  Right.  And I don't know how much you

1   intend to press your agency theory here.  I have to say that I

2   found that a stretch.

3          MR. BUTHOD:  I don't think it necessarily requires an

4   agency finding.

05:28:14   5          THE COURT:  I'm not saying it does.  I'm not saying it

6   does.  You asserted that as a separate ground for anchoring

7   liability findings.

8          MR. BUTHOD:  The language I keep harping back to,

9   Judge, is what the Fifth Circuit tells us in Geraghty & Miller

05:28:27  10   about a nexus between the control and the pollution of the

11   facility.

12          THE COURT:  I understand your arguments, I think, but

13   at least the generalized ones.  I'm working on trying to get my

14   arms around the details.

05:28:40  15          MR. STEINWAY:  Your Honor, there's other language in

16   the Bestfoods case that talks about what is necessary to satisfy

17   the operator standard; and this may go to your question about

18   granularity.  The Court discusses that all you need to do is

19   show it from an organizational sense.

05:28:55  20          The Court -- the Supreme Court went to great

21   lengths to say this does not mean that one has to turn the

22   valves, shovel the dirt, or have a permanently stationed

23   employee there full time.

24          Rather, the Court talks about the Bestfoods

05:29:11  25   standard from looking at it from an organizational business

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  sense, an overriding umbrella sense.  And so the test is really

2  more did the government -- or was there direction and management

3  in conducting of affairs and for more a policy level than from a

4  granular digging the dirt, stationing employees' perspective.

05:29:40  5          One other point that we think is important to

6  note about the Supreme Court case in Bestfoods is the case was

7  remanded back down for further deliberations; and the reason it

8  was remanded back down was there was a gentleman named

9  Mr. Williams.  And Mr. Williams was viewed as a parent -- he was

05:30:00  10  a parent employee who was dictating some policy guidance back

11  down to the wholly-owned subsidiary, albeit, the Bestfoods case

12  was in the corporate parent/subsidiary context.

13          But the point was that the Supreme Court said

14  this kind of eccentric behavior could be the kind of eccentric

05:30:24  15  behavior that would trigger operational control responsibility.

16  And I would analogize that to the government's regulatory

17  program during the war.  That government regulatory program was

18  the -- was, obviously, enormously important.  We needed to win

19  the war.  All bets were off, whatever needed to be done.

05:30:46  20          That is about the most eccentric behavior when a

21  country's security is threatened the next day that one could

22  imagine.  So I would analogize to the Supreme Court's concern

23  about eccentric behavior.  With respect to Mr. Williams, the

24  eccentric behavior of creating the PAW, imposing these far

05:31:08  25  greater regulatory requirements that were never imposed during

1   the peace time as another example of eccentric behavior that the

2   Supreme Court might view as the kind of behavior that would

3   trigger operational control responsibility.

4           The second key legal point that we'd like to

05:31:26   5   bring to the Court's attention is the fundamental concept and

6   CERCLA jurisprudence that in order to determine liability -- in

7   order to determine CERCLA liability, you must look at the

8   totality of the circumstances.

9           And there, the Court in our view, your Honor,

05:31:49  10   establishes a level of CERCLA evidentiary requirements that is,

11   perhaps, somewhat different than other civil matters.  In fact,

12   in the Tenth Circuit in the Tosco case, the Court said, "CERCLA

13   liability may be inferred from the totality of the

14   circumstances.  It need not be proven by written evidence."

05:32:11  15           In fact, in that case, your Honor, a wealth of

16   circumstantial evidence would be sufficient to allow for the

17   consideration of the totality of the circumstances.  And so, we

18   think that's an important facet to your evaluation of operator

19   liability.

05:32:28  20           I would like to point out two other important

21   legal points on this operator control issue.  Turning to your

22   comment about no wartime special rule case, we think, your

23   Honor, that there is a new special rule for governmental

24   responsibility as operators; and that's embodied in the Township

05:32:54  25   of Brighton case, the Sixth Circuit case.

1          In that case, your Honor, the Sixth Circuit ruled

2     that a governmental entity, federal, state, or local entity, who

3     extensively regulates a facility can be subject to operator

4     liability.

05:33:13     5          It is a post-Bestfoods case so -- in fact, that

6     case cites Bestfoods in coming to its -- in rendering its

7     decision.  But in that case, the Court said if a governmental

8     entity is extensively regulating a facility, i.e.,

9     macro-managing that facility, that governmental entity should be

05:33:39    10     subject to CERCLA operator liability.

11          In fact, Justice Moore -- Judge -- Justice Moore

12     in her concurring opinion differentiates between the police

13     powers that a local entity or local sovereign may have and the

14     level of regulatory control that would be sufficient to trigger

05:34:01    15     CERCLA operator liability.

16          And here, we submit, your Honor, that extensive

17     regulation is clearly the case.  You had the PAW imposing again,

18     as I mentioned, Recommendation Number 8, Recommendation Number

19     16.  In fact, overall, the PAW had 80 directives that they

05:34:21    20     imposed on industry during -- on the avgas industry during World

21     War II.

22          Certainly, that should be sufficient to suggest

23     extensive regulation and to satisfy the Brighton test for

24     operator liability in the context of governmental entities and

05:34:41    25     their involvement in facilities.

1    What we think is very interesting is what we
2    point to in our papers, your Honor, about what we call the 50
3    codimer example.  What we mean by that was there was an instance
4    during the war at Baytown where the thought was, given that
5    since refineries are so complex and if you modify one little
6    tilt of the oven it will generate a whole new stream of products
7    on the output, there was thought given by Humble to change the
8    output of the refinery to restrict -- to cut back 50 barrels per
9    day of codimer.

10   Humble was very concerned that if they kept on
11   making this codimer, one of the byproducts that naturally comes
12   out is residual fuel oil.  Now, Humble was running out of
13   capacity to store residual fuel oil.  So they were worried "If
14   we keep on making codimer, we're not going to have a place to
15   put the residual fuel oil anymore."

16   So when the government -- when this was broached
17   to the government, the government said, "We don't care that
18   you're only making 50 barrels per day more of codimer.  We want
19   you to make as much codimer as you possibly can; and if you make
20   a lot more residual fuel oil, we'll find a place to put it."

21   So that's a very good example of the government
22   involvement in macro-managing the facility.

23       THE COURT:  What is macro-managing?  Give me a
24   definition.  I can find a definition of micro-managing.  But
25   what is macro-managing --

1          MR. STEINWAY:  I believe, your Honor --

2          THE COURT:  -- and what's the relationship of

3     macro-managing to operator and where will I find that?

4          MR. STEINWAY:  Well, I think the term is used in the

05:36:36   5     Brighton case so I think --

6          THE COURT:  I know.  I know.  And without explanation

7     or definition that I could really make a whole lot of

8     generalizable sense out of.  So it's a nifty little term.  It's

9     cute.  But what does it mean?

05:36:51  10          MR. STEINWAY:  It means substantial control.  I think

11     macro-managing --

12          THE COURT:  What's the difference between -- I mean,

13     micro-managing means substantial control.  What's the -- is this

14     less substantial but still substantial control?  Is it

05:37:04  15     substantial but not detailed?  Is it -- I mean what -- orient me

16     here.

17          MR. STEINWAY:  I think, your Honor, macro-managing is

18     more going to the question of granularity.  I think the Court in

19     Brighton recognized that macro-managing means at the policy

05:37:19  20     level, at the business management level.  You are dictating --

21     you are conducting managing affairs of the company.

22          I think macro-managing goes more to the affairs

23     of the company.  Micro-managing goes more to actually who's

24     shoveling the dirt, who is digging the trench, how many people

05:37:37  25     you have there?  To me, macro-managing --

1          THE COURT:  So macro-managing is what a CEO does?

2          MR. STEINWAY:  Or in the governmental context imposing

3    regulations such that the government has stepped in the shoes of

4    a private enterprise.

05:37:57    5          THE COURT:  What part of the private enterprise?

6          MR. STEINWAY:  The business -- at the management

7    level.

8          THE COURT:  That's my question.  Management of a

9    facility like these is complicated.  And so then -- and it's

05:38:18    10   management of the entire company, management of the facility,

11   management of the pollution control of the facility?  I mean,

12   you got to keep going down.  So where does macro-managing in the

13   sense of overall policy setting, where does that lead you to

14   conclude that specific decisions affecting pollution management

05:38:46    15   and control at particular facilities at particular times are

16   being assumed by this regulating agency?

17          MR. BUTHOD:  I guess --

18          THE COURT:  That's what I'm trying to figure out.

19          MR. BUTHOD:  I understand the question, Judge.  I

05:39:00    20   guess the way I would submit it is as follows:  If the

21   government through the PAW is dictating input and output, here's

22   what you need to make next year, here's where you're going to

23   get your raw products --

24          THE COURT:  Facility by facility?

05:39:14    25          MR. BUTHOD:  By facility, by refinery, or by the

1 complex in Baytown.  -- then they don't have to manage pollution

2 controls at the facility.  Well, that would be -- again, to take

3 the <u>Brighton</u> terminology, that would be micro-managing.  But

4 dictating price, input/output, this is what we expect this

05:39:26  5 refinery to do next year, it no longer has a corporate free will

6 of its products.

7          THE COURT:  But wait.  I understand that there is

8 specific instances you point to where that directly -- where

9 those allocation decisions, if you will, directly impacted the

05:39:48 10 ability to put specific controls in place; and the most clear

11 example of that is at Baton Rouge and the separator; and we

12 talked about that a little bit.  But I'm still struggling with

13 this step from here are the amounts, here's the price, here's

14 your customers, on the one hand, and here are the specific

05:40:22 15 choices you must make as the owner of the facility to achieve

16 those goals.  You know, clearly, those specific decisions amount

17 to operating that can affect pollution directly.

18          But what you're telling me is that without making

19 those decisions by simply setting the "Here's the output, here's

05:40:53 20 the price, here's the customers," that so directly affects the

21 choice of resource allocation that you don't have to exercise

22 more granular powers to be an operator.

23          MR. BUTHOD:  Absolutely.  I think that's the nexus

24 between -- a nexus between --

05:41:10 25          THE COURT:  But I guess that -- but you know, that's

1  what I'm struggling with because it seems to me to be a huge

2  gap.  I mean, if all Humble did at the Baytown facility was to

3  send out a list to pass out to its unit heads, the guy who runs

4  each of the operating units within the plant, within the

05:41:40  5  refinery, and said, "Here's our requirements and the limits on

6  what we can charge and who we can sell to.  Go do it," nothing

7  would happen.

8           I mean, that's not specific direction of choices

9  to be made to comply with those goals and limits.  So what I'm

05:42:06  10  trying to grasp is what the government does beyond saying,

11  "Here's how much you got to make.  Here's the price limit on

12  what you can charge and here's who we want you to sell it to,"

13  what the -- whether that is sufficient for operation -- for

14  operator when it seems to me that there's a big gap of specific

05:42:34  15  directive steps and choices that have to be made at a more

16  granular level to operate.

17           MR. BUTHOD:  Absolutely.  I guess that's where we come

18  into the notion that I don't think --

19           THE COURT:  So you think they both are operator

05:42:51  20  functions?

21           MR. BUTHOD:  The Fifth Circuit talks about

22  macro-management.  The Fifth Circuit talks about nexus of

23  control of the operation.

24           THE COURT:  Right.

05:42:58  25           MR. BUTHOD:  Frankly, Judge, this may be unhelpful to

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    anyone else in this room but I think of it by rough, rough

2    analogy, it's like a concept of field preemption.  During the

3    wartime --

4         THE COURT:  Oh, that's so unclear by itself, an

05:43:10    5    unclear doctrine to make something confusing more confusing.

6         MR. BUTHOD:  Fair enough.  But just the notion that

7    during the wartime because the manufacture of avgas and the

8    enormous commitment required by the refineries, yes, I think

9    Judge Kelleher had it right and I think the Ninth Circuit, Judge

05:43:26    10    Fletcher, had it right, irrespective of whether it was an

11    arranger just because the waste was disposed of off-site.

12         They had it right in discussing that that control

13    was -- and I won't say the analogy -- was effectively the

14    government operating the industry of the manufacture of avgas,

05:43:44    15    and it doesn't require a valve turning or a decision about a

16    master --

17         THE COURT:  No, I understand that.  But I don't think

18    the Government is, in fairness to the Government, taking the

19    position that government employees had to be out there at the

05:43:58    20    plant checking the valves, turning on the -- turning the

21    handles, priming the pumps.  I don't think the Government's

22    taking that position.

23         I think the Government and you are both

24    struggling with this -- with having to put flesh on the

05:44:19    25    macro-managing bones, and I understand that there can be

1  different levels of operator and there can be more than one

2  operator.  And to some extent, what you are saying is that they

3  were an operator but we, of course, were, too; and that's really

4  where we're all trying to -- and we've already in a sense moved

05:44:42  5  to allocation.

6          MR. BUTHOD:  And the only thing I would add --

7          THE COURT:  Am I right?

8          MR. BUTHOD:  Yes.  I think the only thing I would add

9  to what the Court just said is we're also struggling because,

05:44:53  10  remember, if we are pressed for specific examples, everyone in

11  this room is limited by what the National Archives happens to

12  still retain from what was taking place in 1943.  So it becomes

13  kind of --

14          THE COURT:  Welcome to the world of law.  We're always

05:45:05  15  limited by the facts that we have evidence available to prove.

16  This is complicated because we're looking so far back in time.

17          MR. BUTHOD:  Agreed.

18          THE COURT:  That's all.

19          MR. BUTHOD:  That's why I think details at some point

05:45:14  20  become unhelpful to say, "Oh, I need to see more letters like

21  this," et cetera, et cetera.

22          MR. STEINWAY:  Your Honor --

23          THE COURT:  You know, I got to say you don't have a

24  lot of live witnesses who have clear memories of what happened.

05:45:26  25  That, I get.

1          MR. STEINWAY:  I understand.

2          THE COURT:  But these people were great record

3 keepers, great record -- they were great record generators.  And

4 I'm not persuaded by this notion that there was a wholesale loss

05:45:42   5 of important papers.

6          MR. BUTHOD:  No.

7          THE COURT:  I think we got lots and lots and lots of

8 documents as evidenced by the huge amount of materials that your

9 expert historians were able to access and spent lots of your

05:45:59  10 client's money to explain to me.  I don't really -- I'm not

11 persuaded by the explanation that the absence of examples is due

12 to the lack of presently available information that might have

13 been available at an earlier time.  I don't think that that's

14 sufficient.

05:46:23  15          MR. STEINWAY:  Your Honor, to put a little more flesh

16 on the bones, as you mentioned, in terms of the macro-managing

17 issue, the regulatory programs we've been talking about are

18 really just the tip of the iceberg.  There are a lot of

19 additional things that happened to evidence the government's

05:46:40  20 control.  Let me point out a couple more to you.

21          THE COURT:  Okay.  Are we back in Baytown now?

22          MR. STEINWAY:  Yes, ma'am.

23          THE COURT:  Okay.

24          MR. STEINWAY:  First one is the planned blending

05:46:48  25 programming.  Albeit, you've mentioned a lot about price

1   direction; but all these facilities were now subject to what the

2   PAW has called the planned blending program.  Every month these

3   facilities were required to submit monthly and daily reports,

4   tell the government what they planned to do, what -- what

05:47:12   5   they're going to do in response to the government dictates.

6               The government would tell them, "Okay.  Here's

7   every little piece of the puzzle that we want you to use as part

8   of the planned blending program."  They implemented this by

9   telegrams, and we pointed out a number of these telegrams, your

05:47:30   10   Honor, were on a daily basis to implement the requirements of

11   these regulations.

12               The government would on a moment's notice send a

13   telegram to Baytown or Baton Rouge saying, "Change your product

14   mix.  Now we want you to make more 80 octane gasoline.  We don't

05:47:50   15   want you to make Navy special fuel oil anymore."  So there was

16   constant every day, not -- a substantial number of telegrams.

17   To compound that, there were inspections by the government.  The

18   government would send cadres of engineers down to facilities to

19   specifically change the makeup of those facilities.  They would

05:48:13   20   come in to troubleshoot our production, that those engineers

21   didn't like --

22               THE COURT:  The Government responded that this was to

23   ensure compliance with standards and contractual -- with broad

24   contractual requirements and points to case law saying that that

05:48:29   25   kind of monitoring for quality or standard compliance is not

 1  adequate to confer operator status.

 2           MR. STEINWAY:  And your Honor, the example that the

 3  Government gives, coincidentally, is the example of an

 4  inspection a month after the war when certainly --

05:48:46  5           THE COURT:  No, I understand that.  But what about

 6  their point that to the extent the contract gave the government

 7  the authority to have those kinds of inspections -- and we all

 8  know that they're common in refinery contracts and I assume were

 9  then.

05:49:04  10           But let's assume the authority was exercised,

11  that they came in and inspected to be sure that compliance with

12  quality control was maintained and with -- output requirements

13  were maintained.  Is that sufficient for operator status?

14           MR. STEINWAY:  In our view, your Honor, from the FMC

05:49:27  15  criterion -- we haven't talked about the FMC case yet.  But yes,

16  indeed, that was one of the compelling factors in the Court's

17  decision in FMC in the Third Circuit.

18           THE COURT:  Well, here again, we have a continuum --

19  and I'm familiar with the case, of course; but we have a

05:49:41  20  continuum between the plants where the government had personnel

21  present for permanent or extended periods, present and

22  exercising significant authority.  So we got that on the one

23  hand.

24           And then we've got -- not at the Baytown

05:50:00  25  refinery.  And then we have more sporadic parachutings in

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  inspection and departure.  Somewhere clearly having personnel on

2  site with continuing oversight responsibility and authority is a

3  more persuasive case for indicia of operator authority that was

4  being exercised than some periodic parachute in and then inspect

05:50:34   5  and depart.

6              So are you telling me that the parachuting

7  approach is as much a factor in -- or as persuasive a factor in

8  finding operator status as a more permanent presence and

9  oversight authority?

05:50:55  10             MR. STEINWAY:  Your Honor, at the Plancors, there were

11  governmental officials stationed permanently.

12             THE COURT:  I understand that.

13             MR. STEINWAY:  And at the Baytown Ordinance Works

14  where they made the toluene --

05:51:04  15             THE COURT:  Right.

16             MR. STEINWAY:  -- it was treated more like a fort.

17             THE COURT:  You're talking about BOW.  I like that.

18             MR. STEINWAY:  But I think you need to look at it,

19  your Honor, in terms of the overall indicia control; and the

05:51:20  20  best case that's really quantified this issue is the FMC case.

21  In the FMC case, the Court found substantial control and how

22  much -- I think some of the questions you're asking, your Honor,

23  with all due respect are questions how much is necessary to

24  trigger this operational control.

05:51:36  25             THE COURT:  You know, judges hate it when you say

1  "with all due respect."

2          MR. STEINWAY:  I'm sorry.

3          THE COURT:  We hate it because, you know, we know what

4  it means.  Keep going.

05:51:46  5          MR. STEINWAY:  In the FMC case, the Third Circuit said

6  that there were four basic indicia of control when the

7  government told them what product to make, the level of

8  production, to whom the product should be sold, and the price;

9  and we can talk about the six cents per cost of profit that

05:52:09  10  Exxon got.  But those were the four basic indicia of control.

11          And where we strongly disagree with the

12  Government is the Government says that FMC is an outlier after

13  Bestfoods.  And that's very far from the case.

14          THE COURT:  Well, I understand your legal arguments

05:52:26  15  here, but I think I'm asking a slightly different question now,

16  and I understand your argument that FMC supports the position

17  that if the government did nothing other than set these output,

18  price, and customer designation requirements, that would be

19  enough.  But you're also telling me -- that's what I hear you

05:52:48  20  just said.

21          MR. STEINWAY:  Yes, your Honor.

22          THE COURT:  But you're also telling me that this

23  inspection authority added to those basic indicia of control

24  cements the deal.

05:53:02  25          MR. STEINWAY:  We have more, your Honor.  Not only the

1  inspection authority but the fact that the government decided to

2  site the Plancors adjacent to the refinery and added -- changed

3  the makeup of these facilities --

4      THE COURT:  Tell me what the inspection authority

05:53:19  5  does.  Where's the nexus between that and pollution?

6      MR. STEINWAY:  The inspectors were often sent in --

7  the records show the inspectors were often sent in to,

8  basically, troubleshoot if there was a problem in making the

9  particular octane enhancer or the mix between the base stock and

05:53:42  10  the octane enhancer was off.  Where there was too much octane

11  enhancer and not enough base stock, the production engineers

12  would come in and mess and twiddle with the refinery processes

13  to try to put it back in balance.  If there was a breakdown in

14  the piping system, the inspectors came in on a periodic basis,

05:54:16  15  basically, for production troubleshooting.

16      THE COURT:  I understand that.  But again, the nexus

17  to pollution, what you're saying is that -- sort of other than

18  the kind of argument that says it's all connected and the shin

19  bone is connected to the knee bone connected to the thigh bone,

05:54:35  20  I'm looking for a more particularized nexus here.  Where in the

21  record am I going to find that?  It's a big record, I know.

22      MR. STEINWAY:  Well, in some respects, relating to

23  pollution is also modified by having to do with waste disposal;

24  and in our view, your Honor, all manufacturing operations have

05:55:01  25  something to do with waste disposal.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  So we're, basically, arguing that the shin

2    bone is connected to the knee is connected to the thigh bone,

3    that is, everything has to do with everything?

4          MR. BUTHOD:  I think it's a little stronger than that,

05:55:14    5    Judge, because the Fifth Circuit says control over the activity

6    causing pollution.

7          THE COURT:  So every activity in these plants in some

8    way causes pollution?

