1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION

3  EXXON MOBIL CORPORATION        .  C.A. NO. H-10-2386
                                  .  HOUSTON, TEXAS
4  VS.                            .
                                  .  MAY 26, 2016
5  UNITED STATES OF AMERICA       .  2:00 P.M. to 2:51 P.M.

6

7           TRANSCRIPT of DISCOVERY HEARING
     BEFORE THE HONORABLE LEE H. ROSENTHAL
8           UNITED STATES DISTRICT JUDGE

9

10 <u>APPEARANCES</u>:

11 FOR THE PLAINTIFF:        * MR. MICHAEL P. MCGOVERN
                             * MR. DANIEL M. STEINWAY
12                           Baker Botts LLP
                             1299 Pennsylvania Ave NW
13                           Washington, D.C.  20004-2400

14                           * MR. TYNAN BUTHOD
                             Baker Botts LLP
15                           One Shell Plaza
                             910 Louisiana St.
16                           Houston, Texas  77002

17

18 FOR THE DEFENDANT:        * MR. MICHAEL D. ROWE
                             * MR. JUSTIN D. HEMINGER
19                           U.S. Department of Justice
                             Environmental and Natural
20                             Resources Division
                             601 D St., NW
21                           Suite 8000
                             Washington, D.C.  20004

22

23 * Appearing by phone

24

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.

1                    <u>APPEARANCES CONTINUED</u>

2  FOR THE DEFENDANT:              * MS. STEPHANIE J. TALBERT
                                     U.S. Department of Justice
3                                    999 18th St.
                                     South Terrace, Suite 370
4                                    Denver, Colorado  80202

5                                  * MS. ERICA M. ZILIOLI
                                     U.S. Department of Justice
6                                    P.O. Box 7611
                                     Washington, D.C.  20044

7

8

   OFFICIAL COURT REPORTER:         MS. KATHY L. METZGER
9                                    U.S. Courthouse
                                     515 Rusk
10                                   Room 8004
                                     Houston, Texas  77002
11                                   713-250-5208

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2  *THE COURT:*  Good afternoon.  Thank you for
3 participating in this.
4    So here is the question that I have as just a
5 run-up to this:  What is the status right now of the two cases
6 in relationship to each either?
7  *MR. STEINWAY:*  This is Dan Steinway, Baker Botts, for
8 Exxon.  The two cases, are you referring, Your Honor, to the
9 CERCLA case and the contract case or the two consolidated cases
10 before you, Your Honor, the --
11  *THE COURT:*  The CERCLA and the contract.
12  *MR. STEINWAY:*  Your Honor, I can answer.  It's Dan
13 Steinway again.  Your Honor, the contract case was stayed by
14 Judge Braden pending the resolution of a case currently before
15 her in her court, *Shell Oil versus United States*.  We are
16 awaiting a decision from Judge Braden on the *Shell* case.  Judge
17 Braden did tell us that she will issue a decision in August,
18 before the end of the term for her clerks, in the *Shell*
19 contract case.
20  *THE COURT:*  Okay.
21  *MR. ROWE:*  And, Your Honor, good afternoon.  This is
22 Michael Rowe for the government.  I agree with most of that,
23 although I was just rereading the Judge's order this afternoon,
24 and it appears to say that the stay is dependent on what
25 happens in Your Honor's court.  She refers to the Southern

1  District of the United States District Court of Texas and the

2  Houston Division at the end of her order.  It may be that she

3  offered that in some subsequent conference, but I wasn't aware

4  of that, if that's the case.  In any event, the case is stayed.

5           *THE COURT:*  So, we're not going to get any guidance

6  out of there.  If anything, it's going to come the opposite

7  direction?

8           *MR. STEINWAY:*  Your Honor, this is Dan Steinway again

9  for Exxon.  The way that we understood Judge Braden's order in

10  the contract case is that once the *Shell* decision was issued by

11  the Court in that case, she would reconsider her decision to

12  lift the stay in the *Exxon* case.  And, again, as I mentioned to

13  you earlier, Your Honor, we believe the Court's going to issue

14  a decision in the *Shell* case in August.

15          *THE COURT:*  Okay.  Good.  Okay.  Let's try to take up

16  the disputes here and not so much the extension deadline, but

17  the substantive response issue, the adequacy of the response.

18  And I'm happy to hear first from the party asserting that the

19  response is inadequate.

20          *MR. ROWE:*  Yes, Your Honor.  It's Michael Rowe.  And

21  that would be the government.  And I will tell you that I think

22  both Mr. Steinway and I are sorry to be here.  We have managed

23  to resolve many similar disputes in the past, but this one we

24  seem not to be able to get past.

25              We do, however, agree about what the dispute is

about.  From our point of view, the company has failed to answer the core questions in our entire first round of discovery, but we agree amongst the parties that there basically are three topics.  Not to say that there are not other small issues, but these are by far the dominant ones.

The first one is the company's declining to respond at least for the time being to any and all questions relating to the company's efforts, if there are any, to comply with the national contingency plan, which, as Your Honor may know from prior CERCLA experiences, is an element of their case and is an issue that the parties reserved with the Court's permission for Phase II, which is why we're asking the questions now.

So, we're not able to get any information about the NCP.  And that -- I will hint a little bit at where we're going.  I'll tell you that it seems to be the company's position, that that is a question only for experts.  So we have to come back to that in a minute.

And the two remaining topics are in some sense related.  They're what we have come to call between us the collateral source issues.  It is certainly the government's position and we have a fair amount of authority for the prospect, that the collateral source rule does not apply in CERCLA cases.  And so we have asked the company for information about portions of its insurance recovery that relate to the two

refineries from a number of pieces of insurance litigation,
which they admit they made some recovery, but where they are
thus far refusing even to inquire as to how much work it would
be to go back into what's called the -- their first insurance
case out of California was the North American coverage case,
and they have a thing called the NACC repository, which we've
asked them to look in for documents.

