```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3   EXXON MOBIL CORPORATION      .  C.A. NO. H-10-2386
                                  .  C.A. NO. H-11-1814
 4   VS.                          .  HOUSTON, TEXAS
                                  .  AUGUST 15, 2016
 5   UNITED STATES OF AMERICA     .  3:00 P.M. to 4:19 P.M.

 6

 7                    TRANSCRIPT of HEARING
              BEFORE THE HONORABLE LEE H. ROSENTHAL
 8                UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:

11   FOR THE PLAINTIFF:          * MR. MICHAEL P. MCGOVERN
                                 * MR. DANIEL M. STEINWAY
12                                 Baker Botts LLP
                                   1299 Pennsylvania Ave NW
13                                 Washington, D.C.  20004-2400

14                               * MR. TYNAN BUTHOD
                                   Baker Botts LLP
15                                 One Shell Plaza
                                   910 Louisiana St.
16                                 Houston, Texas   77002

17

18   FOR THE DEFENDANT:          * MR. MICHAEL D. ROWE
                                 * MR. JUSTIN D. HEMINGER
19                                 U.S. Department of Justice
                                   Environmental and Natural
20                                   Resources Division
                                   601 D St., NW
21                                 Suite 8000
                                   Washington, D.C.  20004
22

23   * Appearing by phone

24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

1                          <u>APPEARANCES CONTINUED</u>

2   FOR THE DEFENDANT:              * MS. ERICA M. ZILIOLI
                                      U.S. Department of Justice
3                                     P.O. Box 7611
                                      Washington, D.C.  20044
4

5
    OFFICIAL COURT REPORTER:         MS. KATHY L. METZGER
6                                     U.S. Courthouse
                                      515 Rusk
7                                     Room 8004
                                      Houston, Texas   77002
8                                     713-250-5208

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

*THE COURT:*  Good afternoon.  Go ahead and state your

2  appearances, please.

3

*MR. STEINWAY:*  Dan Steinway, Mike McGovern for --

4

*THE COURT:*  Can't hear you.  I'm so sorry.

5

*MR. STEINWAY:*  Your Honor, Dan Steinway and Mike

6  McGovern for ExxonMobil, Your Honor.

7

*THE COURT:*  I cannot hear you.  We've got to figure

8  out a better way to do this.

9

*MR. STEINWAY:*  I'm right over the phone.  Can I try

10  again, Your Honor?

11

*THE COURT:*  Yes, why don't we do that.  Thank you.

12

*MR. STEINWAY:*  Dan Steinway, Mike McGovern for

13  ExxonMobil.

14

*THE COURT:*  I hear you loud and clear.

15

*MR. STEINWAY:*  Thank you, Your Honor.

16

*MR. BUTHOD:*  And Ty Buthod for ExxonMobil as well,

17  Judge.

18

*THE COURT:*  Also very clear.

19

*MR. ROWE:*  And, Your Honor, Mike Rowe, Justin

20  Heminger, and Erica Zilioli for the government.  And I hope

21  given that I tested this phone this morning that you can hear

22  me now.

23

*THE COURT:*  It is better.  It is not great.

24

*MR. ROWE:*  All right.  Let me see if I can check --

1          *THE COURT:*  But I think we can manage.

2          *MR. ROWE:*  Okay.

3          *THE COURT:*  All right.  So, I understand from your

4    letter today, at least from the Department's letter, that some

5    issues have been at least partly resolved and some remain

6    subject to discussion and some have not really yet been

7    explored.  Is that fair?

8          *MR. ROWE:*  This is Mike Rowe at the Justice

9    Department, yes, ma'am.

10          *MR. STEINWAY:*  Dan Steinway from Exxon, Your Honor.

11    Yes, Your Honor.

12          *THE COURT:*  All right.  Very good.  So why don't we

13    start with a couple of them.  I understand that we still

14    haven't received the opinion in the *Shell* case from the judge

15    in the court of claims and that we really don't have a

16    timetable at this point for knowing when we can expect it.

17          *MR. STEINWAY:*  Dan Steinway for Exxon, Your Honor.

18    That's correct.  All we know, Your Honor, is what Judge Braden

19    had said in open courtroom, that she expected to issue a

20    decision in August of this year.

21          *THE COURT:*  Our understanding from her chambers is

22    that it will be somewhat beyond what we thought.

23          *MR. STEINWAY:*  Okay.

24          *THE COURT:*  Okay.  So that takes us to -- and even

25    then it was unclear to the extent to which that would impact

1   our case.  I think the question was whether the judge would

2   then continue to keep the stay, but other than that, it has

3   only an attenuated impact on our case.  So we need to just

4   continue on the road that we have begun.

5              I want to focus, because I gather that these are

6   the focus of your continued discussions -- of course, we'll do

7   the 30-day extension.  That's not an issue.  So let's take up

8   the other two categories that were identified as areas that

9   warrants discussion.  The first is the issue surrounding

10  insurance proceeds by Exxon, the extent to which those were

11  recovered in the past.  I gather we need to go over that area.

12             Second is the extent to which the new expert

13  reports -- and I need to first know how many of those there

14  are -- the extent to which those new reports cover Phase I

15  issues under cover, if you will, as they're being part of the

16  Phase II issues.

17             And I'm having a hard time understanding what the

18  offending overlap is, because the Phase I issues dealt with

19  liability for proportional shares.

20        *(Judge speaking to law clerk.)*

21        *THE COURT:*  And the Phase II issues, of course, deal

22  with the -- much more with the costs amounts.  But in order to

23  know the costs of what -- that is, in what category the costs

24  are directed, you have to at least cover some allocation

25  issues; and if they haven't yet been resolved, then we need to

1  address them here to the extent necessary to identify the

2  amounts and the purpose for which they were incurred.

3              So I guess I'm trying to understand how we avoid

4  any overlap and therefore what is offending about the overlap

5  here.

6          *MR. ROWE:*  Your Honor, it's Michael Rowe.  Would you

7  like me to -- did you want to start with that issue and --

8          *THE COURT:*  Well, I don't care.  Which is the more

9  vexing of the two and are there others that I have not

10  included?

11         *MR. ROWE:*  Well, there's good news, if you would like

12  to start with that.

13         *THE COURT:*  Oh, you've settled the entire ball of wax?

14         *MR. ROWE:*  Not --

15         *THE COURT:*  Short call.

16         *MR. ROWE:*  Not quite that good.

17         *THE COURT:*  All right.  Ah, be still my heart.  Go

18  ahead.

19         *MR. ROWE:*  Let's do a couple of housekeeping good news

20  things where we did agree, because we did try to agree as much

21  as we could -- or can.  The first thing is very simple, but the

22  Court may want to be aware of it.  When Your Honor at our May

23  conference extended all the deadlines 30 days, there was some

24  question as to whether we should count 30 days or just go from

25  August 22nd to September 22nd.  The parties have just agreed

1  that whatever the date is, if it's the 22nd of one month, it

2  will be the 22nd of the next month, unless it falls on a Sunday

3  or something.  So that makes it easy for us to deal with our

4  30-day extensions as we go through the schedule.

5          *THE COURT:*  All right.  Will you draft an extension --

6  and extended -- an amended extended 30-day order --

7          *MR. ROWE:*  I believe --

8          *THE COURT:*  -- an amended scheduling order with the

9  30-day extension as you have just described it?

10          *MR. ROWE:*  Yes, ma'am.  I believe that my colleagues

11  on the other side, we talked about it last week, and I believe

12  they already have that in progress.  But we can certainly do

13  it.  One of us can certainly do it.

14          *THE COURT:*  All right.  And if you can file that by a

15  week from this coming Friday, that would be helpful.

16          *MR. ROWE:*  That would be -- we would have to have huge

17  arguments over it for it to take that long, I think.

18          *THE COURT:*  Well, that's right.

19          *MR. ROWE:*  Okay.  The second, it's not so much an

20  agreement as it's an issue I think we have all but effectively

21  resolved and it's not at all unimportant in terms of our

22  ability to move the case along, and that's Item 1 in my letter,

23  which is, as you know, we talked in May about the collateral

24  source issues, other sources of income that might have offset

25  the cost that Exxon is using in the case.  One of those was

1  from government contracts.  The other is from insurance.  The

2  insurance one, you're correct, we still need to talk about, but

3  it's very much appearing both from Exxon's interrogatory

4  answers -- and they had pressed us to look for ourselves, and

5  we have been looking for ourselves as well.  It looks very much

6  like they sell us fuel and other things as commodities, and

7  that means there's no opportunity to load costs in cost pools

8  and that sort of thing.  And so there, in effect, is no

9  collateral source from government contracts as far as we can

10 tell at this point.  We expect to have that wrapped up on our

11 side shortly.  That is no small thing in terms of the

12 complication of the case.  So I suppose it's just good luck for

13 all of us in some ways, but it's quite significant.

14         *THE COURT:*  Okay.

