**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| EXXON MOBIL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | 4:10-CV-02386 (LHR) |
| ) | 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT ON PHASE TWO ISSUES**

ABE MARTINEZ
  *Acting United States Attorney*

JIMMY A. RODRIGUEZ
  *Assistant United States Attorney*
  Southern District No. 572175
  Texas Bar No. 24037378
  1000 Louisiana, Suite 2300
  Houston, TX 77002
  (717) 567-9532
  jimmy.rodriguez2@usdoj.gov

JEFFREY H. WOOD
  *Acting Assistant Attorney General*
  Environment and Natural Resources Division
  United States Department of Justice

MICHAEL D. ROWE (Attorney-in-Charge)
ERICA M. ZILIOLI
JUSTIN D. HEMINGER
BRIAN H. LYNK
STEPHANIE J. TALBERT
  *Trial Attorneys*
  Environmental Defense Section
  P.O. Box 7611
  Washington, D.C.  20044
  (202) 514-3144
  michael.rowe@usdoj.gov

*Counsel for Defendant United States*

# TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Table of Authorities ............................................................................................... iv

Glossary .................................................................................................................. xi

Nature and Stage of the Proceedings ...................................................................... 1

Statement of the Issues and Standard of Review .................................................... 1

Argument ................................................................................................................. 7

I.     EXXON MAY NOT RECOVER COSTS THAT ARE NOT "NECESSARY COSTS OF RESPONSE." ................................................ 7

      A.    Exxon's costs to excavate non-hazardous sludge at the Lower Outfall Canal are not "necessary costs of response." ................................ 8

      B.    Exxon's costs to apply for the two Facility Operations Areas at Baytown are not "necessary costs of response." ........................................ 8

II.    EXXON CANNOT RECOVER FOR ACTIONS THAT ARE TIME-BARRED AND/OR INCONSISTENT WITH THE NCP. ................................ 10

      A.    Exxon conducted multiple response actions at the Sites. ........................ 11

      B.    Exxon's response actions at the units in question were remedial in nature ...................................................................................................... 13

          1.    Exxon was not responding to an imminent threat. ........................ 15

          2.    Exxon's response actions provided permanent remedies. ............ 17

      C.    The statute of limitations in CERCLA Section 9613(g)(2) bars Exxon's cost claims for multiple units at Baytown and Baton Rouge. .................................................................................................... 18

      D.    Exxon's response costs at multiple units at Baytown and Baton Rouge were not incurred consistent with the NCP. ................................. 21

          1.    Baytown ....................................................................................... 23

          2.    Baton Rouge ................................................................................. 25

III.    EXXON SHOULD ONLY RECOVER AN EQUITABLE SHARE OF
        THOSE COSTS THAT ARE NOT PREVIOUSLY REIMBURSED AND
        ACCURATELY ACCOUNTED FOR WITH SUFFICIENT EVIDENCE. ........ 27

        A.    The Court should prevent Exxon from obtaining an inequitable
              double recovery by accounting for its prior insurance recoveries. ........... 27

        B.    Exxon has failed to accurately account for a substantial portion of
              its past costs. ........................................................................................... 30

              1.    The Court should require Exxon to provide invoices and
                    proof of payment documentation to prove each of its costs. ........ 32

              2.    Exxon cannot use its accounting system records or a NACC
                    litigation database to prove costs for which it lacks
                    sufficient documentation............................................................. 37

              3.    Exxon has failed to produce sufficient documentation to
                    accurately account for at least $6.7 million in costs. ................... 42

IV.     THE COURT SHOULD EQUITABLY ALLOCATE TO THE UNITED
        STATES A ZERO SHARE OF SOME OF EXXON'S COSTS AND A
        SMALL SHARE OF THE REST. ........................................................................ 44

        A.    The United States should not bear any of Exxon's costs to address
              four (and part of a fifth) cleanup units at the Sites. ................................. 45

              1.    The Court should not allocate to the United States any
                    share of Exxon's costs that were not necessary to address a
                    threat to human health or the environment. .................................. 45

              2.    The United States should not bear any of Exxon's costs to
                    address three cleanup units with no or de minimis
                    Government involvement.............................................................. 46

        B.    The Court should equitably allocate no more than 2% of any
              remaining costs at Baytown and 1% of any remaining costs at
              Baton Rouge to the United States. ........................................................... 53

              1.    Step 1: Assigning response costs to years..................................... 56

              2.    Step 2: Costs subject to allocation during the "Federal"
                    period. ......................................................................................... 58

              3.    Step 3:  Equitable allocation (parties and equitable shares). ........ 64

V.    EXXON IS NOT ENTITLED TO A DECLARATORY JUDGMENT
      ALLOCATING UNKNOWN FUTURE COSTS ................................................. 68

Conclusion ............................................................................................................................. 74

# TABLE OF AUTHORITIES

## CASES

*Acushnet Co. v. Mohasco Corp.*,
   191 F.3d 69 (1st Cir. 1999) ............................................................................ 44, 45

*Amoco Oil Co v. Borden, Inc.*,
   889 F.2d 664 (5 th Cir. 1989) ........................................................................ 44, 73

*Appleton Papers, Inc. v. George A. Whiting Paper Co.*,
   776 F. Supp. 2d 857 (E.D. Wis. 2011) ................................................................ 47

*Basic Mgmt. Inc. v. United States*,
   569 F. Supp. 2d 1106 (D. Nev. 2008) ............................................................ 28, 70

*Beazer East, Inc. v. Mead Corp.*,
   412 F.3d 429 (3d Cir. 2005) ................................................................................ 70

*Bernstein v. Bankert*,
   733 F.3d 190 (7th Cir. 2013) .............................................................................. 19

*Boeing Co. v. Cascade Corp.*,
   920 F. Supp. 1121 (D. Ore. 1996) ................................................................. 34, 71

*Boeing Co. v. Cascade Corp.*,
   207 F.3d 1177 (9th Cir. 2000) ................................................................. 27, 70, 71

*Broad. Music, Inc. v. Xanthas, Inc.*,
   855 F.2d 233 (5th Cir. 1988) .............................................................................. 40

*C&B Sales & Servs., Inc. v. McDonald*,
   177 F.3d 384 (5th Cir. 1999) .............................................................................. 35

*Calmat Co. v. San Gabriel Valley Gun Club*,
   809 F. Supp. 2d 1218 (C.D. Cal. 2011) ................................................................ 9

*Carson Harbor Village, Ltd. v. County of Los Angeles*,
   433 F.3d 1260 (9th Cir. 2006) ............................................................................ 24

*City of Wichita, Kansas v. Trustees of APCO Oil Corp.*,
   306 F. Supp. 2d 1040 (D. Kans. 2003) ......................................... 33, 34, 70, 71, 73

*Colorado v. Sunoco, Inc.*,
   337 F.3d 1233 (10th Cir. 2003) .......................................................................... 10

*Consol. Envtl. Mgmt., Inc. v. Zen-Noh Grain Corp.*,
   981 F. Supp. 2d 523 (E.D. La. 2013) ................................... 40

*County Line Investment Co. v. Tinney*,
   933 F.2d 1508 (10th Cir. 1991) ........................................ 22

*Cytec Indus., Inc. v. B.F. Goodrich Co.*,
   232 F. Supp. 2d 821 (S.D. Ohio 2002) ............................ 16, 17

*Davis v. Chevron U.S.A., Inc.*,
   14 F.3d 1082 (5th Cir. 1994) .......................................... 48

*Davis v. St. Anselm Expl. Co.*,
   10-cv-883, 2013 WL 11336859 (Mar. 28, 2013) ................... 41

*Douglas Autotech Corp. v. Scott Fetzer Co.*,
   No. 1:07-cv-1062, 2008 WL 205217 (W.D. Mich. Jan. 23, 2008) ......... 13

*Elementis Chromium L.P. v. Coastal States Petroleum Co.*,
   450 F.3d 607 (5th Cir. 2006) .......................................... 44

*Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*,
   969 F.2d 503 (7th Cir. 1992) ....................................... 44, 45

*Envtl. Transport Sys. v. Ensco*,
   763 F. Supp. 384 (C.D. Ill. 1991) ................................... 45

*Exxon Mobil Corp. v. United States*,
   108 F. Supp. 3d 486 (S.D. Tex. 2015) ................ 1, 4, 44, 45, 46, 53, 54, 57, 69

*F.P. Woll & Co. v. Fifth & Mitchell Street, Corp.*,
   No. 96-cv-5973, 2006 WL 2381778 (E.D. Pa. Aug. 16, 2006),
   *aff'd*, 326 Fed. Appx. 658 (3d Cir. 2009) ........................ 70

*Frey v. EPA*,
   403 F.3d 828 (7th Cir. 2005) .......................................... 14

*Friedland v. TIC-The Indus. Co.*,
   566 F.3d 1203 (10th Cir. 2009) .................................... 28, 29

*Geraghty & Miller, Inc. v. Conoco Inc.*,
   243 F.3d 917 (5th Cir. 2000) .......................................... 15

*Halliburton Energy Serv., Inc. v. NL Indus.*,
   648 F. Supp. 2d 840 (S.D. Tex. 2009) ........................... 44, 47, 59

*Hatco Corp. v. W.R. Grace & Co.*,
836 F. Supp. 1049 (D.N.J. 1993) .................................................... 55

*Hobart Corp. v. Dayton Power & Light Co.*,
No. 3:13-cv-115, 2014 WL 5308631 (S.D. Ohio Oct. 16, 2014) ........................... 70

*K.C. 1986 Ltd. P'ship v. Reade Mfg.*,
472 F.3d 1009 (8th Cir. 2007) ........................................................ 27

*Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*,
725 F.3d 369 (3d Cir. 2013)........................................................... 27

*Litgo New Jersey, Inc., v. Martin*,
No. 06-cv-2891, 2011 WL 65933 (D.N.J. Jan. 7, 2011)................................. 45, 53

*Litgo New Jersey, Inc. v. Martin*,
No. 06-cv-2891, 2012 WL 32200 (D.N.J. Jan. 5, 2012)................................. 36, 37

*Lockeed Martin Corp. v. United States*,
833 F.3d 225 (D.C. Cir. 2016) ........................................................ 44

*Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*,
84 F. Supp. 3d 553 (E.D. Tex. 2015) .................................................. 40

*Morrison Enterprises, LLC v. Dravo Corp.*,
638 F.3d 594 (8th Cir. 2011) ......................................................... 14

*Nashua Corp. v. Norton Corp.*,
116 F. Supp. 2d 330 (N.D.N.Y. 2000)................................................... 34

*NCR Corp. v. George R. Whiting Paper Co.*,
768 F.3d 682 (7th Cir. 2014) ..................................................... 44, 45

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*,
766 F.3d 212 (2d Cir. 2014).......................................................... 28

*New York v. Next Millennium Realty, LLC*,
732 F.3d 117 (2d Cir. 2013).......................................................... 14

*NL Indus., Inc. v. Kaplan*,
792 F.2d 896 (9th Cir. 1986) ........................................................ 23

*Nola Spice Designs, LLC v. Haydel Enters., Inc.*,
783 F.3d 527 (5th Cir. 2015) ........................................................ 48

*Northern States Power Co. v. City of Ashland*,
    131 F. Supp. 3d 802 (W.D. Wis. 2015) ....................................................... 70, 71, 73

*Paddack v. Dave Christensen, Inc.*,
    745 F.2d 1254 (9th Cir. 1984) ............................................................. 41

*Public Serv. Co. of Colorado v. Gates Rubber Co.*,
    175 F.3d 1177 (9th Cir. 1999) ........................................................... 14, 24

*Raytheon Aircraft Co. v. United States*,
    No. 05-2328-JWL, 2007 WL 4300221 (D. Kan. Dec. 8, 2007) ............................... 28

*Regional Airport Auth. of Louisville v. LFG, LLC*,
    460 F.3d 697 (6th Cir. 2006) ............................................................. 24

*Shell Oil Co. v. United States*,
    751 F.3d 1282 (Fed. Cir. 2014) ........................................................... 59

*Strategic Envtl. Partners, LLC v. N.J. Dep't of Envtl. Prot.*,
    No. 12-cv-3252, 2017 WL 4678199 (D.N.J. Oct. 16, 2017) ................................. 34

*U.S. Virgin Islands Dep't of Planning & Nat. Res. v. St. Croix Renaissance Grp., L.L.L.P.*,
    527 Fed. App'x 212 (3d Cir. 2013) ....................................................... 37

*Union Pac. R.R. v. Reilly Indus., Inc.*,
    215 F.3d 830 (8th Cir. 2000) ............................................................. 24

*United States v. Akzo Nobel Coatings, Inc.*,
    990 F. Supp. 897 (E.D. Mich. 1998) ...................................................... 19

*United States v. Ambroid Co., Inc.*,
    34 F. Supp. 2d 86 (D. Mass. 1999) .................................................... 13, 19

*United States v. Bell Petroleum Servs.*,
    3 F.3d 889 (5th Cir. 1993) ............................................................... 44

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ....................................................................... 4

*United States v. Charles George Trucking, Inc.*,
    34 F.3d 1081 (1st Cir. 1994) ............................................................. 45

*United States v. Chrysler Corp.*,
    168 F. Supp. 2d 754 (N.D. Ohio 2001) .................................................... 33

*United States v. Davis*,
   261 F.3d 1 (1st Cir. 2001) ............................................................. 70

*United States v. Doe Run Resources*,
   No. 15-cv-0663, 2017 WL 4270526 (N.D. Sept. 26, Okla. 2017).......................................... 45

*United States v. JG-24, Inc.*,
   331 F. Supp. 2d 14 (D.P.R. 2004)........................................................... 33

*United States v. Jones*,
   664 F.3d 966 (5th Cir. 2011) ............................................................. 41

*United States v. Manzo*,
   182 F. Supp. 2d 385 (D.N.J. 2000) ............................................... 13, 19, 20

*United States v. Northernaire Plating Co.*,
   685 F. Supp. 1410 (W.D. Mich. 1988),
   *aff'd sub nom. United States v. R.W. Meyer, Inc.*,
   889 F.2d 1497 (6th Cir. 1989) ........................................................... 36

*United States v. W.R. Grace & Co.*,
   429 F.3d 1224 (9th Cir. 2005) ...................................................... 10, 14

*United States v. W.R. Grace & Co.–Conn.*,
   280 F. Supp. 2d 1149 (D. Mont. 2003)....................................... 32, 33, 37

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*,
   No. 1:10-cv-044, 2013 WL 1182985 (N.D. Ind. Mar. 21, 2013) ......................... 12, 13, 19, 20

*Vine Street, LLC v. Keeling*,
   460 F. Supp. 2d 728 (E.D. Tex. 2006),
   *rev'd and vacated on other grounds*,
   776 F.3d 312 (5th Cir. 2015) ........................................................... 29

*Wash. State Dep't of Transp. v. Wash. Nat. Gas Co.*,
   59 F.3d 793 (9th Cir. 1995) ...................................................... 21, 22

*Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*,
   209 F. Supp. 3d 1093 (E.D. Mo. 2016).................................................. 36

*Young v. United States*,
   394 F.3d 858 (10th Cir. 2005) ...................................................... 9, 21

## STATUTES

42 U.S.C. § 9601(23) ...................................................... 10, 14

42 U.S.C. § 9601(24) ........................................................................... 10, 14

42 U.S.C. § 9601(25) ................................................................................ 10

42 U.S.C. § 9607(a)(2) ............................................................................... 4

42 U.S.C. § 9607(a)(4)(A) ....................................................................... 32

42 U.S.C. § 9607(a)(4)(B) ............................................................ 7, 10, 21

42 U.S.C. § 9613(f)(2) ............................................................................. 30

42 U.S.C. § 9613(g)(2) ......................................................................... 2, 18

42 U.S.C. § 9613(g)(2)(A) ................................................................. 10, 21

42 U.S.C. § 9613(g)(2)(B) ................................................................. 10, 20

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56 ...................................................................................... 1

Fed. R. Civ. P. 56(c)(2) ........................................................................... 39

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 802 .................................................................................... 40

Fed. R. Evid. 901 .................................................................................... 40

Fed. R. Evid. 1006 .................................................................................. 41

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. Part 300.............................................................................. 10, 21

40 C.F.R. § 300.5 .............................................................................. 13, 14

40 C.F.R. § 300.68(d) (1985).................................................................. 23

40 C.F.R. § 300.68(f) (1985) ............................................................ 23, 25

40 C.F.R. § 300.160(a)(1) ...................................................... 22, 27, 31, 32

40 C.F.R. § 300.410 ................................................................................ 15

40 C.F.R. § 300.415 ................................................................................................ 10

40 C.F.R. § 300.415(b)(2) ....................................................................................... 14

40 C.F.R. § 300.430 (1990) .................................................................................... 25

40 C.F.R. § 300.430 ................................................................................................ 10

40 C.F.R. § 300.700(c)(3)(i) .............................................................................. 22, 32

40 C.F.R. § 300.700(c)(5)(ii) .................................................................................. 32

## FEDERAL REGISTER

45 Fed. Reg. 33,154 (May 19, 1980) ........................................................................ 5

51 Fed. Reg. 40,572 (Nov. 7, 1986) ......................................................................... 5

55 Fed. Reg. 8666 (Mar. 8, 1990) .......................................................................... 22

## STATE REGULATIONS

30 Tex. Admin. Code §§ 350.131-.132 ..................................................................... 8

30 Tex. Admin. Code §§ 350.132(a) ......................................................................... 9

30 Tex. Admin. Code §§ 350.133(a) ......................................................................... 9

30 Tex. Admin. Code §§ 350.133(c) .......................................................................... 9

# GLOSSARY

| | |
|---|---|
| Avgas | Aviation gasoline |
| BOW | Baytown Ordnance Works |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| EPA | United States Environmental Protection Agency |
| FOA | Facility Operations Area |
| LNAPL | Light Non-Aqueous Phase Liquid (hydrocarbons) |
| NACC | North American Coverage Case |
| NCP | National Contingency Plan |
| Phase I Decision | *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) |
| PRP | Potentially Responsible Party |
| PSH | Phase Separated Hydrocarbon |
| RCRA | Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k. |
| Site(s) | The refinery(ies), Government plants (s), and other nearby areas or surface waters (as defined by this Court in the Phase I Decision) |
| SOF | United States' Statement of Facts |
| SWMU | Solid Waste Management Unit |
| U.S. Phase I SJ Mot. | United States' Memorandum in Support of Motion for Partial Summary Judgment (Sep. 30, 2013), Dkt. No. 104 in 4:10-cv-02386 |

## NATURE AND STAGE OF THE PROCEEDINGS

Exxon Mobil Corporation ("Exxon") brought this pair of cases seeking to compel the United States to reimburse a portion of specific environmental costs associated with Resource Conservation and Recovery Act ("RCRA") compliance at two large oil refineries; one sited at Baytown, Texas and the other at Baton Rouge, Louisiana.  Both suits are advanced pursuant to the Comprehensive, Response, Compensation and Liability Act of 1980 ("CERCLA"), and are predicated upon arrangements relating to each refinery's production of high octane aviation gasoline during World War II and the Korean conflict.

