**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---

| | |
|---|---|
| EXXON MOBIL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) 4:10-CV-02386 (LHR) |
| | ) 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

---

**DEFENDANT UNITED STATES OF AMERICA'S
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT ON PHASE TWO ISSUES**

ABE MARTINEZ
  *Acting United States Attorney*

JIMMY RODRIGUEZ
  *Assistant United States Attorney*
  Southern District No. 572175
  Texas Bar No. 24037378
  1000 Louisiana, Suite 2300
  Houston, TX 77002
  (717) 567-9532
  jimmy.rodriguez2@usdoj.gov

JEFFREY H. WOOD
  *Acting Assistant Attorney General*
  Environment and Natural Resources Division
  United States Department of Justice

MICHAEL D. ROWE (Attorney-in-Charge)
ERICA M. ZILIOLI
JUSTIN D. HEMINGER
BRIAN H. LYNK
STEPHANIE J. TALBERT
  *Trial Attorneys*
  Environmental Defense Section
  P.O. Box 7611
  Washington, D.C.  20044
  (202) 514-3144
  michael.rowe@usdoj.gov

*Counsel for Defendant United States*

# TABLE OF CONTENTS

Table of Contents ................................................................................................ i

Glossary .......................................................................................................... iii

Table of Exhibits ............................................................................................. iv

United States' Statement of Undisputed Facts ............................................... 1

I.     Undisputed facts to support Argument Point I: Exxon may not recover for costs that are not "necessary costs of response"; Argument Point II: Exxon cannot recover for actions that are time-barred and/or inconsistent with the NCP); and Argument Point IV.A.1: The Court should not allocate to the United States any share of Exxon's costs that were not necessary to address a threat to human health or the environment. ........................... 1

     A.     Baytown ......................................................................... 2

     B.     Baton Rouge.................................................................... 8

II.     Undisputed facts to support Argument Point III: Exxon should only recover an equitable share of those costs that are not previously reimbursed and are accurately accounted for with sufficient evidence. ............... 10

     A.     Undisputed facts to support Argument Point III.A.: The Court should prevent Exxon from obtaining an inequitable double recovery by accounting for its prior insurance recoveries. ....................... 10

     B.     Undisputed facts to support Argument Point III.B.: Exxon has failed to accurately account for a substantial portion of its past costs................................................................................... 12

III.     Undisputed facts to support Argument Point IV: The Court should equitably allocate to the United States a zero share of some of Exxon's costs and a small share of the rest. ....................................................... 17

     A.     Undisputed facts to support Argument Point IV.A.: The United States should not bear any of Exxon's costs to address four (and part of a fifth) cleanup units at the Sites. ................................... 17

     B.     Undisputed facts to support Argument Point IV.B.: The Court should equitably allocate no more than 2% of any remaining costs at Baytown and 1% of any remaining costs at Baton Rouge to the United States. ....................................................................... 24

IV.     Undisputed facts to support Argument Point V: Exxon is not entitled to a
        declaratory judgment allocating unknown future costs. ...................................... 26

**GLOSSARY**

| | |
|---|---|
| Avgas | Aviation gasoline |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| Complex(es) | The Refinery(ies) and chemical plants |
| EPA | United States Environmental Protection Agency |
| FOA | Facility Operations Area |
| NACC | North American Coverage Case |
| NCP | National Contingency Plan |
| Phase I Decision | *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) |
| RCRA | Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k. |
| Site(s) | The Refinery(ies), chemical plants, and other nearby areas or surface waters (as defined by this Court in the Phase I Decision) |
| SWMU | Solid Waste Management Unit |

