**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

_____

|  |  |  |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 4:10-CV-02386 (LHR) |
| | ) | 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## REGULATORY ADDENDUM

Contents:

1.  Excerpts of the National Contingency Plan, 40 C.F.R. Part 300 (1986):

      40 C.F.R. § 300.61
      40 C.F.R. § 300.63
      40 C.F.R. § 300.64
      40 C.F.R. § 300.65
      40 C.F.R. § 300.66
      40 C.F.R. § 300.67
      40 C.F.R. § 300.68
      40 C.F.R. § 300.69
      40 C.F.R. § 300.70


2.  Excerpts of the National Contingency Plan, 40 C.F.R. Part 300 (1990):

      40 C.F.R. § 300.150
      40 C.F.R. § 300.160
      40 C.F.R. § 300.400
      40 C.F.R. § 300.405
      40 C.F.R. § 300.410
      40 C.F.R. § 300.415
      40 C.F.R. § 300.420
      40 C.F.R. § 300.430
      40 C.F.R. § 300.435

# Excerpts of the National Contingency Plan

## 40 C.F.R. Part 300 (1986)

# SUBCHAPTER J—SUPERFUND PROGRAMS

## PART 300—NATIONAL OIL AND HAZARDOUS SUBSTANCES POLLUTION CONTINGENCY PLAN

### Subpart A—Introduction

Sec.
300.1   Purpose and objectives.
300.2   Authority.
300.3   Scope.
300.4   Application.
300.5   Abbreviations.
300.6   Definitions.

### Subpart B—Responsibility

300.21   Duties of President delegated to Federal agencies.
300.22   Coordination among and by Federal agencies.
300.23   Other assistance by Federal agencies.
300.24   State and local participation.
300.25   Nongovernment participation.

### Subpart C—Organization

300.31   Organizational concepts.
300.32   Planning and coordination.
300.33   Response operations.
300.34   Special forces and teams.
300.35   Multi-regional responses.
300.36   Communications.
300.37   Special considerations.
300.38   Worker health and safety.
300.39   Public information.
300.40   OSC reports.

### Subpart D—Plans

300.41   Regional and local plans.
300.42   Regional contingency plans.
300.43   Local contingency plans.

### Subpart E—Operational Response Phases for Oil Removal

300.51   Phase I—Discovery and notification.
300.52   Phase II—Preliminary assessment and initiation of action.
300.53   Phase III—Containment, countermeasures, cleanup, and disposal.
300.54   Phase IV—Documentation and cost recovery.
300.55   General pattern of response.
300.56   [Reserved]
300.57   Waterfowl conservation.
300.58   Funding.

Sec.
### Subpart F—Hazardous Substances Response

300.61   General.
300.62   State role.
300.63   Discovery or notification.
300.64   Preliminary assessment for removal actions.
300.65   Removals.
300.66   Site evaluation phase and National Priorities List determination.
300.67   Community relations.
300.68   Remedial action.
300.69   Documentation and cost recovery.
300.70   Methods of remedying releases.
300.71   Other party responses.

### Subpart G—Trustees for Natural Resources

300.72   Designation of Federal trustees.
300.73   State trustees.
300.74   Responsibilities of trustees.

### Subpart H—Use of Dispersants and Other Chemicals

300.81   General.
300.82   Definitions.
300.83   NCP Product Schedule.
300.84   Authorization of use.
300.85   Data requirements.
300.86   Addition of products to schedule.

APPENDIX A—UNCONTROLLED HAZARDOUS WASTE SITE RANKING SYSTEM; A USERS MANUAL

APPENDIX B—NATIONAL PRIORITIES LIST

APPENDIX C TO PART 300—REVISED STANDARD DISPERSANT EFFECTIVENESS AND TOXICITY TESTS

AUTHORITY: Sec. 105, Pub. L. 96–510, 94 Stat. 2764, 42 U.S.C. 9605 and sec. 311(c)(2), Pub. L. 92–500 as amended, 86 Stat. 865, 33 U.S.C. 1321(c)(2); E.O. 12316, 46 FR 42237 (August 20, 1981); E.O. 11735, 38 FR 21243 (August 1973).

## Subpart A—Introduction

SOURCE: 50 FR 47951, Nov. 20, 1985, unless otherwise noted.

### § 300.1   Purpose and objectives.

The purpose of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP or Plan) is to effectuate the response powers and responsibilities created by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the authorities

(1) EPA may provide funds to begin timely discharge removal actions when the OSC is an EPA representative.

(2) The USCG pollution control efforts are funded under "operating expenses." These funds are used in accordance with agency directives.

(3) The Department of Defense has two specific sources of funds which may be applicable to an oil discharge under appropriate circumstances. (This does not consider military resources which might be made available under specific conditions.)

(i) Funds required for removal of a sunken vessel or similar obstruction of navigation are available to the Corps of Engineers through Civil Works Appropriations, Operations and Maintenance, General.

(ii) The U.S. Navy may conduct salvage operations contingent on defense operational commitments, when funded by the requesting agency. Such funding may be requested on a direct cite basis.

(4) Pursuant to section 311(c)(2)(H) of the CWA, the State or States affected by a discharge of oil may act where necessary to remove such discharge and may, pursuant to 33 CFR Part 153, be reimbursed from the pollution revolving fund for the reasonable costs incurred in such a removal.

(i) Removal by a State is necessary within the meaning of section 311(c)(2)(H) of the CWA when the OSC determines that the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs does not effect removal properly, or is unknown, and that:

(A) State action is required to minimize or mitigate significant threat to the public health or welfare which Federal action cannot minimize or mitigate, or

(B) Removal or partial removal can be done by the State at a cost which is less than or not significantly greater than the cost which would be incurred by the Federal departments or agencies.

(ii) State removal actions must be in compliance with this Plan in order to qualify for reimbursement.

(iii) State removal actions are considered to be Phase III actions, under

the same definitions applicable to Federal agencies.

(iv) Actions taken by local governments in support of Federal discharge removal operations are considered to be actions of the State for purposes of this section. Federal regional and Federal local plans shall show what funds and resources are available from participating agencies under various conditions and cost arrangements. Interagency agreements may be necessary to specify when reimbursement is required.

## Subpart F—Hazardous Substances Reponse

SOURCE: 50 FR 47969, Nov. 20, 1985, unless otherwise noted.

§ 300.61  General.

(a) This subpart establishes methods and criteria for determining the appropriate extent of response authorized by CERCLA:

(1) When there is a release of a hazardous substance or there is a substantial threat of such a release into the environment; or

(2) When there is a release or substantial threat of a release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare.

(b) Section 104(a)(1) of CERCLA authorizes removal or remedial action unless it is determined that such removal or remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party. If appropriate response actions are not being taken or executed properly, including in a timely manner, the lead agency may initiate proper action, terminate any improper actions and shall so advise any known responsible party, and complete response activities.

(c) In determining the need for and in planning or undertaking Fund-financed action, the lead agency shall, to the extent practicable:

(1) Engage in prompt response.

(2) Encourage State participation in response actions (see § 300.62).

(3) Conserve Fund monies by encouraging private party cleanup.

(4) Be sensitive to local community concerns (see §300.67).

(5) Rely on established technology, but also consider alternative and innovative technology when feasible and cost-effective.

(6) Involve the RRT in both removal and remedial response actions at appropriate decisionmaking stages.

(7) Encourage the involvement and sharing of technology by industry and other experts.

(8) Encourage the involvement of organizations to coordinate responsible party actions, foster site cleanup, and provide technical advice to the public, Federal and State governments, and industry.

(d) The lead agency shall, as practicable, provide surveillance over actions taken by responsible parties to ensure that a response is conducted consistent with this Plan. The lead agency also, as practicable, shall monitor the actions of third parties preauthorized under §300.25(d).

(e)(1) This subpart does not establish any preconditions to enforcement action by either the Federal or State governments to compel response actions by responsible parties.

(2) While some of this subpart is oriented toward Federally funded response actions, this subpart may be used as guidance concerning methods and criteria for response actions by other parties under other funding mechanisms. Except as provided in §300.71, nothing in this part limits the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA section 107.

(3) Activities by the Federal and State governments in implementing this subpart are discretionary governmental functions. This subpart does not create in any private party a right to Federal response or enforcement action. This subpart does not create any duty of the Federal government to take any response action at any particular time.

§300.62   State role.

(a)(1) States are encouraged to undertake actions authorized under this subpart. Section 104(d)(1) of CERCLA authorizes the Federal government to enter into contracts or cooperative agreements with the State to take Fund-financed response actions authorized under CERCLA, when the Federal government determines that the State has the capability to undertake such actions. A State agency acting under such an agreement is referred to as the lead agency.

(2) Cooperative agreements or State Superfund contracts are unnecessary for response actions that are not Fund-financed, including any State or other party actions. Coordination with EPA or USCG is encouraged in such situations, however. If a State intends to use expenses incurred as part or all of its cost-sharing obligations under section 104(c)(3) of CERCLA, it must enter into a response agreement to this effect.

(b) EPA will provide assistance from the Fund and other Federal agencies will provide assistance under their existing authority to States pursuant to a contract or cooperative agreement. The cooperative agreement can authorize States to undertake most actions specified in this subpart. However, certain authorities are reserved for the Federal lead agency.

(c) Contracts and cooperative agreements between the State(s) and Federal government for Fund-financed remedial action are subject to section 104(c)(3) of CERCLA. Such agreements are not a precondition to access, information gathering, investigations, studies, or liability pursuant to sections 106 and 107 of CERCLA.

(d) Prior to remedial action as defined in section 101(24) of CERCLA, the State must make a firm commitment, through either a new or amended cooperative agreement or State contract, to provide its required cost share for remedial implementation by:

(1) Authorizing the reduction of a State credit to cover its share of costs;

(2) Identifying currently available funds earmarked for remedial implementation; or

(3) Submitting a schedule with milestones for obtaining necessary funds during the period of remedial implementation.

(e) State credits allowed under section 104(c)(3) of CERCLA must be

documented on a site-specific basis for State out-of-pocket, non-Federal eligible response costs between January 1, 1978, and December 11, 1980. Prior to remedial action at a site, the State must submit its accounting of these costs as a part of the cooperative agreement application, or as a part of the EPA State agreement. State credits will be applied against State cost shares for Federally funded remedial actions. A State cannot be reimbursed from the Fund for credit in excess of its matching share nor may the credit be applied to any other site.

(f) Pursuant to section 104(c)(2) of CERCLA, prior to determining any appropriate remedial action, the Federal lead agency shall consult with the affected State or States.

(g) States are encouraged to participate in all RRT planning and response activities.

(h) State and local public safety organizations are normally expected to initiate public safety measures (e.g., actions to limit public access to a site) and are responsible for directing evacuations pursuant to existing State/local procedures.

§ 300.63 Discovery or notification.

(a) A release may be discovered through:

(1) Notification in accordance with sections 103 (a) or (c) of CERCLA;

(2) Investigation by government authorities conducted in accordance with section 104(e) of CERCLA or other statutory authority;

(3) Notification of a release by a Federal or State permit holder when required by its permit;

(4) Inventory efforts or random or incidental observation by government agencies or the public;

(5) Other sources.

(b) All reports of releases shall be made to the NRC. If direct reporting to the NRC is not practicable, reports may be made to the Coast Guard or EPA predesignated OSC for the geographic area where the release occurs. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or predesignated OSC immediately, reports may be made immediately to the nearest Coast Guard unit, provided that the releaser notifies the NRC as soon as possible.

(c) Upon receipt of a notification of a release, the NRC shall promptly notify the appropriate OSC. The OSC shall notify the Governor of the State affected by the release.

(d)(1) When the OSC is notified of a release which may require response pursuant to § 300.65(b), a preliminary assessment shall, as appropriate, be promptly undertaken pursuant to § 300.64.

(2) When notification indicates that action pursuant to § 300.65(b) is not required, site evaluation shall, as appropriate, be undertaken by the lead agency pursuant to § 300.66.

§ 300.64 Preliminary assessment for removal actions.

(a) A preliminary assessment of a release or threat of a release identified for possible CERCLA response pursuant to § 300.65 shall, as appropriate, be undertaken by the lead agency as promptly as possible. The lead agency shall, as appropriate, base the assessment on readily available information. This assessment may include but is not limited to:

(1) Identification of the source and nature of the release or threat of release;

(2) Evaluation by HHS or by other sources (e.g., State public health agencies) of the threat to public health;

(3) Evaluation of the magnitude of the potential threat;

(4) Evaluation of factors necessary to make the determination of whether a removal is necessary; and

(5) Determination if a non-Federal party is undertaking proper response.

(b) A preliminary assessment of releases or threats of releases from hazardous waste management facilities may include collection or review of data such as site management practices, information from generators, photographs, analysis of historical photographs, literature searches, and personal interviews conducted as appropriate. In addition, a perimeter (off-site) inspection may be necessary to determine the potential for a release. Finally, if more information is needed, a site visit may be performed,

if conditions are such that it may be performed safely.

(c) A preliminary assessment shall be terminated when the OSC or lead agency determines:

(1) There is no release or threat of release;

(2) The source is neither a vessel nor a facility;

(3) The release does not involve a hazardous substance, nor a pollutant or contaminant;

(4) The amount, quantity, and concentration released does not warrant Federal response;

(5) A party responsible for the release, or any other person, is providing appropriate response, and on-scene monitoring by the government is not required; or

(6) The assessment is completed.

(d) If it is determined during the assessment that natural resources have been, or are likely to be, damaged, the OSC or lead agency shall, where possible, ensure that the trustees of the affected natural resources are notified in order that the trustees may initiate appropriate actions as identified in § 300.74(b). Where practicable, the OSC shall consult with trustees in making such determinations.

(e) If the preliminary assessment indicates that removal action under § 300.65 is not required, but that remedial actions under § 300.68 may be necessary, the lead agency shall, as appropriate, initiate site evaluation pursuant to § 300.66.

§ 300.65 Removals.

(a)(1) In determining the appropriate extent of action to be taken at a given release, the lead agency shall first review the preliminary assessment and the current site conditions to determine if removal action is appropriate.

(2) Where the responsible parties are known, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to have them perform the necessary removal actions. Where responsible parties are unknown, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to locate

them and have them perform the necessary removal action.

(3) This section does not apply to removal actions taken pursuant to section 104(b) of CERCLA. The criteria for such actions are set forth in section 104(b).

(b)(1) At any release, regardless of whether the site is included on the National Priorities List, where the lead agency determines that there is a threat to public health or welfare or the environment, based on the factors in paragraph (b)(2) of this section, the lead agency may take any appropriate action to abate, minimize, stabilize, mitigate, or eliminate the release or threat of release, or the threat resulting from that release or threat of release.

(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this subsection:

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;

(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

(3) Removal actions, other than those authorized under section 104(b) of CERCLA, shall be terminated after $1 million has been obligated for the action or six months have elapsed from the date of initial response, unless the lead agency determines that:

(i) There is an immediate risk to public health or welfare or the environment;

(ii) Continued response actions are immediately required to prevent, limit, or mitigate an emergency; and

(iii) Such assistance will not otherwise be provided on a timely basis.

(4) If the lead agency determines that a removal action pursuant to this subsection is appropriate, actions shall, as appropriate, begin as soon as possible to prevent, minimize, or mitigate the threat to public health or welfare or the environment. The lead agency shall, at the earliest possible time, also make any necessary determinations contained in paragraph (b)(3) of this section.

(c) The following removal actions are, as a general rule, appropriate in the following situations; however, this list does not limit the lead agency from taking any other actions deemed necessary in response to any situation or preclude the lead agency from deferring response action to other appropriate Federal or State enforcement or response authorities:

(1) Fences, warning signs, or other security or site control precautions—where humans or animals have access to the release;

(2) Drainage controls (e.g., run-off or run-on diversion)—where precipitation or run-off from other sources (e.g., flooding) may enter the release area from other areas;

(3) Stabilization of berms, dikes, or impoundments—where needed to maintain the integrity of the structures;

(4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground water, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects—where the use of such chemicals will reduce the spread of the release;

(6) Removal of highly contaminated soils from drainage or other areas—where removal will reduce the spread of contamination;

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants—where it will reduce the likelihood of spillage, leakage, exposure to humans, animals or food chain, or fire or explosion;

(8) Provision of alternative water supply—where it will reduce the likelihood of exposure of humans or animals to contaminated water.

(d) Where necessary to protect public health or welfare, the lead agency will request that FEMA conduct a temporary relocation or evacuation.

(e) If the lead agency determines that the removal action will not fully address the threat or potential threat posed by the release and the release may require remedial action, the lead agency shall ensure an orderly transition from removal to remedial response activities.

(f) Although Fund-financed removal actions and removal actions pursuant to CERCLA section 106 are not required to comply with other Federal, State, and local laws governing the removal activity, including permit requirements, such removal actions shall, to the greatest extent practicable considering the exigencies of the circumstances, attain or exceed applicable or relevant and appropriate Federal public health and environmental requirements. Other Federal criteria, advisories, and guidance and State standards also shall, as appropriate, be considered in formulating the removal action.

(g) Fund-financed removal actions and removal actions pursuant to section 106 of CERCLA involving the storage, treatment, or disposal of hazardous substances or pollutants or contaminants at off-site facilities shall involve only off-site facilities that are operating under appropriate Federal or State permits or authorization and other legal requirements.

(h) Removal actions pursuant to section 106 of CERCLA are exempt from the following requirements of this section:

(1) Section 300.65(a)(2) requirement to locate responsible parties and have them undertake the response.