9          MR. BUTHOD:  The significantly --

05:55:25    10         THE COURT:  The manufacturing?

11         MR. BUTHOD:  -- the enormously increased manufacture

12    of avgas --

13         THE COURT:  Uh-huh.

14         MR. BUTHOD:  -- which is not what the plant's

05:55:32    15    originally designed to do --

16         THE COURT:  That's a fair point.

17         MR. BUTHOD:  -- absolutely caused pollution.  That is

18    absolutely the case.

19         THE COURT:  In every aspect of the refinery

05:55:40    20    processing --

21         MR. STEINWAY:  It overtaxed the system.

22         MR. BUTHOD:  And that is, the nexus, if you want to

23    look at Geraghty Miller or control over the activity causing

24    pollution.

05:55:50    25         THE COURT:  All right.

1            All right, go ahead.

2        MR. STEINWAY:  Your Honor, just to close --

3        THE COURT:  I take your point.

4        MR. STEINWAY:  -- on the operator refinery issue --

05:56:00  5        THE COURT:  Yes.

6        MR. STEINWAY:  -- the Government has pointed out a

7 number of examples of cases where they were not held to be

8 responsible as an operator.

9        And to sort of generalize those cases, they're

05:56:17 10 cases where the government had a quality control person at the

11 back end of the production line or in the Litgo case dealing

12 with Columbia aircraft and the government was regulating TCE and

13 the government there was not held responsible as an operator.

14        This situation is far different than those

05:56:40 15 situations.  This is not a situation where the government was a

16 mere interested consumer.  The government worked all the way up

17 the chain in the operator control issues.  They were not just at

18 the back end looking at quality control.  They were on the front

19 end with raw materials, raw supplies, production quotas, coming

05:57:02 20 in -- making waste disposal decisions throughout the chain of a

21 manufacturing process.

22        So we think all the cases that the government has

23 cited for propositions that they were not liable as an operator

24 don't anywhere approach the situation we have here at Baytown.

05:57:18 25        THE COURT:  All right.  So now is it appropriate for

1   me to hear responsive argument from the Government on these

2   points?

3               MR. STEINWAY:  Your Honor, we have not talked about

4   operator liability with respect to the Plancors but --

05:57:30   5               THE COURT:  That's fine.  I understand.  But there's a

6   different arrangement there.  So keeping these distinctions

7   before us, perhaps, it would be helpful at this point.

8               MR. ROWE:  Your Honor, we're happy to do it either

9   way.  Our argument is actually organized by, I guess, legal

05:57:46   10   topic, operator --

11               THE COURT REPORTER:  I can't hear you.

12               MR. ROWE:  We would be happy to let Exxon go ahead and

13   finish, if they would like.

14               THE COURT:  That's fine.  That's fine.

05:57:55   15               Keep going.

16               MR. STEINWAY:  Your Honor, with respect to the

17   question of operator liability for the Plancors in holding the

18   government responsible as an operator under 107(a)(2), the

19   government has admitted that they are liable as an owner under

05:58:17   20   107(a)(2) in the first place.

21               Now we'll turn to the question of operator

22   responsibility.  And there, your Honor, we submit that the

23   operator responsibility is even greater than at the refinery

24   level.

05:58:34   25               For the rubber industry -- these Plancors were

1  facilities used to construct components of rubber or rubber

2  products.  At Baytown, for example, there's a butyl rubber

3  Plancor that is lower quality rubber than the butyl-S copolymer

4  plant that is not the subject of the litigation but it is a

05:58:58  5  rubber product.  And the other Plancor is a butadiene Plancor;

6  and basically, you combine butadiene with styrene to make a high

7  quality rubber.

8            Both of those facilities were owned by the Rubber

9  Reserve Company and that -- and they were part -- and the

05:59:17  10  contracts were let by the Defense Plant Corporation.  There was

11  no rubber industry before these Plancors were built.

12            The United States faced the undaunting prospect

13  of having to develop overnight a synthetic rubber industry when

14  we knew the Japanese had controlled literally 90 percent of our

05:59:38  15  rubber production overseas during World War II.  We had no

16  longer any access to natural rubber supplies.  We had to create

17  our own natural rubber industry.

18            And Exxon, albeit, was one of the leaders in

19  converting petroleum byproducts into rubber goods.  There were

05:59:56  20  other ways to make rubber; but really, nobody had made rubber

21  from petroleum byproducts before and Exxon and their

22  predecessors were the first.

23            So in terms of creating an industry and

24  controlling what's going on, this is the quintessential example

06:00:13  25  of government control.  They literally built this industry

1   overnight.  Rubber, indeed, as we discussed earlier, your Honor,

2   was one of the, perhaps, two most critical essential materials

3   during World War II, avgas being the other, rubber being the

4   other.  That's why there were separate governmental agencies

06:00:32   5   just regulating those specific products per se.

6                While you've mentioned your views on our agency

7   argument earlier --

8                THE COURT:  I'm just skeptical.  I'm not ruling.

9   Please don't misunderstand me.  It seemed like a stretch.

06:00:53   10                MR. STEINWAY:  Your Honor, I would like to point out

11   to you -- and we have in the record -- and I'm going to mention

12   this in a moment.  This is a copy of the manual of

13   administrative procedures.

14                THE COURT:  Okay.

06:01:00   15                MR. STEINWAY:  And in that manual, if you take a

16   look -- we will concede, your Honor, that the word "agent" is

17   not used in the operating agreements that govern the activities

18   of the Baytown Plancors in contrast, for example, to the agency

19   word that's used in the Dow plant -- in the Plancors for Dow in

06:01:24   20   the Ninth Circuit.

21                However, as a practical matter, Humble was the

22   agent of the United States and these documents show that.  For

23   example, if you take a look at the manual of administrative

24   procedures that guided all of these Plancors and you turn to --

06:01:40   25   I just picked one representative example of the -- this manual

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  is the manual that guided the operations of the Plancors at

2  Baytown as well as Baton Rouge.

3              And the page number -- the Bates Stamp page

4  number for the record is BAYC, four zeros, 9463.  It's page 11,

06:02:07  5  your Honor, of the manual; and I thought this is a very good

6  representative example of the typical treatment -- or the

7  typical categorization that the government viewed Humble in

8  operating these Plancors.

9              It says here in discussing forms prescribed

06:02:22  10  and/or approved by the Rubber Reserve Company in Section 501:

11  "Operator shall use the form of purchase order prescribed on RUS

12  Form 62 for all purchases which are made as agents for RRC."  So

13  while the word "agent" may not actually be in the contract per

14  se, your Honor, Humble clearly held themselves out as the agent

06:02:50  15  for the Rubber Reserve Company.

16              These documents specifically prescribe them to be

17  the agent for the Rubber Reserve Company.  In fact, there are

18  documents known in the record where Humble held themselves out

19  as the agent for these Plancors.  When they were purchasing

06:03:06  20  sewer pipe, when they were handling waste disposal activities at

21  these Plancors, the term "agent" is used to describe the

22  capacity of Humble or when Humble is shipping the rubber

23  products from those Plancors or when Humble is purchasing the

24  raw materials, naphtha, that is used for the Baytown Ordinance

06:03:31  25  Works, in all those circumstances, your Honor, the record shows

1  that Humble was categorized as the agent of the government for

2  purposes of conducting those activities.

3          We tried to lay out, your Honor, in these papers

4  three criteria that we believe govern the agency relationship.

06:03:48  5  Those criteria are as follows:  one, that the parties consented

6  to the situation that they were involved with.  And that's

7  certainly the case.  We had an operating contract.

8          Second of all, the second criteria is the

9  government controlled all of the activities.  Well, certainly,

06:04:07  10  the government controlled all the activities at the Plancors.

11  They have this manual that's yay thick telling Humble how to

12  conduct all kinds of activities from monthly and daily reports

13  to purchasing equipment.  Anything above a prescribed level had

14  to get governmental approval as a matter of course to do

06:04:27  15  anything at any of those Plancors.  So certainly, the government

16  controlled the activities.

17          And the final criteria for agency responsibility

18  is that this activity was conducted entirely for the benefit of

19  one party, here in this case, the Government.

06:04:43  20          THE COURT:  What's your best case for transferring

21  common law agency principles to this context?

22          MR. STEINWAY:  Well, we've cited several cases in our

23  papers, your Honor.

24          THE COURT:  I know.  What's your best case?

06:04:55  25          MR. STEINWAY:  We feel this is our best case.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  This -- okay.

2          MR. STEINWAY:  I don't have the names readily at hand.

3          THE COURT:  All right.  All right.  Well, perhaps,

4     while the Government's putting their argument before me, you can

5     take a look.

6          MR. STEINWAY:  One other key facet about these

7     contracts that we think support to bring to your attention is

8     that all of the costs of waste disposal, all of these costs were

9     borne by the government and added criteria to the agency

10    relationship.  It's almost equates -- in our view it almost

11    equates to an indemnity because, here, the government agreed by

12    contract to assume all of the costs and responsibilities for

13    those operations.

14          So we think that's an added feature that adds

15    emphasis to the agency argument.  As a practical matter, the

16    Courts have already ruled that the government is an operator in

17    a Plancor situation.  In the Ninth Circuit, Cadillac Fairview,

18    at the Dow facility, the styrene facility, the Court ruled that

19    Dow was an operator of a Plancor and subject to CERCLA 107(a)(2)

20    liability.

21          Similarly, in FMC dealing with another Plancor, a

22    government-owned facility, there in that case the government was

23    viewed again as an operator of a government-owned Plancor

24    facility.  So we think the precedent has already been set by the

25    Third Circuit and the Ninth Circuit.

1          Having said that, taking a look at the specific

2     operational control factors that would influence your decision,

3     your Honor, on operator control --

4          THE COURT:  Yes, sir.

06:06:41    5          MR. STEINWAY:  -- here again, all of those factors are

6     satisfied if nothing more than even better than at the

7     refineries because here the government controlled the product.

8          They said for sure that the only thing that could

9     be made is butadiene or butyl rubber.  The government set the

06:06:57   10     production levels.  The government set the pricing.  And the

11     government said, "Here's the market.  Here's where you sit."

12          Admittedly, these were all in a contract.

13     Admittedly, these were all in an operating contract.  But the

14     fact of the matter is that contract was a codification of the

06:07:14   15     government's requirements.  Essentially, the government said,

16     "We're requiring your cooperation.  We're requiring you do this.

17     And yeah, if you need a contract as a matter of corporate

18     formality, we'll enter into a contract as a matter of corporate

19     formality" but the fact of the matter is the government would

06:07:33   20     have instituted this regardless of whether or not they had a

21     contract or not and they would have seized the facility as we

22     discussed earlier, your Honor.

23          A couple of other key points to bring to your

24     attention regarding the operational facets of these Plancors.  I

06:07:51   25     mentioned earlier all actions were -- all actions taken in any

1  of these Plancors had to be approved by the DPC, the
2  governmental agency.

3          Now there were some instances where if the
4  expenditures did not exceed some minimum threshold, there was
06:08:09  5  not any governmental regulatory requirement for approval; but by
6  and large, almost all substantial capital expenditures at these
7  plants had to be subject and approved by the government; and
8  there were instances where the government would deny these
9  expenditures for various and sundry reasons.

06:08:27  10          So another key point that you've already
11  mentioned, your Honor, is the stationing of employees at these
12  facilities.  And I'd like to just point out two examples for
13  your consideration.  One, at the Baytown Ordinance Works, which
14  is where they manufactured the toluene there, there's
06:08:48  15  documentation in the record which shows that the Humble folks
16  were always concerned about getting routine daily orders from
17  the ordinance department.

18          And they were always complaining about having --
19  and the quote goes to having to send orders back to St. Louis in
06:09:08  20  response to the Ordinance Works.  It shows again a constant
21  presence of the governmental employees at these facilities
22  embarking on orders, directives, managing, conducting of
23  facilities.

24          At the Baytown facility -- at the Baytown
06:09:23  25  Plancor, for example, there was a permanently stationed

 1  employee; and we've put in the record a quote:  that the

 2  employee observed -- one day the employee was observing, as one

 3  example, private employees leaving work early.  That's just one

 4  example of what -- we tried to use that as one example of

 5  government employees exercising some kind of supervisory

 6  capabilities over these Plancors.

 7          What I think might even really go to the operator

 8  liability concern for these Plancors is two fundamental facts

 9  about waste disposal per se.  The first point is the record is

10  clear -- and we've discussed this earlier, your Honor -- that

11  the Rubber Reserve Company built these facilities in a very

12  hasty manner, as I mentioned earlier like a Model T.

13          And the government intentionally knew that they

14  were building facilities that could not handle adequately the

15  waste.  And they knew that they were influencing waste disposal

16  decisions, and it was a general policy during the war that

17  saving people's lives was, obviously, more important than saving

18  pollution.

19          The other key point about waste disposal I think

20  is confirmed by the government's own auditor himself after the

21  war.  His name was Shepard Powell and we quote from him in our

22  papers.  Shepard Powell was commissioned by the Rubber Reserve

23  Company after the war to conduct an audit of all these Plancors

24  and to decide and determine what kind of recommendation should

25  be made to improve the waste handling processes of these

1    facilities.

2              And during his audit of Baytown and Baton Rouge,

3    Powell expressly mentioned all the deficiencies and problems

4    that he foresaw and saw in running these Plancors.  So we think

06:11:21  5    here that's a very clear example of the government involved in

6    waste disposal decisions and environmental compliance decisions

7    are manifested by their directions and policies in building

8    these Plancors in the first place.

9              We have not talked much about the Baytown

06:11:38  10   Ordinance Works, and I'm just going to briefly mention this.

11             THE COURT:  All right.

12             MR. STEINWAY:  I mentioned earlier, your Honor, that

13   the Ordinance Works was the facility that took naphtha and

14   converted it into toluene.  And 40 percent of the country's

06:11:54  15   toluene was produced by the Baytown ordinance during the war and

16   that was sent over to Ordinance Works to construct TNT.

17             I think that -- I think that there are two points

18   that are worth mentioning there.  And the first point is that

19   the Baytown Ordinance Works -- and I think you mentioned this,

06:12:17  20   your Honor -- almost operated more like a fort than like a

21   chemical plant.

22             The plant was completely -- was completely

23   involved with military folks, military personnel who were

24   constantly at the plant.  And so I think that shows an

06:12:43  25   additional presence even beyond some of the fundamental FMC

1   indicia of control that we talked about earlier.

2                   I thought it was interesting what Cadillac

3   Fairview -- what the Court says in Cadillac Fairview about this

4   in describing the role of Dow as an operator -- as a Plancor

06:13:05   5   operator of the styrene plant.  The Court in the Ninth Circuit

6   said Dow's role was more nearly analogous to that of a soldier

7   than that of a commercial sentence.  And I think that really

8   categorizes the nature of all these Plancors across the country

9   that were involved in building rubber -- manufacturing rubber or

06:13:24   10   rubber components.

11                   The other key point about the Ordinance Works is

12   the records showing very clearly a constant monitoring of the

13   Ordinance Works, rightfully so, was toluene construction for

14   explosives by the ordinance department; and there's substantial

06:13:43   15   evidence to support that.

16                   That sort of really covers in a nutshell our

17   points on operator liability with respect to the Plancors.

18                   THE COURT:  All right.  And at this point, I'm trying

19   to figure out when the appropriate point is, given the

06:13:59   20   government's somewhat different organization of its

21   presentation, for the government to jump in.

22                   MR. ROWE:  Your Honor, I think -- I think I'm having

23   trouble being heard.  So let me do it this way.

24                   THE COURT:  That's very helpful.  Thank you.

06:14:16   25                   MR. ROWE:  I'll apologize to the reporter who I'm

1  already being cruel to here.

2          I can tell you what we have and we can do it any

3  way you would like.  I don't expect to spend a lot of time

4  talking about individual facts at this refinery or that

06:14:29  5  refinery, at this Plancor or that Plancor.  We will talk about

6  them but not at that level of detail because it's really all

7  about the operator theory and how it applies.  And I'm going to

8  try to keep that at a level of generality.

9          And there are a number of other issues that I

06:14:42  10  will cover; and when I get up, I'll give you a who is going to

11  do what kind of presentation.  I would expect that I can do

12  everything I have to say to you in 45 minutes to an hour, and I

13  think Mr. Lynk probably has about a half hour.  But it's not

14  divided up Baytown/Baton Rouge.

06:15:02  15          THE COURT:  Start talking.  Start talking.

16          MR. ROWE:  Would it be okay for us to take a short

17  break before we start?

18          THE COURT:  Sure, that's fine.

19          MR. ROWE:  Five minutes.

20          THE COURT:  Five minutes is great.

21          Is that all right with you, Gayle, or do you need

22  more?

23          THE COURT REPORTER:  If I could have ten, please?  I

24  have to make a couple of phone calls.