We also think there might be some documents, by
the way, that might be responsive to Phase I discovery in
there, we don't know, but that's not really the issue right
now.

So the question is if the collateral source rule
does not, in fact, apply and if they made a 260 million --
$269 million recovery, as they say, and keeping in mind that
they were also suing about things that we acknowledge have
nothing to do with the case, how much of that recovery might
the Court consider as an equitable factor when you're
allocating as we get to the next phase of the case.

The third item is similar. You may remember in
your earlier opinion, that you mentioned the *Lockheed*
litigation before Judge Huvelle --

*THE COURT:* Uh-huh.

*MR. ROWE:* -- the issue about whether or not large
corporations with government contracts are effectively
recovering response costs as part of their -- essentially an

1    overhead pool.  That issue is currently still pending before
2    the D.C. Circuit.  And, again, we have asked for information.
3              There Exxon's response -- we've kind of gone back
4    and forth a little bit.  We were first told that we would get
5    an answer to those questions and that the company believed they
6    didn't have any contracts that would bring that issue into the
7    case.  When the responses were served, we got instead
8    objections and declinations to answer; but then in our
9    post-service discussions, Mr. Steinway agreed that the company
10   needed to respond to those.  So we don't -- I'm not sure where
11   we are on that right now.  My understanding is that they intend
12   to do that at some point, but they haven't yet.
13             And I'll go just a little more and then stop.
14   The problem for us and the reason I think you're right to know
15   that this is much more important than the issue of the time for
16   experts, is that our experts to some degree are dependent on
17   the answers to these questions.  So I have an environmental
18   engineer who is prepared to opine about the company's efforts
19   to comply with the NCP and whether they're adequate on the
20   various projects that Exxon may choose to define or however
21   they decide to group their various costs.
22             And it's -- it is possible, you know, we can look
23   at the last three years of work they've done and try to make
24   our own judgments about what those projects logically are and
25   whether they're removal or remedial actions and whether they

1 did what they were supposed to do or not.  But almost

2 inevitably their experts will group them some different way,

3 and we wind up with a rather haphazard presentation to the

4 Court.

5 So, it's difficult -- it's much more difficult

6 for our experts if Exxon hasn't taken some sort of position at

7 least about what these projects are, which ones go together,

8 which ones they think are removal, which ones they think are

9 remedial, and how they think they complied, if they did, or if

10 they think they did, than it is -- so if you get that, as an

11 expert, at least you have a set of materials to work on.

12 Without it, you're really left at sea and we're likely to have

13 a good bit of chaos in the exchange of presentations.

14 A similar problem arises with respect to the

15 accounting material, because one of the things that we have

16 asked our accountant -- and those are the two experts, by the

17 way, environmental engineering and accounting, that we're

18 planning to offer.  The accountant is, of course, looking at

19 invoices and proof of payment and all of the usual sorts of

20 things, but was also assigned when we hired him back around the

21 holiday, the task of looking at the information relating to

22 these other sources of payment that may have resulted in an as

23 yet unknown amount of recovery for the company.  And at this

24 point he literally has nothing to work with, because we don't

25 have any information about either one of these things.  Now,

1  those are things that can be fixed, but that's our problem.

2          So what we're looking for is basically to have

3  our questions answered and to have some attempt by Exxon to at

4  least go and look at the NACC repository and determine what the

5  burden would be of answering our questions, some of which are

6  as simple as asking for interrogatory answers, some of which,

7  admittedly, could be more burdensome, but we don't know how

8  much until we get some information about how the information is

9  stored.  As of the Friday before I sent the --

10          *THE COURT:*  And what specific information in that

11  respect do you need?

12          *MR. ROWE:*  Well, we need to have some understanding of

13  how Exxon calculated the figures that it has told us were the

14  approximate demand at the outset of the insurance case, and we

15  need to have some sort of motion that would allow us to make

16  some kind of arguments to Your Honor about how the recovery

17  should be allocated.  And I can expand a bit --

18          *THE COURT:*  Well, hang on.  Two separate issues.

19          *MR. ROWE:*  Okay.

20          *THE COURT:*  So, let's focus on the insurance issue

21  first.  There's no issue here that Exxon is going to be

22  judgment proof, I take it, or unable to respond in damages?

23          *MR. ROWE:*  I'm sorry?  I beg your pardon?

24          *THE COURT:*  There's no issue as to Exxon's ability to

25  respond in damages, is there?

1    *MR. BUTHOD:*  Not that I'm aware, Judge.  This is Ty

2  Buthod for Exxon.

3    *MR. ROWE:*  I believe that Exxon has the money.

4    *THE COURT:*  Right.

5    *MR. ROWE:*  I'm not sure I understand the question,

6  Your Honor, but I think the answer is "no."

7    *THE COURT:*  Exactly.  And you also know -- and you've

8  been given copies of some of the policies, as I understand it;

9  is that correct?

10    *MR. ROWE:*  We have been given partial copies of three

11  or four policies with all of the insurers and policy numbers

12  redacted.

13    *THE COURT:*  Okay.  So this is sounding good.  What

14  more do you need with respect to that kind of proof?

15    *MR. ROWE:*  Well, the simplest way for me to explain

16  this, Your Honor, is to talk a little bit about what the cases

17  say.

18    *THE COURT:*  Well, no, no, no.  Cases are fact

19  dependent.  What I really need to know is what benefit the

20  additional discovery on insurance will provide that you cannot

21  obtain or have not already obtained from discovery that has

22  occurred so far.

23    *MR. ROWE:*  Okay.

24    *THE COURT:*  Okay?  It's not a jurisprudence question,

25  so much as a practical fact-bound question, necessary to

1    determine proportionality in specific ways.