15         *MR. ROWE:*  The second issue you may remember we talked

16 about last time was this NCP issue and the discovery that the

17 government had sent to Exxon about the NCP.  Your Honor

18 resolved that essentially the last time by allowing Exxon to

19 wait when it served its expert report.  And we have a nice

20 lengthy, meaty expert report from Exxon's NCP expert now that

21 lays out in some detail the answers to the questions that we

22 were posing.

23         So, our only bit of business today about that is

24 to make sure that Exxon isn't, in effect, admitting that that

25 report is the answer to the questions that we were posing.  So

1    as long -- I don't want to put them through having to answer

2    all these discovery questions that they've effectively

3    answered, but I do want to make sure we can rely on that expert

4    report.

5              *MR. STEINWAY:*  Your Honor, it's Dan Steinway for

6    Exxon.  Yes, the expert report, Mr. Johnson's report does opine

7    on the questions of NCP and it's supported by some of the other

8    experts before Exxon.  That is our response to the government's

9    interrogatories with respect to the NCP criteria and questions.

10             *MR. ROWE:*  Very good.  Mike Rowe, Your Honor.

11   Continuing then -- yes?  Sorry.  Oh, okay.

12             *THE COURT:*  I'm here.  I'm waiting.

13             *MR. ROWE:*  You asked a moment ago about which issue

14   was more vexing, and I don't know that one is more vexing than

15   the other.  But since we're already talking now about

16   collateral source issues, I think it might make sense for us to

17   move on to the one that -- the older one from back in May,

18   which was about the insurance proceeds.  And rather than -- and

19   I will tell you that we have received a number of things from

20   Exxon within the past week or two and some a little earlier,

21   response -- things we've discussed back in May, but I think at

22   this point what I would like to do is rather than argue over

23   the individual discovery items --

24             *THE COURT:*  Sir, you're fading in and out and

25   you're -- the volume is going way up and then way down.  It's

1   making it very hard to understand.

2          *MR. ROWE:*  Okay.  Is this any better, Judge?

3          *THE COURT:*  Yes.

4          *MR. ROWE:*  Okay.  I think we may have to use a

5   different kind of phone next time.  We tested this one this

6   morning and it seemed to work fine.  But it's not a game day

7   player apparently.

8               So I was just saying, I thought we might proceed

9   with the insurance proceeds issue, and I wanted to try to take

10   a more practical tack than going question by question and

11   interrogatory by interrogatory and talking about coverage

12   charts and that sort of thing --

13          *THE COURT:*  I'm still finding it hard to hear you.  I

14   don't know what we can do about this, but it is very, very

15   difficult.

16          *MR. ROWE:*  Well, Your Honor, what I can do about it,

17   if you don't mind taking a moment, is I can leave my colleagues

18   here and I can go call in from my office where I have a headset

19   that will probably make it much easier to hear, if you would --

20          *THE COURT:*  I think that is much better, and, frankly,

21   this way is just not working.

22          *MR. ROWE:*  Okay.  I will do that.  Just bear with me

23   while I go call in.

24          *MR. STEINWAY:*  Just so we know, Your Honor -- it's Dan

25   Steinway -- can you hear us okay?

1          *THE COURT:*  Yes, I hear you fine.

2          *MR. STEINWAY:*  Thank you, Your Honor.

3          *MR. ROWE:*  Hello.

4          *THE COURT:*  Yes.

5          *MR. ROWE:*  Oh, Your Honor, I'm sorry.  It's Mike Rowe.

6   I didn't know I was going to get connected quite that quickly.

7          *THE COURT:*  It worked a whole lot better.

8          *MR. ROWE:*  Okay.  And you can hear me all right now?

9          *THE COURT:*  Much better.

10         *MR. ROWE:*  Okay.  So I think we were through our

11  immediate good news and we were on to insurance proceeds.

12         *THE COURT:*  Right.

13         *MR. ROWE:*  And I was going to try to say that rather

14  than go interrogatory by interrogatory or quibble over coverage

15  charts or things, that I was going to try to go at this from a

16  little more practical angle.  You may remember that we talked

17  the last time about the collateral source rule and it not being

18  applicable to -- at least the government's position, it's not

19  applicable to allocation --

20         *THE COURT:*  You're still going in and out.  I don't

21  know what the problem is.

22         *MR. ROWE:*  I don't either.  Let me try closing my door

23  and going hands-free.  Let's see if that helps.  Usually that's

24  worse, but we'll try it.

25         *THE COURT:*  It may be our end.  I just don't know.

1   And if it is, I apologize.

2           *MR. ROWE:*  No, not at all.  Is this any better now?

3           *THE COURT:*  I don't know yet.  Let's keep going.

4           *MR. ROWE:*  Oh, we have to see if it fades.  Okay.

5           So what I wanted to talk about was the insurance

6   proceeds problem in general and the fact that the government's

7   position at least is that the collateral source rule doesn't

8   apply to an allocation case between PRPs and a CERCLA

9   contribution action.  And that means that whatever the

10  insurance proceeds are need to be accounted for in the case.

11          We know that Exxon combined a whole bunch of

12  insurance claims, including those for these two refineries,

13  asked for, I believe it was, 1.2 billion.  We know that they

14  collected 267 million.  We know that their demand for Baytown

15  was about 36.8 million and 51.1 for Baton Rouge.

16          We do not know anything about the ensuing ten

17  years of what went on, what claims if they were to succeed as

18  they went through discovery and their negotiations.  And so

19  we're left with only a couple of options at this point, and

20  that's why we're going at this discovery as much as we are.

21  So, we -- I think I told you last time that there are cases out

22  there that suggest that it is Exxon's burden and that if they

23  can't -- they didn't make an allocation at the time of

24  discovery, then the whole 267 million would be applicable to

25  this case.  And I also told you that some courts haven't done

1    that, not surprisingly.

2           We expect Exxon to argue that you should just
3    take a pro rata across-the-board reduction from their original
4    claim down to the 200 million and then take some more pieces
5    off of that for other refineries that are not involved in the
6    case, which would essentially negate the value of insurance
7    that the government believes that it paid during World War II.

8           And the only remaining option if the government
9    does not get any information about what insurance companies
10   paid for and what they were unwilling to pay for, it's probably
11   going to be when we get there, that the government is likely to
12   argue that the demands are the most reliable indication.  We
13   know that Exxon had costs up to those numbers, and we know that
14   they asked the insurance companies for them.  And the sum of
15   those numbers is way less than the 267 million.

16          Now, I don't know whether the Court is going to
17   agree with the government about that.  The problem is with no
18   discovery, there's nowhere to go.  You know, Exxon has this
19   information -- oh, and by the way, I'm sorry, I should have --
20   last time we spoke, I think I made a completely unwarranted
21   assumption that Your Honor would remember all the details of
22   the case a year after the decision.  So I should remind us that
23   this is not a case in which the government is seeking money
24   from Exxon.  This is a case which Exxon is seeking
25   contributions from the government.  So all the money that's

1  going to be flowing will be flowing from the government to

2  Exxon.  And the question is how much has the insurance already

3  covered.

4            So, you know, if that's where we are and Exxon is

5  unwilling to do the discovery and the Court believes it's

6  unwarranted, I just want everybody to understand where the

7  government is left at that point and what we end up having to

8  argue.  And I don't know how you would humor Exxon's argument,

9  knowing that they have information that they haven't looked for

10  and they just want to reduce everything by a percentage.  So, I

11  think it's worth discussing, and we would like to find some

12  practical solution to it, but that's where we are right now.

13  And I just don't want to be springing that on people, you know,

14  in February when we're filing a summary judgment motion.

15            THE COURT:  All right.  Let me hear from Exxon.

16            MR. STEINWAY:  Your Honor, Dan Steinway will kick it

17  off.  Your Honor, in the last status conference, as you know,

18  per direction of the Court, we have given the government a

19  substantial amount of insurance coverage information.  And the

20  Court made it clear that there had to be specific items that

21  the government really needed and requested.  We've given the

22  government so far, Your Honor, coverage charts, as the Court

23  has directed.  We've given the government the NACC data sheets,

24  and we've confirmed to the government that all of the

25  depositions in the insurance NACC case that the government

1   wanted, we've given them.  So we've given them narrow, tailored
2   discovery replies per the Court's request.
3              We also, as you may recall, Your Honor, you
4   asked -- the Court directed us to give the government
5   information regarding whether or not there were any future
6   claims or future cost issues still to be resolved.
7         *THE COURT:*  Right.
8         *MR. STEINWAY:*  We've given the government the
9   information on this, and we've told the government that indeed
10  all the insurance cases were settled and that the settlements
11  included any future claims.  So the government has all the
12  information regarding future issues.  We responded, Your Honor,
13  to the specific requests of the government as to what they have
14  asked for.  And we feel, quite frankly, Your Honor, that the
15  government's characterization of the law in this area is not
16  correct.  They have referred to one case.  We call that the
17  *Friedland* case, Your Honor, in the Tenth Circuit, which is
18  clearly the minority opinion.  We believe the majority opinion
19  is the *NCR* case in the Seventh Circuit, which was just handed
20  down, as well as the standard CERCLA jurisprudence, which says
21  if there's enough information out there to sit down and try to
22  do a calculation, then that should be the basis for the
23  adjudication of these issues.  And we certainly feel the
24  government now has all that information to make those
25  dispositive calculations.