Following the completion of discovery in the "liability and allocation" phase of bifurcated pre-trial proceedings, the parties briefed cross-motions for partial summary judgment, largely resolved by the Court in *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) ("Phase I Decision*")*.  That decision established, in pertinent part, that: (1) the statute of limitations applicable to Exxon's claims is section 113(g)(2), 42 U.S.C. § 9613(g)(2); (2) the refinery and chemical plant at each Site constitute a single CERCLA "facility"; (3) the United States was not a CERCLA operator of either refinery; and (4) the United States owned and operated (with Exxon) various "Plancors" at each Site.  The Court deferred addressing allocation and future costs questions until Phase II, along with Exxon's ability to prove up its response costs and to demonstrate compliance with the National Contingency Plan.  As detailed in the next section, the United States now moves for summary judgment on additional issues.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

The Court should grant summary judgment if the movant shows that there is no genuine dispute as to the material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see* Phase I Decision at 504-05.  Here, the Court should grant the United States

summary judgment on five major issues as to which the material facts are undisputed.[1]  We summarize these issues based on the five argument points in our brief:

**Argument Point I (Necessary Costs of Response)**.  We argue that costs Exxon incurred for two cleanup units at the Baytown Site are not "necessary costs of response" eligible for CERCLA recovery.

**Argument Point II (Statute of Limitations and National Contingency Plan Consistency)**.  We argue that Exxon conducted multiple CERCLA "response actions" at each Site and that each such action is best characterized as a remedial action, not a removal action.[2]  Argument Point I.A.  Because Exxon's response actions are remedial in nature, CERCLA's statute of limitations in Section 9613(g)(2) bars Exxon from claiming costs incurred at five cleanup units at Baytown and three cleanup units at Baton Rouge.  Argument Point I.B.  In addition, Exxon has failed to substantially comply with requirements in CERCLA regulations (the National Contingency Plan) for remedial actions at three out of seven cleanup units at Baytown and two out of three cleanup units at Baton Rouge.  Exxon therefore cannot recover cleanup costs incurred at those units.  Argument Point I.C.

**Argument Point III (Double Recovery and Accurate Accounting)**.  We argue that the Court should also address two discrete issues concerning Exxon's claimed $77 million in past costs.  First, Exxon has already recovered millions of dollars of its cleanup costs from insurance proceeds, and the Court should deduct those insurance payments from Exxon's claimed costs to prevent Exxon from obtaining an inequitable double recovery.  Argument point III.A.  Second,

---

[1] The United States reserves its right to present facts and defenses at trial with respect to those cleanup units and claimed costs for which the United States is not moving for summary judgment.

[2] Although the United States uses the term "response action" for purposes of this brief, we do not concede that all of Exxon's claimed activities in fact were CERCLA response actions.

Exxon has failed to satisfy the requirement in the National Contingency Plan to accurately account for its costs with sufficient documentation.  Thus, before applying the equitable allocation to Exxon's past costs at each individual cleanup unit, the Court should deduct those costs for which Exxon has not accurately accounted.  Argument Point III.B.

**Argument Point IV (Equitable Allocation).**  First, we argue that, if the Court finds that the costs incurred at the two Baytown cleanup units discussed in Argument Point I are in fact necessary costs of response, the Court nonetheless should not allocate any share of those costs to the United States.  Argument Point IV.A.1.  Second, we argue that there are three cleanup units at the Sites – one at Baytown and two at Baton Rouge – where the United States' potential contribution to the contamination is so limited that the Court should equitably allocate the United States a zero share of responsibility.  Argument IV.A.2.  Third, we argue that, for cleanup units not addressed in Argument Points I, II, and III.A., the Court should allocate costs between Exxon and the United States by: (1) applying a time-on-the-risk analysis so that the United States is only responsible for years when it is liable as an owner or operator; (2) identifying the contamination generated during that period for which the United States bears some liability; and (3) allocating the cleanup costs associated with that contamination between Exxon and the United States.  We argue that this analysis warrants a federal share of no more than 2% of past costs at Baytown and 1% at Baton Rouge.  Argument IV.B.

**Argument Point V (Declaratory Judgment on Future Costs)**.  We argue that the Court should decline to enter a declaratory judgment establishing the equitable allocation for costs that Exxon may incur in the future to investigate and remediate the waterbodies and sediments near the Baytown and Baton Rouge Sites.  The evidence concerning these areas remains "unduly

speculative," Phase I Decision at 536, and therefore does not provide the Court with a sound basis to allocate responsibility between Exxon and the United States.

## STATEMENT OF THE CASE

CERCLA was enacted in 1980 in response to the serious environmental and health dangers posed by property contaminated by hazardous substances. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). It identifies four categories of persons who may be held liable for costs of cleaning up hazardous substances, including owners and operators of facilities at the time of disposal of hazardous substances. *See* 42 U.S.C. § 9607(a)(2). As set forth in the United States' prior briefing, and as discussed in the Court's Phase I Decision, these cases concern CERCLA liability at two of the largest and longest-running oil refineries in United States history. *See* U.S. Mot. for Partial Summ. J. 3-7 (Sep. 20, 2013) ("U.S. Phase I SJ Mot."); Phase I Decision at 493-503.

Exxon seeks recovery of costs incurred to clean up wastes associated with operations at: (1) the Baytown and Baton Rouge refineries; and (2) additional plants, referred to as "Plancors," associated with World War II operations at both refineries. *See* U.S. Phase I SJ Mot. at 1-2. The United States has acknowledged that it is liable as an owner of the Plancors. *See Id.* at 2 n.3. And in Phase I, the Court decided that: (1) Exxon operated both refineries; (2) the United States did not operate either refinery; and (3) both parties operated the Plancors. *See* Phase I Decision at 491. Both parties thus bear some share of liability for the cost of cleaning up wastes at both sites. What remains to be determined is how great those shares should be, which in turn requires careful consideration of the nature of Exxon's work at the sites and of the costs incurred to perform that work. Both Sites are large and complex, and work occurred in multiple different

areas at different times.  Additional facts are set forth below as relevant to specific issues; however, following is a list of the cleanup units at issue in this Motion[3]:

### A.    Baytown Units

Exxon closed **Separator 3M**, an earthen impoundment storing oily refinery wastes, for two reasons: (1) to avoid upgrading it to comply with then-new EPA regulations implementing Subtitle C of the Resource Conservation and Recovery Act ("RCRA")[4]; and (2) to make room for a new wastewater treatment aeration basin.  United States' Statement of Fact ("SOF") ¶¶ 4-6, 9.  Exxon "clean-closed" Separator 3M by excavating wastes in and soils beneath the separator to cleanup standards in two parts – the first half was closed in 1984 and the second half was closed in 1986, with no further monitoring required.  SOF ¶¶ 7-8.  Exxon similarly clean-closed **Separator 10**, an oil-water separator, in 1986 in order to avoid upgrading it to comply with the same regulations.  SOF ¶¶ 10-14.  Closure generally consisted of excavation of contaminated material in the separator and soil beneath the separator.  SOF ¶¶ 12-13.

Exxon closed the **Upper and Lower Outfall Canals**, two unlined earthen ditches that conveyed wastewater to the Houston Ship Channel, in 1994.  SOF ¶¶ 15-16.  Exxon excavated sludge from both canals, but the excavation was voluntary for the Lower Outfall Canal.  SOF ¶¶

---

[3] Annotated maps showing the locations of the various units at the Sites are available at Ex. 27, Alborz Wozniak Rebuttal Report, Figures BT-2, BT-3, BR-2 (Feb. 15, 2017).  Charts summarizing the United States' arguments unit-by-unit are attached at Appendix A.

[4] Subtitle C of RCRA establishes a "cradle to grave" system for hazardous waste management. In 1980, EPA published its first comprehensive set of regulations to implement the solid and hazardous waste management programs required by the 1976 passage of RCRA.  Owners and operators of hazardous waste treatment, storage or disposal facilities were required to obtain a permit that set out construction and operating requirements.  *See generally* 45 Fed. Reg. 33,154 (May 19, 1980).  They were also required to upgrade existing waste treatment units to comply with new RCRA Subtitle C standards or else close those units.  *Id.*  In response to 1984 RCRA amendments, EPA also promulgated rules phasing out land disposal of various chemical wastes, including petroleum refinery waste.  *See* 51 Fed. Reg. 40,572 (Nov. 7, 1986).

18-20.  Exxon similarly closed the **Velasco Street Ditch**, an unlined earthen ditch that conveyed wastewater in the northern part of the Baytown refinery, in 1991.  SOF ¶¶ 23-27.  Exxon excavated some sludge in 1991, sampled the remaining sludge in 1993 to confirm that it was not hazardous, and obtained certification of clean closure in 2008.  SOF ¶¶ 25-26.

Exxon closed the **South Landfarm**, an earthen landfill for disposal of refinery wastes, in 1991, again, to avoid upgrading it to comply with RCRA regulations.  SOF ¶¶ 29, 31-34. Closure consisted of a "rest period" to allow for wastes to dry out and biodegrade followed by placing a cap on top of the Landfarm.  SOF ¶¶ 33.

Under a March 1995 Agreed Order with the State of Texas, Exxon began a RCRA Facility Investigation of 22 solid waste management units (SWMUs) within the Baytown refinery.  SOF ¶ 36.  Exxon suspended work at the majority of the SWMUs in 2003 in light of its plan to apply for a **Facility Operations Area (FOA)** that would include those SWMUs.[5]  SOF ¶¶ 38, 42.  Exxon has also applied for a FOA for the Baytown chemical plant. SOF ¶ 40.

Finally, the **Tank Farm 3000 groundwater plume area**, which contains hydrocarbon plumes discovered in 1990, is located in part beneath the northwest portion of the Baytown refinery and in part beneath the adjacent chemical plant.  SOF ¶¶.  A July 1995 Agreed Order with Texas required Exxon to investigate and clean up the Tank Farm 3000 plumes.  SOF ¶¶ 160-61.

**B.    Baton Rouge Units.**

In 1980, pursuant to its RCRA permit, Exxon began monitoring groundwater contamination at the **Shallow Fill Zone**, a large waste-deposit area on the western edge of the

---

[5] A FOA is a Texas regulatory tool that allows refineries and chemical plants to manage, prioritize, and defer cleanup obligations during the plants' operational life.

Baton Rouge refinery.  SOF ¶¶ 45-46.  Under two 1987 Louisiana Compliance and Corrective Action Orders, Exxon installed groundwater recovery wells on the western boundary of the Shallow Fill Zone, along the Mississippi River, to recover light non-aqueous phase liquid ("LNAPL") hydrocarbons.  SOF ¶¶ 47-48.  Recovery is ongoing.  SOF ¶ 48.

Exxon closed the **Old Silt Pond**, a surface impoundment that handled a wide range of solid and liquid wastes, in 1994 because it did not meet RCRA regulations.  SOF ¶¶ 52, 54. Exxon removed the contaminated material from the Old Silt Pond, mixed it with fly ash, returned it to the pond, and placed a landfill cap over the Pond.  SOF ¶¶ 54. That same year, Exxon similarly closed the **Rice Paddy Landfarm**, an earthen land treatment unit for silt contaminated with wastewater and sludge, again because it did not meet RCRA regulations.  SOF ¶¶ 57-59. Exxon initially attempted to let the contamination at the Landfarm degrade naturally, but it did not degrade to acceptable levels fast enough.  SOF ¶¶ 59-60.  Thus, Exxon capped the Rice Paddy Landfarm.  SOF ¶ 60.

## ARGUMENT

## I.    EXXON MAY NOT RECOVER COSTS THAT ARE NOT "NECESSARY COSTS OF RESPONSE."

CERCLA authorizes Exxon to recover only "*necessary* costs of response incurred … consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B) (emphasis added).  As we explain in points I.A. and B., Exxon's costs to excavate non-hazardous sludge from the Lower Outfall Canal and to establish Facility Operations Areas at Baytown are not necessary costs of response.[6]

---

[6] As discussed *infra* at 45-46, even if the Court finds that Exxon's costs at these units are "necessary costs of response," the United States should be allocated a zero share at both units.

### A.    Exxon's costs to excavate non-hazardous sludge at the Lower Outfall Canal are not "necessary costs of response."

In 1991, Exxon applied to add the **Lower Outfall Canal** to its RCRA permit as a hazardous waste management unit because field data indicated that wastewater passing through the canal periodically contained elevated levels of benzene.  SOF ¶ 17.  In August 1993, however, Exxon tested the accumulated sludge in the Lower Outfall Canal to determine whether it actually contained contaminants that would require further action.  SOF ¶ 19.  According to Exxon's consultant's report, all constituents found in the sludge were at levels well *below* regulatory levels for toxicity.  *Id.*  Thus, Exxon informed Texas that "the sludge in the Lower Outfall Canal *did not have to be removed* because it was not [toxicity characteristic] hazardous." *Id.* (emphasis added).  Despite these findings, Exxon "removed a substantial amount of the sludge (approximately 90%) *on a voluntary basis . . . .*"  SOF ¶ 20.

Exxon's choice to take accumulated sludge out of the Lower Outfall Canal was not an action necessary to address a threat to human health or the environment.  Because the constituents were well below regulatory levels (i.e., were not hazardous wastes under RCRA and Exxon did not give any other reason for responding to the sludge), Exxon could have left the sludge in place and taken no further action.  Thus, the costs Exxon incurred to remove sludge from the Lower Outfall Canal are not "necessary costs of response," and Exxon may not recover them.

### B.    Exxon's costs to apply for the two Facility Operations Areas at Baytown are not "necessary costs of response."

Under Texas regulations, a refinery or chemical manufacturing plant may apply for a "Facility Operations Area" to address multiple sources of contamination while the facility continues operating.  30 Tex. Admin. Code §§ 350.131-.132.  A FOA applicant "can propose to modify" otherwise applicable Texas regulations concerning contamination, for example by

deferring cleanup actions.  *Id.* § 350.132(a); SOF ¶ 37.  A FOA "may remain in effect for the duration of active industrial operations."  *Id.* § 350.133(a).  When the FOA ends, the plant "shall comply fully" with Texas's requirements to address the contamination.  *Id.* § 350.133(c).

Exxon spent over $8 million from 2003 through December 31, 2014 (and continues to incur additional costs) in connection with two separate FOA applications—one for the Baytown refinery and one for the Baytown chemical plant.  SOF ¶ 1.  Exxon admitted that applying for the FOA was voluntary and not required by Texas.  *See* Exxon Reply in Support of Mot. for Partial Summ. J. at 9 (Jan. 23, 2014), Dkt. 121 in 4:10-cv-2386 ("This voluntary work includes, for example, all of the efforts to establish a Facility Operations Area ('FOA') at the Baytown Site."). Texas approved Exxon's application for a FOA at the refinery in 2016; the application for a FOA at the chemical plant was still pending as of June 2017.  SOF ¶¶ 39, 41.  The refinery FOA that Exxon negotiated allows the company to *postpone* cleaning up certain contamination, potentially until the refinery ceases operating decades in the future.  SOF ¶¶ 39, 42.

Although the analogy is not perfect, courts have denied recovery of costs expended on investigations where the plaintiff could not demonstrate any intention to actually clean up the property being investigated.  *See Young v. United States*, 394 F.3d 858, 864-65 (10th Cir. 2005) (costs of preliminary investigation were not necessary response costs where plaintiffs did not intend to clean up the property); *Calmat Co. v. San Gabriel Valley Gun Club*, 809 F. Supp. 2d 1218, 1221-25 (C.D. Cal. 2011) (granting a motion to dismiss CERCLA claims as unripe when the plaintiff "ha[d] just done some investigation and testing, primarily for the purposes of [the] litigation").  Here, Exxon has acknowledged that its intention in seeking FOA status is not to *conduct* a cleanup, it is to *postpone* one.  Exxon thus cannot recover the costs of obtaining FOAs as "necessary costs of response."

## II.   EXXON CANNOT RECOVER FOR ACTIONS THAT ARE TIME-BARRED AND/OR INCONSISTENT WITH THE NCP.

CERCLA response actions consist of "removal" and "remedial" actions.  *See* 42 U.S.C. § 9601(23-25).  Determining what type of action or actions Exxon undertook at cleanup units addressed in this Motion is important for two reasons.  First, cost recovery claims for the two types of response action are subject to different statutes of limitations.  *See id.* § 9613(g)(2)(A)-(B).  Second, a necessary element of any cost recovery claim is establishing that costs were incurred "consistent with the national contingency plan"—and remedial and removal actions are governed by different sections of that plan.  *See id.* § 9607(a)(4)(B); 40 C.F.R. Part 300.

This, of course, is not a case where EPA (or any other federal agency exercising response authority under CERCLA) made a considered decision to conduct either a removal or a remedial action under the NCP.  When EPA selects a response action, it typically creates a clear record of which process it is following and declares contemporaneously which type of response action is at issue.  Under 40 C.F.R. § 300.415, EPA considers the need for a removal under specified factors and memorializes its removal action selection in a decision document such as an Action Memorandum.  Under 40 C.F.R. § 300.430, EPA follows a more elaborate process to develop remedial alternatives and select a remedial action in a formal Record of Decision.  Courts often defer to EPA's expertise in evaluating whether particular circumstances call for a removal or remedial action, especially where an action could be reasonably characterized as either type of response.  *See United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1243-45 (9th Cir. 2005); *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1243 (10th Cir. 2003).

This case is different.  Exxon did not even attempt an analysis of whether a removal or remedial action was appropriate before conducting the work at the Sites.  Exxon's cleanup actions were performed under legal regimes other than CERCLA, and its decisions concerning

10

what actions to take did not follow either the removal decision process or that for remedial action. For that reason, it is inherently more difficult to determine whether CERCLA's removal or remedial limitations period should apply to Exxon's activities. To resolve the statute of limitations and NCP issues posed here, the Court is therefore faced with the need to decide after the fact which legal category best fits cleanup actions that were chosen with neither category in mind, and with none of the usual indicators of agency decision-making under CERCLA.

Exxon's expert Stephen Johnson opines that all of Exxon's cleanup activities to date, plus future work, constitute a single, continuous removal action at each Site that is still ongoing and may continue for decades more. Despite serving as an expert witness approximately 50 times, Mr. Johnson had never offered such an opinion before. Ex. 39, Stephen Johnson Dep. 62:11-14 (Apr. 6, 2017) ("Johnson Dep. Vol. I"). His unprecedented claim here is unsurprising, however, as characterizing the entire 30-plus-year history of Exxon's work at each Site as a single, ongoing removal action is the *only* way that Exxon can recover its claimed costs—otherwise, some of Exxon's cost claims are barred by the statute of limitations, inconsistency with the NCP, or both.

As demonstrated below, the undisputed material facts establish that, contrary to Mr. Johnson's opinion: (1) Exxon conducted multiple response actions at each site; (2) the actions at the cleanup units at issue in this Motion are best characterized as remedial; (3) Exxon's claim seeking costs incurred at many of those units is time-barred; and (4) Exxon's costs incurred at some of those units were not consistent with the NCP. Exxon therefore is not entitled to recover costs incurred at those cleanup units.