**TABLE OF EXHIBITS**

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| 1 | Declaration of Jay Brigham (Dec. 14, 2017) | | |
| 2 | Declaration of E.J. Janik (Dec. 14, 2017) | | X |
| 3 | Declaration of James Kittrell (Dec. 13, 2017) | | |
| 4 | Declaration of Matthew Low (Dec. 10, 2017) | | |
| 5 | Declaration of Matthew Low (Dec. 20, 2013) | | |
| 6 | Declaration of Mary Sitton (Dec. 12, 2017) | | |
| 7 | Declaration of Alborz Wozniak ( Dec. 12, 2017) | | |
| 8 | Expert Rebuttal Report of Jay Brigham, A Regarding the ExxonMobil Facility at Baytown, Texas, etc. (Nov. 16, 2012) | | |
| 9 | Expert Supplemental Report of Paul S. Ficca (Jan. 2017) | | |
| 10 | Expert Supplemental Report of Paul S. Ficca Attachment 3 - Analysis of CERCLA Response Costs (Jan. 2017) | | X |
| 11 | Expert Supplemental Report of Paul S. Ficca, January 2017, Supplemental Attachment 3, Schedule B-1 – Baytown Summary (Jan. 2017) | | X |
| 12 | Expert Supplemental Report of Paul S. Ficca, January 2017, Supplemental Attachment 3, Schedule C-1 – Baton Rouge Cost Summary (Jan. 2017) | | X |
| 13 | Expert Report of  A.J. Gravel (Jun. 18, 2012) | | |
| 14 | Expert Rebuttal Report of E.J. Janik (Sep. 22, 2016) | | X |
| 15 | Expert Report of E.J. Janik with Attachments (Jun. 23, 2016) | | X |
| 16 | Expert Report of Stephen Johnson (May 27, 2016) | | |
| 17 | Expert Rebuttal Report of Dr. James R. Kittrell to The Supplemental Report of Mr. Gregory G. Kipp, seriatim (Jan. 2017) | | |
| 18 | Expert Supplemental Report of Dr. James R. Kittrell, Responding to Report of John M. Beath (Sep. 2016) | | |
| 19 | Expert Supplemental Rebuttal Dr. James R. Kittrell to The Reports of Mr. John M. Beath and Mr. Jere M. Johnson, seriatim (Apr. 12, 2013) | | |
| 20 | Expert Rebuttal Report of Dr. James R. Kittrell to the Reports of Mr. J.M. Johnson, Mr. A.J. Gravel and Mr. R.L. White (Nov. 2012) | | |
| 21 | Expert Report of Dr. James R. Kittrell,: Historical Operations at Exxon's Baytown and Baton Rouge Refineries, etc., at 5, 29-38 (Aug. 10, 2012) | | |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| 22 | Expert Supplemental Report of Matthew Low on Allocation With Respect To Exxon's Baytown And Baton Rouge Refinery And Chemical Complexes (Jan. 30, 2017) | | |
| 23 | Expert Rebuttal Report of Matthew Low on Allocation with Respect To Exxon's Baytown and Baton Rouge Refineries And Chemical Complexes (Nov. 16, 2012) | | |
| 24 | Expert Report of Matthew Low on Allocation with Respect to Exxon's Baytown and Baton Rouge Refinery and Chemical Complexes (Aug. 10, 2012) | | |
| 25 | Expert Report of R. L. White, An Allocation Framework with Respect to the Allocation of Response Costs at the ExxonMobil Baytown Complex and The Baton Rouge Complex Sites: 2017 Supplemental Report (Jan. 10, 2017) | | |
| 26 | Expert Report of R. L. White, An Allocation Framework With Respect To The Allocation of Response Costs At the ExxonMobil Baytown Complex and the Baton Rouge Complex Sites (Jun. 18, 2012) | | |
| 27 | Expert Rebuttal Report of Alborz Wozniak (Feb. 15, 2017) | | |
| 28 | Deposition of Dick Cureton, Vol. I (Feb. 17,1999) | NACCMIS-00192705 | X |
| 29 | Supplemental Deposition of Paul S. Ficca (Jun. 30, 2017) | | |
| 30 | Deposition of Paul S. Ficca, Vol. I (Nov. 28, 2016) | | |
| 31 | Deposition of Paul S. Ficca, Vol. II (Nov. 29, 2016) | | |
| 32 | Deposition of Peter Gagnon, Phase I (Apr.11, 2013) | | |
| 33 | Deposition of Peter Gagnon (Mar. 22, 2017) | | |
| 34 | Deposition of Alfred Gravel (Jun. 28, 2017) | | |
| 35 | Deposition of Wayne Grip, Vol. I (Apr. 17, 2013) | | |
| 36 | Deposition of Wayne Grip, Vol. I, Ex. 2, 11/6/1944 photograph (Nov. 6, 1944) | | |
| 37 | Deposition of Wayne Grip, Vol. II (Apr. 18, 2013) | | |
| 38 | Deposition of E.J. Janik, Jr., Vol. I (Dec. 14, 2016) | | |
| 39 | Deposition of Stephen Johnson, Vol. I (Apr. 6, 2017) | | |
| 40 | Deposition of Stephen Vol. II (Apr. 7, 2017) | | |
| 41 | Deposition of Gregory Kipp, Vol. II (May 12, 2017) | | |
| 42 | Deposition of Leon Paredes (Jun. 14, 2017) | | |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| 43 | Deposition of Michael Pisani (May 18, 2017) | | |
| 44 | Deposition of Gary Robbins (Jun. 15, 2017) | | |
| 45 | Deposition of Mary Sitton, Vol. II (Feb. 1, 2013) | | |
| 46 | Deposition of Timothy Tucker (May 17, 2017) | | |
| 47 | Deposition of Alborz Wozniak (May 24, 2017) | | |
| 48 | Construction, Equipment, and Operation Contract (Oct. 21, 1940) | US-BT010074 | |
| 49 | Agreement between Defense Supplies Corp and Standard Oil of New Jersey (Jan. 13, 1942) | MIS-00022185 | |
| 50 | Contract between Defense Supplies Corp. and Humble Oil & Refining Co., (Feb. 4, 1942) | BAYHIS-00000585 | |
| 51 | Major War Projects: Baton Rouge Refinery (May 30, 1943) | BRC-00011607 | |
| 52 | Data on War Products, Baytown Refinery (Jun. 2, 1943) | BAYHIS-00028167 | |
| 53 | Forecast of Operations – June 1944, 5/19/1944, US-GEN013463-78 (May 19, 1944) | US-GEN013463 | |
| 54 | Forecast of Operations – July 1944, 6/19/1944, US-GEN013479-97 (Jun. 19, 1944) | US-GEN013479 | |
| 55 | Forecast of Operations – August 1944, 7/19/1944, US-GEN013498-516 (Jul. 19, 1944) | US-GEN013498 | |
| 56 | Forecast of Operations – September 1944, 8/19/1944, US-GEN013517-37 (Aug. 19, 1944) | US-GEN013517 | |
| 57 | Forecast of Operations – October 1944, 9/19/1944, US-GEN013538-57 (Sep. 19, 1944) | US-GEN013538 | |
| 58 | Forecast of Operations – November 1944, 10/19/1944, US-GEN013602-21 (Oct. 19, 1944) | US-GEN013602 | |
| 59 | Forecast of Operations – December 1944, 12/20/1944, US-GEN013578-99 (Dec. 20, 1944) | US-GEN013578 | |
| 60 | Memorandum to The Treasurer (Oct. 11, 1945) | BAYHIS-00019119 | |
| 61 | Report to Reconstruction Finance Corporation on Industrial Wastes (Sep. 18, 1946) | BRHIS-00008931 | |
| 62 | J. Frey and C. Ide, A History of the Petroleum Administration for War (Washington, DC: GPO, 1946) | MIS-00022327 | |
| 63 | Proposed Earthen Separator for Callaghan's Bayou (Aug. 27, 1948) | BRC-00000461 | |
| 64 | Operation of the Oil Conservation Department at the Baton Rouge Refinery," BRHIS-00013937-89 (May 1, 1950) | BRHIS-00013937 | |
| 65 | Esso Standard Oil Company, Plants at Baton Rouge, Louisiana, Operated or Maintained in Standby | BRC-00010976 | |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| | Condition, (Dec. 31, 1950) | | |
| 66 | The Humble Way (Jan. 1, 1952) | BAYC-00013898 | |
| 67 | 52 Loss Committee (Mar. 31, 1952) | MIS-00031624 | |
| 68 | Esso Standard Oil Company, Letter from Mr. H. J. Voorhies (Jun. 23, 1953) | BRC-00003872 | |
| 69 | Brady, Effluent Improvement Program at Humble's Baytown Refinery (May 10, 1954) | BAYC-00013615 | |
| 70 | Inter-Office Correspondence (Jul. 26, 1955) | BRC-00000605 | |
| 71 | Memorandum Re: Esso Standard Oil Company Plancor 572 SR 15 (Dec. 15, 1955) | US-BR005349 | |
| 72 | Baton Rouge Solid Waste memo (Sep. 25, 1968) | NACCMIS-00035434 | |
| 73 | Partial Closure Plan for Separator 3M (Feb. 17, 1984) | BAYTECH-00013402 | |
| 74 | Closure Plans for Spill Basin 1, Separators 3A and 3M, South Landfarm (Jan. 20, 1985) | BAYTECH-00095523 | |
| 75 | Exxon, South Landfarm Post-Closure Plan at BAYTECH-00019009  (Jan. 20, 1985) | BAYTECH-00019009 | |
| 76 | Memorandum Incoming Streams to Old Slit Pond (May 19, 1986) | BRC-00055266 | |
| 77 | J. Hebert, La. Dep't Envtl. Quality (LDEQ), Mem. to J. Daggett at BRC-00040775 (Sep. 22, 1986) | BRC-00040775 | |
| 78 | R. Rabinow Letter to L. Soward re Closure Certification of Spill Basin 1 (Sep. 30, 1986) | BAYTECH-00010170 | |
| 79 | Texas Certification of Closure of Separator 10 (Oct. 16, 1986) | BAYTECH-00010172 | |
| 80 | Shallow Fill Zone Hydrogeologic Investigation (Oct. 31, 1986) | BRTECH-00002158 | |
| 81 | LDEQ Compliance Order re Shallow Fill Zone (Feb. 5, 1987) | BRC-00022876 | |
| 82 | LDEQ Corrective Action Order re Shallow Fill Zone (Feb. 5, 1987) | BRHIS-00015112 | |
| 83 | Preliminary Review/VSI Report (Aug, 26, 1987) | BRTECH-00005956 | |
| 84 | Texas Certification of Closure of Separator 3M North Half (Dec. 6, 1988) | BAYTECH-00010128 | |
| 85 | Woodward-Clyde Consultants, Preliminary Report, RCRA Facility Investigationat BRC-00024212 (Feb. 1991) | BRC-00024212 | |
| 86 | Closure Plans for South Landfarm (Oct. 28, 1991) | BAYTECH-00010206 | |
| 87 | L. Smith, TWC, Letter to S. Glass, Exxon (Oct. 28, | BAYTECH- | |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| | 1991) | 00095620 | |
| 88 | Community Relations in Superfund Handbook (Jan. 1, 1992) | WOZNIAK005025 | |
| 89 | Old Silt Pond Regulatory File Information (Sep. 1, 1992) | BRTECH-00004484 | |
| 90 | EPA, CERCLA Superfund Orientation Manual (Oct. 1, 1992) | WOZNIAK006115 | |
| 91 | Removed | | |
| 92 | Phase III Subsurface Investigation Report (Feb. 2, 1993) | BAYTECH-00027105 | |
| 93 | Mabry Letter to Trevino re Additional Info Delay of Closure (May 27, 1993) | BAYTECH-00000693 | |
| 94 | Phase 1 GW Quality Assessment Plan for LOC (Jul. 26, 1993) | BAYTECH-00014488 | |
| 95 | Phase 1 GW Quality Assessment Plan for UOC (Jul. 26, 1993) | BAYTECH-00014550 | |
| 96 | Fugro and McClelland, Sludge Characterization Report (Aug. 24, 1993) | BAYTECH-00012451 | |
| 97 | K. Ramirez, TNRCC, Letter to R. Murray, Exxon (Sep. 23, 1993) | BAYTECH-00010258 | |
| 98 | Salmon & Associates, Inc., Closure Certification Report, Old Silt Pond at BRTECH-00001138-40 (Nov. 1993) | BRTECH-00001109 | |
| 99 | Removed | | |
| 100 | LDEQ/EPA, Final Post-Closure Permit (1994) at WOZNIAK000485 (Apr. 6, 1994) | WOZNIAK000430 | |
| 101 | Mabry Letter to Trevino re Delay of Closure Permit Waste Removal Activities (Jul. 15,1994) | BAYTECH-00014761 | |
| 102 | Salmon & Associates, Inc., Closure Certification Report, Rice Paddy Landfarm at BRTECH-00003669-70 (Aug. 1994) | BRTECH-00003653 | |
| 103 | Memo re Outfall Canals (Aug. 15, 1994) | BAYTECH-00014452 | |
| 104 | Louisiana Closure Certification for OSP, RPLF (Jan. 19, 1995) | BRTECH-00003656 | |
| 105 | Agreed Order - Baytown Refinery (Mar. 15, 1995) | BAYTECH-00010436 | |
| 106 | Delay of Closure Chart (Aug. 18, 1995) | BAYTECH-00014775 | |
| 107 | Hydrocarbon Recovery Action Plan (HRAP) (Nov. 20, 1995) | BAYTECH-00001295 | |
| 108 | Removed | | |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| 109 | Revised RCRA Facility Investigation Work Plan (Jun. 15, 1998) | BAYTECH-00003336 | |
| 110 | Texas Solid Waste Registration No. 33880 Exxon Chemical Americas Baytown Chemical Plant Hydrocarbon Source Investigation - Final Report (Jul. 23, 1998) | BAYTECH-00096188 | |
| 111 | Preliminary Design Information for Full-Scale Hydrocarbon Recovery System (Oct. 13, 1999) | BAYTECH-00030347 | |
| 112 | EPA, Use of Non-Time-Critical Removal Authority in Superfund Response Actions (Feb. 14, 2000) | | |
| 113 | EMER.ERM Baytown Review Meeting (Mar. 10, 2000) | BAYC-00072750 | |
| 114 | Exxon internal insurance allocation (Jul. 6, 2000) | NACCMIS-00375833 | X |
| 115 | Exxon Summary of June 2000 Environmental Insurance Settlements (Jul. 10, 2000) | NACCMIS-00375826 | X |
| 116 | Exxon Emails About Insurance Settlement Allocation (Jul. 11, 2000) | NACCMIS-00375824 | X |
| 117 | Early and Meaningful Community Involvement Memo (Oct. 12, 2001) | WOZNIAK005485 | |
| 118 | Response to Notice of Deficiencies, RFI Workplan (February 16, 1995) And RFI Workplan (November 10, 1995) | BRTECH-00000990 | |
| 119 | Exxon, BTRF Remediation Project Summary (Nov. 2003) | BAYTECH-00122218 | |
| 120 | Second Half 2003 Semiannual Ground Water Monitoring Report Tank Fam 3000, BAYTECH-00032403 at BAYTECH-00032491 (Feb. 23, 2004) | BAYTECH-00032403 | |
| 121 | ERM, FOA Assessment Report: Step 2, Chemical Plant at BAYTECH-00000016 (Jan. 31, 2005) | BAYTECH-00000001 | |
| 122 | ERM, FOA Assessment Report: Step 2, Refinery at BAYTECH-00005015  (Jan. 31, 2005) | BAYTECH-00005000 | |
| 123 | D. Edwards, Exxon, to C. Palomares, TCEQ at BAYTECH-00010254 (Apr. 11, 2005) | BAYTECH-00010254 | |
| 124 | Removed | | |
| 125 | Removed | | |
| 126 | ERM invoice for cost ID 5057 (also appears at Cost ID 4959) (Oct. 11, 2005) | BAYTECH-00167031 | |
| 127 | Texas Certification of Closure of Separator 3M South Half (Jun. 27, 2006) | BAYTECH-00011459 | |
| 128 | ERM Invoice and Ficca Exhibit 014 (Dec. 27, 2006) | BAYTECH-00159755 | |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| 129 | ERM Invoice for Cost ID 5064 but also appears at Cost ID 4960 (Dec. 27, 2006) | BAYTECH-00167107 | |
| 130 | Removed | | |
| 131 | L. Buatt, LDEQ Letter to R. Cotton, Exxon re Shallow Fill Zone (May 20, 2008) | WOZNIAK004639 | |
| 132 | BC Groundwater Tank Farm BAYTECH-00047469 (May 30, 2008) | BAYTECH-00047469 | |
| 133 | E. Johnbull, TCEQ, Letter to M. Snyder, Exxon (Jul. 8, 2008) | MISC-00015870 | |
| 134 | Removed | | |
| 135 | TPDES Permit No. WQ0001215000, Texas Commission on Environmental Quality Permit to Discharge Wastes issued June 22, 2009 | US-BT015510 | |
| 136 | 2009 Annual Progress Report Tank Farm 3000 Area ExxonMobil Chemical Company Baytown Chemical Plant AO Docket No. 95-1078-IHW-E TCEQ SW Reg. No. 33880 EPA ID No. TXD980809909 (Jul. 15, 2009) | BAYTECH-00046007 | |
| 137 | TCEQ Regulatory Guidance re FOA (Jan. 1, 2010) | WOZNIAK004716 | |
| 138 | Exxon, RCRA Permit & Compliance Plan Renewal Application (Apr. 14, 2010) | BAYC-00018867 | |
| 139 | TPDES Permit No. WQ0000592000, Texas Commission on Environmental Quality Permit to Discharge Wastes issued January 26, 2011 | US-BT015468 | |
| 140 | Exxon's Responses to US First Set of Discovery Requests (Jul. 11, 2013) | | |
| 141 | Offshore Report ExxonMobil Baytown Refinery Mitchell Bay Docks 2 to 7 Baytown, Texas (Oct. 17, 2011) | BAYTECH-00122665 | |
| 142 | Removed | | |
| 143 | ERM, FOA Application Step 3, Monitoring and Corrective Action Program, Baytown Refinery at BAYTECH-00196158 (Sep. 12, 2013) | BAYTECH-00196158 | |
| 144 | Exxon Letter to TCEQ at BAYTECH-00196570 (Mar. 20, 2015) | BAYTECH-00196570 | |
| 145 | Removed | | |
| 146 | 4Q2015 Fluid Recovery Monitoring Report (Jan. 28, 2016) | BRTECH-00043652 | |
| 147 | Removed | | |
| 148 | Exxon Response to US First Set of Phase 2 Discovery (Apr. 25, 2016) | | |
| 149 | Baker Botts Letter to Mike Rowe (Aug. 8, 2016) | | X |

| U.S. Exhibit Number | Description | Bates Number | Filed Under Seal |
|---|---|---|---|
| 150 | 2016-09-16 Exxon Letter to TCEQ (Sep. 16, 2009) | BAYTECH-00198426 | X |
| 151 | 2016-09-19 Hazardous Waste Permit No. 50111 (Sep. 19, 2016) | BAYTECH-00204216 | X |
| 152 | Exxon Response to United States Second Request for Phase 2 Discovery (Jan. 30, 2017) | | |
| 153 | Exxon Responses to Third Set of US Discovery Requests (Jun. 21, 2017) | | |
| 154 | Removed | | |
| 155 | Exxon, Phase I/II RFI Report for Eight Perimeter SWMUs | BAYTECH-00003814 | |
| 156 | History of The Baytown Ordnance Works | BAYHIS-00017743 | |
| 157 | History of The Baytown Refinery | BAYC-00000657 | |
| 158 | J. Mabry Mem. to L. Barra re Questions on Lower Outfall Canal (Undated) | BAYTECH-00014787 | |
| 159 | Production of War Products at Humble Oil and Refining Company's Baytown Refinery | BAYHIS-00024502 | |
| 160 | Matt Low's live worksheet Baton Rouge | | |
| 161 | Matt Low's live worksheet Baytown | | |
| 162 | E.J. Janik Supplemental Expert Report (Jan. 30, 2017) | | X |

## UNITED STATES' STATEMENT OF UNDISPUTED FACTS

Defendant United States of America submits the following statement of undisputed facts in support of its Motion for Summary Judgment on Phase Two Issues.  The United States' exhibits are identified as "Ex."

**I.     Undisputed facts to support Argument Point I: Exxon may not recover for costs that are not "necessary costs of response"; Argument Point II: Exxon cannot recover for actions that are time-barred and/or inconsistent with the NCP); and Argument Point IV.A.1: The Court should not allocate to the United States any share of Exxon's costs that were not necessary to address a threat to human health or the environment.**

1.      Exxon did not conduct any of the environmental cleanups at issue in this litigation pursuant to CERCLA.

2.      Exxon did not consult or otherwise attempt to follow the NCP when conducting the environmental cleanups at issue in this litigation.  Exxon's employees overseeing or working on Exxon's environmental cleanup actions either were not familiar with the NCP or did not consult the NCP in the course of their work.  Ex. 43, Michael Pisani Dep. 153:1-19 (May 18, 2017); Ex. 46, T. Tucker Dep. 137:22-138:11 (May 17, 2017); Ex. 44, Gary Robbins Dep. 35:12-36:3 (June 15, 2017); Ex. 42, Leon Paredes Dep. 147:22-25 (June 14, 2017) ("Paredes Dep."). Peter Gagnon of Environmental Resources Management, Exxon's consultant who oversaw many of the environmental cleanup matters at Baytown at issue in this litigation, explained:

> Q: Do you have an understanding of whether
> Exxon asked ERM to provide any services relating
> to compliance with the NCP at the Baytown site?
>
> A: We did not discuss the NCP in relation
> to the activities that were completed that we
> just described or just discussed.