(2) Section 300.65(b)(2)(vii) requirement to consider the availability of other appropriate Federal or State re-

**Environmental Protection Agency** § 300.66

sponse and enforcement mechanisms to respond to the release.

(3) Section 300.65(b)(3) requirement to terminate response after $1 million has been obligated or six months have elapsed from the date of the initial response.

(i) Other private party responses not pursuant to section 106 of CERCLA are exempt from paragraphs (b)(2)(vii) and (b)(3) of this section.

§ 300.66   Site evaluation phase and National Priorities List determination.

(a) *The Site Evaluation Phase.* (1) This phase of response includes activities beginning with discovery of a release and extends through the initial evaluation (preliminary assessment and site inspection—see § 300.64). The purpose of the site evaluation phase is to further categorize the nature of any releases and potential threats to public health and welfare and the environment and to collect data as required to determine whether a site should be included on the National Priorities List (NPL). (See § 300.66(b) and (c).)

(2) Pursuant to sections 104(b) and (e) of CERCLA and other authorities, the lead agency may undertake preliminary assessments and site inspections to gather appropriate information to determine if a release warrants response and, if so, its priority for response.

(3) For response actions that may be taken pursuant to § 300.68, a preliminary assessment consists of a review of existing data and may include an offsite reconnaissance. The purposes of such a preliminary assessment are:

(i) To eliminate from further consideration those releases where available data indicate no threat or potential threat to public health or the environment exists;

(ii) To determine if there is any potential need for removal action;

(iii) To establish priority for scheduling a site inspection.

(4) A site inspection consists of a visual inspection of the site and routinely includes collection of samples. There are several major purposes for a site inspection:

(i) To determine which releases pose no threat or potential threat to public health and the environment;

(ii) To determine if there is any immediate threat to persons living or working near the release;

(iii) To collect data, where appropriate, to determine whether a site where a release has occurred or may occur should be included on the NPL.

(b) *Methods for Establishing Priorities.* (1) Section 105(8)(A) of CERCLA requires the President to include as part of the Plan criteria for establishing priorities among releases and potential releases. Three mechanisms are set forth here for that purpose: The Hazard Ranking System (HRS); designation by the States of their top priority releases; and determination that a site poses a significant threat to public health or welfare or the environment as indicated in paragraph (b)(4) of this section. These criteria will be used to establish and amend the NPL (see § 300.66(c)).

(2) The primary mechanism for identifying releases for inclusion on the NPL will be scores calculated by applying the HRS (Appendix A).

(3) Each State may designate a release as the State's highest priority release by certifying in writing, signed by the Governor or the Governor's designee, that the release presents the greatest danger to public health or welfare or the environment among known releases in the State. Each State may designate one top priority site over the life of the NPL.

(4) In addition to those releases whose HRS scores qualify them for the NPL, EPA may include on the NPL any other release if:

(i) The Agency for Toxic Substances and Disease Registry of the Department of Health and Human Services has issued a public health advisory which recommends dissociation of individuals from the release;

(ii) EPA determines that the release poses a significant threat to public health; and

(iii) EPA anticipates that it will be more cost-effective to use its remedial authority than to use removal authority to respond to the release.

(c) *The National Priorities List.* (1) Section 105(8)(B) of CERCLA requires

the President to establish a list of at least 400 releases and potential releases, based upon the criteria developed pursuant to section 105(8)(A) of the Act. CERCLA also requires the States to identify their priorities at least annually and requires that each State's designated top priority releases be included among the one hundred (100) highest priority releases, to the degree practicable. The process for establishing the NPL is set forth below.

(2) The NPL serves as a basis to guide the allocation of Fund resources among releases. Except as provided by CERCLA section 111(e)(3), Federal facilities listed on the NPL are not eligible for Fund-financed remedial actions other than actions specified in CERCLA section 111(c). Only those releases included on the NPL will be considered eligible for Fund-financed remedial action. Inclusion on the NPL is not a precondition to liability pursuant to Agency action under CERCLA section 106 or to action under CERCLA section 107, for recovery of non-Fund-financed costs or Fund-financed costs other than remedial construction costs.

(3) States that wish to submit candidates for the NPL must use the HRS (Appendix A of this part) to score the releases and furnish EPA with appropriate documentation for the scores.

(4) EPA will notify the States at least thirty days prior to the deadline for submitting candidate releases for the NPL or any revisions.

(5) EPA will review the States' HRS scoring documents and revise the application of the hazard ranking criteria when appropriate. EPA will add any additional priority releases known to the Agency after consultation with the States. Taking into account the HRS scores, the States' top priority releases, and the criteria specified in paragraph (b)(4) of this section, EPA will compile the NPL.

(6) Minor differences in HRS scores among releases may not accurately differentiate among threats represented by the releases. Thus, releases having similar scores may be presented in groups on the NPL.

(7) Sites may be deleted from or recategorized on the NPL where no further response is appropriate. In making this determination, EPA will consider whether any of the following criteria has been met:

(i) EPA, in consultation with the State, has determined that responsible or other parties have implemented all appropriate response actions required;

(ii) All appropriate Fund-financed response under CERCLA has been implemented, and EPA, in consultation with the State, has determined that no further cleanup by responsible parties is appropriate; or

(iii) Based on a remedial investigation, EPA, in consultation with the State, has determined that the release poses no significant threat to public health or the environment and, therefore, taking of remedial measures is not appropriate.

(8) All releases deleted from the NPL are eligible for further Fund-financed remedial actions should future conditions warrant such action.

(9) EPA will submit the recommended NPL to the NRT for review and comment.

(10) EPA will revise and publish the NPL at least annually.

## § 300.67 Community relations.

(a) The lead agency shall develop and implement a formal community relations plan for removal actions taken pursuant to § 300.65 and for remedial action at NPL sites, including enforcement actions, except as provided for in § 300.67(b). Such plans must specify the communications activities which will be undertaken during the response and shall include provision for a public comment period on the alternatives analysis undertaken pursuant to § 300.68. The use of the RRT to assist community relations activities shall be considered in developing community relations plans.

(b) In the case of actions taken pursuant to § 300.65 or enforcement action to compel response analogous to § 300.65, or other short-term action needed to abate a threat to public health or welfare or the environment, a spokesperson will be designated by the lead agency. The spokesperson will inform the community of actions taken, respond to inquiries, and provide information concerning the re-

lease. In such cases, if the action is of short duration, or if response is needed immediately, a formal plan is not necessary. However, if the removal action is expected to extend or does extend beyond 45 days, a formal plan must be developed and implemented.

(c) For all remedial actions pursuant to CERCLA section 106 at NPL sites including Fund-financed and enforcement actions, a community relations plan must be developed and approved prior to initiation of field activities and implemented during the course of the action. In enforcement actions, a responsible party may be permitted with lead agency oversight to implement appropriate parts of the community relations plan.

(d) In remedial actions at NPL sites, including Fund-financed and enforcement actions, feasibility studies that outline alternative remedial measures must be provided to the public for review and comment for a period of not less than 21 calendar days. Such review and comment shall precede selection of the remedial response. Public meeting(s) shall, in most circumstances, be held during the comment period. The lead agency may also provide the public with an opportunity to comment during the development of the feasibility study.

(e) A document which summarizes the major issues raised by the public and how they are addressed must be included in the decision document approving the remedy.

(f) In enforcement actions in litigation under CERCLA section 106, the community relations plan, including provision for public review of any feasibility study prepared for source control or management of migration measures, may be modified or adjusted at the direction of the court of jurisdiction or to accommodate the court calendar.

(g) Where responsible parties agree to implement the permanent site remedy pursuant to an administrative order on consent, the lead agency shall provide public notice and a 30-day period for public comment, including comment on remedial measures. Where settlement is embodied in a consent decree, public notice and opportunity for public comment shall be provided in accordance with 28 CFR 50.7. A document summarizing the major issues raised by the public and how they are addressed will be prepared.

§ 300.68  **Remedial action.**

(a) *Introduction.* (1) Remedial actions are those responses to releases that are consistent with permanent remedy to prevent or minimize the release of hazardous substances or pollutants or contaminants so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment [see CERCLA section 101(24)]. Fund-financed remedial action, excluding remedial planning activities pursuant to CERCLA section 104(b), may be taken only at sites listed on the NPL.

(2) The Remedial Project Manager (RPM) shall carry out responsibilities in a remedial action as delineated in § 300.33(b).

(3) Federal, State, and local permits are not required for Fund-financed remedial action or remedial actions taken pursuant to Federal action under section 106 of CERCLA. However, remedial actions that involve storage, treatment, or disposal of hazardous substances or pollutants or contaminants at off-site facilities shall involve only such off-site facilities that are operating under appropriate Federal or State permits or authorization and other legal requirements.

(b) *State Involvement.* (1) States are encouraged to undertake Fund-financed remedial response in accordance with § 300.62 of this Plan.

(2) States must meet the requirements of CERCLA section 104(c)(3) prior to initiation of a Fund-financed remedial action.

(3) Planning activities associated with remedial actions taken pursuant to CERCLA section 104(b) shall not require a State cost share unless the facility was owned at the time of any disposal of hazardous substances therein by the State or a political subdivision thereof. Such planning activities include, but are not limited to, remedial investigations, feasibility studies, and design of the proposed remedy. For sites owned by a State or

its political subdivision, cost sharing commitment is required prior to remedial action.

(c) *Operable Unit.* Response action may be conducted in operable units. Operable units may be conducted as remedial and/or removal actions.

(1) Response actions may be separated into operable units consistent with achieving a permanent remedy. These operable units may include removal actions pursuant to § 300.65(b), and/or remedial actions involving source controls, and/or management of migration.

(2) The RPM shall, as appropriate, recommend whether or not operable units should be implemented prior to selection of the appropriate final remedial measure.

(3) Implementation of operable units may begin before selection of an appropriate final remedial action if such measures are cost-effective and consistent with a permanent remedy. Compliance with § 300.68(b) is a prerequisite to implementing remedial operable units.

(d) *Remedial Investigation/Feasibility Study* (RI/FS). An RT/FS shall, as appropriate, be undertaken by the lead agency conducting the remedial action to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies. This includes sampling, monitoring, and exposure assessment, as necessary, and includes the gathering of sufficient information to determine the necessity for and proposed extent of remedial action. Part of the RI/FS may involve assessing whether the threat can be prevented or minimized by controlling the source of the contamination at or near the area where the hazardous substances were originally located (source control measures) and/or whether additional actions will be necessary because the hazardous substances have migrated from the area of or near their original location (management of migration). Planning for remedial action at these releases shall, as appropriate, also assess the need for removals. During the remedial investigation, the original scoping of the project may be modified based on the factors in § 300.68(e).

(e) *Scoping of Response Actions during the Remedial Investigation.* (1) The lead agency, in cooperation with the State(s), will examine available information and determine, based on the factors indicated in paragraph (e)(2) of this section, the type of response that may be needed to remedy the release. This scoping will serve as a basis for requesting funding for a necessary removal action and may serve as the basis for further supporting funding requests for a remedial investigation or feasibility study. Initial analysis shall indicate the extent to which the release or threat of release may pose a threat to public health or welfare or the environment, indicate the types of removal measures and/or remedial measures suitable to abate the threat, and set priorities for implementation of the measures. Initial analysis shall, as appropriate, also provide a preliminary determination of the extent to which Federal environmental and public health requirements are applicable or relevant and appropriate to the specific site and the extent to which other Federal criteria, advisories, and guidance and State standards are to be used in developing the remedy.

(2) The following shall, as appropriate, be assessed in determining whether and what type of remedial and/or removal actions will be considered:

(i) Population, environmental, and welfare concerns at risk;

(ii) Routes of exposure;

(iii) Amount, concentration, hazardous properties, environmental fate and transport (e.g., ability and opportunities to bioaccumulate, persistence, mobility, etc.), and form of the substance(s) present;

(iv) Hydrogeological factors (e.g., soil permeability, depth to saturated zone, hydrologic gradients, proximity to a drinking water aquifer, floodplains and wetlands proximity);

(v) Current and potential ground water use (e.g., the appropriate ground water classes under the system established in the EPA Ground-Water Protection Strategy);

(vi) Climate (rainfall, etc.);

(vii) The extent to which the source can be adequately identified and characterized;

(viii) Whether substances at the site may be reused or recycled;

(ix) The likelihood of future releases if the substances remain on-site;

(x) The extent to which natural or man-made barriers currently contain the substances and the adequacy of the barriers;

(xi) The extent to which the substances have migrated or are expected to migrate from the area of their original location, or new location if relocated, and whether future migration may pose a threat to public health welfare or the environment;

(xii) The extent to which Federal environmental and public health requirements are applicable or relevant and appropriate to the specific site, and the extent to which other Federal criteria, advisories, and guidance and State standards are to be considered in developing the remedy;

(xiii) The extent to which contamination levels exceed applicable or relevant and appropriate Federal requirements or other Federal criteria, advisories, and guidance and State standards;

(xiv) Contribution of the contamination to an air, land, water, and/or food chain contamination problem;

(xv) Ability of responsible party to implement and maintain the remedy until the threat is permanently abated;

(xvi) For Fund-financed responses, the availability of other appropriate Federal or State response and enforcement mechanisms to respond to the release; and

(xvii) Other appropriate matters may be considered.

(3) As a remedial investigation progresses, the project may be modified if the lead agency determines that, based on the factors in § 300.68(e)(2), such modifications would be appropriate.

(f) *Development of Alternatives.* (1) To the extent that it is both possible and appropriate, at least one remedial alternative shall be developed as part of the feasibility study (FS) in each of the following categories:

(i) Alternatives for treatment or disposal at an off-site facility, as appropriate;

(ii) Alternatives that attain applicable or relevant and appropriate Federal public health and environmental requirements;

(iii) As appropriate, alternatives that exceed applicable or relevant and appropriate Federal public health and environmental requirements;

(iv) As appropriate, alternatives that do not attain applicable or relevant and appropriate Federal public health and environmental requirements but will reduce the likelihood of present or future threat from the hazardous substances and that provide significant protection to public health and welfare and the environment. This must include an alternative that closely approaches the level of protection provided by the applicable or relevant and appropriate requirements;

(v) No action alternative.

(2) These alternatives, including those in paragraph (f)(1)(iv) of this section, shall, as appropriate, be developed based upon the analysis conducted under paragraphs (c), (d), and (e) of this section. The alternatives shall, as appropriate, consider and integrate waste minimization, destruction, and recycling.

(g) *Initial Screening of Alternatives.* The alternatives developed under paragraph (f) of this section will be subject to an initial screening to narrow the list of potential remedial actions for further detailed analysis. When an alternative is eliminated in screening, the rationale shall be documented in the feasibility study. Three broad criteria shall, as appropriate, be used in the initial screening of alternatives:

(1) *Cost.* For each alternative, the cost of implementing the remedial action must be considered, including operation and maintenance costs. An alternative that far exceeds the costs of other alternatives evaluated and that does not provide substantially greater public health or environmental protection or technical reliability shall usually be excluded from further consideration. For purposes of this paragraph, an alternative that meets or exceeds applicable or relevant and appropriate Federal public health and environmental requirements provides substantially greater protection than

**771**

do alternatives that do not meet such requirements.

(2) *Acceptable Engineering Practices.* Alternatives must be feasible for the location and conditions of the release, applicable to the problem, and represent a reliable means of addressing the problem.

(3) *Effectiveness.* Those alternatives that do not effectively contribute to the protection of public health and welfare and the environment shall not be considered further. If an alternative has significant adverse effects, and very limited environmental benefits, it shall also be excluded from further consideration.

(h) *Detailed Analysis of Alternatives.* (1) A more detailed evaluation will be conducted of the limited number of alternatives that remain after the initial screening in § 300.68(g).

(2) The detailed analysis of each alternative shall, as appropriate, include:

(i) Refinement and specification of alternatives in detail, with emphasis on use of established technology. Innovative or advanced technology shall, as appropriate, be evaluated as an alternative to conventional technology;

(ii) Detailed cost estimation, including operation and maintenance costs, and distribution of costs over time;

(iii) Evaluation in terms of engineering implementation, reliability, and constructability;

(iv) An assessment of the extent to which the alternative is expected to effectively prevent, mitigate, or minimize threats to, and provide adequate protection of public health and welfare and the environment. This shall include an evaluation of the extent to which the alternative attains or exceeds applicable or relevant and appropriate Federal public health and environmental requirements. Where the analysis determines that Federal public health and environmental requirements are not applicable or relevant and appropriate, the analysis shall, as appropriate, evaluate the risks of the various exposure levels projected or remaining after implementation of the alternative under consideration;

(v) An analysis of whether recycle/reuse, waste minimization, waste bio-

degradation, or destruction or other advanced, innovative, or alternative technologies is appropriate to reliably minimize present or future threats to public health or welfare or the environment;

(vi) An analysis of any adverse environmental impacts, methods for mitigating these impacts, and costs of mitigation.

(3) In performing the detailed analysis of alternatives, it may be necessary to gather additional data to complete the analysis.

(i) *Selection of Remedy.* (1) The appropriate extent of remedy shall be determined by the lead agency's selection of a cost-effective remedial alternative that effectively mitigates and minimizes threats to and provides adequate protection of public health and welfare and the environment. Except as provided in § 300.68(i)(5), this will require selection of a remedy that attains or exceeds applicable or relevant and appropriate Federal public health and environmental requirements that have been identified for the specific site.

(2) In selecting the appropriate extent of remedy from among the alternatives that will achieve adequate protection of public health and welfare and the environment in accordance with § 300.68(i)(1), the lead agency will consider cost, technology, reliability, administrative and other concerns, and their relevant effects on public health and welfare and the environment.