06:15:11  25          THE COURT:  Ten minutes, please.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1         (Court recessed at 6:15 p.m.)
 2         (Court resumed at 6:28 p.m.)
 3              THE COURT:  All right.  Are you starting with
 4    operator?
 5              MR. ROWE:  Yes, your Honor.  Actually, I'm starting
 6    with schedule because I'm afraid that I will forget this if I
 7    don't do it right now.
 8              THE COURT:  Okay.
 9              MR. ROWE:  I wanted to let the Court know we -- at the
10    moment I think we have on the docket a final pretrial in the
11    middle of April.  The parties are agreed that that doesn't
12    really fit --
13              THE COURT:  No, I agree with that, too.  I would --
14    I'm going to just sort of suspend the deadlines until we get
15    these resolved, these threshold issues.
16              MR. ROWE:  That will be fine.  We have also talked
17    about an alternative schedule that might work.
18              THE COURT:  All right.
19              MR. ROWE:  If you would like to do it that way, that's
20    fine.
21              THE COURT:  I'll hear that as well.  Are you going to
22    submit that to me in writing?
23              MR. ROWE:  We will once we -- we have a little more
24    work to do on it.
25              THE COURT:  That's fine.
```

1          MR. ROWE:  There is one question about it that we

2     wanted to ask.  We just passed the deadline in March for -- I

3     believe it's stated in the standard order "Motions other than

4     motions in limine."  And we were not clear --

06:30:00    5          THE COURT:  You've already filed those with respect to

6     the threshold issues.

7          MR. ROWE:  So this --

8          THE COURT:  You're fine.

9          MR. ROWE:  Okay.

06:30:08   10          THE COURT:  That's where you are.  That's what we're

11     arguing.

12          MR. ROWE:  We do have a few other motions that we may

13     put -- build into the schedule if and when we do it.

14          THE COURT:  That's fine.

06:30:15   15          MR. ROWE:  If we want to wait and see how this comes

16     out, that's perfectly fine with the Government.

17          THE COURT:  All right.

18          MR. ROWE:  Okay.  So I'm going to take only just a

19     moment to do this, but it would be inappropriate for me not to

06:30:25   20     recognize my colleagues on the telephone.  They are Stephanie

21     Talbert and Erica Zilioli.  I suspect they're probably still

22     listening.

23          THE COURT:  I'm not sure.

24          MR. ROWE:  Mr. Lynk -- I guess they're gluttons for

06:30:39   25     punishment.  Mr. Lynk and I are very much standing on their

1  shoulders doing this argument.  Certainly, I am.

2          THE COURT:  Yeah.  Both sides did very, very fine and

3  thorough briefing.  I appreciate it very much.

4          MR. ROWE:  Thank you, your Honor.  And I did want to

06:30:51  5  recognize we don't have with us today Monique Peoples who, I'm

6  sure, would be here -- hanging in here with us were it not for a

7  death in her family.

8          THE COURT:  I'm sorry to hear it.

9          MR. ROWE:  That's our team.  And I just wanted to let

06:31:04  10  you know who was listening on the phone.

11          THE COURT:  Thank you.

12          MR. ROWE:   Next order of business, apart from I'll

13  try to be as fast as I possibly can --

14          THE COURT:  There's no need to rush.  You came a long

06:31:12  15  way to be here.

16          MR. ROWE:  Thank you.  -- is our division of labor;

17  and I will tell you what I will do and what Mr. Lynk will do;

18  and I will also tell you that if you prefer to do it in the

19  other order, I'll sit down and he can stand up.

06:31:25  20          So, I will take all of the various operator

21  issues and try to squash them together where we can.

22          THE COURT:  All right.

23          MR. ROWE:  I suspect that's where we'll spend most of

24  our time.

06:31:32  25          I also have what we think of as sort of the extra

1    issues in the case.  So I have the -- Exxon's argument that

2    there's only one facility at each site rather than the two that

3    we say are there.  I have the Government's argument about why we

4    think the Court might not want to go setting percentage shares

06:31:49    5    for Exxon now for unknown future costs.  And I have Exxon's

6    argument about adopting Mr. White's allocation method now as

7    opposed to thinking about it later.

8             Mr. Lynk has the nature of the kind of claim you

9    get if Exxon has a 107 claim against us, whether that is joint,

06:32:07    10   several, or whether it's several after the Supreme Court's

11   Atlantic Research decision which I will probably acronym out on

12   you and call ARC at some point.  So if I do, that's the case I'm

13   referring to.

14             And he will also talk about this argument that

06:32:22    15   we've made at Baytown that Exxon claims an (f)(3)(B) case under

16   the AOC; and if they have that, they must use it.  And there's

17   an SOL problem there.  That argument applies only at Baytown.

18             THE COURT:  You know what, you're using way too many

19   acronyms.  You sound like a Government lawyer.

06:32:41    20             MR. ROWE:  I'll try not to do that.  He will talk

21   about the fact that if you have an administrative order that

22   allows you to sue under --

23             THE COURT:  You're talking about the 113 problem?

24             MR. ROWE:  Yes.

06:32:53    25             THE COURT:  Okay.  And that only applies --

1          MR. ROWE:  -- at Baytown.

2          THE COURT:  -- at Baytown.

3          MR. ROWE:  And the other thing I wanted to tell you

4     about that -- he's going to tell you in much more detail -- is I

06:32:59   5     just wanted to note that we have not moved for summary judgment

6     on that.  We're only using that as a manner to resist Exxon's

7     motion for summary judgment.

8               We can skip the page on the map because I thought

9     my colleague on the other side did a fine job of that.  I had a

06:33:14  10     few things.  They're not worth mentioning.  And we'll get down

11     to operator status.

12               The first thing I wanted to talk with the Court a

13     little bit about is the legal standard.  It is, obviously, in

14     dispute here.

06:33:26  15          THE COURT:  Am I turning to the Bestfoods point again

16     -- Bestfoods quote?

17          MR. ROWE:  You certainly can if you would like.  There

18     are, obviously, two possibilities.  Exxon is pressing the FMC

19     standard as continuing to be relevant after Bestfoods.  That

06:33:42  20     test, basically, seems to us to say that there is -- that all

21     facts count, which we agree with, and that there's a point at

22     which the government in its regulatory capacity exercises

23     sufficient influence over industry or a particular plant that it

24     becomes an operator.  It is in a sense, at least as I look at

06:34:05  25     it, a quantitative sort of test; and it's very much a judgment

1  call, of course.

2           The alternative theory is Bestfoods.  We've all

3  read that definition.  So I won't read it to you again.  We

4  understand, I just want to make clear again, that the government

06:34:21  5  doesn't have to turn valves or throw switches in order to be an

6  operator.  Substituting for the plant manager will do nicely

7  under the Supreme Court's test.

8           We're not so sure that requirements, contracts,

9  or control and allocation of raw materials during wartime or

06:34:37  10  regulation of labor market and draft affirmance would satisfy

11  that test.  So the reason that we prefer as a litigant the

12  Bestfoods test is because we think of it as qualitative.

13           It is not -- it still requires judgment,

14  obviously.  All the facts are still fair game, but it is the

06:34:57  15  character of the intrusion in the everyday operation of the

16  plant that seems to control under Bestfoods.

17           So in our view, to be perfectly honest about it,

18  the Third Circuit's test might well allow the government -- is

19  more likely to allow the government to be held liable.  Because

06:35:13  20  of this idea that you can manage the facility or the plant by

21  managing the industry, the Bestfoods test does not seem to go

22  that way.

23           Arguments that --

24           THE COURT:  What about the argument that they're so

06:35:27  25  integrally connected that once you set facility-by-facility

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   limits on -- or requirements for production limits on price and

2   specific permitted --

3            MR. ROWE:  I understand.

4            THE COURT:  -- customers, if you will --

06:35:45   5            MR. ROWE:  Yes.

6            THE COURT:  -- then you have, in essence, dictated

7   enough of the policy or enough of the choices on how to get

8   there that it inevitably affects pollution and inevitably puts

9   you in the position of being an operator, not the only operator

06:36:04  10  but an operator.

11           MR. ROWE:  The best short answer I can give you to

12  that problem is that we don't believe the government typically

13  was doing the things that really are commanding people to do

14  things in a sense plant by plant.  The -- even the production

06:36:22  15  levels at the plants were generally negotiated before the order

16  was issued is my understanding.

17           THE COURT:  Can you speak a little more louder.

18           MR. ROWE:  Yes, I'm sorry.  I'll get a little closer

19  here.

06:36:32  20           So, for example, one of the things we've talked

21  about in this case is the rationing of steel and the

22  government's refusal to approve steel for various projects, and

23  we'll pick up a few knits about that while we're here; but the

24  main points in the context of your question is --

06:36:47  25           THE COURT:  I think that was primarily insofar as that

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  dealt with the Baton Rouge separator issue.

2        MR. ROWE:  That's correct.  That's correct.  And we'll

3  do a little bit of that while we're here so we don't have to do

4  it later.  But in answering your question, the point is that

06:36:58  5  steel was rationed economy wide.  Anybody who wanted to build --

6  and it was rationed because it was in short supply.  So it

7  wasn't just rationed at Baton Rouge or Baytown.  It was rationed

8  everywhere, and that applied to a plant that didn't have any

9  government contracts.

06:37:15  10        Just in passing a couple of minutes about the

11  Baton Rouge situation, I know Mr. Steinway showed you a letter

12  from the Corps of Engineers.  We also, I think, have shown you

13  some evidence that that problem had been around at that plant

14  since the mid-1930s and had not been fixed.

06:37:32  15        There was actually an industrial design for

16  fixing it by 1937 which was not implemented.  As far as we can

17  tell, the only reason that Standard at Baton Rouge sought to do

18  anything about the problem was because the Corps of Engineers

19  threatened to refer them to the US Attorney's Office, I assume,

06:37:52  20  for some kind of nuisance claim.

21        They had a barge spill, an oil spill, into the

22  river; and when they came to look at the barge spill, they found

23  what -- practices that they did not approve of; and they set

24  upon Standard and said, "You better do something about this";

06:38:08  25  whereupon, understandably, Standard came up with every plan they

1  had and submitted it to the government.

2              There was a relatively brief exchange, it

3  appears, between the Corps of Engineers and the folks who had to

4  approve the steel.  They approved one project and didn't approve

06:38:24  5  the other one.  The determination, basically, was that something

6  called the silt treating unit would be adequate and that the

7  master separator could come after the war.  So that's what was

8  done.

9              In addition to that, it's not the case that when

06:38:40  10  steel is denied for a project all progress about environmental

11  issues at the plant had to stop, and we should be pleased with

12  the folks at Standard that during the war they had a waste

13  reduction program that they thought might actually make the

14  master separator unnecessary, that did not require any steel.

06:39:01  15              They implemented it.  It was quite successful and

16  it was later done after the war at Baytown.  It was, apparently,

17  not successful enough because they still built the master

18  separator here.  Shortly after the war, the Corps of Engineers

19  which had set upon Standard -- once they found this oil in the

06:39:19  20  river, within months, I think, of V-J Day, the Corps was faxing,

21  "Okay, when are we going to get this master separator built now

22  because this is still a problem?"

23              And then it takes a long time to get it built,

24  and it's not -- to me, anyway -- I may need to study this some

06:39:41  25  more -- it's not entirely clear why.  There are some indications

1  of some engineering problems with silt.  That might explain why

2  it did not get done within the approximately one year that

3  Standard promised the Corps they would have it done.

4           But it did take seemingly longer than that would

06:39:59  5  explain, and that's about the most I can give you with that.

6           THE COURT:  Okay.

7           MR. ROWE:  Okay.  So back to actual control and

8  Bestfoods and the test.  So what I want to do is just briefly

9  give you a sense of the problems that the government has or the

06:40:17  10  disagreements that we have with the actual control test.

11          The first one is if I'm at all right about this

12  difference in the test or any other difference in the test, it

13  seems to us that when the Supreme Court speaks to the issue,

14  that's the end of it.  The test is what the Supreme Court says

06:40:33  15  it is.  And while we certainly don't mean any disrespect to

16  Courts that have found FMC to be instructive or interesting or

17  otherwise useful afterwards, if they are saying that they're

18  adopting a test that does not meet the same standard the Supreme

19  Court has stated, we respectfully disagree.

06:40:53  20          We think Miami Dade got this right; that the

21  Supreme Court's test while it doesn't formally overrule any of

22  the prior standards, it does effectively replace them.  And that

23  would include the actual control test which you'll see in FMC

24  comes from the Landford-Coaldale case which is actually sort of,

06:41:16  25  ironically, a veil-piercing corporate case.  So they borrowed

1   the standard from corporate veil-piercing and tried to fit it

2   here.  And it probably works better than macro-management, but

3   it's got its problems I think.

4            The Ninth Circuit is still out there holding onto

06:41:31   5   the authority-to-control test which really scares those of us

6   who are sovereigns because that would sort of be a problem for

7   us.  We think all of those have been replaced by the Supreme

8   Court's test in Bestfoods.

9            In addition to that --

06:41:45   10            THE COURT:  In Bestfoods?

11            MR. ROWE:  Yes, in Bestfoods.  We absolutely think

12   Bestfoods is the test.  And we're going to talk a little bit

13   about some of those details as we go.

14            In addition to the fact that we think the Supreme

06:41:58   15   Court has spoken, we have a sort of fundamental analytical

16   problem or two with the actual control test, and that is, that

17   it seems to us that the actual control test, basically,

18   conflates CERCLA allocation in which Courts are given very broad

19   discretion.  You can use the Gore factors or the not Gore

06:42:16   20   factors or you can use the status, whether they're an operator,

21   an arranger, or an owner or you cannot use that.  You have lots

22   of discretion when there's the allocation once people are

23   liable.

24            The problem with this test is it effectively

06:42:30   25   conflates that with what is, basically, a simple question of

1   statutory construction that does not involve equitable

2   discretion.  It's just a question of what the word "operator"

3   means in the statute.

4                    In addition to that problem, there is the

06:42:43   5   additional problem of the fact that we learned in FMC, somewhat

6   to our chagrin, that -- and I think the Court was probably right

7   about this -- that we argued that there was a sovereign immunity

8   problem and that the rule should be construed strictly and the

9   Government should get a different standard that actually helped

06:43:04   10   us rather than the one you were talking to Mr. Steinway about a

11   few minutes ago.

12                    The Court didn't agree, and it cited Indian

13   Towing in the Supreme Court and, basically, said, "Look, the

14   waiver is clear and the liability, basically, is the scope of

06:43:17   15   Section 107."  So whatever those standards are, if the

16   government meets those standards, they're liable.

17                    And that means when we're construing Section 107

18   that we have to pay at least some attention to the idea that

19   waivers are strictly construed, we would contend.  I'm not

06:43:32   20   suggesting -- I'm not arguing with the Supreme Court's -- I'm

21   sorry, with the Third Circuit's suggestion that the waiver is

22   what it is.

23                    But I am saying there has to be some echo of that

24   out here because if we just keep expanding Section 107 terms

06:43:47   25   more and more broadly in some of the ways that we see Exxon

1  wanting to do, we're not only doing that in derogation of the

2  ordinary rules of statutory construction where we read the plain

3  words, we're also doing it in derogation of the rule that strict

4  construction applies to waivers.

5  06:44:02          And with a bit of help from Chief Judge Sloviter

6  in her FMC dissent -- I didn't get to read these cases but I

7  want to at some point -- you'll see in there -- I think it's 29

8  F3d at 850 -- she actually looked up the cases and found some

9  that say what happens when strict construction of the waiver

10 06:44:25 meets admittedly liberal remedial sense of CERCLA?  And the

11 answer is strict construction wins, apparently.  I haven't read

12 the cases, but you might want to -- I certainly want to look at

13 them when I get a chance.

14          Lastly, our problem with actual control is we

15 06:44:40 just think it's a lousy test.  It's not much better than

16 macro-management.  It is very broad.  It doesn't really tell you

17 very much.  It's hard to define.  It's highly subjective, excuse

18 me, and it provides very little guidance to Courts or lawyers.

19          And I'll give you a couple of examples of ways

20 06:45:01 that we think that is true.  One is that you have the FMC case

21 that comes along and seems to think the government is widely in

22 control of everything and says we're liable.

23          Then shortly thereafter, in a series of cases

24 that either seek to distinguish FMC, even though the facts seem

25 06:45:22 to be fairly similar, or adopt the FMC test and nevertheless

1  hold the government liable.  There's a whole series of these.

2  We almost think we have a trend going now with these cases.

3  It's just under the wrong test.

4         So early on, I think before Bestfoods, we had

06:45:39  5  East Bay MUD and Iron Mountain Mines.  The judge in East Bay

6  MUD, I think, went out of his way to try to distinguish FMC.  I

7  leave it to the Court whether that was entirely successful or

8  not.

9         Then we have the defoliate cases, Vertac and

06:45:53  10  Maxus Energy, both of which have lots of government involvement

11  with the plant, both of which seem to nod to FMC, both of which

12  find the government is not liable.

13         There's a good case in the Ninth -- I'm sorry, in

14  the Central District of California in 2009.  That's the

06:46:06  15  Steadfast case you have in our briefs.  It's not a good case in

16  itself.  It's actually an easy case, I think, because the only

17  evidence of government involvement is a safety manual.  It's

18  good because it has a nice list in it of cases that use the

19  actual control test and nevertheless hold the government's not

06:46:22  20  liable, cases like Washington versus United States, the

21  shipyard.

22         Rospatch Jessco is one that I would particularly

23  take a look at.  That's a Korean war aircraft engines case, and

24  there are a lot of facts that are not that different from FMC.

06:46:36  25  And Coeur d'Alene which is another mining case like Iron

1   <u>Mountain Mines</u> but much later.

2            That case is -- I think we have it in the brief;

3   but just in case we don't, it's 2009 WL 3785565 and the

4   discussion begins at page star four.

06:46:52   5            THE COURT:  Okay.

6            MR. ROWE:  I heard Mr. Steinway talk about <u>Township of</u>

7   <u>Brighton</u>.  We have a rather different view of that case than he

8   does.  First of all, we certainly don't think it establishes any

9   new special rule for the government.  It does not purport to do

06:47:08   10   so.  It purports to simply be applying the same rules that have

11   always been applied.

12            But for us, it serves as a good illustration of

13   the problems with <u>FMC</u> and the actual control test.  You have

14   three judges.  You have three opinions.  You have -- I think --

06:47:25   15   I think it was Judge Dowd in the dissent who finally voted for

16   something so that there would be a result.  He actually says in

17   the opinion:  Well, this is all confused but I'm going to vote

18   for this and try to make this case go away.

19            All three of those opinions claim both <u>Bestfoods</u>

06:47:41   20   and the actual control test; and at least, two of them,

21   obviously, come to completely different results.  So we don't --

22   in addition to the fact that we think it's -- the Supreme Court

23   has supplanted it and it's legally wrong and in derogation of

24   the waiver sovereign immunity problem, it's just not a very good

06:48:01   25   test.