2            MR. ROWE:  Okay.  Let me try to do it this way --

3            THE COURT:  It's not just relevance now.  It's

4    proportionality.

5            MR. ROWE:  Yes, ma'am, I understand.

6            THE COURT:  And you know that better than I do.

7            MR. ROWE:  Yes, ma'am.  Exxon has --

8            THE COURT:  You've got to tell me louder though.

9            MR. ROWE:  Oh, I'm sorry.

10           THE COURT:  That's okay.

11           MR. ROWE:  I'll bring the phone a little closer.

12           THE COURT:  Don't apologize, just increase volume.

13           MR. ROWE:  Okay.  Exxon has the represented to the

14   United States --

15           THE COURT:  Louder.  I don't know if you're on the

16   speaker or if you're at the bottom of the tunnel or what.

17           MR. ROWE:  Let me turn this.  How about now, is that

18   better?

19           THE COURT:  Nope.

20           MR. ROWE:  Okay.

21           THE COURT:  Pick up the phone and talk into the thing

22   called a mouthpiece.

23           MR. ROWE:  Unfortunately, it's one of these fancy

24   conference phones, Your Honor, that's supposed to make that

25   unnecessary.

1      *THE COURT:*  Then get on top of it.

2      *MR. ROWE:*  Okay.  I am directly on top of it now.

3      *THE COURT:*  Better.  Okay.  And we increased volume

4  here.  So I think we're going to be -- together, we'll be

5  adequate.  Go ahead.

6      *MR. ROWE:*  Okay.  I will try to speak as loudly as I

7  can, without yelling.

8      *THE COURT:*  You're doing good.

9      *MR. ROWE:*  Exxon has represented to the government

10  that it brought a large elaborate insurance claim against

11  dozens of insurance companies covering decades of potential

12  liability.  Portions of those insurance claims appear to

13  include policies from World War II, which we believe the United

14  States or the taxpayers paid the premiums on, either directly

15  or indirectly, and so logically some portion of that, since the

16  collateral source rule does not apply, would be applied against

17  the cost that Exxon is claiming in response for this case.  The

18  question is, how much.

19          Well, possible answers are -- and this is the

20  only reason why I was going to the jurisprudence.  One, that

21  they would have to have allocated that in the insurance claim,

22  or we would take the entire 269 million that they represent

23  that they recovered and apply it to this case.  The Tenth

24  Circuit actually did that.  A number of courts in subsequent

25  cases have not done that.  And the ways in which they have not

1   done that involved things like policy limits, looking at the

2   number of sites that were present in the case and trying to

3   make some judgment about how much insurance applied to one or

4   the other and all the kinds of things you would expect to do if

5   you were trying to make an equitable determination about how

6   much of a sum of money should be applied in the group of costs.

7         It's not an easy thing to do here.  We

8   acknowledge that.  We are not claiming as yet that it is a

9   major issue in the case.  We can't determine how significant it

10   is because Exxon has declined to tell us at present how it

11   calculated all these numbers that it represents are

12   approximations of the dollar figures that it claimed,

13   recovered, and so forth, and we know nothing about what

14   happened in the ensuing ten years of litigation, so we don't

15   know whether the 3500 gas stations that they keep referring to

16   were -- those claims were successful or unsuccessful and we

17   don't know what that says about the amount of money they

18   recovered for the refineries and so forth.

19         So our problem is we have no raw material from

20   which to assemble arguments on which perhaps the parties are

21   able to agree as to what sum of money it would be appropriate

22   to subtract from the 60 plus million dollars that we're talking

23   about here as a result of reimbursement by insurer.  We're not

24   looking for lots of information about the insurance claims.

25   We're trying to figure out what went on with the refineries and

what portions of the recovery logically relates to the
refineries or if we have to reconstruct that after the fact,
some reasonable way to do so.

    *THE COURT:* All right. Let me have a response to that
argument, because there's a -- that is not an insignificant
basis for requiring production of at least a limited amount of
information, and we can talk about what those limits might look
like.

    *MR. BUTHOD:* Judge, this is Ty Buthod for ExxonMobil.
I'll say fundamentally, we do have a very real difference of
opinion about what the law would be regarding the collateral
source rule under CERCLA cases, et cetera. We certainly
recognize there's a lot of law indicating that the collateral
source rule does not apply. However, we do believe that with
the presence of a contract action as well where they -- we
would argue the government indemnified Exxon, there may be a
basis later down the road, either in this case or in
Washington, to assert that among the other equitable factors to
be considered, the sort of black letter rule that the
collateral source rule doesn't apply may not apply to this
case. That's not today's fight. I just want to sort of put a
placeholder out there to say we don't readily concede that it
would not apply.

      But I think the fundamental difference we have
is, the notion we're hearing from the government is because the

collateral source rule doesn't apply, the government is
entitled to sort of a first dollar credit for any kind of
insurance proceeds.  And that's where we fundamentally differ.
What CERCLA case law tells us, is that a plaintiff is not
entitled to double recovery, which we recognize and don't
quarrel with.  However, we don't believe you even need to get
to that, Judge.  Because there's not going to be a circumstance
in which Exxon would recover both from an insurer and from the
government for some amount that exceeds a hundred percent of
its costs.  We'll never get anywhere near that.

So, I will just say, before we get into the
details of what the government is seeking, we disagree with the
notion that the significant burden that may be associated with
going to produce this material from the so-called NACC, that
is, the coverage litigation that ExxonMobil had, we disagree
that the burden associated with that is at all proportional to
whatever benefit that could arise in this case, because we
don't think we would ever get to a point where there would be a
credit, so to speak, because we're never going to be at risk of
experiencing a double recovery.