1          *THE COURT:*  All right.  Did you want to respond?

2          *MR. ROWE:*  Just briefly, Your Honor.  It is true that

3    Exxon has sent us some of the specific things you allowed.

4    Most of them thus far have not been terribly helpful at trying

5    to ascertain what the nature of the settlement was.  Some of

6    that's technical glitches.  The coverage charts came in

7    pixelated and we couldn't read them, so we have new ones.  But

8    at the moment it does not appear that they will answer the

9    question.

10          What Mr. Steinway referred to as the NACC charts

11   just a moment ago, the NACC is the North American coverage case

12   that Exxon brought, so that's the insurance case.  The charts

13   they have given us are helpful, because they demonstrate that a

14   lot of the same projects that Exxon is asking us to pay for,

15   they were asking the insurance companies to pay for.  I can't

16   yet tell whether it's a complete overlap, but it appears to be

17   close.  Curiously --

18          *THE COURT:*  Did Exxon get insurance money from those

19   requests?

20          *MR. ROWE:*  Well, that's -- I mean, yes, and the

21   question is how much.  So --

22          *THE COURT:*  Exxon, how hard would it be to answer that

23   question, not what did you ask for from both insurance and

24   Exxon, but what did you get from insurance that you've also

25   asked Exxon for?

1              *MR. STEINWAY:*  Your Honor, Dan Steinway for Exxon.  We

2      have given the government what we've gotten, but unfortunately

3      a lot of these insurance cases where there's over 200 insurance

4      policies and 300 -- 3,500 sites at issue, there is never a

5      clear allocation of specifics that the government has asked us

6      to do.  That's just not normally what is done in these massive

7      insurance coverage cases --

8              *THE COURT:*  How were they allocated?  Number one, how

9      many cases are there?

10             *MR. STEINWAY:*  There were 200 insurance policies --

11             *THE COURT:*  That's not my question.  How many pieces

12     of litigation?

13             *MR. STEINWAY:*  Just one for the -- just one piece of

14     litigation, Your Honor.  It's called the NACC, as the

15     government has referred to it, the North American --

16             *THE COURT:*  All right.  All right.  I just wondered if

17     there were other cases.  So it's a number of policies

18     applicable to different periods and different places, correct?

19             *MR. STEINWAY:*  Yes, Your Honor.

20             *MR. BUTHOD:*  And different insurers, of course, yes.

21             *THE COURT:*  And, I'm sorry, different what?

22             *MR. BUTHOD:*  Oh, I apologize, Judge.  It's Ty Buthod.

23     And different insurers of course.

24             *THE COURT:*  Of course.  Of course.  And if they are

25     not allocated in the same way, that is, the proceeds paid tied

1  to the same kind of categorization that the -- that Exxon is

2  applying to its cross-recovery request to the government in

3  this case, how are they tied?  How are they allocated,

4  identified?

5       *MR. STEINWAY:*  Your Honor, Dan Steinway again for

6  Exxon.  They are identified and tied just by very generic

7  categories, by the sites themselves.  We don't have the kind of

8  information that talks about it on the specific, really defined

9  unit-by-unit approach that the government --

10      *THE COURT:*  But let's start with the first thing you

11 said though.  So the first way they're allocated is by site; is

12 that correct?

13      *MR. STEINWAY:*  Generally speaking, we can deduce that

14 from the type of -- the amounts that are settled for by the

15 carriers.

16      *THE COURT:*  So the first thing you can do to identify

17 what insurance moneys have already been received is to look at

18 the ones that involve the same sites as we are dealing with

19 here, the two sites in question, correct?

20      *MR. MCGOVERN:*  Your Honor, this is Mike McGovern for

21 Exxon.  And in terms of the settlement agreements with the

22 insurers, there's no allocation whatsoever.  They basically

23 paid a certain amount of money.  There's --

24      *THE COURT:*  Do they do it tied to any particular

25 geographic site?

1          *MR. MCGOVERN:*  No, they did not.

2          *MR. BUTHOD:*  No, Judge.

3          *THE COURT:*  All right.  So all we can do is look at

4     how many claims were generated for other sites and get that as

5     some sort of sense of the amounts at issue?  Is that where we

6     are?

7          *MR. MCGOVERN:*  That's correct, Your Honor.  I mean, to

8     give you sort of a general sense of what it was like, the total

9     past expenditures that were claimed in this litigation to the

10    insurers was, as Mike Rowe said, approximately 1.2 billion.  Of

11    that amount, the Baytown/Baton Rouge components of those

12    were -- for Baytown, all of 3 percent of the claim costs; for

13    Baton Rouge, all of 4 percent of the claim costs.

14               Exxon ultimately recovered -- when you eliminate

15    their litigation fees in doing this litigation, they recovered

16    16 percent from a pro rata basis, in other words, you know,

17    1.2 billion.  There was no allocation in the settlement

18    agreements.  There's been no allocation since then.  And so

19    that's the quandary we're in.  And that's why we thought as --

20    or the courts do, if it's not simply double discovery, in other

21    words, what we recovered from the insurers on a pro rata basis

22    for Baytown and Baton Rouge, coupled with what we could in our

23    wildest dreams recover from the government in this case is less

24    than a hundred percent.  But even if you were to do a pro rata

25    of the 3,600 sites in the NACC litigation, the pro rata

1    across-the-board, it's only 16 percent of the costs.  And so

2    that only comes down to -- for Baytown and Baton Rouge in this

3    case, you know, 3 or 4 million for each site that would be even

4    conceivably considered recovered from our loss claim of about

5    80 million in this case.

6         MR. ROWE:  Your Honor, Mike Rowe.  A couple of

7    clarifications there.  First of all, we don't agree with the

8    pro rata thing, and there's no evidence that that happened.

9    And I think we can all be certain that whatever the basis for

10   the final figure was, it was not just 16 percent of the ask for

11   the whole thing, when it was all calculated up for all these

12   sites.

13        The second thing is that unfortunately there is a

14   case out there -- I don't recall the name of it.  I read it

15   back in May -- in which a court had, I think, 16 or 18 sites

16   and 8 were at issue and it said, Well, I'm just going to take

17   the 8 sites and prorate that way.  The problem is, that in this

18   case you would be prorating a number of gas stations against

19   one of the world's largest oil refineries.  So, that's really

20   not going to work here.

21        In terms of the allocation questions you were

22   asking, I think we have to be a little careful with

23   allocations.  So, I would say to you -- I think what you were

24   asking was, how do we know if the costs are the same.  And what

25   we know, for example, is Exxon has a number of projects that it

 1  conducted on the environmental work, and one of those, for

 2  example, is on an oil/water separator they called 3M.  And

 3  there is a cost figure for the separator 3M in the NACC data

 4  that they have given me.  So, I know that was a project in the

 5  insurance case and that's a project in this case.  And there

 6  are a number of other similar ones.

 7            What we don't know is in the course of the

 8  negotiation, how did the insurance companies respond to the

 9  demand, if in this printout it's 34.7 million and Exxon's

10  answer -- or initial disclosures, they said it was

11  approximately 36.8 million.  But it's in the 35-million-dollar

12  range somewhere.  And I just -- you know, the government -- I

13  understand that there are going to be differences of opinion

14  about whether the collateral source rule applies and if it does

15  apply, whether Mr. McGovern's view prevails, or whether what I

16  think is the more common place view, which is that the costs

17  recovered from insurance are simply removed from the sum before

18  the allocation is done.  That's the common version of this.

19            We have to know how much to subtract.  And the

20  courts appear to say, certainly that Tenth Circuit case that

21  Mr. Steinway doesn't like, says that that's Exxon's -- it's

22  their burden to show the court some form of allocation.  And I

23  just -- you know, I think they are to some degree at a loss.

24  The problem for the government is, we're bearing the loss based

25  on this massive pro -- supposed pro rata reduction, when we

1    paid -- we think we can show the Court that we paid the

2    premiums for these insurance policies in World War II.  We

3    don't know what they recovered, and that's what we're trying to

4    find out.  Maybe there's nothing to find out, but then we're

5    going to have to deal with the issue down the road.  So that's

6    really what I wanted to talk about today.

7            *MR. BUTHOD:*  And, Judge, if I could, this is Ty Buthod

8    for Exxon.  It's fair to say that fundamentally there are a

9    number of things counsel just said that we differ about.  But

10   one of them is, frankly, if the government's view prevails,

11   that absent our specific demonstrated evidence and specific

12   allocation of insurance proceeds, they take the whole

13   enchilada, so to speak --

14           *THE COURT:*  You mean they pay you nothing?