### A. Exxon conducted multiple response actions at the Sites.

Exxon conducted multiple response actions at both Baytown and Baton Rouge, not a single continuous response. Exxon's actions at the areas listed *supra* at 5-7 were distinct in time,

space, source of contamination, media addressed (soil vs. groundwater), and/or regulatory driver. SOF ¶¶ 4-62; Ex. 27, Alborz Wozniak Rebuttal Report 70 (Feb. 15, 2017) ("Wozniak Report").[7] *See, e.g., Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-cv-044, 2013 WL 1182985 at *11-12 (N.D. Ind. Mar. 21, 2013) (factors to distinguish response actions included whether the actions were taken under different regulatory orders, when the actions were taken, where on the site the actions were taken, and whether the actions constituted a discrete step towards overall site remediation).  Indeed, even Exxon's Mr. Johnson analyzed most of these actions separately for NCP consistency.  Ex. 16, Stephen Johnson Expert Report 30-117 (May 27, 2016).

At Baytown, Exxon conducted a series of discrete response actions beginning in the 1980s to close several waste management units (Separator 3M, Separator 10, the Upper Outfall Canal, the Velasco Street Ditch, and the South Landfarm) that otherwise would have required costly upgrades to comply with new RCRA regulations.  SOF ¶¶ 5, 11, 24, 31, 52, 58.  These units served different functions, were closed at different times, and were located in many different parts of the Baytown refinery.  SOF ¶¶ 4-8, 10-20, 23-27.[8]

At Baton Rouge, Exxon conducted a separate response action under Louisiana Compliance and Corrective Action Orders from the 1980s to the late 2000s to address groundwater contamination in the Shallow Fill Zone.  SOF ¶¶ 46-49.[9]  Exxon also conducted

---

[7] Per the practice the Court preferred in Phase I, the United States' experts signed declarations adopting their reports as testimony.  Both the declarations and reports are included as exhibits.

[8] Additional, separate response actions at Baytown that are not addressed in this Motion included investigation and extraction of refinery groundwater plumes, the capping of Mitchell Point (SWMU 60) and the Main Office Building (SWMU 62) under individual Response Action Plans, investigation of other SWMUs, and actions to characterize and begin treating the Tank Farm 3000 area groundwater plume at the Baytown chemical plant.  The chemical plant is the subject of a second 1995 Agreed Order with Texas.

[9] Additional, separate response actions at Baton Rouge that are not addressed in this motion included investigation of a number of other SWMUs under a RCRA Facility Investigation,

*Cont.*

discrete response actions in the 1980s to close the Old Silt Pond and the Rice Paddy Landfarm that otherwise would have required costly upgrades to comply with new RCRA regulations. SOF ¶¶ 52-54, 56, 57-60.

Examined a different way, Exxon's multiple response actions at both sites are analogous to operable units or "OUs".  A single remedial action may be divided into multiple OUs, addressing discrete types of contamination (soil, groundwater, and so forth).  EPA's regulations state that operable units "may address geographic portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site."  40 C.F.R. § 300.5.  Courts have applied the factors used to define OUs to define separate remedial actions, particularly for statute of limitations purposes.  *See Valbruna Slater Steel Corp.*, 2013 WL 1182985 at *11-12 (citing *United States v. Manzo*, 182 F. Supp. 2d 385, 401-02 (D.N.J. 2000)); *see also United States v. Ambroid Co., Inc.*, 34 F. Supp. 2d 86 (D. Mass. 1999); *Douglas Autotech Corp. v. Scott Fetzer Co.*, No. 1:07-cv-1062, 2008 WL 205217 (W.D. Mich. Jan. 23, 2008).  As discussed in the preceding paragraphs, Exxon's response actions at both sites addressed distinct geographic areas; addressed distinct site problems; and addressed different phases of cleanup.

**B.     Exxon's response actions at the units in question were remedial in nature.**

CERCLA defines "removal" as "the cleanup or removal of released hazardous substances from the environment," while a "remedial action" includes "those actions consistent with permanent remedy taken instead of or in addition to removal actions . . . ."  42 U.S.C.

---

investigation of potential contamination at the Maryland Tank Farm (several miles from the Baton Rouge refinery) to facilitate a real estate transaction, and voluntary extraction of hydrocarbons at the Monte Sano Bayou area in the chemical plant.

§ 9601(23), (24).  There is no bright line between the statutory definitions, and EPA's

implementing regulations likewise contain overlapping definitions.  *See* 40 C.F.R. § 300.5.

Importantly, however, those regulations also identify eight factors that "shall be considered in

determining the appropriateness of a removal action," such as the presence of "situations or

factors that may pose threats to public health or welfare or the environment.  *Id*. § 300.415(b)(2).

Along the same lines, EPA guidance states that "remedial authority generally would be used to

address complex site problems that will likely require a costly, complicated response" *unless*

there is time sensitivity, i.e., "a threat to human health or the environment that, though not time-

critical, is nonetheless sufficiently serious that the added time needed to comply with remedial

requirements . . . would be unacceptable."  Ex. 112, EPA, Use of Non-Time-Critical Removal

Authority in Superfund Response Actions 5 & n.6 (Feb. 14, 2000); *see also* Ex. 90, EPA,

CERCLA/Superfund Orientation Manual at I-8, V-1 (Oct. 1992).

Courts similarly have focused on: (1) the presence or absence of an imminent threat to

human health or the environment; and (2) the permanence (or lack thereof) of the response as

distinguishing factors between removal and remedial actions.  *E.g., New York v. Next Millennium

Realty, LLC*, 732 F.3d 117, 125 (2d Cir. 2013) (citations omitted); *Morrison Enterprises, LLC v.

Dravo Corp*., 638 F.3d 594, 608 (8th Cir. 2011) (citations omitted); *Frey v. EPA*, 403 F.3d 828,

835 (7th Cir. 2005) (citations omitted); *W.R. Grace & Co.*, 429 F.3d at 1243-45; *Sunoco, Inc*.,

337 F.3d at 1240 (citation omitted).  Some courts also consider the cost of the response action.

*E.g., Sunoco, Inc.*, 337 F.3d at 1240; *Public Serv. Co. of Colorado v. Gates Rubber Co*., 175 F.3d

1177, 1182 (9th Cir. 1999).[10]  Ultimately, however, determining what type (or types) of actions

---

[10] Courts have also considered the duration of the response action, *e.g., Sunoco*, 337 F.3d at
1240, but EPA's guidance states that "this characteristic usually is not helpful."  Ex. 112, EPA,

*Cont.*

occurred at a given site requires a "highly fact-specific" inquiry. *Geraghty & Miller, Inc. v. Conoco Inc.*, 243 F.3d 917, 926 (5th Cir. 2000).

As noted above, there is no evidence that Exxon intended to conduct any of the work at Baytown or Baton Rouge as either a CERCLA removal action or a CERCLA remedial action. SOF ¶¶ 1-2.  There are no documents indicating that Exxon conducted, for example, *either* a "removal site evaluation" (40 C.F.R. § 300.410) or a "remedial site evaluation" (*id*. § 300.420), or took any of the other technical steps described in the NCP.  Even during the course of this litigation, Exxon was not able to answer the United States' interrogatories asking Exxon to identify whether its response actions were removal or remedial actions, stating instead that such responses required an expert opinion.  SOF ¶ 3.

Thus, this Court is left to evaluate retroactively whether Exxon's work was more in the nature of a removal action or remedial action.  Taken in isolation, no one factor is determinative.[11]  When viewed in light of all of the above principles, however, the specific facts of these cases show that the response actions conducted by Exxon at the units in question at each Site are best characterized as remedial actions.  These facts are summarized in Appendix B.

### 1.    Exxon was not responding to an imminent threat.

Alborz Wozniak, P.E., BCEE, a civil engineer with over 25 years of experience in soil, sediment, and groundwater contaminant characterization and remediation, including both removal and remedial actions, testified that, based on his experience, none of the hallmarks of an imminent risk to any receptors (e.g., humans or water bodies) were present at either Site.  Ex. 27,

---

Use of Non-Time-Critical Removal Authority in Superfund Response Actions at 3 n.2 (Feb. 14, 2000).

[11] A "removal," for instance, may in some cases provide a permanent solution to environmental contamination.  Some removals can also be very costly.

Wozniak Report at 76-112.  When asked whether there was *any* "time sensitivity" within the meaning of EPA's guidance, even Exxon's expert Stephen Johnson admitted that, with "one possible exception," *there was no time sensitivity at either Site*.  Ex. 39, Johnson Dep. Vol. I at 222:5-21.[12]  Exxon's actions at the units as to which the United States seeks summary judgment are consistent with that assessment.

Indeed, the undisputed facts show that many of Exxon's actions at the relevant units were driven by its own choices about how to satisfy RCRA requirements and regulatory deadlines, not by any immediate need to address potential risks to potential receptors.[13]  Specifically, Exxon decided to close the following unlined waste management units in order to comply with new RCRA requirements and avoid having to perform costly upgrades: Separators 3M and 10, the Upper and Lower Outfall Canals, the Velasco Street Ditch, and the South Landfarm at Baytown; and the Old Silt Pond and Rice Paddy Landfarm at Baton Rouge.  SOF ¶¶ 5, 11, 16, 24, 31, 52, 58.

These RCRA unit closures at issue in this case are substantially similar to the RCRA closures of two unlined treatment ponds that the court in *Cytec Industries, Inc. v. B.F. Goodrich Co.* concluded were remedial.  232 F. Supp. 2d 821, 838 (S.D. Ohio 2002).  The court held that the cleanups of the treatment ponds "was not the result of an immediate release or threat of release of hazardous substances, but instead was the option chosen by Cytec when it had to either close the ponds or fit them with liners to comply with environmental regulations."  *Id*.  As in

---

[12] The "one possible exception" was the Tank Farm 3000 plume at Baytown, although Mr. Johnson could not recall in any detail why Exxon took steps to recover the free hydrocarbon product there.  Ex. 39, Johnson Dep. Vol. I at 222:5-21.  More importantly, he did not suggest that there was any risk the hydrocarbons were migrating or exposing anyone.

[13] This is not to say that RCRA cleanups may never qualify as CERCLA removal actions.  But in order to do so, the characteristics that justify resort to removal authority must be present, something Exxon cannot establish at these Sites.

*Cytec*, Exxon's cleanups have been driven largely by choices to meet regulatory deadlines and were not being taken in response to an imminent release or threat of release.  Thus, the unit closures are best characterized as remedial actions.

Even as to the work Exxon conducted in response to State orders, such as addressing groundwater plumes, the leisurely pace with which the States allowed Exxon to conduct that work confirms that there was no immediate threat.  At Baton Rouge, Exxon has been recovering LNAPL hydrocarbon from groundwater at the Shallow Fill Zone for almost 30 years.  SOF ¶ 48.

### 2.    Exxon's response actions provided permanent remedies.

Exxon's closures of Separators 3M and 10, the Outfall Canals[14], the Velasco Street Ditch, and the South Landfarm at Baytown; and the Old Silt Pond and Rice Paddy Landfarm at Baton Rouge were permanent solutions that addressed the contamination in those units at its source; no further corrective action is planned.  SOF ¶¶ 8, 14, 17-21, 27, 34, 56, 62.  Finally, the corrective action to address groundwater contamination at the Shallow Fill Zone at Baton Rouge was designed to permanently remedy the contamination.  SOF ¶¶ 47, 49.

### 3.    Many of Exxon's actions were costly.

Because some of Exxon's costs have been bundled together for accounting purposes, *see* Exs. 11-12, Ficca Suppl. Report Attach. 3, Schedules B-1 & C-1 (Jan. 2017), and shifted between categories over time, it is not clear precisely how much Exxon spent at every unit.  But, in general terms, Exxon is claiming a (pre-interest) total of approximately $4.4 million for Separators 3M and 10 (combined), $10.5 million for the Upper and Lower Outfall Canals, $1.8 million for the Velasco Street Ditch, and $1.6 million for the South Landfarm.  Ex. 11 Ficca

---

[14] If the Court disagrees that Exxon's costs to excavate non-hazardous sludge from the Lower Outfall Canal were not "necessary" costs, *see* Argument Point I.A., the Court should still find that the excavation of trace contaminants provided a permanent remedy for that contamination.

Suppl. Report Attach. 3, Schedule B-1.  At Baton Rouge, Exxon is claiming approximately $670,000 for the Shallow Fill Zone, $10 million for the Old Silt Pond, $4.6 million for the Rice Paddy Landfarm, and an additional $3.3 million for the Old Silt Pond and Rice Paddy Landfarm (combined).  Ex. 12, Ficca Suppl. Report Attach. 3, Schedule C-1.  While cost is not determinative of whether a response action is removal or remedial, the high cost of many of Exxon's actions weighs in favor of finding that the actions were remedial in nature.

### C. The statute of limitations in CERCLA Section 9613(g)(2) bars Exxon's cost claims for multiple units at Baytown and Baton Rouge.

CERCLA's statute of limitations provides that an action for recovery of response costs incurred in a remedial action "must be commenced . . . within 6 years after initiation of physical on-site construction, and that an action for costs of a removal action "must be commenced . . . within 3 years after completion of the removal action."  42 U.S.C. § 9613(g)(2).  Exxon signed a tolling agreement with the United States to preserve its claims concerning the Baytown and Baton Rouge Sites on December 15, 2003, *decades* after Exxon had closed waste management units and performed other response activities at both Sites (*see supra* at 5-7).  Because of Exxon's lengthy delay in pursuing its judicial claims, its cost claims for multiple cleanup units at both Baytown and Baton Rouge were time-barred before the tolling agreement was signed. Exxon therefore cannot recover costs incurred at those units.

As discussed above, Exxon has performed the cleanups at both Baytown and Baton Rouge through multiple, distinct actions rather than one continuous response action.  *See* Argument Point II.A.  Courts applying CERCLA's statute of limitations at such sites frequently have analyzed each cleanup unit to determine if, and by what date, the response activities in that unit triggered the statute of limitations.  Where the limitations period for a distinct cleanup unit has run before a complaint was filed or a tolling agreement signed, cost recovery claims for that

unit may be time-barred even if cost recovery claims for other units at the same site were timely filed or preserved. *See, e.g.*, *United States v. Akzo Nobel Coatings, Inc.*, 990 F. Supp. 897, 905-07 (E.D. Mich. 1998); *Ambroid Co., Inc.*, 34 F. Supp. 2d at 88; *United States v. Manzo*, 182 F. Supp. 2d 385, 402 (D.N.J. 2000); *Valbruna Slater Steel Corp.*, 2013 WL 1182985 at *12; *Bernstein v. Bankert*, 733 F.3d 190, 215 (7th Cir. 2013).

In *Manzo*, for example, EPA sought to recover costs it had incurred at a superfund site in New Jersey, which it had divided into three separate operable units for purposes of remedial action. 182 F. Supp. 2d at 391. The remedy for the first operable unit was implemented beginning in 1985, while the remedies for the second and third operable units were not implemented until at least 1991, less than six years before EPA filed its complaint in 1997. *Id.* at 391–92. The court noted that CERCLA's statutory text does not make clear "whether the United States may recover remedial expenses incurred for operable units when any recovery for the initial operable unit would be time-barred," but ultimately found that "the statute of limitations does not bar compensation for operable units qualifying under the limitation even if the plaintiff is barred from seeking compensation for earlier unit." *Id.* at 402. This meant that under the facts established in *Manzo*, EPA could seek costs it incurred for the second and third operable units, but not the first. *See id.* at 399, 403; *accord, e.g.*, *Akzo Nobel*, 990 F. Supp. at 905–07 (analyzing two operable units separately for statute of limitations purposes); *Ambroid*, 34 F. Supp. 2d at 88 (holding that two removals performed at distinct points in time at a site would be treated as separate for statute of limitations purposes).

More recently, the court in *Valbruna Slater* reached a similar conclusion at a site where the cleanup process was similar to Exxon's Baytown and Baton Rouge cleanups, in that early response activities "dealt primarily with RCRA compliance" and only addressed discrete

19

portions of the site.  2013 WL 1182985 at *12.  The court determined that these early activities were removals, but that even if considered to be remedial actions, "they were separate and distinct" from the remedial action later performed across the whole site.  *Id.* at *13.  Following *Manzo* and other cases, therefore, the court treated the earlier and later response actions separately for statute of limitations purposes.  Claims for costs incurred in the earlier cleanup phases were thus untimely, while claims based on the later remedial action were timely.  *Id.* at *4–5, 12–13.

 An approach similar to that used in *Manzo* and *Valbruna Slater* makes sense here given that Exxon has performed discrete actions, over many years, in distinct geographic areas and (in some instances) distinct environmental media at Baytown and Baton Rouge.  As also discussed above, those actions are best characterized as remedial in nature.  *See* Argument Point II.B. Indisputable evidence shows that at multiple cleanup units within each Site, Exxon's response activities reached the stage of the "initiation of physical on-site construction of the remedial action," 42 U.S.C. § 9613(g)(2)(B), prior to December 15, 1997.  Accordingly, the six-year statute of limitations for the following units ran prior to the date of Exxon's tolling agreement with the United States, and the Court should enter summary judgment for the United States finding that Exxon's claim for costs incurred at those units is time-barred: at Baytown, **Separator 3M** (sludge and contaminated soil excavated 1984-1986 and certified closed in 1988 (north half) and 2006 (south half), SOF ¶¶ 7-8); **Separator 10** (sludge and contaminated soil excavated in 1986 and certified closed in 1986, SOF ¶¶ 13-14); the **Upper and Lower Outfall Canals** (sludge excavated in 1994, SOF ¶¶ 18, 20); **Velasco St. Ditch** (sludge excavated in 1991 and certified closed in 2008, SOF ¶¶ 25, 27); and the **South Landfarm** (cap installed in 1990 and certified closed in 1991, SOF ¶¶ 33-34). At Baton Rouge, the **Shallow Fill Zone** (LNAPL

20

recovery began in 1987 and is ongoing, SOF ¶¶ 48), the **Old Silt Pond** (sludge solidified 1991-1993 and certified closed in 1995, SOF ¶¶ 54, 56), and the **Rice Paddy Land Farm** (cap installed 1993-1994 and certified closed in 1995, SOF ¶¶ 60, 62).

Moreover, at five of these units – Separator 10, the Upper and Lower Outfall Canals, the South Landfarm, the Old Silt Pond, and the Rice Paddy Land Farm – *all* response activity was "complete[d]" before December 15, 2000, *id.* § 9613(g)(2)(A).  The United States is thus entitled to summary judgment that Exxon's cost claim for those units is untimely even if the Court applies the three-year statute of limitations that runs from the completion of removal actions.

### D.    Exxon's response costs at multiple units at Baytown and Baton Rouge were not incurred consistent with the NCP.

To the extent the Court concludes that Exxon's claims are timely, the next question is whether Exxon's costs are recoverable.  Under CERCLA, a private party may recover only "necessary costs of response incurred  . . . consistent with the national contingency plan" or NCP.  42 U.S.C. § 9607(a)(4)(B).  The NCP, 40 C.F.R. Part 300, is a set of EPA regulations "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment."  *Wash. State Dep't of Transp. v. Wash. Nat. Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995).  A private party plaintiff bears the burden of establishing that its costs were incurred consistent with the NCP.  *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005).  Exxon has failed to meet its burden.