Ex. 33, P. Gagnon Dep. 219:22;220:5 (Mar. 22, 2017) ("Gagnon Phase II Dep.").

3.      Exxon could not identify whether the response activities it conducted were removal or remedial in nature in its answers to the United States' interrogatories.  Ex. 148, Exxon's Responses to United States' First Set of Phase II Discovery Requests, Interrogatories Nos. 3-7 (Apr. 25, 2016).  Rather, Exxon deferred to the opinions of its expert.  *Id*.

A.      **Baytown**

1.      **Separator 3M**

4.      Separator 3M was an earthen, unlined impoundment that stored refinery wastes.[1] When Separator 3M was operational, Exxon removed the accumulated sludges once or twice per year and disposed of them in the South Landfarm.  Ex. 73, ERM-Southwest, Inc. ("ERM"), Partial Closure Plan for Separator 3M (Feb. 17, 1984) at BAYTECH-00013407.

5.      Exxon decided to close Separator 3M rather than upgrading it to comply with RCRA's standards for hazardous waste management units.  Ex. 39, Stephen Johnson Dep. 186:5-21, 187:11-188:2 (Apr. 6, 2017) ("Johnson Dep. Vol. I").  There is no evidence Exxon closed Separator 3M because it posed an imminent risk to human health or the environment.  Ex. 27, Alborz Wozniak Rebuttal Report 77 (Feb. 15, 2017) ("Wozniak Report").

6.      In February 1984, Exxon prepared a partial closure plan for Separator 3M.  Ex. 73, ERM, Partial Closure Plan for Separator 3M (Feb. 17, 1984) at BAYTECH-00013402.  The partial closure plan stated that Exxon "intends to partially close Separator 3M (a hazardous waste impoundment regulated under the RCRA program) in order to allow for construction of a new wastewater treatment aeration basin.  This new facility will occupy approximately half of the area of Separator 3M."  *Id*. at BAYTECH-00013404.  In January 1985, Exxon submitted a final closure plan for Separator 3M to Texas[2].  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095523.

7.      Separator 3M was closed under RCRA's interim status regulations.  *Id*. at BAYTECH-00095580.  The northern half of Separator 3M was "clean-closed" in 1984.  Ex. 109, ERM, Revised RCRA Facility Investigation for Twenty-Two Solid Waste Management Units (June 15, 1998) at BAYTECH-00003505.  The southern half was clean-closed in 1986.  *Id*. Contaminated soils excavated from the closure of Separator 3M were transported to the South Landfarm for treatment and disposal.  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095589.

8.      In 1988, Texas certified that the northern half of Separator 3M was clean-closed. Ex. 84, S. Pole, Texas Water Commission, Letter to M. Nash, Exxon (Dec. 6, 1988) at BAYTECH-00010128.   In 2006, Texas certified that the southern half of Separator 3M was clean-closed.  Ex. 127, E. Johnbull, TCEQ, Letter to M. Snyder, Exxon (June 27, 2006) at BAYTECH-00011459.

---

[1] An annotated aerial photograph showing the locations of the various units at Baytown is located at Exhibit 27, Wozniak Report Fig. BT-2.

[2] During the course of Exxon's response activities, the applicable Texas state environmental regulatory agency held four names: the Texas Department of Water Resources, the Texas Water Commission (TWC), the Texas Natural Resource Conservation Commission (TNRCC), and the Texas Commission on Environmental Quality (TCEQ).  For ease of reference, the United States refers simply to "Texas" in these statements of fact.

9.      Two waste management units and several roads were constructed on the surface of what was Separator 3M.  Ex. 109, ERM, Revised RCRA Facility Investigation for Twenty-Two Solid Waste Management Units (June 15, 1998) at BAYTECH-00003505.  According to Exxon's consultant, A.J. Gravel, Exxon charged the costs for the closure of the southern half of Separator 3M to a capital project, not to an environmental remediation project, because "the cleanup was done as part of a project where they built something on top of the unit."  Ex. 34, A.J. Gravel Dep. 136:12-22 (June 28, 2017) ("Gravel Dep.").

## 2.      Separator 10

10.     Separator 10, also known as Spill Basin 1, was a concrete-walled, clay-bottomed oil-water separator.  From approximately 1929 to 1950, sediments accumulated in the separator were dredged approximately once or twice per year and disposed of at the South Landfarm.  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095556.  After "modernization" of Separator 10 in 1950, approximately 300 barrels of oil per day were skimmed from the surface and approximately five tons per day of sediments were dredged from the bottom.  Ex. 69, Brady, Effluent Improvement Program at Humble's Baytown Refinery, Proceedings of the Ninth Industrial Waste Conference (May 10-12, 1954) at BAYC-00013617.

11.     Exxon decided to close Separator 10 rather than upgrading it to comply with RCRA's standards for hazardous waste management units.  Ex. 39, Johnson Dep. Vol. I at 186:5-21, 207:16-208:1.  There is no evidence Exxon closed Separator 10 because it posed an imminent risk to human health or the environment.  Ex. 27, Wozniak Report at 79.

12.     In January 1985, Exxon submitted a closure plan for Separator 10 to Texas.  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095523.  According to the closure plan, "accumulated sludges were removed from [Separator 10] in August and December 1983" after Separator 10 was replaced by Separator 12.  *Id.* at BAYTECH-00095558.  The closure plan stated that "Exxon intends to close [Separator 10] by removing any remaining contaminated soil from the bottom to a predetermined background level."  *Id.*

13.     Separator 10 was closed under RCRA's interim status regulations.  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095556.  Separator 10 was clean-closed in August 1986.  Ex. 78, R. Rabinow, Exxon, Letter to L. Soward, TWC (Sep. 30, 1986) at BAYTECH-00010170.  The excavated sludges and contaminated soils were disposed of at the South Landfarm.  *Id.*

14.     In 1986, Texas certified that Separator 10 was clean-closed.  Ex. 79, M. Hibbs, TWC, to R. Rabinow, Exxon (Oct. 16, 1986) at BAYTECH-00010172-73.

## 3.      Upper and Lower Outfall Canals

15.     The Upper and Lower Outfall Canals were open earthen ditches in the southern part of the Baytown Refinery that conveyed wastewater and stormwater from the Refinery to the Houston Ship Channel.  Ex. 96, Fugro-McClelland Environmental, Inc. ("Fugro"), Sludge

Characterization: Phase II, Stormwater Retention Basin and Upper and Lower Outfall Canals (Aug. 24, 1993) at BAYTECH-00012455.

16.     Exxon decided to close the Upper and Lower Outfall Canals rather than upgrading them to comply with RCRA's standards for hazardous waste management units. Ex. 140, Exxon Resp. to U.S. First Set Interrogs. 31 (July 13, 2011). There is no evidence Exxon closed the Canals because they posed an imminent risk to human health or the environment. Ex. 27, Wozniak Report at 80.

17.     On September 23, 1991, Exxon submitted to Texas a RCRA permit application that requested a "delay of closure" for both the Upper and Lower Outfall Canals to allow for the continued use of the canals to receive non-hazardous wastewater and stormwater from the Baytown Refinery. Ex. 97, K. Ramirez, TNRCC, Letter to R. Murray, Exxon (Sep. 23, 1993) at BAYTECH-00010271.

18.     In March-June 1994, 23,822 tons of sludge were excavated from the Upper Outfall Canal. Ex. 106, Exxon, Delay of Closure Information: Surface Impoundment Dredging (Aug. 18, 1995) at BAYTECH-00014775.

19.     In 1993, Exxon hired a consultant to sample the sludge in the Lower Outfall Canal to determine if it exhibited any toxicity characteristics that would render the material hazardous waste under RCRA. Ex. 96, Fugro, Sludge Characterization: Phase II, Stormwater Retention Basin and Upper and Lower Outfall Canals (Aug. 24, 1993) at BAYTECH-00012455. The results of the test showed that the constituents present in the Lower Outfall Canal were well below the regulatory thresholds for toxicity. *Id*. at BAYTECH-00012475. As a result, Exxon did not need to remove the sludge in the Lower Outfall Canal, as stated in the following explanation Exxon prepared for Texas:

> Question 3: Why isn't sludge being removed from the LOC?
>
> Answer: Exxon is removing all hazardous sludges from its impoundments as a condition of receiving this permit. The sludges in the LOC were tested and found to be non-hazardous under RCRA. These tests and conclusions were reviewed with TNRCC Technical staff who provided verbal endorsement for this position . . . .

Ex. 158, J. Mabry, Exxon, Mem. to L. Barras & S. Fernandes, Radian (undated) at BAYTECH-00014788.

20.     Despite Exxon's statement, on June-December 1994, 18,850 tons of sludge were excavated from the Lower Outcall Canal. Ex. 106, Exxon, Delay of Closure Information: Surface Impoundment Dredging (Aug. 18, 1995) at BAYTECH-00014775. According to an Exxon letter to Texas, "the sludge in the Lower Outfall Canal *did not have to be removed* because it was not TC hazardous. However, Exxon has removed a substantial amount of the sludge (approximately 90%) *on a voluntary basis . . . .*" Ex. 101, J. Mabry, Exxon, to A. Trevino, TNRCC (July 15, 1994) at BAYTECH-00014761 (emphasis added).

21.     Since 1994, the Upper and Lower Outfall Canals have not been used for hazardous waste management.  Ex. 138, Exxon, RCRA Permit & Compliance Plan Renewal Application (Apr. 14, 2010) at BAYC-00018896.

22.     The only evidence that Exxon (or Texas) engaged in public participation with respect to the Upper and Lower Outfall Canals was that Exxon issued a public notice and held a public meeting in October 1991 after it filed the RCRA permit modification.  Ex. 158, J. Mabry, Exxon, Mem. to L. Barras & S. Fernandes, Radian (undated) at BAYTECH-00014788-89.  Exxon in fact was opposed to further public comment, stating it would "not be a prudent or efficient use of [its] resources."  *Id*. at BAYTECH-00014789.

### 4.     Velasco Street Ditch

23.     The Velasco Street Ditch was an earthen ditch that conveyed stormwater and wastewater along the northern portion of the Baytown Refinery.  Ex. 123, D. Edwards, Exxon, to C. Palomares, TCEQ (Apr. 11, 2005) at BAYTECH-00010254.

24.     Exxon decided to close the Velasco Street Ditch rather than upgrade it to comply with RCRA's standards for hazardous waste management units.  Ex. 33, Gagnon Phase II Dep. at 194:19-195:5; Ex. 140, Exxon Resp. to First Set U.S. Interrogs. 31 (July 31, 2011).  There is no evidence Exxon closed the Velasco Street Ditch because it posed an imminent risk to human health or the environment.  Ex. 27, Wozniak Report at 82-83.

25.     In 1991, 20,000 tons of sludge were excavated from the Velasco Street Ditch so that it could meet EPA's May 2, 1991 deadline for primary sludge removal.  Ex. 106, Exxon, Delay of Closure Information: Surface Impoundment Dredging (Aug. 18, 1995) at BAYTECH-00014775.

26.     In 1993, Exxon proposed to Texas a "delay of closure" approach that would allow for the continued use of the Velasco Street Ditch to receive non-hazardous wastewater and stormwater.  Ex. 93, Mabry, Exxon, Letter to A. Trevino, TNRCC (May 27, 1993) at BAYTECH-00000693.  Sampling of the remaining sludge in the Ditch showed that it was not hazardous.  Thus, no additional waste material was excavated from the Ditch.  Ex. 101, J. Mabry, Exxon, Letter to A. Trevino, TNRCC (July 15, 1994) at BAYTECH-00014761.

27.     On July 8, 2008, Texas certified the clean closure of the Velasco Street Ditch.  Ex. 133, E. Johnbull, TCEQ, Letter to M. Snyder, Exxon (July 8, 2008) at MISC-00015870.  No groundwater monitoring for the Velasco Street Ditch was required since November 2008.  Ex. 138, Exxon, RCRA Permit & Compliance Plan Renewal Application (Apr. 14, 2010) at BAYC-00018912.

28.     Exxon (or Texas) has not held any public meetings, published any notices, or otherwise engaged the public concerning the Velasco Street Ditch.[3]

---

[3] In response to a Phase I United States interrogatory, Exxon stated that both Exxon and TCEQ solicited public comments on the proposed delay of closure of the Velasco Street Ditch and that

*Cont.*

### 5.    South Landfarm

29.    The South Landfarm was an unlined landfill in the southernmost portion of the Baytown Refinery used for disposal of refinery wastes.

30.    Sludges and soils excavated from the closure of Separators 3M and 10 were placed at the South Landfarm.  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095589; Ex. 78, R. Rabinow, Exxon, Letter to L. Soward, TWC (Sep. 30, 1986) at BAYTECH-00010170.