(3) If there are no applicable or relevant and appropriate Federal public health or environmental requirements, the lead agency will select that cost-effective alternative that effectively mitigates and minimizes threats to and provides adequate protection of public health and welfare and the environment, considering cost, technology, and the reliability of the remedy.

(4) Pertinent other Federal criteria, advisories, and guidance and State standards will be considered and may be used in developing alternatives, with adjustments for site-specific circumstances.

(5) Notwithstanding § 300.68(i)(1), the lead agency may select an alternative that does not meet applicable or

**Environmental Protection Agency** **§ 300.68**

relevant and appropriate Federal public health or environmental requirements in any of the following circumstances:

(i) The selected alternative is not the final remedy and will become part of a more comprehensive remedy;

(ii) *Fund-Balancing:* For Fund-financed responses only, the need for protection of public health and welfare and the environment at the facility under consideration for all of the alternatives that attain or exceed applicable or relevant and appropriate Federal requirements is outweighed by the need for action at other sites that may present a threat to public health or welfare or the environment, considering the amount of money available in the Fund. In the event of Fund-balancing, the lead agency shall select the alternative which most closely approaches the level of protection provided by applicable or relevant and appropriate Federal requirements, considering the specific Fund-balanced sum of money available for the facility under consideration. Fund-balancing is not a consideration in determining the appropriate extent of remedy when the response will be performed or funded by a responsible party;

(iii) *Technical Impracticality:* Where no alternative that attains or exceeds applicable or relevant and appropriate Federal public health and environmental requirements is technically practical to implement at the specific site in question from an engineering perspective, the lead agency shall select the alternative that is reasonable to implement from an engineering perspective and that most closely approaches the level of protection provided by applicable or relevant and appropriate Federal public health and environmental requirements.

(iv) *Unacceptable Environmental Impacts:* Where all the alternatives that attain or exceed applicable or relevant Federal public health and appropriate environmental requirements will result in significant adverse environmental impacts if implemented, the lead agency shall select the alternative that most closely approaches the level of protection provided by applicable or relevant and appropriate Federal public health and environ-

mental requirements, without resulting in significant adverse environmental impacts.

(v) Where the remedy is to be carried out pursuant to Federal action under CERCLA section 106, the Fund is unavailable, there is a strong public interest in expedited cleanup, and the litigation probably would not result in the desired remedy, the lead agency shall select the alternative that most closely approaches the level of protection provided by applicable or relevant and appropriate Federal public health and environmental requirements in light of the strong public interest in expedited cleanup.

(6)(i) If a factor under § 300.68(i)(5) is used in eliminating an alternative or in scaling down the extent of remedy, it must be explained and documented in the appropriate decision document.

(ii) Other Federal criteria, advisories, and guidance and State standards will be considered and may be used by the lead agency in developing remedial alternatives. If the lead agency does not use or uses and adjusts any other standards, the decision documents must explain and document the reasons. The rationale for not using such other standards may include one or more of the circumstances enumerated in § 300.68(i)(5).

(j) *Appropriate Actions.* The following remedial actions are, as a general rule, appropriate in the following situations; however, this list does not limit the lead agency from selecting any other actions deemed necessary in response to any situation:

(1) In response to contaminated ground water—elimination or containment of the contamination to prevent further contamination, treatment and/or removal of such ground water to reduce or eliminate the contamination, physical containment of such ground water to reduce or eliminate potential exposure to such contamination, and/or restrictions on use of the ground water to eliminate potential exposure to the contamination;

(2) In response to contaminated surface water—elimination or containment of the contamination to prevent further pollution, and/or treatment of the contaminated water to reduce or eliminate its hazard potential;

(3) In response to contaminated soil or waste—actions to remove, treat, or contain the soil or waste to reduce or eliminate the potential for hazardous substances or pollutants or contaminants to contaminate other media (ground water, surface water, or air) and to reduce or eliminate the potential for such substances to be inhaled, absorbed, or ingested;

(4) In response to the threat of direct contact with hazardous substances or pollutants or contaminants—any of the actions listed in § 300.65(c) to reduce the likelihood of such contact or the severity of any effects from such contract.

(k) *Remedial Site Sampling.* (1) Sampling performed pursuant to Fund-financed remedial action must have a written quality assurance/site sampling plan. Sampling performed pursuant to the written quality assurance/site sampling plan will generally be adequate if the plan includes the following elements:

(i) A description of the objectives of the sampling efforts with regard to both the phase of the sampling and the ultimate use of the data;

(ii) Sufficient specification of sampling protocol and procedures;

(iii) Sufficient sampling to adequately characterize the source of the release, likely transport pathways, and/or potential receptor exposure;

(iv) Specifications of the types, locations, and frequency of samples taken, taking into account the unique properties of the site, including the appropriate hydrological, geological, hydrogeological, physiographical, and meteorological properties of the site; and

(v) Such other elements as may be required by the RPM and the appropriate EPA Regional or Headquarters quality assurance office on a site-by-site basis.

(2) In Fund-financed actions or actions under CERCLA section 106, the quality assurance/site sampling plan must be reviewed and approved by the Remedial Project Manager with a coordination signature from the Qualify Assurance Officer.

(l) *Response Actions Pursuant to sections 106 and 111(a)(2) of CERCLA/ Consistency With NCP.* When a person other than the lead agency takes the response action, the lead agency shall evaluate and approve the adequacy of proposals submitted when the response action: is taken pursuant to section 106 of CERCLA; or involves preauthorization pursuant to section 111(a)(2) of CERCLA or § 300.25 of this Plan. When evaluating these proposed response actions and for the purpose of determining consistency with this Plan for cost recovery under section 107 of CERCLA, the remedial investigation or its equivalent must address the factors outlined in paragraph (e) of this section. The full range of alternatives outlined in paragraph (f) of this section must be developed unless a specific, more limited range of alternatives has been negotiated with the lead agency pursuant to action under section 106 of CERCLA or preauthorization.

§ 300.69  Documentation and cost recovery.

(a) During all phases of response, documentation shall be collected and maintained to support all actions taken under this Plan, and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the condition, the identity of responsible parties, accurate accounting of Federal or private party costs incurred, and impacts and potential impacts to the public health and welfare and the environment. Where applicable, documentation shall state when the National Response Center received notification of a release of a reportable quantity and when Fund-balancing has been used to limit the Federal response.

(b) The information and reports obtained by the lead agency for Fund-financed response actions shall, as appropriate, be transmitted to the RRT. Copies can then be forwarded to the NRT, members of the RRT, and others as appropriate. In addition, OSCs shall report as required by § 300.40 for all major releases and all Fund-financed removal actions taken.

(c) Information and documentation of actual or potential natural resource damages shall be made available to

the trustees of affected natural resources.

(d) Actions undertaken by the participating agencies in response shall be carried out under existing programs and authorities when available. This Plan intends that Federal agencies will make resources available, expend funds, or participate in responses to releases under their existing authority. Interagency agreements may be signed when necessary to ensure that the Federal resources will be available for a timely response to a release. The ultimate decision as to the appropriateness of expending funds rests with the agency that is held accountable for such expenditures.

§ 300.70 **Methods of remedying releases.**

(a) This section lists methods for remedying releases that may be considered by the lead agency before selecting the response action. This list of methods shall not be considered inclusive of all possible methods of remedying releases.

(b) Engineering Methods for On-Site Actions—(1)(i) *Air emissions control.* The control of volatile gaseous compounds shall, as appropriate, address both lateral movements and atmospheric emissions. Before gas migration controls can be properly installed, field measurements to determine gas concentrations, pressures, and soil permeabilities shall, as appropriate, be used to establish optimum design for control. In addition, the types of hazardous substances present, the depth to which they extend, the nature of the gas and the subsurface geology of the release area shall, if possible, be determined. Typical emission control techniques include the following:

(A) Pipe vents;
(B) Trench vents;
(C) Gas barriers;
(D) Gas collection;
(E) Overpacking.

(ii) *Surface water controls.* These are remedial techniques designed to reduce water infiltration and to control runoff at release areas. They also serve to reduce erosion and to stabilize the surface of covered sites. These types of control technologies are usually implemented in conjunction with other types of control and include the following:

(A) Surface seals;
(B) Surface water diversions and collection systems:
(1) Dikes and berms;
(2) Ditches, diversions, waterways;
(3) Chutes and downpipes;
(4) Levees;
(5) Seepage basins and ditches;
(6) Sedimentation basins and ditches; and
(7) Terraces and benches;
(C) Grading;
(D) Revegetation.

(iii) *Ground water controls.* Ground water pollution is a particularly serious problem because, once an aquifer has been contaminated, the resource cannot usually be cleaned without the expenditure of great time, effort, and resources. Techniques that can be applied to the problem with varying degrees of success are as follows:

(A) Impermeable barriers:
(1) Slurry walls;
(2) Grout curtains; and
(3) Sheet pilings;
(B) Permeable treatment beds;
(C) Ground water pumping:
(1) Water table adjustment; and
(2) Plume containment;
(D) Leachate control: Leachate control systems control surface seeps and seepage of leachate to ground water. Leachate collection systems consist of a series of drains which intercept the leachate and channel it to a sump, wetwell, treatment system, or appropriate surface discharge point. Technologies applicable to leachate control include the following:
(1) Subsurface drains;
(2) Drainage ditches; and
(3) Liners.

(iv) *Contaminated water and sewer lines.* Sanitary sewers and municipal water mains located downgradient from hazardous waste disposal sites may become contaminated by infiltration of leachate or polluted ground water through cracks, ruptures, or poorly sealed joints in piping. Technologies applicable to the control of such contamination to water and sewer lines include:
(A) Grouting;
(B) Pipe relining and sleeving; and
(C) Sewer relocation.

(2) Treatment technologies.

(i) *Gaseous emissions treatment.* Gases from waste disposal sites frequently contain malodorous and toxic substances, and thus require treatment before release to the atmosphere. There are two basic types of gas treatment systems:

(A) Vapor phase adsorption; and

(B) Thermal oxidation.

(ii) *Direct waste treatment methods.* In most cases, these techniques can be considered long-term permanent solutions. Many of these direct treatment methods are not fully developed and the applications and process reliability are not well demonstrated. Use of these techniques for waste treatment may require considerable pilot plant work. Technologies applicable to the direct treatment of wastes are:

(A) Biological methods:

(*1*) Treatment via modified conventional wastewater treatment techniques;

(*2*) Anaerobic, aerated and facultative lagoons; and

(*3*) Supported growth biological reactors.

(B) Chemical methods:

(*1*) Chlorination;

(*2*) Precipitation, flocculation, sedimentation;

(*3*) Neutralization;

(*4*) Equalization; and

(*5*) Chemical oxidation.

(C) Physical methods:

(*1*) Air stripping;

(*2*) Carbon absorption;

(*3*) Ion exchange;

(*4*) Reverse osmosis;

(*5*) Permeable bed treatment;

(*6*) Wet air oxidation; and

(*7*) Incineration.

(iii) *Contaminated soils and sediments.* In some cases where it can be shown to be cost-effective, contaminated sediments and soils will be treated on the site. Technologies available include:

(A) Incineration;

(B) Wet air oxidation;

(C) Solidification;

(D) Encapsulation; and

(E) On-site treatment:

(*1*) Solution mining (soil washing or soil flushing);

(*2*) Neutralization/detoxification;

(*3*) Microbiological degradation.

(c) Off-site Transport for Storage, Treatment, Destruction or Secure Disposition.

(1) General: Off-site transport or storage, treatment, destruction, or secure disposition off-site may be provided in cases where EPA determines that such actions:

(i) Are more cost-effective than other forms of remedial actions;

(ii) Will create new capacity to manage, in compliance with Subtitle C of the Solid Waste Disposal Act, hazardous substances in addition to those located at the affected facility; or

(iii) Are necessary to protect public health or welfare or the environment from a present or potential risk which may be created by further exposure to the continued presence of such substances or materials.

(2) Contaminated soils and sediments may be removed from the site. Technologies used to remove contaminated sediments from soils include:

(i) Excavation;

(ii) Hydraulic dredging;

(iii) Mechanical dredging.

(d) Provision of alternative water supplies can be provided in several ways:

(1) Provision of individual treatment units;

(2) Provision of water distribution system;

(3) Provision of new wells in a new location or deeper wells;

(4) Provision of cisterns;

(5) Provision of bottled or treated water;

(6) Provision of upgraged treatment for existing distribution systems.

(e) *Relocation:* Permanent relocation of residents, businesses, and community facilities may be provided where it is determined that human health is in danger and that, alone or in combination with other measures, relocation would be cost-effective and environmentally preferable to other remedial response. Temporary relocation may also be taken in appropriate circumstances.

**§ 300.71  Other party responses.**

(a)(1) Any person may undertake a response action to reduce or eliminate the release or threat of release of haz-

**Excerpts of the National Contingency Plan**

**40 C.F.R. Part 300 (1990)**

**PART  300**                                                     **40 CFR Ch. I (7-1-90 Edition)**

# SUBCHAPTER J—SUPERFUND, EMERGENCY PLANNING, AND COMMUNITY RIGHT–TO–KNOW PROGRAMS

## PART 300—NATIONAL OIL AND HAZARDOUS SUBSTANCES POLLUTION CONTINGENCY PLAN

### Subpart A—Introduction

Sec.
300.1   Purpose and objectives.
300.2   Authority and applicability.
300.3   Scope.
300.4   Abbreviations.
300.5   Definitions.
300.6   Use of number and gender.
300.7   Computation of time.

### Subpart B—Responsibility and Organization for Response

300.100   Duties of President delegated to federal agencies.
300.105   General organization concepts.
300.110   National Response Team.
300.115   Regional Response Teams.
300.120   On-scene coordinators and remedial project managers: general responsibilities.
300.125   Notification and communications.
300.130   Determinations to initiate response and special conditions.
300.135   Response operations.
300.140   Multi-regional responses.
300.145   Special teams and other assistance available to OSCs/RPMs.
300.150   Worker health and safety.
300.155   Public information and community relations.
300.160   Documentation and cost recovery.
300.165   OSC reports.
300.170   Federal agency participation.
300.175   Federal agencies: additional responsibilities and assistance.
300.180   State and local participation in response.
300.185   Nongovernmental participation.

### Subpart C—Planning and Preparedness

300.200   General.
300.205   Planning and coordination structure.
300.210   Federal contingency plans.
300.215   Title III local emergency response plans.
300.220   Related Title III issues.

### Subpart D—Operational Response Phases for Oil Removal

300.300   Phase I—Discovery or notification.

Sec.
300.305   Phase II—Preliminary assessment and initiation of action.
300.310   Phase III—Containment, countermeasures, cleanup, and disposal.
300.315   Phase IV—Documentation and cost recovery.
300.320   General pattern of response.
300.330   Wildlife conservation.
300.335   Funding.

### Subpart E—Hazardous Substance Response

300.400   General.
300.405   Discovery or notification.
300.410   Removal site evaluation.
300.415   Removal action.
300.420   Remedial site evaluation.
300.425   Establishing remedial priorities.
300.430   Remedial investigation/feasibility study and selection of remedy.
300.435   Remedial design/remedial action, operation and maintenance.
300.440   Procedures for planning and implementing off-site response actions. [Reserved]

### Subpart F—State Involvement in Hazardous Substance Response

300.500   General.
300.505   EPA/State Superfund Memorandum of Agreement (SMOA).
300.510   State assurances.
300.515   Requirements for state involvement in remedial and enforcement response.
300.520   State involvement in EPA-lead enforcement negotiations.
300.525   State involvement in removal actions.

### Subpart G—Trustees for Natural Resources

300.600   Designation of federal trustees.
300.605   State trustees.
300.610   Indian tribes.
300.615   Responsibilities of trustees.

### Subpart H—Participation by Other Persons

300.700   Activities by other persons.

### Subpart I—Administrative Record for Selection of Response Action

300.800   Establishment of an administrative record.
300.805   Location of the administrative record file.
300.810   Contents of the administrative record file.

4

**Environmental Protection Agency** § 300.3

Sec.
300.815 Administrative record file for a remedial action.
300.820 Administrative record file for a removal action.
300.825 Record requirements after the decision document is signed.

**Subpart J—Use of Dispersants and Other Chemicals**

300.900 General.
300.905 NCP Product Schedule.
300.910 Authorization of use.
300.915 Data requirements.
300.920 Addition of products to schedule.

**Subpart K—Federal Facilities [Reserved]**

APPENDIX A TO PART 300—UNCONTROLLED HAZARDOUS WASTE SITE RANKING SYSTEM; A USERS MANUAL
APPENDIX B TO PART 300—NATIONAL PRIORITIES LIST
APPENDIX C TO PART 300—REVISED STANDARD DISPERSANT EFFECTIVENESS AND TOXICITY TESTS
APPENDIX D TO PART 300—APPROPRIATE ACTIONS AND METHODS OF REMEDYING RELEASES

AUTHORITY: 42 U.S.C. 9601-9657; 33 U.S.C. 1321(c)(2); E.O. 11735, 38 FR 21243; E.O. 12580, 52 FR 2923.

## Subpart A—Introduction

SOURCE: 55 FR 8813, Mar. 8, 1990, unless otherwise noted.

§ 300.1 Purpose and objectives.

The purpose of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) is to provide the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants.

§ 300.2 Authority and applicability.