```
 1              THE COURT:  In what way is it deficient?
 2              MR. ROWE:  Is it deficient?
 3              THE COURT:  Yes, sir.
 4              MR. ROWE:  We would say that it's -- it's not so much
 5    that it's deficient is that it doesn't help you very much.  It
 6    just allows your Honor or any other judge to make a sort of
 7    vaguely defined judgment about when the government is
 8    interfering enough, even though it may not be running the plant,
 9    that it will be said to be liable.  It makes -- it makes
10    everything completely subjective in our view.  I understand
11    there may be differences of opinion about it, but that's the way
12    we look at it.
13              Does that answer your question?
14              THE COURT:  Yes, I think so.
15              MR. ROWE:  And I may be able to help.  I actually have
16    a little metaphor that I thought I would do.  I will try to do
17    it very quickly.  It's just an example of how this might look if
18    we did it today.
19              So if we take something very familiar like the
20    manufacture of an automobile today, the government has lots and
21    lots of rules even in normal peacetime circumstances that apply
22    to how you manufacture an automobile.  There are safety rules
23    about bumpers.  There are safety rules about air bags now and
24    I-beams on the side of the car.  There are environmental
25    controls, emissions control standards, urea for diesel engines
```

06:48:08 (line 5)
06:48:26 (line 10)
06:48:36 (line 15)
06:48:50 (line 20)
06:49:09 (line 25)

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  and various things for catalytic converters for gasoline

2  engines.

3          Both of those things cut against or at least make

4  it more difficult to comply with a third kind of standard for

06:49:21  5  gas mileage because they make the car heavier but, nevertheless,

6  we're now going to have some rules with some fairly significant

7  teeth about the efficiency of automobiles.

8          In addition to that, the government will impose

9  taxes on automobiles and on fuel.  Some of those taxes are just

06:49:36  10  to raise revenue.  Some of them are, even today, designed to

11  change behavior.  So if you drive a Prius or a Tesla, you get a

12  tax break in much the same way that Exxon's predecessors got tax

13  breaks if they had certificates of necessity that they were

14  doing a product for the war back in World War II.

06:49:54  15          And there, of course, are lots of rules governing

16  behavior on the factory floor.  So the government is going to

17  get involved in the emissions standards for paint booths when

18  you make the car.  They're going to get involved in worker

19  safety rules.  There are all kinds of labor and LRA and LRB type

06:50:10  20  things that you have to comply with in your factory even in

21  peacetime.

22          Many of those rules will change the nature.  They

23  will funnel what a -- an entrepreneurial actor is able to do.

24  And I would suggest that if anybody doubts that, you might ask

06:50:29  25  the CEO of any automobile company how much they would really

1  like to have a single set of safety standards between the United

2  States, Europe, and Japan and a couple of other markets maybe

3  that they would hope would be the same.

4          Some of those rules may be controversial or

06:50:47  5  unpopular.  We had a rule for a long time that at least the gear

6  heads on the sites that I occasionally visit didn't like about

7  advanced headlights.  We had a rule that said you had to use a

8  very standard kind of headlight.  Europe was light years ahead,

9  and this was terrible.  But that was the rule we had.

06:51:02  10          And we have been talking about having a rule

11  about a further percentage of ethanol in gasoline in the winter.

12  That's very unpopular with some folks.  You know, there are

13  arguments that it's not actually environmentally beneficial.

14  There are arguments that it will cause the rubber hoses in cars

06:51:21  15  already manufactured to deteriorate because ethanol is corrosive

16  to rubber, apparently, or this kind of rubber.  And there are

17  even some people on those same sites, which I'm certainly not

18  saying are necessarily authoritative, that say that a marvelous

19  six-cylinder BMW engine in both my car and Mr. Steinway's will

06:51:38  20  actually start to knock if we -- so some of these things are not

21  very -- they're intrusive, they're not popular, and people may

22  not want to do them.

23          And of course, those controls will be tighter

24  even still in wartime.  Fuel will be rationed, all the same

06:51:54  25  sorts of things you saw in World War II.  And yet, I would

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   submit to the Court that no one would seriously contend that the

2   United States Government today is operating the BMW plant in

3   South Carolina.  It's just not.

4           THE COURT:  Is the government telling those plants how

06:52:05   5   much to produce?

6           MR. ROWE:  No.  And I don't believe the government --

7   I mean, I understand there may be a factual dispute about this.

8   It is true that there are -- are documents that say how much

9   plants will produce.  Most of those documents in this case are

06:52:19  10   contracts.  So the government has negotiated with folks -- in

11   the case of the master avgas contract, I think it -- I don't

12   remember if it sets volumes or not but it sets price per

13   volumes.

14           So for the first so many barrels there's one

06:52:35  15   price and then the price goes down a little bit; and if there

16   are labor shortages or other problems, you can get adjustments

17   and renegotiate.

18           Some of the Plancor contracts I think do set

19   amounts, but those are amounts that people have agreed that they

06:52:51  20   can produce.  And I think that, for example -- if I remember

21   correctly, I think it's the Baytown Ordinance Works actually has

22   a clause in the beginning of that contract that you'll see if

23   you take a look that says that in the early parts, before the

24   plant's really up and running, they'll try to make as much as

06:53:06  25   they can and we'll buy it if they can make it.

1          And it's only after they get the plant up and

2    running the way they expect that they sort of -- they have the

3    contractual obligation to make a particular amount.  So I'm not

4    -- I don't think I can represent to you categorically that there

06:53:22    5    are no orders but I think you'll find, if we dig into them a

6    little more, there are requirements.

7          Most of them are in contracts and most of them

8    are negotiated, and I believe my historian would tell you when

9    he gets here -- I'm not sure we've had him put this in his

06:53:36    10    report yet -- that even when there were directives, people went

11    to Washington.  The folks in Washington running the Defense

12    Plant Corporation said --

13          THE COURT:  So again, you're going back to your

14    argument to the fact that there might have been authority to set

06:53:48    15    those directives isn't sufficient absent --

16          MR. ROWE:  Not quite.  But I understand your point and

17    I do agree with you, but that's not -- what I was saying here is

18    more -- even things that look like orders during the war are not

19    necessarily coercive.

06:54:01    20          THE COURT:  So even the exercise of that authority

21    isn't sufficient if it's negotiated?  Is that where you are,

22    bottom line?

23          MR. ROWE:  I'm not sure I was going quite that far,

24    but that's the thrust of what I'm saying, yes.  I'm saying, for

06:54:15    25    example --

1          THE COURT:  Make it as nuanced as you want to but see

2    if you can get -- summarize it for me so I capture your point.

3          MR. ROWE:  No, no.  I think that your formulation is

4    fine.  I'm simply suggesting that -- and there was -- the other

06:54:28  5    reason that orders were commonly issued during this period is

6    because of antitrust problems.  If the government issued you an

7    order to collaborate with your peers in the planned blending

8    program or various other things they were doing, that protected

9    you from antitrust law, which is something people in these

06:54:44  10   industries were very concerned about at the time.

11         So I'm simply -- I guess the shortest version of

12   what I'm saying is everything is not as it appears.  That's all

13   I'm really saying, I think.

14         So I think you might be inclined to ask me -- I

06:55:03  15   think I would if I were the Court -- whether or not the

16   Government's interpretation of Bestfoods then is too

17   restrictive?  Is the government going to get off scot-free all

18   the time?  And the answer to that question is no for two kinds

19   of reasons.

06:55:16  20         The first is we're not arguing that this is some

21   kind of exclusion.  I'm not suggesting that government behavior

22   or even regulation cannot make the government an operator.  I'm

23   just suggesting that it usually doesn't.  And of course, we also

24   have --

06:55:31  25         THE COURT:  Well, I mean, if --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. ROWE:  Sorry.

2          THE COURT:  With all due respect, whether it can or

3    often does not doesn't really help me with understanding whether

4    on this record it did.

06:55:47    5          MR. ROWE:  Yes.  We'll -- I'll be there in just a

6    moment.

7          THE COURT:  Okay.

8          MR. ROWE:  The second sort of -- in fact, we can

9    almost start right now.  The second point I wanted to make about

06:55:58   10   this is that there are cases that have been decided in the

11   record right now where this test would likely produce federal

12   liability, this test being the Supreme Court's test.

13          One of those, I think, is probably Cadillac

14   Fairview.  And I want to talk with you a little bit about that

06:56:16   15   plant because it's a great distinction that -- the things that

16   are going on at the plant are readily distinguished from what

17   goes on with most of the Plancors here.

18          The reason you don't see much about liability in

19   that case, I think, is because the government owned the plant.

06:56:29   20   So it's really just all about allocation once we owned the

21   plant.  I don't think -- I think the Court does find that we're

22   an owner, operator, or arranger; but there's very little

23   discussion about it in the case.

24          What there is the discussion about in the case is

06:56:41   25   the facts.  Here are some facts about Cadillac Fairview as

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    reported by the Court.  The government had a design for these

2    plants.  This was -- I should back up and sort of make a little

3    bit of a concession here.  I agree with Mr. Steinway that rubber

4    was a very big deal during World War II.

06:57:01   5    There are people who would tell you that is

6    second only to the atomic bomb in terms of the difficulty and

7    importance of what was being done.  It was definitely a crash

8    program.  We lost all our natural rubber to the Japanese and we

9    needed to get this done.  Because that was the case, at the very

06:57:20  10    pentacle of the rubber program, as best I can understand it

11    right now, there are some very unusual Plancors.

12    They're not like most of the Plancors in the

13    system.  Those are the agent plants.  And what the government

14    did is it actually hired a bunch of people from the industry to

06:57:35  15    try to figure out how to make the synthetic rubber.  They

16    figured it out.  They ran pilot plants.  This is all reported in

17    the case.  They created these pilot plants.  They figured out

18    which one works the best; and then they said, "That's what we're

19    going to do."

06:57:53  20    So if you were running a styrene copolymer plant

21    for the company, in Dow, for example, here were the rules:  You

22    had to build the plant to the design written by the government,

23    not like here where the company designs the plants.  You had to

24    -- there was a standard operating procedures manual, and I'm not

06:58:11  25    talking about the kind of manual Mr. Steinway is talking about

1    with administrative procedures, I'm talking about which valves
2    to turn, how high to heat this stuff, and how we were going
3    to --
4                THE COURT:  Micromanaging.
06:58:22  5                MR. ROWE:  Yes, that would be fair.  Or technical
6    management might be fair.  And there was a --
7                THE COURT:  That doesn't answer the question.  That
8    may have been sufficient; but if what we have here is fairly
9    characterized as macro-managing, at what point does the
06:58:36 10    Government think it becomes insufficient --
11                MR. ROWE:  Well, I don't know what --
12                THE COURT:  -- for operator liability?
13                MR. ROWE:  I don't have any idea what macro-managing
14    means so I'm not even going to try to speak to that.
06:58:48 15                THE COURT:  Well but I really need you to.
16                MR. ROWE:  Well --
17                THE COURT:  I need the Government's understanding.
18                MR. ROWE:  I think I understand your question, and I
19    will try to answer it.
06:58:52 20                THE COURT:  All right.
21                MR. ROWE:  I just don't know how to do it in terms of
22    macro-managing because I don't know what that means.
23                And I think the simple answer is we go back to
24    Bestfoods.  If the regulations were -- or the behavior that I
06:59:05 25    was just describing in Dow reaches the point where the

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   government is directly involved in the operations of the plant

2   on a day-to-day or week-to-week basis -- and I don't mean

3   turning valves; I mean, you know, managing the plant will do

4   fine -- then we're liable as an operator.  We don't think that

06:59:21   5   happened here, and it's really as simple as that.

6                I don't know how to embellish anymore for you

7   except that we're going to go through some detailed facts here

8   in just a second, and I'll tell you what I think that means.

9                Okay.  So my point about -- kind of like Fairview

06:59:35  10   is, though, twofold.  One is there are places for this rule,

11   this -- what I would -- what Exxon would certainly say is a more

12   restrictive rule to operate; and there's already case law out

13   there with examples of fact patterns where we would still be

14   liable as an operator.

06:59:49  15                The other thing that's interesting about that

16   case, though, is not just Exxon but most opponents of the

17   Government in these cases are very quick to emphasize

18   regulation.  "The government regulated this and forced us to do

19   that."

07:00:04  20                In that Dow situation, if you look at the things

21   I just told you that we required, they were all required by

22   contract.  So if you're really looking to see where the

23   government was an operator, maybe this will be a piece of the

24   answer to your question.  It's probably more often going to be

07:00:22  25   found in a situation where the parties agreed to do it because

1   there's no rule that says if we agree with somebody that we're

2   going to help them run the plant that that doesn't make us an

3   operator.  There's no such rule.  We would be an operator.  And

4   it appears that in practice that's more likely to be the case.

07:00:41   5              So I guess I'll wrap up the legal argument now

6   and we'll get down to the facts with just one thought, and that

7   is, that in the most rudimentary terms, the Government's gripe

8   with the actual control test is that it does not include -- it

9   does not include an "of what" question.  That's what the Supreme

07:01:01  10   Court test adds.  It says you got to be running the refineries,

11   essentially.  That's all it seems to be saying.  We don't think

12   we were running these refineries, and we don't think we were

13   running the Plancors.

14              So now let's talk about some -- now I'm going to

07:01:15  15   switch away from the legal standard; and I will tell you that we

16   believe, notwithstanding our objections to the actual control

17   test, that under any standard, whether it be the Supreme Court's

18   test or the actual control test -- I'm going to leave off the

19   authority-to-control test for the time being; but we don't

07:01:30  20   believe the facts would render us liable in these particular

21   instances as an operator in -- as the several places around the

22   plant will now do.

23              There are a couple of little places I would like

24   to go before we get to the specific facts because this is not

07:01:47  25   something that we are visiting for the first time even within

1    the entire world of CERCLA jurisprudence.  This is something

2    that Courts have needed to address before; and with more thanks

3    to Chief Judge Sloviter who called this to my attention in her

4    dissent in FMC, I wanted to tell the Court about a case that I

07:02:05   5    do not believe is cited in our briefs.

6         It is Lichter versus the United States.  It is in

7    the handout that I just gave you.  It's 334 US 742, and the

8    discussion is at 767 and 68.  It's a 1948 Supreme Court case.

9    It, obviously, has nothing to do with operator liability.  What

07:02:25   10   it is about is a challenge to the constitution of some of the

11   renegotiation -- I'm sorry, the constitutionality of some of the

12   renegotiation acts that came out of World War II about profit

13   and pricing.

14        So the Supreme Court in the process of laying out

07:02:40   15   the fact pattern for that case describes the federal plan for

16   industrial operations during the war as follows.  I'll read it

17   as quickly as I can.  "Laying aside as undesirable the complete

18   governmental ownership and operation of the production of war

19   goods of all kinds, many alternative solutions were attempted.

07:03:00   20   Often, these called for capital expenditures by the government

21   in building new plant facilities.

22        "Adhering, however, to the policy of private

23   operation of these facilities, Congress and the administration

24   sought to promote a policy of wide distribution of prime

07:03:15   25   contracts and subcontracts even to comparatively high cost

1  marginal producers of unfamiliar products.

2          "Congress sought to do everything possible to

3  retain and encourage individual initiative in the worldwide race

4  for the largest and quickest production of the best equipment

07:03:32  5  and supplies.  It clung to its faith in private enterprise."

6          That is not a statement of the Government's

7  position of the case.  It is not a statement from a Government

8  expert.  That is the Supreme Court of the United States less

9  than three years after V-J Day.

07:03:47  10          THE COURT:  So you think Judge Fletcher just blew it

11  in his description?

12          MR. ROWE:  No, I don't.  I actually think Judge

13  Fletcher is pretty close.  I don't think that his treatment and

14  this treatment are particularly --

07:03:57  15          THE COURT:  Tell me what you would reject from his

16  description --

17          MR. ROWE:  From Judge Fletcher's description?

18          THE COURT:  -- and what you would accept.

19          MR. ROWE:  Nothing, nothing.

07:04:03  20          THE COURT:  So you accept both sides of it then?

21  That's pretty good.

22          MR. ROWE:  I'm somewhat surprised -- well, a couple of

23  things about Judge Fletcher's, I think, rather well done

24  treatment about this.

07:04:13  25          THE COURT:  No, I agree.  I thought it was eloquently

1    stated.  I'm just trying to figure out if either side disagrees

2    with any significant part of his characterization.

3              MR. ROWE:  Well, I don't.  So that's the answer to

4    that.  But I also have a couple of observations about it, one of

07:04:27  5    which is that Exxon likes to quote or cite Judge Kelleher.

6              THE COURT:  I know.

7              MR. ROWE:  And if you look at Judge Kelleher's

8    decisions, they are very much not in the same vein as Judge

9    Fletcher's description.  He did not -- he was, I think, very

07:04:41  10    measured and very polite about the way he did this as well as

11    being fairly eloquent.  He did say, "I don't think that's what

12    happened."

13              But if you look, for example, at the 1995

14    liability decision from Judge Kelleher -- that one, by the way,

07:04:56  15    is only on Lexis.  It's 1995 US District Lexis 19778, and it's

16    at pages 23 and 24.  You will see something that is more like

17    what Exxon likes to quote:  "The undisputed facts reveal that

18    the actions of the United States resulted in, as a practical

19    matter, almost total control over the production of avgas."

07:05:15  20              You don't see Judge Fletcher saying things like

21    that.  I had two quotes.  I'm not going to read them to you

22    because it's clear that you've already read the passage.  I am

23    delighted if Exxon does agree; but I think if they're going to

24    agree that that is a fair treatment, they're going to have to

07:05:29  25    abandon some of these sort of more hyperbolic quotes, if you

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  will, from Judge Kelleher.

2          The two cannot be reconciled.  And I will tell

3  you that I was struck by the same passage you were and I had

4  Mr. White, Exxon's expert allocator, read it during his

07:05:47  5  deposition; and he also had no disagreement with it.  So I think

6  in many respects that may become a telesmatic statement of our

7  view about how the war was fought.

8          I don't think there's any difference between what

9  I just read you from the Supreme Court.  It's a little more

07:06:02  10  flowery.  But the fact is that the government relied on private

11  industry does not mean that there were not some teeth in the

12  regulations.  I don't think they were saying that.  I don't

13  think they meant to say that.  And if they did say that, they

14  would be incorrect.  Judge Fletcher is right about what

07:06:17  15  happened.

16          What we would say about those two passages,

17  Lichter and Judge Fletcher's treatment, is that we have,

18  therefore, both contemporaneous, in the case of Lichter, and

19  contemporary, in the case of Judge Fletcher, indications that

07:06:33  20  Exxon's view that the government was running everything during

21  the war is not really right.

22          In addition to that, because we had some issues

23  about Korea that required us to bring our historical expert into

24  the mix -- and we had hoped not to give you his report but maybe

07:06:50  25  now it's going to be a little bit useful.

1          If you would care to read his report, you will

2   also see the same sense from historians about the cooperation

3   that went on during the war.  You see him talk about tax breaks.

4   You will see him talk about the assumption of risk of post-war

07:07:09   5   ownership, which is really why the government owned the

6   Plancors.

7          During the -- actually somewhat before but,

8   particularly, during the Great Depression, there was a huge

9   perceived problem in business of excess capacity.  So if you

07:07:22   10   were in any industry during the war, you understood that World

11   War II was going to be great for business.  What you were

12   worried about was what was going to happen after the war when we

13   went back into something akin to the Great Depression and you

14   had all these plants that you were paying taxes and fixed costs

07:07:35   15   on and you couldn't do anything.

16          So in a sense, the government's ownership of the

17   Plancors, somewhat to our chagrin today, I suppose, was a form

18   of subsidy.  It was a way for the government to take the risk

19   that the capacity would not be good after the war.  It did not

07:07:50   20   turn out that way.  Everybody bought the plants.  Everybody

21   thought it was great.  There is some dispute among historians

22   about the deal that industry got on the various plants.

23          And since you have to stay here and it's late and

24   listen to me drone on, I'll give you a fun tidbit about that

07:08:03   25   which I got from my historian.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  That's okay.  Keep going.

2          MR. ROWE:  Keep going?  Okay.  Okay.  Another time

3    I'll tell you Lyndon Johnson's story about that.

4               And then, finally, we have -- we had from

07:08:17   5    depositions from other cases a few individuals who actually

6    participated in all of this at the time and their testimony is

7    admittedly mixed.  But I wanted to call to your Honor's

8    attention our proposed -- the Government's proposed statement of

9    fact, paragraph 36 where there are quotes from Lincoln Gordon

07:08:35   10   who was the vice chairman of the War Production Board.

11               And I'm not going to give you the quote, if I can

12   just give you a little piece of the quote:  "The idea was that

13   we would regulate what could be done with the flow of materials,

14   allocating resources; the conservation of materials, keeping

07:08:50   15   them from being spent on frivolous things; but that operations

16   were for individual businesses to carry on."  The WPB did not

17   participate in the actual manufacturing and operations of

18   individual plants.  That's our basic point.

19          THE COURT:  But we have one example in which a

07:09:05   20   decision on allocation directly affected operations, and that's

21   the Baton Rouge separator.  Are there other -- that makes the

22   point forcefully.

23          MR. ROWE:  Yes.

24          THE COURT:  But are there others that -- or can you

07:09:21   25   generalize from that -- I guess what I'm asking is that an

1 exception or was there a general impact of the allocation

2 choices that drove operations in ways that makes the government

3 an operator, not the operator, an operator?

4             MR. ROWE:  I'm going to try to jump ahead and --

07:09:41  5             THE COURT:  In other words --

6             MR. ROWE:  I'm not sure I'm going to answer that

7 question.

8             THE COURT:  -- it puts us in the allocation land

9 instead of joint and several liability.

07:09:51 10             MR. ROWE:  Of course, the Government believes the

11 answer is no and we don't think it even works for the separator.

12 So it may be that it's better for you to ask Exxon that

13 question.  They may have different ideas.

14             I'm going to jump ahead since we're on this topic

07:10:02 15 and talk about why we don't think the separator is -- that that

16 denial of steel for the separator is controlling, and that's

17 because that depends on the sharpening part of the Supreme

18 Court's discussion.

19             Bear with me while I find this so I do it right

07:10:22 20 for you.

21             Yeah.  Excuse me one second here so I don't get

22 completely lost.

23             There is a tendency among commentators for

24 Plaintiffs these days to see the second part of the Bestfoods

07:10:51 25 test, the sharpening of the definition that simply says you have

1 to manage or control things that have to do with either the

2 disposal of waste or the running of environmental programs as

3 though it is a separate and self-sufficient test for liability.

4                We don't think that it is.  We think it is what

07:11:11   5 it purports to be.  It sharpens the principal definition about

6 what it means to run the plant.  And the best way for me to do

7 that for you quickly is to give you a couple of hypothetical

8 examples and then we can do more if you're really a glutton for

9 punishment.

07:11:28   10               Company X hires a consulting firm to deal with

11 personnel and payroll.  They're involved in running the plant.

12 They're doing management and control things that under the first

13 part of the definition might seem to catch them.  That

14 sharpening prevents that -- or at least that's the way I see it.

07:11:47   15               A second example:  Company X instead hires an

16 environmental consulting firm to deal with all of its ongoing

17 environmental compliance issues.  That company is also clearly

18 meeting the first part of the Supreme Court's definition and now

19 we would say also meeting the second and acting as another

07:12:05   20 operator of the plant.  The plant manager overall is still an

21 operator.  It's a classic dual operator kind of case.

22               The third one and last, I promise, is Company X

23 hires an engineering firm to install and manage on an extended

24 basis a new technology for distilling crude oil.  So now I'm

07:12:26   25 talking about the process of making products rather than

1  environmental issues.  Same result.  Both the manager of the

2  refinery overall and the fellow who is helping them run this

3  machine in the plant, they're both involved with things that

4  have to do with waste.

07:12:42  5          The point is that the converse is not necessarily

6  true.  Every time somebody touches something that has some

7  indirect impact on environmental behavior at the plant, that

8  does not mean that actor is running the plant and satisfying the

9  principal part of the Bestfoods definition.

07:13:06  10         So when we were denying steel for the Baytown

11  separator, I mean we didn't have any choice but to look at what

12  the project was.  That's the way the rationing program worked.

13  So it didn't matter if it was an environmental issue or a

14  construction issue or people wanted to build a new office, we

07:13:26  15 were going to look at the steel.

16         So if Exxon's view of that is right, if you take

17  that to its logical conclusion, everywhere during the war where

18  the government made a single decision denying steel for anything

19  that has an indirect impact on environmental issues, we're an

07:13:48  20 operator of that plant, and that just can't be right.

21         So I hope that goes at least part way towards

22  answering your Honor's question.  If you want to try again, I'm

23  happy to -- okay.

24         Okay.  So let's go back a minute and do some

07:14:02  25 specifics about the plant.  And when I say "specific," I don't

1  mean exceedingly specific.  I want to -- now we're going to walk

2  through each of these operator situations beginning with Exxon's

3  contention that it did not operate its own refineries during

4  World War II.

07:14:22  5  This was a little surprising for us.  We actually

6  sent them a request for admission somewhere in the middle of our

7  discovery.  We asked them to admit that they were an operator of

8  their own refineries during the war -- or I think it was more

9  generic.  Anyway, we asked them to admit that they were an

07:14:37  10  operator of their own refineries.

11  We were not asking them to say that we were not,

12  just that they were also an operator; and we were surprised when

13  they said, "Well, outside of the war, yes; but during the war

14  period, we do not believe we were an operator of our own

07:14:50  15  refineries."

16  Now we're talking about the government not just

17  being an operator of their refinery, we're talking about the

18  government being the operator

19  THE COURT:  I understand.  And I think Exxon has moved

07:15:01  20  away from that.

21  MR. STEINWAY:  Yes.

22  THE COURT:  And you are, in fact, no longer seeking

23  that relief?

24  MR. STEINWAY:  Yes, your Honor.

07:15:07  25  THE COURT:  That's correct?

1              MR. STEINWAY:  Yes, your Honor.

2              THE COURT:  All right.  It's denied.

3                   I mean, to the extent you were seeking summary

4    judgment that you were not an operator of your own refinery even

07:15:18    5    during the war, I'm denying that motion.

6              MR. ROWE:  Thank you, your Honor.  I'll ask --

7              THE COURT:  Any other concessions to clear the

8    underbrush?

9              MR. STEINWAY:  No.

07:15:28   10              THE COURT:  No?

11              MR. STEINWAY:  No.

12              THE COURT:  Okay, keep going.

13              MR. ROWE:  Okay, we'll keep working.

14                   What I was going to do is give you a list of

07:15:33   15    things -- and it cuts both ways, so I still have to do it

16    because it also controls whether we're an operator or not -- of

17    things that I believe there is no contest in the evidence that

18    the government did not do at these refineries during the war.

19                   I'll read it real quick.  And I will tell you

07:15:50   20    that this case is very complicated, and I'm -- I tried very hard

21    to stay true to things where we really don't have a big dispute.

22    There may be knits here and there where I've missed something;

23    and if so, I will stand corrected.

24                   I don't believe there's any evidence that a

07:16:07   25    government employee ever turned valves, threw switches, or

1  operated machinery at any of these plants.  Now if Exxon is

2  conceding, we don't need to do that, I agree.

3           THE COURT:  We don't need to.  So keep going.

4           MR. ROWE:  Okay.  Maybe I'll skip a couple of these

07:16:15  5  then.

6           THE COURT:  That will be good.  The ones that don't

7  matter because we know that they're not -- they're not --

8           MR. ROWE:  Yeah, I think you're right.  So maybe

9  we'll just talk then about what the government did do --

07:16:25  10          THE COURT:  That will be good.

11          MR. ROWE:  -- because that will get us where we need

12  to go.

13               And of course, there is -- Exxon is still arguing

14  that we're an operator during the war; and coincidentally,

07:16:36  15  Mr. Steinway selected one of the favorite ways people do that;

16  and that's the planned blending program.  And this is the one

17  where you have the quote that "Under this plan, the nation's

18  refineries were all treated as one big national refinery."

19               I have no problem with that basic concept.  I

07:16:55  20  think we actually treated them as three or four refineries.  So

21  there was a District 3 that was the southeast United States.

22               But in concept, there's nothing wrong with that

23  statement.  We do respectfully -- I think I do disagree a little

24  bit with Mr. Steinway about telegrams, and you'll see how that

07:17:11  25  works.  There were telegrams.  I'm not sure they were about this

1  topic.  There may have been some.

2              So I needed to tell you how -- what this plan

3  blending program was about and how it worked.  Basically, as

4  Mr. Steinway, I think, alluded to, aviation gasoline is made

07:17:30  5  with a base stock that is very similar to motor gasoline and you

6  dump in a bunch of additives which boosts octane and gives you

7  various other characteristics.

8              Those additives are a substantial part of the

9  volume of the avgas that goes out of the plant.  Some -- there

07:17:46  10  may be a dispute about this.  I think my side says about half.

11  It may be slightly less or more and various -- and there were

12  various recipes for avgas during the war.  So it may actually

13  change over time.

14              The most familiar example to most people is tetra

07:18:03  15  lead.  That's an additive that helps with knocking.  It's

16  illegal now.  But back during the war, that was something you

17  could do.  In a competitive prewar economy, companies that were

18  wanting to make avgas or motor gas or other products that

19  required additives like this had to go out and get them and

07:18:18  20  compete for them on the market.

21              And at some point, one of these various things

22  would control how much of the product you could make.  And there

23  was a fair degree of likelihood that you had some other things

24  left over.  Those other things were a significant part of the

07:18:34  25  key to getting a lot of additional avgas during the war out of

1    an only modestly larger crude.

2              So the idea was if somebody's got codimer over

3    here or they've got lead over there, whatever we were using in

4    the recipe, how did we get that from the guy who couldn't use it

07:18:55    5    because he had other -- some other restraint on his process to

6    somebody who could use it and then we'd get more avgas?  And we

7    did that several ways.

8              The first thing is we provided orders to protect

9    people from antitrust concerns.  We formed a committee that was

07:19:12    10    a sort of quasi-government committee, but it was made up of -- I

11    don't know that it was officially a government committee; but in

12    any event, it was made up of refiners' representatives who would

13    meet once a month and they would figure out who's got what and

14    who needs what and then they would present that to the War

07:19:30    15    Production Board to make sure nobody was up to any shenanigans;

16    and we would say "fine" or "stop doing the shenanigans" if

17    somebody was up to something.

18              And that would become the monthly plan.  That's

19    the planned blending program.  And that meant if you were at

07:19:45    20    Baytown, you knew what to expect.  You would have this much

21    codimer coming in or something that you needed for your output

22    processor, whatever it was; and that program was tremendously

23    successful.

24              The question is does it make us an operator?  I

07:19:58    25    agree with Mr. Steinway that's probably as close as anything

1  you're going to get because you have sort of the government

2  looking over this.  But conceptually, I don't really see it as

3  any different from rationing steel.  There's a sort of technical

4  difference.  If you're rationing steel, you know where it is and

07:20:17  5  you just don't give it away unless you got a project that needs

6  to be built.

7          The problem with this material is it was spread

8  all over the place and nobody knew where it was.  So we had to

9  have a program to go find it.  The other distinction is if

07:20:29  10  you're rationing steel, you're conserving.  Here, we were

11  actually trying to recover stuff that we could use to make more

12  of something.

13          So technically, it's a little different.  But

14  conceptually, it's very much the same.  And I guess we don't

07:20:41  15  think that's the kind of thing that would make us an operator.

16  It's closer than some other things, but it seems to us that it's

17  not as big a deal.

18          Now I'll give you another short list.  This is

19  like the other one, but this is of things that we did do by way

07:21:03  20  of -- in other words, it's not just the planned blending program

21  that Exxon is arguing; and there's some other things that we

22  need to talk about.

23          I'm going to give this to you again with my best

24  understanding of what you'll find when you go through the facts.

07:21:16  25  This is the rest of the story as I would see it from the point

1  of view of somebody working at the refinery during World War II.

2  So what's your point of view?  What have you got?  What's the

3  government telling you and what they're not.

4          Your crude supply, which is, of course, crucial

07:21:32  5  to everything you do at the refinery, is assured by allocation.

6  You don't have to go out and compete for it in the market.  You

7  do have to pay for the crude, and it belongs to you when you pay

8  for it.

9          There are other raw materials that are allocated

07:21:45  10  that will help you.  I can't tell you chapter and verse what

11  they are, but there are other programs like that.  And there are

12  draft affirmance and such to help you if you can't hire enough

13  folks to run the plant.  But you're doing the hiring and firing.

14  You're running the labor.  You're doing the labor relations.

07:22:02  15  You have a contract with your union.  The government is not

16  involved in any of that.

17          Most of these programs, by the way, not that it

18  matters particularly here, worked to the benefit of large

19  concerns like Exxon because these were the big companies that

07:22:15  20  knew how to do things.  So they were going to get all the best

21  stuff.  Steel, aluminum, and copper and other materials, rubber

22  certainly, were rationed; and if you needed to do something that

23  required a bunch of them, whether or not we had a contract with

24  you to make avgas, you needed to get a chip for that from the

07:22:35  25  government.  So that overbearing sort of regulatory program is

1   always there in the background.

2                   Your supply of blending agents which you need to

3   make the aviation gasoline comes from two sources.  You're

4   making them yourself in the refinery with whatever processes you

07:22:53   5   have available or you're getting them out of your oil fields or

6   wherever you can get them.  And you also are getting the

7   benefits, if you're getting them -- you may be on the sending or

8   receiving end of this planned blending program.

9                   So you may be getting codimer from someplace in

07:23:07   10  Arkansas, and the hydrocodimer plant that you heard Mr. Steinway

11  talk about is designed to take advantage of that.  Codimer is a

12  great octane booster which, apparently, will gum up the fuel

13  lines in an airplane like crazy unless you hydrogenate it.

14                  If you do this process with hydrogen, it

07:23:23   15  becomes --

16                  THE COURT:  The detail is terrific, but I think you

17  are well over what you told me was going to be the maximum time.

18                  MR. ROWE:  I hope that's -- okay.

19                  THE COURT:  Well, it's almost -- it's 7:20.

07:23:34   20                  MR. ROWE:  I don't know when I started.  So let me see

21  if I can do Plancors.

22                  THE COURT:  I'm happy to hear it but --

23                  MR. ROWE:  Okay.  I'll try to go more quickly, Judge.

24                  THE COURT:  I want to hear from your colleague as

07:23:46   25  well.

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1              MR. ROWE:  Okay.

2              THE COURT:  And then we need to give the other side a

3    chance to respond.

4              MR. ROWE:  That is certainly true.

07:23:52  5         So I think I've given you -- I have more things

6    on the list.  We'll skip the rest of the list and move on to the

7    -- we've already talked about the government involvement in

8    waste disposal.  So we'll skip that and we'll go to Plancors.

9              THE COURT:  All right.  Basically, what you're telling

07:24:12  10   me --

11             MR. ROWE:  If Exxon is making -- sorry, beg your

12   pardon.

13             THE COURT:  Let me ask one question:  Basically, what

14   you're telling me is you don't see any meaningful distinction

07:24:19  15   between Baytown and Baton Rouge?

16             MR. ROWE:  That's right.

17             THE COURT:  All right.

18             MR. ROWE:  Because of the matters that we talked about

19   before about how the sharpening definition works.

07:24:25  20             THE COURT:  Okay.

21             MR. ROWE:  Yeah.  It is true that the -- we think the

22   example of the acid treating facility at Baytown is particularly

23   unpersuasive because it's a backup system.  It never made any

24   difference in the waste.

07:24:41  25             THE COURT:  I understand.

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. ROWE:  But conceptually, no difference.

2          THE COURT:  That was -- all of that was fully briefed?

3          MR. ROWE:  Yes.

4          THE COURT:  I'd really like --

07:24:46  5          MR. ROWE:  We're happy to stand on our briefs.

6          THE COURT:  -- to hear what wasn't fully briefed.

7          MR. ROWE:  Yes.  I need to ask your Honor a question

8  now because if Exxon is making that same concession it made a

9  little while ago about its operation of the Plancors during the

07:24:58  10  war, we can skip a whole other section.

11          MR. STEINWAY:  We're not going to make the concession.

12          THE COURT:  Because of the different ownership

13  structure?  All right.

14          MR. ROWE:  I'm not -- I mean, your Honor, we concede

07:25:12  15  that we owned the plants so --

16          THE COURT:  I understand.

17          MR. ROWE:  Okay, all right.

18          THE COURT:  I think the Government's point is that

19  your ownership had a significant impact on your operational role

07:25:27  20  as well.

21          MR. ROWE:  Well, I guess -- if Exxon doesn't want to

22  concede this, I'm not going to press the issue.  What we're

23  saying is we owned the Plancors, that makes us a PRP.  And if

24  you're not going to allocate based on status, then the rest sort

07:25:46  25  of arguably doesn't matter.

07:25:53

           1                THE COURT:  We are talking about allocation now?
           2                MR. ROWE:  We would be talking about allocation now,
           3    that's right.
           4                THE COURT:  All right.
           5                MR. ROWE:  So I didn't want to talk about that.  But
           6    since Exxon did not own the Plancors, it is not unimportant, to
           7    the government anyway, that they were operating them under
           8    contracts which, in several cases, actually called them the
           9    operator.
07:26:10  10                THE COURT:  I guess maybe it is worth asking the
          11    question in a more pointed way.
          12                Is Exxon standing on its position that it is not
          13    an operator at all of the Plancors?
          14                MR. ROWE:  Right.  That's the only question.  I'm
07:26:22  15    sorry if I was not clear.
          16                THE COURT:  You are.
          17                MR. STEINWAY:  With respect to the Plancors, your
          18    Honor, we've argued the agency position and the factual
          19    position.
07:26:29  20                THE COURT:  Is the agency position the basis on which
          21    you say you're not the operator?
          22                MR. STEINWAY:  And the operational control and the
          23    fact that -- the factual operational issues of the rubber
          24    industry was really directed by the government.  As you --
07:26:42  25                THE COURT:  Macro-managing?  Ownership plus


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1   macro-managing by the government you think is sufficient --
 2              MR. STEINWAY:  Yes, your Honor.
 3              THE COURT:  -- to make them the only operator?
 4              MR. STEINWAY:  With respect to the --
 5              THE COURT:  Because in the other position you've taken
 6   -- you've argued that macro-managing means that they are also an
 7   operator.  Here, you're taking the position that ownership plus
 8   macro-managing means they're the only operator.
 9              MR. STEINWAY:  Because of the ownership status.
10              THE COURT:  So that makes you the agent.  If you take
11   agency out of it, common law agency --
12              MR. STEINWAY:  Yes.
13              THE COURT:  -- are you an operator?
14              MR. STEINWAY:  We have -- no, we do not feel from the
15   Plancor perspective we would be an -- or the refinery, as you --
16              THE COURT:  Okay.
17              MR. STEINWAY:  -- granted the Government's motion on
18   operator --
19              THE COURT:  All right.  I'm trying to figure out the
20   principle distinction other than the ownership.  But I guess we
21   look at the contracts to make those determinations more than
22   anything else.
23              MR. STEINWAY:  The operational control factors in
24   terms of price, the FMC --
25              THE COURT:  That's true in the refineries, as well.
```