So when you think of the factors at issue, we
don't think the importance of this discovery is there.  We
don't think there's a risk of double recovery here.  And we
absolutely feel like there is significant burden that's being
thought to be imposed upon ExxonMobil, to go back and produce

1   material from the NACC litigation in excess of the 374,000

2   pages of deposition transcripts, exhibits, trial exhibits, et

3   cetera, that the government has had from us for about a period

4   of three years.

5        *THE COURT:*  Okay.  So, let's talk about the specific

6   categories of requested discovery and what is the most and the

7   least burdensome.  Let's start with the least burdensome.

8        *MR. ROWE:*  Your Honor, Mike Rowe.  If I might just

9   take a quick moment, because I think that was a fair summary of

10  Exxon's position.  I would say to you with respect to the issue

11  of set-off, there is also a difference of opinion about that.

12  I'm aware that there is one case in which the Court said that

13  the collateral source rule did not apply and proceeded to

14  determine that since the plaintiff in contribution, in effect,

15  had not made a profit, that they would not take that into

16  account.  There are also multiple cases in which courts applied

17  the lack of a collateral source rule much more typically to

18  simply to take off the top the money from the insurance

19  recovery.  So, again, that's a legal issue that's in dispute.

20       I'm going to speak to burden, because that's what

21  you asked, and then I'll come back to the 300,000 pages.  I

22  don't know what to tell you about the burden, because I do not

23  believe the company has made an inquiry about the way the

24  material is stored sufficient to make a burden argument.

25       *THE COURT:*  Then I really can't rule unless I find

1  that it is simply irrelevant.  I can't rule on proportionality.

2  *MR. ROWE:*  I think I might be forced to agree with

3  you, although I think there are solutions for that problem.

4  All I can tell you is, that the Friday before we wrote the

5  letter to you, when we were talking about this, I asked if this

6  case -- if the insurance case that was happening during the

7  1990s, whether the material was stored physically or

8  electronically, and I was told that the lawyers I was talking

9  to did not know.  And I also subsequently had a conversation

10 just before I sent you a letter, in which I was told, they did

11 not know what was in the index or finding aids to that

12 repository; they did not know whether there were indexes or

13 finding aids; they did not know what was in the repository;

14 but, nevertheless, I was on a wild goose chase.  And it was at

15 that point that I came --

16 *THE COURT:*  Wild goose chase because there wasn't

17 going to be anything there or it wasn't worth looking?

18 *MR. ROWE:*  Yes, I think.

19 *THE COURT:*  Why?

20 *MR. ROWE:*  Were you asking me?

21 *THE COURT:*  Yes.  What were their reasons for saying

22 that it was irrelevant or wild goose?

23 *MR. ROWE:*  Well, I think, roughly, you just heard them

24 from Exxon's counsel, but I do not believe I can answer that

25 question for you.

1          *THE COURT:*  Okay.  That's a fair response.

2          *MR. BUTHOD:*  If I may, Judge.  Ty Buthod, again, for

3     ExxonMobil.  We know there is a NACC -- and that's the acronym

4     NACC that you will see.  There is a NACC database.  There's

5     one that we got from the counsel who represented the company in

6     the insurance coverage litigation that we produced three years

7     ago to the --

8          *THE COURT:*  And describe to me, without being overly

9     detailed, what information that provides that --

10         *MR. BUTHOD:*  Well, I can tell you what I know it

11    provides.  It provides the deposition transcripts of witnesses

12    who testified in the NACC litigation.  It provides exhibits to

13    every deposition that's provided therein.  And it provides a

14    large set -- as the Court's well-aware, lawyers tend to

15    over-include when they come up with their trial exhibits.  And

16    what's described as trial exhibits is basically an exceedingly,

17    exceedingly large volume of exhibits that were collected by the

18    company of over 3500 sites that were subject to the NACC

19    recovery litigation.  It is no doubt a very, very large volume

20    of material.

21              Now, to answer the Court's prior question about

22    what's most onerous, what's least onerous, et cetera, I fully

23    recognize that today on this call, I will absolutely concur

24    that it would be difficult to address the burden issue standing

25    alone, and I'll confess, Judge, I've always perceived these

1    calls to be in a sense kind of a screening function to see

2    whether the Court really needs to entertain briefing on a

3    discovery fight or whether it's one of the vast majority of

4    discovery fights where frankly the parties ought to just be

5    able to put their heads together with a little guidance from

6    the Court and then get on to things that are more important.

7    So, you know --

8         *THE COURT:*  Well, there is that advantage.  And I

9    guess that goes to the combined issues of benefit and burden.

10   How hard is this stuff to get; can we narrow the request to

11   provide what is most useful to the plaintiff, without it

12   imposing as much of a burden; and if so, what is going to be

13   the greatest benefit to the plaintiff?

14        *MR. BUTHOD:*  Or to the defendant, I guess I would say,

15   Judge.  But, yes, I understand the Court's comments precisely.

16   What I would offer is, while counsel has represented to the

17   Court that it's time to ask narrow questions, the requests for

18   production that we had to respond to, that they've never

19   indicated, as far as I'm aware, they've never indicated any

20   willingness to recast or more narrowly tailor.  You know,

21   Request for Production No. 1 says, "All communications between

22   the company and any insurer or any representative of any

23   insurer relating to any claim relating to the Baytown or Baton

24   Rouge sites."

25             Well, I would actually submit something like that

as a matter of law, without me getting an affidavit, the Court would look at that and say, "Well, that's just too broad.  You don't have to answer that."  So, I mean, the reason we did find ourselves unable to reach a resolution about this, is the defendant -- the government has declined to try to narrowly tailor the requests to something that's even colorably related to something we still don't think is --

THE COURT:  Okay.  Lose the rhetoric.  Lose the rhetoric.  Okay?

MR. BUTHOD:  Okay.

THE COURT:  I need to know what could be done to narrow the requests on behalf of the government to focus on what is going to be at least at the outset the most valuable information that you need.  That's what I'm looking for.  It's a very practical question.