15           *MR. BUTHOD:*  They pay us nothing, because we can --

16   we'll stipulate that we got $200 million post deduction for

17   attorneys' fees from the NACC litigation.

18           *THE COURT:*  And that would be the 16 percent?

19           *MR. BUTHOD:*  No, that -- yeah, that would be

20   16 percent of what was originally sought.  And if the

21   government --

22           *THE COURT:*  Wait, wait, wait.  16 percent of what you

23   are seeking in this case; is that correct?

24           *MR. ROWE:*  Your Honor, Mike --

25           *MR. BUTHOD:*  No.

1              *MR. ROWE:*  -- and I think what Mr. Buthod is saying,

2    is that Exxon's initial insurance demand for all of the claims

3    was 1.2 billion.  Their recovery was 267 million, of which they

4    had told us approximately 67 million was attorneys' fees, and

5    that's about 16 percent of the original ask.

6              *MR. BUTHOD:*  Correct.  And my point --

7              *THE COURT:*  How about -- well, wait, wait.  How does

8    the original ask relate to what you are asking in this case

9    from the government?

10             *MR. BUTHOD:*  Well, we can identity our original ask in

11   the insurance litigation that can be attributed to Baytown and

12   Baton Rouge.

13             *THE COURT:*  I'm not asking that question.  I

14   understand you can't do that.

15             *MR. BUTHOD:*  I said we can, what we originally asked.

16             *THE COURT:*  All right.  And what was that?

17             *MR. BUTHOD:*  Those are the percentages that

18   Mr. McGovern mentioned earlier.  Right, Mike?

19             *MR. MCGOVERN:*  Sorry?

20             *THE COURT:*  Is that a 16 percent or is that an

21   earlier -- a different one?

22             *MR. MCGOVERN:*  Your Honor, this is Mike McGovern.  If

23   you're asking for what was the percentage of the Baytown and

24   Baton Rouge costs claimed in the NACC litigation as to the

25   total amount of the NACC claim --

1      *THE COURT:*  Yes.

2      *MR. MCGOVERN:*  -- Baytown was approximately

3  34.7 million.  Baton Rouge was approximately 47.4 million.  So

4  each of those was -- Baytown was 3 percent of the total NACC

5  claim.  Baton Rouge was approximately 4 percent of the total

6  NACC claim.

7      *THE COURT:*  All right.  So you take 7 percent of the

8  total NACC claims, right?

9      *MR. BUTHOD:*  Yes.

10     *THE COURT:*  And 7, correct?  And that's what's

11  allocated to these two properties.  And then how does what was

12  paid out in the NACC litigation, the NACC sets of disputes --

13  you told me that that was 16 percent of what was asked for.

14     *MR. BUTHOD:*  Correct.

15     *THE COURT:*  So we know that 3 -- that 7 percent of the

16  16 percent went to the two properties -- the two refineries

17  here?

18     *UNIDENTIFIED SPEAKER:*  That's correct, Your Honor.

19     *MR. BUTHOD:*  Yes, Judge.

20     *THE COURT:*  And what is that percentage?  Somebody do

21  that arithmetic.

22     *MR. BUTHOD:*  I was thinking from the prior notes I

23  had, about $6 million --

24     *THE COURT:*  Who is speaking?

25     *MR. BUTHOD:*  Oh, I'm sorry.  This Ty Buthod for

1    ExxonMobil.

2              THE COURT:  Thank you.

3              MR. BUTHOD:  I apologize.

4              THE COURT:  Okay.  7 percent -- what is the answer to

5    that arithmetic question?

6              MR. STEINWAY:  Dan Steinway for Exxon, Your Honor.

7    It's about $7 million.

8              THE COURT:  So 7 million out of the 200 million paid

9    went to Exxon in insurance proceeds for these two properties?

10             MR. MCGOVERN:  On a pro rata business, that would be

11   correct, Your Honor.  Mike McGovern.

12             MR. ROWE:  And, Your Honor, this is Mike Rowe.  And

13   that's our -- that is our concern here, is that we have no way

14   to know that this was done on a pro rata basis, and I'm pretty

15   sure it --

16             THE COURT:  Well, wait.  What is "this"?

17             MR. ROWE:  In other words, Exxon asked for

18   $1.2 billion for hundreds of gas stations and multiple

19   refineries and various projects --

20             THE COURT:  Well, but, look, what we are doing is an

21   approximation, because there is no other more precise approach

22   that the records will permit, correct?

23             MR. STEINWAY:  Dan Steinway for Exxon, Your Honor.

24   That is correct.  And we have no further information to do

25   anything other than what Your Honor is suggesting right now.

1        *THE COURT:*  So even if we were to extend -- to

2   increase the amount -- that is, to presume that it should be

3   less because it covers some things that are wholly different

4   from the remediation at issue, such as gas stations -- so let's

5   assume for the sake of discussion that we ought to instead of

6   giving Exxon credit, if you will, for having already received

7   $7 million, we should perhaps reduce that by a number

8   proportional to the disparate kinds of costs covered by the

9   7 million or included in the 7 million.

10       *MR. STEINWAY:*  Dan Steinway for Exxon, Your Honor.  We

11  would agree with that.  And we don't have any further

12  information to suggest one way or the other how to allocate it.

13  So, what the Court is suggesting makes reasonable sense to us,

14  Your Honor.

15       *THE COURT:*  So if we assumed -- and you tell me based

16  on your examination of the records if this is accurate.  Let's

17  assume that 10 percent of the properties covered by the NACC

18  litigation or addressed by it were so different from these

19  refineries, that they should not be -- that the proceeds should

20  not be included in the credit or the allocation to Exxon for

21  the payment of the proceeds.  So 10 percent of 7 million is how

22  much?

23       *MR. BUTHOD:*  $700,000, Judge.  This is Ty Buthod.

24       *THE COURT:*  Right.  So if we were to say deduct

25  700,000 from 7 million, we would get --

1       *MR. BUTHOD:*  6.3, Judge.

2       *THE COURT:*  -- 6.3, right?

3       *MR. STEINWAY:*  Yes, Your Honor.

4       *THE COURT:*  And what if we then -- I mean, if that's

5  right, if 10 percent is a reasonable reflection --

6       *MR. STEINWAY:*  Your Honor, this is Dan Steinway for

7  Exxon.  10 percent, I mean -- I don't know the scope of the

8  3500 sites involved, Your Honor, but I would say that

9  10 percent attributable to gas stations was probably low.  I

10 don't have a basis for saying that before you, Your Honor,

11 right now.

12      *THE COURT:*  Well, let's be conservative.

13      *MR. STEINWAY:*  That would be a very conservative

14 number.

15      *THE COURT:*  All right.  That would sort of favor the

16 government in the sense of being conservative and --

17      *MR. ROWE:*  I'm sorry, it's Mike Rowe.  I'm getting a

18 little bit lost in the mathematics here.  But I do want to make

19 clear that I do not think what you're talking about would favor

20 the government.

21      *THE COURT:*  No, I think that's exactly right.  On

22 reflection, you are exactly right.

23      *MR. ROWE:*  Yes.

24      *THE COURT:*  The more conservative we are, that is, by

25 understating the number of disparate properties --

1          *MR. ROWE:*  Right, Exxon would benefit.

2          *THE COURT:*  That's correct.  So let's increase it to

3     15 percent or 20 percent, which would --

4          *MR. ROWE:*  Yeah.

5          *THE COURT:*  -- help the government.  At least we can

6     see the differences.  We're not talking about huge amounts of

7     money.  It would be the difference -- if we went to 20 percent,

8     we would have 1.4 million to deduct from the 7 million,

9     correct?

10          *MR. BUTHOD:*  Yes.

11          *THE COURT:*  So that would be --

12          *MR. BUTHOD:*  5.6 million, Judge.

13          *THE COURT:*  Right.  And if it was 15 percent?

14          *MR. ROWE:*  Your Honor, it's Mike Rowe again.  And the

15     difficulty that we have is that Exxon wants to do this all by

16     percentages, which leads to an assumption that is okay to just

17     do a pro rata reduction across-the-board.

18          *THE COURT:*  Come up with a better way that

19     approximates --

20          *MR. ROWE:*  Well, we would say -- you know, again,

21     nobody is asking the Court to decide this today, but --

22          *THE COURT:*  No, I understand, but we need to back into

23     what are the necessary pieces of information to refine this to

24     the extent we can.

25          *MR. ROWE:*  My answer would be that the government

1  would take the position that Exxon has provided no evidence of

2  allocation that would suggest that they did not collect the

3  insurance for the refineries that they asked for.

4       *THE COURT:*  A hundred percent?

5       *MR. ROWE:*  Well, I don't -- the reason I'm asking for

6  the discovery is to try to find some evidence to do something

7  else.