Once again, it is important to note that Exxon made no effort to comply with the NCP when it conducted its response actions.  Exxon employees and consultants overseeing the cleanup activities have admitted that they were not familiar with the NCP and/or were not trying to follow it when conducting the activities at issue in these cases.  SOF ¶ 2.  This is not a surprise.  Although most of Exxon's actions were conducted under state supervision, they were

not conducted under CERCLA, and Exxon thus was not required to follow the NCP to satisfy the

state regulators.  And Exxon likely was not planning to follow the NCP in anticipation of

bringing CERCLA claims, because, according to Exxon's expert Stephen Johnson, Exxon did

not consider pursuing a cost recovery action against the United States "until recently when

Exxon became aware of the Government's potential liability and filed a complaint . . . ."  Ex. 16,

Stephen Johnson Expert Report 27 (May 27, 2016).  Exxon's lack of intent to follow the NCP is

significant, because the NCP requirements are sufficiently detailed that it would be difficult for a

party to stumble into compliance.  *See, e.g., Wash. State Dep't of Transp.*, 59 F.3d at 802-03

(noting "WSDOT's compliance with regulations that it did not consult is questionable" even if

not determinative for NCP consistency analysis).

A private party response action – whether removal or remedial – is considered consistent

with the NCP if it meets four criteria: (1) it substantially complies with applicable NCP technical

requirements (which vary depending on whether the action at issue is a removal or, as Exxon's

actions here are best characterized, remedial); (2) it provides for "meaningful public

participation"; (3) it attains "applicable and relevant and appropriate requirements" (ARARs)

(i.e., cleanup standards such as worker exposure thresholds and surface water quality standards);

and (4) it provides a cost-effective remedy that is protective of human health and the

environment. [15]  55 Fed. Reg. 8666, 8793 (Mar. 8, 1990); 40 C.F.R. § 300.700(c)(3)(i).[16]  When

---

[15] The NCP also requires that costs be adequately documented.  *See* 40 C.F.R. § 300.160(a)(1).
We discuss Exxon's failure to comply with this requirement in Argument Point III.B. below.

[16] Although courts generally held parties responsible for strict compliance with the NCP prior to
the introduction of the "substantial compliance" standard in the 1990 version, *e.g., County Line
Investment Co. v. Tinney*, 933 F.2d 1508, 1513 (10th Cir. 1991), Mr. Wozniak applied the more
lenient "substantial compliance" standard in his evaluation of Exxon's work conducted under all
NCP versions.  Ex. 47, Alborz Wozniak Dep. 81:3-15 (May 24, 2017).

analyzing consistency with the NCP, courts generally look to the version in effect at the time that costs were incurred.  *See, e.g., NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

In this case, Exxon's response actions have spanned four decades and three versions of the NCP.  Mr. Wozniak analyzed whether Exxon's activities at each cleanup unit identified by Exxon satisfied the four criteria for consistency with the applicable NCP version.  His analysis considered information on (and credited Exxon with) actions taken by Texas or Louisiana to the extent cited by Exxon's expert, Stephen Johnson, or otherwise available.  For example, in evaluating whether Exxon had considered ARARs, he looked for any reference in the available documents (whether drafted by Exxon or the States) to an applicable regulatory requirement.  Mr. Wozniak concluded that Exxon failed to comply with one or more elements of the NCP in taking response actions at the units discussed in Arugment Points II.D.1 and II.D.2. below.

### 1.    Baytown

Mr. Wozniak evaluated Exxon's closure of the **<u>South Landfarm</u>** against the 1985 NCP[17] and found the following deficiencies.  First, Exxon did not substantially comply with the technical requirements of the NCP.  Ex. 27, Wozniak Report at 85.  Before deciding to close the South Landfarm, Exxon did not conduct any investigations analogous to a remedial investigation/feasibility study (required by section 300.68(d) of the 1985 NCP), such as evaluating contaminants in the soil and groundwater in and around the unit.  *Id*.  Exxon also did not evaluate any alternative methods of closure prior to selecting the landfarm cap (as required by section 300.68(f)).  *Id*.  Second, Exxon did not conduct *any* public participation during the

---

[17] Relevant excerpts of the 1985 NCP regulations, as published in the 1986 Code of Federal Regulations, are provided in the attached Regulatory Addendum.

six-year period from submitting the closure plan to completing the capping.  *Id*.  Exxon's response action at the South Landfarm thus was not consistent with the 1985 NCP.

Exxon's response action at the **Upper and Lower Outfall Canals** was evaluated against the 1990 NCP[18] and was deficient with respect to the public participation requirement of the NCP.  Although, unlike the South Landfarm, Exxon conducted some public participation, Exxon's action still did not meet the public participation requirements of the NCP.  The prevailing view of those requirements is that the public must be given informed notice and an opportunity to comment *before* the remedy is selected.  *Regional Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 708-09 (6th Cir. 2006); *Carson Harbor Village, Ltd. v. County of Los Angeles*, 433 F.3d 1260, 1266 (9th Cir. 2006); *Union Pac. R.R. v. Reilly Indus., Inc.*, 215 F.3d 830, 835-38 (8th Cir. 2000); *Public Serv. Co. v. Gates Rubber Co*., 175 F.3d 1177, 1185 (10th Cir. 1999).  EPA guidance also explains the importance of two-way community relations, i.e., *both* providing notice and information to the public *and* providing opportunities for public input, both early in, and throughout, the process.  *See, e.g.*, Ex. 88, EPA, Community Relations in Superfund Handbook (1992) at WOZNIAK005038; Ex. 117, EPA, Early and Meaningful Community Involvement Memo (2001) at WOZNIAK05485.  Exxon, however, conducted very limited public participation at the Upper and Lower Outfall Canals.  SOF ¶ 22; Ex. 27, Wozniak Report at 81-82.  Specifically, Exxon issued a single public notice and held a single public meeting in 1991 *after* the submission of its permit modification to clean up the Outfall Canals.  SOF ¶ 22.  Exxon made no attempt to update the public when it completed its hazardous sludge characterization or to solicit public input on its plan to delay closure of the units.  Ex. 27,

---

[18] Relevant excerpts of the 1990 NCP regulations, as published in the 1990 Code of Federal Regulations, are also provided in the attached Regulatory Addendum.

Wozniak Report at 81-82.   This performance does not satisfy the applicable public participation requirements, and Exxon's response action at the Outfall Canals was therefore inconsistent with the 1990 NCP.

Exxon's response action at the **Velasco Street Ditch** was evaluated against the 1990 NCP and had the following deficiencies.  First, Exxon did not substantially comply with the technical requirements of the NCP.  Ex. 27, Wozniak Report at 83-84.  Exxon did not conduct the equivalent of a feasibility study, i.e., evaluate the feasibility of multiple corrective action options (as required by section 300.430 of the 1990 NCP).  *Id*.  Exxon also did not conduct the equivalent of a remedial investigation (also required by section 300.430).  *Id*.  Following the discovery of hazardous constituents in the ditch in February 1991, Exxon excavated the sludge in order to satisfy RCRA requirements without any attempt to characterize or otherwise investigate the sludge.  *Id*. at 83-84.  Second, Exxon has not established that it conducted *any* public participation in connection with the Velasco Street Ditch.  SOF ¶¶ 28; Ex. 27, Wozniak Report at 84.  Third, there is no evidence that Exxon considered any ARARs during its response action at the Velasco Street Ditch.  Ex. 27, Wozniak Report at 84.  Exxon's response action at the Velasco Street Ditch thus was not consistent with the 1990 NCP.

### 2.    Baton Rouge

Exxon's response action at the **Shallow Fill Zone** was evaluated against the 1985 NCP, and had the following deficiencies.  First, Exxon did not comply with NCP technical requirements because it did not evaluate any possible alternative before submitting a plan to Louisiana to recover the LNAPL present in groundwater remedies (as required by section 300.68(f) of the 1985 NCP).  *Id*. at 103.  The purpose of the plan was to use the LNAPL recovery system as a means of defining and characterizing the extent of the plume.  *Id*.  Second, Exxon

did not conduct *any* public participation at the Shallow Fill Zone before selection of the remedy, nor for that matter has it done so during the past 30 years of LNAPL recovery.  SOF ¶ 50; Ex. 27, Wozniak Report at 103-04.  Third, Exxon did not consider any ARARs, either in 1987 or when the recovery system was upgraded.  Ex. 27, Wozniak Report at 104.  Exxon's response action at the Shallow Fill Zone thus was not consistent with the 1985 NCP.

Exxon's response action at the **Rice Paddy Landfarm** was evaluated against the 1985 NCP and was deficient because it did not substantially comply with the technical requirements of the NCP.  *Id*. at 83-84.  Specifically, Exon did not identify and analyze multiple potential closure alternatives prior to selecting natural biodegradation (as required by section 300.68(f)).  *Id*. at 105-07.  Exxon's response action at the Rice Paddy Landfarm thus was not consistent with the 1985 NCP.

In conclusion, Exxon has failed to meet its burden of showing that these response actions were consistent with the NCP, and, thus, those costs are barred under CERCLA.  Even if the Court finds Exxon's claims timely, the Court should nevertheless enter summary judgment for the United States that Exxon cannot recover any of its cleanup costs for these units because Exxon's work did not comply with the applicable NCP.[19]

If the Court holds that Exxon cannot claim costs at a cleanup unit for any reason discussed in the preceding sections – because the costs are not necessary response costs, because Exxon's claim is barred by the statute of limitations, or because Exxon failed to comply with the NCP – the Court need go no further.  To the extent that Exxon's cost claims survive (or are not subject to) these challenges, however, there are two remaining questions:  first, has Exxon

---

[19] If the Court finds Exxon's claims for the following units to be timely, the United States concedes that the costs were incurred consistent with the NCP: at Baytown, Separator 3M, Separator 10; and, at Baton Rouge, the Old Silt Pond.

demonstrated that it is entitled to recover the full amount it seeks?  And second, as to those costs that are adequately documented, what share (if any) should be allocated to the United States?  We consider these questions in the following sections.

### III.   EXXON SHOULD ONLY RECOVER AN EQUITABLE SHARE OF THOSE COSTS THAT ARE NOT PREVIOUSLY REIMBURSED AND ACCURATELY ACCOUNTED FOR WITH SUFFICIENT EVIDENCE.

Before the Court applies the equitable allocation to Exxon's past costs, the Court should address two cost-related issues.  *First*, CERCLA directs courts to prevent parties from obtaining double recovery for response costs.  As we explain in Argument Point III.A., Exxon has already recovered $8.65 million of its costs at Baytown and $11.24 million of its costs at Baton Rouge through settlements with its insurance companies; thus, Exxon is not entitled to recover those costs again from the United States.  *Second*, CERCLA requires Exxon to prove that its response costs are consistent with the National Contingency Plan, *id*., which in turn requires Exxon to complete and maintain documentation that provides an accurate accounting of its costs.  *See* 40 C.F.R. § 300.160(a)(1).  As we explain in Argument Point III.B., Exxon has failed to provide sufficient evidence to satisfy this requirement.

### A.   The Court should prevent Exxon from obtaining an inequitable double recovery by accounting for its prior insurance recoveries.

In CERCLA, Congress expressed a "general policy against double recovery."  *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 391 (3d Cir. 2013).  Thus, federal courts universally recognize that preventing a party from obtaining a double recovery is a relevant equitable factor that should be considered in a CERCLA allocation.  *See, e.g.*, *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) (district court abused its discretion by failing to consider effect of prior settlements, which implicated an equitable factor that should bear "significant weight"); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1189 (9th Cir. 2000)

("The district court correctly notes that one equitable factor is preventing someone from recovering for the same harm twice."); *Raytheon Aircraft Co. v. United States*, No. 05-2328-JWL, 2007 WL 4300221 at *3 (D. Kan. Dec. 8, 2007) ("[I]nsurance payments and other payments or credits constitute a significant allocation factor under CERCLA that the court is required to consider in its allocation determination.").  Preventing a party from receiving a double recovery is important in allocating costs because permitting a CERCLA claimant "to recoup more than the response costs he paid out of pocket flies in the face of CERCLA's mandate to apportion those costs equitably among liable parties."  *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1207 (10th Cir. 2009).

Exxon has already been paid once for some of the costs it seeks from the United States. Beginning in the 1990s, Exxon pursued litigation (the North American Coverage Case, or "NACC") against its insurers to recover its environmental cleanup costs at many sites across the United States.  SOF ¶ 63.  In that litigation, Exxon argued that its insurance policies should cover environmental cleanup costs at the Baytown and Baton Rouge Sites.  SOF ¶ 64.  As a result of that case, Exxon eventually recovered $269 million in insurance settlements.  SOF ¶ 65.  In similar situations, courts have held that when a PRP recovers its cleanup costs through insurance, those insurance proceeds should be accounted for in a CERCLA equitable allocation.  *See New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 237–39 (2d Cir. 2014); *see also Friedland*, 566 F.3d at 1208–09; *Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1123–24 (D. Nev. 2008).

Exxon has contended that the $269 million in insurance settlements are a global settlement for environmental liabilities at hundreds or thousands of sites, and therefore it is improper to treat any of the insurance proceeds as prior payments for the costs it claims in these

28

CERCLA cases.  SOF ¶ 66.  Exxon has recovered $8.65 million that relate

to Baytown, and approximately $11.24 million that relate to Baton Rouge.  SOF ¶¶ 67–70.[20]

One traditional method for preventing double recovery is to take already-recovered costs

off the top—in other words, to subtract the prior recovery of cleanup costs from the total cleanup

costs to be equitably allocated between the parties.  *See, e.g.*, *Vine Street, LLC v. Keeling*, 460 F.

Supp. 2d 728, 764–66 (E.D. Tex. 2006), *rev'd and vacated on other grounds,* 776 F.3d 312 (5th

---

[20] We recognize that Exxon may have recovered insurance proceeds that could be attributed to
cleanup costs at Baytown and Baton Rouge that it is not seeking in these CERCLA cases.  But to
date, Exxon has failed to offer a rational, alternative basis for allocating its prior recoveries.

Cir. 2015).  This is similar to Congress's approach in CERCLA Section 113(f)(2), which provides that a CERCLA settlement with the United States or a State "reduces the potential liability of [other PRPs] by the amount of the settlement."  *See* 42 U.S.C. § 9613(f)(2).  This method of preventing double recovery ensures that PRPs receive a share of the prior recovery in proportion to their respective share of responsibility for the response costs.  Thus, if a court allocates 98 percent of responsibility to one party and 2 percent to the other, the party that bears 98 percent of the costs also receives the benefit of 98 percent of the prior recovery.

To prevent double recovery in these cases, the Court should adopt this traditional method by deducting $8.65 million from Exxon's total costs at Baytown and $11.25 million from its total costs at Baton Rouge before equitably allocating the remaining costs between Exxon and the United States.  Moreover, because Exxon has divided its costs into cleanup units at each Site, the Court should deduct the insurance proceeds by reducing Exxon's past costs by the same percentage at each cleanup unit.  In sum, the Court should conclude that preventing double recovery is a relevant equitable factor in these cases and should grant summary judgment to the United States on this issue by reducing Exxon's past costs at each Baytown cleanup unit by 17% ($8.65 million divided by $51 million) and reducing Exxon's past costs at each Baton Rouge cleanup unit by 43% ($11.25 million divided by $26 million).  After making these deductions, for reasons discussed next in Argument Point III.B., the Court should further deduct $6.5 million in Exxon's costs because they are not documented with adequate evidence.

###   B.      Exxon has failed to accurately account for a substantial portion of its past costs.

Exxon must prove that its costs are consistent with the National Contingency Plan. Among its requirements, the National Contingency Plan requires a CERCLA plaintiff like Exxon to complete and maintain documentation sufficient to accurately account for its response costs.

40 C.F.R. § 300.160(a)(1).  Exxon claims it has incurred over $77 million in response costs at the two Sites.  Exxon's accounting expert, Paul S. Ficca, has opined that Exxon has accurately accounted for all of those costs.  SOF ¶ 71.  But Exxon lacks sufficient evidence to prove many of these costs, not just at one cleanup unit, but at many units at both Baytown and Baton Rouge.

The United States' accounting expert, E.J. Janik, a Certified Public Accountant with a Master of Science in Accounting and thirty years of experience in forensic accounting, has reviewed Exxon's $77 million claim.  SOF ¶ 72.  Mr. Janik has concluded that Exxon has failed to provide sufficient documentation to accurately account for roughly one-third of its costs—about $23 million.  SOF ¶ 73.  This figure includes $6.7 million—8% of Exxon's costs—for which Mr. Janik has concluded that Exxon has produced no invoice and no proof of payment.  SOF ¶ 74.

As discussed below, the Court should grant partial summary judgment to the United States on three cost documentation issues.  First, the Court should hold that Exxon's evidentiary burden for proving its costs under the National Contingency Plan requires it to produce invoices and proof of payment, or equivalent documentation, to support each individual cost that it seeks.  Second, the Court should reject Exxon's attempt to prove its costs by relying on unreliable accounting records, an inadmissible litigation database, and inadmissible summaries of its costs.  Third, the Court should deduct the $6.7 million in costs for which Exxon has no invoice and no proof of payment and has offered no other competent evidence to prove those costs.  Finally, after resolving these three issues, the Court should order Exxon and the United States and their respective experts to work together to seek agreement on what amount of the remaining $70 million in costs is accurately accounted for and what amount remains in dispute between the parties.

### 1. The Court should require Exxon to provide invoices and proof of payment documentation to prove each of its costs.

The National Contingency Plan requires that private parties "complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery." 40 C.F.R. § 300.160(a)(1) (governing federal agency actions); *id.* § 300.700(c)(5)(ii) (section 300.160 potentially applies to private party actions). The NCP further specifies that, "[i]n general, documentation shall be sufficient to provide . . . accurate accounting of . . . private party costs incurred for response actions." *Id.* § 300.160(a)(1). As with other NCP requirements, as a private party, Exxon must demonstrate "substantial compliance," not perfect compliance. *Id.* § 300.700(c)(3)(i).[21]

In *United States v. W.R. Grace & Co.–Conn.*, 280 F. Supp. 2d 1149, 1179–81 (D. Mont. 2003), the district court thoroughly analyzed the National Contingency Plan's cost documentation provision. Rather than establishing "prescriptive standards for the content of cost documents," the provision requires that "'in general' documentation be sufficient to provide an accurate accounting of costs incurred." *Id.* at 1179–80. According to *Grace*, "courts have applied civil evidentiary standards to assess the adequacy of cost documentation supporting a CERCLA cost recovery claim, rather than imposing any additional burden." *Id.* at 1180. The court concluded that no particular document or type of document is required as long as "the documentation [is] 'adequate' or 'sufficient' to support the cost claim." *Id.* at 1181. Thus, the

---

[21] In contrast to private parties, EPA is entitled to recover all costs of a removal or remedial action that are "not inconsistent" with the NCP. 42 U.S.C. § 9607(a)(4)(A).

plaintiff in a CERCLA case "has a range of options for proving up the amount of costs it has incurred." *Id.*[22]

Although the *Grace* case correctly concludes that no particular form or type of document is required, Exxon still has to present enough documentation to prove its costs by a preponderance of the evidence. *See City of Wichita, Kansas v. Trustees of APCO Oil Corp.*, 306 F. Supp. 2d 1040, 1093 (D. Kan. 2003) ("*Grace* concluded . . . that detailed cost summaries, vendor invoices, payment vouchers, and contractor bills provided sufficient proof."). The evidence should allow the Court to conclude that Exxon's costs are: (1) accurate in amount; and (2) recoverable CERCLA response costs that it incurred cleaning up waste units where the United States bears an equitable share. *See, e.g.*, *United States v. Chrysler Corp.*, 168 F. Supp. 2d 754, 768–78 (N.D. Ohio 2001) (providing detailed invoices and other documentation that allowed the court to determine which costs were incurred response costs that were adequately documented and which were not and should be excluded).