31.    Exxon decided to close the South Landfarm rather than upgrading it to comply with RCRA's standards for hazardous waste management units.  Ex. 40, Stephen Johnson Dep. 445:16-446:19 (April 7, 2017) ("Johnson Dep. Vol. II").  There is no evidence Exxon closed the South Landfarm because it posed an imminent risk to human health or the environment.  Ex. 27, Wozniak Report at 84.

32.    In January 1985, Exxon submitted a closure plan for the South Landfarm.  Ex. 97, TNRCC Letter to Exxon (Sep. 23, 1993) at BAYTECH-00010270.  Exxon submitted a revised closure plan in November 1988.  Ex. 86, Exxon, Closure Plan (Nov. 1988) at BAYTECH-00010232-38.

33.    The South Landfarm was closed under RCRA's interim status regulations.  Ex. 74, ERM, Closure Plans for Spill Basin 1, Separators 3A and 3M, and the South Landfarm (Jan. 20, 1985) at BAYTECH-00095556.  From 1988-1990, the South Landfarm had a "rest period" to allow the waste materials to degrade and dry out.  Ex. 86, Exxon, Closure Plan (Nov. 1988) at BAYTECH-00010232-38.  In 1990, a cap was placed over the South Landfarm.  *Id*.

34.    In October 1991, Texas certified the closure of the South Landfarm.  Ex. 87, L. Smith, TWC, Letter to S. Glass, Exxon (Oct. 28, 1991) at BAYTECH-00095620-21.  Exxon has conducted post-closure groundwater monitoring in and around the South Landfarm.  Ex. 75, Exxon, South Landfarm Post-Closure Plan (Jan. 20, 1985) at BAYTECH-00019009.

35.    Exxon (or Texas) has not held any public meetings, published any notices, or otherwise engaged the public concerning the South Landfarm.

---

Exxon held a public meeting.  Ex. 140, Exxon Resp. to U.S. Interrogs. 32 (July 13, 2011).  However, Mr. Wozniak was not able to find any evidence in the technical documentation that these activities occurred.  Ex. 27, Wozniak Report at 84.  And neither of the documents relied on by Exxon's expert Mr. Johnson in support of his opinion that Exxon had conducted public participation actually mentioned such activities for the Velasco Street Ditch.  *See* Ex. 16, Stephen Johnson Expert Report 51 n.147 (May 27, 2016).

## 8.  Facility Operations Areas (FOAs)

36.    In a March 1995 Agreed Order concerning the Baytown Refinery, Texas required Exxon to conduct a RCRA Facility Investigation for 22 SWMUs.  Ex. 105, TNRCC, Agreed Order Resolving Enforcement Action (Mar. 15, 1995) at BAYTECH-00010447-48.

37.    According to Exxon's consultants, the advantage of using a FOA is to "defer final remedy to end of operations."  Ex. 113, ERM, EMER/ERM Baytown Review Meeting (Mar. 10, 2000) at BAYC-00072812.  *See also* Ex. 137, TCEQ Regulatory Guidance: Facility Operations Area (Jan. 2010) at WOZNIAK004716-17 (stating that one of the "benefits" of a FOA is to defer regulatory obligations).  As Mr. Gagnon explained: "[T]here might be opportunities to defer certain corrective action activities until after the operational life of the facility should somebody want to exercise that option.  And that's not specific to ExxonMobil.  That's part of the program that TCEQ has established."  Ex. 33, Gagnon Phase II Dep. at 135:5-10.  He further said:

> Q   At what point would the final work that's being delayed under the FOA have to be performed?
>
> A   Hypothetically, when the refinery no longer operates.

*Id.* at 138:17-21.

38.    Exxon began the five-step process of applying for a FOA for the Baytown Refinery in September 2003 when it submitted paperwork on its qualifications for the FOA.  Ex. 122, ERM, FOA Assessment Report: Step 2, Refinery (Jan. 31, 2005) at BAYTECH-00005015.  Exxon submitted its Step 2 (assessments) paperwork in January 2005, its Step 3 (monitoring and corrective action program) paperwork in September 2013, and its Step 4 (formal application) paperwork in March 2015.  *Id.*; Ex. 143, ERM, FOA Application Step 3, Monitoring and Corrective Action Program, Baytown Refinery (Sep. 12, 2013) at BAYTECH-00196158; Ex. 144, Exxon Letter to TCEQ (Mar. 20, 2015) at BAYTECH-00196570.  The application process included numerous correspondence, *see, e.g., id.*, and meetings with Texas, Ex. 33, Gagnon Phase II Dep. at 128:5-129:1.

39.    In September 2016, Texas approved Exxon's FOA application by amending Exxon's RCRA permit to establish the Baytown Refinery FOA.  Ex. 151, TCEQ, Hazardous Waste Permit No. 50111 (Sep. 19, 2016) at BAYTECH-00204246.  As a result, Exxon requested that the 1995 Agreed Order concerning the Baytown Refinery be terminated.  Ex. 150, Exxon Letter to TCEQ (Sep. 16, 2016) at BAYTECH-00198426.

40.    Exxon began the five-step process of applying for a FOA for the Baytown chemical plant in September 2003 when it submitted paperwork on its qualifications for the FOA.  Ex. 121, ERM, FOA Assessment Report: Step 2, Chemical Plant (Jan. 31, 2005) at BAYTECH-00000016.  Exxon submitted its Step 2 (assessments) paperwork in January 2005.  *Id.*  The application process included correspondence with Texas, *see, e.g., id.*, as well as numerous meetings with Texas.  Ex. 33, Gagnon Phase II Dep. at 114:3-19.

41.     The application process for the chemical plant FOA has not been completed, and the chemical plant FOA has not yet been approved.  Ex. 42, Paredes Dep. at 132:18-133:5.

42.     According to a November 2003 Exxon report, the RCRA Facility Investigation-related activities at most of the SWMUs at the Refinery (including SWMUs at issue in this litigation – 47, 59, 64, and 69-74) were being deferred indefinitely pending Exxon's submission of the FOA application that would include those SWMUs.  Ex. 119, Exxon, BTRF Remediation Project Summary (Nov. 2003) at BAYTECH-00122224-25.

43.     Through December 31, 2014, Exxon spent approximately $8,056,656 on the FOAs applications.  Ex. 153, Exxon Resp. to Interrog. No. 2, US Third Set of Phase II Discovery Requests (June 21, 2017).  Exxon stated that it could not break down this number any further to identify which costs were incurred in connection with the Refinery FOA and which costs were incurred in connection with the Chemical plant FOA.  *Id.*  Since December 31, 2014, Exxon has incurred and continues to incur additional costs in connection with the FOA applications.  *Id.*

44.     The FOAs include more cleanup units than those Exxon claims have a federal nexus in this litigation.  Ex. 33, Gagnon Phase II Dep. at 100:12-102:5.

**B.     Baton Rouge**

    **1.     Shallow Fill Zone**

45.     The Shallow Fill Zone is a large area on the western boundary of the Baton Rouge Refinery where wastes were deposited.[4]

46.     Exxon began monitoring groundwater contamination at the Shallow Fill Zone in 1980 under its RCRA permit.  Ex. 77, J. Hebert, La. Dep't Envtl. Quality (LDEQ), Mem. to J. Daggett (Sep. 22, 1986) at BRC-00040775.  The fact that Exxon was aware of contamination in the Shallow Fill Zone but did not take corrective action until after 1987 suggests the absence of imminent threat to human health or the environment.  Ex. 27, Wozniak Report at 102.

47.     Two February 1987 Louisiana orders required Exxon to investigate and monitor the groundwater in the Shallow Fill Zone and then submit a corrective action plan to remove or treat in place the groundwater contamination.  Ex. 81, LDEQ, Compliance Order (Feb. 5, 1987) at BRC-00022877; Ex. 82, LDEQ, Corrective Action Order (Feb. 5, 1987) at BRHIS-00015113.  The 1987 Corrective Action Order did not cite any imminent risk, and there is no other evidence that Shallow Fill Zone posed an imminent risk to human health or the environment.  Ex. 27, Wozniak Report at 102.

48.     In 1987, Exxon installed groundwater recovery wells on the western boundary of the Shallow Fill Zone, along the Mississippi River, to recover light non-aqueous phase liquid hydrocarbons.  Exxon had removed a total of approximately 26,000 gallons of light non-aqueous

---

[4] An annotated aerial photograph showing the locations of the various units at Baton Rouge is located at Exhibit 27, Wozniak Report at Fig. BR-2.

phase liquid between 1987 and the end of 2015.  Ex. 146, Groundwater & Envtl. Services, Fourth Quarter 2015 Fluid Recovery Monitoring Report (Jan. 28, 2016) at BRTECH-00043658. Exxon continues to recover light non-aqueous phase liquid.

49.     On May 20, 2008, Louisiana "closed out" the two 1987 orders at Exxon's request, stating that "the Orders require no further action from ExxonMobil." Ex. 131, L. Buatt, LDEQ Letter to R. Cotton, Exxon (May 20, 2008) at WOZNIAK004639.

50.     Exxon (or Louisiana) has not held any public meetings, published any notices, or otherwise engaged the public concerning the Shallow Fill Zone.

### 2.     Old Silt Pond

51.     Exxon submitted a RCRA permit application to Louisiana for the Old Silt Pond in 1984. Ex. 85, Woodward-Clyde Consultants, Preliminary Report, RCRA Facility Investigation (Feb. 1991) at BRC-00024212.

52.     Exxon decided to close the Old Silt Pond rather than upgrading it to comply with RCRA's standards for hazardous waste management units. Ex. 89, ERM, Old Silt Pond RCRA Closure and Post-Closure Plan (June 8, 1988) at BRTECH-00004590, 4597.  There is no evidence Exxon closed the Old Silt Pond because it posed an imminent risk to human health or the environment. Ex. 27, Wozniak Report at 104.

53.     On June 8, 1988, Exxon submitted a closure plan to Louisiana for the Old Silt Pond.  Ex. 89, ERM, Old Silt Pond RCRA Closure and Post-Closure Plan (June 8, 1988) at BRTECH-00004588.

54.     The Old Silt Pond was closed under RCRA interim status regulations.  Id. at BRTECH-00004590.  From 1991-1993, Exxon solidified the sludge through mixing it with fly ash in temporary pits and returned it to the Old Silt Pond. Ex. 98, Salmon & Associates, Inc., Closure Certification Report, Old Silt Pond (Nov. 1993) at BRTECH-00001138-40.  Once the waste was replaced and compacted, Exxon placed a final cap over it.  Id. at BRTECH-00001138, 40-42.

55.     Exxon was required to conduct post-closure groundwater monitoring.  Ex. 100, LDEQ/EPA, Final Post-Closure Permit (1994) at WOZNIAK000485.

56.     On January 19, 1995, Louisiana issued a closure certification for the Old Silt Pond.  Ex. 104, G. Miller, LDEQ, Letter to L. Kronenberger, Exxon (Jan. 19, 1995) at BRTECH-00003656.

### 3.     Rice Paddy Landfarm

57.     Exxon submitted a RCRA permit application to Louisiana for the Rice Paddy Landfarm in 1984.  Ex. 85, Woodward-Clyde Consultants, Preliminary Report, RCRA Facility Investigation (Feb. 1991) at BRC-00024212.

58.     Exxon decided to close the Rice Paddy Landfarm rather than upgrading it to comply with RCRA's standards for hazardous waste management units.  There is no evidence Exxon closed the Rice Paddy Landfarm because it posed an imminent risk to human health or the environment.  Ex. 27, Wozniak Report at 104.

59.     On June 8, 1988, Exxon submitted a closure plan to Louisiana for the Rice Paddy Landfarm.  In the plan, Exxon briefly considered two closure alternatives, natural biodegradation or closure as a landfill (i.e., installing a RCRA cap).  But Exxon did not compare the two alternatives to any regulatory standards or consider other factors such as whether they were implementable.  Exxon selected biodegradation; once the oil content in the waste material fell below 1%, Exxon would shift to post-closure care.

60.     The Rice Paddy Landfarm was closed under RCRA interim status regulations.  Natural biodegradation failed to reduce the oil content below 1% by 1990.  Ex. , Exxon Letter to LDEQ (June 5, 1990) at BRTECH-00004186.  Thus, Exxon had to install a RCRA cap on the Rice Paddy Landfarm, which was completed from July 20, 1993, to June 30, 1994.  Ex. 102, Salmon & Associates, Inc., Closure Certification Report, Rice Paddy Landfarm (Aug. 1994) at BRTECH-00003669-70.

61.     Exxon was required to conduct post-closure groundwater monitoring.  Ex. 100, LDEQ/EPA, Final Post-Closure Permit (1994) at WOZNIAK000485.

62.     On January 19, 1995, Louisiana issued a closure certification for the Rice Paddy Landfarm.  Ex. 104, G. Miller, LDEQ, Letter to L. Kronenberger, Exxon (Jan. 19, 1995) at BRTECH-00003656.