The NCP is required by section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. 9605, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. 99-499, (hereinafter CERCLA), and by section 311(c)(2) of the Clean Water Act (CWA), as amended, 33 U.S.C. 1321(c)(2). In Executive Order (E.O.) 12580 (52 FR 2923, January 29, 1987), the President delegated to the

Environmental Protection Agency (EPA) the responsibility for the amendment of the NCP. Amendments to the NCP are coordinated with members of the National Response Team (NRT) prior to publication for notice and comment. This includes coordination with the Federal Emergency Management Agency and the Nuclear Regulatory Commission in order to avoid inconsistent or duplicative requirements in the emergency planning responsibilities of those agencies. The NCP is applicable to response actions taken pursuant to the authorities under CERCLA and section 311 of the CWA.

§ 300.3 Scope.

(a) The NCP applies to and is in effect for:

(1) Discharges of oil into or upon the navigable waters of the United States and adjoining shorelines, the waters of the contiguous zone, and the high seas beyond the contiguous zone in connection with activities under the Outer Continental Shelf Lands Act or the Deepwater Port Act of 1974, or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson Fishery Conservation and Management Act). (See sections 311(b)(1) and 502(7) of the CWA.)

(2) Releases into the environment of hazardous substances, and pollutants or contaminants which may present an imminent and substantial danger to public health or welfare.

(b) The NCP provides for efficient, coordinated, and effective response to discharges of oil and releases of hazardous substances, pollutants, and contaminants in accordance with the authorities of CERCLA and the CWA. It provides for:

(1) The national response organization that may be activated in response actions. It specifies responsibilities among the federal, state, and local governments and describes resources that are available for response.

(2) The establishment of requirements for federal regional and on-scene coordinator (OSC) contingency

for a consensus on scientific issues surrounding the response but will also ensure that any differing opinions within the community are communicated to the OSC/RPM.

(3) The SSC will assist the OSC/RPM in responding to requests for assistance from state and federal agencies regarding scientific studies and environmental assessments. Details on access to scientific support shall be included in the RCPs.

(e) For marine salvage operations, OSCs/RPMs with responsibility for monitoring, evaluating, or supervising these activities should request technical assistance from DOD, the Strike Teams, or commercial salvors as necessary to ensure that proper actions are taken. Marine salvage operations generally fall into five categories: Afloat salvage; offshore salvage; river and harbor clearance; cargo salvage; and rescue towing. Each category requires different knowledge and specialized types of equipment. The complexity of such operations may be further compounded by local environmental and geographic conditions. The nature of marine salvage and the conditions under which it occurs combine to make such operations imprecise, difficult, hazardous, and expensive. Thus, responsible parties or other persons attempting to perform such operations without adequate knowledge, equipment, and experience could aggravate, rather than relieve, the situation.

(f) Radiological Assistance Teams (RATs) have been established by EPA's Office of Radiation Programs (ORP) to provide response and support for incidents or sites containing radiological hazards. Expertise is available in radiation monitoring, radionuclide analysis, radiation health physics, and risk assessment. Radiological Assistance Teams can provide on-site support including mobile monitoring laboratories for field analyses of samples and fixed laboratories for radiochemical sampling and analyses. Requests for support may be made 24 hours a day to the Radiological Response Coordinator in the EPA Office of Radiation Programs. Assistance is also available from the Department of Energy and other federal agencies.

(g) The USCG Public Information Assist Team (PIAT) is available to assist OSCs/RPMs and regional or district offices to meet the demands for public information and participation. Its use is encouraged any time the OSC/RPM requires outside public affairs support. Requests for the PIAT may be made through the NRC.

§ 300.150 Worker health and safety.

(a) Response actions under the NCP will comply with the provisions for response action worker safety and health in 29 CFR 1910.120.

(b) In a response action taken by a responsible party, the responsible party must assure that an occupational safety and health program consistent with 29 CFR 1910.120 is made available for the protection of workers at the response site.

(c) In a response taken under the NCP by a lead agency, an occupational safety and health program should be made available for the protection of workers at the response site, consistent with, and to the extent required by, 29 CFR 1910.120. Contracts relating to a response action under the NCP should contain assurances that the contractor at the response site will comply with this program and with any applicable provisions of the OSH Act and state OSH laws.

(d) When a state, or political subdivision of a state, without an OSHA-approved state plan is the lead agency for response, the state or political subdivision must comply with standards in 40 CFR part 311, promulgated by EPA pursuant to section 126(f) of SARA.

(e) Requirements, standards, and regulations of the Occupational Safety and Health Act of 1970 (29 U.S.C. 651 et seq.) (OSH Act) and of state laws with plans approved under section 18 of the OSH Act (state OSH laws), not directly referenced in paragraphs (a) through (d) of this section, must be complied with where applicable. Federal OSH Act requirements include, among other things, Construction Standards (29 CFR part 1926), General Industry Standards (29 CFR part 1910), and the general duty requirement of section 5(a)(1) of the OSH Act

§ 300.155

(29 U.S.C. 654(a)(1)). No action by the lead agency with respect to response activities under the NCP constitutes an exercise of statutory authority within the meaning of section 4(b)(1) of the OSH Act. All governmental agencies and private employers are directly responsible for the health and safety of their own employees.

§ 300.155 Public information and community relations.

(a) When an incident occurs, it is imperative to give the public prompt, accurate information on the nature of the incident and the actions underway to mitigate the damage. OSCs/RPMs and community relations personnel should ensure that all appropriate public and private interests are kept informed and that their concerns are considered throughout a response. They should coordinate with available public affairs/community relations resources to carry out this responsibility.

(b) An on-scene news office may be established to coordinate media relations and to issue official federal information on an incident. Whenever possible, it will be headed by a representative of the lead agency. The OSC/RPM determines the location of the on-scene news office, but every effort should be made to locate it near the scene of the incident. If a participating agency believes public interest warrants the issuance of statements and an on-scene news office has not been established, the affected agency should recommend its establishment. All federal news releases or statements by participating agencies should be cleared through the OSC/RPM.

(c) The community relations requirements specified in §§ 300.415, 300.430, and 300.435 apply to removal, remedial, and enforcement actions and are intended to promote active communication between communities affected by discharges or releases and the lead agency responsible for response actions. Community Relations Plans (CRPs) are required by EPA for certain response actions. The OSC/RPM should ensure coordination with such plans which may be in effect at the scene of a discharge or release or which may need to be developed during follow-up activities.

§ 300.160 Documentation and cost recovery.

(a) For releases of a hazardous substance, pollutant, or contaminant, the following provisions apply:

(1) During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment. Where applicable, documentation shall state when the NRC received notification of a release of a reportable quantity.

(2) The information and reports obtained by the lead agency for Fund-financed response actions shall, as appropriate, be transmitted to the chair of the RRT. Copies can then be forwarded to the NRT, members of the RRT, and others as appropriate. In addition, OSCs shall submit reports as required under § 300.165.

(3) The lead agency shall make available to the trustees of affected natural resources information and documentation that can assist the trustees in the determination of actual or potential natural resource injuries.

(b) For discharges of oil, documentation and cost recovery provisions are described in § 300.315.

(c) Response actions undertaken by the participating agencies shall be carried out under existing programs and authorities when available. Federal agencies are to make resources available, expend funds, or participate in response to discharges and releases under their existing authority. Interagency agreements may be signed when necessary to ensure that the federal resources will be available for a timely response to a discharge or release. The ultimate decision as to the appropriateness of expending funds rests with the agency that is held accountable for such expenditures. Fur-

ther funding provisions for discharges of oil are described in § 300.335.

(d) The Administrator of EPA and the Administrator of the Agency for Toxic Substances and Disease Registry (ATSDR) shall assure that the costs of health assessment or health effect studies conducted under the authority of CERCLA section 104(i) are documented in accordance with standard EPA procedures for cost recovery. Documentation shall include information on the nature of the hazardous substances addressed by the research, information concerning the locations where these substances have been found, and any available information on response actions taken concerning these substances at the location.

### § 300.165   OSC reports.

(a) Within one year after completion of removal activities at a major discharge of oil, a major release of a hazardous substance, pollutant, or contaminant, or when requested by the RRT, the OSC/RPM shall submit to the RRT a complete report on the removal operation and the actions taken. The OSC/RPM shall at the same time send a copy of the report to the Secretary of the NRT. The RRT shall review the OSC report and send to the NRT a copy of the OSC report with its comments or recommendations within 30 days after the RRT has received the OSC report.

(b) The OSC report shall record the situation as it developed, the actions taken, the resources committed, and the problems encountered.

(c) The format for the OSC report shall be as follows:

(1) Summary of Events—a chronological narrative of all events, including:

(i) The location of the hazardous substance, pollutant, or contaminant release or oil discharge, including, for oil discharges, an indication of whether the discharge was in connection with activities regulated under the Outer Continental Shelf Lands Act (OCSLA), the Trans-Alaska Pipeline Authorization Act, or the Deepwater Port Act;

(ii) The cause of the discharge or release;

(iii) The initial situation;

(iv) Efforts to obtain response by responsible parties;

(v) The organization of the response, including state participation;

(vi) The resources committed;

(vii) Content and time of notice to natural resource trustees relating injury or possible injury to natural resources;

(viii) Federal or state trustee damage assessment activities and efforts to replace or restore damaged natural resources;

(ix) Details of any threat abatement action taken under CERCLA or under section 311(c) or (d) of the CWA;

(x) Treatment/disposal/alternative technology approaches pursued and followed; and

(xi) Public information/community relations activities.

(2) Effectiveness of removal actions taken by:

(i) The responsible party(ies);

(ii) State and local forces;

(iii) Federal agencies and special teams; and

(iv) Contractors, private groups, and volunteers, if applicable.

(3) Difficulties Encountered—A list of items that affected the response, with particular attention to issues of intergovernmental coordination.

(4) Recommendations—OSC/RPM recommendations, including at a minimum:

(i) Means to prevent a recurrence of the discharge or release;

(ii) Improvement of response actions; and

(iii) Any recommended changes in the NCP, RCP, OSC contingency plan, and, as appropriate, plans developed under section 303 of SARA and other local emergency response plans.

### § 300.170   Federal agency participation.

Federal agencies listed in § 300.175 have duties established by statute, executive order, or Presidential directive which may apply to federal response actions following, or in prevention of, the discharge of oil or release of a hazardous substance, pollutant, or contaminant. Some of these agencies also have duties relating to the rehabilitation, restoration, or replacement of natural resources injured or lost as a

sponsibility of the operating or supervising agency.

(f) The following agencies have funds available for certain discharge removal actions:

(1) EPA may provide funds to begin timely discharge removal actions when the OSC is an EPA representative.

(2) The USCG pollution control efforts are funded under "operating expenses." These funds are used in accordance with agency directives.

(3) The Department of Defense has two specific sources of funds that may be applicable to an oil discharge under appropriate circumstances. This does not consider military resources that might be made available under specific conditions.

(i) Funds required for removal of a sunken vessel or similar obstruction of navigation are available to the Corps of Engineers through Civil Works Appropriations, Operations and Maintenance, General.

(ii) The U.S. Navy may conduct salvage operations contingent on defense operational commitments, when funded by the requesting agency. Such funding may be requested on a direct cite basis.

(4) Pursuant to section 311(c)(2)(H) of the CWA, the state or states affected by a discharge of oil may act where necessary to remove such discharge and may, pursuant to 33 CFR part 153, be reimbursed from the oil pollution fund for the reasonable costs incurred in such a removal.

(i) Removal by a state is necessary within the meaning of section 311(c)(2)(H) of the CWA when the OSC determines that the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs does not effect removal properly, or is unknown, and that:

(A) State action is required to minimize or mitigate significant threat(s) to the public health or welfare or the environment that federal action cannot minimize or mitigate; or

(B) Removal or partial removal can be done by the state at a cost that is less than or not significantly greater than the cost that would be incurred by the federal agencies.

(ii) State removal actions must be in compliance with the NCP in order to qualify for reimbursement.

(iii) State removal actions are considered to be Phase III actions, described in § 300.310, under the same definitions applicable to federal agencies.

(iv) Actions taken by local governments in support of federal discharge removal operations are considered to be actions of the state for purposes of this section. The RCP and OSC contingency plan shall show what funds and resources are available from participating agencies under various conditions and cost arrangements. Interagency agreements may be necessary to specify when reimbursement is required.

### Subpart E—Hazardous Substance Response

SOURCE: 55 FR 8839, Mar. 8, 1990, unless otherwise noted.

### § 300.400 General.

(a) This subpart establishes methods and criteria for determining the appropriate extent of response authorized by CERCLA:

(1) When there is a release of a hazardous substance into the environment; or

(2) When there is a release into the environment of any pollutant or contaminant that may present an imminent and substantial danger to the public health or welfare.

(b) *Limitations on response.* Unless the lead agency determines that a release constitutes a public health or environmental emergency and no other person with the authority and capability to respond will do so in a timely manner, a removal or remedial action under section 104 of CERCLA shall not be undertaken in response to a release:

(1) Of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;

(2) From products that are part of the structure of, and result in expo-

sure within, residential buildings or business or community structures; or

(3) Into public or private drinking water supplies due to deterioration of the system through ordinary use.

(c) *Fund-financed action.* In determining the need for and in planning or undertaking Fund-financed action, the lead agency shall, to the extent practicable:

(1) Engage in prompt response;

(2) Provide for state participation in response actions, as described in subpart F of this part;

(3) Conserve Fund monies by encouraging private party response;

(4) Be sensitive to local community concerns;

(5) Consider using treatment technologies;

(6) Involve the Regional Response Team (RRT) in both removal and remedial response actions at appropriate decision-making stages;

(7) Encourage the involvement and sharing of technology by industry and other experts; and

(8) Encourage the involvement of organizations to coordinate responsible party actions, foster site response, and provide technical advice to the public, federal and state governments, and industry.

(d) *Entry and access.* (1) For purposes of determining the need for response, or choosing or taking a response action, or otherwise enforcing the provisions of CERCLA, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), has the authority to enter any vessel, facility, establishment or other place, property, or location described in paragraph (d)(2) of this section and conduct, complete, operate, and maintain any response actions authorized by CERCLA or these regulations.

(2)(i) Under the authorities described in paragraph (d)(1) of this section, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), may enter:

(A) Any vessel, facility, establishment, or other place or property

where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from;

(B) Any vessel, facility, establishment, or other place or property from which, or to which, a hazardous substance or pollutant or contaminant has been, or may have been, released or where such release is or may be threatened;

(C) Any vessel, facility, establishment, or other place or property where entry is necessary to determine the need for response or the appropriate response or to effectuate a response action; or

(D) Any vessel, facility, establishment, or other place, property, or location adjacent to those vessels, facilities, establishments, places, or properties described in paragraphs (d)(2)(i)(A), (B), or (C) of this section.

(ii) Once a determination has been made that there is a reasonable basis to believe that there has been or may be a release, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), is authorized to enter all vessels, facilities, establishments, places, properties, or locations specified in paragraph (d)(2)(i) of this section, at which the release is believed to be, and all other vessels, facilities, establishments, places, properties, or locations identified in paragraph (d)(2)(i) of this section that are related to the response or are necessary to enter in responding to that release.

(3) The lead agency may designate as its representative solely for the purpose of access, among others, one or more potentially responsible parties, including representatives, employees, agents, and contractors of such parties. EPA, or the appropriate federal agency, may exercise the authority contained in section 104(e) of CERCLA to obtain access for its designated representative. A potentially responsible party may only be designated as a representative of the lead agency where that potentially responsible party has agreed to conduct response activities pursuant to an administrative order or consent decree.

(4)(i) If consent is not granted under the authorities described in paragraph (d)(1) of this section, or if consent is conditioned in any manner, EPA, or the appropriate federal agency, may issue an order pursuant to section 104(e)(5) of CERCLA directing compliance with the request for access made under § 300.400(d)(1). EPA or the appropriate federal agency may ask the Attorney General to commence a civil action to compel compliance with either a request for access or an order directing compliance.

(ii) EPA reserves the right to proceed, where appropriate, under applicable authority other than CERCLA section 104(e).

(iii) The administrative order may direct compliance with a request to enter or inspect any vessel, facility, establishment, place, property, or location described in paragraph (d)(2) of this section.

(iv) Each order shall contain:

(A) A determination by EPA, or the appropriate federal agency, that it is reasonable to believe that there may be or has been a release or threat of a release of a hazardous substance or pollutant or contaminant and a statement of the facts upon which the determination is based;

(B) A description, in light of CERCLA response authorities, of the purpose and estimated scope and duration of the entry, including a description of the specific anticipated activities to be conducted pursuant to the order;

(C) A provision advising the person who failed to consent that an officer or employee of the agency that issued the order will be available to confer with respondent prior to effective date of the order; and

(D) A provision advising the person who failed to consent that a court may impose a penalty of up to $25,000 per day for unreasonable failure to comply with the order.

(v) Orders shall be served upon the person or responsible party who failed to consent prior to their effective date. Force shall not be used to compel compliance with an order.

(vi) Orders may not be issued for any criminal investigations.

(e) *Permit requirements.* (1) No federal, state, or local permits are required for on-site response actions conducted pursuant to CERCLA sections 104, 106, 120, 121, or 122. The term "on-site" means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action.

(2) Permits, if required, shall be obtained for all response activities conducted off-site.

(f) *Health assessments.* Health assessments shall be performed by ATSDR at facilities on or proposed to be listed on the NPL and may be performed at other releases or facilities in response to petitions made to ATSDR. Where available, these health assessments may be used by the lead agency to assist in determining whether response actions should be taken and/or to identify the need for additional studies to assist in the assessment of potential human health effects associated with releases or potential releases of hazardous substances.

(g) *Identification of applicable or relevant and appropriate requirements.* (1) The lead and support agencies shall identify requirements applicable to the release or remedial action contemplated based upon an objective determination of whether the requirement specifically addresses a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site.