1  That's why I'm having trouble with the principal distinction.

2  You made the same argument in the refineries; and other than

3  ownership, you said "But that doesn't mean we're not an

4  operator.  That means that they are, too."  Here, you're making

07:27:59  5  the identical arguments -- and I've asked you to take agency, I

6  understand that.  I've asked you to make that assumption.  But

7  if we make that assumption --

8          MR. STEINWAY:  Your Honor, if --

9          MR. BUTHOD:  In fairness, Judge, the problem is when

07:28:12  10  you say "other than ownership," it's a little like saying --

11          THE COURT:  I'm not saying other than ownership, I'm

12  saying other than agency.

13          MR. BUTHOD:  But I guess what I'm saying is the

14  ownership distinction is not idle.

07:28:22  15          THE COURT:  I'm not saying it's idle.  It may affect

16  allocation in a huge way.  But the question is are you an

17  operator?  Does the fact that you are not the owner --

18          MR. BUTHOD:  We do not concede that we're an operator

19  of the plant.

07:28:38  20          THE COURT:  That's fine.  But again, I'm having

21  trouble, if we set aside common law agency, figuring out a

22  principle distinction here between your arguments on the

23  refinery side and the -- for not being -- for having no role.  I

24  understand how it directly impacts allocation, but that's a

07:28:56  25  little different.

1          MR. STEINWAY:  From a liability -- you're talking from

2     a liability perspective?

3          THE COURT:  Absolutely.

4          MR. STEINWAY:  I understand.

07:29:03  5          THE COURT:  You're taking the position regardless of

6     -- "Because of the impact of macro-management plus ownership, we

7     were not an operator at all."  At all.  That's pretty -- that's

8     stout, and I'm having real trouble with that.  That,

9     essentially, means you had no role.

07:29:30 10          MR. STEINWAY:  It's a matter of degree.

11          THE COURT:  That's my point.  That's my point.  For

12     you to take the position "We had no authority," real or -- "We

13     had no authority that we either had the right to exercise or we

14     did exercise as an operator" seems to me to be a difficult

07:29:55 15     position for you to take, with respect -- due respect.

16          MR. STEINWAY:  We understand your position, your

17     Honor, in terms of the consistency of the philosophy of

18     macro-managing per se.

19          THE COURT:  I'm not talking philosophy, I'm just --

07:30:08 20     this is pretty common sense stuff.  You guys were the ones

21     turning the valves.  You did have a significant management role

22     on this -- in these Plancors.  You weren't absent.

23          MR. STEINWAY:  We will concede there's an operator

24     liability perspective.

07:30:24 25          THE COURT:  I'm saying that everything you're saying

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    matters terribly for allocation.

2            MR. STEINWAY:  We understand.

3            THE COURT:  But that's different.

4            MR. STEINWAY:  Our view is operator liability and

07:30:35  5    operator damages are somewhat coextensive:  the more liable you

6    are, perhaps, the more operator damages you may have.

7            THE COURT:  A little different from saying, "We were

8    Casper, the Friendly Ghost.  You didn't even see us."

9            MR. STEINWAY:  It's a liability perspective per se.

07:30:52  10           THE COURT:  That's exactly my point.

11           MR. STEINWAY:  We will concede, your Honor, that from

12   a Plancor perspective, Exxon is an operator.

13           THE COURT:  Yeah.  I just was having real trouble

14   understanding how you could take a different position.  All

07:31:07  15   right.

16           MR. ROWE:  Turn the page.

17               I'm actually getting very close to the end,

18   Judge.

19           THE COURT:  And I don't mean to rush you.  This is

07:31:12  20   important.

21           MR. ROWE:  No, I understand.

22           THE COURT:  But I want to make sure that we're

23   focusing on what matters and what really wasn't unpacked in the

24   briefs.

07:31:19  25           MR. ROWE:  So Exxon is saying, okay, it was an

operator.  They're also saying we were an operator of the

Plancors.  There, we have somewhat of a disagreement.  We did

own them.  So you're right that we're into allocation.  But in

part, because Mr. White proposes to you that you allocate based

07:31:37  on status, this does still matter.

The shortest possible version of the argument is

-- as far as I know, there's no analog of the planned blending

program with respect to the Plancors.  So there's nothing quite

that dramatic, if you will.

07:31:54  There is, however, greater restriction on what

you spend your money on, capital costs; and there's more

paperwork because we own the plants and we're spending the

taxpayers' money.  We're paying for everything that's being

built in the plant.

07:32:07  So that's probably a little bit of a trade-off

relative to what we saw at the refinery.  Otherwise, we can put

ourselves in the place of a plant manager of, say, the butadiene

plant -- that's the middle one -- during World War II, say, in

the middle of 1943; and we can try to see what the world would

07:32:23  look like.

In this case, your basic input stock, which is --

never mind the technical issue -- comes from the refinery.  You

would continue to benefit -- it just comes from the refinery

because it's a byproduct, the input.  That's why they were

07:32:37  co-located.  I don't agree with Mr. Steinway that the government

1  made some grandiose decision.  This is just the shortest pipe

2  from here to there.  But that's how it worked.

3            You continue to benefit from the draft

4  affirmance.  Steel, copper, all those rationing programs are

07:32:53  5  still in place.  You have been aware of Humble's lease agreement

6  under which you did, while you were building the plant, operate

7  as an agent of the Defense Plant Corporation.

8            You would also have been aware of the operating

9  agreements which explicitly provide -- they don't say the word

07:33:12  10  "agent," but they do say the words "independent contract" --

11  actually, they do say -- they say both.

12            For certain very limited purposes of purchasing

13  and selling things --

14            THE COURT:  I understand.

07:33:21  15            MR. ROWE:  Okay, you already -- so -- but when you're

16  running the plant, there's --

17            THE COURT:  That part I understood from the briefing

18  and it was clearly laid out.

19            MR. ROWE:  There are, of course, pricing provisions in

07:33:31  20  the contract.  I believe those were negotiated as part of the

21  contract.  There are also -- I don't think I mentioned this

22  before and I should have with respect to the refinery -- profit

23  limitation regulations during the war.  There had been great

24  profiteering in World War I.

07:33:45  25            There were interwar Nye Commission merchants of

1  death hearings in the senate and there was great concern that

2  there would be more.  So there are some regulations on profits.

3  I don't think they bite quite as much as Exxon -- sorry.

4           THE COURT:  If the Government is agreeing that it is

07:33:58  5  an operator -- I mean, sorry, if Exxon, but that it should be

6  viewed as having a significantly less -- lower degree of

7  responsibility than the government, what is the relevance of the

8  fact that the arrangement between the allocation of duties and

9  control was negotiated as opposed to imposed?

07:34:25  10           Now, I understand that if it had been imposed

11  coercively, that would cut heavily against operator exposure.

12           MR. ROWE:  That's all I'm saying.

13           THE COURT:  But they've agreed that it's --

14           MR. ROWE:  No.  I don't -- I'm not saying we should

07:34:38  15  get out because it was negotiated, I'm saying we should not be

16  dragged in because it appears to be a command.  The prices --

17           THE COURT:  If you're talking about the Plancors which

18  you own, you're in anyway.

19           MR. ROWE:  Oh, okay.  I'm sorry, I may have

07:34:51  20  misunderstood your point and --

21           THE COURT:  And I don't think you're saying that you

22  had no operator responsibility.

23           MR. ROWE:  Let me put it to you this way.  Well, I

24  think we are saying we had no operator responsibility at those

07:35:02  25  plants.  We are an owner and we may be an active owner; but

1  having said that --

2          THE COURT:  Okay.  I want to be real clear here.

3  You're saying you had no operator responsibility at these

4  plants --

07:35:14  5          MR. ROWE:  That's correct.

6          THE COURT:  -- just owner responsibility?

7          MR. ROWE:  That's correct.  But I'm not necessarily --

8  that does not mean I am saying that we were an absentee

9  disinterested owner.  I just don't think the level of what we're

07:35:23  10  doing, just as it didn't in the refinery, amounts to operator --

11  it's the same argument in both contexts.

12          So just as you're asking them to be consistent, I

13  realize I'm fighting to get out of the case in a sense.  But let

14  me put it to you this way:  If -- the only reason we're having

07:35:39  15  this conversation about whether we are or are not -- we, the

16  government, are or are not an operator of the Plancors is

17  because some Courts and Exxon's expert use that -- the number of

18  ways that you trip the CERCLA liability factors as part of the

19  means of doing allocation.

07:35:57  20          And it sounds to me like you may be interested in

21  doing it a different way which is the Court's right, privilege,

22  and --

23          THE COURT:  You mean wherever I find equity?

24          MR. ROWE:  Right.  So if your version of finding

07:36:12  25  equity does not involve status, we don't have to have this

1   conversation because we owned the plants and we are liable

2   and --

3            THE COURT:  Status is not irrelevant, but I don't

4   think anybody is going to argue that status alone in a case as

07:36:26  5   complicated and as multi-factored as this one is going to be the

6   entire answer.

7            MR. ROWE:  If we had time, which we don't, I would

8   argue to you that even the Courts that purport to use status

9   don't really use it.  They really look at the facts and then

07:36:38  10   toss status in except in cases where there are big landfills

11   with, you know, 40 people who are generators.  Sometimes that

12   works.

13            THE COURT:  All right.

14            MR. ROWE:  Okay.  So -- but it is our position that we

07:36:47  15   were not an operator of the Plancors.  And I was just listing.

16   So we went through pricing provisions.

17            You did not have, if you were a Plancor operator,

18   the interruptions that I actually didn't mention and should have

19   about the refineries where the government would send you

07:37:08  20   telegrams and they would ask you to make this instead of that.

21            Now, you'll see in our briefs that Lincoln

22   Gordon, the War Production Board vice chairman, says that those

23   are jaw-boning, those are not -- those telegrams are not legally

24   binding but they were an annoyance if you were running a

07:37:27  25   refinery and you had to keep changing what you were doing.

1          That's not happening at the Plancors for the most

2   part because you're generally making one thing at most of these

3   Plancors, and you're just making as much of it as you can as

4   fast as you can.

07:37:36   5          The tradeoff, to some degree, if you're a Plancor

6   manager -- I don't think this particularly bears on operator but

7   some people may argue that it would so I'll mention it -- is

8   that there were fairly -- if not continuous, certainly frequent

9   amendments to the lease agreements to add additional facilities

07:37:54  10   to these Plancors.  They tended to grow by leaps and bounds

11   during the war.  So while you didn't have to change what you

12   were doing all the time, you were probably tripping over the

13   construction crew a lot.

14          If your Honor is satisfied, I am prepared to

07:38:09  15   stand on my briefs on the agency issue.

16          THE COURT:  All right.

17          MR. ROWE:  That will save us a little time.

18          THE COURT:  Just tell me your best case for saying

19   there's no agency basis for liability here.

07:38:24  20          MR. ROWE:  Let me -- actually --

21          THE COURT:  Or there's no agency basis for avoiding or

22   minimizing liability.

23          MR. ROWE:  It's actually -- I think the best answer I

24   can give you is not so much a case, although we have cases in

07:38:36  25   our brief, as a couple of examples from the contracts.  Here's

1   one from Plancor 1909, the hydrocodimer plant that's in the

2   middle of the refinery.

3            This is from the operating agreement.  "The

4   parties now wish to agree upon terms and provisions under which

07:38:55   5   Humble shall operate the plant for the hydrogenation of raw feed

6   stocks."  Section 1(e) of that agreement says when they're

7   purchasing feed stocks and equipment, when they're arranging for

8   transportation, or when they're selling hydrogenated products,

9   they are in an agency relationship with the government.