MR. ROWE:  Your Honor, Mike Rowe again.  The government -- a couple of quick things.  One, we are certainly willing -- we're not looking, obviously, for information about the 3500 gas stations.  We are certainly willing to look at options, if we had some information about what was in the repository and how it was stored, about how we might narrow the request.

THE COURT:  No, no, no.  You don't need to know what they've got to narrow your request about what you want.  It might be helpful, but can you narrow your request, knowing what

you know now, about what you want?

    *MR. ROWE:*  Oh, plausibly.  I would say to the Court, that we tried to keep all of our requests confined to the two refineries, that to some degree we need to know about insurance claims for those refineries later on, because we have to do an allocation between recoveries that might be for, you know, liter gasoline during the Sixties instead of World War II and that sort of thing.  But I'm sure that we could work together to try to narrow these things.

    My counterpoint to counsel's broad question would be that we asked them to see their discovery responses related to the refineries and the insurance case, something I would expect to find in a pleadings file in that repository, and we have not gotten an answer.

    I should speak briefly to the 300,000 pages, because you need to understand what we did and did not get and where it came from.  That production came about during a discussion between the parties in Phase I, about whether the group of issues now before the Court is a Phase I or Phase II issue.  During the discussions, the government discovered that lawyers in a later insurance case had made a demand on Exxon for materials from a prior insurance case and that they were contained on a group of CDs.  The sum total burden of production of those for Exxon was burning a set of CDs for us.  And I don't know whether I was just learning things on the

1   phone a little while ago, but I have specifically asked whether

2   we got all of the depositions, and I was told, we didn't know.

3   I don't know -- we got a lot of material.  Because the

4   insurance case does not specifically relate to the CERCLA case,

5   a lot of it is not terribly useful.  Some of it definitely is.

6   The problem is, I don't know what I've got and I don't know

7   what I haven't got.  So that's the problem with the 300,000

8   pages.

9              And we are busily looking through it, and some of

10  it is useful.  We have at least one deposition in that material

11  from a witness that Exxon has already offered as an expert in

12  this case.  So it's not like we're not paying attention to it.

13             So, you know, one of the things that we offered

14  to do in our discussions was we had a pair of requests relating

15  to -- there are three sets of insurance cases.  The NACC is the

16  one that's most likely to apply to our case.  And then there's

17  a case that involved a bunch of Mobil refineries, and then

18  there's a personal injury case with asbestos in New York.  We

19  believe we have good reasons for asking for some information

20  from all of those, but we agree that the NACC case and that

21  repository is undoubtedly the core, and so we offered to at

22  least respond to any efforts to answer to those, because maybe

23  we're going to get what we need from the questions, which we

24  tried to limit, from the NACC case.

25             So, you know, we're certainly willing to continue

1  to have a discussion like that, but it would certainly help us
2  to know, for example, whether there are files in that
3  repository that pertain to the claims relating to these
4  refineries and the policies and insurers that were attached to
5  them, because there appear to be a whole bunch of separate
6  settlements here.  So if it turns out that the material is
7  stored in a way that facilitates to our narrowing the inquiry
8  in that sort of way, I'm sure we would be happy to consider
9  that.  Right now we don't know.
10          *MR. BUTHOD:*  And, Judge, Ty Buthod for Exxon again.  I
11  would merely suggest that counsel's suggestions sort of puts
12  the cart before the horse.  I mean, maybe the right approach is
13  for counsel to identify a request that would be limited to the
14  purposes he's articulated, that is, trying to ascertain whether
15  there's some sort of insurance proceeds that admittedly we
16  think he's not entitled to, he thinks he's entitled to by way
17  of off-set or credit or what have you.  And while we disagree
18  on that legal issue, we recognize the difference between
19  discoverability and admissibility.  So, I don't want to quarrel
20  with that.
21          But I don't think that it's incumbent upon the
22  opposing party to identify what they have so that then the
23  narrowly tailored requests can come.  I think the requests
24  should really be limited to what could even colorably be
25  discoverable, and then let's see whether we can meet that

 1   request.

 2        *MR. STEINWAY:*  Your Honor, this is Dan Steinway from

 3   Exxon as well.  To supplement what Mr. Buthod has just said,

 4   we -- Exxon has already produced to the government in Phase I a

 5   substantial cost expert report, which includes a lot of

 6   invoices.  And Mr. Rowe has talked about the need to

 7   substantiate the numbers with respect to the insurance claim.

 8   Exxon would submit, Your Honor, that a lot of the information

 9   that the government needs is already included in the exhibits

10   to the expert's report included in Phase I.  That information,

11   Your Honor, would go a long way to help substantiate the kinds

12   of numbers that, frankly, the government and Exxon have been

13   talking about to try to stipulate to some kind of a decision in

14   this matter.

15        *THE COURT:*  Why doesn't that make sense as a first

16   exploration?

17        *MR. ROWE:*  Your Honor, my answer to that is I'm not

18   sure I even understand what I'm being told.  It is true that

19   Exxon has produced cost sets to us and then they reproduced

20   them in December and updated them for some Bates number

21   problems in January, and that's the raw material my accountant

22   is looking at.  It is true that my accountant is examining

23   those documents to see whether there are invoices and proof of

24   payment.

25              I'm continually told that they somehow relate to

the calculations that Exxon made to make the approximations of
the demand for each refinery in the insurance cases and that
somehow the information is there.  But I'm never told how the
calculation was made, what estimate was done, how these things
all fit together.  And those questions are in our discovery.
So if Exxon is prepared to tell us how they made those
estimates, you know, then that might be a place to start.

       *THE COURT:*  Are there documents that set that out?

       *MR. ROWE:*  Not that my accountant people tell me that
they can find.