8       *THE COURT:*  Well, what other evidence is there that

9  Exxon has to produce that you haven't already received?  That's

10  what I'm struggling to understand.

11       *MR. ROWE:*  And that's a fair question.  I'm sorry.

12  It's Mike Rowe again.  The answer is, we don't know.  We think

13  it is very likely that --

14       *THE COURT:*  Well, I need to pause then and ask Exxon

15  what else is there responsive to this question that you haven't

16  already produced?

17       *MR. BUTHOD:*  Judge, this is Ty Buthod for Exxon.

18  Here's the box we're in.  We have given the information on the

19  demand.  We've given the information on the settlements.  And

20  you'll note before, counsel for the government indicated -- he

21  sort of skipped over ten years of this litigation in the NACC,

22  in the NACC case.  And the problem becomes we did not settle

23  the NACC case in such a way that said A, B, C insurer is paying

24  30 percent of this claim because they believe Baytown, but they

25  don't believe whatever, Beaumont, or they believe Baton Rouge,

1  but they're not going to give any credit for anything in New

2  Jersey or what have you.

3       *THE COURT:*  Or this is a gas station and not either

4  refinery?

5       *MR. BUTHOD:*  Correct.  This is like any settlement.

6  It was -- you know, it's a little messy, but that's how the

7  sausage is made, Judge.  There is a settlement.  We've provided

8  the data for the settlement of --

9       *THE COURT:*  And was it a global settlement so that all

10  contributed to a pot?

11      *MR. STEINWAY:*  Yes, Your Honor.  Dan Steinway for

12  Exxon.  Yes, Your Honor, it was a global settlement.

13      *THE COURT:*  So the insurers simply chipped in.  And

14  did they chip in some kind of formula -- according to some kind

15  of formula?

16      *MR. BUTHOD:*  Candidly, Judge -- Ty Buthod again -- we

17  don't know what motivated and how the individual insurers

18  necessarily chipped in and what formula they used.

19      *THE COURT:*  All right.  So bottom line is, they did

20  all chip into a pot?

21      *MR. BUTHOD:*  And they all got released, so --

22      *MR. ROWE:*  Yes, Your Honor.  This is Mike Rowe.  And I

23  don't think we disagree with that.

24      *THE COURT:*  All right.  So that's fine.

25      *MR. ROWE:*  Okay.

1          *THE COURT:*  So we know then we have to back up to the

2     claims that were asserted.

3          *MR. ROWE:*  Yes, ma'am.

4          *THE COURT:*  And we know that -- and nobody -- and this

5     is not, I think, a rough approximation.  This is more precise.

6     We know that of the total asserted, that approximately -- let's

7     see, where were we.  Of the claims, 7 percent of those claims

8     related to the two refineries?

9          *MR. BUTHOD:*  Yes, Judge.

10          *MR. ROWE:*  Right.  And, Your Honor, our point is that

11     it is not necessarily the case that the rest of this is

12     unknowable.  Exxon --

13          *THE COURT:*  Well, that's the question.  That's the

14     question.  So what is the rest of this?  So the major part of

15     the rest of this is what has to do with what other stuff or

16     stuff that is so dissimilar that we know it's got to be other

17     stuff.

18          *MR. ROWE:*  Right.  So there is a repository of

19     documentation from that insurance case.  It is undoubtedly the

20     case that there were settlement discussions back and forth.  It

21     is likely the case that people did some math in the course of

22     those settlement discussions and had views about whether the

23     gas station claims were good and whether the refinery claims

24     were good and whether there were statute limitations problems

25     and all the rest.  Now, you know, at some point we're not going

1   to be able to be precise about this.  Our complaint really is

2   that Exxon has been unwilling to look.  So, I don't know how

3   they can say they don't know.  I mean, they literally don't

4   know, but they haven't gone and looked.  And if they don't go

5   and look --

6           *THE COURT:*  All right.  Here's the approach I want to

7   take --

8           *MR. ROWE:*  Okay.

9           *THE COURT:*  -- I want to do a very limited but

10  representative sampling and make Exxon look at a slice of the

11  data in this depository.  And we can limit it by six months or

12  three months.  We can limit it to a period when we knew that

13  the -- when settlement discussions of the sort you are

14  imagining must have occurred.  And I see no reason that you are

15  fanciful here.  I see no reason to believe that.

16          *MR. ROWE:*  I'm sorry.

17          *THE COURT:*  And order Exxon to do an examination of

18  documents or communications that might shed light on a formula

19  used to identify claims that were for these refineries as

20  opposed to other types of properties or other properties, other

21  kinds -- other costs not in the -- not attributable to the

22  refinery remediation requirements.  Limit it to a very specific

23  period of time.  Would that give us the information we need to

24  find out if there's any there there?

25          *MR. ROWE:*  Your Honor, this is Mike Rowe on the

1   government's side, and I think that would generally be fine

2   with us.   It is much easier for somebody who's looking at these

3   documents to identify the ones that are meaningful than for us

4   to speculate about it here.   And I think we would suggest

5   probably the last six months to a year before this settlement

6   was actually arrived at is when this -- you know, or if they

7   know of a period when the settlement -- you know, if it's

8   really from a year and a half to six months and they just

9   didn't close the settlement.   You want the final settlement

10  discussion is what you're really looking for.

11          *THE COURT:*   I got it.   So the last six months before

12  the settlement concluded or the settlement agreement was

13  reached, at least in principle.

14          *MR. BUTHOD:*   Judge, Ty Buthod for Exxon.

15          *THE COURT:*   How hard is that for Exxon, Mr. Buthod?

16          *MR. BUTHOD:*   Yes.   I was going to say, I understand

17  exactly what the Court's instructing.   And you can, I suspect,

18  appreciate that no one on this call was involved in the NACC

19  litigation.   So we understand what the instruction is.   And I

20  can simply represent that we'll go back and identify --

21  identify if that's going to be a problem, and certainly the

22  parties and the Court will hear back from us.   But I understand

23  what the instruction is, and we'll do our very best to comply.

24          *THE COURT:*   I think that within 14 days you ought to

25  have a protocol in place, a discovery plan to conduct precisely

1    this kind of sample.  You ought to -- if you are going to

2    assert that is overly burdensome even to do this, I'm going to

3    need some precise support on what those burdens are.

4              *MR. BUTHOD:*  Understood.

5              *THE COURT:*  If you suggest that there is no reasonable

6    benefit to expect, that is, this is simply -- you know enough

7    to know that there's no there there, even if the work is

8    doable, that there wouldn't be anything to find that would

9    correspond to what we're looking for, it simply doesn't exist,

10   if you know that now, you can assert that in an objection -- in

11   an objection, but I would need some affidavit or declaration or

12   testimonial proof as to why you can reach that conclusion

13   without even looking at the information to see what it

14   contains.

15             *MR. BUTHOD:*  Judge, I fully understand what the

16   Court's instruction is on this.

17             *THE COURT:*  All right.  Good.

18             *MR. BUTHOD:*  As a mere placeholder, let me do say,

19   that we do believe at the end of the day that because what

20   CERCLA prohibits is double recovery, we don't believe what the

21   legal position the government is taking, that their first

22   dollar of an insurance payment is somehow a settlement credit

23   to the government.  But I'm not trying to hold up this

24   discovery on that.  I just want to make that point so that we

25   don't all assume that we're all going down the road --

1          *THE COURT:*  And I appreciate that.  I appreciate that.

2     But there is a prohibition on double recovery, which is sort of

3     a check to that balance.

4          *MR. ROWE:*  Yes, Your Honor.  This is Mike Rowe.  And I

5     think the parties and I think the Court has understood since

6     May that that is a different of opinion that we'll have to sort

7     out when it's time to brief.  So if I seemed to suggest

8     otherwise, it was not my intention.

9          *THE COURT:*  No, I don't think anybody took it that

10    way.

11          All right.  So we'll have within 14 days a

12    discovery plan with specific objections if those are to be

13    asserted.  If there's -- if that plan is generated without

14    objection, then I would like the discovery it calls for to be

15    concluded 30 days later.  So, our first deadline is going to be

16    August 28 for the generation of the discovery protocol by

17    Exxon.  And then the second deadline is going to be

18    September 25th to have the discovery completed and the

19    production made.  We will schedule a subsequent status

20    conference for October -- hold on.  I'm looking you up -- for

21    October 6 at 3:00 o'clock central.  We can do it by telephone

22    again.  And that should resolve this discovery dispute.  I do

23    not know if we will need to revise expert reports.  Once this

24    information is received, perhaps you can tell me.

25          *MR. ROWE:*  Your Honor, it's Mike Rowe.  It's a little

1  hard to predict, but I think if there were revisions, they

2  would probably only be the costs and accounting reports at that

3  point and it might not be necessary.  It's a little hard to

4  tell until we see whether there's anything to find out.