Almost all of the costs that Exxon seeks are for third-party contractors. Thus, the most straightforward way for Exxon to prove its costs is to produce both a vendor invoice and proof of payment for each cost. As Mr. Janik explained, accountants will "generally seek support for a given cost item by looking for an invoice . . . and then for proof of payment relating to that invoice." SOF ¶ 75. Another Exxon expert, A.J. Gravel, has testified that he employs a similar methodology when serving as an expert on the NCP's accurate accounting standard in other cases, including reviewing vendor invoices and proof of payment. SOF ¶ 76.

---

[22] EPA has well-established procedures for documenting its costs that courts have routinely upheld and that are not at issue here. *See United States v. JG-24, Inc.*, 331 F. Supp. 2d 14, 45–52, 66–67 (D.P.R. 2004) (discussing EPA's cost documentation procedures and concluding defendants "did not meet their burden of establishing that the United States' response actions were inconsistent with the NCP").

The Baytown and Baton Rouge Sites are massive industrial operations that have caused pollution in numerous areas.  SOF ¶ 77.  And Exxon hires many contractors to conduct innumerable projects at the Sites.  SOF ¶ 78.  But only some of those contractors and some of those projects relate to the cleanup units where the United States bears some responsibility under CERCLA.  SOF ¶ 79.  Without an invoice (or other documents providing equivalent evidence), neither the Court nor the United States can determine whether the work that Exxon's contractors performed is for response actions at the cleanup units where the United States bears some CERCLA responsibility.  *See City of Wichita*, 306 F. Supp. 2d at 1094 ("The problem arises in determining how much of that work amounts to response costs."); *Strategic Envtl. Partners, LLC v. N.J. Dep't of Envtl. Prot.*, No. 12-cv-3252, 2017 WL 4678199 at *6 (D.N.J. Oct. 16, 2017) (plaintiff failed to provide "facts or evidence that tied this testing to a CERCLA response cost").

Nor can the Court or the United States confirm that the amount of each cost that Exxon claims accurately reflects what the contractor charged Exxon without an invoice.  That is why it is common in CERCLA cases for the plaintiff to produce all of the invoices to support its contractor costs and for the court or the defendant to then examine those invoices to determine whether the costs are recoverable.  *See, e.g.*, *Nashua Corp. v. Norton Corp.*, 116 F. Supp. 2d 330, 354–55 (N.D.N.Y. 2000) (where the private plaintiff "offered all the invoices at trial," the defendant challenged certain invoices, and the court ruled on which costs should be included and which should be excluded); *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1134–35 (D. Ore. 1996) ("At trial, Boeing presented voluminous documentation of each and every invoice . . . ."). Indeed, an Exxon employee, Gary Robbins, testified that when he supervised contractors at the Baytown Site, Exxon itself would not pay a contractor without first receiving and reviewing an invoice.  SOF ¶ 80.

In addition to an invoice, proof of payment is critical because it proves the amount that the plaintiff actually paid the contractor.  SOF ¶ 81.  As Mr. Gravel has explained when testifying in a prior case as an expert on the NCP's accurate accounting requirement, "proof of payment is often overlooked, but in my view a critical part of the process" because it provides evidence about "the purchaser's side of the transaction."  SOF ¶ 82.  In general, Mr. Gravel believes that proof of payment is "very important because that's where you might see discrepancies in payment and other types of discounting or other types of lump sum settlements or other things that need to be reconciled in order for those costs to [be] acceptable."  SOF ¶ 83; *see also C&B Sales & Servs., Inc. v. McDonald*, 177 F.3d 384, 388 n.6 (5th Cir. 1999) ("Indicia [that C&B paid the invoice] included copies of canceled checks from C&B to COI or wire payments from Hanover on behalf of C&B.  If the record indicated that COI invoiced C&B but did not indicate that C&B had paid the invoice or that COI had received payment, we did not include that amount in our approximation of revenues.").

According to Exxon's expert, Exxon need not prove each cost by producing an invoice and proof of payment.  SOF ¶ 84.  Mr. Ficca explained that "I don't think this type of micro level, transaction-by-transaction type of analysis . . . is proper in terms of reaching a conclusion about accurate accounting.  I don't think you [] look at every single one of thousands and thousands of transactions in isolation."  SOF ¶ 85.  Instead, Mr. Ficca believes that "you have to look at the documentation in its totality."  SOF ¶ 86.  In effect, Mr. Ficca is arguing that if Exxon has documentation to accurately account for *some* of its costs, then it is entitled to a presumption that the rest of its costs are also accurately accounted for—even costs for which Mr. Ficca concedes Exxon lacks basic evidentiary support, such as an invoice and proof of payment.  The Court can and should consider all of Exxon's documentation, but that does not excuse Exxon

35

from proving each individual cost item that it claims.  *See United States v. Northernaire Plating Co.*, 685 F. Supp. 1410, 1415 (W.D. Mich. 1988), *aff'd sub nom. United States v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir. 1989) ("Plaintiff has submitted documentation detailing the source and computation of each cost item requested.").

Mr. Ficca, also claims that he has proved some of Exxon's costs using types of documents other than invoices and proof of payment, such as purchase orders and contracts. That approach is consistent with the National Contingency Plan's requirements, as interpreted by *Grace* and other cases.  But as Mr. Ficca acknowledged, the point of relying on those other types of documentation is still to "verify the work that was performed" and to establish what "amounts were . . . paid."  SOF ¶ 87.  Here, Mr. Ficca has failed to show how the additional documents that he points to actually support the specific costs that Exxon is seeking.  Instead, Mr. Ficca merely points to documents showing that contractors performed environmental cleanup work for Exxon. *See Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1115 (E.D. Mo. 2016) (plaintiffs' costs were insufficiently documented because they failed to provide record evidence to sufficiently address gaps in the contractor invoices).

Because invoices and proof of payment would provide the evidence needed to prove the costs that Exxon has paid to contractors, the Court should hold that Exxon must produce both types of evidence, or produce other documentation that provides equivalent support for Exxon's costs.  The Court should further hold that each individual cost item that Exxon cannot prove in this fashion will be excluded from Exxon's claims.  *See, e.g. U.S. Virgin Islands Dep't of Planning & Nat. Res. v. St. Croix Renaissance Grp., L.L.L.P.*, 527 Fed. App'x 212, 214 (3d Cir. 2013) ("We also agree that the second item is not a qualified response cost because, as DPNR itself concedes, DPNR did not maintain adequate records of those expenses."); *Litgo New Jersey,*

*Inc. v. Martin*, No. 06-cv-2891, 2012 WL 32200 at *5 (D.N.J. Jan. 5, 2012) (reducing recovery for consultant's work by 25% because plaintiffs' "invoices submitted do not provide sufficiently detailed entries for the Court to determine that all of the services performed are properly recoverable").

### 2. Exxon cannot use its accounting system records or a NACC litigation database to prove costs for which it lacks sufficient documentation.

Despite significant gaps in Exxon's cost documentation Mr. Ficca has opined that Exxon has accurately accounted for all $77 million in past costs.  According to Mr. Ficca, Exxon's accounting system records and a database that Exxon maintained for the NACC litigation are sufficiently accurate and reliable that Exxon can rely on them to prove costs for which Exxon is missing documentation.  But Exxon's accounting system records are not reliable enough to substitute for basic evidentiary support, such as invoices and proof of payment.  And Exxon has not established that the NACC litigation database is admissible in evidence.  Finally, Mr. Ficca cannot use his cost summaries to prove Exxon's costs when the summaries themselves are inadmissible.  For these reasons, Mr. Ficca's attempt to prove Exxon's costs despite the lack of adequate cost documentation should be rejected.

### a. Exxon's accounting system records are too incomplete and unreliable to prove its costs.

In *Grace*, the court noted that "the type of documentation the plaintiff's accounting system maintains" is one factor in assessing the "nature of the documentation presented to support the cost claim."  *Grace*, 280 F. Supp. 2d at 1181.  Mr. Ficca, has opined that because Exxon has produced documentation that validates many cost items in Exxon's accounting system records, the accounting records are reliable and complete enough to prove the remaining costs where Exxon lacks documentation, such as an invoice or a canceled check or both.  SOF ¶ 88.  Mr. Ficca's confidence is not supported by the record.

37

Mr. Ficca testified that Exxon's accounting systems capture information such as invoice numbers, invoice date, invoice payment amount, payment date, payment check number, and vendor name. SOF ¶ 89. If Exxon's accounting system records for its Baytown and Baton Rouge costs were as reliable and accurate as Mr. Ficca claims they are, then those records should provide complete information for each of Exxon's claimed costs. SOF ¶ 90. Yet for many costs, the accounting system record that Mr. Ficca relies on is missing basic information, such as the invoice number, invoice date, or vendor name. SOF ¶ 91.

Indeed, the United States identified several costs totaling more than half a million dollars where the accounting system records that Mr. Ficca relied on are inaccurate. For example, Mr. Ficca was shown a $199,870.78 cost at the Baytown Site that he believed came from Exxon's Everest accounting system but for which Exxon had no invoice or proof of payment. SOF ¶ 92. Although the accounting system record was missing information such as an invoice number and vendor name, Mr. Ficca expressed no concerns about the accuracy of the cost because "this is information that came from [the] Everest" accounting system. SOF ¶ 93. Mr. Ficca was then shown an invoice for a different cost that proved Exxon had erroneously included this $199,870.78 in its claim (as a duplicative or overlapping cost). SOF ¶ 94. This is not an isolated mistake. In fact, the United States has identified two more examples of this exact same error. SOF ¶ 95. Together, the three errors add up to $575,118.84 in duplicative or overlapping charges—amounts that Mr. Ficca subsequently removed from Exxon's claim "out of an abundance of caution." SOF ¶ 96.

After his first deposition in these cases, Mr. Ficca excluded all costs from Exxon's claim where there was no invoice, invoice number, and vendor name—304 cost items totaling $307,901 at Baytown and six cost items totaling $2,925 at Baton Rouge. SOF ¶ 97. Mr. Ficca

declined, however, to exclude other cost items where the accounting system has failed to produce complete information and for which Exxon has not produced other documentation to support the cost.  SOF ¶ 98.  Thus, large portions of Exxon's cost claim remain suspect.  And even where Exxon's accounting system records are complete, they provide only rudimentary information about the costs.  Mr. Ficca thus cannot use Exxon's accounting system records to substitute for the types of documentation that CERCLA plaintiffs typically provide to prove their costs, such as invoices and proof of payment.

> **b.    Exxon cannot use the NACC database to prove its costs because the database is unauthenticated and inadmissible.**

In the 1990s, Exxon developed a "damages database" for purposes of the NACC insurance coverage litigation against its insurers.  SOF ¶ 99.  Exxon seeks to prove a portion of its undocumented costs based on that database.  Because Exxon has not authenticated the NACC database nor established its admissibility, the Court should exclude the database as evidence at the summary judgment stage.  Fed. R. Civ. P. 56(c)(2).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████   In other words, Exxon created the NACC database to support its claims in litigation, not in the ordinary course of its business operations.  And when asked in this litigation about the NACC database's purpose, Mr. Ficca testified that he was "[o]nly very broadly" aware that it was related to the NACC litigation.  SOF ¶ 101.  Mr. Ficca did not recall who developed the database, did not know how or when it was created, and did not know whether Exxon's lawyers were involved in creating the database.  *Id.*  Despite lacking knowledge about the NACC database, Mr. Ficca expressed confidence that the reliability of the NACC database was "right up there" with the reliability of Exxon's accounting systems.  SOF ¶ 102.

To date, Exxon has not authenticated the NACC database, nor has it identified an exception to the hearsay rule that would allow the Court to admit the database into evidence. *See* Fed. R. Evid. 901, 802.  Mr. Ficca's lack of personal knowledge about the development of the NACC database precludes him from "establish[ing] the predicate for [its] admission" as "competent summary-judgment evidence."  *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F. Supp. 3d 553, 568 (E.D. Tex. 2015).  Moreover, Exxon cannot claim that the NACC database is admissible under the hearsay exception for business records in Federal Rule of Evidence 803(6) because Exxon developed the database for the NACC litigation.  *See Consol. Envtl. Mgmt., Inc. v. Zen-Noh Grain Corp.*, 981 F. Supp. 2d 523, 530 (E.D. La. 2013) ("Because of this concern for trustworthiness, it has long been the rule that the business records exception does not apply to records prepared in anticipation of litigation."); *see also Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988) (similar).  The Court should exclude the NACC database from the summary judgment evidence that it considers.

> **c.**     **Exxon has not demonstrated that Mr. Ficca's cost summaries are admissible under Federal Rule of Evidence 1006.**

Mr. Ficca's opinion that Exxon has accurately accounted for $77 million in past costs at Baytown and Baton Rouge depends on a collection of Excel spreadsheets that list those costs and purport to summarize the evidence that Mr. Ficca relies on to support the costs (the Cost Summaries).  SOF ¶ 103.  But the Cost Summaries are admissible only if Exxon can satisfy Federal Rule of Evidence 1006, which provides that a party may use a "summary, chart or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court."  Exxon has not met the conditions to admit the Cost Summaries under Rule of Evidence 1006, and thus Mr. Ficca cannot point to the Cost Summaries themselves as sufficient evidence to prove Exxon's otherwise undocumented costs.

First, the Cost Summaries are admissible only if they are based on admissible evidence. *See United States v. Jones*, 664 F.3d 966, 976 & n.1 (5th Cir. 2011); *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259–61 (9th Cir. 1984).  "A summary based partly on admissible evidence and partly on inadmissible evidence is itself inadmissible."  Davis v. St. Anselm Expl. Co., 10-cv-883, 2013 WL 11336859 *4 (Mar. 28, 2013) (citing *Paddack*, 745 F.2d at 1259-61).  In addition to substantial information from the NACC database, which as discussed above is inadmissible, the Cost Summaries contain other information derived from inadmissible evidence.  For example, the Cost Summary for the Baytown Site contains numerous statements like "I understand from Peter Gagnon" that certain costs relate to a particular waste unit at the Site.  SOF ¶ 104.  When asked about these statements, however, Mr. Ficca stated that he never spoke directly with Mr. Gagnon, that Mr. Gagnon's information actually came from conversations with Exxon's lawyers, and that he (Mr. Ficca) had no other notes about his conversations with Exxon's lawyers.  SOF ¶ 105.  The statements in the Cost Spreadsheets about what an Exxon lawyer told Mr. Ficca that Mr. Gagnon said are inadmissible double-hearsay.

Second, Exxon has to demonstrate that it has complied with the condition in Rule of Evidence 1006 to make "[t]he originals, or duplicates available for examination or copying or both, by other parties at a reasonable time and place."  Fed. R. Evid. 1006.  Exxon has not yet satisfied this requirement.  For instance, for costs from 1998 at the Baton Rouge Site, Exxon "only provided invoices and invoice detail for . . . line items greater than $5K."  SOF ¶ 106.  Mr. Ficca believed that he asked Exxon to "provide everything that [the company] could reasonably get accumulated" and that the $5,000 cutoff was not a choice that he made.  *Id.*  Regardless of who made the choice, Exxon has failed to make available all of the documents underlying the Cost Summaries.

For other costs listed in the Cost Summaries, Exxon appears to be doing little more than repeating data downloaded from Exxon's accounting system. For those costs, Exxon is not summarizing voluminous documents; it is merely copying information from a single source. To be sure, for many other costs in the Cost Summaries, Exxon is summarizing evidence that it has made available—for example, an accounting record, an invoice, and a proof of payment record that substantiate the cost. But the Cost Summaries have the potential to sow confusion because some costs are true summaries of evidence, while others are not. For these reasons, Exxon's Cost Summaries are inadmissible under Rule of Evidence 1006, and Exxon cannot rely on them to prove its costs.

### 3. Exxon has failed to produce sufficient documentation to accurately account for at least $6.7 million in costs.

After establishing what Exxon's evidentiary burden is, and rejecting Exxon's attempt to prove its costs with unreliable and inadmissible evidence, the Court should grant the United States partial summary judgment as to $6.7 million in costs where Exxon has failed to provide basic evidence—an invoice and proof of payment. For the remaining $70 million in past costs that Exxon seeks at the two Sites, the Court should order the parties to apply the Court's guidance to determine what, if any, costs remain disputed.

More specifically, Mr. Janik has concluded that Exxon has no invoices and no proof of payment for $4.7 million at Baytown and $2 million at Baton Rouge. SOF ¶ 107. The chart below shows what amounts should be deducted at each cleanup unit at Baytown. SOF ¶ 108

| Baytown Cleanup Unit | Costs to be deducted |
|---|---|
| Facility Operating Areas | $ 290,245 |
| Former Ordnance Works Site Cleanup | $ 1,475,361 |
| General Canals and Separators Cleanup | $ 810,356 |
| Investigation of SWMUs | $ 170,128 |
| Mitchell Point – SWMU 60 | $ 0 |
| Refinery Groundwater | $ 309,050 |

| Separator 3M and Separator 10 Cleanup | $    282,355 |
| South Landfarm Cleanup | $      38,357 |
| SWMU 62/Main Office Building (MOB) | $              0 |
| Velasco Street Ditch | $ 1,416,546 |
| **TOTAL** | **$ 4,792,400** |

The chart below shows which costs should be deducted at each cleanup unit at Baton

Rouge.  SOF ¶ 109.

| **Baton Rouge Cleanup Unit** | **Costs to be deducted** |
| --- | --- |
| Old Silt Pond | $    140,166 |
| Rice Paddy Landfarm | $    442,827 |
| Old Silt Pond/Rice Paddy Landfarm | $    827,187 |
| SWMU Investigation & Remediation | $    539,622 |
| Shallow Fill Zone | $      57,703 |
| **TOTAL** | **$ 2,007,504** |

As a matter of law, these $6.7 million in costs are not accurately accounted for, and the

Court therefore should grant the United States partial summary judgment by deducting them

from the specific cleanup units where Exxon is claiming them.

For Exxon's remaining costs of about $70 million, Mr. Janik has questioned whether

Exxon has sufficiently documented a substantial portion of the costs.  For example, Mr. Janik has

concluded that Exxon has proof of payment but no invoices to support about $14.4 million in

costs at the two Sites.  SOF ¶ 110.  On the other hand, Mr. Ficca's opinion is that Exxon has

accurately accounted for these costs.  Rather than attempting to resolve these disagreements at

this stage, or deferring resolution for a trial, the Court should order Exxon and the United States

and their respective experts to work together to determine which costs remain in dispute after the

Court's summary judgment decision.  The Court's rulings as to other issues, such as the statute

of limitations, will also provide the parties with further direction on which costs remain at issue.