## II.     Undisputed facts to support Argument Point III: Exxon should only recover an equitable share of those costs that are not previously reimbursed and are accurately accounted for with sufficient evidence.

### A.     Undisputed facts to support Argument Point III.A.: The Court should prevent Exxon from obtaining an inequitable double recovery by accounting for its prior insurance recoveries.

63.     Beginning in the 1990s, Exxon pursued litigation against its insurers to recover its environmental cleanup costs at many sites across the United States—known as the North American Coverage Case, or NACC litigation.  Ex. 148, Exxon's Responses to United States' First Set of Phase II Discovery Requests at 18, Request for Admission No. 1 (Apr. 26, 2016).

64.     In that litigation, Exxon argued that its insurance policies should cover environmental cleanup costs at the Baytown and Baton Rouge Complexes.  Ex. 149, Baker Botts Letter to Michael D. Rowe at 2–3 (Aug. 8, 2016).

65.     As a result of that case—Exxon eventually recovered $269 million in insurance settlements.  Ex. 152, Exxon's Responses to United States' Second Set of Phase II Discovery Requests at 3, Request for Admission No. 1 (January 30, 2017).

66.     Exxon has contended that the $269 million in insurance settlements are a global settlement for environmental liabilities at hundreds or thousands of sites, and therefore it is improper to treat any of the insurance proceeds as prior payments for the costs it claims in these CERCLA cases.  Ex. 148, Exxon's Responses to United States' First Set of Phase II Discovery Requests at 11, Interrogatory No. 12 (Apr. 26, 2016) ("Given that the insurance settlements resolved claims for environmental cleanup costs at over 3,500 sites in the NACC litigation, ExxonMobil obtained insurance recovery in the NACC litigation for, at the very most, only a very limited amount of the claimed response costs in the instant action—even if the company's NACC litigation costs were not deducted from its gross insurance recoveries, which ExxonMobil contends should be deducted.").

67.



68.     Exxon allocated $173 million of the NACC Insurance recoveries to its business segments, including $40 million to the "U.S. Refining" segment and $10.7 million to the "U.S. Chemicals" segment, for a total of $50.7 million to the Refining and Chemicals business segments.  Ex. 152, Exxon's Responses to United States' Second Set of Phase II Discovery Requests at 4, Request for Admission No. 2 (January 30, 2017).

69.





70.     As a matter of basic math, applying the 17.08% ratio for Baytown and the 22.18% ratio for Baton Rouge to the $50.7 million of insurance proceeds that Exxon allocated to the U.S. Refinery and U.S. Chemicals business segments, Exxon has recovered $8.65 million that relates to Baytown, and approximately $11.24 million that relates to Baton Rouge.

**B.    Undisputed facts to support Argument Point III.B.: Exxon has failed to accurately account for a substantial portion of its past costs.**

71.     Exxon's accounting expert, Paul S. Ficca, has opined that Exxon has accurately accounted for more than $77 million in response costs at the two Sites.  Ex. 9, Ficca Supplemental Expert Report at 6 (January 2017).

72.     The United States' accounting expert, E.J. Janik, a Certified Public Accountant with a Master of Science in Accounting and thirty years of forensic accounting experience, has reviewed Exxon's claim.  Ex. 2, Declaration of EJ Janik ¶ 4 (Dec. 14, 2017).

73.     Mr. Janik has concluded that Exxon has failed to provide sufficient documentation to accurately account for roughly one-third of its costs—about $23 million.  Ex. 2, Declaration of EJ Janik ¶ 9 and Table 1 (Dec. 14, 2017).

74.     This figure includes $6.7 million—8% of Exxon's costs—for which Mr. Janik has concluded that Exxon has produced no invoice and no proof of payment.  Ex. 2, Declaration of EJ Janik ¶ 10 & Table 2 (Dec. 14, 2017).

75.     Mr. Janik explained that accountants will "generally seek support for a given cost item by looking for an invoice confirming an accounting ledger entry, and then for proof of payment relating to that invoice."  Ex. 15, EJ Janik Expert Report at 2 (June 23, 2016).

76.     A.J. Gravel testified that in his work as an expert on the National Contingency Plan's accurate accounting requirement, his methodology includes reviewing vendor invoices and proof of payment documentation.  Ex. 34, Gravel Dep. at 32:9–33:22, 68:15–69:14, 78:16–87:6.

77.     The Baytown and Baton Rouge Sites are massive industrial operations that have caused pollution in numerous areas of the Sites.  Ex. 153, Exxon's Responses to United States' Third Set of Phase II Discovery Requests at 11–20, Responses to Interrogatory Nos. 6 through 9 (June 21, 2017).

78.     Exxon hires many contractors to conduct innumerable projects at the Complexes. Ex. 42, Paredes Dep. at 31:7–35:3; Ex. 15, EJ Janik Expert Report at 51 (listing 35 vendors at Baytown); *id.* at 52 (at Baytown, "[t]here are over 500 vendors with the totals below per Mr.

Ficca's support codes"); *id.* at 67 (listing 40 vendors at Baton Rouge); *id.* at 68 (at Baton Rouge, "[t]here are over 200 vendors with the below totals per Mr. Ficca's support codes").

79.     Only some of those contractors and some of those projects relate to cleanup of the waste units where the United States bears some responsibility under CERCLA. Ex. 34, Gravel Dep. at 77:16–78:7 ("[A]t Baton Rouge, you had a cost center and everything related to the cleanups would be booked to that cost center, and so you had to tease out, you know, by doing more detailed analysis what was related to what units.").

80.     Exxon's employee, Gary Robbins, testified that when he supervised contractors at the Baytown Site, Exxon would not pay a contractor without first receiving and reviewing an invoice. Ex. 44, Gary D. Robbins Dep. at 51:9–53:18 (June 15, 2017) (testifying that "in my tenure, an invoice was required" before Exxon would pay a contractor).

81.     "Proof of payment establishes that the approved invoice was paid and whether it was paid in part or in full, among others." Ex. 15, EJ Janik Expert Report at 2.

82.     "'[P]roof of payment,'" according to Mr. Gravel, "'is often overlooked, but in my view [a] critical part of the process'" because it provides evidence about "'the purchaser's side of the transaction.'" Ex. 34, Gravel Dep. at 84:21–85:6.

83.     In general, Mr. Gravel agrees with his prior testimony as an expert that proof of payment is "'very important because that's where you might see discrepancies in payment and other types of discounting or other types of lump sum settlements or other things that need to be reconciled in order for these costs to [be] acceptable.'" Ex. 34, Gravel Dep. at 85:6–15; *id.* at 34:17–35:5 ("I think invoices are important, but I think so are proof of payment records and accounting reports and all the other things.").

84.     According to Exxon's accounting expert, Mr. Ficca, Exxon need not prove each individual cost by producing an invoice and proof of payment. Ex. 30, Ficca Dep. Vol. I at 123:16–126:13.

85.     According to Mr. Ficca, "I don't think this type of micro level, transaction-by-transaction type of analysis . . . is proper in terms of reaching a conclusion about accurate accounting. I don't think you [] look at every single one of thousands and thousands of transactions in isolation. … I don't think see anywhere where accurate accounting means that you have to reach an individual conclusion about every single dollar that was ever incurred." Ex. 30, Ficca Dep. Vol. I at 132:14–133:15.

86.     Mr. Ficca believes that "you have to look at the documentation in its totality." Ex. 30, Ficca Dep. Vol. I at 132:18–133:15.

87.     As Mr. Ficca acknowledged, the point of relying on those other types of documentation is still to "verify the work that was performed" and to establish what "amounts were . . . paid." Ex. 30, Ficca Dep. Vol. I at 62:11-18.

88.     Mr. Ficca' opinion is that because Exxon has produced documentation that validates many cost items in Exxon's accounting system records, the accounting records are

therefore reliable enough to prove the remaining costs where Exxon lacks documentation, such as an invoice or a canceled check or both. Ex. 30, Ficca Dep. Vol. I at 135:1–135:19; Ex. 29, Ficca Supplemental Dep. at 200:20–201:4 ("I think the work that I have done proves that the accounting records are accurate and can be relied upon even if an invoice is missing from the information that was produced.").

89.     Mr. Ficca testified that Exxon's accounting systems capture information such as invoice numbers, invoice date, invoice payment amount, payment amount, payment date, payment check number, and vendor name. Ex. 30, Ficca Dep. Vol. I at 190:2–191:11, 202:17–203:9.

90.     If Exxon's accounting system records for its Baytown and Baton Rouge costs were as reliable and accurate as Mr. Ficca claims they are, then those records should provide complete information about Exxon's costs. Ex. 38, EJ Janik Dep. Vol. I at 228:16–229:16 (Dec. 14, 2016).

91.     For many individual costs that Exxon is claiming, the accounting system record that Mr. Ficca relies on is missing basic information, such as the invoice number, invoice date, and vendor name. Ex. 10, Ficca Supplemental Attachment 3, Schedule B-2 – Baytown Cost Detail (examples of missing invoice numbers are Baytown Cost IDs 2128 through 2144; examples of missing invoice dates are Cost IDs 2863 through 2870; examples of missing vendor names are Cost IDS 6420 through 6423).[5]

92.     Mr. Ficca was shown a $199,870.78 cost item at the Baytown Site that reportedly came from Exxon's Everest accounting system but for which Exxon had no invoice or proof of payment. Ex. 31, Paul S. Ficca Dep. Vol. II at 344:3–18 (Nov. 29, 2016).

93.     Although the accounting system record was also missing information such as an invoice number and vendor name, Mr. Ficca expressed no concerns about the accuracy of the cost because "this is information that came from [the] Everest" accounting system. Ex. 31, Ficca Dep. Vol. II at 344:3–347:5. Consistent with his opinion, Mr. Ficca asserted, "I don't see any reason to believe that this report from Everest is inaccurate." *Id*. at 346:8–347:2.

94.     Mr. Ficca was then shown an invoice for a different cost in Exxon's claim (Baytown Cost ID 4945), for $18,273.35, which also listed $199,870.78 as a summary of the vendor's total costs for the "Project to Date." Ex. 31, Ficca Dep. II 340:13–359:4. In other words, the invoice demonstrated that Exxon had erroneously included the $199,870.78 in its claim as Cost ID 4961, despite Mr. Ficca's opinion that the cost had to be accurate because it came from Exxon's Everest accounting system. *Id*.; Ex. 128, ERM Invoice at BAYTECH-00159755 (Dec. 27, 2006). Mr. Ficca later removed the $199,870.78 from Exxon's claim. Ex. 9, Ficca Supplemental Expert Report at 5.

---

[5] This exhibit is an Excel spreadsheet Mr. Ficca attached to his Supplemental Expert Report. To see Cost IDs for Baytown, select the third tab labeled "B-2 Baytown Cost Detail." The Cost ID numbers are in Column B of the spreadsheet.

95.     The United States has identified two more examples of this exact same error. Compare Ex. 126, ERM Invoice for Cost ID 5057 at BAYTECH-00167031 (invoice for $2,958.53 with a "Project to Date" summary of $269,983.26) with Ex. 10, Ficca Supplemental Attachment 3, Schedule B-2 – Baytown Cost Detail for Cost ID 4959 (cost item originally in Exxon's claim for $269,983.26); *compare* Ex. 129, ERM Invoice for Cost ID 5064 at BAYTECH00167107 (invoice for $1,148.00 with a "Project to Date" summary of $105,264.80) *with* Ex. 10, Ficca Supplemental Attachment 3, Schedule B-2 – Baytown Cost Detail for Cost ID 4960 (cost item originally in Exxon's claim for $105,264.80).

96.     Together, the three errors add up to $575,118.84 in duplicative or overlapping charges.  Mr. Ficca subsequently removed those three costs from Exxon's claim, in his words, "out of an abundance of caution."  Ex. 9, Ficca Supplemental Expert Report at 5 (January 2017).

97.     After his first deposition in these cases, Mr. Ficca proceeded to exclude all costs from Exxon's claim where there was no invoice, invoice number, and vendor name in the Cost Summaries—304 cost items totaling $307,901 at Baytown and six cost items totaling $2,925 at Baton Rouge.  Ex. 9, Ficca Supplemental Expert Report at 5–6 (January 2017); Ex. 29, Ficca Supplemental Dep. at 194:11–198:16 (June 30, 2017).

98.     Mr. Ficca has declined to exclude other cost items where the accounting system has failed to produce complete information and Exxon has not produced other documentation to support the cost.  Ex. 29, Ficca Supplemental Dep. at 203:5–206:1 (June 30, 2017).