(2) If, based upon paragraph (g)(1) of this section, it is determined that a requirement is not applicable to a specific release, the requirement may still be relevant and appropriate to the circumstances of the release. In evaluating relevance and appropriateness, the factors in paragraphs (g)(2)(i) through (viii) of this section shall be examined, where pertinent, to determine whether a requirement addresses problems or situations sufficiently similar to the circumstances of the release or remedial action contemplated, and whether the requirement is well-suited to the site, and therefore is both relevant and appropriate. The pertinence of each of the following factors will depend, in part, on whether a requirement addresses a chemical, location, or

action. The following comparisons shall be made, where pertinent, to determine relevance and appropriateness:

(i) The purpose of the requirement and the purpose of the CERCLA action;

(ii) The medium regulated or affected by the requirement and the medium contaminated or affected at the CERCLA site;

(iii) The substances regulated by the requirement and the substances found at the CERCLA site;

(iv) The actions or activities regulated by the requirement and the remedial action contemplated at the CERCLA site;

(v) Any variances, waivers, or exemptions of the requirement and their availability for the circumstances at the CERCLA site;

(vi) The type of place regulated and the type of place affected by the release or CERCLA action;

(vii) The type and size of structure or facility regulated and the type and size of structure or facility affected by the release or contemplated by the CERCLA action;

(viii) Any consideration of use or potential use of affected resources in the requirement and the use or potential use of the affected resource at the CERCLA site.

(3) In addition to applicable or relevant and appropriate requirements, the lead and support agencies may, as appropriate, identify other advisories, criteria, or guidance to be considered for a particular release. The "to be considered" (TBC) category consists of advisories, criteria, or guidance that were developed by EPA, other federal agencies, or states that may be useful in developing CERCLA remedies.

(4) Only those state standards that are promulgated, are identified by the state in a timely manner, and are more stringent than federal requirements may be applicable or relevant and appropriate. For purposes of identification and notification of promulgated state standards, the term "promulgated" means that the standards are of general applicability and are legally enforceable.

(5) The lead agency and support agency shall identify their specific requirements that are applicable or relevant and appropriate for a particular site. These agencies shall notify each other, in a timely manner as described in § 300.515(d), of the requirements they have determined to be applicable or relevant and appropriate. When identifying a requirement as an ARAR, the lead agency and support agency shall include a citation to the statute or regulation from which the requirement is derived.

(6) Notification of ARARs shall be according to procedures and timeframes specified in § 300.515 (d)(2) and (h)(2).

(h) *Oversight.* The lead agency may provide oversight for actions taken by potentially responsible parties to ensure that a response is conducted consistent with this part. The lead agency may also monitor the actions of third parties preauthorized under subpart H of this part. EPA will provide oversight when the response is pursuant to an EPA order or federal consent decree.

(i) *Other.* (1) This subpart does not establish any preconditions to enforcement action by either the federal or state governments to compel response actions by potentially responsible parties.

(2) While much of this subpart is oriented toward federally funded response actions, this subpart may be used as guidance concerning methods and criteria for response actions by other parties under other funding mechanisms. Except as provided in subpart H of this part, nothing in this part is intended to limit the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA section 107.

(3) Activities by the federal and state governments in implementing this subpart are discretionary governmental functions. This subpart does not create in any private party a right to federal response or enforcement action. This subpart does not create any duty of the federal government to take any response action at any particular time.

**§ 300.405  Discovery or notification.**

(a) A release may be discovered through:

(1) A report submitted in accordance with section 103(a) of CERCLA, i.e., reportable quantities codified at 40 CFR part 302;

(2) A report submitted to EPA in accordance with section 103(c) of CERCLA;

(3) Investigation by government authorities conducted in accordance with section 104(e) of CERCLA or other statutory authority;

(4) Notification of a release by a federal or state permit holder when required by its permit;

(5) Inventory or survey efforts or random or incidental observation reported by government agencies or the public;

(6) Submission of a citizen petition to EPA or the appropriate federal facility requesting a preliminary assessment, in accordance with section 105(d) of CERCLA; and

(7) Other sources.

(b) Any person in charge of a vessel or a facility shall report releases as described in paragraph (a)(1) of this section to the National Response Center (NRC). If direct reporting to the NRC is not practicable, reports may be made to the United States Coast Guard (USCG) on-scene coordinator (OSC) for the geographic area where the release occurs. The EPA predesignated OSC may also be contacted through the regional 24-hour emergency response telephone number. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or predesignated OSC immediately, reports may be made immediately to the nearest USCG unit. In any event, such person in charge of the vessel or facility shall notify the NRC as soon as possible.

(c) All other reports of releases described under paragraph (a) of this section, except releases reported under paragraphs (a) (2) and (6) of this section, shall, as appropriate, be made to the NRC.

(d) The NRC will generally need information that will help to characterize the release. This will include, but not be limited to: Location of the release; type(s) of material(s) released;

an estimate of the quantity of material released; possible source of the release; and date and time of the release. Reporting under paragraphs (b) and (c) of this section shall not be delayed due to incomplete notification information.

(e) Upon receipt of a notification of a release, the NRC shall promptly notify the appropriate OSC. The OSC shall notify the Governor, or designee, of the state affected by the release.

(f)(1) When the OSC is notified of a release that may require response pursuant to § 300.415(b), a removal site evaluation shall, as appropriate, be promptly undertaken pursuant to § 300.410.

(2) When notification indicates that removal action pursuant to § 300.415(b) is not required, a remedial site evaluation shall, if appropriate, be undertaken by the lead agency pursuant to § 300.420, if one has not already been performed.

(3) If radioactive substances are present in a release, the EPA Radiological Response Coordinator should be notified for evaluation and assistance, consistent with §§ 300.130(f) and 300.145(f).

(g) Release notification made to the NRC under this section does not relieve the owner/operator of a facility from any obligations to which it is subject under SARA Title III or state law. In particular, it does not relieve the owner/operator from the requirements of section 304 of SARA Title III and 40 CFR part 355 and § 300.215(f) of this part for notifying the community emergency coordinator for the appropriate local emergency planning committee of all affected areas and the state emergency response commission of any state affected that there has been a release. Federal agencies are not legally obligated to comply with the requirements of Title III of SARA.

**§ 300.410  Removal site evaluation.**

(a) A removal site evaluation includes a removal preliminary assessment and, if warranted, a removal site inspection.

(b) A removal site evaluation of a release identified for possible CERCLA

response pursuant to § 300.415 shall, as appropriate, be undertaken by the lead agency as promptly as possible. The lead agency may perform a removal preliminary assessment in response to petitions submitted by a person who is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant pursuant to § 300.420(b)(5).

(c)(1) The lead agency shall, as appropriate, base the removal preliminary assessment on readily available information. A removal preliminary assessment may include, but is not limited to:

(i) Identification of the source and nature of the release or threat of release;

(ii) Evaluation by ATSDR or by other sources, for example, state public health agencies, of the threat to public health;

(iii) Evaluation of the magnitude of the threat;

(iv) Evaluation of factors necessary to make the determination of whether a removal is necessary; and

(v) Determination of whether a non-federal party is undertaking proper response.

(2) A removal preliminary assessment of releases from hazardous waste management facilities may include collection or review of data such as site management practices, information from generators, photographs, analysis of historical photographs, literature searches, and personal interviews conducted, as appropriate.

(d) A removal site inspection may be performed if more information is needed. Such inspection may include a perimeter (i.e., off-site) or on-site inspection, taking into consideration whether such inspection can be performed safely.

(e) A removal site evaluation shall be terminated when the OSC or lead agency determines:

(1) There is no release;

(2) The source is neither a vessel nor a facility as defined in § 300.5 of the NCP;

(3) The release involves neither a hazardous substance, nor a pollutant or contaminant that may present an imminent and substantial danger to public health or welfare;

(4) The release consists of a situation specified in § 300.400(b)(1) through (3) subject to limitations on response;

(5) The amount, quantity, or concentration released does not warrant federal response;

(6) A party responsible for the release, or any other person, is providing appropriate response, and on-scene monitoring by the government is not required; or

(7) The removal site evaluation is completed.

(f) The results of the removal site evaluation shall be documented.

(g) If natural resources are or may be injured by the release, the OSC or lead agency shall ensure that state and federal trustees of the affected natural resources are promptly notified in order that the trustees may initiate appropriate actions, including those identified in subpart G of this part. The OSC or lead agency shall seek to coordinate necessary assessments, evaluations, investigations, and planning with such state and federal trustees.

(h) If the removal site evaluation indicates that removal action under § 300.415 is not required, but that remedial action under § 300.430 may be necessary, the lead agency shall, as appropriate, initiate a remedial site evaluation pursuant to § 300.420.

§ 300.415 **Removal action.**

(a)(1) In determining the appropriate extent of action to be taken in response to a given release, the lead agency shall first review the removal site evaluation, any information produced through a remedial site evaluation, if any has been done previously, and the current site conditions, to determine if removal action is appropriate.

(2) Where the responsible parties are known, an effort initially shall be made, to the extent practicable, to determine whether they can and will perform the necessary removal action promptly and properly.

(3) This section does not apply to removal actions taken pursuant to section 104(b) of CERCLA. The criteria

for such actions are set forth in section 104(b) of CERCLA.

(b)(1) At any release, regardless of whether the site is included on the National Priorities List, where the lead agency makes the determination, based on the factors in paragraph (b)(2) of this section, that there is a threat to public health or welfare or the environment, the lead agency may take any appropriate removal action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release.

(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this section:

(i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii) Other situations or factors that may pose threats to public health or welfare or the environment.

(3) If the lead agency determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare or the environment. The lead agency shall, at the earliest possible time, also make any necessary determinations pursuant to paragraph (b)(4) of this section.

(4) Whenever a planning period of at least six months exists before on-site activities must be initiated, and the lead agency determines, based on a site evaluation, that a removal action is appropriate:

(i) The lead agency shall conduct an engineering evaluation/cost analysis (EE/CA) or its equivalent. The EE/CA is an analysis of removal alternatives for a site.

(ii) If environmental samples are to be collected, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. Sampling and analysis plans shall be reviewed and approved by EPA. The sampling and analysis plans shall consist of two parts:

(A) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

(B) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in planning and documenting the removal action.

(5) Fund-financed removal actions, other than those authorized under section 104(b) of CERCLA, shall be terminated after $2 million has been obligated for the action or 12 months have elapsed from the date that removal activities begin on-site, unless the lead agency determines that:

(i) There is an immediate risk to public health or welfare or the environment; continued response actions are immediately required to prevent, limit, or mitigate an emergency; and such assistance will not otherwise be provided on a timely basis; or

(ii) Continued response action is otherwise appropriate and consistent with the remedial action to be taken.

(c) Removal actions shall, to the extent practicable, contribute to the efficient performance of any anticipated long-term remedial action with respect to the release concerned.

(d) The following removal actions are, as a general rule, appropriate in the types of situations shown; however, this list is not exhaustive and is not intended to prevent the lead agency from taking any other actions deemed necessary under CERCLA or other ap-

propriate federal or state enforcement or response authorities, and the list does not create a duty on the lead agency to take action at any particular time:

(1) Fences, warning signs, or other security or site control precautions—where humans or animals have access to the release;

(2) Drainage controls, for example, run-off or run-on diversion—where needed to reduce migration of hazardous substances or pollutants or contaminants off-site or to prevent precipitation or run-off from other sources, for example, flooding, from entering the release area from other areas;

(3) Stabilization of berms, dikes, or impoundments or drainage or closing of lagoons—where needed to maintain the integrity of the structures;

(4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground or surface water, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects—where the use of such chemicals will reduce the spread of the release;

(6) Excavation, consolidation, or removal of highly contaminated soils from drainage or other areas—where such actions will reduce the spread of, or direct contact with, the contamination;

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants—where it will reduce the likelihood of spillage; leakage; exposure to humans, animals, or food chain; or fire or explosion;

(8) Containment, treatment, disposal, or incineration of hazardous materials—where needed to reduce the likelihood of human, animal, or food chain exposure; or

(9) Provision of alternative water supply—where necessary immediately to reduce exposure to contaminated household water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

(e) Where necessary to protect public health or welfare, the lead agency shall request that FEMA conduct a temporary relocation or that state/local officials conduct an evacuation.

(f) If the lead agency determines that the removal action will not fully address the threat posed by the release and the release may require remedial action, the lead agency shall ensure an orderly transition from removal to remedial response activities.

(g) Removal actions conducted by states under cooperative agreements, described in subpart F of this part, shall comply with all requirements of this section.

(h) Facilities operated by a state or political subdivision at the time of disposal require a state cost share of at least 50 percent of Fund-financed response costs if a Fund-financed remedial action is conducted.

(i) Fund-financed removal actions under CERCLA section 104 and removal actions pursuant to CERCLA section 106 shall, to the extent practicable considering the exigencies of the situation, attain applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws. Waivers described in § 300.430(f)(1)(ii)(C) may be used for removal actions. Other federal and state advisories, criteria, or guidance may, as appropriate, be considered in formulating the removal action (see § 300.400(g)(3)). In determining whether compliance with ARARs is practicable, the lead agency may consider appropriate factors, including:

(1) The urgency of the situation; and

(2) The scope of the removal action to be conducted.

(j) Removal actions pursuant to section 106 or 122 of CERCLA are not subject to the following requirements of this section:

(1) Section 300.415(a)(2) requirement to locate responsible parties and have them undertake the response;

(2) Section 300.415(b)(2)(vii) requirement to consider the availability of other appropriate federal or state response and enforcement mechanisms to respond to the release;

(3) Section 300.415(b)(5) requirement to terminate response after $2 million has been obligated or 12

months have elapsed from the date of the initial response; and

(4) Section 300.415(f) requirement to assure an orderly transition from removal to remedial action.

(k) To the extent practicable, provision for post-removal site control following a Fund-financed removal action at both NPL and non-NPL sites is encouraged to be made prior to the initiation of the removal action. Such post-removal site control includes actions necessary to ensure the effectiveness and integrity of the removal action after the completion of the on-site removal action or after the $2 million or 12-month statutory limits are reached for sites that do not meet the exemption criteria in paragraph (b)(5) of this section. Post-removal site control may be conducted by:

(1) The affected state or political subdivision thereof or local units of government for any removal;

(2) Potentially responsible parties; or

(3) EPA's remedial program for some federal-lead Fund-financed responses at NPL sites.

(l) OSCs/RPMs conducting removal actions shall submit OSC reports to the RRT as required by § 300.165.

(m) *Community relations in removal actions.* (1) In the case of all removal actions taken pursuant to § 300.415 or CERCLA enforcement actions to compel removal response, a spokesperson shall be designated by the lead agency. The spokesperson shall inform the community of actions taken, respond to inquiries, and provide information concerning the release. All news releases or statements made by participating agencies shall be coordinated with the OSC/RPM. The spokesperson shall notify, at a minimum, immediately affected citizens, state and local officials, and, when appropriate, civil defense or emergency management agencies.

(2) For actions where, based on the site evaluation, the lead agency determines that a removal is appropriate, and that less than six months exists before on-site removal activity must begin, the lead agency shall:

(i) Publish a notice of availability of the administrative record file established pursuant to § 300.820 in a major

local newspaper of general circulation within 60 days of initiation of on-site removal activity;

(ii) Provide a public comment period, as appropriate, of not less than 30 days from the time the administrative record file is made available for public inspection, pursuant to § 300.820(b)(2); and

(iii) Prepare a written response to significant comments pursuant to § 300.820(b)(3).

(3) For removal actions where on-site action is expected to extend beyond 120 days from the initiation of on-site removal activities, the lead agency shall by the end of the 120-day period:

(i) Conduct interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns, information needs, and how or when citizens would like to be involved in the Superfund process;

(ii) Prepare a formal community relations plan (CRP) based on the community interviews and other relevant information, specifying the community relations activities that the lead agency expects to undertake during the response; and

(iii) Establish at least one local information repository at or near the location of the response action. The information repository should contain items made available for public information. Further, an administrative record file established pursuant to subpart I for all removal actions shall be available for public inspection in at least one of the repositories. The lead agency shall inform the public of the establishment of the information repository and provide notice of availability of the administrative record file for public review. All items in the repository shall be available for public inspection and copying.

(4) Where, based on the site evaluation, the lead agency determines that a removal action is appropriate and that a planning period of at least six months exists prior to initiation of the on-site removal activities, the lead agency shall at a minimum:

(i) Comply with the requirements set forth in paragraphs (m)(3)(i), (ii), and (iii) of this section, prior to the com-

pletion of the engineering evaluation/cost analysis (EE/CA), or its equivalent, except that the information repository and the administrative record file will be established no later than when the EE/CA approval memorandum is signed;

(ii) Publish a notice of availability and brief description of the EE/CA in a major local newspaper of general circulation pursuant to § 300.820;

(iii) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments after completion of the EE/CA pursuant to § 300.820(a). Upon timely request, the lead agency will extend the public comment period by a minimum of 15 days; and

(iv) Prepare a written response to significant comments pursuant to § 300.820(a).

§ 300.420 Remedial site evaluation.

(a) *General.* The purpose of this section is to describe the methods, procedures, and criteria the lead agency shall use to collect data, as required, and evaluate releases of hazardous substances, pollutants, or contaminants. The evaluation may consist of two steps: a remedial preliminary assessment (PA) and a remedial site inspection (SI).

(b) *Remedial preliminary assessment.* (1) The lead agency shall perform a remedial PA on all sites in CERCLIS as defined in § 300.5 to:

(i) Eliminate from further consideration those sites that pose no threat to public health or the environment;

(ii) Determine if there is any potential need for removal action;

(iii) Set priorities for site inspections; and

(iv) Gather existing data to facilitate later evaluation of the release pursuant to the Hazard Ranking System (HRS) if warranted.