07:39:12   10           Here's what the contract says when it turns to

11   operation:  "In the operation and maintenance of the plant in

12   the processing of raw feed stocks therein and in the performance

13   of all other services hereunder, however, Humble shall act as an

14   independent contractor, it being understood that supplies shall

07:39:30   15   not have the right to direct the details of such operation but

16   is interested only in the results obtained therefrom.

17           I have another example.  I won't read you the

18   quotes from the Baytown Ordinance Works.  I'll simply tell you

19   that there's only one contract there.  Plancors have a lease and

07:39:46   20   an operating contract.  This Ordinance Works was the Department

21   of the Army.  They had one contract with three titles.

22           Title 1 is buying the land.  Title 2 is building

23   the plant where they did not extend, apparently, an agency

24   relationship.  So even the building of that plant was not under

07:40:02   25   a relationship.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1      Article 3A(2) has a short quote:  "Upon

2  completion of the plant in accordance with the terms of Title 2

3  hereof, the contractor shall, acting as an independent

4  contractor, proceed to operate it for the production of toluol

07:40:16   5  in the quality set forth in this article."

6      THE COURT:  All right.  That's helpful.

7      MR. ROWE:  So, you know, these were -- we sometimes

8  think that these folks were not sophisticated and they really

9  were quite sophisticated about what they were doing.

07:40:29  10      I might command to your attention as well that if

11  you look at the Cadillac Fairview case, which is the Dow plant,

12  where there is an express agency and an express indemnity

13  agreement -- this plant is being operated by -- for and at the

14  risk of the United States Government.  When we get to the

07:40:49  15  contract issue in this case, I may come back to that and remind

16  the Court that people were sophisticated; and when they wanted

17  to write an indemnity agreement, they knew how to do it.

18      THE COURT:  All right.  Well, I think you already have

19  reminded us.  But go ahead.

07:41:00  20      MR. ROWE:  Okay.

21      THE COURT:  All right.

22      Is the best thing now for you to respond to any

23  of these points or should we hear from Mr. Lynk?

24      MR. STEINWAY:  We have a response, your Honor.  It's

07:41:11  25  whatever the Court wishes.

1          THE COURT:  Why don't you briefly respond --

2          MR. STEINWAY:  Yes, your Honor.

3          THE COURT:  -- confining yourself to what's not in

4    your brief or simply telling me where to look in your brief.

07:41:22   5          MR. STEINWAY:  Your Honor, we have several factual

6    disputes with some of the points that the Government has made.

7    I'll just briefly go through them real quickly.

8          THE COURT:  All right.  That would be helpful.

9          MR. STEINWAY:  The Government's point in quoting

07:41:35   10   Lincoln Gordon from the War Production Board in terms of the

11   views of the Government and how the government's role was, we

12   have in our brief, your Honor, several quotes from actual PAW

13   officials who were there:  Mr. Goldsmith and J. Howard Marshall,

14   the general counsel, whose views were clearly not mixed at all.

07:42:01   15         Their position was very clear:  One, they were --

16   the PAW would be involved in all decisions relating to the

17   operation of the refineries.  And J. Howard Marshall, the

18   general counsel of the PAW, specifically said that if the -- if

19   the refinery did not cooperate with the requirements of the PAW

07:42:22   20   directives, they would lose their allocation and responsibility.

21         We think those are much more persuasive than an

22   official from the War Production Board who is not at all

23   involved with the PAW decision-making process.  That's point

24   one.

07:42:42   25         Point two, we have addressed the Government's

1  views about the language on independent contractors in our

2  briefs.  So we will be --

3       THE COURT:  Yes.

4       MR. STEINWAY:  -- we will just refer you, your Honor,

07:42:56  5  to the comments on the briefs.

6       I'd like to point out just a couple of things.

7  In -- you've made mention, your Honor, of Judge Fletcher's

8  decision in the Ninth Circuit.

9       THE COURT:  Yes, sir.

07:43:12  10       MR. STEINWAY:  I think Judge Fletcher's decision has

11  two key points in it that are very, very important.  The first

12  point is in his discussion of avgas production background, Judge

13  Fletcher says, "Because avgas was critical to the war effort,

14  the United States Government exercised significant control over

07:43:31  15  the means of its production during World War II."

16       And my personal view, your Honor, is if Judge

17  Fletcher would have had the record that Exxon has developed in

18  this case, he would have included a lot more facts

19  substantiating control over the facilities; and I'd just like to

07:43:50  20  point out one example.  And that's from Demonstrative Number 12

21  on the telegrams.

22       We've had a lot of discussion this afternoon,

23  your Honor, about the telegrams; and I happen to think this

24  quote from the telegram is very clear.  This is a telegram to

07:44:09  25  the refineries; and basically, what it says is "From the total

1  input, you should extract maximum quantities of whichever of the

2  following projects are produced at your plant."

3          I mean, that is about as directive and as

4  affirmative and as mandating as I believe, your Honor, you could

07:44:30  5  -- you could ever have.  So we haven't talked too much -- and

6  our view, your Honor, is if Judge Fletcher would have had more

7  of these facts that have been developed by Exxon and referred to

8  in our papers, that would have even further substantiated the

9  positions on control.

07:44:50  10          THE COURT:  All right.  That's a fair point.

11          MR. STEINWAY:  The point the Government raised about

12  rationing and -- steel during the war, your Honor, our view is

13  that's really not relevant.  This was not a rationing, this was

14  a directive.  The government directed us to make something.

07:45:12  15  They didn't ask for a rationing of materials or supplies, they

16  told us at our plants to make a product.  So we don't really

17  view this as a rationing exercise.

18          I wanted to just mention, your Honor, a point

19  about the contracts and a question of whether or not everything

07:45:31  20  that was required by Exxon was embodied in these contracts, the

21  Defense Supply Corporation contracts.

22          We see the contracts as really a codification of

23  government responsibilities.  It was a contract that was

24  formalized, cobbled together very quickly by a DSA person to

07:45:53  25  effectuate their responsibilities as the purchasing arm of the

1  government during the war.

2              But it was really a codification.  There are many

3  requirements that aren't included in these contracts that Exxon

4  or Humble or the predecessors had to comply with.  The telegrams

07:46:08  5  are one good example.  Another example is the planned blending

6  program.  That was not included as any contractual provision or

7  requirement.  This was an independent additional requirement.

8              We see the -- we talked a lot about the

9  regulatory program; and the Government's made the point that if

07:46:26  10  we extended this to the extreme, there would be PRPs across the

11  country as a national -- as a national regulator.

12              Well, if you take a look, your Honor, at the

13  Brighton decision -- and indeed, the Brighton decision, the

14  paragraph we have in our demonstrative, the first sentence says,

07:46:45  15  "And the FMC case is instructive in terms of helping us to

16  fashion the macro-management test, the extensive regulatory

17  test."

18              This is far more than just a national regulatory

19  program.  That was just the tip of the iceberg.  This was a much

07:47:00  20  more detailed effort.  The government -- there was a wartime

21  situation.  The government told us to make as much avgas as we

22  possibly can no matter what we do, and that's the long and the

23  short of it.  We needed to make avgas as quickly as possible.

24              THE COURT:  That's Judge Fletcher's point,

07:47:19  25  essentially.  Right?

1          MR. STEINWAY:  And your Honor, Judge Fletcher says at
2    the end of his decision -- he says at the end of his decision
3    that this was a -- the clean-up cost of properly seeing as part
4    of the war effort for which the American public as a whole
5    should pay.  And that's Judge Fletcher's conclusion in the Ninth
6    Circuit.
7          Your Honor, the Government mentioned a lot about
8    a number of the cases in terms of governmental control.  You
9    talk about the <u>Rospatch</u> case which is a case where widgets were
10   being sold by Rospatch.  That situation is far different than
11   our situation.  We've talked a lot about how all the cases cited
12   by the Government are distinguishable on the facts in terms of
13   the overwhelming accumulation of criteria and substantial
14   control in this case.
15         Suffice it to say, in <u>Rospatch</u> there was a -- the
16   government was bidding to have companies submit to sell them
17   widgets.  And certainly, we're not saying that we were bidding
18   to sell avgas to the United States.  The United States was
19   telling us what to make.  It was a wartime situation.
20         And frankly, the more we talk about this, if you
21   take a look again at the letter about the master separator,
22   again, the government says, the US Engineer's Office, "The
23   project, including the separator, appears adequate to end
24   pollution in the Mississippi River.  It is believed that the
25   urgency of construction is sufficiently necessary for the war

1    effort.  The war effort was the effort that generated" --

2              THE COURT:  This stuff I've read.  So tell me how

3    you're responding to the facts that were pointed out in the

4    argument that we heard.

07:49:08    5              MR. STEINWAY:  Yes, your Honor.

6              THE COURT:  Okay.  And I'm happy to consider -- point

7    me to places in the record, but you don't need to read me the

8    record.

9              MR. STEINWAY:  Yes, your Honor.

07:49:22   10                   I think I've covered --

11              THE COURT:  Okay.

12              MR. STEINWAY:  -- some of the facts.

13              THE COURT:  All right.  And I appreciate that.  I

14    don't mean to cut you off, but we've heard a lot of detail, and

07:49:30   15    that's important because it's where the devil lives.

16              MR. STEINWAY:  We could go on and on on this.

17              THE COURT:  We could but we're not.  I think we all

18    agree on that one.

19                   All right.  Let me hear from you please,

07:49:41   20    Mr. Lynk.

21              MR. LYNK:  Thank you, your Honor.

22              THE COURT:  Tell me what Fifth Circuit case controls

23    this issue.

24              MR. LYNK:  Well, I'm going to try to deliver on that

07:49:51   25    promise.

1          THE COURT:  Thank you.

2          MR. LYNK:  I think I should point something out as

3    well:  The first part of my argument is going to be assuming

4    that Exxon is still requesting a joint and several liability

07:50:04    5    judgment at Baytown and at Baton Rouge.  However --

6          THE COURT:  You mean that it has no --

7          MR. LYNK:  In part -- one way to understand that is

8    Exxon has no liability.  Another is that they are entitled to a

9    form of relief in which they can wholly collect from the other

07:50:20    10    liable party even without regard to equitable considerations.

11          We don't think that they're entitled to that

12    judgment but it may not be clear whether they are still seeking

13    it given that they do concede they are an operator under wartime

14    period.

07:50:33    15          THE COURT:  Well, perhaps, we can clarify whether the

16    questions extend that far.

17          MR. BUTHOD:  Judge, the basis for joint and several

18    liability is because it's commingled waste.  It's not -- in

19    fact, frankly, the very first thing the Court said when you came

07:50:40    20    out a few hours ago, I was a little concerned.  It's not based

21    on the fact that we are not an operator.

22          THE COURT:  No, I understand.  I understand.

23          MR. BUTHOD:  So maybe --

24          THE COURT:  So I think you do need to -- they are

07:50:48    25    seeking that relief but not because of status, if you will.

```
 1            MR. LYNK:  That's fine.  And --
 2            THE COURT:  I'm sorry?
 3            MR. STEINWAY:  We also have not had an opportunity to
 4    talk about some of the other issues like joint and several -- we
 5    focused our presentation on the operator issue.
 6            THE COURT:  I understand.  But your point now is that
 7    you are seeking joint and several liability because the waste is
 8    commingled, not because you don't -- not because you have no
 9    responsibility as an operator.  Okay.  So you better argue it.
10            MR. LYNK:  I think I should stick to my -- the script
11    I have.  I'll start with --
12            THE COURT:  No, no.  Every good lawyer knows that
13    scripts are not --
14            MR. LYNK:  That was a bit -- yes, that was a bit
15    facetious.  And in fact, the half hour Mr. Rowe talked about,
16    I'll try to turn that into 20 minutes, if I can.
17            THE COURT:  That would be appreciated since I do want
18    to hear from the other side once you finish talking.
19            MR. LYNK:  Sure.
20            Your Honor, I'll start with the bottom line,
21    10,000-foot view.  We think the response to a question you asked
22    very early on, what should happen in these cases, where should
23    they go, we think both of these cases, assuming they were timely
24    filed, should end not with the declaration that the United
25    States is jointly and severally liable --
```

07:50:58 (line 5)
07:51:19 (line 10)
07:51:30 (line 15)
07:51:45 (line 20)
07:52:02 (line 25)

1          THE COURT:  For Baytown?

2          MR. LYNK:  For either side.  Baytown or Baton Rouge.

3    -- not jointly and severally liable because we don't think that

4    that form of relief is a form of relief available to a PRP, an

07:52:17  5    admitted PRP, for the wartime period, at least, as an operator.

6               It should end instead with a judgment of each

7    parties' several liability and an allocation between those

8    parties applying equitable considerations as the Court is

9    authorized to do by Section 113(f).

07:52:34  10          THE COURT:  And the commingling?

11          MR. LYNK:  Commingling in this context, where the suit

12   is brought by a PRP against a PRP, essentially, has no

13   relevance.  Let me explain that a bit.  Let me -- let me explain

14   that a bit.

07:52:49  15          THE COURT:  All right.

16          MR. LYNK:  You could have -- you have actions under

17   107(a)(4)(A) brought by the United States, a state, a tribe in

18   its enforcement capacity.  In that capacity, none of those

19   entities are PRPs.  They, in appropriate cases, may be entitled

07:53:07  20   to a judgment of joint and several liability.  That is a form of

21   relief with roots in the common law, as the Supreme Court has

22   described it in Burlington Northern.

23               And the common law theory was an innocent

24   plaintiff harmed by multiple tortfeasors should not be put at

07:53:23  25   risk of failing to recover for their injury, if they prove it,

1   simply because some parties are no longer reachable, insolvent,

2   no longer there, and the other co-tortfeasors point to those

3   absent parties and say, "Well, they were responsible.  He was

4   responsible.  They were the proximate cause."

07:53:40   5        Joint and several liability was a way to shift

6   the risk away from the innocent plaintiff to those

7   co-tortfeasors and to say, "You're all going to be joint and

8   severally liable if this claim is proven and then it's up to you

9   to show the Court how it should allocate amongst you based on

07:53:57  10   your comparative fault."

11        That scheme, essentially, has been imported into

12   CERCLA; and in the CERCLA statutory scheme, again, a government,

13   state, tribe in its enforcement capacity or an innocent party --

14        THE COURT:  We don't have any tribes here.

07:54:13  15        MR. LYNK:  Right, we don't.  -- or an innocent party,

16   somebody that has not contributed to the harm but for whatever

17   reason has incurred potential response costs, they are the party

18   that is most closely in the shoes of the innocent plaintiff

19   under the theory at tort.

07:54:28  20        And in those situations, joint and several

21   liability may be appropriate, although, even then, as the

22   Supreme Court held in Burlington Northern, it is not always.

23   This, however, is a case between PRPs; and this is where the

24   Fifth Circuit precedent comes into play.

07:54:46  25        Elementis Chromium cited in our brief -- and this

 1  is one instance where I'm going to quote the holding, although I
 2  try not to do that too often -- made the following statement,
 3  part of which was overruled by ARC, part of which has not been,
 4  "When one liable party sues another liable party under
 5  CERCLA" --
 6          THE COURT:  Can I ask for clarification?
 7          MR. LYNK:  Yes.
 8          THE COURT:  Are you reading only the part that was not
 9  overruled?
10          MR. LYNK:  I will read only -- well, I think it will
11  become clear why this is still good law if I read the whole
12  sentence.
13          THE COURT:  Okay.
14          MR. LYNK:  Does that make sense?
15          THE COURT:  Not yet.
16          MR. LYNK:  The sentence was this:  "When one liable
17  party sues another liable party under CERCLA, the action is not
18  a cost recovery action under Section 107(a) and the imposition
19  of joint and several liability is inappropriate."
20              Now, we know after ARC that when a party has
21  incurred costs as Exxon has done at Baton Rouge, for example,
22  but where it does not have a remedy available under 113(f), no
23  prior action under 106, 107, no settlement that qualifies under
24  (f)(3) -- 113(f)(3)(B), nothing that would make 113(f) directly
25  applicable, we know that those parties, yes, can bring a claim

1    under 107(a).

2              However, ARC did -- expressly did not decide

3    whether such a claim would provide for joint and several

4    liability.  So in this circuit, at least, the holding in

07:56:08  5    Elementis Chromium on that point is still good law; that if this

6    is an action between liable parties, imposing joint and several

7    liability is inappropriate.

8              And now in our brief we have explained more about

9    why that's so.  We've talked about the common law principles

07:56:24  10   again that I've summarized here.  I won't belabor those points.

11   But I will note that -- but I will note that the description

12   I've just given about why -- about how this is rooted in common

13   law and why, therefore, joint and several liability makes sense

14   in some cases but not others, that has been part of the Fifth

07:56:44  15   Circuit's jurisprudence since Bell Petroleum cited in our brief.

16             And in 2009 when the Supreme Court issued the

17   Burlington Northern opinion, it agreed with this understanding

18   of where joint and several liability came from and how it's

19   relevant under CERCLA.  In fact, it cited very favorably the

07:57:01  20   Fifth Circuit cases on that point.

21             So we think, again, the Elementis Chromium

22   statement that the imposition of joint and several liability is

23   inappropriate in an action between liable parties is still good

24   law and we think that that is true whether or not you refer to

07:57:18  25   Exxon's claim as a cost recovery action.

1            It may be a cost recovery action, but it is still

2    one brought by a liable party against another liable party.

3    Therefore, it must only be for several liability and it is

4    subject to equitable allocation as Congress intended.

07:57:36    5            All right.  I will also make two additional

6    points about why the common law roots are important and also why

7    it's important to be clear about the nature of the liability

8    that Exxon can obtain, and that is, that -- that if the Court

9    were to construe their action as one genuinely for joint and

07:57:57    10   several liability, it confuses the burden of proof in

11   allocation.

12            I say that because when I read Exxon's reply

13   brief, they appear to be asserting that in Phase 1 of this case,

14   the liability and allocation phase, the US must prove that a

07:58:14    15   reasonable basis for apportionment exists under Burlington -- or

16   as was set forth in Burlington.

17            Here's the problem with that:  Burlington, again,

18   was an enforcement claim under 107.  So the Defendants in that

19   enforcement action, yes, have the burden to prove a reasonable

07:58:35    20   basis for apportionment or else they would be jointly and

21   severally liable for EPA's costs; and then they would have to go

22   on and deal with allocation amongst themselves.

23            This is not that type of case.  Not an innocent

24   Plaintiff, not an enforcement claim.  It's a claim between

07:58:52    25   liable parties.  In that setting, the Court can allocate based

1  on equitable circumstances and whatever equitable factors it

2  deems appropriate under the facts of the case.

3               And it is not either parties' burden to prove,

4  for example, the visibility of harm there.  We might elect to

07:59:09  5  make the attempt.  We might elect to say that there is a portion

6  of one of these sites or the other of these sites that is so

7  distinguishable from the rest that it is, in fact, only their

8  harm.

9               But we're not obligated to do that.  All we have

07:59:23  10  to do is make our case for equitable allocation.  They would

11  make their case.  And the Court would have the equitable -- have

12  the discretion to decide what is equitable under these

13  circumstances.  So that's an important point.

14               The other is the treatment of orphan shares, the

07:59:36  15  shares associated with a party that may have contributed to the

16  harm but is no longer reachable.  Now, that --

17          THE COURT:  We don't have that in this case.  Why are

18  we worrying about that if it's not even present?

19          MR. LYNK:  The past costs, I would agree with that

07:59:53  20  statement.  I don't think within the Baytown Complex or within

21  the Baton Rouge Complex, in general, that there are any third

22  parties we have to worry about.

23               However, at both of these sites, part of what

24  Exxon is seeking is a declaration of future cost liability for

08:00:09  25  unknown costs of dealing with something that might be in any one

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   of these water bodies adjacent to these sites.  We don't know
2   yet if they'll have to do something there, when they'll have to
3   do it, what it will cost, what contamination it will be dealing
4   with.
5         THE COURT:  My understanding is that they're looking
6   for an allocation decision, not "You pay this dollar amount,"
7   "You pay that dollar amount," "You pay this dollar amount."
8   It's a formula that would apply and enable the parties to --
9   when the costs are incurred, when they are known to know how
10  much their respective shares would be.  Am I understating what
11  they are asking?
12        MR. LYNK:  That -- in theory, that should be it.  And
13  obviously, we briefed -- we've stated our position in our briefs
14  about why we think the Court shouldn't reach that yet even for
15  allocation purposes but let --
16        THE COURT:  Can I ask one other question?  You've also
17  asked in the alternative that if I do reach that, I leave open
18  kind of a safety valve that says -- or an escape hatch that says
19  if the factual basis for the Court's allocation formula turns
20  out as the costs are incurred to have been significantly flawed
21  in a way that leads to the -- should lead to a revision of the
22  allocation itself, then you should leave open the possibility of
23  allowing the United States to move for that or Exxon?
24        MR. LYNK:  That is another possible resolution; and if
25  I may -- although there is not a clock in front of me --

08:00:20
08:00:42
08:00:58
08:01:16
08:01:41

```
 1              THE COURT:  Can I --
 2              MR. LYNK:  Sorry.
 3              THE COURT:  Can I just briefly turn to opposing
 4    counsel and say if that window was opened, would you protest?
 5              MR. STEINWAY:  We would totally agree with that, your
 6    Honor.  In fact, that's very consistent with the Boeing case.
 7              THE COURT:  It's also real consistent with equity
 8    which is driving the entire inquiry.
 9              MR. STEINWAY:  And we also felt, your Honor, that also
10    would be a proper issue for Phase 2.  We see that more as a
11    recoverability or a new fact issue.
12              THE COURT:  Right.
13              MR. STEINWAY:  And Exxon's position on this has always
14    been we would like to bring some certainty; and certainly, if
15    there's an egregious error or some erroneous fact or some
16    assumption, we would certainly ask the Court to revisit the
17    situation.
18              THE COURT:  Isn't that the better approach than simply
19    punting entirely and saying I don't have enough information even
20    to set a -- based on what's already been incurred, even to set
21    an allocation structure that would apply not only
22    retrospectively but prospectively subject to the possibility
23    that things will change as events and costs develop in a way
24    that should lead to significant revision?  Why isn't that the
25    better way to do it?
```

1          MR. LYNK:  May I defer to my colleague on that

2  question --

3          THE COURT:  Sure.

4          MR. LYNK:  -- and let's say reserve two minutes of my

5  time?