       *MR. STEINWAY:*  Your Honor, Dan --

       *MR. ROWE:*  And that --

       *THE COURT:*  Who's talking?  Who's talking?

       *MR. ROWE:*  I'm sorry, Your Honor.  Mike Rowe --

       *MR. STEINWAY:*  Dan Steinway, ExxonMobil --

       *THE COURT:*  One at a time, and tell me who you are.

       *MR. STEINWAY:*  I apologize, Your Honor.  It's Dan
Steinway, Baker Botts, for Exxon.

        We have provided to the -- we've had discussions
with the government, Your Honor, over how those numbers were
calculated, and Exxon is fully committed to try to explain to
the government just as much as we can how those insurance
calculations were made and the basis for these analyses.  And
the documents that we've given, Your Honor, to the government
in the first phase would tend to supplement and, in fact, would

confirm pretty closely.  I would admit, Your Honor, it may not get down to the precise cent of each particular clean-up item, but it would get very, very close to the kinds of numbers that we have suggested to the government are involved in these insurance calculations.  And we would maintain, Your Honor, I apologize for repeating this, that those invoices, if properly calculated by the government's experts, should provide the government with the kind of substantiation and information that they need to satisfy their questions.

MR. HEMINGER:  Your Honor, this is Justin Heminger for the government.

I just wanted to respond to what I think Mr. Steinway is saying.  I believe what he's saying is that the invoices that Exxon has produced, if we add those up, that those relate to the initial amounts that Exxon says that it's paid in the insurance cases.  And I guess what I wanted to emphasize is that our -- a lot of our discovery that we're doing -- or that we submitted was directed towards understanding how much Exxon finally recovered in the insurance cases and how that relates to the two refineries.

So we certainly have the invoices for their costs, but we don't have the settlement communications, as far as we know, between Exxon and its insurers to tell us where those hours actually ended up.

MR. STEINWAY:  Your Honor, Dan Steinway replying to

the government on that point.  We have given them, as
Mr. Buthod mentioned earlier, several models of the
settlements.  To the best of our ability already, we've given
the government four model settlements redacted for
confidentiality reasons, but surely sufficient to give the
government all the information that Exxon has with respect to
how these insurance proceeds were distributed.  That's been
given to the government already.  So the answer to the
government's question, we have given them the settlement
information and we've given them -- there were 200 policies at
issue, Your Honor, in the insurance coverage litigation, and we
started with giving the government one as a model and we've
given them two and then we've given them three and four.  And
we tried to give them a model on these policies.  And that is
what the government has asked for, and we tried to give it to
them.

       *MR. ROWE:*  Your Honor, Mike Rowe again, I'm sorry, and
then -- and maybe then we can stop and hear what the Court has
to say.  But I just don't know what to make of some of that.
We have been provided with four, of dozens of insurance
settlements, that are heavily redacted for relevant
information.  And I believe we were offered them primarily as
evidence that the company did not affirmatively allocate the
proceeds at the time of discovery.  And I think we're prepared
to accept Exxon's representation on that point, probably even

1  without the policies.  But we are missing lots of information

2  that we would need in order to make any argument to the Court

3  at all about how you ought to after the fact allocate those

4  proceeds.  It's much like allocation, there are different ways

5  to do it, but we need some sort of raw material on which to do

6  it, and right now we believe we have none.

7          *THE COURT:*  I'm still not confident that I understand

8  what raw material Exxon has reasonable access to that would

9  shed light on just what you've described.

10          *MR. ROWE:*  Okay.

11          *THE COURT:*  That's where I'm -- I think my hole in the

12  understanding is.

13          *MR. ROWE:*  Okay.  It's Mike Rowe again, Your Honor.

14          *THE COURT:*  And I apologize if I'm making you repeat,

15  but I'm just not connecting those dots yet.

16          *MR. ROWE:*  No, I don't think you're making me repeat.

17  You're asking me a question that is somewhat hypothetical given

18  what I don't know right now, but I think I can give you some

19  examples of the kind of material that might be relevant.

20          Often in insurance cases, particularly these big

21  elaborate insurance cases, people do what are called coverage

22  charts.  And that's where we lay out all the claims and the

23  reinsurance and the supplemental insurance and what insurance

24  companies paid off, parts of their liability to another

25  insurance company, and you could line those up and see what the

claims were with respect to the refineries, who the insurers
were and then perhaps we could go and look at those settlements
and the related information to try to figure something out.

If there is information about the settlement
negotiations, we might well be able to figure out which claims
the parties agreed were not terribly meritorious, even though
no one is going to flat-out say that, and we would have some
idea whether the fortunes of claims for the refineries waxed or
waned relative to claims for all of the gas stations.  If there
were any internal informal allocations of proceeds, it would
obviously be useful to see those.

You know, there are lots of different ways to do
it.  It would be interesting to know within the refineries what
the insurance companies believed the merits of the claims were
to --

*THE COURT:*  Okay.  Look, interesting to know is not a
recognized test.

*MR. ROWE:*  I understand.

*THE COURT:*  So coverage charts, to the extent that
would have been a feature of the litigation that occurred at
that time.  What's another specific thing that would be
relevant and proportional, that is, really beneficial to
understanding the theories of liability or defense?

*MR. ROWE:*  Your Honor, I will admit --

*THE COURT:*  I can't hear.  I'm sorry.

1          *MR. ROWE:*  I'm sorry.  It's Mike Rowe again.

2               And I will admit that it is somewhat difficult

3    for me to name other specific things I would like to see

4    without -- while I know almost nothing about how the insurance

5    claims went.  I guess I can give you one more, which is in our

6    case we have supplemental cost claims offered as recently as

7    December of last year.  At present we do not know whether that

8    happened in the insurance cases or not.  So that would be

9    interesting, and maybe --

10          *THE COURT:*  Supplemental cost?

11          *MR. ROWE:*  Claims.  So, costs were updated as the

12   company spent more money.