5          THE COURT:  All right.  So I don't think that we need

6  beyond what we have already done.  I think what we'll do is

7  extend the scheduling order by 60 days rather than the 30 to

8  accommodate the one expert's illness and also to take into

9  account that we're not going to get a decision in the *Shell*

10  case that may or may not slightly impact where we are on the

11  stay and the contract dispute that might affect this case until

12  later than we expected.

13          MR. STEINWAY:  Your Honor, it's Dan Steinway for

14  Exxon.  When you say to extend the schedule order by 60 days,

15  are you talking specifically just about this issue or

16  across-the-board?

17          THE COURT:  Across-the-board.

18          MR. STEINWAY:  Well, and, Your Honor -- it's Mike

19  Rowe -- just to be clear, I think Mr. Steinway maybe is

20  worrying more than he intends.  You're saying instead of 30

21  days, 60 days, or are --

22          THE COURT:  Yes.  Yes.  Yes.

23          MR. STEINWAY:  Okay.

24          THE COURT:  Got it.

25          MR. STEINWAY:  Total.

1          *MR. ROWE:*  Okay.  And it is Mike Rowe again, Your

2     Honor.  At the risk of my -- I know we've been at this for a

3     bit now and so I'm about to make myself more unpopular.  We do

4     have the one issue with the new experts yet to go.

5          *THE COURT:*  Yes.  No, I appreciate that.

6          *MR. ROWE:*  Should we go ahead and dive into that or --

7          *THE COURT:*  Absolutely.

8          *MR. ROWE:*  Okay.  So, as the Court may remember, and

9     may not remember, way back in 2011, in November, shortly after

10    the two refinery cases were consolidated for discovery, the

11    parties agreed to a bifurcation for discovery in which the

12    liability and allocation issues were to be done in the

13    discovery in Phase I of the case and cost issues, the

14    accounting issues and Exxon's ability to prove that it actually

15    spent the money and their compliance with the national

16    contingency plan, did they do the things that CERCLA rules

17    require them to do were to be put off until Phase II.

18              You'll first see an indication of that in -- and

19    I'm using the docket numbered items from the Baytown case,

20    which is 10-2386.  The first indication I see of that is

21    November 15th of 2011 in our -- in one of our early scheduling

22    orders.  It is also noted in the Court's opinion, which is

23    No. 161, and the Court tells us early in the opinion, I'm

24    citing to Exxon's summary judgment motion, which is No. 102,

25    that that is the bifurcation for discovery.

1          The parties completed their Phase I discovery,

2    according to the last scheduling order, in June of 2013.  And

3    thereafter while experts could update their reports, we were

4    done with our discovery for liability and allocation.

5          We then -- and I think it's either that fall for

6    the following fall -- let's see, we filed summary -- partial

7    summary judgment motions, which for the government included a

8    number of liability issues, but not allocation.  Exxon had a

9    number of liability issues and at least some allocation issues,

10   which the Court ultimately declined to decide.  And if you look

11   back at your opinion, you will see a number of places where you

12   indicate that we will decide the allocation issues in Phase II.

13         We did not understand that to mean -- I don't

14   believe either party understood that to mean that we were

15   reopening Phase I to discovery.  So we then in November 2015

16   came up with a scheduling order for the new case.  And in that

17   order we reported that the Court would be deciding the

18   allocation issues.  But if you look at the first two pages of

19   that order -- which I'll get you a number for here, hang on.  I

20   have to find the right one.  Bear with me just a moment.  That

21   is No. 111.  And it describes that allocation is one of the

22   issues along with costs and NCP, but it then said -- it then

23   says, The scope of written fact and expert witness discovery

24   for Phase II is limited to Items B through E -- allocation is

25   the A item -- because the parties agreed at the time that we

1  had completed our Phase I discovery.  So now we're on to Phase

2  II.

3         *MR. BUTHOD:*  Hey, Mike I'm sorry to interrupt you.

4  This is Ty Buthod.  When you're reading from that, would mind

5  reading the full sentence, where it says "the scope of

6  written," et cetera, et cetera?

7         *MR. ROWE:*  I don't mind.

8         *MR. BUTHOD:*  I appreciate it.

9         *MR. ROWE:*  But I'm not sure I didn't read it, but

10  sure.  Let me get back to it.

11         *MR. BUTHOD:*  I'll just put it simply.  It says, "The

12  scope of written fact witness and expert witness discovery for

13  Phase II is limited to Items B through E, except as otherwise

14  noted below."

15         *MR. ROWE:*  Yes.  So --

16         *MR. BUTHOD:*  Thank you.

17         *MR. ROWE:*  Okay.  Well, and I assume there's something

18  below that somebody is now going to refer to.  I am absolutely

19  persuaded that there was a clear understanding between the

20  parties that we were done with Phase I discovery.  Both --

21         *THE COURT:*  Well, I think that doesn't answer the

22  question though.  It raises the question.

23         *MR. ROWE:*  Okay.

24         *THE COURT:*  Because both of these orders -- and I'm

25  looking at --

1     *(Judge speaking to law clerk.)*

2     *THE COURT:* I'm looking at the scheduling and docket

3 control order that deals with No. 1. It says it is liability

4 and allocation. And Phase II is costs, NCP issues. And then

5 if you look at the subsequent scheduling and docket control

6 order that defines Phase II issues, it's got a long list, and

7 it starts with the allocation --

8     *MR. ROWE:* Yes, ma'am, but --

9     *THE COURT:* -- of past and future costs among the

10 responsible parties under 9613(f). So, I think the question

11 is, under what you have outlined, what does it mean to reopen

12 allocation when both phases to some extent cover allocation?

13     *MR. ROWE:* Well, okay. So the first point, Your

14 Honor -- I'm sorry. It's Mike Rowe again. The first point is

15 if you turn the page below that long list of A, B, C, D, E

16 items, you will see the language Mr. Buthod and I were just

17 talking about.

18     *THE COURT:* Yes, sir, I do see it.

19     *MR. ROWE:* And that's the B to E limitation, which I

20 believe the parties mutually intended --

21     *THE COURT:* And I understand that, but there's still

22 allocation aspects --

23     *MR. ROWE:* Yes, ma'am. So then --

24     *THE COURT:* -- included. And that's what I'm trying

25 to grapple with.

1          *MR. ROWE:*  So the answer to your question is that when

2     the parties talk about costs and NCP compliance --

3          *THE COURT:*  Right.

4          *MR. ROWE:*  -- NCP compliance is an element of Exxon's

5     case.  If they did not comply with the NCP, they will not get

6     paid.

7          *THE COURT:*  Right.

8          *MR. ROWE:*  But the cost items was always understood to

9     be simply did they have invoices and proof of payment and

10    accounting records that demonstrated that the 30 -- the

11    50 million at Baytown or what -- I can't remember the numbers

12    anymore, that they had actually invested those costs on the

13    clean-up.  So, I would have expected going into Phase II, that

14    each side would have two experts, an NCP expert, which we

15    talked about in May and accounting people.  And we might have

16    had to have more than one accounting person.  But the

17    allocation, the equitable allocation issues are all about the

18    issue of World War II and all those things that we talked about

19    back in Phase I.  So, perhaps it will help if I then proceed to

20    tell you, that Exxon has now added -- or they just served two

21    additional expert reports --

22         *THE COURT:*  Right.

23         *MR. ROWE:*  -- both of which had long segments about

24    the history of World War II and how the government took control

25    of the refineries.  If you read them straight up, they not only

1  sound like allocation issues, much of what's in those reports

2  sounds intended to persuade the Court about a liability issue

3  that the Court has now already decided, but there's always some

4  overlap with allocation, so I don't want to press that point

5  too far.  And then new technical issues, where they quarrel

6  with the government's chemical engineer about how various

7  blending imports that were -- that we believe we can show the

8  Court now were, in fact, imported to the refinery during the

9  war, something we differ with Exxon about, were actually

10  applied at the refineries.  So, I think they are now beginning

11  to recognize that the imports happened, and now they want to

12  have a new expert that will say they don't matter.

13         And they have a second new expert who wants

14  to create new quarrels, again, with my chemical engineer

15  Dr. Kittrell, about the importance or lack of importance of

16  wastes from particular facilities that were in use during the

17  war, that he had things to say about.  So it's a question of,

18  you know, how much waste came out of the fluid catalytic

19  cracker and that sort of thing and how important was that

20  relative to the waste that came out of some other part of the

21  refinery.

22         *MR. STEINWAY:*  Your Honor --

23         *MR. ROWE:*  Those were all extensively covered by

24  multiple engineers on both sides in Phase I, and now here we

25  are essentially looking for a do-over.  That's our gripe.

1          *MR. STEINWAY:*  Your Honor, Dan Steinway for Exxon.

2    May I respond?

3          *THE COURT:*  Of course.