IV.     **THE COURT SHOULD EQUITABLY ALLOCATE TO THE UNITED STATES A ZERO SHARE OF SOME OF EXXON'S COSTS AND A SMALL SHARE OF THE REST.**

To the extent that Exxon's cost claims survive, the Court will be called on to allocate costs between Exxon and the United States "using such equitable factors as the court determines are appropriate."  Phase I Decision at 534; *see Lockheed Martin Corp. v. United States*, 833 F.3d 225, 227 (D.C. Cir. 2016); *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir. 1992) ("a court may consider several factors, a few factors, or only one determining factor . . . depending on the totality of circumstances presented to the court").  The non-exhaustive list of factors to which courts typically look includes:

> the amount of hazardous substances involved; the degree of toxicity or hazard of the materials involved; the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the substances; the degree of care exercised by the parties with respect to the substance involved; and the degree of cooperation of the parties with government officials to prevent any harm to public health or the environment.

*Amoco Oil Co. v. Bordon, Inc.*, 889 F.2d 664, 672–73 (5th Cir. 1989) (quotation and citation omitted); *see also United States v. Bell Petroleum Servs.*, 3 F.3d 889, 899-900, 901 n.12 (5th Cir. 1993).  The Court is free to allocate 100% of the costs in question to one party in appropriate circumstances.  *Halliburton Energy Serv., Inc. v. NL Indus.,* 648 F. Supp. 2d 840, 862 (S.D. Tex. 2009) (Rosenthal, J.) (citation omitted).  Allocation decisions are reviewable only for abuse of discretion, *Lockheed*, 833 F.3d at 234, and accompanying factual findings are reviewable for "clear error."  *Elementis Chromium L.P. v. Coastal States Petroleum Co.,* 450 F.3d 607, 613 (5th Cir. 2006).

Allocation in complex cases like those presently before the Court is challenging and fact-intensive.  *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 82 (1st Cir. 1999); *NCR Corp. v. George R. Whiting Paper Co.,* 768 F.3d 682, 696 (7th Cir. 2014) ("*NCR Corp.*").  That does not

mean, however, that summary judgment is not available in appropriate circumstances.  *See, e.g., Envtl. Transport Sys. v. Ensco*, 763 F. Supp. 384, 392 (C.D. Ill. 1991).  A party seeking summary judgement on CERCLA allocation bears the normal burdens with regard to proposed factual findings, Phase I Decision at 504 (citations omitted); *Acushnet Co.*, 191 F.3d at 79, but because allocation involves an exercise of the Court's discretion, neither party bears a traditional burden of proof with regard to the allocation itself.  *Acushnet Co.*, 191 F.3d at 78 ("[D]efendant in a contribution proceeding seeking to limit his liability has a 'less demanding burden of proof'"); *Litgo New Jersey, Inc., v. Martin*, No. 06-cv-2891, 2011 WL 65933 at *4 (D.N.J. Jan. 7, 2011). Further, almost by definition, the record available to support the allocation effort will be imperfect.  *See United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1088 (1st Cir. 1994) (recognizing that "[i]t is impossible to explain an allocation of liability in minute detail when, as now, the historical record is incomplete"); *United States v. Doe Run Resources*, No. 15-cv-0663, 2017 WL 4270526 at *7 (N.D. Sept. 26, Okla. 2017) (same).

    **A.**    **The United States should not bear any of Exxon's costs to address four (and part of a fifth) cleanup units at the Sites.**

        **1.**    **The Court should not allocate to the United States any share of Exxon's costs that were not necessary to address a threat to human health or the environment.**

If the Court finds that Exxon's costs to excavate non-hazardous sludge from the **Lower Outfall Canal** are "necessary costs of response" (Argument Point I.A.), the United States nonetheless should be allocated a zero share of those costs.  As explained *supra* at 8, Exxon's consultant established in August 1993 that the hazardous constituents in the Lower Outfall Canal sludge were well below regulatory levels.  SOF ¶ 19.  And Exxon reported to Texas that the sludge "did not have to be removed" but that Exxon did so voluntarily.  *Id.*  The United States should not have to pay any share of Exxon's costs to excavate the non-hazardous sludge.

In addition, in the event the Court finds that Exxon's **FOA**-related costs are "necessary costs of response" (Argument Point I.B.), the United States nonetheless should be allocated a zero share of those costs.  Both FOAs cover many more cleanup units than those claimed by Exxon in this litigation.  SOF ¶ 44.  Exxon could not even break down which costs are attributable to the refinery FOA versus the chemical plant FOA, let alone which costs are attributable to specific cleanup units.  SOF ¶ 43.  There is thus no way to determine which costs are attributable to units for which the United States is not liable, i.e., units unrelated to World War II and the Korean War.  *Id*.  Thus, Exxon should bear the full share of the $8 million in past FOA-related costs and all future FOA-related costs.

### 2. The United States should not bear any of Exxon's costs to address three cleanup units with no or de minimis Government involvement.

In the Phase I Decision, the Court held that the Plancors and refinery at the Baton Rouge Site are a single facility under CERCLA, thereby making the United States liable for response costs at the entire Site, despite the Court's conclusion that the Government operated the Plancors only and not the refinery.  Phase I Decision at 519, 530.  Likewise, the Court concluded that the Baytown Ordnance Works, plancors, and the Baytown refinery constituted one facility for determining the parties' liability at the Baytown Site.  The Court noted, however, that "[t]his conclusion would not preclude allocating less fault to the government based on lower culpability for wastes generated at the refineries than at the plancors."  *Id.* at 517 n.24.

Allocation of units to which the United States made some real contribution is discussed in Argument Point IV.B. below; however, there are two cleanup units at the Baton Rouge Site—the **Old Silt Pond** and the **Rice Paddy Landfarm**—and one cleanup unit at the Baytown Site—the **Tank Farm 3000 Area**—for which Exxon cannot prove that the United States contributed significant waste.  As such, the Court should assign a zero or otherwise *de minimis* share of the

costs for these units to the United States.  *See, e.g.*, *Halliburton Energy Servs., Inc.*, 648 F. Supp.

2d at 871 ("When a PRP contributes only minimally to the contamination at issue, it may be

appropriate to allocate zero response costs to that party."); *id.* at 865 (citing cases in which courts

allocated zero response costs to a party); *see also, e.g., TDY Holdings, LLC v. United States*, 872

F.3d 1004, 1011 (9th Cir. 2017) (concurring opinion stating that the record did not support

allocating 100% of cleanup costs to the plaintiff but did support "something close to that"

because the plaintiff was solely responsible for the acts that led to the contamination); *Appleton*

*Papers, Inc. v. George A. Whiting Paper Co.*, 776 F. Supp. 2d 857, 866 (E.D. Wis. 2011)

(holding that, under principles of equity, the plaintiff was not liable for contribution costs for one

of the cleanup units at issue when it did not contribute pollutants to that unit), *aff'd in part,* 768

F.3d 682, 710-11 (7th Cir. 2014).

> **a.      At the Baton Rouge Site, the United States should not bear any of the costs for the Old Silt Pond or the Rice Paddy Landfarm.**

At the Baton Rouge Site, the **Old Silt Pond** and the **Rice Paddy Landfarm** are

geographically distinct from other cleanup units at the Site.  SOF ¶ 2.  Exxon has identified

discrete sums of past costs spent to clean up these two units: $9,977,687 at the Old Silt Pond,

$4,622,578 at the Rice Paddy Landfarm, and $3,302,781 at both the Old Silt Pond and the Rice

Paddy Landfarm.  *Id.* ¶ 111.  Exxon cannot prove that any of the costs for these two units are

attributable to the United States.

> **i.      The United States did not contribute contaminants to the Old Silt Pond and Rice Paddy Landfarm during World War II and could not have contributed more than a de minimis amount in later years.**

No contamination of the Old Silt Pond can be attributed to the United States' World War

II involvement at the Baton Rouge Site.  SOF ¶¶ 113-119.  Exxon's own proffered expert

historian, A.J. Gravel, and Exxon's documents state that Exxon first began using the Old Silt Pond in October 1945 when Exxon began operating a new Silt Treating Unit located north of the Old Silt Pond.  *Id.* ¶ 3.  Consistent with this evidence, the United States' aerial photography expert, Mary Sitton, testified that she did not see evidence of waste disposal in the Old Silt Pond in three photographs taken prior to and during the World War II years (September 1, 1939, through August 14, 1945).  SOF ¶ 114.

The only shred of evidence Exxon could identify to establish that the Old Silt Pond was used for waste disposal prior to the end of World War II is its aerial photography expert's testimony about an August 10, 1945 photograph, which was taken just four days before the end of World War II.  SOF ¶ 115.  Exxon's expert, Wayne Grip, testified that he saw an area in the western portion of the Old Silt Pond that "could be fill" or "could be something else."  SOF ¶ 115.  He also testified that he saw some kind of material in the northeast corner of the Old Silt Pond, but he could not identify the material, its source, or the purpose of the area at the time of the photograph.  *Id.* ¶ 116-117.  Surely, such inconclusive testimony about a single photograph cannot establish a material dispute of fact regarding the use of the Old Silt Pond during World War II.  *See Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) ("A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . .'") (internal quotations and citations omitted); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994) (concluding that even if a plaintiff had presented a "scintilla of evidence," "a mere scintilla is not enough to defeat a motion for summary judgment").

With respect to the Rice Paddy Landfarm, Ms. Sitton testified that she saw no evidence of waste disposal in photographs taken during World War II.  SOF ¶ 127.  Mr. Grip admitted that

he could not tell whether inundated areas within the Rice Paddy Landfarm contained oil, and that the earliest date on which he could see light-toned materials entering the Rice Paddy Landfarm was September 1947, well after the end of World War II.  SOF ¶¶ 129, 131, 132.  Thus, Exxon cannot establish a genuine issue of material fact with respect to waste disposal related to United States' involvement in the Rice Paddy Landfarm during World War II.

After World War II and during the Korean War, only four of the six Baton Rouge plancors remained in operation.[23]  SOF ¶¶ 140-145.  The Butyl Rubber Plant (Plancor 572) and Avgas Blending Component (Plancor 1065) were sold to Standard in 1955 and 1950, respectively.  *Id.* ¶¶ 141, 144.  They discharged waste into the Monte Sano Bayou, far north of the Old Silt Pond and the Rice Paddy Landfarm, and thus could not have contributed waste to the Old Silt Pond and Rice Paddy Landfarm.  *Id.* ¶ 146.  The other two plancors—the Butadiene Plancor (Plancor 152) and the Butadiene Conversion Plancor (Plancor 1355)—operated until August 6, 1947, and January 1, 1949, respectively.  *Id.* ¶ 140, 143.  Although they used the refinery's waste processing system, there is no evidence of the volume of wastes sent from those plancors to the refinery.  *Id.* ¶ 149.  Thus, although the Butadiene Plancor and the Butadiene Conversion Plancor *may* have contributed some small amount of waste to the Old Silt Pond and Rice Paddy Landfarm during the short time they were in operation after World War II (approximately 2 years and 5 years, respectively), their contribution to the contamination is surely *de minimis* compared to the refinery's contribution over the several decades it used those areas for waste disposal.

---

[23] A fifth ceased operation on September 30, 1945, just fifteen days after the end of World War II. SOF ¶ 145.

49

ii.     **Exxon's costs for the Old Silt Pond and Rice Paddy Landfarm were spent to address 1970s and 80s-era contamination.**

Not only is there no evidence that the United States contributed any significant amount of waste to the Old Silt Pond or the Rice Paddy Landfarm during the war years, the money Exxon spent to clean up the Old Silt Pond and the Rice Paddy Landfarm was actually spent addressing impoundments Exxon built in the 1970s on top of the former waste disposal areas.  Exxon used the original Old Silt Pond for disposal of oily silt until it reached its design capacity in the late-1950s.  SOF ¶ 4.  Then, in the mid-1970s, Exxon built a new impoundment on a five-acre area on the western side of the original Old Silt Pond.  *Id.* ¶ 120.  Exxon conservatively estimated that it disposed of 31,000 tons of sludge annually in the "new" Old Silt Pond through the late 1980s.  *Id.* ¶ 121.  Exxon's costs for the Old Silt Pond were incurred under a state-approved closure plan that required stabilization of the waste added to the five-acre area in the 1970s and 80s and the installation of a cap over the unit.  *Id.* ¶¶ 123-125.

Similarly, Exxon built a fifteen-acre impoundment on top of the Rice Paddy Landfarm in 1976, and disposed of waste in the unit until November 1988.  *Id.* ¶ 134.  Exxon's state-approved closure plan required bioremediation and ultimately capping the fifteen-acre impoundment.  *Id.* ¶¶ 135-138.  The cap was required because Exxon could not obtain the required oil content through bioremediation and because Exxon discovered hazardous substances below the treatment area.  *Id.* ¶ 136.  To the extent the United States may have contributed to the hazardous substances below the treatment area during the post-World War II operation of the Butadiene Plancors, that amount would have been *de minimis*, as explained above.  Accordingly, Exxon's costs to address the Rice Paddy Landfarm primarily were incurred to address wastes added to the fifteen-acre impoundment in the 1970s and 80s.

50

In summary, because the past costs associated with the cleanup of the Old Silt Pond and the Rice Paddy Landfarm cannot be attributed to the United States' involvement at the Site during World War II, the United States could have contributed only *de minimis* contamination during a few years after World War II, and Exxon's costs for those units primarily were spent to address 1970s-era contamination, none of the past costs should be borne by the United States. Exxon alone should bear the $9,977,000 for the Old Silt Pond, the $4,623,000 for the Rice Paddy Landfarm, and the $3,302,781 for both.

> **b.   At the Baytown Site, Exxon should be allocated all of the costs for the Tank Farm 3000 Area.**

Like the Old Silt Pond and the Rice Paddy Landfarm at the Baton Rouge Site, the **Tank Farm 3000 Area**[24] is geographically distinct from the other cleanup units at the Baytown Site. SOF ¶¶ 150, 151, 160.  Exxon claims it has incurred a discrete sum of $5,481,340 in cleanup costs at the Tank Farm 3000 Area.  *Id.* ¶ 169.

This Court has a reasonable basis for allocating all of the costs for the Tank Farm 3000 Area to Exxon.  The costs related to the Tank Farm 3000 Area were spent to address two groundwater plumes discovered in that area in the early 1990s.  *Id.* ¶ 160.   At that time, Exxon conducted studies to determine the nature, extent, and source of the contamination.  *Id.* ¶ 161.  At the conclusion of their study, Exxon's own engineers reported to the Texas Water Commission that, based on the chemical composition of the plumes, the contamination likely could be attributed to units built *after* the Baytown Ordnance Works ceased operation in 1945, or that Exxon continued to use for decades after 1945.  *Id.* ¶ 165.  In particular, Exxon's engineers reported that the contamination was likely due to a Linear Paraffins Unit that operated from

---

[24] The area is also often called the Baytown Ordnance Works or BOW area.

approximately 1964 to 2009, a Paraxylene Extraction Unit that operated from 1952 to the early

1980s, and a Naphtha Rerun Unit that was part of the original Baytown Ordnance Works and is

still in use today.  *Id.* ¶ 152-157, 165.  When the plumes were discovered, they were located

directly under the Paraxylene Extraction Unit and the Linear Paraffins Unit, and monitoring

wells indicated the presence of contamination under those Units but not under the Naphtha Rerun

Unit.  *Id.* ¶¶ 5, 163.  Indeed, notwithstanding the fact that the Naphtha Rerun Unit was in use

during the war years, Exxon can point to no evidence that the Unit contributed to the plume

during that time as opposed to during the many decades afterwards when Exxon operated the

Unit exclusively.  *Id.* ¶¶ 157, 163-164, 168.  No contamination has been found in the monitoring

wells near the Naphtha Rerun Unit in subsequent years.  *Id.* ¶ 163.

Exxon's expert, Mr. Gravel, points to a 1998 letter in which Exxon states to the Texas

Natural Resource Conservation Commission that "the main source of the . . .  plume is believed

to be historic."  *Id.* ¶ 166.  But this statement, when read in context, means nothing more than

that recent leaks from a tank and three pipelines in use at the time were not believed to be

significant contributors to the plume.  *Id.* ¶ 6.  The 1998 letter in no way suggests that the

contamination originated during the World War II operation of the Baytown Ordnance Works.

Thus, Exxon cannot establish a genuine issue of material fact with respect to the Baytown

Ordnance Works' contribution to the Tank Farm 3000 Area plumes.  Accordingly, none of the

costs associated with the Tank Farm 3000 Area should be attributed to the United States.

In summary, Exxon cannot prove that the past costs incurred to address the Old Silt Pond

and the Rice Paddy Landfarm at the Baton Rouge Site or the Tank Farm 3000 Area at the

Baytown Site were caused by contamination that occurred during the time of United States'

involvement during World War II and the Korean War.  At most, Exxon can point to evidence of

52

only a *de minimis* contribution of waste at those units.   Accordingly, the United States should not be allocated any portion of the past costs; instead, Exxon should bear responsibility for those units alone.

**B.     The Court should equitably allocate no more than 2% of any remaining costs at Baytown and 1% of any remaining costs at Baton Rouge to the United States.**

The starting point for any discussion of allocation in this case, of course, is the Court's Phase I Decision, which was explicitly intended to bear on the issue.  The decision holds that each Site is a single facility, but proceeds to evaluate "owner" and "operator" status at various "sub-facilities," noting that the latter determination would be useful when it came time to apportion costs.  Phase I Decision at 519; *see Litgo*, 2011 WL 65933 at *3 ("There is a close overlap between the factors that are relevant to an equitable allocation of costs and the facts that were presented at trial to establish liability").  The Court's observation matters, because the vast majority of Exxon's past costs are confined to the refinery properties, where the Court has opined that the United States – were it not for the existence of the Government owned and operated plants outside the refinery boundary – would not be liable.  Keeping the Court's existing guidance regarding owner and operator status in mind, the United States respectfully submits that any equitable allocation should account for the following:

- Both the United States and Exxon are liable under CERCLA as current or former owners and operators of chemical plants at both Baytown and Baton Rouge (*see* Phase I Decision at 491, 516, 530);

- The United States, however, *did not* own or operate either refinery; only Exxon did. (*see id.*);

- The United States should not be asked to contribute to costs associated with wastes generated entirely after the Government's involvement;

- The Court should assign only a portion of costs related to wastes consistently generated over the long-term to the period of Federal involvement, and should decline

to apply "waste reduction" or other adjustments not shown to be based on credible evidence and reasonable inferences; and

- The Court should account for the fact that aviation gasoline made up a small portion of each refinery's wartime production, and the United States should not be asked to contribute to the remediation of wastes associated with commercial production.