101.    When asked about the NACC database's purpose, Mr. Ficca testified that he was "[o]nly very broadly" aware that it was related to the NACC litigation.  Ex. 30, Ficca Dep. Vol. I at 203:20–204:3.  Mr. Ficca also testified, "I don't know exactly how [the NACC database] was used in the [NACC] litigation."  *Id*. at 204:4–204:9.  Mr. Ficca acknowledged that he did not recall who developed the NACC database, and he did not know whether Exxon's lawyers were involved in creating the database.  *Id*. at 203:14–19.  Mr. Ficca also did not know how the NACC database was created, and he did not know when it was created.  Ex. 31, Ficca Dep. Vol. II at 246:18–247:4.

102.    Mr. Ficca expressed confidence that the reliability of the NACC database was "right up there" with the reliability of Exxon's accounting systems.  Ex. 30, Ficca Dep. Vol. I at 179:18–22.

103.    Mr. Ficca's opinion is that Exxon has accurately accounted for more than $51,048,743 in past costs at the Baytown Site and $26,046,130 in past costs at the Baton Rouge Site.  Ex. 11, Ficca Supplemental Expert Report at 6.  That opinion is based in large part on a collection of Excel spreadsheets that list those costs and purport to summarize the evidence that

Mr. Ficca relies on to support the costs (the Cost Summaries).  Ex. 10, Ficca Supplemental Attachment 3 (containing thirteen Excel spreadsheets).

104.    Exxon's Cost Summaries include substantial information from the NACC database.  Mr. Ficca has relied on information from the NACC database to support a total of $23,463,406 in costs at the two Sites.  Ex. 14, Janik Expert Rebuttal Report at 11 (Sept. 22, 2016).  The Cost Summary for the Baytown Site also contains numerous statements like "I understand from Peter Gagnon" that certain costs relate to a particular waste unit at the Site.  Ex. 10, Ficca Supplemental Attachment 3, Schedule B-2 – Baytown Cost Detail, Cost IDs 3340, 3498, 3499, 3501.[6]

105.    When asked about these statements, Mr. Ficca stated that he never spoke directly with Mr. Gagnon, that Mr. Gagnon's information actually came from his conversations with Exxon's lawyers, and that he (Mr. Ficca) had no other notes about his conversations with Exxon's lawyers.  Ex. 31, Ficca Dep. Volume II at 366:16–368:13.  When Exxon described in an interrogatory response how Mr. Ficca obtained some information from Mr. Gagnon, Exxon did not indicate that its lawyers were involved in transmitting the information.  Ex. 153, Exxon's Responses to United States' Third Set of Phase II Discovery Requests, Response to Interrogatory No. 5, pages 10–11 (June 21, 2017).  It is unclear whether this information from Mr. Gagnon is the same as the information that Mr. Ficca testified about in his June 30, 2017 deposition.

106.    For costs from 1998 at the Baton Rouge Site, Mr. Ficca's spreadsheet stated that Exxon "only provided invoices and invoice detail for . . . line items greater than $5K [thousand]."  Ex. 31, Ficca Dep. II at 381:12–382:17.  Mr. Ficca believed that he asked Exxon to "provide everything that [the company] could reasonably get accumulated" and that the $5,000 cutoff was not a choice that he made.  *Id*. at 381:18–383:3.

107.    The United States' accounting expert, Mr. Janik, has concluded that Exxon has no invoice and no proof of payment for $4.7 million at Baytown and $2 million at Baton Rouge.  Ex. 2, Decl. of EJ Janik ¶ 10 (Dec. 14, 2017); Ex. 15, EJ Janik Expert Report with attachments (Jun. 23, 2016), Ex. 14 EJ Janik Expert Rebuttal Report (Sept. 22, 2016); Ex. 162, EJ Janik Supplemental Expert Report (Jan. 30, 2017).

108.    Mr. Janik has concluded that Exxon has no invoice and no proof of payment for a total of $4,792,400 that Exxon claims at the Baytown cleanup units.  Ex. 2, Decl. of EJ Janik ¶ 11 (Dec. 14, 2017).  In his declaration, Mr. Janik has identified those costs in Table 3, Column C.  *Id*.

109.    Mr. Janik has concluded that Exxon has no invoice and no proof of payment for a total of $2,007,504 that Exxon claims at the Baton Rouge cleanup units.  Ex. 2, Decl. of EJ Janik ¶ 12 (Dec. 14, 2017).  In his declaration, Mr. Janik has identified those costs in Table 3, Column C.  *Id*.

---

[6] This exhibit is an Excel spreadsheet Mr. Ficca attached to his Supplemental Expert Report.  To see Cost IDs for Baytown, select the third tab labeled "B-2 Baytown Cost Detail."  The Cost ID numbers are in Column B of the spreadsheet.

110.    Mr. Janik has concluded that Exxon has proof of payment but no invoices to
support about $14.4 million in costs at the two Sites.  Ex. 2, Decl. of EJ Janik ¶ 10 (Dec. 14,
2017).  In his declaration, Mr. Janik has identified those costs in Table 2, Row 4.  *Id.*

**III.    Undisputed facts to support Argument Point IV: The Court should equitably
allocate to the United States a zero share of some of Exxon's costs and a small share
of the rest.**

    **A.    Undisputed facts to support Argument Point IV.A.: The United States should
not bear any of Exxon's costs to address four (and part of a fifth) cleanup
units at the Sites.**

        **1.    Undisputed facts to support Argument Point IV.A.1.: The Court
should not allocate to the United States any share of Exxon's costs
that were not necessary to address a threat to human health or the
environment.**

(see I., *supra*)

        **2.    Undisputed facts to support Argument Point IV.A.2.: The United
States should not bear any of Exxon's costs to address three cleanup
units with no or de minimis Government involvement.**

            **a.    Undisputed facts to support Argument Point IV.A.2.a: At the
Baton Rouge Site, the United States should not bear any of the
costs for the Old Silt Pond or the Rice Paddy Landfarm.**

111.    Exxon has claimed $9,977,687 in costs to address the Old Silt Pond alone;
$4,622,578 in costs to address the Rice Paddy Landfarm alone; and an additional $3,302,781 in
costs to address both the Old Silt Farm and the Rice Paddy Landfarm.  Ex. 12, Ficca
Supplemental Attachment 3, Schedule C-1 – Baton Rouge Cost Summary.[7]

112.    The original Old Silt Pond was an unlined, approximately twenty-acre surface
impoundment at the Baton Rouge Site.  Ex. 83, A.T. Kearney, Inc., Preliminary Review/VSI
Report, August 26, 1987 ("VSI Report"), BRTECH-00005956 at 00005991; Ex. 13, Expert
Report of A.J. Gravel ("Gravel Report"), June 18, 2012, at 139.

113.    The original Old Silt Pond went into operation in October 1945, when a silt
treating unit began operating at the Baton Rouge Site.  Ex. 13, Gravel Report at 213 (citing
Proposed Earthen Separator for Callaghan's Bayou, August 27, 1948, BRC-00000461 at BRC-
00000461-62 ("Proposed Earthen Separator Report"); Proposed Earthen Separator Report at

---

[7] This exhibit is an Excel spreadsheet that Mr. Ficca attached to his Supplemental Expert Report.
To see Exxon's claimed costs for the Old Silt Pond and Rice Paddy Landfarm, select Tab "C-1
Baton Rouge Cost Summary."

BRC-00000461 (stating that the silt treating unit was put in operation on October 1, 1945); Ex. 83, VSI Report at BRTECH-00005992 (stating that "fill activities are reported to have taken place as early as the 1950s").

114.    Wastes were not disposed of in the Old Silt Pond prior to October 1945.  Ex. 45, Sitton Dep. Tr. 419:3-420:8 (Vol. II, Feb. 1, 2013) ("Sitton Dep. Vol. II") (stating that she does not see evidence of material being placed in the Old Silt Pond in 1937 and 1944 photographs); *id.* at 420:9-421:6 (stating that she did not see an outwash fan emanating from the silt treating unit in the August 1945 photograph); *id.* at 421:13-22 (stating that she did not see any evidence of overflow from a diversion chamber into the Old Silt Pond in any photograph); *id.* at 422:7-423:2 (stating that the light-toned area on the western portion of the Old Silt Pond could not have been waste disposal because there were no access roads into the area or evidence of piling or grating).

115.    Exxon's aerial photography expert, Wayne Grip, testified that an area on the western portion of the Old Silt Pond in an August 10, 1945, photo that he labeled as "vegetation removed, possible fill" "could be fill" or "could be something else" and that he did not see any evidence of pushing or pulling or spreading of material in that area.  Ex. 35, Grip Dep. Tr. 117:14-119:5, 121:7-11 (Vol. I, April 17, 2013) ("Grip Dep. Vol. I").

116.    Mr. Grip also testified that although he identified "borrow areas" or trenches in the August 10, 1945, photograph, he did not see any evidence of what those areas were used for. *Id.* at 132:17-133.

117.    Mr. Grip also testified that while he was certain there was material flowing into a borrow area in the eastern portion of the Old Silt Pond in an August 10, 1945, photograph, he could not identify the material or where it came from.  *Id.* at 133:14-134:14 (testifying that he could not identify the purpose of the borrow area); *id.* at 144:2-145:1 (testifying that he could not identify where the material came from); *id.* at 146:1-147:3 (testifying that the dark-toned material identified could have been water or oil).

118.    The Old Silt Pond cleanup unit is geographically distinct from other cleanup units at the Baton Rouge Site.  Ex. 118, ERM, Shallow Fill Zone Technical Report, March 22, 1996, BRTECH-00000990 at BRTECH-000001057, BRTECH-000001060, BRTECH-000001065 ("Shallow Fill Zone Report"); Ex. 13, Gravel Report 140.

119.    The original Old Silt Pond was used for disposal of oily silt until it reached its design capacity in the late-1950s.  Ex. 13, Gravel Report 213.

120.    In the mid-1970s, Exxon built a "new" Old Silt Pond impoundment on a five-acre area on the western side of the Old Silt Pond.  Ex. 89, Exxon, Old Silt Pond Regulatory File, September 1992, BRTECH-00004484 at 4590-92; Ex. 83, VSI Report at BRTECH-00005992.

121.    In 1986, Exxon conservatively estimated the annual amount of sludge deposited in the "new" Old Silt Pond at 31,041 tons.  Ex. 76, Exxon, Internal Memorandum, May 19, 1986, BRC-00055266-67; Ex. 83, VSI Report at BRTECH-00005992 (describing sludge).

122.    Exxon was required to cease disposing of waste in the "new" Old Silt Pond by November 8, 1988.  Ex. 89, ERM-Southwest, June 8, 1988, Closure and Post-Closure Plans for Old Silt Pond, BRTECH-00004588 at BRTECH-00004590 ("Old Silt Pond Closure Plan").

123.    Exxon's initial Old Silt Pond Closure Plan required stabilization of approximately 185,200 cubic yards of waste in the "new" unit and the installation of a cap over the unit.  Ex. 89, Old Silt Pond Closure Plan at BRTECH-00004590-91, 4610-12.

124.    When the stabilization plan did not succeed, Exxon had to segregate and solidify the sludge, compact solidified materials, and install a cap over the five-acre "new" Old Silt Pond impoundment.  Ex. 13, Gravel Report 219; Exxon, Letter to LDEQ, October 25, 1990, BRTECH-00004850-51.

125.    Exxon's Closure Plan for the "new" Old Silt Pond addressed wastes placed in the impoundment during the 1970s and 80s.  It does not address any of the waste placed in the original Old Silt Pond.  Ex. 89, LDEQ Interoffice Correspondence, June 28, 1990, BRTECH00004781 (discussing the post-closure permit for the 5-acre surface impoundment).

126.    The Rice Paddy Landfarm cleanup unit is geographically distinct from other cost units at the Baton Rouge Site.  Ex. 83, VSI Report at BRTECH-00006112 (describing the area as "entirely surrounded by earthen dikes"); Ex. 13, Gravel Report 139-40, 213.

127.    There is no evidence of waste disposal in the Rice Paddy Landfarm area during World War II.  Ex. 45, Sitton Dep. Vol. II, 433:22-25, 434:12-16 (stating that the entire Rice Paddy Landfarm was vegetated in a January 1940 photograph, that an inundated area in Rice Paddy Landfarm visible in a February 1941 photograph could not be connected to an outfall located south of the Rice Paddy Landfarm, and that discharge from the outfall did not appear to be entering the Rice Paddy Landfarm); *id.* at 435:17-436:3 (stating that she could not identify an inundated area or discharge from the outfall in a November 1944 photograph); id. at 329:2-330:9 (stating that an inundated area in the Rice Paddy Landfarm visible in August 1945 photograph could not have contained oily wastewater because vegetation appeared healthy, and a light-toned area in the Rice Paddy Landfarm did not look as if material had been placed there); *id.* at 436:4-437:8 (stating that an inundated area in the Rice Paddy Landfarm visible in August 1945 photo did not appear to be connected to the outfall, that she could not see any kind of discharge from the outfall, and that the outwash fan identified by Mr. Grip did not appear to be going into the Rice Paddy Landfarm).