(2) A remedial PA shall consist of a review of existing information about a release such as information on the pathways of exposure, exposure targets, and source and nature of release. A remedial PA shall also include an off-site reconnaissance as appropriate. A remedial PA may include an on-site reconnaissance where appropriate.

(3) If the remedial PA indicates that a removal action may be warranted, the lead agency shall initiate removal evaluation pursuant to § 300.410.

(4) In performing a remedial PA, the lead agency may complete the EPA Preliminary Assessment form, available from EPA regional offices, or its equivalent, and shall prepare a PA report, which shall include:

(i) A description of the release;

(ii) A description of the probable nature of the release; and

(iii) A recommendation on whether further action is warranted, which lead agency should conduct further action, and whether an SI or removal action or both should be undertaken.

(5) Any person may petition the lead federal agency (EPA or the appropriate federal agency in the case of a release or suspected release from a federal facility), to perform a PA of a release when such person is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant. Such petitions shall be addressed to the EPA Regional Administrator for the region in which the release is located, except that petitions for PAs involving federal facilities should be addressed to the head of the appropriate federal agency.

(i) Petitions shall be signed by the petitioner and shall contain the following:

(A) The full name, address, and phone number of petitioner;

(B) A description, as precisely as possible, of the location of the release; and

(C) How the petitioner is or may be affected by the release.

(ii) Petitions should also contain the following information to the extent available:

(A) What type of substances were or may be released;

(B) The nature of activities that have occurred where the release is located; and

(C) Whether local and state authorities have been contacted about the release.

(iii) The lead federal agency shall complete a remedial or removal PA within one year of the date of receipt of a complete petition pursuant to paragraph (b)(5) of this section, if one

has not been performed previously, unless the lead federal agency determines that a PA is not appropriate. Where such a determination is made, the lead federal agency shall notify the petitioner and will provide a reason for the determination.

(iv) When determining if performance of a PA is appropriate, the lead federal agency shall take into consideration:

(A) Whether there is information indicating that a release has occurred or there is a threat of a release of a hazardous substance, pollutant, or contaminant; and

(B) Whether the release is eligible for response under CERCLA.

(c) *Remedial site inspection.* (1) The lead agency shall perform a remedial SI as appropriate to:

(i) Eliminate from further consideration those releases that pose no significant threat to public health or the environment;

(ii) Determine the potential need for removal action;

(iii) Collect or develop additional data, as appropriate, to evaluate the release pursuant to the HRS; and

(iv) Collect data in addition to that required to score the release pursuant to the HRS, as appropriate, to better characterize the release for more effective and rapid initiation of the RI/FS or response under other authorities.

(2) The remedial SI shall build upon the information collected in the remedial PA. The remedial SI shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling.

(3) If the remedial SI indicates that removal action may be appropriate, the lead agency shall initiate removal site evaluation pursuant to § 300.410.

(4) Prior to conducting field sampling as part of site inspections, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type, and location of samples, and the type of analyses, and

(ii) The quality assurance project plan (QAPP), which describes policy, organization, and functional activities, and the data quality objectives and measures necessary to achieve adequate data for use in site evaluation and hazard ranking system activities.

(5) Upon completion of a remedial SI, the lead agency shall prepare a report that includes the following:

(i) A description/history/nature of waste handling;

(ii) A description of known contaminants;

(iii) A description of pathways of migration of contaminants;

(iv) An identification and description of human and environmental targets; and

(v) A recommendation on whether further action is warranted.

§ 300.425   Establishing remedial priorities.

(a) *General.* The purpose of this section is to identify the criteria as well as the methods and procedures EPA uses to establish its priorities for remedial actions.

(b) *National Priorities List.* The NPL is the list of priority releases for long-term remedial evaluation and response.

(1) Only those releases included on the NPL shall be considered eligible for Fund-financed remedial action. Removal actions (including remedial planning activities, RI/FSs, and other actions taken pursuant to CERCLA section 104(b)) are not limited to NPL sites.

(2) Inclusion of a release on the NPL does not imply that monies will be expended, nor does the rank of a release on the NPL establish the precise priorities for the allocation of Fund resources. EPA may also pursue other appropriate authorities to remedy the release, including enforcement actions under CERCLA and other laws. A site's rank on the NPL serves, along with other factors, including enforcement actions, as a basis to guide the allocation of Fund resources among releases.

(3) Federal facilities that meet the criteria identified in paragraph (c) of this section are eligible for inclusion on the NPL. Except as provided by

ment period of a minimum of 30 calendar days;

(ii) In a major local newspaper of general circulation at or near the release that is proposed for deletion, publish a notice of availability of the notice of intent to delete;

(iii) Place copies of information supporting the proposed deletion in the information repository, described in § 300.430(c)(2)(iii), at or near the release proposed for deletion. These items shall be available for public inspection and copying; and

(iv) Respond to each significant comment and any significant new data submitted during the comment period and include this response document in the final deletion package.

(5) EPA shall place the final deletion package in the local information repository once the notice of final deletion has been published in the FEDERAL REGISTER.

§ 300.430   Remedial investigation/feasibility study and selection of remedy.

(a) *General*—(1) *Introduction.* The purpose of the remedy selection process is to implement remedies that eliminate, reduce, or control risks to human health and the environment. Remedial actions are to be implemented as soon as site data and information make it possible to do so. Accordingly, EPA has established the following program goal, expectations, and program management principles to assist in the identification and implementation of appropriate remedial actions.

(i) *Program goal.* The national goal of the remedy selection process is to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste.

(ii) *Program management principles.* EPA generally shall consider the following general principles of program management during the remedial process:

(A) Sites should generally be remediated in operable units when early actions are necessary or appropriate to achieve significant risk reduction quickly, when phased analysis and response is necessary or appropriate given the size or complexity of the

site, or to expedite the completion of total site cleanup.

(B) Operable units, including interim action operable units, should not be inconsistent with nor preclude implementation of the expected final remedy.

(C) Site-specific data needs, the evaluation of alternatives, and the documentation of the selected remedy should reflect the scope and complexity of the site problems being addressed.

(iii) *Expectations.* EPA generally shall consider the following expectations in developing appropriate remedial alternatives:

(A) EPA expects to use treatment to address the principal threats posed by a site, wherever practicable. Principal threats for which treatment is most likely to be appropriate include liquids, areas contaminated with high concentrations of toxic compounds, and highly mobile materials.

(B) EPA expects to use engineering controls, such as containment, for waste that poses a relatively low long-term threat or where treatment is impracticable.

(C) EPA expects to use a combination of methods, as appropriate, to achieve protection of human health and the environment. In appropriate site situations, treatment of the principal threats posed by a site, with priority placed on treating waste that is liquid, highly toxic or highly mobile, will be combined with engineering controls (such as containment) and institutional controls, as appropriate, for treatment residuals and untreated waste.

(D) EPA expects to use institutional controls such as water use and deed restrictions to supplement engineering controls as appropriate for short- and long-term management to prevent or limit exposure to hazardous substances, pollutants, or contaminants. Institutional controls may be used during the conduct of the remedial investigation/feasibility study (RI/FS) and implementation of the remedial action and, where necessary, as a component of the completed remedy. The use of institutional controls shall not substitute for active response measures (e.g., treatment and/or contain-

ment of source material, restoration of ground waters to their beneficial uses) as the sole remedy unless such active measures are determined not to be practicable, based on the balancing of trade-offs among alternatives that is conducted during the selection of remedy.

(E) EPA expects to consider using innovative technology when such technology offers the potential for comparable or superior treatment performance or implementability, fewer or lesser adverse impacts than other available approaches, or lower costs for similar levels of performance than demonstrated technologies.

(F) EPA expects to return usable ground waters to their beneficial uses wherever practicable, within a timeframe that is reasonable given the particular circumstances of the site. When restoration of ground water to beneficial uses is not practicable, EPA expects to prevent further migration of the plume, prevent exposure to the contaminated ground water, and evaluate further risk reduction.

(2) *Remedial investigation/feasibility study.* The purpose of the remedial investigation/feasibility study (RI/FS) is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy. Developing and conducting an RI/FS generally includes the following activities: project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives. The scope and timing of these activities should be tailored to the nature and complexity of the problem and the response alternatives being considered.

(b) *Scoping.* In implementing this section, the lead agency should consider the program goal, program management principles, and expectations contained in this rule. The investigative and analytical studies should be tailored to site circumstances so that the scope and detail of the analysis is appropriate to the complexity of site problems being addressed. During scoping, the lead and support agencies shall confer to identify the optimal set and sequence of actions necessary to address site problems. Specifically, the lead agency shall:

(1) Assemble and evaluate existing data on the site, including the results of any removal actions, remedial preliminary assessment and site inspections, and the NPL listing process.

(2) Develop a conceptual understanding of the site based on the evaluation of existing data described in paragraph (b)(1) of this section.

(3) Identify likely response scenarios and potentially applicable technologies and operable units that may address site problems.

(4) Undertake limited data collection efforts or studies where this information will assist in scoping the RI/FS or accelerate response actions, and begin to identify the need for treatability studies, as appropriate.

(5) Identify the type, quality, and quantity of the data that will be collected during the RI/FS to support decisions regarding remedial response activities.

(6) Prepare site-specific health and safety plans that shall specify, at a minimum, employee training and protective equipment, medical surveillance requirements, standard operating procedures, and a contingency plan that conforms with 29 CFR 1910.120 (l)(1) and (l)(2).

(7) If natural resources are or may be injured by the release, ensure that state and federal trustees of the affected natural resources have been notified in order that the trustees may initiate appropriate actions, including those identified in subpart G of this part. The lead agency shall seek to coordinate necessary assessments, evaluations, investigations, and planning with such state and federal trustees.

(8) Develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. Sampling and analysis plans shall be reviewed and approved by EPA. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

(ii) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures

**59**

necessary to achieve adequate data for use in selecting the appropriate remedy.

(9) Initiate the identification of potential federal and state ARARs and, as appropriate, other criteria, advisories, or guidance to be considered.

(c) *Community relations.* (1) The community relations requirements described in this section apply to all remedial activities undertaken pursuant to CERCLA section 104 and to section 106 or section 122 consent orders or decrees, or section 106 administrative orders.

(2) The lead agency shall provide for the conduct of the following community relations activities, to the extent practicable, prior to commencing field work for the remedial investigation:

(i) Conducting interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns and information needs, and to learn how and when citizens would like to be involved in the Superfund process.

(ii) Preparing a formal community relations plan (CRP), based on the community interviews and other relevant information, specifying the community relations activities that the lead agency expects to undertake during the remedial response. The purpose of the CRP is to:

(A) Ensure the public appropriate opportunities for involvement in a wide variety of site-related decisions, including site analysis and characterization, alternatives analysis, and selection of remedy;

(B) Determine, based on community interviews, appropriate activities to ensure such public involvement, and

(C) Provide appropriate opportunities for the community to learn about the site.

(iii) Establishing at least one local information repository at or near the location of the response action. Each information repository should contain a copy of items made available to the public, including information that describes the technical assistance grants application process. The lead agency shall inform interested parties of the establishment of the information repository.

(iv) Informing the community of the availability of technical assistance grants.

(3) For PRP actions, the lead agency shall plan and implement the community relations program at a site. PRPs may participate in aspects of the community relations program at the discretion of and with oversight by the lead agency.

(4) The lead agency may conduct technical discussions involving PRPs and the public. These technical discussions may be held separately from, but contemporaneously with, the negotiations/settlement discussions.

(5) In addition, the following provisions specifically apply to enforcement actions:

(i) Lead agencies entering into an enforcement agreement with de minimis parties under CERCLA section 122(g) or cost recovery settlements under section 122(h) shall publish a notice of the proposed agreement in the FEDERAL REGISTER at least 30 days before the agreement becomes final, as required by section 122(i). The notice must identify the name of the facility and the parties to the proposed agreement and must allow an opportunity for comment and consideration of comments; and

(ii) Where the enforcement agreement is embodied in a consent decree, public notice and opportunity for public comment shall be provided in accordance with 28 CFR 50.7.

(d) *Remedial investigation.* (1) The purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. To characterize the site, the lead agency shall, as appropriate, conduct field investigations, including treatability studies, and conduct a baseline risk assessment. The RI provides information to assess the risks to human health and the environment and to support the development, evaluation, and selection of appropriate response alternatives. Site characterization may be conducted in one or more phases to focus sampling efforts and increase the efficiency of the investigation. Because estimates of actual or potential exposures and associated impacts on

**Environmental Protection Agency**                                            **§ 300.430**

human and environmental receptors may be refined throughout the phases of the RI as new information is obtained. site characterization activities should be fully integrated with the development and evaluation of alternatives in the feasibility study. Bench- or pilot-scale treatability studies shall be conducted, when appropriate and practicable, to provide additional data for the detailed analysis and to support engineering design of remedial alternatives.

(2) The lead agency shall characterize the nature of and threat posed by the hazardous substances and hazardous materials and gather data necessary to assess the extent to which the release poses a threat to human health or the environment or to support the analysis and design of potential response actions by conducting, as appropriate, field investigations to assess the following factors:

(i) Physical characteristics of the site, including important surface features, soils, geology, hydrogeology, meteorology, and ecology;

(ii) Characteristics or classifications of air, surface water, and ground water;

(iii) The general characteristics of the waste, including quantities, state, concentration, toxicity, propensity to bioaccumulate, persistence, and mobility;

(iv) The extent to which the source can be adequately identified and characterized;

(v) Actual and potential exposure pathways through environmental media;

(vi) Actual and potential exposure routes, for example, inhalation and ingestion; and

(vii) Other factors, such as sensitive populations, that pertain to the characterization of the site or support the analysis of potential remedial action alternatives.

(3) The lead and support agency shall identify their respective potential ARARs related to the location of and contaminants at the site in a timely manner. The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner (see § 300.400(g)(3)).

(4) Using the data developed under paragraphs (d) (1) and (2) of this section, the lead agency shall conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment that may be posed by contaminants migrating to ground water or surface water, releasing to air, leaching through soil, remaining in the soil, and bioaccumulating in the food chain. The results of the baseline risk assessment will help establish acceptable exposure levels for use in developing remedial alternatives in the FS, as described in paragraph (e) of this section.

(e) *Feasibility study.* (1) The primary objective of the feasibility study (FS) is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected. The lead agency may develop a feasibility study to address a specific site problem or the entire site. The development and evaluation of alternatives shall reflect the scope and complexity of the remedial action under consideration and the site problems being addressed. Development of alternatives shall be fully integrated with the site characterization activities of the remedial investigation described in paragraph (d) of this section. The lead agency shall include an alternatives screening step, when needed, to select a reasonable number of alternatives for detailed analysis.

(2) Alternatives shall be developed that protect human health and the environment by recycling waste or by eliminating, reducing, and/or controlling risks posed through each pathway by a site. The number and type of alternatives to be analyzed shall be determined at each site, taking into account the scope, characteristics, and complexity of the site problem that is being addressed. In developing and, as appropriate, screening the alternatives, the lead agency shall:

(i) Establish remedial action objectives specifying contaminants and media of concern, potential exposure pathways, and remediation goals. Initially, preliminary remediation goals

61

are developed based on readily available information, such as chemical-specific ARARs or other reliable information. Preliminary remediation goals should be modified, as necessary, as more information becomes available during the RI/FS. Final remediation goals will be determined when the remedy is selected. Remediation goals shall establish acceptable exposure levels that are protective of human health and the environment and shall be developed by considering the following:

(A) Applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws, if available, and the following factors:

(1) For systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime, incorporating an adequate margin of safety;

(2) For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response. The $10^{-6}$ risk level shall be used as the point of departure for determining remediation goals for alternatives when ARARs are not available or are not sufficiently protective because of the presence of multiple contaminants at a site or multiple pathways of exposure;

(3) Factors related to technical limitations such as detection/quantification limits for contaminants;

(4) Factors related to uncertainty; and

(5) Other pertinent information.

(B) Maximum contaminant level goals (MCLGs), established under the Safe Drinking Water Act, that are set at levels above zero, shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water, where the MCLGs are relevant and appropriate under the circumstances of the release based on the factors in § 300.400(g)(2). If an MCLG is deter-

mined not to be relevant and appropriate, the corresponding maximum contaminant level (MCL) shall be attained where relevant and appropriate to the circumstances of the release.

(C) Where the MCLG for a contaminant has been set at a level of zero, the MCL promulgated for that contaminant under the Safe Drinking Water Act shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water, where the MCL is relevant and appropriate under the circumstances of the release based on the factors in § 300.400(g)(2).

(D) In cases involving multiple contaminants or pathways where attainment of chemical-specific ARARs will result in cumulative risk in excess of $10^{-4}$, criteria in paragraph (e)(2)(i)(A) of this section may also be considered when determining the cleanup level to be attained.

(E) Water quality criteria established under sections 303 or 304 of the Clean Water Act shall be attained where relevant and appropriate under the circumstances of the release.

(F) An alternate concentration limit (ACL) may be established in accordance with CERCLA section 121(d)(2)(B)(ii).

(G) Environmental evaluations shall be performed to assess threats to the environment, especially sensitive habitats and critical habitats of species protected under the Endangered Species Act.

(ii) Identify and evaluate potentially suitable technologies, including innovative technologies;

(iii) Assemble suitable technologies into alternative remedial actions.