6          THE COURT:  Hold that thought --

7          MR. LYNK:  That's fine.

8          THE COURT:  -- and you can keep going and we'll come

9  back to that.

10         MR. LYNK:  But I will just say this:  that it does

11  still matter, though, thinking about those future costs, that

12  the Court be clear that Exxon's action must be limited -- must

13  be an action for several liability; and the reason is if these

14  water bodies ultimately do entail contributions from other

15  parties and if we find later that those parties aren't

16  reachable, the effect of the joint and several liability

17  judgment against Defendants is that they are stuck with any

18  orphan shares.

19              So part of the reason in the cases -- in the

20  enforcement 107 cases or cases brought by an innocent party,

21  part of the reason that you may go through the exercise of

22  apportionment first before those liable parties, then allocate

23  is because the orphan shares rest with the Defendants in that

24  context unless they prove that they should be apportioned.  And

25  then and only then do they escape liability for them.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          Whereas, in an action between liable parties

2     where it is clear that it is simply a matter of equitable

3     allocation, then the Court has the discretion to allocate not

4     just the known costs amongst those who are still reachable but

08:04:20     5     also to allocate the orphan shares.

6          So we then, as the United States, are not forced

7     to meet a burden of proof that shouldn't apply in the

8     apportionment context simply to escape those shares.  So that is

9     the other reason why it's important to be clear that Exxon's

08:04:36    10    action is one for several liability as we believe Elementis

11    Chromium holds.

12         So I'll move on now to the second issue which is

13    whether Exxon's (f) -- 113(f)(3)(B) contribution remedy is

14    exclusive with respect to Baytown; and this is only an issue --

08:04:56    15         THE COURT:  This is only at Baytown.

16         MR. LYNK:  -- only at Baytown.

17         And here, unfortunately, I cannot promise you

18    controlling Fifth Circuit law for the most part.

19         THE COURT:  So what's your best case and what's your

08:05:08    20    worst case?

21         MR. LYNK:  Well, we start with this:  Unlike some of

22    the -- many of the cases -- and I would venture to say most --

23    that Exxon has cited in its brief, this is not a case in which

24    the parties are disputing that the agreed orders that they

08:05:21    25    showed us in their handout -- I think that was the first tab

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  that described the two facility operation areas governed by

2  those orders.

3              No one is disputing that those orders qualify as

4  administrative settlements for purposes of a contribution remedy

08:05:36   5  under 113(f)(3)(B); and if there was any dispute about that,

6  obviously, I could address it.  But Exxon's opening motion

7  pointed to the same case we would recommend to your Honor as the

8  leading authority on this now, which is Trinity in the Third

9  Circuit.

08:05:50  10              I believe we also described how the Second

11  Circuit's Niagara Mohawk decision, as well, is largely in accord

12  with Trinity.  We are aware, obviously, that you yourself have

13  had a case in the past, Differential Development, in which you

14  reached a different decision.  I'll point out to you that

08:06:10  15  factually that case was different because it involved a

16  voluntarily agreement --

17              THE COURT:  Yes.

18              MR. LYNK:  -- not binding on anyone.

19              THE COURT:  Appreciate that difference.

08:06:20  20              MR. LYNK:  So we don't think that that would control

21  here, those facts aren't present.

22              Now -- now, when you talk about -- now, then that

23  means --

24              THE COURT:  Is my case your worst case?

08:06:32  25              MR. LYNK:  Well, I don't think it is because, again, I

1   do think it's readily distinguishable.  Con Ed, Second Circuit,

2   was one that I believe you discussed in that opinion; and that

3   also involved a voluntary agreement; and I'll point out that

4   Niagara Mohawk had certainly, at least, suggested that, to the

08:06:49   5   extent Con Ed reflected a very narrow look at what settlements

6   could qualify that they had to release CERCLA liability, Niagara

7   Mohawk was moving away from that.

8            Niagara Mohawk was an administrative order that

9   was certainly not an order under the two types of CERCLA

08:07:09   10   authority that are referenced, for example, in Section

11   113(g)(3)(B).  So in that respect, we don't think Con Ed

12   represents the current state of the law even in the Second

13   Circuit; and we don't think you should follow it here.

14            Now, to the extent that there is a remedy under

08:07:28   15   (f)(3)(B) we argue that you don't have a choice.  So I'm going

16   to put aside for a second the question of whether these agreed

17   orders cover all the costs at Baytown.  I'll get to that.  But

18   obviously, they cover some of the costs.  There's no doubt about

19   that.

08:07:44   20            To the extent that that remedy is available, it's

21   exclusive; and on that issue, we think the Supreme Court case

22   law controls.  ARC specifically in its opinion said that -- made

23   clear that the remedies under 107 and 113, while they may have

24   some conceptual overlap, are distinct claims; and a PRP can't

08:08:09   25   simply choose one over the other as a means of getting to joint

1    and several liability.

2              If 113(f) is available, they have to use it.

3    That's clear under ARC and it's clear under other case law that

4    we cited.  And we think -- and generally, although I won't spend

08:08:26    5    too much time talking about the specific cases Exxon cited in

6    their reply but I think for the most part you're going to find

7    that where they allowed the Plaintiff to proceed under 107(a),

8    it was not because they thought the Plaintiff is free to choose

9    either one.  Generally, it was because they felt 113 hadn't been

08:08:44   10    triggered.

11             So under the various facts of those cases, they

12    felt that the settlement wasn't a qualifying settlement; but if

13    it was, 113(f) was exclusive; and that was true even in the

14    Bernstein decision which is discussed a fair amount in the reply

08:08:58   15    brief.  That was the Seventh Circuit.  And I'll talk -- and I'll

16    stop for a moment and talk a little bit about that case because

17    it shows a factual distinction from these orders.

18             Bernstein involved two successive administrative

19    orders on consent signed with EPA, and it was a form that the

08:09:17   20    EPA has commonly used at many sites.  The first order provided

21    for the preparation of an engineering evaluation and cost

22    analysis which is, basically, the study you use to identify

23    proposed remedial -- removal, excuse me, alternatives.  So they

24    did an order that provided for this study to be done.  That's

08:09:38   25    not the end of the cleanup.

1                    Later, a second order was signed and that order

2       provided for the company to actually go out and do the removal

3       that EPA had selected and then meet the final cleanup

4       objectives.  So then what happens in this case is that the Court

08:09:54   5       says, "Well, both of these orders involve a covenant that's

6       conditional."  In other words, there's no -- in that Court's

7       conclusion, there was no resolution until the end of the

8       cleanup.

9                    And as I've described it, the first order covered

08:10:10   10       a part of the cleanup.  The second order covered the rest.

11       Because the condition had been satisfied under the first order,

12       the Second Circuit held that that one at least was a qualifying

13       settlement; and it decided that that claim was time barred under

14       either of the potentially applicable statutes of limitation

08:10:28   15       which I haven't come to yet.

16                    The second order, the condition hadn't been

17       satisfied yet; and so it was for that reason that the Second

18       Circuit held, okay, this is not a qualifying settlement.  That

19       means 113 hasn't been triggered for these costs.  And that means

08:10:44   20       107(a) by default is the claim.

21                    The facts present there that lead to that outcome

22       aren't present here.  These agreed orders, as I read them -- and

23       I could go through the provisions of them in more detail if it

24       were helpful -- they do not make the resolution of the

08:11:03   25       settlement -- the resolution of liability contingent.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          In fact, in the March, 1995, agreed order, there

2   is a provision that does make one express reservation criminal

3   liability; but that would, obviously, suggest that everything

4   else is resolved.  And actually, I think it is worth citing the

08:11:23   5   page of that.

6          So what I'm looking at -- and I'm not going to

7   cite a Bate's numbered page, I'm going to cite an original

8   number.  But I think this will appear when you look at the

9   actual copy of the agreed order which is one of Exxon's exhibits

08:11:47   10   with its opening motion.

11          So there is on pages 40 to 41 of the May --

12   excuse me, March, 1995, agreed order -- and this is in paragraph

13   24 -- a statement:  "It is understood and agreed that acceptance

14   of the terms of this settlement agreement confirmed by signature

08:12:12   15   hereto does not in any way release Exxon officers, agents,

16   et cetera, from any federal criminal liability arising out of

17   the same conduct this agreement addresses."  That's the only

18   reservation; and by obvious implication, it suggests that, at

19   least, as to civil this was a resolution.

08:12:30   20          And I will just mention without reading them all

21   a few other provisions that we think also support that.  The

22   first page of the order in the last paragraph on that page, we

23   believe there's language that supports the reading of this as a

24   resolution of liability.

08:12:51   25          On page 9 there is additional language in the

1    first full paragraph on that page -- actually, the first

2    sentence of that paragraph where it says it resolves matters

3    raised in all of the proceeding notices of violation and on page

4    41, paragraph 27, where it says "This order dispenses with all

08:13:16    5    claims and allegations set forth in the executive director's

6    original petition against Exxon."

7                So we think all of these provisions read as a

8    whole indicate that this was a resolution of liability.  And we

9    think it's distinguishable factually from those cases Exxon has

08:13:33   10    cited in which agreements were held not to qualify.  There is --

11    there is a case Exxon has cited, ITT Corp from the Sixth

12    Circuit -- and it appeared in our brief as well -- in which one

13    of the things that the Court did was find that it narrowly read

14    -- or restrictively, let's say, read the language in the

08:13:58   15    (g)(3)(B) statute of limitations which refers to certain types

16    of settlements and said, well, we think this means that only the

17    listed types of settlements are the ones that qualify and give

18    rise to a contribution remedy.

19                That case, even within that circuit, is

08:14:12   20    questionable authority because of a decision earlier in RSR

21    Corporation; and because this is, I think, the only case we are

22    mentioning today that's not cited in the briefs, I'm going to

23    read the citation for it.  I may have to search for it, but I'll

24    make my point while I'm looking for the citation.

08:14:34   25                RSR Corporation, to the contrary, held that --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    that read as <u>Aviall</u> did the companion provisions 113(f) and

2    113(g) as sort of universal -- universal provisions regarding

3    the contribution right and the statute of limitations that

4    applies to it.

08:14:54    5            So in other words, where <u>RSR Corporation</u> came out

6    was that the statute of limitations in 113(g)(3) applies to any

7    settlement of -- of some or all of the costs of a response

8    action and provides the statute of limitations for that claim.

9    <u>RSR Corporation</u> is 496 F3d 552, Sixth Circuit, 2007.  And

08:15:19   10    because it came before <u>ITT</u>, arguably, it's the controlling

11    decision.  In any event, neither of them are a Fifth Circuit

12    decision and we would refer the Court initially, as we've cited,

13    to <u>Trinity</u>, the same case Exxon has recommended.

14            THE COURT:  All right, thank you.

08:15:35   15            MR. LYNK:  Now, let me get to the factual question of

16    are all the costs after these orders signed -- were signed

17    encompassed within those orders?  And that will lead me to what

18    about any costs Exxon incurred beforehand.

19            So after 1995 our reading of these orders as

08:15:53   20    their own terms and how Exxon described them in the allegations

21    of its complaint and in its opening motion is that they provide

22    comprehensively between the two of them for the clean-up

23    activities that Exxon is conducting at Baytown to this day.

24            I'm going to leave aside the question of whether

08:16:14   25    they also provide for the water bodies because, again, we've

1   argued that they haven't done anything there yet.  They may, at

2   least, to some degree, disagree with that characterization.  But

3   at least if you're talking about the Baytown Complex where all

4   the past costs, for the most part, have been incurred, we see

08:16:30   5   nothing in this factual presentation to the Court that suggests

6   anything other than the conclusion they're comprehensive.

7          And in the reply brief, I -- the only suggested

8   costs outside the scope that I recall is a reference to Exxon's

9   negotiations to establish the FOAs, the facility operations

08:16:53   10   areas.  But on its face to us, that just sounds like further

11   discussions with the state about implementing these agreed

12   orders.

13          These agreed orders by their terms provide for

14   Exxon to address all of the soil contamination that it finds in

08:17:10   15   its investigations, to address all groundwater pollutants,

16   including pollutants that may be identified after the date the

17   order is entered.

18          It makes clear that -- what the goals of the

19   cleanup are, and it provides for the order to be terminated

08:17:24   20   after those goals are met.  There is nothing partial about this

21   order.  So we don't think that there is any credible evidence

22   here that any costs since 1995 are somehow outside the scope.

23          And that's why we would say the (f)(3) -- the

24   113(f) remedy is exclusive for those costs, and the statute of

08:17:43   25   limitations applicable to that claim is also exclusive for those

1  costs.

2          Now, costs prior to 1995.  Exxon has argued,

3  well, these are things we did voluntarily before we signed these

4  orders.  We can still sue under 107.  That is the point -- and

08:17:59  5  in part, because we didn't understand that that precisely is the

6  argument until now.  That is the point on which we submitted

7  case law to your Honor's attention in our notice of supplemental

8  authority, and I will be the first to say that at that point

9  you're looking at pretty much nothing but district court

08:18:15  10  opinions and only a few of them because most Courts have yet to

11  reach this precise issue.

12          But we think that -- we do refer you to the

13  Whittaker case and the Appleton case, and we think their logic

14  is persuasive.  And although both of those cases ultimately

08:18:32  15  dealt with 113(f)(1) specifically, the during or following a

16  civil action contribution remedy, we think the same rationale

17  should apply if you're talking about entry into an order that's

18  comprehensive for a site.

19          And so we believe those cases are precedent for

08:18:50  20  finding that all of the costs incurred to date at the Baytown

21  site are subject to an exclusive 113(f)(3)(B) remedy.  And I'll

22  just -- again, just to reinforce this point, while that

23  particular facet of the problem may not have been addressed yet

24  by many Courts, what you do about previously incurred costs, it

08:19:10  25  is definitely clear that when this remedy is available, it's the

1    exclusive remedy.  That is clear.  There just haven't been that

2    many cases that have pursued that issue that far into the

3    details yet.

4                    Now, the last issue that I'm assigned to talk

08:19:23   5    about is which statute of limitations applies.  And --

6                    THE COURT:  Is this only a Baytown issue?

7                    MR. LYNK:  Again, it's only a Baytown issue.  We've

8    not raised the statute of limitations issue with respect to

9    Baton Rouge and we are not suggesting that the (g)(3) statute of

08:19:39  10    limitations applies to the 107 claim at Baton Rouge, but we are

11    suggesting that it applies to the --

12                    THE COURT:  This is the 113 claim?

13                    MR. LYNK:  Yes, 113(f) claim at Baytown.

14                    And our argument is based on Aviall.  So, again,

08:19:57  15    this is a controlling law issue, we would say; and it's based on

16    Aviall's analysis of 113(f) and 113(g) because Aviall looked at

17    those provisions side by side and said it seemed pretty clear

18    that 113(f) was intended to set forth the contribution remedies

19    Congress intended to put in the statute in 1986 and that 113(g)

08:20:24  20    was written to provide corresponding statute of limitations for

21    each of those contribution remedies.

22                    And even though, again, (g)(3)(B) has this odd

23    quirk where it lists certain types of settlements, Aviall, when

24    it described these provisions, did not seem to put any weight on

08:20:42  25    that characterization.  Rather, it seemed to suggest that (g)(3)

1  was quite simply the universal statute of limitations for

2  contribution actions under CERCLA.

3              And the cases we've cited since Aviall are cases

4  that have read Aviall for this very point and have suggested

08:20:58  5  that it controls and that that is the reason you would apply the

6  statute of limitations in (g)(3)(B) to a contribution claim.

7  Whether -- (g)(3), I should say.  Whether it arises as a during

8  or following contribution claim or an administrative settlement

9  contribution claim, either way, (g)(3) applies the statute of

08:21:17  10  limitations.

11              In terms of cases that Exxon has cited in its

12  reply, again, I'm not going to go at length about them; but

13  almost exclusively what they are referring to are cases decided

14  before Aviall; and because of that, they are no longer good law

08:21:33  15  on this point; and that includes Geraghty & Miller, the Fifth

16  Circuit decision that they've cited.

17              And in fact, Geraghty & Miller relied on a theory

18  that used to carry some weight with a fair amount of Courts,

19  which was this:  that 113 and 107 are really different sides of

08:21:52  20  the same claim and that 113 was just another form of cost

21  recovery.  And so there were Courts, including Sun Company,

22  which, I believe, was the first, that said, well, therefore,

23  there are instances in which a contribution claim can serve as

24  the initial action for purposes of the (g)(2) statute of

08:22:10  25  limitations.

08:22:24

1    That theory and that way of looking at CERCLA
2    ended with Aviall because Aviall said, no, these are distinct
3    claims; and ARC totally agreed with that in a different context
4    and carried it even further, explained it further, but said
5    again these are distinct remedies available in different
6    procedural circumstances.

7    So any case that relies on that rationale to
8    apply the (g)(2) statute of limitations is no longer good law
9    after Aviall and ARC.  And in terms of -- again, in addition to

08:22:42

10   the district courts we've cited, we can refer you to the Sixth
11   Circuit decision I mentioned earlier, RSR Corporation, on this
12   point; Niagara Mohawk, 596 F3d at 128, Note 19; and the Eighth
13   Circuit's decision in Morrison Enterprises, 638 F3d at 609.  All
14   are cases that find that (g)(3) is the universal statute of

08:23:10

15   limitations for contribution actions.

16   And I'll -- and I'll conclude with one final
17   point about the statute of limitations.  We don't think your
18   Honor should conclude or can that there is no statute of
19   limitations applicable here.  That's been one of Exxon's

08:23:24

20   arguments; and we think that that would be the wrong answer,
21   whether or not the Defendant was the United States or a private
22   party.

23   But because the Defendant is the United States,
24   it's particularly problematic because there's no waiver of

08:23:38

25   sovereign immunity for a time unlimited claim that can be

1 brought at any time in the future.  So we think that if there

2 was a default position, it would have to be the general federal

3 statute of limitations that we cited in our brief.  And we

4 pointed out that the claim would still be time barred even under

08:23:55   5 that statute.

6          THE COURT:  All right.

7          MR. LYNK:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          MR. STEINWAY:  We can start with the strict liability

08:24:04  10 -- the joint and several liability and then the statute of

11 limitations arguments.

12          THE COURT:  That's fine.

13          MR. BUTHOD:  The only thing I was going to say, Judge,

14 is we'll follow the Court's instruction.  We're grateful --

08:24:14  15 there's a lot that just came up that we need to address.  We're

16 grateful for the Court and most grateful for the court's staff.

17          THE COURT:  The court reporter is really the one we

18 ought to be thanking here.

19              Do you need a break, Gayle, or can we --

08:24:20  20          THE COURT REPORTER:  No, I'm fine.  Thank you.

21          THE COURT:  All right.

22          MR. STEINWAY:  I know how hard you've been working

23 before any of us even got here.  I appreciate that.

24              We'll address the best we can the 107, 113

08:24:31  25 interplay and limitations.

1           Frankly, your Honor, we're concerned about the

2    time that it's going to take us to reply to these issues; and

3    we've also asked in our briefing papers for the opportunity,

4    given the page limitations, to have an opportunity to further

08:24:44    5    brief --

6           THE COURT:  I'll give you another 20 pages on these

7    points.  That's a lot.  It's a huge amount.

8           MR. STEINWAY:  Thank you, your Honor.

9           THE COURT:  But that should limit your presentation

08:24:52   10    here this evening to the highpoints that you really want to make

11    sure that I don't walk away thinking you don't dispute, okay?

12    But I think you can limit yourself to that for now.

13           MR. STEINWAY:  Thank you, your Honor.

14           MR. LYNK:  Your Honor, if I can add one thing, just

08:25:08   15    one?

16           THE COURT:  Yes, sir.

17           MR. LYNK:  First of all, of course, that we were -- I

18    was already prepared to say we would be fine; and obviously, you

19    granted a supplemental brief.  I mentioned earlier that we don't

08:25:18   20    think factually in terms of what's presented here, including in

21    their reply, that there's any reason to suggest that there are

22    costs outside the scope.

23           But we are at an inherent disadvantage when we

24    talk about the facts relating to what they're doing in their

08:25:33   25    response actions because in this case we bifurcated costs and

1  NCP compliance issues to Phase 2.  And in fact, when we issued

2  certain discovery requests that asked targeted questions about

3  the nature of the response actions, for example, whether actions

4  were removals or remedials or both, we did not get an answer.

08:25:55  5          And we discussed that.  And we ultimately

6  stipulated to expressly reserve that in the Phase 2, which

7  already seemed to be the proper reading of your scheduling

8  order.  So the problem now is if there are factual issues that

9  they would raise that suggest, well, this is -- this is how the

08:26:12  10  cleanup is being conducted and this is why certain things are

11  outside the scope, they would be issues on which we never had a

12  chance yet to take discovery.

13          Now, we think the motions can be resolved at this

14  point without speculating about whether there are costs outside

08:26:26  15  the scope because we think if you look at all the filings to

16  date, there's no basis to reach any other conclusion as a matter

17  of fact.  And of course, again, in our arguments about the

18  statute of limitations, we've not asked the Court to enter a

19  summary judgment on that basis --

08:26:38  20          THE COURT:  I understand that.