13          *THE COURT:*  Got it.  Okay.

14          *MR. ROWE:*  We would like to know about how the

15   settlements dealt with future costs.  We understand from the

16   ones we have, that are supposed to be models, that the claim

17   was settled for occurrences through a certain date, but we

18   don't know whether there's any obligation at this point for

19   there to be some supplemental payment if the costs rise in the

20   future or if the money that was paid is all.

21               And, lastly, the company estimates that it spent

22   $69 million over the course of litigation on its attorneys, but

23   we have -- and I'm not claiming that I need, you know, all

24   the --

25          *THE COURT:*  It seems to me this is a little premature.

1          *MR. ROWE:*  Okay.

2          *THE COURT:*  Okay.  So what I would propose is that we

3    do this:  Number one, to the extent Exxon has offered it, and

4    it seems to have done so robustly, to sit down and walk through

5    some of the practices used, fine, that should occur.  We've now

6    identified three specific categories of information that would

7    be beneficial to the government to understand with more

8    precision what insurance was done in ways that would have a

9    bearing on the allocation issues.  One is any coverage charts

10   for insurance claims that have been paid out; two, supplemental

11   cost claims; and, three, provisions about future claims.

12   Right?

13         *MR. BUTHOD:*  Ty Buthod for Exxon.  That's my

14   understanding.

15         *THE COURT:*  All right.  It seems to me that Exxon now

16   needs to go back to Exxon and find out if such documents exist

17   and if so, how far -- how hard they are to locate and retrieve.

18         *MR. STEINWAY:*  Your Honor, Dan Steinway for Exxon.  If

19   I may say something.  On the future claims issue, Your Honor,

20   typically all the insurance coverage settlements clearly

21   address the scope of whether or not there's a future claim.  So

22   I would submit, the government, we've already given them the

23   settlement agreements.  They would already address the issue of

24   our future responsibilities as a part of the settlement of

25   those claims.  So that information would already be readily

1  available to the government.

2       THE COURT:  Response?

3       MR. ROWE:  Your Honor, I am willing to take another

4  look at that.  That was not entirely my understanding, but we

5  can take a look.

6       THE COURT:  Take a look.

7       MR. ROWE:  If I might add to the list, it would be

8  very helpful for us to have -- I know this is up to Your Honor

9  whether you're willing to do this or not obviously -- the

10  written discovery from the insurance case and an indication as

11  to whether the depositions in the material I have already been

12  provided is complete or not.

13       THE COURT:  That's fine.  I don't have a problem with

14  that.

15       MR. BUTHOD:  Judge, Ty --

16       MR. STEINWAY:  Your Honor --

17       MR. BUTHOD:  -- Buthod for --

18       MR. STEINWAY:  Go ahead, Ty.

19       MR. BUTHOD:  If I may.  Sorry, Judge.  Ty Buthod for

20  Exxon.  I'm happy to make that second inquiry and identify

21  whether we know that that's complete or not.  And, of course,

22  I'll let Mr. Rowe know that.

23            As to written discovery, I know that's easily

24  requested, but bear in mind, this was litigation with over 200

25  defendant insurers.  And before I just readily agree that we

can go get all that and make it available to him, I will
suggest that on some level, that's going to hit a point of what
I'm going to call diminishing returns and the Federal Rules are
going to call it proportionality.  And so I'll look into what
we have there and let Mr. Rowe know, but I think that's of a
different category than the three things the Court has already
identified.

MR. ROWE:  Your Honor, I to some degree will save you
the trouble on that one.  It's Mike Rowe.  I take the point,
and I don't completely disagree with it.  I think we have to
look and see what's there.  Obviously we're interested in the
discovery about issues pertaining to the refineries, not all
the gas stations and the other things that went on.  So I
suspect we would be able to work that out.

THE COURT:  All right.  Let's start with the points
that I've identified.  And you can come back in 30 days, if
that's enough time, and let me know if that is sufficient
movement towards the goal or if more is needed.

MR. ROWE:  Your Honor, I'm sorry, it's Mike Rowe.  And
I think that's a fine plan for the portions we've talked about.
We have a few -- obviously the insurance issue is the core of
our dispute.

THE COURT:  Right.

MR. ROWE:  We do have a couple of other issues.  I
have an expert trying to work on the NCP issues.

1          THE COURT:  All right.  Well, let's take those up, and
2     then I think we can declare this conference successfully and
3     overly lengthily concluded.
4          MR. ROWE:  Very well.  Okay.  So it's Mike Rowe again.
5     And you may remember from before that --
6          THE COURT:  I've got it.
7          MR. ROWE:  -- we asked Exxon to tell us about its
8     efforts to comply with the NCP.  There are -- I think in the
9     vein of trying to solve problems, it seems that Exxon believes
10    that it cannot answer those questions until its expert's
11    report.  I think my expert cannot report properly until we have
12    answers to those questions.  So the government would be content
13    with either the answer that Exxon can give us now as to what it
14    thinks it's done to comply with the NCP and at least which of
15    these projects are projects and which are just cost groups.
16         THE COURT:  Okay.
17         MR. ROWE:  Or we could -- I think we're going to have
18    to alter the schedule a bit anyway.  So we could change -- I
19    know they're opposed to this, but I would suggest anyway that
20    they might want to go ahead and deliver maybe not all their
21    expert reports but maybe just that one, and then they would be
22    able to respond to that discovery and then we could have some
23    time and have our expert's report.
24         MR. BUTHOD:  Ty Buthod for Exxon.  If I may real
25    quickly, Judge.

1    *THE COURT:*  Yeah.