4          *MR. STEINWAY:*  Your Honor, I would just like to make

5    two points and I'm sure my fellow counsel will make others as

6    well.  In your summary judgment order that you issued on Phase

7    I, Your Honor, I would just like to quote -- I apologize for

8    quoting from in your opinion -- "The United States argues that

9    the Court should defer deciding equitable allocation, including

10   methodology, until it receives more evidence during Phase II of

11   this case, including the opinion of the United States' expert

12   on CERCLA allocation, Matt Low.  The Court agrees with the

13   United States that deciding on the method for allocating fault

14   is premature.  The Court will resolve that issue during Phase

15   II of the litigation."

16         *THE COURT:*  May I interrupt for one second and ask --

17         *MR. STEINWAY:*  Yes, Your Honor.

18         *THE COURT:*  -- you to also address that the impact of

19   the inclusion in this Phase II -- and I'm looking at Docket

20   Entry No. 111 in the 11 case, which is 168 in the 10 case.

21   That we specifically provided -- that nothing in the order

22   would preclude further deposing any experts, serving a

23   supplemental report, regardless of the issues that that report

24   covers.

25         *MR. STEINWAY:*  Yes, Your Honor.

1          *THE COURT:*  Given the deferral or the recognition that

2    we couldn't address all aspects of allocation raised in Phase I

3    in Phase I, that there would be parts that you would have to

4    defer deciding to Phase II, that method did not equate to all

5    issues, number one; and the fact that the supplemental reports

6    can be followed by depositions of these experts as to the

7    supplemental information raised in the reports and that will

8    provide a shield against any unfairness.

9          *MR. BUTHOD:*  Correct, Judge.  Ty Buthod for Exxon.

10         *THE COURT:*  Now, it may complicate matters more.  It

11   may add to the mix of information that has to be assimilated

12   and absorbed and accounted for and then decided by the Court,

13   but I'm not sure that we can avoid that.  We can minimize it,

14   but I don't think we can avoid it.

15         *MR. ROWE:*  Your Honor, it's Mike Rowe.  Might I be

16   heard on that point?

17         *THE COURT:*  Yes, sir.

18         *MR. ROWE:*  I sincerely believe, and I believe there

19   was a meeting of the minds of the parties, the reason that

20   language is in this report, and I believe we may have -- or in

21   this schedule, and I believe we've had it in a number of prior

22   schedules, is that rule -- I think it's Rule 26(e)(2), you

23   probably know better than I, says that an expert is not only

24   permitted but obligated to update his or her work --

25         *THE COURT:*  Okay.

1          *MR. ROWE:*  -- to the final pretrial.  We decided

2     amongst ourselves that we would set a date somewhat earlier

3     than that, because this is a very complex case.  That will now

4     be early December, with the 60-day extension.  And we have

5     also -- Exxon also served a supplemental report of A.J. Gravel,

6     their historian, and we are not protesting about that even

7     though --

8          *THE COURT:*  No, I understand.  But you didn't simply

9     say you can take a deposition of any supplemental -- to cover

10    any supplemental report.  You said "regardless of the issues

11    that report addresses," which means it didn't matter if it was

12    a Phase I issue or a Phase II issue.

13         *MR. ROWE:*  Yes.  No, you're quite right, and that was

14    meant to allow Phase I experts to continue to supplement their

15    work.  It was not meant to allow entire new experts with entire

16    new sets of opinions, so --

17         *THE COURT:*  And how much of this is supplementation

18    and how much of this is brand-new to the table?

19         *MR. ROWE:*  Well, there are two new engineering experts

20    in addition to the two, I believe, that Exxon already had.  And

21    they are offering -- on the history material, which they're not

22    qualified to testify about anyway, frankly, they're not much

23    different from what Mr. Gravel said.  So, it's cumulative, but

24    it's not particularly --

25         *THE COURT:*  Harmful.

1           *MR. ROWE:* -- important or enlightening, I don't

2    think.  But on the technical issues, these are new attempts --

3           *THE COURT:* Are they new people on the technical

4    issues?

5           *MR. ROWE:* Yes, both are new experts.

6           *THE COURT:* All right.  Keep going.

7           *MR. STEINWAY:* Your Honor, this is Dan --

8           *THE COURT:* Well, wait, wait.  I don't think Mr. Rowe

9    had finished.

10          *MR. ROWE:* I'm close, Your Honor.  The point is that

11   Exxon in some respects may not believe it won the day or will

12   win the day, for example, on an argument that blending agents

13   were, in fact, not imported and used at the refinery during the

14   war.  They had opportunities during Phase I, if they had wanted

15   to, to have engineers say, Well, even if they were imported, it

16   doesn't matter for some reason.  And they are now attempting to

17   insert those experts as, I guess, supplementary or whatever

18   they want to call it, in Phase II.  Those are not the rules

19   we've been playing by.

20               So the government now has to go out and have its

21   expert spend more time rebutting new expert reports.  And, of

22   course, we have not had the opportunity then to go back and see

23   if there are any particular weaknesses in our case where we

24   would like to toss in a new expert.  So the problem for us is,

25   it does not seem equitable and it's not what we agreed.  It's

 1  not that we couldn't do it this way, we just didn't.

 2      *MR. BUTHOD:*  May I address that, Judge?  Ty Buthod for

 3  Exxon.

 4      *THE COURT:*  You may.

 5      *MR. BUTHOD:*  Judge, I think the best evidence of what

 6  the parties agreed is Document 111, the scheduling order, and

 7  it gives two different expert deadlines.  You'll see in 5a,

 8  proponent to designate any expert witness on any Phase II issue

 9  in writing.  That was not staggered, so the plaintiffs do it on

10  one day and the defendants do it on another day.  We agreed to

11  that.  We know that any Phase II issue captures allocation, and

12  the reasons you already talked about.  Then in 5f, there's

13  another deadline later for supplemental expert reports like

14  we've already talked about.

15          I guess it's kind of an unusual circumstance,

16  more than a year out before the trial date, but I understand

17  the government to be asking that these witnesses be struck.

18  And, I mean, I guess counsel's letter said he wants the

19  opportunity to file a brief on this, which we can't oppose him

20  filing a brief, but we know there are standards in the Fifth

21  Circuit about striking an expert.

22      *THE COURT:*  No, I'm not going to strike the expert.

23      *MR. BUTHOD:*  Yeah, I mean --

24      *THE COURT:*  So the question is should we limit them

25  to -- in some fashion that would address the government's

1    concerns?  And I think the government is really saying, Nothing

2    they're saying is appropriate, because it all takes us back to

3    Phase I in an inappropriate way.

4              *MR. BUTHOD:*  Then I would suggest --

5              *MR. STEINWAY:*  Your Honor, Dan --

6              *THE COURT:*  Excuse me.  Go ahead, Mr. Rowe.

7              *MR. BUTHOD:*  It's actually me and Mr. Steinway.  We're

8    talking over each other.  Sorry, Judge.

9              *MR. ROWE:*  I was not in that.  Sorry, Judge.

10             *MR. BUTHOD:*  I apologize.

11             *THE COURT:*  Somebody.

12             *MR. STEINWAY:*  Your Honor, it's Dan Steinway.  The

13   government mischaracterizes the nature of both of these

14   experts' reports.  These reports are not at all intended to

15   address the liability issues.  The Court has already ruled on

16   those questions in Phase I.  These reports clearly -- and the

17   government has carefully excerpted out in their

18   characterization of these reports minimal portions of these

19   reports.  These reports go to substantiate the allocation

20   methodology that our allocation expert has used.  They are not

21   intended at all to address liability considerations.  They are

22   intended to address the very issues that the Court has said

23   need to be addressed in Phase II, equitable allocation.

24   They're intended to address questions of how the allocation

25   methodology should be adopted, the assumptions that go in the

methodology, the technical assumptions of the methodology, and
not at all intended to address the kinds of questions that the
government has suggested that they were intended to address.

THE COURT:  All right.  I'm going to hear once more
from the government on this, and then I'm prepared to rule.
Government.

MR. ROWE:  Your Honor, it's Mike Rowe.  Let's start
with the language.  I take Mr. Buthod's point.  But if you read
5a and the various other places the way he does, it writes the
initial part of the statement of what we're going to do in
Phase II completely out of the schedule, which I can't believe
anybody would believe we intended.

I do believe the issues are new.  I do believe
they're Phase I issues.  If the Court is going to allow them,
then, you know -- and I don't think it is going to be
productive to try to allow these witnesses to testify and then
try to restrict what they can talk about.

THE COURT:  I agree with that.  I agree with that.

MR. ROWE:  I hear your willingness to think about
that.  I just don't think it's very --

THE COURT:  No, I think the line drawing would be
extraordinarily difficult, not to mention time-consuming.