The facts relevant to allocation are not subject to genuine dispute, and the parties agree that equity is best served by examining the relationships between the parties' activities and the environmental costs Exxon has incurred at both Sites.[25]  Accordingly, they further agree that three questions therefore effectively control the allocation:

- First, Baytown and Baton Rouge have been operating continuously since the early 20th century (Phase I Decision at 497).  Therefore, any allocation requires assigning a share of waste created over nearly a century of operations, together with associated costs, to the years of "government involvement" – primarily periods for World War II and the Korean War.[26]

- Second, both refineries make a wide slate of products from crude oil feedstocks, and did so during wartime.  Thus, the Court must also decide what portion of the costs associated with wartime periods is fairly attributed to products for which the Government is at least partially responsible.[27]

- Finally, the Court will need to equitably divide the portion of the wartime costs it determines to be subject to allocation, based on the parties' degree of involvement with the wartime activities that generated those costs.[28]

---

[25]  Ex. 24, Matthew Low Expert Report 6-7 (Aug. 2012) ("Low 2012 Report"); Ex. 26, White Report at 15 ("As a general matter, waste give rise to costs; parties are related to wastes.").

[26]  Ex. 24, Low 2012 Report at 8; Ex. 26, Richard White Supplemental Report 11 (Jan. 2017) ("White Suppl.") ("[T]hree steps that anyone must examine include . . . Assigning Costs too Years.").

[27]  Ex. 24, Low 2012 Report at 25 (addressing the quantum of "war products" as part of his "Degree of Involvement" considerations); Ex. 25, White Suppl. at 11 ("The second step is to determine which costs within a year are subject to allocation").

[28]  To avoid confusion, the United States adopted the rubric found in Mr. White's supplemental report, naming the steps:  Step 1: Assigning Costs to Years; Step 2: Determining Costs Subject to Allocation; and Step 3: Degree of Involvement or Equitable Allocation.  *See* Ex. 25, White Suppl. at 11.

Before delving into the allocation process, however, there is one further threshold consideration.  As already discussed, Exxon conducted multiple response actions at multiple units at both sites.  Mr. Low, the government's allocation expert, evaluated Exxon's claimed costs for each unit independently, examining the years of federal involvement, the products that produced the wastes at each unit, and other unit-specific factors as required.  Exxon, by contrast, asks the Court to look at refinery wastes as a whole – declining to examine differences between individual cost groups and waste units despite factual distinctions that would logically bear on the equities.  Ex. 26, Richard White Expert Report 56-59 (June 2012) ("White Report").

Ignoring these differences can work serious inequity.  The application of this technique to Old Silt Pond and Rice Paddy Landfill, discussed in Part IV.A.2.a and in Mr. Low's Supplemental Report, is a dramatic example, but not the only one.  Ex. 22, Matthew Low Supplemental Report at 37-39 (Jan. 2017) ("Low Suppl.").  Exxon also applies the plant-wide approach to the Baytown's South Landfarm, imposing global waste reduction factors on a post-war unit without accounting for the fact that the United States is connected to the unit only because Exxon deposited separator sludge there during the 1980s that amounts to approximately 2% of total unit waste.  Ex. 24, Low 2012 Report at 18.[29]  The site-wide approach overlooks too much, and tends to ignore facts that suggest the dominant role of post-war waste disposal at specific units.  Mr. Low's approach avoids problems of the sort described: If a unit operates for a shorter period of time, the government's share may be proportionally larger than for one that, for

---

[29]  Because Exxon transported the sludge from Separators 3M and 10 to the South Landfarm as part of Exxon's closure of the separators without otherwise addressing the contamination, there is fair argument that the United States should not be assigned a share.  *See Hatco Corp. v. W.R. Grace & Co.*, 836 F. Supp. 1049, 1065-67, 1070 (D.N.J. 1993) (assigning dominant PCB shares to Grace, but assigning to Hatco 100% of the PCB costs associated with a tank Hatco chose to move).  At the very least, equity requires recognition of the Government's limited involvement with a unit constructed after the War.

example, is still in operation today.  If there are specific circumstances that suggest a reduced Federal share, they can be addressed without developing a collateral process for exceptions (or unjustifiably ignoring them).  Ex. 22, Low Suppl. at 20-24 & Attach. 2-3 (detailing reasons for, and extent of, unit-by-unit adjustments).  The United States is not, however, arguing that the Court should assign a separate share to each cost group.  Instead, Mr. Low has compiled a weighted average figure that restores administrative simplicity once he has examined the details that insure a proper regard for the equities.

### 1.    Step 1: Assigning response costs to years.

The first step in the allocation process is assigning costs to years – the designation of some portion of Exxon's overall response costs to the period of Federal involvement at each Site. Again, the basic facts are not in dispute.  Obviously, operations during World War II and Korea generated wastes.  The United States agrees that Exxon's predecessors made a largely successful effort over a period of a decade or more following World War II to reduce oil losses and improve effluent quality.  SOF ¶ 170.  The parties disagree about the magnitude and impact of post-war waste processing improvements.  This dispute, however, is about the interpretation of undisputed facts: i.e., about whether the period of Federal involvement contributed a greater proportion to the wastes Exxon has cleaned up, and, if so, whether the available data permits the Court to make a reasonable estimate about any differential more than 75 years later.

Exxon's allocation expert has proposed a production-based allocation, adjusted by a series of site-wide "waste reduction" multipliers said to reflect Exxon's post-war waste reduction efforts.  Ex. 26, White Report at 48-54.  In theory, there is nothing wrong with Mr. White's approach, given reliable and appropriate data.  But reliable data is not available, and Exxon's proposed allocation is undermined by calculations that do not comport with sound engineering or

mathematics.[30]  The magnitude of Exxon's proposed adjustments is breathtaking, reducing waste

per barrel of crude run to 3% of the World War II figure at Baytown after 1959, and to less than

1% at Baton Rouge after 1972 – all but eliminating refinery waste loads in the post-war years

despite large increases in production.  Yet Exxon effectively declined to consider several

alternative surrogates it might have chosen, all of which suggest that Mr. White's calculations

greatly overestimate the benefit of the post-war waste reduction programs.[31]

        In contrast to Exxon's approach, Mr. Low examined the available options, and selected a

time of use method: i.e., he divided the waste generated at each facility by the total years of

operation, holding waste generation constant over time.  He did so largely because he found no

reliable data from which to make waste reduction estimates.  Ex. 24, Low 2012 Report at 12-

---

[30]  Ex. 23, Matthew Low Rebuttal Report 6-14 (Nov. 2012); Ex. 20, Dr. James Kittrell Rebuttal
Report (Nov. 2012); Ex. 22, Low Suppl. at 20-39; Ex. 19, Dr. James Kittrell Supplemental
Report, *seriatim* (Jan. 30, 2017).  Mr. White exacerbates the basic problem by applying separate
"delay" multipliers that operate to further reduce the post-war production that "counts" in his
allocation, arguing, for example, that the Government denied Baton Rouge an allocation for steel
required for the construction of a master separator during World War II.  *Compare* Ex. 26, White
Report at 64-66 *with* Ex. 23, Matthew Low Rebuttal Report 17-20 (Nov. 2012); *see generally*
Phase I Decision at 502-03.

[31]  There are at least three alternative surrogates available at Baytown, for example.  First, there
is a post-war report that contains data suggesting a 32% reduction in the number of tank and pipe
leaks, Ex. 67, Loss Committee Report at MIS-00031654 (Table 6; "Total Leaks:" 1011/1480 =
.68, a 32% reduction overall).  Second, a Humble Way newsletter recording post-war success in
reducing total refinery oil losses records an overall reduction of approximately 43% after
corrections to exclude recovery of evaporative losses.  Ex. 66, The Humble Way; Stop that Leak,
BAYC-00013898 at 13900 (nearly illegible); Ex. 22, Low Suppl. at 27 (capturing figures, and
making corrections for evaporation in the Humble Way document); *see* Ex. 41 *Gregory Kipp.
Dep.* Vol II at 610-43 (discussing report and confirming calculations).  Finally, Mr. Low also
separately examined "oil and grease figures" from the main Baytown outfall over time in his
initial report, and found a reduction between 1947 and 1964 amounting to about 49%.  Ex. 24
Low 2012 Report at 14 n.18.  None of these figures is definitive.  But, collectively, they raise
very serious questions about Exxon's proposal to reduce waste to 3% of the World War II figure.

13.[32]  Mr. White criticizes that choice, arguing that a time of use method unreasonably holds production constant when reliable evidence establishes that substantial increases occurred over time.

There are two answers to Mr. White's criticisms.  First, Mr. White's method is useful only if he can demonstrate that his waste reduction multipliers reasonably predict changes that impact Exxon's costs, and that they are reliable refinery-wide – a case Exxon cannot make.  *See* Note 30, *supra*.  Second, his critique is much too aggressive.  In this case, time of use holds production constant, for example, despite the fact that throughput eventually rises by over 300% at Baytown relative to World War II figures.  Because that is the case, the result produced is much like Mr. White's calculation in the presence of more reasonable multipliers, and consistently reflects the sort of reduction that would be produced by the alternative surrogates already mentioned.  *See* Note 31 *supra*.  Apart from the stated difference of opinion over the magnitude of Mr. White's post-war waste reduction assumptions, therefore, there is no room for the Company to argue that it has been unfairly treated.

## 2.    Step 2: Costs subject to allocation during the "Federal" period.

Having assigned a portion of Exxon's costs to the years when the Government was actively involved with the refinery, the Court must next decide what portion of the costs assigned to the "Federal period" in Step 1 should be included in the cost pool to be allocated between the

---

[32]  An example from the preceding footnote illustrates the problem.  "Leaks per month" data provides no information about size, time, or quantity of oil released.  *See* Low Suppl. at 26-28.  The use of effluent figures is also problematic, because some units at the refineries function as repositories for contaminants extracted from effluent as systems improved.  Associated costs in those units will tend to be *inversely* related to improvements in water quality (*i.e.,* cleaner effluent produces *more* sludge).  Ex. 22, Low Suppl. at 35 n.72; *see generally* Ex. 17, Dr. James Kittrell Supplemental Report 3-6 (Jan. 30, 2017) (regarding criteria for adopting surrogates in general).

parties.  This step applies primarily during World War II, and is required because both refineries made a large range of products during the war, the majority of which were for ordinary commercial consumption.  There are three additional questions:  1) the scope and impact of the Government's contractual obligation to indemnify Exxon for costs produced "by reason of" the production of aviation gasoline; 2) whether the Court will choose to allocate a share to the United States for "war products" other than aviation gasoline; and 3) how to account for the waste load that the Government-owned plants imposed on refinery systems.

### a.      Contractual indemnity.

Aviation gasoline is, of course, the heart of Exxon's case.  In early 1942, Exxon's predecessors and the United States entered into aviation gasoline contracts providing that:

> Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or *charges*, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state or federal law in the United States or any foreign country to collect or pay *by reason of* the production, manufacture, sale or delivery of the commodities delivered hereunder . . . (emphasis added).

SOF ¶ 171.  In *Shell Oil Co. v. United States*, the Federal Circuit construed this "taxes clause" to require the United States to indemnify the contractor for additional "charges," including the cost of subsequent environmental remediation.  751 F.3d 1282 (Fed. Cir. 2014). The Government is thus contractually obliged to pay for 100% of environmental costs generated "by reason of" the production of aviation gasoline produced at the Refineries under the contract.  *Compare* U.S. Phase I Statement of Undisputed Facts ¶¶ 77-78 (Sep. 30, 2013), Dkt. 103-2 in No. 4:10-cv-2386, *with Shell Oil Co.*, 751 F.3d at 1290 (quoting avgas contract).

This Court, of course, does not have jurisdiction to determine federal contractual liability to Exxon.  Contractual obligations are, however, relevant to the allocation process.  *Halliburton Energy Servs.. Inc. v. NL Indus.*, 648 F. Supp. 2d 840, 863 (S.D. Tex. 2009); *see* Exxon Mot. for

Partial Summ. J. & Supporting Mem. 54-56 (Sept. 30, 2013), Dkt. 102 in No. 4:10-cv-2386,

("The Courts in wartime cases have recognized that contractual obligations also should be

viewed as an equitable factor to be taken into account in allocation cases.").  The United States'

liability for wastes generated "by reason of" avgas production should thus be taken into account

in the final allocation.  To do so, the Court must decide what portion of the wastes at the two

refineries was generated "by reason of" the production of aviation gasoline under the wartime

contracts.

The answer is straightforward.  There is no dispute that Exxon made a full slate of refined

products before, during, and after the period of federal involvement, and that only a limited

amount of a barrel of crude oil can be used to produce aviation gasoline.  SOF ¶ 173.  Surviving

records establish that aviation gasoline made up about 14% of wartime production at Baytown

and about 19% at Baton Rouge.[33]  Because, however, the records also establish that

approximately 50% of wartime aviation gasoline was made up of blending materials imported

from other refineries and physically mixed with local stocks, and because the imports would

generally have produced little or no waste at the Exxon properties, the waste generated "by

reason of the production" of commodities subject to the contractual indemnity is that associated

with half of the production figure.[34]  Accordingly, the Court should account for the contract by

adding to the pool of costs to be allocated 7% of period costs to allow for the contract at

---

[33] Ex. 24, Low 2012 Report at 26, 37 (deriving composite figures); Ex. 8, Jay Brigham Rebuttal Report App'x 3.1-3.2 (Nov. 16, 2012) (recording Petroleum Administration for War Production figures from September, 1942, to June, 1945).

[34] Ex. 21, Dr. James Kittrell Expert Report 5, 29-38 (Aug. 10, 2012); Ex. 19, Dr. James Kittrell Supplemental Report, *seriatim* (Apr. 12, 2013); Ex. 18, Dr. James Kittrell Supplemental Report 11-21 (Sept. 22, 2016).

Baytown and 9.5% at Baton Rouge.  The court should then allocate 100% of those costs to the United States in Step 3.

Exxon seeks to inflate this figure by construing a standard price-escalation clause in the contracts to require that all crude run during the war be included in both the allocation pool and the indemnity.  Ex. 25, White Suppl. at 35-39.  The term provides, simply enough, that "[t]he prices hereinabove set forth are based upon . . . a normal operation of said refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. . ." and that, should "normal operations" be disrupted, the seller could either reduce the amounts of aviation gasoline delivered, or raise the price for aviation gasoline.  SOF ¶ 172.  This is simply a recognition of something both sides understood – that the refineries made, and would continue to make, a wide array of products – and that Exxon would continue to sell those products for its own account in the normal manner.  If wartime conditions disrupted that expectation, thereby also disrupting refinery economics, the United States would have to pay a higher price for the continued high-rate production of its airplane fuel.

But the parties were not, as Exxon would have it, assuming that refinery operations were *already* disrupted by the onset of the 100 octane program.  Rather, they were making provision for something that might or might not occur, and that ultimately did not.  There is no basis for Exxon's counter-intuitive inference that a provision establishing an indemnity for costs incurred "by reason of" the production of aviation gasoline alone should now be construed to require the United States to indemnify Exxon for waste generated "by reason of" *the entire output of the refinery* – made up primarily of products that were not "commodities delivered" pursuant to the aviation gasoline contract, as required to trigger the indemnity in the taxes clause.

**b.      Any assignment of costs associated with "other war products" should be limited.**

The second question required to resolve Step 2 asks whether the Court should assign additional costs to the allocation pool to account for production of what the parties have come to refer to as "other war products."  These are simply commodities other than aviation gasoline that the United States purchased during World War II including, for example, Navy fuel oil and diesel for ships, military lubricants, and asphalt.  CERCLA liability, of course, does not extend to the purchase of commodities in ordinary commercial transactions, even in wartime.  *See* U.S. Phase I SJ Mot. at 12-13.  Given that the Court determined that the Government's involvement was insufficient to establish operator liability at the refineries even with regard to aviation gasoline, including costs associated with wastes from these products in the allocation simply because the Government purchased motor gasoline and naval fuel is unwarranted.

The Court has, however, determined that the Government bears liability for the refinery as part of the overall CERCLA facility, and there is no conceptual distinction in that regard between aviation gasoline and other products purchased during the war.  If, on that basis, the Court wishes to include waste generated by the production of other war products in the allocation, it will be necessary to make a rough estimate of their magnitude, because existing records are incomplete and inconsistent. SOF ¶ 174.  The most reasonable way to do that is to start with the figure for critical war products, which are generally about 30%-35% of production, and then subtract the Avgas component.  The court might then wish to add back sales of non-aviation gasoline to the United States.  These sales were of a specially formulated all-purpose 80 octane gasoline to the Army.  The historical record is incomplete, but the available documentation allows for a reasonable estimate.  Ex. 1, Declaration of Dr. Jay Brigham ¶¶ 6-7.

The figures suggest that military gasoline averaged no more than 5% production at Baytown, and about 3% at Baton Rouge.

**c.      Estimating "Government plant" waste load impacts.**

There is one further category of impacts on refinery-related costs for which the United States bears a portion of the responsibility, based on interactions between Government plants (the Plancors at each Site and the Baytown Ordnance Works) and each refinery.  The parties agree that the operation of the Plancors and the BOW imposed limited waste loads on refinery systems and that the associated costs should be included in the allocation pool.  The impact is based upon two factors: First, small portions of the refinery crude runs provided inputs for several Plancors (at both refineries) and the BOW (at Baytown), generating an associated waste load.  Second, several of the separate, government-owned plants operating during and after World War II produced modest waste streams that were returned to the refineries and processed in refinery separators.  With the exception of one documented waste stream amounting to 680-750 gallons per minute fed back to Baytown refinery systems from the Butadiene Plant (Plancor 485) beginning in early 1944, all of the figures on both the production and waste sides of any allowance made for these factors are estimates – there are no further details in the record.  Nevertheless, it seems clear that these are modest, even when assessed collectively. Following an item-by-item review, Mr. Low has updated his calculations, establishing a composite figure of 5.89% to account for both factors at Baytown, which he then "rounded up" to 7% to account for possible disputes or imperfect estimates.  Ex. 22, Low Suppl. at 4-14 & Attach. 4.

Estimating similar impacts at Baton Rouge is even more difficult, with no reliable evidence of waste loads, sporadic operation of the four Plancors that actually used refinery wastewater systems, and the termination of all but one liquid waste stream processed by refinery

63

waste systems by the end of 1948.  Mr. Low nevertheless produced an estimate, added an allowance to take small amounts of crude used to supply raw materials to Government plants, and rounded up the resulting 1.25% figure to 2%.  *Id.* at 12-14.

### 3.    Step 3:  Equitable allocation (parties and equitable shares).

The final step in the allocation process is the establishment of equitable shares for each party.  Having now decided in Step 1 what portion of Exxon's costs are attributable to the years inclusive of World War II and Korea, and having further made a judgment about what World War II products should remain in the allocation pool, the final step is to assign "equitable shares" to the parties.  With the pool of costs to be allocated established, the Court would logically return to its Phase I findings to aid with this step, examining the parties' respective roles at each portion of the Site, and allocating accordingly. Keeping the Government's ownership and operation (with Exxon) of the "Government plants" in mind, along with Exxon's ownership and exclusive operation of the refineries, there are several ways in which the Court might allocate consistent with the thrust of the guidance provided in the Phase I Decision.  Mr. Low has updated his original allocation to allow for the Court's view, and discussed three distinct approaches in his Supplemental report.