128.    Mr. Grip identified an area he called "old flow" in the Rice Paddy Landfarm in a 1940 photograph, but could not be certain it was evidence of an old flow, and admitted that it could be an area that was revegetating.  Ex. 35, Grip Dep. Vol. I, 222:18-224:3.

129.    Mr. Grip stated that he could not tell if the inundated area in the Rice Paddy Landfarm visible in a 1941 photograph contained oil, but admitted he could see live vegetation within the area.  Ex. 35, Grip Dep. Vol. I, 224:9-225:1; Ex. 37, Grip Dep. Vol. II, 268:17-269:20.

130.    Mr. Grip stated that he believed he could see material entering the Rice Paddy Landfarm in a 1944 photo because he could identify sediment/stressed vegetation, but on the

photograph exhibit, he identified that area as south of the RPL boundary.  Ex. 35, Grip Dep. Vol. I, 225:2-19; Ex. 36, Grip Dep. Vol. I, Ex. 2, 11/6/1944 photograph.

131.    Mr. Grip admitted that an inundated area in the Rice Paddy Landfarm visible in the August 1945 photograph could be water.  Ex. 35, Grip. Dep. Vol. I, 225: 20, 227:10-19, Ex. 37, Grip Dep. Vol. II, 271:12-273:16 (acknowledging that dark-toned inundated area could be oil or clear water, and could have been a remnant from a rain event).

132.    Mr. Grip stated that the September 25, 1947, photograph was the earliest date on which he saw light-toned materials crossing a pipe scar located south of the Rice Paddy Landfarm.  Ex. 35, Grip Dep. Vol. I, 229:19-230:1.

133.    Mr. Grip acknowledged that the area within the Rice Paddy Landfarm that appeared to be periodically flooded in the photographs were lower in elevation than other areas of the Rice Paddy Landfarm.  Ex. 37, Grip Dep. Vol. II, 280:11-18.

134.    In 1976, Exxon built a fifteen-acre impoundment on top of the Rice Paddy Landfarm and disposed of waste in the impoundment through November 8, 1988.  Ex. 89, Exxon, May 5, 1989, Letter to LDEQ re Rice Paddy Landfarm Closure Plan, BRTECH-00004683 at 4683; Ex. 83, VSI Report at BRTECH-00006112.

135.    Exxon's Closure Plan for the Rice Paddy Landfarm required bioremediation of the fifteen-acre area.  Ex. 89, LDEQ Internal Memorandum, July 11, 1989, BRTECH-00004696 at 96.

136.    Bioremediation was ultimately inadequate because Exxon could not achieve the required oil content in the fifteen-acre area and hazardous substances were discovered below the treatment zone.  Ex. 13, Gravel Report 220.

137.    Exxon had to install a cap over the fifteen-acre Rice Paddy Landfarm impoundment.  Ex. 13, Gravel Report 220; Ex. 89, Exxon, Letter to LDEQ, October 25, 1990, BRTECH-00004850 at BRTECH-00004851.

138.    Exxon's remediation of the fifteen-acre Rice Paddy Landfarm impoundment primarily addressed wastes place in the impoundment during the 1970s and 80s.  Ex. 89, Exxon, Letter to LDEQ, October 25, 1990, BRTECH-00004850 at BRTECH-00004851 (requesting approval to construct a "RCRA cap" over the entire fifteen-acre impoundment).

139.    The end of World War II in Europe, known as VE Day, occurred on May 8, 1945, and the end of World War II in Japan, known as VJ Day, occurred on August 14, 1945.  The Korean War began on June 25, 1950, and ended on July 27, 1953.[8]

---

[8] The Court may take judicial notice of these facts.  *See, e.g., Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 334 (1922).

140.     Plancor 152 (Butadiene Plant) shut down on August 6, 1947 and was placed on standby.  It was sold to Copolymer Corporation on September 20, 1950.  Ex. 13, Gravel Report 144.

141.     Plancor 572 (Butyl Rubber Plant) was sold to Standard in April 1955.  Ex. 71, Memorandum to Mr. G. I. Irwin (Dec. 15, 1955), US-BR005349 at US-BR005349, US-BR005367.

142.     Plancor 1526 (Catalyst Plant) was transferred to the account of Plancor 572 in June 1950, which was later sold to Standard and dismantled towards the end of 1950.  Ex. 68, Esso Standard Oil Company, Letter from Mr. H. J. Voorhies, June 23, 1953, BRC-00003872 at BRC-00003876; Ex. 65, Esso Standard Oil Company, Plants at Baton Rouge, Louisiana, Operated or Maintained in Standby Condition, December 31, 1950, BRC-00010976 at BRC-00010976-80.

143.     Plancor 1355 (Butadiene Conversion Plant) was sold to Standard on January 1, 1949.  Ex. 13, Gravel Report 145.

144.     Plancor 1065 (Avgas Blending Components) was sold to Standard on October 20, 1950.  *Id*.

145.     Plancor 1868 (Hydrogenation Plant Expansion) ceased operation on September 30, 1945.  *Id*.

146.     Plancors 572 and 1065 sent waste to a 72-inch sewer which flowed north to a separator and ultimately discharged into the Monte Sano Bayou.  Ex. 13, Gravel Report 199 (citing Report to the RFC on Industrial Wastes, RuR SR-15 & 158, September 18, 1946, p. 191, BRHIS-00008931 at 8935).  *See also* Phase I Decision at 501.

147.     Plancor 152 discharged process wastewaters to the Monte Sano Bayou, but also sent some waste to the refinery's waste-processing system.  *See* Phase I Decision at 501.

148.     Plancor 1355 used the refinery waste-processing system for treatment and disposal of its waste.  *See id*.

149.     Exxon has not produced any evidence of the volume of waste or material sent by Plancors 1355 and 152 through the refinery's waste-processing system.

        **b.     Undisputed facts to support Argument Point IV.A.2.b.: At the Baytown Site, Exxon should be allocated all of the costs for the Tank Farm 3000 Area.**

150.     The Baytown Ordnance Works was built in 1940 for the purpose of manufacturing toluol.  Ex. 48, Construction, Equipment, and Operation Contract, US-BT010074 at US-BT020074-77.

151.     The Baytown Ordnance Works operated from September 1941 to August 1945.  Ex. 156, Humble, History of the Baytown Ordnance Works (1943), BAYHIS-00017743 at

BAYHIS-00017747, 00017763; Ex. 60, Reconstruction Finance Corporation, Memorandum, October 11, 1945, BAYHIS-00019119.

152.    In 1952, Exxon built a Paraxylene Extraction Unit in the former Baytown Ordnance Works area.  Ex. 157, History of the Baytown Refinery, May 1988, BAYC-00000657 at BAYC-00000658; Ex. 92, Exxon Chemical Americas, Phase III Subsurface Investigation Report for Tank Farm 3000 and Adjacent Areas – Exxon Chemical Americas, Baytown Chemical Plant, Baytown, Texas ("Phase III Report"), February 2, 1993, BAYTECH-00027105 at BAYTECH-00027113.

153.    The Paraxylene Extraction Unit was dismantled in the early 1980s.  *Id.* at BAYTECH-00027109.

154.    In 1964, Exxon built a Linear Paraffin Unit in the former Baytown Ordnance Works area.  Ex. 157, History of the Baytown Refinery at BAYC-00000658; Ex. 92, Phase III Report at BAYTECH-00027107, 00027113.

155.    The Linear Paraffin Unit ceased operation in approximately 2009.  Ex. 153, Exxon Responses to United States' Third Set of Phase II Discovery Requests, Response to Interrogatory 6.

156.    A Naphtha Rerun Unit was part of the original Baytown Ordnance Works.  Ex. 92, Phase III Report at BAYTECH-00027108, 0027113.

157.    Exxon continues to operate the Naphtha Rerun Unit today.  Ex. 153, Exxon Responses to United States' Third Set of Phase II Discovery Requests, Response to Interrogatory 6.

158.    Exxon also built tanks to serve the Paraxylene Extraction Unit, Linear Paraffin Unit, and Naphtha Rerun Unit, called the "3000 series tank farm" or "Tank Farm 3000." Ex. 92, Phase III Report at BAYTECH-00027109, 00027113.

159.    Tank 3011 was used for feedstock service at the Naphtha Rerun Unit until the mid-1980s.  Ex. 92, Phase III Report at BAYTECH-00027108.

160.    In the early 1990s, Exxon discovered two groundwater plumes in the Tank Farm 3000 area.  Ex. 136, Letter dated July, 2009 from Exxon to TCEQ, Attachment 1:  Chronology of Tank Farm 3000 Area Activities ("Chronology of Tank Farm 3000 Area"), BAYTECH-00046007 at BAYTECH-00046015; Ex. 92, Phase III Report at BAYTECH-00027113.

161.    Exxon subsequently investigated the nature, extent, and source of the plumes.  Ex. 136, Chronology of Tank Farm 3000 Area at BAYTECH-00046015; Ex. 92, Phase III Report at BAYTECH-00027105-110.

162.    In 1992, the two plumes were located directly below the Linear Paraffin Unit and Paraxylene Extraction Unit.  Ex. 92, Phase III Report at BAYTECH-00027113.

163.    In 1992, no contamination was found in the monitoring wells surrounding the Naphtha Rerun Unit.  Ex. 92, Phase III Report at BAYTECH-00027113 (showing 0.0 free product thickness at MW-15, MW-25, MW-27, MW-31, MW-33, MW-35, and MW-56).

164.    No contamination has been found in these wells in subsequent years.  Ex. 107, Hydrocarbon Recovery Action Plan, BAYTEC-00001295 at BAYTECH-00001330; Ex. 111, Preliminary Design Information for Full-Scale Hydrocarbon Recovery System, BAYTECH-00030347 at BAYTECH-00030359 (showing no contamination in MW-15, 25, 27, 31, 35, and 40 in 1999); Ex. 120, Second Half 2003 Semiannual Ground Water Monitoring Report Tank Fam 3000, BAYTECH-00032403 at BAYTECH-00032491 (showing no contamination in MW-15, 25, 27, 31, 35, and 40 in 2003).

165.    In a 1993 letter to the Texas Water Commission, Exxon attributed the plumes to activities associated with the Linear Paraffins Unit, Naptha Rerun Unit, and the Paraxylene Extraction Unit.  Specifically, Exxon stated:

> Exxon believes the kerosene and linear paraffin product (LPU Product) seen in the northwestern portion of the plume was most likely related to the Linear Paraffins Unit. . . .

> The predominately C6 to C10 aromatic-rich reformate component observed in monitor wells MW-4 and MW-9 is probably related to historic activities at the Naphtha Rerun Unit (NRU). . . .

> The naphtha and alkylate-rich gasoline blend stock type materials present in the central and southern portions of the plume . . . are also likely to be associated with historic activities at the 3000 series tank farm. . . .

> The mixed xylene/aromatic concentrate material that pr[e]dominates in the northeastern portion of the plume . . . is similar to the feedstock material used at the Paraxylene Extraction Unit (PXU). . . .

> As previously mentioned, the Paraxylene Extraction Unit was dismantled in the early 1980's.  Therefore, we believe that the source of the hydrocarbons in this portion of the plume, like the source of hydrocarbon types present in the remainder of the plume, are historic in nature.

Ex. 92, Phase III Report at BAYTECH-00027106-00027109; Ex. 41, Gregory Kipp Dep. Tr. 559:1-6; 563:4-564:3 (Vol. II, May 12, 2017) (Exxon's expert engineer discussing the contour lines on BAYTECH-00027113 and text on BAYTECH-00027108 and agreeing that one could reasonably infer from the report that "there's a fairly large source of contamination which the engineers who wrote this report tribute to the linear paraffins unit" and the paraxylene extraction unit and not the naphtha rerun unit).

166.    Mr. Gravel's report states, that "at least a portion of a phase separated hydrocarbon ("PSH") groundwater contaminant plume under the [Baytown Ordnance Works]

23

site that is being addressed by ExxonMobil in accordance with Agreed Order 2 is likely related to the Site's [World War II] operations . . . ." Ex. 13, Gravel Report 121. The 1998 letter cited by Mr. Gravel that stated that the source of the contamination at the Tank Farm 3000 area was "historic in nature" meant that the sources were not ongoing leaks from a tank and three pipelines in use at the time. Ex. 110, Letter from J.M. Bruney, Chemical Americas to J.A. Saitas, TNRCC, Hydrocarbon Investigation, July 23, 1998, BAYTECH-00096188 at BAYTECH-00096188-90; Ex. 92, Phase III Report at BAYTECH-00027105-110.