(3) For source control actions, the lead agency shall develop, as appropriate:

(i) A range of alternatives in which treatment that reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants is a principal element. As appropriate, this range shall include an alternative that removes or destroys hazardous substances, pollutants, or contaminants to the maximum extent feasible, eliminating or minimizing, to the degree possible, the need for long-term management. The lead agency

also shall develop, as appropriate, other alternatives which, at a minimum, treat the principal threats posed by the site but vary in the degree of treatment employed and the quantities and characteristics of the treatment residuals and untreated waste that must be managed; and

(ii) One or more alternatives that involve little or no treatment, but provide protection of human health and the environment primarily by preventing or controlling exposure to hazardous substances, pollutants, or contaminants, through engineering controls, for example, containment and, as necessary, institutional controls to protect human health and the environment and to assure continued effectiveness of the response action.

(4) For ground-water response actions, the lead agency shall develop a limited number of remedial alternatives that attain site-specific remediation levels within different restoration time periods utilizing one or more different technologies.

(5) The lead agency shall develop one or more innovative treatment technologies for further consideration if those technologies offer the potential for comparable or superior performance or implementability; fewer or lesser adverse impacts than other available approaches; or lower costs for similar levels of performance than demonstrated treatment technologies.

(6) The no-action alternative, which may be no further action if some removal or remedial action has already occurred at the site, shall be developed.

(7) As appropriate, and to the extent sufficient information is available, the short- and long-term aspects of the following three criteria shall be used to guide the development and screening of remedial alternatives:

(i) *Effectiveness.* This criterion focuses on the degree to which an alternative reduces toxicity, mobility, or volume through treatment, minimizes residual risks and affords long-term protection, complies with ARARs, minimizes short-term impacts, and how quickly it achieves protection. Alternatives providing significantly less effectiveness than other, more promising alternatives may be eliminated. Al-

ternatives that do not provide adequate protection of human health and the environment shall be eliminated from further consideration.

(ii) *Implementability.* This criterion focuses on the technical feasibility and availability of the technologies each alternative would employ and the administrative feasibility of implementing the alternative. Alternatives that are technically or administratively infeasible or that would require equipment, specialists, or facilities that are not available within a reasonable period of time may be eliminated from further consideration.

(iii) *Cost.* The costs of construction and any long-term costs to operate and maintain the alternatives shall be considered. Costs that are grossly excessive compared to the overall effectiveness of alternatives may be considered as one of several factors used to eliminate alternatives. Alternatives providing effectiveness and implementability similar to that of another alternative by employing a similar method of treatment or engineering control, but at greater cost, may be eliminated.

(8) The lead agency shall notify the support agency of the alternatives that will be evaluated in detail to facilitate the identification of ARARs and, as appropriate, pertinent advisories, criteria, or guidance to be considered.

(9) *Detailed analysis of alternatives.* (i) A detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage. The lead and support agencies must identify their ARARs related to specific actions in a timely manner and no later than the early stages of the comparative analysis. The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner.

(ii) The detailed analysis consists of an assessment of individual alternatives against each of nine evaluation criteria and a comparative analysis that focuses upon the relative performance of each alternative against those criteria.

(iii) *Nine criteria for evaluation.* The analysis of alternatives under review shall reflect the scope and complexity of site problems and alternatives being evaluated and consider the relative significance of the factors within each criteria. The nine evaluation criteria are as follows:

(A) *Overall protection of human health and the environment.* Alternatives shall be assessed to determine whether they can adequately protect human health and the environment, in both the short- and long-term, from unacceptable risks posed by hazardous substances, pollutants, or contaminants present at the site by eliminating, reducing, or controlling exposures to levels established during development of remediation goals consistent with § 300.430(e)(2)(i). Overall protection of human health and the environment draws on the assessments of other evaluation criteria, especially long-term effectiveness and permanence, short-term effectiveness, and compliance with ARARs.

(B) *Compliance with ARARs.* The alternatives shall be assessed to determine whether they attain applicable or relevant and appropriate requirements under federal environmental laws and state environmental or facility siting laws or provide grounds for invoking one of the waivers under paragraph (f)(1)(ii)(C) of this section.

(C) *Long-term effectiveness and permanence.* Alternatives shall be assessed for the long-term effectiveness and permanence they afford, along with the degree of certainty that the alternative will prove successful. Factors that shall be considered, as appropriate, include the following:

(*1*) Magnitude of residual risk remaining from untreated waste or treatment residuals remaining at the conclusion of the remedial activities. The characteristics of the residuals should be considered to the degree that they remain hazardous, taking into account their volume, toxicity, mobility, and propensity to bioaccumulate.

(*2*) Adequacy and reliability of controls such as containment systems and institutional controls that are necessary to manage treatment residuals and untreated waste. This factor ad-

dresses in particular the uncertainties associated with land disposal for providing long-term protection from residuals; the assessment of the potential need to replace technical components of the alternative, such as a cap, a slurry wall, or a treatment system; and the potential exposure pathways and risks posed should the remedial action need replacement.

(D) *Reduction of toxicity, mobility, or volume through treatment.* The degree to which alternatives employ recycling or treatment that reduces toxicity, mobility, or volume shall be assessed, including how treatment is used to address the principal threats posed by the site. Factors that shall be considered, as appropriate, include the following:

(*1*) The treatment or recycling processes the alternatives employ and materials they will treat;

(*2*) The amount of hazardous substances, pollutants, or contaminants that will be destroyed, treated, or recycled;

(*3*) The degree of expected reduction in toxicity, mobility, or volume of the waste due to treatment or recycling and the specification of which reduction(s) are occurring;

(*4*) The degree to which the treatment is irreversible;

(*5*) The type and quantity of residuals that will remain following treatment, considering the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous substances and their constituents; and

(*6*) The degree to which treatment reduces the inherent hazards posed by principal threats at the site.

(E) *Short-term effectiveness.* The short-term impacts of alternatives shall be assessed considering the following:

(*1*) Short-term risks that might be posed to the community during implementation of an alternative;

(*2*) Potential impacts on workers during remedial action and the effectiveness and reliability of protective measures;

(*3*) Potential environmental impacts of the remedial action and the effectiveness and reliability of mitigative measures during implementation; and

(*4*) Time until protection is achieved.

(F) *Implementability.* The ease or difficulty of implementing the alternatives shall be assessed by considering the following types of factors as appropriate:

(*1*) Technical feasibility, including technical difficulties and unknowns associated with the construction and operation of a technology, the reliability of the technology, ease of undertaking additional remedial actions, and the ability to monitor the effectiveness of the remedy.

(*2*) Administrative feasibility, including activities needed to coordinate with other offices and agencies and the ability and time required to obtain any necessary approvals and permits from other agencies (for off-site actions);

(*3*) Availability of services and materials, including the availability of adequate off-site treatment, storage capacity, and disposal capacity and services; the availability of necessary equipment and specialists, and provisions to ensure any necessary additional resources; the availability of services and materials; and availability of prospective technologies.

(G) *Cost.* The types of costs that shall be assessed include the following:

(*1*) Capital costs, including both direct and indirect costs;

(*2*) Annual operation and maintenance costs; and

(*3*) Net present value of capital and O&M costs.

(H) *State acceptance.* Assessment of state concerns may not be completed until comments on the RI/FS are received but may be discussed, to the extent possible, in the proposed plan issued for public comment. The state concerns that shall be assessed include the following:

(*1*) The state's position and key concerns related to the preferred alternative and other alternatives; and

(*2*) State comments on ARARs or the proposed use of waivers.

(I) *Community acceptance.* This assessment includes determining which components of the alternatives interested persons in the community support, have reservations about, or oppose. This assessment may not be completed until comments on the proposed plan are received.

(f) *Selection of remedy*—(1) Remedies selected shall reflect the scope and purpose of the actions being undertaken and how the action relates to long-term, comprehensive response at the site.

(i) The criteria noted in paragraph (e)(9)(iii) of this section are used to select a remedy. These criteria are categorized into three groups.

(A) *Threshold criteria.* Overall protection of human health and the environment and compliance with ARARs (unless a specific ARAR is waived) are threshold requirements that each alternative must meet in order to be eligible for selection.

(B) *Primary balancing criteria.* The five primary balancing criteria are long-term effectiveness and permanence; reduction of toxicity, mobility, or volume through treatment; short-term effectiveness; implementability; and cost.

(C) *Modifying criteria.* State and community acceptance are modifying criteria that shall be considered in remedy selection.

(ii) The selection of a remedial action is a two-step process and shall proceed in accordance with § 300.515(e). First, the lead agency, in conjunction with the support agency, identifies a preferred alternative and presents it to the public in a proposed plan, for review and comment. Second, the lead agency shall review the public comments and consult with the state (or support agency) in order to determine if the alternative remains the most appropriate remedial action for the site or site problem. The lead agency, as specified in § 300.515(e), makes the final remedy selection decision, which shall be documented in the ROD. Each remedial alternative selected as a Superfund remedy will employ the criteria as indicated in paragraph (f)(1)(i) of this section to make the following determination:

(A) Each remedial action selected shall be protective of human health and the environment.

(B) On-site remedial actions selected in a ROD must attain those ARARs that are identified at the time of ROD signature or provide grounds for invoking a waiver under § 300.430(f)(1)(ii)(C).

(1) Requirements that are promulgated or modified after ROD signature must be attained (or waived) only when determined to be applicable or relevant and appropriate and necessary to ensure that the remedy is protective of human health and the environment.

(2) Components of the remedy not described in the ROD must attain (or waive) requirements that are identified as applicable or relevant and appropriate at the time the amendment to the ROD or the explanation of significant difference describing the component is signed.

(C) An alternative that does not meet an ARAR under federal environmental or state environmental or facility siting laws may be selected under the following circumstances:

(1) The alternative is an interim measure and will become part of a total remedial action that will attain the applicable or relevant and appropriate federal or state requirement;

(2) Compliance with the requirement will result in greater risk to human health and the environment than other alternatives;

(3) Compliance with the requirement is technically impracticable from an engineering perspective;

(4) The alternative will attain a standard of performance that is equivalent to that required under the otherwise applicable standard, requirement, or limitation through use of another method or approach;

(5) With respect to a state requirement, the state has not consistently applied, or demonstrated the intention to consistently apply, the promulgated requirement in similar circumstances at other remedial actions within the state; or

(6) For Fund-financed response actions only, an alternative that attains the ARAR will not provide a balance between the need for protection of human health and the environment at the site and the availability of Fund monies to respond to other sites that may present a threat to human health and the environment.

(D) Each remedial action selected shall be cost-effective, provided that it first satisfies the threshold criteria set forth in § 300.430(f)(1)(ii) (A) and (B).

Cost-effectiveness is determined by evaluating the following three of the five balancing criteria noted in § 300.430(f)(1)(i)(B) to determine overall effectiveness: long-term effectiveness and permanence, reduction of toxicity, mobility, or volume through treatment, and short-term effectiveness. Overall effectiveness is then compared to cost to ensure that the remedy is cost-effective. A remedy shall be cost-effective if its costs are proportional to its overall effectiveness.

(E) Each remedial action shall utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. This requirement shall be fulfilled by selecting the alternative that satisfies paragraph (f)(1)(ii) (A) and (B) of this section and provides the best balance of trade-offs among alternatives in terms of the five primary balancing criteria noted in paragraph (f)(1)(i)(B) of this section. The balancing shall emphasize long-term effectiveness and reduction of toxicity, mobility, or volume through treatment. The balancing shall also consider the preference for treatment as a principal element and the bias against off-site land disposal of untreated waste. In making the determination under this paragraph, the modifying criteria of state acceptance and community acceptance described in paragraph (f)(1)(i)(C) of this section shall also be considered.

(2) *The proposed plan.* In the first step in the remedy selection process, the lead agency shall identify the alternative that best meets the requirements in § 300.430(f)(1), above, and shall present that alternative to the public in a proposed plan. The lead agency, in conjunction with the support agency and consistent with § 300.515(e), shall prepare a proposed plan that briefly describes the remedial alternatives analyzed by the lead agency, proposes a preferred remedial action alternative, and summarizes the information relied upon to select the preferred alternative. The selection of remedy process for an operable unit may be initiated at any time during the remedial action process. The purpose of the proposed plan is to supple-

ment the RI/FS and provide the public with a reasonable opportunity to comment on the preferred alternative for remedial action, as well as alternative plans under consideration, and to participate in the selection of remedial action at a site. At a minimum, the proposed plan shall:

(i) Provide a brief summary description of the remedial alternatives evaluated in the detailed analysis established under paragraph (e)(9) of this section;

(ii) Identify and provide a discussion of the rationale that supports the preferred alternative;

(iii) Provide a summary of any formal comments received from the support agency; and

(iv) Provide a summary explanation of any proposed waiver identified under paragraph (f)(1)(ii)(C) of this section from an ARAR.

(3) *Community relations to support the selection of remedy.* (i) The lead agency, after preparation of the proposed plan and review by the support agency, shall conduct the following activities:

(A) Publish a notice of availability and brief analysis of the proposed plan in a major local newspaper of general circulation;

(B) Make the proposed plan and supporting analysis and information available in the administrative record required under subpart I of this part;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments on the proposed plan and the supporting analysis and information located in the information repository, including the RI/FS. Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the site at issue regarding the proposed plan and the supporting analysis and information;

(E) Keep a transcript of the public meeting held during the public comment period pursuant to CERCLA section 117(a) and make such transcript available to the public; and

(F) Prepare a written summary of significant comments, criticisms, and new relevant information submitted during the public comment period and the lead agency response to each issue. This responsiveness summary shall be made available with the record of decision.

(ii) After publication of the proposed plan and prior to adoption of the selected remedy in the record of decision, if new information is made available that significantly changes the basic features of the remedy with respect to scope, performance, or cost, such that the remedy significantly differs from the original proposal in the proposed plan and the supporting analysis and information, the lead agency shall:

(A) Include a discussion in the record of decision of the significant changes and reasons for such changes, if the lead agency determines such changes could be reasonably anticipated by the public based on the alternatives and other information available in the proposed plan or the supporting analysis and information in the administrative record; or

(B) Seek additional public comment on a revised proposed plan, when the lead agency determines the change could not have been reasonably anticipated by the public based on the information available in the proposed plan or the supporting analysis and information in the administrative record. The lead agency shall, prior to adoption of the selected remedy in the ROD, issue a revised proposed plan, which shall include a discussion of the significant changes and the reasons for such changes, in accordance with the public participation requirements described in paragraph (f)(3)(i) of this section.

(4) *Final remedy selection.* (i) In the second and final step in the remedy selection process, the lead agency shall reassess its initial determination that the preferred alternative provides the best balance of trade-offs, now factoring in any new information or points of view expressed by the state (or support agency) and community during the public comment period. The lead agency shall consider state (or support agency) and community comments re-

garding the lead agency's evaluation of alternatives with respect to the other criteria. These comments may prompt the lead agency to modify aspects of the preferred alternative or decide that another alternative provides a more appropriate balance. The lead agency, as specified in § 300.515(e), shall make the final remedy selection decision and document that decision in the ROD.

(ii) If a remedial action is selected that results in hazardous substances, pollutants, or contaminants remaining at the site above levels that allow for unlimited use and unrestricted exposure, the lead agency shall review such action no less often than every five years after initiation of the selected remedial action.

(iii) The process for selection of a remedial action at a federal facility on the NPL, pursuant to CERCLA section 120, shall entail:

(A) Joint selection of remedial action by the head of the relevant department, agency, or instrumentality and EPA; or

(B) If mutual agreement on the remedy is not reached, selection of the remedy is made by EPA.

(5) *Documenting the decision.* (i) To support the selection of a remedial action, all facts, analyses of facts, and site-specific policy determinations considered in the course of carrying out activities in this section shall be documented, as appropriate, in a record of decision, in a level of detail appropriate to the site situation, for inclusion in the administrative record required under subpart I of this part. Documentation shall explain how the evaluation criteria in paragraph (e)(9)(iii) of this section were used to select the remedy.

(ii) The ROD shall describe the following statutory requirements as they relate to the scope and objectives of the action:

(A) How the selected remedy is protective of human health and the environment, explaining how the remedy eliminates, reduces, or controls exposures to human and environmental receptors;

(B) The federal and state requirements that are applicable or relevant and appropriate to the site that the remedy will attain;

(C) The applicable or relevant and appropriate requirements of other federal and state laws that the remedy will not meet, the waiver invoked, and the justification for invoking the waiver;

(D) How the remedy is cost-effective, i.e., explaining how the remedy provides overall effectiveness proportional to its costs;

(E) How the remedy utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and

(F) Whether the preference for remedies employing treatment which permanently and significantly reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants as a principal element is or is not satisfied by the selected remedy. If this preference is not satisfied, the record of decision must explain why a remedial action involving such reductions in toxicity, mobility, or volume was not selected.

(iii) The ROD also shall:

(A) Indicate, as appropriate, the remediation goals, discussed in paragraph (e)(2)(i) of this section, that remedy is expected to achieve. Performance shall be measured at appropriate locations in the ground water, surface water, soils, air, and other affected environmental media. Measurement relating to the performance of the treatment processes and the engineering controls may also be identified, as appropriate;

(B) Discuss significant changes and the response to comments described in paragraph (f)(3)(i)(F) of this section;

(C) Describe whether hazardous substances, pollutants, or contaminants will remain at the site such that a review of the remedial action under paragraph (f)(4)(ii) of this section no less often than every five years shall be required; and

(D) When appropriate, provide a commitment for further analysis and selection of long-term response measures within an appropriate timeframe.