21          MR. LYNK:  -- only to deny.

22          So I'm not suggesting that we definitely need to

23  have discovery but I would say if there are further --

24          THE COURT:  You're not seeking affirmative summary

08:26:48  25  judgment, you simply don't want me to grant theirs?

1          MR. LYNK:  Exactly.

2          THE COURT:  Okay.  Then I think that simplifies and

3     clarifies, and I appreciate your reminding us of that.

4          MR. LYNK:  Thank you.

08:26:57   5          THE COURT:  All right, thank you.

6               Go ahead.

7          MR. STEINWAY:  Your Honor, we will address the joint

8     and several liability question first.  First, we think our

9     motion for imposing joint and several liability is proper.  The

08:27:13   10   Government has admitted all of the prima facie elements of a 107

11    claim except for the question of the covered party issue.  The

12    fundamental prima facie elements of facility, hazardous

13    substance, release, and occurrence of response costs have all

14    been admitted.

08:27:31   15          You asked us for the precedent for granting or

16    imposing joint and several liability.  Not only has BNSF, the

17    Supreme Court precedent, but here in the Fifth Circuit, In Re:

18    Bell Petroleum Services specifically said that 107(a) can

19    provide a basis for -- a 107(a) claim can provide a basis for

08:28:01   20   the imposition of joint and several liability.

21          Here even in this Court, your Honor, you, in the

22    Differential Development, a 1994 case, or the Halliburton Energy

23    Services case, have recognized that a 107 claim can result in

24    the imposition of joint and several liability.

08:28:21   25          Our factual basis is again not only the

1  commingling of the waste resulting in an individual --

2  indivisible harm but also the fact that the facilities were

3  integrated.  So not only do you have an indivisible waste

4  between the United States and Exxon but you have a temporal

08:28:40  5  issue as well.  So we feel that the imposition of joint and

6  several liability is proper.

7          We believe the Court wrestled with this issue in

8  the Halliburton Energy Services case that we set out.  In fact,

9  in a page of your decision, your Honor, you talked about the

08:28:58  10  question of Halliburton Energy Services and Georgia Pacific and

11  the procedural status of that case and the imposition of joint

12  and several liability in that context.

13          We think that our situation here is far different

14  than the situation that faced the Court in that case.  The

08:29:16  15  difference is as follows:  Georgia-Pacific conceded liability in

16  the Halliburton Energy Services case.  And so because of that

17  concession of liability, the Court looked at the questions of

18  blunting and et cetera and moved forward.

19          Here, however, in contrast, the Government has

08:29:40  20  not conceded any liability.  If the Government conceded

21  liability, we would maintain that, perhaps, the situation would

22  be different.  But the fact that the Government has not conceded

23  liability makes this case far different from the case of

24  Halliburton Energy Services; and furthermore, apportionment of

08:29:59  25  liability and the divisibility is a critical factor.  It shifts

1   the burden of proof from the Plaintiff to the Defendant as part

2   of a defense on a liability claim.

3            So we do believe that the joint and several

4   liability claim that we're making here is quite important, and

08:30:15   5   it's -- the precedent is the Fifth Circuit in In Re:  Bell

6   Petroleum Services; and in fact, it would be consistent with

7   this Court's decision in Halliburton Energy Services.

8            THE COURT:  All right.  That's helpful, thank you.

9            MR. STEINWAY:  Let me turn to the statute of

08:30:29   10   limitations argument, your Honor.

11            THE COURT:  Of course, the Government has conceded

12   owner liability as to some of these facilities, just not

13   operator liability.

14            MR. STEINWAY:  Not for operator liability.

08:30:43   15            THE COURT:  And not arranger liability.

16            MR. STEINWAY:  Not arranger.  But if this Court

17   granted our motion on operator liability, the Government being a

18   covered party as an operator, then, since they've admitted all

19   the prima facie elements, that would satisfy our prerequisites

08:30:58   20   for a 107 claim and the imposition of joint and several

21   liability.  Our position is it's straightforward according to

22   all the cases.

23            THE COURT:  All right.

24            MR. STEINWAY:  As to the statute of limitations

08:31:09   25   argument, your Honor, you've asked once in awhile what is our

1  best case and what is our worst case.  I'd like to answer that

2  question.

3            THE COURT:  Good.

4            MR. STEINWAY:  Our best case is two:  one case the

08:31:20  5  Government hasn't mentioned, the case of <u>LWD PRP Group</u> which

6  just came down; and we just gave you a notice of supplemental

7  authority there.  In that case, three fundamental points:  one,

8  the Government in that case -- the Plaintiffs in that case,

9  rather, had both voluntary and involuntary costs, much like our

08:31:41  10  situation; two, the Court in that case used (g)(2) -- 113(g)(2)

11  as a basis for statute of limitations; and three, in that case

12  the Court said there was no exclusive remedy.  So that's one of

13  our best cases.

14            We believe the other best case is the Fifth

08:31:59  15  Circuit decision in <u>Geraghty & Miller</u>.  In that case, as the

16  Government counsel has recognized -- we would agree that

17  <u>Geraghty & Miller</u> was based on a legal status prior to the

18  Supreme Court's rulings in this area.  However, we think it's a

19  fundamental notion of law that not only do you look at the prior

08:32:20  20  rulings but you also look at the rationale of the Court in

21  reaching those rulings as dispositive of precedent in

22  influencing decisions.

23            In <u>Geraghty & Miller</u> the Court faced three

24  options.  The Court said in the Fifth Circuit, one, we have

08:32:34  25  three options here.  We can say there's no statute of

1  limitations; Option Two, we could say there's a three-year

2  statute of limitations under (g)(3); or three, we could have a

3  six-year statute of limitations under (g)(2).

4             The Court picked (g)(2), the six-year statute of

08:32:49  5  limitations, because of the words "an initial action for

6  recovery of costs."  In that case, exactly similar to the case

7  here, this is an initial action for recovery of costs.

8  Following the same language of -- same rationale of Geraghty &

9  Miller, we would argue again it should not be (g)(3).  At the

08:33:10  10  very worst, it should be (g)(2).

11            And furthermore, one of the key points from a

12  rationale perspective in the Geraghty & Miller case is the Court

13  fought hard to avoid imposing words on the statute.  (g)(3)

14  enumerates -- 113(g)(3) enumerates the various types of statute

08:33:35  15  of limitations and the claims that are subject to that

16  particular provision.

17            There -- this limitation applied to judgments and

18  three categories of settlements.  The categories of settlements

19  are 122(g), de minimis; 122(h), cost recovery; and

08:33:52  20  judicially-approved settlements.  Those types of settlements are

21  cost reimbursement settlements that deal with common liabilities

22  and payments to third parties.  That's far different than our

23  situation here.

24            And so we don't think that (g)(3) would apply;

08:34:05  25  and we think that the Geraghty & Miller Court, the Fifth

1   Circuit, worked hard to avoid putting words into (g)(3) that

2   weren't there; and that's part of the rationale that led them to

3   (g)(2).

4           So while the basis for Geraghty & Miller may

08:34:20   5   admittedly be changed based on the Supreme Court's decision, the

6   rationale of the Court still remains vital and effective and

7   should govern the case here.

8           The bad case is Whittaker, and we don't think

9   Whittaker applies; but if it was a bad case, that would be the

08:34:38   10   case.   In Whittaker --

11           THE COURT:   How do you distinguish it briefly?

12           MR. STEINWAY:   We distinguish Whittaker very simply,

13   your Honor.   Whittaker dealt -- and the Court was extremely

14   clear about this -- dealt with an (f)(1) situation during and

08:34:49   15   following a 106 and --

16           THE COURT:   All right.   Now I understand that

17   distinction.

18           MR. STEINWAY:   What -- we have a number of points, and

19   I don't know where to begin.   But factually, we would disagree

08:35:06   20   with the Government on the facts of the situation.   They've

21   misrepresented the situation.   We have a group of voluntary

22   costs.   We voluntarily cleaned up what we call Separator 2, 3M,

23   10, the upper and lower canal and the --

24           THE COURT:   You mean not because the settlement

08:35:24   25   required it?

1          MR. STEINWAY:  Right.  And the settlement, in our

2    view, if it covers anything at all, only covers costs within the

3    scope of the settlement.  That's clear from the statutory

4    language and the interpretation of the statute.  And we -- there

08:35:37    5    is work being done voluntarily outside the scope of the

6    settlement.

7          THE COURT:  Is there a dispute as to the amount of

8    work beyond the settlement scope or the settlement requirements

9    that's being done?

08:35:49   10          MR. STEINWAY:  Yes, your Honor.

11          THE COURT:  And if there is a dispute, does that mean

12    that I simply -- again, the Government is just asking me to deny

13    summary judgment, right?

14          MR. STEINWAY:  I believe so.

08:36:01   15          THE COURT:  And you're telling me it's disputed.  Why

16    doesn't that sort of support the Government's argument, you

17    should deny summary judgement because there are material factual

18    disputes that raise -- that have to be resolved?

19          MR. STEINWAY:  But those issues don't go to the

08:36:15   20    question of operator liability, they go --

21          THE COURT:  No, I'm not talking about operator

22    liability.  It's still -- I mean, on this point, if I understood

23    you correctly, your -- and maybe I'm getting confused because it

24    is late.  But you have repeatedly reminded me that you are not

08:36:33   25    asking for summary judgment --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1           MR. STEINWAY:  Correct.

2           THE COURT:  -- you are asking me to deny their motion

3   for summary judgment.

4           MR. LYNK:  Yes.

08:36:37   5           THE COURT:  And if there are disputed fact issues

6   material to determining this, shouldn't I deny your motion for

7   summary judgment?

8           MR. STEINWAY:  With respect to the disputed -- I

9   understand, your Honor; but we do not think there's a dispute

08:36:51  10  over the fact that the FOA work is outside the scope outside of

11  the settlement.

12          THE COURT:  And that's the only point in which you're

13  seeking 113 relief or seeking denial of their motion for summary

14  judgment on the basis of 113 preclusion?

08:37:11  15          MR. LYNK:  Yes.  I mean --

16          THE COURT:  All right.  Fair enough.  That clarifies

17  it.  Okay.  That's helpful.  Thank you.

18          MR. STEINWAY:  One of the --

19          MR. LYNK:  Let me be clear, 113(f) precluding

08:37:21  20  107(a) --

21          THE COURT:  Yes.

22          MR. LYNK:  -- and that -- and also that the claim is

23  too late, although, again, we've not moved yet to dismiss the --

24          THE COURT:  I understand.

08:37:28  25          All right, go ahead.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. BUTHOD:  Conceptually -- let me just real quickly.

2    If there's a fact issue on a defensive issue for which the

3    Defendant has the burden of proof --

4          THE COURT:  No.  I understand.  I don't need a 56

08:37:42  5    lecture now.  Yeah, that's all right.  I got Rule 56.

6          MR. LYNK:  And again, a fact issue on which we believe

7    we've not had the chance for discovery and could not have had.

8          THE COURT:  You're not asking me for a continuance

9    under Rule 56 either.

08:37:48  10         MR. LYNK:  No.

11         THE COURT:  So go ahead.

12         MR. STEINWAY:  The Government's characterization --

13   many of the Government's characterizations of the cases that

14   they've cited to your Honor we would disagree.  We would make

08:38:00  15   just a couple of fundamental points in the interest of time.

16         THE COURT:  I appreciate that.

17         MR. STEINWAY:  First, we believe a 107 claim can be

18   maintained with the 113 claim.  The LWD case stands for that

19   proposition.  We think that all the cases the Government has

08:38:19  20   cited are distinguishable for various reasons.  For example,

21   Solutia -- the Government cites Solutia as a particular case

22   where an exclusive remedy had to be 113.

23             In that case -- the exclusive remedy had to be

24   113 because in that case the Government had cut -- granted

08:38:38  25   contribution protection to the Defendants in that case.  So

1   there would be gamesmanship played if a 107 action had been

2   brought.

3             Here, the Government has not granted us any

4   contribution protection.  So the concern about doing end-runs

08:38:54   5   around settlements that have contribution protection do not

6   apply.

7             Second, joint and several liability.  Some of

8   these cases were concerned about joint and several liability.

9   Here, in contrast, joint and several liability has already been

08:39:07   10   blunted by the fact that the Government has brought a

11   counterclaim.

12             Our point is that all the cases the Government

13   has cited for the proposition that an exclusive remedy in terms

14   of 113(f)(3)(B) should apply are distinguishable from the

08:39:24   15   situation that we have at hand.  We'll lay all this out for you,

16   your Honor, in our papers.

17             In any event, we do believe that the cases

18   suggest that 107 claims can still be maintained with 113.  We

19   cite to Bernstein which said in a 2002 ROD --

08:39:45   20             THE COURT:  I need to interrupt.  Is there a

21   distinction between voluntary arrangement and the required

22   actions under the settlement as the Government argued?

23             MR. STEINWAY:  Yes, there is, your Honor.  But now,

24   the case law has been extended.  In the old -- prior to recent

08:40:02   25   case law, there was -- the Court --

1         THE COURT:  When does "recent case law" start?

2         MR. STEINWAY:  The FMC case and Zotos in the Second

3   Circuit.

4         THE COURT:  All right.

08:40:12   5         MR. STEINWAY:  The Supreme Court in ARC recognized

6   that the distinct remedies apply in distinct and different

7   procedural circumstances.  And the Court recognized that 107

8   actions apply for voluntary and direct cleanups and contribution

9   actions apply when there's a reimbursement or a common party

08:40:30  10   liability situation.

11         But the Courts have now recognized that 107

12   actions can even be extended to comply -- to apply to compelled

13   cleanups.  So it addresses the overlap that the Supreme Court

14   recognized in the footnote --

08:40:45  15         THE COURT:  So the distinction of the bad cases that

16   the Government made based upon a voluntary agreement you think

17   goes by the wayside?

18         MR. STEINWAY:  Yes, your Honor

19         MR. BUTHOD:  The LWD case that's submitted out of

08:41:00  20   Kentucky talks about the exact topic.

21         THE COURT:  All right.

22         MR. STEINWAY:  And as to the time barring situation,

23   the Government cites the Aviall for the proposition that all

24   contribution actions ought to fit into the (g)(3) contribution

08:41:15  25   box.  That's an inference that's made that must be trumped by

1  the fact of the strict language of the statute.

2          The Supreme Court and this Court in every CERCLA

3  case has literally parsed the words of each statute.  They

4  relied on the plain language of the statute.  Here, the plain

08:41:31  5  language of the statute is quite clear:  (g) -- 122(g), 122(h),

6  and no other settlements.

7          And so you cannot read the inference that the

8  Aviall Court said of contribution actions that all of them fit

9  into the box of (g)(3).  That inference doesn't apply.  It's

08:41:52  10  directly contrary to the Supreme Court's parsing out of in

11  Aviall the language of the words of 113(f)(1) in the first

12  place.

13          Furthermore, all the cases that have addressed

14  this issue have looked at (g)(3), and whether they've applied

08:42:10  15  (g)(3) or not have depended on the exact words of (g)(3).  The

16  Government cites the RSR case as suggesting that it falls within

17  113(g)(3).  Well, RSR dealt with a situation far different than

18  the situation we have here.

19          RSR dealt with a judicially enforceable consent

08:42:32  20  decree clearly falling within the square terms of the

21  judicially-approved bucket of limitations covered by (g)(3).  It

22  dealt with an immediate release, and it dealt with a full no

23  reservation of rights.  That's clearly at odds with the

24  administrative order consent that we have here.

08:42:52  25          In contrast, ITT can be easily reconcilable with

1  RSR because ITT, again, another Sixth Circuit, dealt with a

2  situation where there was a conditional precedent to granting --

3  terminating, much like our situation in the AOC.  We'll explain

4  -- we'll address these issues, your Honor, in our papers for

08:43:15   5  you.

6          THE COURT:  I think you've outlined the basic points,

7  and that's very helpful.

8          MR. STEINWAY:  The bottom line is we see the bucket of

9  (g)(3) limitations dealing with reimbursement for contribution.

08:43:28  10  This is not a contribution action.  This is a cost recovery

11  action, much more akin to Bernstein and 107 and would fall in

12  the (g)(2) bucket.

13          And with respect to the 2401 issue, the

14  Government -- the general statute, there's no -- there's no case

08:43:40  15  in the country right now, your Honor, who has applied 2401 to a

16  CERCLA case.  In fact, in the Government's brief, they

17  contradict themselves.

18          On one hand, the Government said the 2401 would

19  apply to the situation.  On the other hand, later on in their

08:43:54  20  brief, the Government says all the statute of limitations

21  provisions are covered by CERCLA in the first place.  So there's

22  an inherent contradiction to it.

23          And the final point we'd like to make on that

24  point is the Government expressly waived sovereign immunity

08:44:08  25  under 120 of CERCLA.  That goes to every defense -- that puts

1   the Government in the same shoes as a private party for purposes

2   of CERCLA PRP liability.  The Government should not have any

3   special defense such as a special -- special default six-year

4   statute of limitation that would not apply to the -- to a

08:44:26   5   private party.

6          The private party and the Government are put in

7   the same shoes under 120.  There's a waiver of sovereign

8   immunity.  There can be no 2401.

9          THE COURT:  I'm not going to -- I don't want to reopen

08:44:37   10   anything, trust me.  But I'm struck a little bit by your saying,

11   on the one hand, there's no special rule for the Government,

12   including for the consequences of actions that occurred in

13   wartime, and your earlier statement that, "By golly, we need a

14   special rule that recognizes the exigencies of wartime

08:44:56   15   contracting."  It's just a little point --

16          MR. STEINWAY:  May I --

17          THE COURT:  -- as we're talking about the internal

18   inconsistencies that this -- that --

19          MR. STEINWAY:  May I address that point, your Honor?

08:45:09   20          THE COURT:  Yes, you can.  And I understand that the

21   statute of limitations kicks in on -- on recent events that are

22   well after the wartime events; and I do understand that.  If

23   that was where you were going, I think I get that.

24          MR. STEINWAY:  We think -- with the special rule here,

08:45:25   25   we're just saying the Government and the private parties are in

1   the same footing pursuant to 120 of CERCLA which waived the

2   Government's --

3                   THE COURT:  No, no, no.  I understand what you're

4   saying.  I understand what you're saying, and I was just taking

08:45:37   5   a somewhat more abstract view, too abstract.

6                   All right.  Anything further that is worth saying

7   at this point?

8                   MR. ROWE:  Two things, your Honor.

9                   THE COURT:  Think carefully.

08:45:52   10                   MR. ROWE:  Two things because I was deferred to

11   earlier --

12                   THE COURT:  Yes.

13                   MR. ROWE:  -- and Exxon made a concession.  So I'll

14   make one, which is easy since I think I know where the judge is

08:46:01   15   going anyway.  This was with respect to the question about the

16   future costs.

17                   We had thought that we know enough about what we

18   don't know to make the decision now.  We don't disagree that an

19   opportunity to reopen might work.  We also acknowledge that this

08:46:17   20   is not really a summary judgment issue.  We thought it was a

21   reasonable time to do it.  So if the Court would like to wait

22   and explore with us as we go through the case the best solution

23   to that problem, that's fine with us.

24                   Second thing:  On scheduling, it seems to me, in

08:46:32   25   light of all the things we've talked about and having additional

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  briefing, that it may not make sense to go forward with a -- the
2  rest of the schedule kind of --
3          THE COURT:  No, I think that's right.  So what I'm
4  going to do is set a deadline for your briefs two weeks from
08:46:44  5  Friday, all right?
6          And I'll give you two weeks after that to file
7  a --
8          MR. ROWE:  Thank you.
9          THE COURT:  -- ten-page reply, nothing further.
08:46:49  10         MR. ROWE:  That is fine.
11         THE COURT:  Then we're done with briefing, okay?
12  Done.  Say what you need to say, no more.
13         MR. ROWE:  Okay.
14         THE COURT:  All right.
08:46:58  15         MR. ROWE:  Your Honor, you should be aware -- I just
16  want to make sure this is okay with you.  There's a possibility
17  that Exxon will shortly serve us a supplemental expert report.
18  We have not seen it so we don't know whether we're opposed to
19  it.
08:47:11  20         THE COURT:  When is "shortly"?
21         MR. ROWE:  End of March, I think.
22         MR. STEINWAY:  We haven't had a chance -- our expert
23  is out of the country, but we're working on it.  I just learned
24  about this --
08:47:20  25         MR. ROWE:  Oh.  It's already --

1          THE COURT:  Is there going to be a dispute on --

2          MR. ROWE:  Well, in any event, they're going to serve

3   it.  We haven't decided -- at some point.  We haven't decided

4   whether we're going to oppose it.  But if we don't, they've

08:47:29   5   agreed to a short deposition.

6          THE COURT:  That's fine.

7          MR. ROWE:  That seems that it would still be worth

8   doing.

9          THE COURT:  I think it might mesh with this schedule

08:47:36   10  depending on how long it takes after the end of March for the

11  expert to file its -- his, her, whatever, supplement and for you

12  to decide whether you oppose it and how you want to respond to

13  it.

14         MR. ROWE:  Thank you, your Honor.

08:47:51   15         THE COURT:  All right.  Thank you-all.

16              And thanks, in particular, to our court reporter

17  who I don't think expected to work this late.  Thank you.

18      (Proceedings concluded at 8:48 p.m.)

19               C E R T I F I C A T E

20         I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter, to

22  the best of my ability.

23

24  By: /s/**Gayle L. Dye**                    **05-02-2014**

25         Gayle L. Dye, CSR, RDR, CRR        Date


Gayle Dye, CSR, RDR, CRR - 713.250.5582