2    *MR. BUTHOD:*  Ty Buthod for ExxonMobil.  We oppose any

3  notion that we would at this stage sort of change the schedule

4  to have the expert reports staggered.  I think the parties and

5  the Court contemplated this when we set up a deadline in our

6  original scheduling order for supplemental expert reports.  We

7  would suggest that like in a lot of matters, NCP compliance is

8  something that experts are going to be opining about, and we

9  naturally want to defer and say that our response to that is

10 going to come from our experts' reports.  I'm certain that the

11 government will have an expert say there was not NCP

12 compliance.  And if there's information from our export reports

13 they feel like they've got to confront later, that's why they

14 have a supplemental report deadline already in the DCO.

15   *MR. ROWE:*  Your Honor, we --

16   *THE COURT:*  So you would propose doing nothing?

17   *MR. BUTHOD:*  I would propose doing nothing, but

18 recognizing they have the right, and we're not quarreling with

19 this, Judge, they have the right upon receipt of our expert

20 report, for their expert to file a supplemental report if there

21 are things in it they have not anticipated and they feel like

22 they have to address.

23   *MR. STEINWAY:*  Your Honor, Dan Steinway for Exxon.

24 When we originally proposed this case management schedule to

25 you, you told us to go back to the drawing board, because it

was way too long.  And so we tried to compress the schedule and make it a very effective schedule.  Both parties went to great lengths to set up a fair and reasonable schedule.  We all understood the expert reports were due May 23rd and that there would be opponent reports.  So all of this was carefully considered when we originally proposed the case management schedule to you, Your Honor.  And this is a question that's typically, as Mr. Buthod has just noted, typically answered by our experts.  We have every inclination to answer the questions, just as the government will get with their expert, of what the opinion is.  We could say the same thing about the government.  We would like to know what their position is on these issues.  That's why we set up this schedule, so contemporaneously both experts would provide their opinions and each party would have the right to reply accordingly, and this was set up in a very deliberative manner.

MR. ROWE:  Your Honor, Mike Rowe again.  Just briefly. It is true that the government would have preferred to stagger its schedule for experts, because we think it works better.  It is true that we agreed to simultaneous experts, and that's still okay with us.  What's not okay with us is that we're left to guess as to what projects Exxon did and then try to sort out -- I mean, it's almost as though we would waste our first expert report, because these are their projects after all. They presumably know what they've been doing since the summer

of 1985 at this plant.  And it may well be that they're going
to argue that, look, we didn't take any active NCP efforts, but
we did this under RCRA, and we think that's good enough.  But
they could at least answer the question and tell us that and
then they tell us what they think the projects are and what
groups they're in and which ones they think would fit as
removal or remedial so that we have something to address.

       *MR. STEINWAY:*  Your Honor, Dan Steinway for Exxon.

       In 5B of the case management order, the
government will have every right to provide a rebuttal expert
report right on these issues.  That's why this schedule was set
up --

       *THE COURT:*  So you want to wait and do it as a
rebuttal expert and not before then?

       *MR. BUTHOD:*  Oh, no, I'm sorry, Judge.  Ty Buthod.  We
want to do this on the deadline by which we provide our expert
reports.

       *THE COURT:*  All right.

       *MR. BUTHOD:*  The government's opportunity to respond
to it --

       *THE COURT:*  Okay.

       *MR. BUTHOD:*  -- can be done also through a rebuttal
report.  But we think it's appropriate when there's an
interrogatory that really calls for, what do your experts
think, our response is simply, Look at the report --

1    *THE COURT:*  Look at the report.  All right.  I think
2    you're right, Mr. Buthod.  Let's see if that is adequate.  As
3    long as there is a full opportunity for the government's
4    experts to address the arguments and respond, that's fine.  And
5    as long as Exxon recognizes that any effort to pin the experts
6    down before then will be rejected by the Court.

7        *MR. BUTHOD:*  Understood, Judge.  Thank you.

8        *THE COURT:*  That ought to provide what both parties
9    need or at least -- even if it's not what you want.

10       *MR. ROWE:*  Very well, Your Honor.  Mike Rowe.

11           So I think the remaining issues are, we don't --
12   we are told by Exxon that they are going to respond to our
13   questions about government contracts.  We don't know when.  And
14   then what will we do with our rapidly decaying pretrial
15   schedule here?

16       *THE COURT:*  It's not decaying as rapidly as you think,
17   given what I have put into place today and how quickly you are
18   required to get it done, number one.

19           Number two, when will Exxon respond to those
20   questions?

21       *MR. STEINWAY:*  Your Honor, Dan Steinway for Exxon.

22           The government has admittedly asked a very good
23   question.  We are in good faith looking into the contract
24   question that Mr. Rowe just asked and we are pressing our
25   client to give us an answer on that and we will proceed very --

1   we have no intention --

2          *THE COURT:*  Report to him within one week from today

3   when an answer will be provided.

4          *MR. STEINWAY:*  Yes, Your Honor.

5          *MR. BUTHOD:*  We'll do that.

6          *THE COURT:*  Okay.  That's fair.

7          *MR. ROWE:*  And, Your Honor, I understand your point

8   about this.  I didn't mean to just roundly dispose of our

9   existing schedule, but we do have -- at the moment we're --

10         *THE COURT:*  I extend all deadlines 30 days.  That

11  ought to take care of it for now.

12         *MR. ROWE:*  Okay.  Very well.

13         *THE COURT:*  All right?

14         *MR. ROWE:*  Yes, ma'am.

15         *THE COURT:*  Okay.

16         *MR. ROWE:*  Thank you, Judge.

17         *THE COURT:*  Thank you all.  Have a good weekend.

18         *MR. STEINWAY:*  Thank you, Your Honor.

19         *THE COURT:*  Bye-bye.

20      *(Concluded at 2:51 p.m.)*

21                              * * *

22  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled cause, to the best
23  of my ability.

24  /s/ *Kathy L. Metzger*                    *8-9-2016*
    Kathy L. Metzger                     Date
25  Official Court Reporter