MR. ROWE:  And I will -- I hesitate to tell you this,
because it may not be great for how it's going to turn out for
the government, but I have spoken to our expert.  I believe we

can meet the new testimony in these reports.  The problem for

us is -- I mean, I guess the problem for us is that we had this

agreement and we think it's being violated, that Exxon tends to

want to go quickly in Phase II, and we keep hearing that Phase

II is a simple thing with just costs and allocation.  And now

here we are circling all the way back to something that was

supposed to be over in June of 2013, and the government is

having to spend time and effort and money to do this.  And I

guess -- I can't tell you at this point that I know of a topic

on which I would like to submit an expert report -- another

expert report for the government from Phase I, but I can't tell

you that I wouldn't have done it if the option were available.

        So for us it's really a matter of fairness, of

both sides playing by the same rule.  And if you choose to

allow these things, you know, we -- we're a big government, we

will deal with it, but we don't think it's appropriate and we

don't think it's what we agreed to.

        *THE COURT:*  All right.  I think that there's no way to

trim it once it's allowed, and I really don't see either a

terrible cost to allowing it or a principled way to avoid it

entirely, given the way we have structured the relationship of

the two phases, given the opportunities that the order properly

provides for flexibility in implementation.  I think that we

are in the position that we're in because it's unavoidable.  So

my inclination is to allow the reports and allow additional

1  depositions and the designation of responsive -- or the

2  production of responsive reports, including, but not limited

3  to, by newly designated experts, in order to prevent any

4  prejudice.

5       *MR. ROWE:*  Very well, Your Honor.  Did you -- that's

6  fine.  And I understand the Court's position, just as

7  Mr. Buthod understood the instructions before.  We will assume

8  those two experts will proceed normally with their reports.  We

9  will, of course, want to depose them along with the others when

10  we get into that segment.  And we will serve a responsive

11  expert report.  I believe that we probably can serve that

12  report by the existing deadline, if you would like to have us

13  do that.  I'm quite sure we could use a little more time if

14  that's available.

15       *THE COURT:*  Well, remember, you're going to have some

16  extension anyway.

17       *MR. ROWE:*  Well, if we're going to move the expert

18  deadline -- in other words, the 30 days becomes 60 days, then

19  I'm sure we can -- so if everybody is going to move all their

20  expert reports from the 22nd of August to the 22nd of

21  September --

22       *THE COURT:*  Right.

23       *MR. ROWE:*  -- we're fine.  We'll do it.

24       *THE COURT:*  Okay.  That sounds great.  Then, now, the

25  ones that have already been produced or designated, we don't

1   need -- we can add 60 days from that date.  How long ago were

2   they provided?

3           MR. ROWE:  You lost me, Your Honor.  I'm sorry.  It's

4   Mike Rowe.

5           THE COURT:  Have the experts been designated already,

6   and how long ago?

7           MR. ROWE:  Oh, no.  They would be designated today

8   and --

9           THE COURT:  Okay.

10          MR. ROWE:  -- we could apply the same 30 days, if you

11  like, and we would be fine.

12          THE COURT:  All right.  So it will be 30 days added to

13  today --

14          MR. ROWE:  Well, again, just to simplify this, and

15  we're going to send you a new schedule to make it clear, but it

16  would be 60 days from July 22nd, so August --

17          THE COURT:  All right.  Even better.  Even better.

18  All right.  Well, use your presumption -- your trigger --

19          MR. ROWE:  Okay.

20          THE COURT:  -- we'll add the 60 days.  That should

21  obviate the need for any additional extension of these or

22  related deadlines.

23          MR. ROWE:  With the exception of the possible Rocky

24  Mountain spotted fever patient, I certainly agree, Your Honor.

25  And we're hopeful.  His fever seems to have broken in the last

1   day or two.  So if it stays broken this time, I think --

2         *THE COURT:*  Then I think we will have accommodated his

3   needs as well.

4         *MR. ROWE:*  Yeah.

5         *THE COURT:*  Good.  Okay.  Guys, what else?

6         *MR. ROWE:*  Oh, my goodness, I think we have perhaps

7   come to the end, Your Honor.

8         *THE COURT:*  Well, I think that given our history, it

9   is not ajouré.  It is au revoir.  Right?

10         *MR. BUTHOD:*  Thank you, Judge.

11         *THE COURT:*  And we have another hearing set,

12   particularly in the event one is needed, but even if it is not,

13   I think we should have a discovery, touch base status hearing

14   on the date even if there is a clear answer from the sampling

15   that has been ordered.  I suspect that we will need to address

16   some issues and we should keep the date and have the hearing on

17   that date in order to ensure that the case keeps moving.

18         *MR. BUTHOD:*  Understood.  Thank you, Judge.

19         *THE COURT:*  I really want to keep this expanded

20   schedule, because every time we touch it, we expand it further.

21         *MR. ROWE:*  We will do the best we can, Your Honor, and

22   I think there's a -- I think we're getting to the point where

23   we will be fine with this --

24         *THE COURT:*  And I appreciate that.  Let me just raise

25   one more question.  And it is not urging you.  I'm not twisting

anybody's arm one way or t'other.  But my question is this:  At some point -- and I know that you've tried to resolve this in the past, and I appreciate your efforts.  Without in any way suggesting that it is important for you to keep trying -- important to me, that is, it is not.  I'm happy to try the case.  But as you get this additional information and a clearer picture of precisely how much is at stake here in relationship to the collateral sources, recognizing there are disputed legal issues about the effect of prior payments, it may be that it makes sense to reexamine opportunities for resolution.  I only raise it.  I'm not setting deadlines, imposed any requirement. I just want to be sure that we have not taken it off the table as your understanding of the case continues to refine, no pun intended, continues to be refined and to evolve.

        *MR. ROWE:*  Your Honor, Mike Rowe.  From the government's side, we certainly have not written the possibility off.  I think the parties both recognize that we're not in a period where we're talking about it right now.

        *THE COURT:*  Right, and that's fine.  You need to focus elsewhere.  Right now you're focused on getting additional information.

        *MR. ROWE:*  Right.  And we're waiting for Judge Braden and we're waiting for a number of other things --

        *THE COURT:*  Well, I don't think that Judge Braden is going to give us a lot of guidance in the next six months,

1   because of the relationship of the two proceedings.  All she's

2   going to decide is whether she ought to go ahead and decide,

3   that is, lift the stay.

4         *MR. ROWE:*  Oh, yes, I think -- I'm sorry, Your Honor.

5   I think that the decision that people are waiting for is

6   actually in a related case called *Shell* --

7         *THE COURT:*  No, I understand, but she's going to then

8   use that decision --

9         *MR. ROWE:*  Yes.  No, that is our understanding.

10        *THE COURT:*  -- to decide whether to precede in this

11  contract dispute or to keep the stay in place.

12        *MR. ROWE:*  Yes, ma'am.  But to your broader point, I

13  think we all would like -- we would all rather settle the case

14  than try it, if we can find a way to do it.  I haven't talked

15  to Mr. Steinway lately, but he often tells me that he would

16  like to settle it, so I'll let him tell you, but I'm pretty

17  sure we'd both like to do it if we thought we could get there.

18        *MR. STEINWAY:*  Your Honor, it's Dan Steinway for

19  Exxon.  And we agree with the United States.

20        *THE COURT:*  All right.  Well, let's then schedule

21  among the topics to be addressed at our next telephone

22  conference whether it is appropriate at that time, given the

23  additional information you have learned, which I believe will

24  include additional expert reports, as well as information on

25  whether there is information and what it is that would help

1  with more precise allocation of insurance payments previously
2  made, whether it is at that point useful to schedule a formal
3  reassumption of mediation.
4          *MR. ROWE:*  Very good, Your Honor.
5          *THE COURT:*  Does that work?
6          *MR. STEINWAY:*  Yes, Your Honor.
7          *THE COURT:*  Okay.  I think we all have our
8  assignments.  And the immediate thing I will look for is the
9  amended scheduling order that the two of you -- the two sides
10 will exchange, approve, and submit.  Correct?
11         *MR. BUTHOD:*  Thank you, Judge.
12         *MR. ROWE:*  Very good.  Thank you, Judge.
13         *THE COURT:*  And I would like you, Exxon, as well,
14 although ordinarily we don't file discovery requests with the
15 court, that I would like you to file the proposed protocol for
16 searching the information -- searching for the information on
17 the sampling basis I've ordered.  When you produce it to the
18 other side, send it to the other side, please file it with the
19 court as well.
20         *MR. STEINWAY:*  We'll do, Your Honor.
21         *THE COURT:*  Thank you so much.  All right.  I look
22 forward to the next filings and to continuing to move this
23 case.  It continues to be a terrifically interesting case, and
24 I appreciate the parties' patience in presenting it to the
25 Court.

1          MR. ROWE:  Thank you, Judge.

2          MR. BUTHOD:  Thank you, Judge.

3          THE COURT:  Thank you.  You're excused.

4      (Concluded at 4:19 p.m.)

5                          * * *

6   I certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled cause, to the best

8   of my ability.

9

10  /s/ *Kathy L. Metzger*                    *9-22-2016*
    Kathy L. Metzger                    Date
11  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25