### a.    Allocating consistent with the Government's non-operator status.

Because the Court has already determined that the United States is not liable as an "operator" at either refinery, the straightforward way of allocating is to assign costs to the Government only for wastes generated by the Government-owned plants.  That would mean that, apart from the share required to be assigned to the United States by the aviation gasoline contracts, the Court would simply assign the United States a partial share of the Plancor-related waste streams.  This approach keeps faith most precisely with the implications of the Court's

Phase I Decision, requiring the United States to pay a suitable share for its status as owner and

co-operator of the Government owned plants, but excusing it from paying for wastes generated

by normal refining operations – consistent with the notion that Exxon ran its own refinery during

the war.  At Baytown, the net result derived from Mr. Low's allocation using this approach is a

Federal Share of 1.66%.  Similar calculations at Baton Rouge produce a figure of less than 1%.

*See* Ex. 4, Declaration of Matthew Low ¶ 11 & Ex. B ("Low Decl."). [35]

> **b.**      **The equities of "Government involvement."**

Alternatively, the Court might wish to work up a more "traditional" equitable allocation,

in which the Government is assigned a share based upon its perceived "degree of involvement"

with the refinery in a more general sense.  Because the Court has already determined that the

United States is not an "operator" of either refinery, and because the waste loads from the

Government-owned plants are likely to have been quite small, this requires a departure from the

Court's adoption of a "status" based approach in the Phase I Decision.  Nevertheless, the

wartime circumstances were unusual, and simply imposing the costs from the Plancor waste

loads may seem inadequate.  Presumably, such an allocation would account for the

Government's limited role at the refineries themselves and for the fact that Exxon both owned

---

[35] Mr. Low has prepared a simplified working model of his allocation for the Court's
consideration and use, consistent with his unit-by-unit approach and a time of use assignment of
costs to years in Step 1.  The United States has provided the Court with the Excel worksheet so
that it may consider alternative multipliers should it wish to do so.  At the top of the first
worksheet is a set of switches that can be altered to reflect different assumptions about various
aspects of the allocation, producing results that can then be examined on the remainder of the
page, both unit by unit and overall.  Exhibit B to Mr. Low's declaration is a "snapshot" for each
refinery consistent with case described in the text.  Ex. 4, Low Decl. Ex. B. In this instance, cells
B5 and B6 account for the aviation gasoline indemnity.  Cells D5 and D6 are set to zero, because
"other war products" are not part of this scenario.  And cells F5 and F6 allow for the waste load
imposed on refinery systems by the Government plants, allocated in accordance with Mr. Low's
proposed owner/operator equitable share for the United States.

and operated the refineries for profit even during wartime; factors that surely warrant a modest share.

The simplified allocation calculator supplied with Mr. Low's declaration demonstrates how such an allocation could be performed. Mr. Low has prepared two cases to illustrate. The first is based on the Government's position regarding equitable allocation and includes: setting the aviation gasoline indemnity to apply to the wastes actually associated with local production of aviation gasoline (e.g., 7% at Baytown); adding a share for "other war products" estimated to make up an additional 25% of production (total war products; 14% (total avgas production) + 25% = 39%); assigning a Federal share of 20% (a conservatively high figure reflecting *both* a reduced share based on lack of involvement sufficient to support operator status *and* the fact that any Federal imposition on refinery operations regarding "other war products" was less than that relating to aviation gasoline); and including figures for the Plancor contribution. The results are: 1.99% at Baytown and approximately .6% at Baton Rouge. Ex. 4, Low Decl. ¶¶ 13-15 & Ex. D.

The second example sets a case that favors Exxon to a much larger (and decidedly unreasonable) degree, and is offered as a test case. The assumptions are: (1) that the Court will not account for the imported aviation gasoline blend products discussed in Argument point VI.B.2.a (so that the Federal aviation gasoline share rises 14% at Baytown and 19% at Baton Rouge); (2) that fully 60% of refinery output is for war products (a substantially unrealistic assumption that produces a figure of 46% net of aviation gasoline at Baytown); (3) that the Federal equitable share of "other war products" rises to 40% (60% - 14% avgas = 46%; an arbitrary assumption, but one that seems very high absent operator status on these facts); that the Plancor Waste stream rises from 7% to 15% (doubling the result of Mr. Low's calculations); and (4) that, contrary to Mr. Low's opinion, the Court allocates a 50% share of the 1% of crude run

for aviation gasoline during the Korean War to the United States.  Similar assumptions are set for

Baton Rouge, as reported in Mr. Low's Declaration. Ex. 4, Low Decl.  ¶¶ 15 & Ex. E.

The results produced are 4.55% for Baytown and 1.31% for Baton Rouge.  This example

is meant to demonstrate the "sensitivity" of the model to these changes, and to call attention to

the outsized importance to Exxon of the Company's problematic positions at steps 1 and 2 of the

allocation exercise.  Without unreasonably large waste reduction multipliers and the nettlesome

attempt to assign the United States responsibility for 100% of the World War II product slate, the

Government's share simply cannot be driven to the sorts of high numbers Exxon seeks without

completely ignoring the underlying facts.[36]

### c.    Allocating based upon increased crude runs "forced" by Government intervention during World War II.

A final option approaches the question of government responsibility from a different

angle, seeking a metric that measures the impact of the Government's interaction with the

refinery during World War II, while still accounting for the idea that the refiners managed their

own operations.  This alternative acknowledges Mr. White's reliance on crude throughput as a

surrogate for waste generation by requiring the United States to pay for 100% of the incremental

increase in crude oil the refineries had to run during World War II to produce the full combined

slate of domestic and war products.  If one takes Mr. White's view that refinery waste increases

proportionately with crude oil distillation, and that crude runs are therefore a fair surrogate for all

costs at issue in this case, then the waste load attributable to increased wartime production should

---

[36]  Note that the worksheets also allow for the reduction or elimination of the units discussed above in Argument Point III.A., for which the United States should not be assigned a share.  The figures for each refinery appear in Columns G and H, and – for the reasons explained in Mr. Low's declaration – changes may lead to inconsequential differences in the final weighted average share generated by the worksheet.  Ex. 4, Low Decl. ¶ 16.

be fairly represented by the net additional crude oil the refinery was "forced" to run to add the wartime product slate to baseline production.[37]

Dr. Kittrell has examined this question against both a 1941 base year and against the slight upward trend in production during the late 1930s.  Ex. 20, Dr. James Kittrell Rebuttal Report 21-23 (Nov. 16, 2012).  Taking the more conservative measure, rounding up slightly to 9% for both refineries, and allowing for the Plancor shares both before and after the war, produces a share of 1.79% for the Government at Baytown, and .50% at Baton Rouge.  Ex. 4, Low Decl. ¶ 12 & Ex. C. [38]

It thus becomes clear that multiple approaches based upon reasonable estimates about what actually occurred during the brief time with the United States was involved with the two Sites all lead to the conclusion that a fair allocation for Baytown should not exceed 2%, and a similar calculation for Baton Rouge produces a figure in the 1% range.

## V.    EXXON IS NOT ENTITLED TO A DECLARATORY JUDGMENT ALLOCATING UNKNOWN FUTURE COSTS.

In addition to claiming $77 million in past costs, Exxon seeks a declaratory judgment allocating future costs that Exxon will incur to address hazardous substances at the Baytown and Baton Rouge refineries and chemical plants, as well as any costs to be incurred at "other nearby

---

[37]  This model differs from the others in that it effectively collapses Steps 2 and 3, using "forced" increases in crude runs as the basis for all aspects of the allocation beyond the assignment of costs to the period of federal involvement (Step 1) – which continues to be based on time of use, and still imposes a substantial reduction in waste load relative to production increases after the war.  The crude based adjustment discussed in the text applies only to the World War II timeframe, but the "government plants" waste stream continues to be accounted for thereafter.

[38]  Again, this example combines Steps 2 and 3, so that the contractual indemnity effectively becomes part of the 9% Government share, already assigned 100% to the United States in this scenario.  However, because a 9% increase in crude at Baton Rouge would be slightly less than the 9.5% figure for the crude run for aviation gasoline, Mr. Low held a 9.5%, in keeping with the contractual indemnity.

areas or surface waters."  *See* Baton Rouge Compl. ¶¶ 1–2, Dkt. 1 in No. 4:10-cv-02386;

Baytown Compl. ¶¶ 1–2, Dkt. 1 in 4:11-cv-01814.  In Phase I of this litigation, the United States

argued that the Court should enter a declaratory judgment as to *liability only* for unknown and

entirely speculative future costs—costs that may or may not be spent to remedy contamination of

the waterbodies and underlying sediments near the Baytown and Baton Rouge Sites.  The United

States argued that the Court should instead defer any equitable allocation of those costs until they

are actually incurred and sufficient facts are established to determine what allocation is equitable.

*See* U.S. Phase I SJ Mot. at 53; U.S. Opp. to Exxon Mot. for Summ. J. 38-42 (Dec. 20, 2013),

Dkt. 118 in No. 4:10-cv-02386; U.S. Reply in Support of Mot. for Partial Summ. J. 25-30 (Jan.

23, 2014), Dkt. 123 in No. 4:10-cv-02386.

 In the Phase I Decision, this Court stated that "[d]uring Phase II, the court may issue a

declaratory judgment equitably assigning the parties' shares of future costs *if the evidence is not

unduly speculative or otherwise subject to challenge*."  Phase I Decision at 536 (emphasis

added).  After two years of Phase II discovery, the evidence relevant to allocation of potential

future costs to address the waterbodies and sediments is no less speculative than it was during

Phase I.  Thus, the United States renews its argument that when the Court allocates costs

equitably between the United States and Exxon, the Court should do so for known past and

future costs only, and reject any request by Exxon to enter a declaratory judgment allocating

unknown and entirely speculative future costs.

 As the United States argued in Phase I, where the facts related to allocation are not

sufficiently developed to equitably allocate future costs, courts (1) refrain from allocating such

costs at all or (2) allocate future costs, but with the caveat that parties in subsequent actions can

challenge the equity of the allocation with new evidence not available in the initial action.  *See,*

*e.g., Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 449 (3d Cir. 2005) (holding that the judgment on remand should "contain some kind of provision authorizing the parties to re-litigate the allocation . . . for good cause shown in response to *new events* or *new evidence* that would reasonably bear on the equity of the allocation"); *United States v. Davis*, 261 F.3d 1, 45 n.41 (1st Cir. 2001) (quoting contingency provision imposed by district court); *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2014 WL 5308631 *5–6 (S.D. Ohio Oct. 16, 2014) (holding that in lawsuit to recover costs incurred under an Administrative Settlement Agreement and Order on Consent, plaintiffs were not entitled to recover future response costs outside the scope of the Agreement and the defendants' counterclaims for contribution for such costs were premature); *Basic Mgmt. Inc.*, 569 F. Supp. 2d at 1126 (holding that declaratory relief was not appropriate because the future costs were speculative); *F.P. Woll & Co. v. Fifth & Mitchell Street, Corp.*, No. 96-cv-5973, 2006 WL 2381778 at *8–9 (E.D. Pa. Aug. 16, 2006) (issuing a declaratory judgment on liability only, and stating that the court would determine allocation of future costs if incurred), *aff'd*, 326 Fed. Appx. 658, 661 (3d Cir. 2009).

In contrast, where sufficient facts have been established in the initial action to support an equitable allocation of future costs, courts have applied the allocation for past costs to future costs in the declaratory judgment.  *See, e.g., Boeing Co.*, 207 F.3d at 1191–92 (holding that sufficient facts had been developed to award declaratory judgment allocating future costs); *Northern States Power Co. v. City of Ashland*, 131 F. Supp. 3d 802, 820-21 (W.D. Wis. 2015) (granting a declaratory judgment on the question of allocation for costs incurred to address Phase II of the remedy, which was already planned but had not begun); *City of Wichita*, 306 F. Supp. 2d at 1117 (noting that the court spent almost 100 pages determining liability for groundwater remediation and allocating future groundwater remediation costs on the same basis as past costs).

In *Boeing*, for example, the Ninth Circuit concluded that a declaratory judgment allocating future costs in a CERCLA section 113(f) contribution claim was appropriate because "[t]he pollution has been carefully studied, the parties litigated a genuine controversy about millions of dollars they had already spent, and the facts bringing about their relative responsibility have already occurred."  207 F.3d at 1192.

Notably, in *Boeing* and *City of Wichita*, the parties had already litigated issues concerning liability and equitable allocation of past costs for specific cleanup units, and the declaratory judgment was limited to future costs for those units.  *See Boeing*, 207 F.3d at 1192; *Boeing v. Cascade Co.*, 920 F. Supp. 1121, 1141 (D. Or. 1996) (allocating future costs for a contaminated groundwater plume, and explaining, "[t]he parties agree that the two sides of the plume are completely divisible, and evidence presented at trial indicates that the relative responsibility for the contaminants in the plume can be determined through groundwater flow data, chemical analysis, and hydrogeologic study."); *City of Wichita*, 306 F. Supp. 2d at 1106–18 (allocating past and future costs for groundwater and soil contamination at site after an extensive discussion of allocation methods).  Likewise, in *Northern States*, the parties had taken numerous samples of the entire site, including the Phase 2 area for which work had not yet begun, and presented evidence regarding the source of the contamination.  *See, e.g., Northern States*, 131 F. Supp. 3d at 816, 821 (stating that scientists had taken 1,281 samples from 533 locations on the site, including the area at issue in Phase 2).  None of these cases allocated future costs for unknown remediation outside the boundaries of the sites at issue.

Here, Exxon's alleged future costs remain, after two years of Phase II discovery, entirely speculative.  Typically, an equitable allocation of costs for contamination in sediment underlying waterbodies requires extensive information such as the type of contaminants present in the

sediment at the surface and at various depths and locations, a determination of which contaminants pose the greatest risk such that they drive the selected remedy, and the source of the various contaminants.  SOF ¶ 7.  Yet Exxon "does not know the extent of contamination" of the water bodies and underlying sediments near the sites—namely, the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, the Mississippi River, and the Monte Sano Bayou— that it may have to address in the future.  SOF ¶ 8.  With the exception of some limited areas along the shoreline of Mitchell Bay and Black Duck Bay there is no State requirement that Exxon study and address the contamination in these waterbodies and underlying sediments.  SOF ¶ 9.

Indeed, in Phase I, Peter Gagnon, one of Exxon's compliance consultants at Baytown, testified that the only sediment sampling done by Exxon in any waterbody was done in response to the State's request that Exxon determine whether contaminated groundwater at the Baytown Site had migrated into the waterbodies.  SOF ¶ 10.  Mr. Gagnon admitted that Exxon had not conducted any generalized sampling of the underlying sediments.  *See id.*

In Phase II, Mr. Gagnon testified that Exxon had collected pore water samples, i.e., samples of groundwater that had entered the waterbodies, from the shorelines of Black Duck Bay, Mitchell Bay, and the Houston Ship Channel.  SOF ¶ 11.  Yet Mr. Gagnon testified that he was not aware of any remediation activity or corrective action taken as a result of the pore water samples.  *Id.* ¶ 12.  Mr. Gagnon also testified that he was not aware of any sampling of the Houston Ship Channel itself, or the sediments underlying the Channel.  *Id.*  ¶ 13.  Similarly, Leon Paredes, an employee of ExxonMobil Environmental Services, which provides soil and groundwater services to ExxonMobil, testified that Exxon conducted environmental investigation along the shorelines of Mitchell Bay and Black Duck Bay, but that no investigation of the

Houston Ship Channel or Scott's Bay has been required by the State or performed by Exxon. *Id.* ¶ 14. Stephen Johnson, Exxon's proffered National Contingency Plan expert, testified that there have been no appreciable steps taken to prevent the migration of contaminated groundwater towards the Houston Ship Channel. *Id.* ¶ 15. And with respect to Baton Rouge, Mr. Johnson was not aware of any documents showing that groundwater contamination had actually reached the Mississippi River. *Id.* ¶ 16. Nor did he believe Exxon would be seeking costs with respect to the Monte Sano Bayou. *Id.* ¶ 17.

Thus, in contrast to the facts in *Boeing*, *City of Wichita*, and *Northern States*, Exxon has not produced any evidence that contaminants, let alone contaminants related to the production of war products during the 1940s and 1950s, are present in the underlying sediments of the Houston Ship Channel, Scott's Bay, the Mississippi River, or the Monte Sano Bayou. Nor has Exxon produced any evidence that contaminants present along the shorelines of Mitchell Bay and Black Duck Bay extend into the Bays such that they will drive any future required response action.

Equally important, while the events bearing on the United States' responsibility for any contamination in those sediments have already occurred, the facts establishing the United States' *relative* responsibility have not been the subject of discovery in these combined lawsuits. Indeed, given the number of potentially liable parties, who themselves have discharged and currently discharge into the waterbodies, even Exxon's share relative to those of third parties cannot be meaningfully examined in absence of evidence. SOF ¶ 18. Thus, Exxon's future costs with respect to the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, the Mississippi River, and the Monte Sano Bayou are entirely abstract and hypothetical, and the Court has none of the facts to which courts typically look to determine allocation. *See Amoco Oil Co.*, 889 F.2d at 672–73.

Moreover, Exxon will not suffer any hardship if this Court withholds entry of a declaratory judgment allocating future costs at this time.  Exxon has not produced any evidence that it has been required to investigate the extent of contamination of the waterbodies and underlying sediment by EPA or a State agency, or that any kind of investigation is even contemplated.  In the event Exxon is required to remediate the waterbodies and underlying sediment in the future, Exxon may be able to sustain a claim against the United States at that time.  Because the United States' status as a liable party at the Sites will have already been litigated and decided, there will be no need to re-litigate that threshold issue.  However, the parties will be free in subsequent suits—if there are any—to discover facts sufficient to determine an equitable allocation between themselves and any additional potentially liable parties, as well as to challenge the recoverability of such costs under the National Contingency Plan, at that time.

Accordingly, the Court should find that Exxon's alleged future costs to address nearby waterbodies and underlying sediments are too speculative to award an equitable allocation of those costs.  Instead, the Court should defer any allocation of potential future costs until such future costs are actually incurred and sufficient facts are established to support an equitable allocation.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the United States.

74

Respectfully submitted,

Dated: December 15, 2017

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

 /s/ *Erica Zilioli*
Michael D. Rowe (Attorney-in-Charge)
Erica M. Zilioli
Justin D. Heminger
Brian H. Lynk
Stephanie J. Talbert
Trial Attorneys
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, DC  20044
(202) 514-3144
michael.rowe@usdoj.gov

ABE MARTINEZ
Acting United States Attorney

Jimmy A. Rodriguez
Assistant United States Attorney
Southern District No. 572175
Texas Bar No. 24037378
1000 Louisiana, Suite 2300
Houston, TX 77002
(717) 567-9532
jimmy.rodriguez2@usdoj.gov

*Counsel for Defendant United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2017, I filed the foregoing using the Court's

CM/ECF system, which will electronically serve all counsel of record registered to use the

CM/ECF system.

/s/ *Erica Zilioli*