167.    Since the investigations in the early 1990s, Exxon has not conducted a further investigations to determine or date the source of the Tank Farm 3000 plumes. Ex. 33, Gagnon Phase II Dep. at 108.

168.    In Phase II discovery, Exxon objected to requests for information regarding the Linear Paraffins Unit, Paraxylene Extraction Unit, and Naptha Rerun Unit as "overly broad and unduly burdensome in seeking various types of information about numerous, *mostly post-wartime* related process units and their operations at the Baytown complex." Ex. 153, Exxon Responses to United States' Third Set of Phase II Discovery Requests, Response to Interrogatory 6 (emphasis added).

169.    Exxon has claimed $5,481,340 in costs to address the Tank Farm 3000 area, also called the Former Ordnance Works Site Cleanup. Ex. 12, Ficca Supplemental Attachment 3, Schedule B-1 – Baytown Summary.[9]

**B.    Undisputed facts to support Argument Point IV.B.: The Court should equitably allocate no more than 2% of any remaining costs at Baytown and 1% of any remaining costs at Baton Rouge to the United States.**

170.    Both Exxon refineries made efforts in the years following World War II to reduce oil losses and improve the quality of their discharges to surface waters (effluent), and both reported considerable success in connection with these efforts. *See, e.g.,* Ex. 67, Minutes of the 22nd General Meeting; Refinery Loss Committee, MIS-00031624-67 (March/April 1952) ("Loss Committee Report") (cataloging post-war efforts at Baytown); Ex. 64, Operation of the Oil Conservation Department at the Baton Rouge Refinery," BRHIS-00013937-89 (May 1950).

171.    In early 1942, Exxon's predecessors and the United States entered into a pair of contracts providing in Part XII, entitled "Taxes," that:

Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by an municipal, state or federal law in the United States or any foreign country to

---

[9] This exhibit is an Excel spreadsheet that Mr. Ficca attached to his Supplemental Expert Report (January 2017). To see Exxon's claimed costs for the Tank Farm 3000 Area, select Tab B-1 – Baytown Summary.

collect or pay *by reason of* the production, manufacture, sale or delivery of the commodities delivered hereunder . . . (emphasis added).

Ex. 50, Contract between Defense Supplies Corp. and Humble Oil & Refining Co., ¶ XII(a), BAYHIS-00000585 at 597 ("Baytown Contract"); Ex. 49, Agreement between Defense Supplies Corp and Standard Oil of New Jersey, ¶ XII(a), MIS-00022185 at 205 ("SONJ Contract"); *see also* United States' Statement of Undisputed Facts in Support of Phase I Mot. Summ. J. ¶¶ 49-79 (Sept. 30, 2013), Dkt. 130-2 in No. 4:10-cv-02386.

172.    The same contracts also provided the escalation of prices otherwise agreed to between the parties on various grounds, including the disruption of "normal operation of said refinery," as indicated in the following clause:

> The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to the refinery . . . and upon a normal operation of said refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline.  If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods, thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existing of a state of war, the normal function of the refinery at which the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under paragraphs (a) and (b) of this Section V, Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline from the refinery so affected will . . . be reduced in an amount sufficient in the judgement of Seller to offset the added costs of refining unless Buyer shall agree with Seller to increase the price paid for the 100 octane aviation gasoline by an amount sufficient to offset such increased cost.

Ex. 50, Baytown Contract at ¶ V(c), BAYHIS 00000585 at 591-92; Ex. 49, SONJ Contract at ¶ V(c) MIS-00022185 at 196.

173.    Only a limited portion of a given volume of crude oil can be made into high-octane aviation gasoline. Ex. 21, Dr. James R. Kittrell, Expert Report at 14 (August 10, 2012) ("A typical crude oil might contain around 20% of materials that would be generally suitable for use as gasoline").

174.    There are no records available that definitively establish the total sales of refinery products to the United States during World War II, and the anecdotal records that are available are not entirely consistent.  At Baytown, for example, a 1943 trip report records a group of "critical war products" that – inclusive of aviation gasoline – is 29.7% of output for June of that year.  But the figure does not include gasoline, and the government certainly bought motor

gasoline during the war.  Ex. 52, Data on War Products, Baytown Refinery, BAYHIS-00028167 at 00028171, 00028185 (June 1943).   Another Exxon report from February 1943 reports 31% war products, but also confides that the figures for Navy Fuel Oil and Asphalt (11% of 31% figure reported for "war products") are reported as capacity rather than actual sales, with a note indicating that competitive bidding reduced actual throughput of those products to one half to two thirds of the reported figure.  Ordinary gasoline, once again, is excluded.  Ex. 159, Production of War Products at Humble Oil and Refining Company's Baytown Refinery, BAYHIS-00024502 at 00024503 (Feb. 1943).  At Baton Rouge, a similar briefing memorandum characterizes the refinery's entire product slate as at least "non-critical" war products, and includes motor gasoline in that latter category – some of which was undoubtedly sold into domestic commerce, along with home heating oil and other products sold for domestic consumption.  Ex. 51, Major War Projects: Baton Rouge Refinery, BRC-00011607 at 00011620 (May 1943).  As at Baytown, about one-third of total throughput was for "critical war products" with the majority being aviation gasoline. *Id*. (Sum of critical war products = 34.6%).

175.    Both refineries made motor gasoline for the domestic market during the war, and both sold a specific 80 octane gasoline to the United States Army.  Although records for these sales are incomplete, the available information suggests that, on average, production of 80 octane gasoline for the military represented no more than about 5% of refinery production at Baytown, and about 3% at Baton Rouge.  Ex.1, Dr. Jay Brigham Declaration ¶¶ 6-7; *see also* Ex. 62, J. Frey & C. Ide, A History of the Petroleum Administration for War, MIS-00022327-854, at MIS-00022590-91 (1946); Ex. 53, Petroleum Industry Committee, Forecast of Operations – June 1944, 5/19/1944, US-GEN013463-78; Ex. 54, *ibid*, Forecast of Operations – July 1944 (June 19, 1944), US-GEN013479-97; Ex. 55, *ibid*, Forecast of Operations – August 1944 (July 19, 1944), US-GEN013498-516; Ex. 56, *ibid.,* Forecast of Operations – September 1944 (Aug. 19, 1944), US-GEN013517-37; Ex. 57, *ibid.,* Forecast of Operations – October 1944 (Sept. 19, 1944), US-GEN013538-57; Ex. 58, *ibid.,* Forecast of Operations – November 1944 (Oct. 19, 1944), US-GEN013602-21; Ex. 59, *ibid.,* Forecast of Operations – December 1944 (Dec. 20, 1944), US-GEN013578-99.

## IV.    Undisputed facts to support Argument Point V: Exxon is not entitled to a declaratory judgment allocating unknown future costs.

176.    Typically, an equitable allocation of costs for contamination in sediment underlying waterbodies requires extensive information such as the type of contaminants present in the sediment at the surface and at various depths and locations, a determination of which contaminants pose the greatest risk such that they drive the selected remedy, and the source of the various contaminants.  Ex. 5, Matthew Low Phase I Decl. ¶ 8 (adopting reports as testimony); Nov. 16, 2012 Expert Rebuttal Report by Matt Low 28-31; Ex. 23, Matthew Low Phase II Decl. ¶ 4 (adopting reports as testimony); Ex. 22, Matthew Low Supplemental Expert Report 46 (Jan. 30, 2017).

177.    Exxon does not know the extent of contamination of the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, and the Monte Sano Bayou and underlying sediments.  Ex. 26, Richard White Expert Report 24, 71-72, 105 (June 18, 2012).

178.     In Phase I, Mr. Peter Gagnon, an employee of an environmental consulting firm retained by Exxon, testified that Exxon had not conducted any generalized sampling of the Houston Ship Channel, Black Duck Bay, Scott's Bay, Mitchell Bay, or the Monte Sano Bayou to determine how far contamination extends into the waterbodies.  Ex. 32, Gagnon Dep. Tr., 21-24, 196:3-10, 199:14 -209:2 (Vol. I, April 11, 2013).  Exxon's sampling of the waterbodies has been limited to sampling of the water in Mitchell Bay, the Houston Ship Chanel and Black Duck Bay, and sediment along the shoreline of Mitchell Bay in order to determine whether contaminated groundwater at the Baytown Complex had migrated to the waterbodies.  *Id.*; Ex. 141, ExxonMobil, Offshore Report ExxonMobil Baytown Refinery Mitchell Bay Docks 2 to 7 Baytown, Texas (Oct. 17, 2011), BAYTECH-00122665-706.

179.     In his Phase II deposition, Mr. Gagnon testified that Exxon had collected pore water samples, or samples of groundwater that entered the waterbodies, from the sides of Black Duck Bay, Mitchell Bay, and the Houston Ship Channel.  Ex. 33, Gagnon Phase II Dep. at 58-59.

180.     Mr. Gagnon testified that he was not aware of any remediation activity or corrective action taken as a result of the pore water samples.  Ex. 33, Gagnon Phase II Dep. at 60.

181.     Mr. Gagnon testified that he was not aware of any sampling of the Houston Ship Channel itself, or the sediments underlying the Channel, or any plans to collect such samples.  Ex. 33, Gagnon Phase II Dep. at 144.

182.     Mr. Leon Paredes, an employee of ExxonMobil Environmental Services, which provides soil and groundwater services to ExxonMobil, testified that environmental investigation was done along the shorelines of Mitchell Bay and Black Duck Bay, but that no investigation of the Houston Ship Channel or Scott's Bay has been required by the State or performed by Exxon.  Ex. 42, Paredes Dep. at 19, 21, 22, 49-50, 161, 170-74.

183.     Mr. Stephen Johnson, Exxon's expert retained to testify about cleanup process issues and National Contingency Plan compliance for the Baytown and Baton Rouge Complexes, testified that there have been no appreciable steps taken to prevent the migration of contaminated groundwater towards the Houston Ship Channel.  Ex. 39, Johnson Dep. Vol. I at 176.

184.     Mr. Johnson was not aware of any documents showing that groundwater contamination from the Shallow Fill Zone had actually reached the Mississippi River.  Ex. 40, Johnson Dep. Vol. II at 457-58.

185.     As of the date of his deposition, Mr. Johnson believed Exxon would not be seeking costs with respect to Monte Sano Bayou.  Ex. 40, Johnson Dep. Vol. II at 510-513.

186.     Exxon has a permit to discharge stormwater from the Baytown Complex into Scott's Bay. Ex. 135, TPDES Permit No. WQ0001215000, Texas Commission on Environmental Quality Permit to Discharge Wastes issued June 22, 2009, US-BT015510.  According to TCEQ's website, this permit is active.
http://www15.tceq.texas.gov/crpub/index.cfm?fuseaction=iwr.viewAddnDetail&addn_id=39160

7682003128&rn=RN102574803&return=regent&re_id=884821462002163 (last visited
September 27, 2017).

187.   Exxon has a permit to discharge over 5,000 pounds of oil and grease per day from
the Baytown Complex into the Houston Ship Channel.  Ex. 139, TPDES Permit No.
WQ0000592000, Texas Commission on Environmental Quality Permit to Discharge Wastes
issued January 26, 2011, US-BT015468.  According to TCEQ's website, this permit is active.
http://www15.tceq.texas.gov/crpub/index.cfm?fuseaction=iwr.viewAddnDetail&addn_id=25757
4822002312&rn=RN102579307&return=regent&re_id=427847682002163 (last visited
September 27, 2017).

The United States respectfully submits the above-referenced facts in support of its

Motion for Partial Summary Judgment on Phase Two Issues.

Respectfully submitted,

Dated: December 15, 2017                    JEFFREY H. WOOD
                                            Acting Assistant Attorney General
                                            Environment and Natural Resources Division

                                             /s/ Erica Zilioli
                                            Michael D. Rowe (Attorney-in-Charge)
                                            Erica M. Zilioli
                                            Justin D. Heminger
                                            Brian H. Lynk
                                            Stephanie J. Talbert
                                            Trial Attorneys
                                            Environmental Defense Section
                                            United States Department of Justice
                                            P.O. Box 7611
                                            Washington, DC  20044
                                            (202) 514-3144
                                            Email: michael.rowe@usdoj.gov

                                            ABE MARTINEZ
                                            Acting United States Attorney
                                            Jimmy Rodriguez
                                            Assistant United States Attorney
                                            Southern District No. 572175
                                            Texas Bar No. 24037378
                                            1000 Louisiana, Suite 2300
                                            Houston, TX 77002
                                            (717) 567-9532
                                            jimmy.rodriguez2@usdoj.gov

                                            Counsel for Defendant United States

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2017, I filed the foregoing using the Court's

CM/ECF system, which will electronically serve all counsel of record registered to use the

CM/ECF system.

/s/ *Erica Zilioli*