**Environmental Protection Agency**

**§ 300.435**

(6) *Community relations when the record of decision is signed.* After the ROD is signed, the lead agency shall:

(i) Publish a notice of the availability of the ROD in a major local newspaper of general circulation; and

(ii) Make the record of decision available for public inspection and copying at or near the facility at issue prior to the commencement of any remedial action.

**§ 300.435  Remedial  design/remedial action, operation and maintenance.**

(a) *General.* The remedial design/remedial action (RD/RA) stage includes the development of the actual design of the selected remedy and implementation of the remedy through construction. A period of operation and maintenance may follow the RA activities.

(b) *RD/RA activities.* (1) All RD/RA activities shall be in conformance with the remedy selected and set forth in the ROD or other decision document for that site. Those portions of RD/RA sampling and analysis plans describing the QA/QC requirements for chemical and analytical testing and sampling procedures of samples taken for the purpose of determining whether cleanup action levels specified in the ROD are achieved, generally will be consistent with the requirements of § 300.430(b)(8).

(2) During the course of the RD/RA, the lead agency shall be responsible for ensuring that all federal and state requirements that are identified in the ROD as applicable or relevant and appropriate requirements for the action are met. If waivers from any ARARs are involved, the lead agency shall be responsible for ensuring that the conditions of the waivers are met.

(c) *Community relations.* (1) Prior to the initiation of RD, the lead agency shall review the CRP to determine whether it should be revised to describe further public involvement activities during RD/RA that are not already addressed or provided for in the CRP.

(2) After the adoption of the ROD, if the remedial action or enforcement action taken, or the settlement or consent decree entered into, differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall consult with the support agency, as appropriate, and shall either:

(i) Publish an explanation of significant differences when the differences in the remedial or enforcement action, settlement, or consent decree significantly change but do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost. To issue an explanation of significant differences, the lead agency shall:

(A) Make the explanation of significant differences and supporting information available to the public in the administrative record established under § 300.815 and the information repository; and

(B) Publish a notice that briefly summarizes the explanation of significant differences, including the reasons for such differences, in a major local newspaper of general circulation; or

(ii) Propose an amendment to the ROD if the differences in the remedial or enforcement action, settlement, or consent decree fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost. To amend the ROD, the lead agency, in conjunction with the support agency, as provided in § 300.515(e), shall:

(A) Issue a notice of availability and brief description of the proposed amendment to the ROD in a major local newspaper of general circulation;

(B) Make the proposed amendment to the ROD and information supporting the decision available for public comment;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written or oral comments on the amendment to the ROD. Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the facility at issue;

(E) Keep a transcript of comments received at the public meeting held during the public comment period;

(F) Include in the amended ROD a brief explanation of the amendment

and the response to each of the significant comments, criticisms, and new relevant information submitted during the public comment period;

(G) Publish a notice of the availability of the amended ROD in a major local newspaper of general circulation; and

(H) Make the amended ROD and supporting information available to the public in the administrative record and information repository prior to the commencement of the remedial action affected by the amendment.

(3) After the completion of the final engineering design, the lead agency shall issue a fact sheet and provide, as appropriate, a public briefing prior to the initiation of the remedial action.

(d) *Contractor conflict of interest.* (1) For Fund-financed RD/RA and O&M activities, the lead agency shall:

(i) Include appropriate language in the solicitation requiring potential prime contractors to submit information on their status, as well as the status of their subcontractors, parent companies, and affiliates, as potentially responsible parties at the site.

(ii) Require potential prime contractors to certify that, to the best of their knowledge, they and their potential subcontractors, parent companies, and affiliates have disclosed all information described in § 300.435(d)(1)(i) or that no such information exists, and that any such information discovered after submission of their bid or proposal or contract award will be disclosed immediately.

(2) Prior to contract award, the lead agency shall evaluate the information provided by the potential prime contractors and:

(i) Determine whether they have conflicts of interest that could significantly impact the performance of the contract or the liability of potential prime contractors or subcontractors.

(ii) If a potential prime contractor or subcontractor has a conflict of interest that cannot be avoided or otherwise resolved, and using that potential prime contractor or subcontractor to conduct RD/RA or O&M work under a Fund-financed action would not be in the best interests of the state or federal government, an offeror or bidder contemplating use of that prime contractor or subcontractor may be declared nonresponsible or ineligible for award in accordance with appropriate acquisition regulations, and the contract may be awarded to the next eligible offeror or bidder.

(e) *Recontracting.* (1) If a Fund-financed contract must be terminated because additional work outside the scope of the contract is needed, EPA is authorized to take appropriate steps to continue interim RAs as necessary to reduce risks to public health and the environment. Appropriate steps may include extending an existing contract for a federal-lead RA or amending a cooperative agreement for a state-lead RA. Until the lead agency can reopen the bidding process and recontract to complete the RA, EPA may take such appropriate steps as described above to cover interim work to reduce such risks, where:

(i) Additional work is found to be needed as a result of such unforeseen situations as newly discovered sources, types, or quantities of hazardous substances at a facility; and

(ii) Performance of the complete RA requires the lead agency to rebid the contract because the existing contract does not encompass this newly discovered work.

(2) The cost of such interim actions shall not exceed $2 million.

(f) *Operation and maintenance.* (1) Operation and maintenance (O&M) measures are initiated after the remedy has achieved the remedial action objectives and remediation goals in the ROD, and is determined to be operational and functional, except for ground- or surface-water restoration actions covered under § 300.435(f)(4). A state must provide its assurance to assume responsibility for O&M, including, where appropriate, requirements for maintaining institutional controls, under § 300.510(c).

(2) A remedy becomes "operational and functional" either one year after construction is complete, or when the remedy is determined concurrently by EPA and the state to be functioning properly and is performing as designed, whichever is earlier. EPA may grant extensions to the one-year period, as appropriate.

**Environmental Protection Agency**  §300.505

(3) For Fund-financed remedial actions involving treatment or other measures to restore ground- or surface-water quality to a level that assures protection of human health and the environment, the operation of such treatment or other measures for a period of up to 10 years after the remedy becomes operational and functional will be considered part of the remedial action. Activities required to maintain the effectiveness of such treatment or measures following the 10-year period, or after remedial action is complete, whichever is earlier, shall be considered O&M. For the purposes of federal funding provided under CERCLA section 104(c)(6), a restoration activity will be considered administratively "complete" when:

(i) Measures restore ground- or surface-water quality to a level that assures protection of human health and the environment;

(ii) Measures restore ground or surface water to such a point that reductions in contaminant concentrations are no longer significant; or

(iii) Ten years have elapsed, whichever is earliest.

(4) The following shall not be deemed to constitute treatment or other measures to restore contaminated ground or surface water under §300.435(f)(3):

(i) Source control maintenance measures; and

(ii) Ground- or surface-water measures initiated for the primary purpose of providing a drinking-water supply, not for the purpose of restoring ground water.

§300.440  Procedures for planning and implementing off-site response actions [Reserved].

## Subpart F—State Involvement in Hazardous Substance Response

SOURCE: 55 FR 8853, Mar. 8, 1990, unless otherwise noted.

§300.500  General.

(a) EPA shall ensure meaningful and substantial state involvement in hazardous substance response as specified in this subpart. EPA shall provide an opportunity for state participation in removal, pre-remedial, remedial, and enforcement response activities. EPA shall encourage states to enter into an EPA/state Superfund Memorandum of Agreement (SMOA) under §300.505 to increase state involvement and strengthen the EPA/state partnership.

(b) EPA shall encourage states to participate in Fund-financed response in two ways. Pursuant to §300.515(a), states may either assume the lead through a cooperative agreement for the response action or may be the support agency in EPA-lead remedial response. Section 300.515 sets forth requirements for state involvement in EPA-lead remedial and enforcement response and also addresses comparable requirements for EPA involvement in state-lead remedial and enforcement response. Section 300.520 specifies requirements for state involvement in EPA-lead enforcement negotiations. Section 300.525 specifies requirements for state involvement in removal actions. In addition to the requirements set forth in this subpart, 40 CFR part 35, subpart O, "Cooperative Agreements and Superfund State Contracts for Superfund Response Actions," contains further requirements for state participation during response.

§300.505  EPA/State Superfund Memorandum of Agreement (SMOA).

(a) The SMOA may establish the nature and extent of EPA and state interaction during EPA-lead and state-lead response (Indian tribes meeting the requirements of §300.515(b) may be treated as states for purposes of this section). EPA shall enter into SMOA discussions if requested by a state. The following may be addressed in a SMOA:

(1) The EPA/state or Indian tribe relationship for removal, pre-remedial, remedial, and enforcement response, including a description of the roles and the responsibilities of each.

(2) The general requirements for EPA oversight. Oversight requirements may be more specifically defined in cooperative agreements.

(3) The general nature of lead and support agency interaction regarding

71

tions from the OSCs/RPMs of potential injuries to natural resources.

(c) Upon notification or discovery of injury to, destruction of, loss of, or threat to natural resources, trustees may, pursuant to section 107(f) of CERCLA or section 311(f)(5) of the Clean Water Act, take the following or other actions as appropriate:

(1) Conduct a preliminary survey of the area affected by the discharge or release to determine if trust resources under their jurisdiction are, or potentially may be, affected;

(2) Cooperate with the OSC/RPM in coordinating assessments, investigations, and planning;

(3) Carry out damage assessments; or

(4) Devise and carry out a plan for restoration, rehabilitation, replacement, or acquisition of equivalent natural resources. In assessing damages to natural resources, the federal, state, and Indian tribe trustees have the option of following the procedures for natural resource damage assessments located at 43 CFR part 11.

(d) The authority of federal trustees includes, but is not limited to the following actions:

(1) Requesting that the Attorney General seek compensation from the responsible parties for the damages assessed and for the costs of an assessment and of restoration planning; and

(2) Participating in negotiations between the United States and potentially responsible parties (PRPs) to obtain PRP-financed or PRP-conducted assessments and restorations for injured resources or protection for threatened resources and to agree to covenants not to sue, where appropriate.

(3) Requiring, in consultation with the lead agency, any person to comply with the requirements of CERCLA section 104(e) regarding information gathering and access.

(e) Actions which may be taken by any trustee pursuant to section 107(f) of CERCLA or section 311(f)(5) of the Clean Water Act include, but are not limited to, any of the following:

(1) Requesting that an authorized agency issue an administrative order or pursue injunctive relief against the parties responsible for the discharge or release; or

(2) Requesting that the lead agency remove, or arrange for the removal of, or provide for remedial action with respect to, any hazardous substances from a contaminated medium pursuant to section 104 of CERCLA.

## Subpart H—Participation by Other Persons

SOURCE: 55 FR 8858, Mar. 8, 1990, unless otherwise noted.

### § 300.700  Activities by other persons.

(a) *General.* Any person may undertake a response action to reduce or eliminate a release of a hazardous substance, pollutant, or contaminant.

(b) *Summary of CERCLA authorities.* The mechanisms available to recover the costs of response actions under CERCLA are, in summary:

(1) Section 107(a), wherein any person may receive a court award of his or her response costs, plus interest, from the party or parties found to be liable;

(2) Section 111(a)(2), wherein a private party, a potentially responsible party pursuant to a settlement agreement, or certain foreign entities may file a claim against the Fund for reimbursement of response costs;

(3) Section 106(b), wherein any person who has complied with a section 106(a) order may petition the Fund for reimbursement of reasonable costs, plus interest; and

(4) Section 123, wherein a general purpose unit of local government may apply to the Fund under 40 CFR part 310 for reimbursement of the costs of temporary emergency measures that are necessary to prevent or mitigate injury to human health or the environment associated with a release.

(c) *Section 107(a) cost recovery actions.* (1) Responsible parties shall be liable for all response costs incurred by the United States government or a State or an Indian tribe not inconsistent with the NCP.

(2) Responsible parties shall be liable for necessary costs of response actions to releases of hazardous substances incurred by any other person consistent with the NCP.

(3) For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA:

(i) A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (c)(5) and (6) of this section, and results in a CERCLA-quality cleanup;

(ii) Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered "consistent with the NCP."

(4) Actions under § 300.700(c)(1) will not be considered "inconsistent with the NCP," and actions under § 300.700(c)(2) will not be considered not "consistent with the NCP," based on immaterial or insubstantial deviations from the provisions of 40 CFR part 300.

(5) The following provisions of this part are potentially applicable to private party response actions:

(i) Section 300.150 (on worker health and safety);

(ii) Section 300.160 (on documentation and cost recovery);

(iii) Section 300.400(c)(1), (4), (5), and (7) (on determining the need for a Fund-financed action); (e) (on permit requirements) except that the permit waiver does not apply to private party response actions; and (g) (on identification of ARARs) except that applicable requirements of federal or state law may not be waived by a private party;

(iv) Section 300.405(b), (c), and (d) (on reports of releases to the NRC);

(v) Section 300.410 (on removal site evaluation) except paragraphs (e)(5) and (6);

(vi) Section 300.415 (on removal actions) except paragraphs (a)(2), (b)(2)(vii), (b)(5), and (f); and including § 300.415(i) with regard to meeting ARARs where practicable except that private party removal actions must always comply with the requirements of applicable law;

(vii) Section 300.420 (on remedial site evaluation);

(viii) Section 300.430 (on RI/FS and selection of remedy) except paragraph (f)(1)(ii)(C)(6) and that applicable requirements of federal or state law may not be waived by a private party; and

(ix) Section 300.435 (on RD/RA and operation and maintenance).

(6) Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. The following provisions of this part regarding public participation are potentially applicable to private party response actions, with the exception of administrative record and information repository requirements stated therein:

(i) Section 300.155 (on public information and community relations);

(ii) Section 300.415(m) (on community relations during removal actions);

(iii) Section 300.430(c) (on community relations during RI/FS) except paragraph (c)(5);

(iv) Section 300.430(f)(2), (3), and (6) (on community relations during selection of remedy); and

(v) Section 300.435(c) (on community relations during RD/RA and operation and maintenance).

(7) When selecting the appropriate remedial action, the methods of remedying releases listed in Appendix D of this part may also be appropriate to a private party response action.

(8) Except for actions taken pursuant to CERCLA sections 104 or 106 or response actions for which reimbursement from the Fund will be sought, any action to be taken by the lead agency listed in paragraphs (c)(5) through (c)(7) may be taken by the person carrying out the response action.

(d) *Section 111(a)(2) claims.* (1) Persons, other than those listed in paragraphs (d)(1)(i) through (iii) of this section, may be able to receive reimbursement of response costs by means of a claim against the Fund. The categories of persons excluded from pursuing this claims authority are:

(i) Federal government;

(ii) State governments, and their political subdivisions, unless they are po-

**Environmental Protection Agency**                         **§ 300.800**

tentially responsible parties covered by an order or consent decree pursuant to section 122 of CERCLA; and

(iii) Persons operating under a procurement contract or an assistance agreement with the United States with respect to matters covered by that contract or assistance agreement, unless specifically provided therein.

(2) In order to be reimbursed by the Fund, an eligible person must notify the Administrator of EPA or designee prior to taking a response action and receive prior approval, i.e., "preauthorization," for such action.

(3) Preauthorization is EPA's prior approval to submit a claim to the Fund for necessary response costs incurred as a result of carrying out the NCP. All applications for preauthorization will be reviewed to determine whether the request should receive priority for funding. EPA, in its discretion, may grant preauthorization of a claim. Preauthorization will be considered only for:

(i) Removal actions pursuant to § 300.415;

(ii) CERCLA section 104(b) activities; and

(iii) Remedial actions at National Priorities List sites pursuant to § 300.435.

(4) To receive EPA's prior approval, the eligible person must:

(i) Demonstrate technical and other capabilities to respond safely and effectively to releases of hazardous substances, pollutants, or contaminants; and

(ii) Establish that the action will be consistent with the NCP in accordance with the elements set forth in paragraphs (c)(5) through (8) of this section.

(5) EPA will grant preauthorization to a claim by a party it determines to be potentially liable under section 107 of CERCLA only in accordance with an order issued pursuant to section 106 of CERCLA, or a settlement with the federal government in accordance with section 122 of CERCLA.

(6) Preauthorization does not establish an enforceable contractual relationship between EPA and the claimant.

(7) Preauthorization represents EPA's commitment that if funds are appropriated for response actions, the response action is conducted in accordance with the preauthorization decision document, and costs are reasonable and necessary, reimbursement will be made from the Superfund, up to the maximum amount provided in the preauthorization decision document.

(8) For a claim to be awarded under section 111 of CERCLA, EPA must certify that the costs were necessary and consistent with the preauthorization decision document.

(e) *Section 106(b) petition.* Subject to conditions specified in CERCLA section 106(b), any person who has complied with an order issued after October 16, 1986 pursuant to section 106(a) of CERCLA, may seek reimbursement for response costs incurred in complying with that order unless the person has waived that right.

(f) *Section 123 reimbursement to local governments.* Any general purpose unit of local government for a political subdivision that is affected by a release may receive reimbursement for the costs of temporary emergency measures necessary to prevent or mitigate injury to human health or the environment subject to the conditions set forth in 40 CFR part 310. Such reimbursement may not exceed $25,000 for a single response.

(g) *Release from liability.* Implementation of response measures by potentially responsible parties or by any other person does not release those parties from liability under section 107(a) of CERCLA, except as provided in a settlement under section 122 of CERCLA or a federal court judgment.

## Subpart I—Administrative Record for Selection of Response Action

Source: 55 FR 8859, Mar. 8, 1990, unless otherwise noted.

**§ 300.800   Establishment of an administrative record.**

(a) *General requirement.* The lead agency shall establish an administrative record that contains the documents that form the basis for the selection of a response action. The lead agency shall compile and maintain the

81