**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---

|  |  |  |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 4:10-CV-02386 (LHR) |
| | ) | 4:11-CV-01814 (LHR) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT UNITED STATES OF AMERICA'S OPPOSITION TO PLAINTIFF
EXXONMOBIL CORP.'S CONSOLIDATED MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO PHASE 2 COST AND ALLOCATION ISSUES**

RYAN K. PATRICK
  *United States Attorney*

JIMMY A. RODRIGUEZ
  *Assistant United States Attorney*
  Southern District No. 572175
  Texas Bar No. 24037378
  1000 Louisiana, Suite 2300
  Houston, TX 77002
  (717) 567-9532
  jimmy.rodriguez2@usdoj.gov

JEFFREY H. WOOD
  *Acting Assistant Attorney General*
  Environment and Natural Resources Division
  United States Department of Justice

MICHAEL D. ROWE (Attorney-in-Charge)
ERICA M. ZILIOLI
JUSTIN D. HEMINGER
BRIAN H. LYNK
STEPHANIE J. TALBERT
  *Trial Attorneys*
  Environmental Defense Section
  P.O. Box 7611
  Washington, D.C.  20044
  (202) 514-3144
  michael.rowe@usdoj.gov

*Counsel for Defendant United States*

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ......................................................................................................... iv

Glossary ............................................................................................................................ vii

Nature and Stage of the Proceedings ............................................................................ 1

Statement of the Issues and Standard of Review ........................................................ 1

Statement of the Case ....................................................................................................... 3

Argument ............................................................................................................................ 3

    I.     EXXON MAY NOT RECOVER COSTS THAT ARE NOT "NECESSARY COSTS OF RESPONSE." ..................................................... 3

          A.    Exxon's costs to excavate non-hazardous sludge at the Lower Outfall Canal are not "necessary costs of response." ................................ 3

          B.    Exxon's costs to apply for Facility Operations Areas at Baytown are not "necessary costs of response." ........................................................ 4

    II.    EXXON HAS FAILED TO ESTABLISH THAT IT CONDUCTED A SINGLE THIRTY-YEAR REMOVAL ACTION AT EACH SITE CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN. .................... 5

          A.    Exxon has not shown that it conducted a single removal action at each Site. ................................................................................................ 7

                1.    The undisputed facts show that Exxon completed multiple response actions at each Site. ............................................................... 7

                2.    The undisputed facts show that some of Exxon's response actions were remedial in nature. .................................................. 13

          B.    Exxon has not established that all of its response actions were conducted consistent with the National Contingency Plan. ...................... 22

III.   EXXON HAS FAILED TO SUBSTANTIATE AND ACCURATELY ACCOUNT FOR COSTS IT SEEKS TO RECOVER FROM THE UNITED STATES. ................................................................ 26

A.   Exxon is not entitled to judgment as a matter of law on its $77 million in claimed past costs. .................................................. 27

1.   Exxon cannot satisfy the NCP's accurate accounting requirement with inadequate cost documentation. ....................... 28

2.   Exxon cannot use accounting system records and the NACC damages database to substitute for the documentary evidence needed to prove its costs. ................................................ 31

3.   Exxon is relying on disputed material facts to support its costs. ............................................................................................. 34

B.   Exxon is not entitled to an award of interest, five-year "run rate" costs, or consultant investigation costs. ................................... 37

1.   Any award of prejudgment interest is premature. ........................ 37

2.   The five-year "run rate" costs are just estimated future costs. ............................................................................................... 38

3.   The consultant investigation costs are unsupported. .................... 39

C.   Exxon has not proposed any method for the Court to prevent a double recovery from its insurance recoveries. ....................... 39

IV.   THE COURT SHOULD DECLINE TO ADOPT EXXON'S ALLOCATION METHOD. ................................................................. 40

A.   Exxon improperly assigns costs to years using unsupported "waste reduction" adjustments to post-war production ........................ 42

1.   Exxon's Baytown waste reduction factors are not based on meaningful data. .......................................................................... 45

2.   Exxon's Baton Rouge surrogates share the same basic flaws. ............................................................................................. 49

3.   Exxon compounds its errors by multiplying its baseless waste reduction factors. .............................................................. 51

4.      Mr. Kipp's defense of Exxon's reduction multipliers is not
        persuasive, and his discussion of toxicity is not relevant. ............ 53

5.      A "Time of Use" allocation is the better approach. ..................... 55

B.      The costs subject to allocation should exclude commercial
        production. ............................................................... 57

C.      The Government's equitable share should be modest. ............................ 61

D.      The Court should disregard Exxon's "delay multipliers." ........................ 65

1.      Exxon's new proposal to adjust the Government's equitable
        share is unexplained. ................................................... 66

2.      No adjustments for delay are warranted. ...................................... 67

V.      THE COURT SHOULD REJECT EXXON'S UNSUPPORTED
        REQUEST FOR AN EXPANSIVE DECLARATORY JUDGMENT. ............... 72

Conclusion ............................................................................... 74

# TABLE OF AUTHORITIES

## CASES

*Angus Chem. Co. v. Mallinckrodt Group*,
  No. 3:95-cv-0295, 1997 U.S. Dist. LEXIS 5242 (W.D. La. Feb. 10, 1997) ..................... 19, 21

*Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.*,
  100 F.3d 792 (10th Cir. 1996) ........................................................................ 37, 38

*City of Moses Lake v. United States*,
  416 F. Supp. 2d 1015 (E.D. Wash. 2005) ................................................................. 16

*City of Witchita, Kansas v. Trustees of APCO Oil Corp.*,
  306 F. Supp. 2d 1040 (D. Kan. 2003) ................................................................. 28, 29

*Colorado v. Sunoco, Inc.*,
  337 F.3d 1233 (10th Cir. 2003) ........................................................................... 6

*County Line Inv. Co. v. Tinney*,
  933 F.2d 1508 (9th Cir. 1991) ........................................................................ 23, 26

*Exxon Mobil Corp. v. United States*,
  108 F. Supp. 3d 486 (S.D. Tex. 2015) ("Phase I Decision")  1, 39, 53, 61, 62, 63, 64, 65, 67, 73

*ITT Indus., Inc. v. Borgwarner, Inc.*,
  700 F. Supp. 2d 848 (W.D. Mich. 2010) .................................................................. 31

*Kelley v. E.I. DuPont De Nemours & Co.*,
  17 F.3d 836 (6th Cir. 1994) .......................................................................... 11, 12

*MPM Silicones, LLC v. Union Carbide Corp.*,
  No. 1:11-cv-1542, 2016 WL 3962630 (N.D.N.Y July 7, 2016) ............................................. 16

*Pneumo Abex Corp. v. Bessemer & Lake Erie R. Co., Inc.*,
  936 F. Supp. 1250 (E.D. Va. 1996) ...................................................................... 31

*Shell Oil Co. v. United States*,
  86 Fed. Cl. (2009) ..................................................................................... 60

*Shell Oil Co. v. United States*,
  130 Fed. Cl. 8 (2017) ............................................................................... 58, 60

*Shell Oil Co. v. United States*,
  672 F.3d 1283 (Fed. Cir. 2012) ......................................................................... 60

*Shell Oil Co. v. United States*,
   751 F.3d 1282 (Fed. Cir. 2014) ........................................................................ 60

*Steadfast Ins. Co. v. United States*,
   No. CV 06-4686, 2009 WL 10670875 (C.D. Cal. Sept. 30, 2009) .......................... 37

*Union Pacific R. Co. v. Reilly Indus., Inc.*,
   215 F.3d 830 (8th Cir. 2000) ........................................................................... 25

*United States v. Boston & Maine Corp.*,
   2016 WL 5339573 (D. Mass. Sept. 22, 2016) ..................................................... 12

*United States v. Manzo*,
   182 F. Supp. 2d 385 (D.N.J. 2000) .............................................................. 16, 17

*United States v. R.A. Corbett Transp., Inc.*,
   785 F. Supp. 81 (E.D. Tex. 1990) .................................................................... 20

*United States v. Shell Oil Co.*,
   13 F. Supp. 2d 1018 (C.D. Cal. 1998) ............................................................... 60

*United States v. Shell Oil Co.*,
   294 F.3d 1045 (9th Cir. 2002) ............................................................. 60, 62, 63

*United States v. W.R. Grace & Co.*,
   429 F.3d 1224 (9th Cir. 2005) ........................................................................... 6

*United States v. W.R. Grace*,
   280 F. Supp. 2d 1149 (D. Mont. 2003) .......................................................... 28, 29

*Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*,
   209 F. Supp. 3d 1093 (E.D. Mo. 2016) ............................................................. 29

## STATUTES

42 U.S.C. § 9601(23) ............................................................................................ 21

42 U.S.C. § 9601(24) ................................................................................. 15, 16, 21

42 U.S.C. § 9607(a) ............................................................................................. 37

42 U.S.C. § 9607(a)(4)(B) ................................................................................. 3, 22

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56 ................................................................................................... 1

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 1006 ........................................................................................ 34

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 300.5 ..................................................................................... 21, 24

40 C.F.R. § 300.155 ....................................................................................... 22

40 C.F.R. § 300.160(a)(1) .............................................................................. 29

40 C.F.R. § 300.415 ......................................................................................... 6

40 C.F.R. § 300.415(n) ................................................................................... 22

40 C.F.R. § 300.430 ......................................................................................... 6

40 C.F.R. § 300.430(c) ................................................................................... 22

40 C.F.R. § 300.430(f)(2) ............................................................................... 22

40 C.F.R. § 300.430(f)(3) ............................................................................... 22

40 C.F.R. § 300.430(f)(6) ............................................................................... 22

40 C.F.R. § 300.435(c) ................................................................................... 22

40 C.F.R. § 300.700(c)(6) .......................................................................... 22, 25

## FEDERAL REGISTER

52 Fed. Reg. 8704 (Mar. 19, 1987) ............................................................... 15

## STATE REGULATIONS

30 Tex. Admin. Code §§ 350.131-132 ............................................................. 9

# GLOSSARY

| | |
|---|---|
| Avgas | Aviation gasoline |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| EPA | United States Environmental Protection Agency |
| Exxon Mot. / Motion | Exxon Mobil Corporation's Consolidated Motion for Partial Summary Judgment as to Phase 2 Cost and Allocation Issues (Dec. 15, 2017), Dkt. No. 200 in 4:10-cv-02386 |
| Exxon PF | Exxon Mobil Corporation's Proposed Findings of Undisputed Material Facts (Dec. 15, 2017), Dkt. No. 200-4 in 4:10-cv-02386 |
| FOA | Facility Operations Area |
| NACC | North American Coverage Case |
| NCP | National Contingency Plan |
| Phase I Decision | *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) |
| RCRA | Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k |
| Site(s) | The refinery(ies), Government plant(s), and other nearby areas or surface waters (as defined by this Court in the Phase I Decision) |
| SWMU | Solid Waste Management Unit |
| U.S. Mot. / Motion | United States' Memorandum in Support of Motion for Partial Summary Judgment on Phase Two Issues (Dec. 15, 2017), Dkt. No. 202 in 4:10-cv-02386 |
| U.S. Phase I SJ Mot. | United States' Memorandum in Support of Motion for Partial Summary Judgment (Sep. 30, 2013), Dkt. No. 103-1 in 4:10-cv-02386 |
| U.S. Phase I SOF | United States' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment (Sep. 30, 2013), Dkt. 103-2 in 4:10-cv-02386 |
| U.S. Resp. to Exxon PF | United States' Responses to Plaintiff's Proposed Findings of Undisputed Material Fact (attached) |
| U.S. SOF | United States' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment on Phase Two Issues (Dec. 15, 2017), Dkt. 202-2 in 4:10-cv-02386 |

U.S. Suppl. SOF        United States' Supplemental Statement of Undisputed Facts (attached)

## NATURE AND STAGE OF THE PROCEEDINGS

The United States incorporates by reference its summary of the nature and stage of the proceedings set forth in the United States' Motion for Partial Summary Judgment on Phase Two Issues. *See* U.S. Mot. at 1.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

The Court should grant summary judgment if the movant shows that there is no genuine dispute as to the material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see* Phase I Decision at 504-05.  Here, there are genuine issues of material fact, and Exxon cannot prevail as a matter of law.  The Court therefore should deny Exxon's motion for summary judgment, for reasons we summarize based on the following argument points in our brief.[1]

**Argument Point I (Necessary Costs of Response)**.  We argue that costs Exxon incurred for two cleanup units at the Baytown Site are not "necessary costs of response" eligible for CERCLA recovery.

**Argument Point II (Nature of Response Actions and National Contingency Plan Consistency)**.  We argue that Exxon has not demonstrated that it conducted a single, continuous removal action at each Site.  Rather the facts show that Exxon conducted multiple CERCLA response actions, at least some of which were remedial actions.[2]  Argument Point II.A.  Even if the Court concludes that Exxon conducted removal actions, we argue that Exxon has failed to substantially comply with public participation requirements in CERCLA regulations (the

---

[1]  The United States reserves the right to present at trial all defenses and arguments as to units and issues for which Exxon has not sought summary judgment.

[2]  Although the United States uses the term "response action" for purposes of this brief, we do not concede that all of Exxon's claimed activities were in fact CERCLA response actions.

National Contingency Plan, or NCP) at four cleanup units at Baytown and two cleanup units at Baton Rouge.  Exxon therefore cannot recover cleanup costs incurred at those units.  Argument Point II.C.

**Argument Point III (Accurate Accounting and Double Recovery)**.  We argue Exxon has failed to present undisputed material facts that establish as a matter of law that it has satisfied the NCP's accurate accounting requirement for its $77 million in claimed past costs.  Argument Point III.A.  We also argue that Exxon is not entitled to $23 million in other categories of costs (prejudgment interest, estimated future costs, and "consultant investigation costs").  Argument Point III.B.  We further argue that Exxon has not proposed any method for the Court to prevent an inequitable double recovery due to Exxon's prior insurance recoveries.  Argument Point III.C.

**Argument Point IV (Equitable Allocation).**  We argue that Exxon's proposed allocation model is effectively invalidated by the absence of factual support for Exxon's proposed "waste reduction" adjustments (Argument Point IV.A), by Exxon's refusal to acknowledge the need to allocate costs among the product mix during the period when the United States was involved with the refineries (Argument Point IV.B), and by attempts to further dispute matters that Exxon conceded, and that the Court decided, in Phase I with regard to the United States' alleged "total control" of the two refineries during World War II and the United States' alleged operator liability (Argument Point IV.C.).  We also argue that Exxon's proposed "delay factor" adjustments, based on product rationing during World War II, are based on facts substantially misconstrued by Exxon, and are unwarranted.  Argument Point IV.D.

**Argument Point V (Declaratory Judgment).**  We argue that Exxon's request for a declaratory judgment is overbroad.  If the Court does enter a declaratory judgment, it should conform to the Court's Phase II decision on the cleanup units that the parties have briefed and

should not include water bodies and other areas of contamination where Exxon has not yet incurred past costs and where there is an inadequate factual basis to address allocation.

## STATEMENT OF THE CASE

The United States incorporates by reference its summary of the case set forth in the United States' Motion.  *See* U.S. Mot. at 4-7.

## ARGUMENT

## I.    EXXON MAY NOT RECOVER COSTS THAT ARE NOT "NECESSARY COSTS OF RESPONSE."

Exxon asserts that all of the costs it claims in this case are "necessary costs of response" pursuant to 42 U.S.C. § 9607(a)(4)(B).  Exxon Mot. at 18.  For the reasons explained in the United States' Motion, *see* U.S. Mot. at 7-9, and summarized below in Argument Points I.A.-B., Exxon's costs to excavate non-hazardous sludge from the Lower Outfall Canal and to establish Facility Operations Areas ("FOAs") at Baytown are not necessary costs of response, and Exxon may not recover them.  The United States does not dispute the necessity of the remaining response costs Exxon has claimed to date (although for multiple reasons discussed elsewhere in this brief and the United States' Motion, the United States disputes that many of these costs are recoverable).

### A.    Exxon's costs to excavate non-hazardous sludge at the Lower Outfall Canal are not "necessary costs of response."

Exxon chose to excavate the sludge at the Lower Outfall Canal despite the fact that its own consultant found that the constituents in the sludge were below regulatory levels.  U.S. Mot. at 8 (citing U.S. SOF ¶¶ 19-20).  There was also no finding that the sludge posed a risk that warranted a response action.  Thus, the sludge excavation was not an action necessary to address a threat to human health or the environment under CERCLA, 42 U.S.C. § 9607(a)(4)(B).

3

In its Motion, Exxon does not actually analyze why costs associated with the Lower Outfall Canal were necessary.  *See* Exxon Mot. at 18-19.  Exxon's Table 3, which purportedly summarizes the facts supporting Exxon's necessity arguments, has bare allegations of the presence of hazardous substances at each unit but does not cite any evidence in support.  *Id*. at Table 3 (Dkt. 200-2).  Rather, Exxon's necessity arguments depend entirely on the opinions of its expert, Stephen Johnson.  Exxon Mot. at 18 (citing Stephen Johnson Report (May 27, 2016)). But Mr. Johnson's opinions also lack factual support.  For example, when referring to the necessity of Exxon's response actions at surface waste management units, including the Lower Outfall Canal, Mr. Johnson's analysis contains vague and nearly identical boilerplate that "there were actual or threatened releases of hazardous substances to the underlying soils and groundwater that posed a threat to human health or the environment, warranting a response action."  *See, e.g*., U.S. Ex. 16, Stephen Johnson Report 31-32, 38, 44, 53 (May 27, 2016) ("S. Johnson Report").  With respect to the Lower Outfall Canal, Mr. Johnson's mere parroting of statutory language completely ignores Exxon's consultant's report showing that the constituents present in the Lower Outfall Canal sludge did not, in fact, exceed regulatory levels requiring action or otherwise pose a risk that warranted a response action.  *Id*. at 52-53.  Because Exxon relies solely on its expert's opinions and Mr. Johnson's opinions are unsupported by fact, Exxon has failed to meet its burden of establishing that its voluntarily-incurred costs to excavate sludge from the Lower Outfall Canal were "necessary costs of response."

**B.      Exxon's costs to apply for Facility Operations Areas at Baytown are not "necessary costs of response."**

Exxon's voluntary applications to establish two FOAs were not necessary to address a threat to human health or the environment at the covered units because the intent of establishing the FOAs was to *postpone* (not facilitate) cleanup at those units.  U.S. Mot. at 8-9; U.S. SOF ¶¶

36-43.  Future response actions at those covered units may turn out to be necessary, but Exxon's efforts to delay the response actions are not.

With respect to the FOAs, Mr. Johnson states—without citing any supporting evidence—that "the evaluation encompassed releases or threatened releases of hazardous substances, among other contaminants, within the proposed FOA boundaries, as well as releases occurring outside the boundary that originated from the Baytown refinery or chemical plant."  U.S. Ex. 16, S. Johnson Report at 82-83.  It is unclear which FOA Mr. Johnson was referring to by "the evaluation," and the reference in his report to "the FOA that is being established at Baytown," *id*. at 81, suggests a lack of awareness that Exxon actually applied for two distinct FOAs, one covering portions of the Baytown refinery, and the other covering portions of the Baytown chemical plant, *see* Exxon PF ¶ 692.  Regardless, Mr. Johnson acknowledges that all FOA-related work was conducted "in furtherance of and conjunction with the submission of the required FOA reports."  *Id*. at 82.  As explained in the United States' Motion, Exxon voluntarily decided to apply for the FOAs; the FOA investigations were only "required," as Mr. Johnson states, to demonstrate eligibility for the program.  U.S. Mot. at 8-9.  Moreover, Mr. Johnson does not make any attempt to opine that any of Exxon's other FOA application costs (e.g., meetings and correspondence with Texas, *see* U.S. SOF ¶ 38) were necessary.  Thus, Exxon has failed to meet its burden of demonstrating that costs to prepare and support its applications to postpone conducting response actions are "necessary costs of response."

## II.    EXXON HAS FAILED TO ESTABLISH THAT IT CONDUCTED A SINGLE THIRTY-YEAR REMOVAL ACTION AT EACH SITE CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN.

Exxon characterizes the entire 30-plus-year history of its work at each Site as a single, continuous removal action that will not end for years, and possibly decades, to come.  Exxon Mot. at 30-32.  Exxon's position is unsurprising because this is the *only* way that Exxon can

recover all of its claimed costs—otherwise, some of Exxon's cost claims are barred by the statute

of limitations, inconsistency with the NCP, or both.  *See* U.S. Mot. at 18-26.  At the time it

undertook these cleanup actions, Exxon had no intention of implementing a CERCLA removal

action.  In fact, Exxon had no intention of conducting any type of CERCLA response action at

all.  U.S. SOF ¶¶ 1-3.  Further, Exxon made no attempt to follow the NCP's requirements.  *Id*.

As explained in the United States' Motion, these cases are thus different from one in

which EPA or another federal agency exercising response authority under CERCLA made a

considered decision to conduct either a removal or a remedial action under the NCP based on the

factual circumstances.  U.S. Mot. at 10-11.  In contrast to EPA's typical practice, *see* 40 C.F.R.

§§ 300.415, 300.430, Exxon did not consider the need for a response action under specific

factors, memorialize its selection in a decision document such as an Action Memorandum, and

create a clear record of which process it was following.  Exxon did not even attempt an analysis

of whether a removal or remedial action was appropriate before conducting the work at the Sites.

Rather, Exxon's cleanup actions were performed under legal regimes other than CERCLA, and

its decisions concerning what actions to take did not follow either the removal decision process

or that for remedial action.  Courts often defer to EPA's expertise in evaluating whether

particular circumstances call for a removal or remedial action, especially where an action could

be reasonably characterized as either type of response.  *See United States v. W.R. Grace & Co.*,

429 F.3d 1224, 1243-45 (9th Cir. 2005); *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1243 (10th

Cir. 2003).  Exxon's after-the-fact characterizations of its past actions should not be afforded any

such deference.

Instead, the undisputed facts show that Exxon conducted multiple response actions and

that Exxon's actions were not consistent with the NCP at some of them.  Even if the Court

determines otherwise, the facts do not support a finding that the single response action at each Site was (and continues to be) a removal action.

**A.      Exxon has not shown that it conducted a single removal action at each Site.**

**1.      The undisputed facts show that Exxon completed multiple response actions at each Site.**

As explained in the United States' Motion and summarized below, Exxon conducted multiple response actions under different regulatory schemes and requirements, to address different sources of contamination and different media, at different times, and at mostly geographically distinct units.  U.S. Mot. at 11-13; U.S. Ex. 27, Alborz Wozniak Expert Rebuttal Report 69-71 & Figs. BT-2, BT-3, BT-4, BR-2 (Feb. 15, 2017) (hereinafter, "Wozniak Report").

Exxon closed several hazardous waste management units at each Site by a variety of means ranging from excavation of sludge to *in situ* stabilization and capping in order to comply with new RCRA regulations requiring that Exxon either close or perform upgrades (e.g., install liners) to those units: Separator 3M, Separator 10, Upper and Lower Outfall Canals, Velasco Street Ditch, and South Landfarm at Baytown; and Old Silt Pond and Rice Paddy Landfarm at Baton Rouge.  *See* U.S. Mot. at 5-7 & n.4, 12, 16; U.S. SOF ¶¶ 5-7, 11-13, 16-17, 24-25, 31-33, 52-54, 58-60; U.S. Ex. 39, Stephen Johnson Dep. 187:11-88:2 (Apr. 6, 2017) ("S. Johnson Dep. Vol. I"); *see also* U.S. Ex. 27, Wozniak Report at 48-50, 62, 68-71.  As explained in the following paragraphs, the remaining cleanup units at issue in these cases concerned different sources of contamination and sometimes different media (groundwater), and Exxon addressed them separately from the RCRA unit closures under different regulatory drivers.  As shown by the figures depicting the location of the various units and groundwater plumes and explained below, moreover, the response actions often covered geographically distinct areas of the two Sites.  U.S. Ex. 27, Wozniak Report at Figs. BT-2, BT-3, BT-4, BR-2.  And, finally, as

7

summarized in the chronology in Appendix A, Exxon conducted its response actions at different times over the past thirty years.  For all of these reasons, and as further discussed in the United States' Motion, Exxon has failed to sustain its burden of demonstrating that its cleanup actions at each site constituted a single, ongoing response action.

At the Baytown refinery, Exxon agreed to conduct a number of response activities pursuant to a 1995 Agreed Order with Texas.  *See* U.S. SOF ¶ 36.  The 1995 Agreed Order came about after a Texas Water Commission inspection revealed a number of violations of Texas laws and regulations, such as discharging hazardous wastewater into an inappropriate pond, leaking facilities, failure to report spills, and disposing of hazardous wastes at an unauthorized landfill. U.S. Suppl. SOF ¶ 192.  The inspectors also observed, and Texas asserted that Exxon failed to report, several groundwater plumes in four areas of the refinery.  *Id*.; *see* U.S. Ex. 27, Wozniak Report at BT-3 (showing the location of refinery plume areas 1-4, as well as a fifth plume area discovered later).  As a result of its findings, Texas required Exxon to investigate 22 Solid Waste Management Units (SWMUs) as part of a RCRA Facility Investigation and to delineate the groundwater plumes in the four areas identified during the inspection.  U.S. Suppl. SOF ¶ 192.

When Exxon proposed to prioritize certain SWMUs on the perimeter of the Baytown refinery that were not part of the operational area of the refinery potentially eligible for the FOA, Texas required Exxon to develop and follow individual plans to address contamination at two of them: Mitchell Point (SWMU 60), which is located on the westernmost edge of the refinery, and the Main Office Building (SWMU 62), which is located in the northeastern corner of the refinery.  Exxon PF ¶¶ 591, 595, 608, 612; U.S. Ex. 27, Wozniak Report at BT-2.  Exxon was required to address groundwater contamination at Waste Management Area-1, an area east of

SWMU 60 and south of SWMU 62, under a separate Compliance Plan finalized in 1997.  U.S. Suppl. SOF ¶ 194; U.S. Ex. 27, Wozniak Report at BT-4.

Finally, at the Baytown chemical plant, Exxon discovered the groundwater contamination at the Tank Farm 3000 Plume Area in 1990.  U.S. Suppl. SOF ¶ 191.  In 1995, Texas and Exxon entered into a second Agreed Order (separate from the one discussed above) requiring Exxon to recover the hydrocarbons at the Tank Farm 3000 Plume Area.  *Id*.[3]

At Baton Rouge, Exxon similarly conducted response actions covering different units in different parts of the Site at different times under different regulatory drivers.  The bulk of Exxon's actions to address groundwater contamination at the Shallow Fill Zone stemmed from two 1987 enforcement orders issued by Louisiana.  U.S. SOF ¶ 47.  These orders came about after investigations by both Louisiana and Exxon identified contaminants in the groundwater. Exxon PF ¶ 713.  The orders required Exxon to submit a corrective action plan for the Shallow Fill Zone.  *Id*.

Separately, Exxon conducted a broad RCRA facility investigation of multiple SWMUs (only a few of which are at issue in this litigation) independent of both its Shallow Fill Zone efforts and the separate closures of the Old Silt Pond and Rice Paddy Landfarm.  Exxon PF ¶ 771.  The SWMUs had been selected during an EPA inspection.  *Id*.

---

[3] Exxon's actions to establish the Baytown refinery and chemical plant FOAs were conducted under Texas regulations but were also voluntary.  U.S. Mot. at 8-9 (citing 30 Tex. Admin. Code §§ 350.131-132).  Exxon's costs concerning the FOAs were not "necessary costs of response" because the FOAs allow Exxon to postpone certain cleanups.  *Id*.  If the Court disagrees, however, the voluntary and unique nature of Exxon's FOA applications under Texas Code nonetheless render these actions factually distinct from the other cleanup actions.

Finally, Exxon "elected" to evaluate the Maryland Tank Farm (an area miles away from the refinery proper) in order to support the sale of the land to the county for purposes of expanding a road.  U.S. Suppl. SOF ¶ 190; U.S. Ex. 27, Wozniak Report at BR-3.

In sum, it is true that Exxon's actions to address some units at each site (e.g., the Upper and Lower Outfall Canals at Baytown, or investigations of multiple SWMUs at Baton Rouge under a single RCRA Facility Investigation) were conducted in such a coordinated fashion that those limited groupings could be considered a single response action rather than individual response actions.  Even assuming, however, that some such groupings of actions exist, those groupings remain separate from other discrete response actions undertaken at the same site.  The undisputed facts thus show that Exxon conducted multiple response actions at each Site.

Given that, as discussed above, the undisputed facts demonstrate that Exxon conducted multiple, separate response actions at multiple units over many years at each Site, it is unsurprising that Exxon can point to no evidence that supports its argument that only one response action was conducted at each Site.  Exxon Mot. at 30-32.  Exxon's expert Mr. Johnson opined that there was one continuous response action at each Site.  U.S. Ex. 16, S. Johnson Expert Report at 16.  But he testified that his opinion was predicated on a standard that Exxon's attorneys *instructed him to apply*.  U.S. Ex. 39, S. Johnson Dep. Vol. I at 359:22-60:4; U.S. Ex. 16, S. Johnson Report at 13-14.  He did not consider any legal materials with conclusions different than the ones given to him by Exxon.  U.S. Ex. 40, Stephen Johnson Dep. 489:16-90:10 (Apr. 7, 2017) ("S. Johnson Dep. Vol. II").  Thus, Mr. Johnson's opinion should be afforded no weight.  Moreover, rather than evaluating whether Exxon's response actions at Baytown and Baton Rouge were consistent with the NCP on a site-wide basis, Mr. Johnson actually analyzed

the NCP consistency of most units *separately*.  He testified that this was because of the

geographic and temporal differences in the response actions:

> A:  The way I structured the report was to look at it on a -- on a unit-by-unit basis,
> which is typically how I do these NCP consistency analyses, that where there
> are discrete or – or recognizably different, maybe I should say, or
> recognizably discreet actions, that I will look at those individually.
>
> So, like, where you have Separator 10 work done, that that both in time and in
> geography is distinct in terms of the work that was done, and, whereas, things
> like the 22 SWMUs, the investigation there, I think it's more appropriate to
> look at that work collectively, the same type of work done as part of a
> continuum, even though different ones are going to be evaluated at different
> times. So that's what you see in the structure of the report of looking at them
> individually.

U.S. Ex. 40, S. Johnson Dep. Vol. II at 535:3-20.  This is consistent with the approach taken by

the United States' expert, Mr. Wozniak.  *See generally* U.S. Ex. 27, Wozniak Report at 76-112.

The only other support Exxon cites for the "one continuous" response action theory

includes two cases and a brief the United States filed twenty years ago in a factually distinct

case, which purportedly articulate the standard Exxon asked Mr. Johnson to apply.  Exxon Mot.

at 31.  Not only did Mr. Johnson substitute this "standard" for his own judgment and expertise,

but also the legal materials Exxon cites show that the standard would not apply here.  As to the

cases, they are distinguishable.  In *Kelley v. E.I. DuPont De Nemours & Co*., the Michigan

Department of Natural Resources removed over 1000 drums containing hazardous substances

(some of which were leaking) and contaminated soil and conducted a remedial

investigation/feasibility study at a former landfill.  Local residents were at risk of exposure to the

substances in groundwater and through recreational use of the landfill, where the contaminants

had caught fire at times.  17 F.3d 836, 838 (6th Cir. 1994).  In finding that there was a single

removal action at the site in question, the *Kelley* court relied on the facts that the State funded

both the physical removal activities and the RI/FS under a "single appropriations action," that the

"activities started within days of each other," and that "evidence abounds that the two activities were interdependent."  17 F.3d at 844.  The court also found it inconsistent with the essential purpose of CERCLA to require a governmental entity engaged in addressing contamination to file separate cost recovery suits on each arguably independent removal activity.  *Id.* at 843.

In *United States v. Boston & Maine Corp.*, the Army, working with EPA under a federal facility agreement, conducted a time-critical removal action at a six-acre site and adjacent pond (within a 9,000-acre facility) contaminated with high concentrations of heavy metals (e.g., lead and antimony) before issuing a single record of decision for the two areas.  No. 13-cv-10087, 2016 WL 5339573, at *1-5 (D. Mass. Sept. 22, 2016).  The court concluded that the Army had conducted a removal action based on the evidence of the threat posed by the heavy metals, but did not specifically analyze why there was one and not two response actions.  *Id.* at *13.

The facts here are in stark contrast to *Kelley* and *Boston & Maine*.  There was no evidence suggesting that investigations or limited cleanups were taken to address an imminent threat to human health or the environment followed by a record of decision setting forth a comprehensive remedy.  Exxon also did not set out to conduct a CERCLA response action Site-wide at either Site, did not follow the NCP steps for either a removal or remedial action, and did not document a decisionmaking process to proceed with one type of response action.   Instead, Exxon addressed individual units or groundwater plumes as the need arose when required by regulation or state enforcement order and most cleanups were conducted independently of each other.  And, most importantly, the facts discussed above concerning the nature of the response actions themselves, e.g., the number of units and differences in time, space, and regulatory driver, further illustrate why Exxon's response actions were more complex yet less coordinated than the actions in *Kelley* and *Boston & Maine*.

Similarly, the facts that gave rise to the United States' brief in *United States v. Mountain Metal Co.* are distinguishable.  *See* Exxon Ex. 16, Excerpt of U.S. Opp. to Cross-Mots. for Summ. J., *United States v. Mountain Metal Co.*, Civ. A. No. 98-C-2562-S (N.D. Ala. filed June 13, 2000).[4]  As explained in the excerpt of the brief Exxon relies on, EPA conducted "interrelated" and "integrated" response activities (soil excavations and investigations) at a few operable units at the site in question "almost continuously" over a 12-year period culminating in a single comprehensive record of decision.  *Id*. at 28-33.  But none of the investigations or physical response activities at issue provided a permanent solution; the final record of decision explicitly "'supersede[d]' and 'fundamentally change[d]'" the manner of addressing the contamination after prior methods were deemed inadequate.  *Id*. at 31-32.  Here, in contrast, the RCRA unit closures that Exxon performed were intended by Exxon at the time they were conducted to provide permanent solutions to the contamination, in many cases earning "clean-closure" approval by the states, and there is no further remedy that could address the units.

In sum, Exxon has not established that it conducted a single response action at each Site.

### 2. The undisputed facts show that some of Exxon's response actions were remedial in nature.

As explained in the United States' Motion, U.S. Mot. at 13-18, and in more detail below, Exxon's RCRA unit closures and corrective action to address groundwater contamination at the Shallow Fill Zone more closely resemble remedial actions than removal actions, because they provided permanent solutions and were not taken to address imminent risks to human health or the environment.  For this additional reason, those cleanup actions cannot be grouped together

---

[4] The court never reached the merits of the United States' arguments, finding the underlying motion for summary judgment to be moot.  *See* Order, *United States v. Mountain Metal Co*., 2:98-cv-2562, Dkt. 769 (Sept. 26, 2000).

with the remaining activities, some of which more closely resemble removal actions, to constitute a single, continuous response action.[5]

> ### a. Exxon's response actions to close RCRA units and address groundwater contamination at the Shallow Fill Zone provided permanent solutions.

Exxon's closures of Separators 3M and 10, the Outfall Canals, the Velasco Street Ditch, and the South Landfarm at Baytown, and the Old Silt Pond and Rice Paddy Landfarm at Baton Rouge were known at the time they were conducted to be permanent solutions that would address the contamination in those units at its source; the state regulators not only approved the plans for but also certified the closure of these units. U.S. Mot. at 17 & n.14 (citing U.S. SOF ¶¶ 8, 14, 17-21, 27, 34, 56, 62). The certified clean closure of Separators 3M and 10 and the Velasco Street Ditch meant that there was no groundwater contamination to address at those units.[6] *See* 52 Fed. Reg. at 8705 ("Uncontaminated ground water is, therefore a requirement for

---

[5] If the Court concludes that Exxon conducted one continuous response action at each Site, Exxon has failed to establish that either of the two actions was a removal action when evaluating the cleanup actions as a whole. In addition to the two factors discussed in the text, courts consider the cost and duration of the response action. U.S. Mot. at 14-15 & n.11 (citations omitted); *see also* U.S. Ex. 112, EPA, Use of Non-Time-Critical Removal Authority in Superfund Response Actions 5 (Feb. 14, 2000) ("[A]bsent time sensitivity, remedial authority generally would be used to address complex site problems that will likely require a costly, complicated response."). Here, Exxon claims that it incurred cleanup costs totaling over $50,000,000 at Baytown and $26,000,000 at Baton Rouge through December 31, 2014 (and Exxon undoubtedly continues to incur costs). Actual site figures were even higher, because these litigation figures do not include costs associated with Exxon's actions to address units with no connection to World War II or the Korean War. Moreover, approximately 75 SWMUs and 25 groundwater plumes have been identified at Baytown. At Baton Rouge, the number of SWMUs tops 80. Exxon's response actions to address these units have already taken more than three decades and are expected to continue for years, if not decades, into the future. Thus, although cost, complexity, and duration are not dispositive, these factors weigh against a finding that any single, continuous response action at each Site would be a removal action.

[6] As to Separator 3M, Exxon asserts that "Texas regulators found that hazardous constituents related to Separator 3M were detected in groundwater underlying that unit" and, therefore, there must have been actual releases from Separator 3M to groundwater. Exxon PF ¶ 533. The entire support for this assertion rests on a single quote from a document, A004105. But that document

'clean closure' under [RCRA] Part 265 (and Part 264) . . . ."); U.S. SOF ¶¶ 7-8, 13-14, 26-27.

Containing contamination through capping, the action taken at the South Landfarm, Old Silt

Pond, and Rice Paddy Landfarm, is listed as an example of an action consistent with a permanent

remedy in CERCLA's remedial action definition.  42 U.S.C. § 9601(24); U.S. SOF ¶¶ 33-34.

And the excavation of all contaminated sludge (even when not exceeding any regulatory levels

as in the case of the Lower Outfall Canal) and soils at the Outfall Canals under delay-of-closure

allowed those canals to continue being used as non-hazardous stormwater conveyances.  U.S.

SOF ¶¶ 16-17, 21.  When asked at his deposition what further remedy would be necessary for a

clean-closed unit like Separator 3M, Mr. Johnson could only point to the standard he had been

asked to apply in this case that all actions prior to a final site-wide remedy must be removal

actions.  U.S. Ex. 39, S. Johnson Dep. Vol. I at 189:17-190:17.

In addition, the corrective action to address groundwater contamination at the Shallow

Fill Zone at Baton Rouge under a state-approved corrective action plan was also designed to deal

---

does not support the proposition or even contain the quote Exxon provided.  *Id*.  Rather the quote
appears to have originated in another letter from Texas.  U.S. Resp. to Exxon PF ¶ 533.
Regardless, the fact that Texas "reasonably expected" that contamination came from Separator
3M due to the location of the plume relative to the separator does not mean the regulators
"found" releases of hazardous substances from Separator 3M in groundwater, nor does it provide
any data to establish that Separator 3M in fact released hazardous substances to the groundwater
(or even that the contamination in the groundwater posed an urgent threat to the environment).
No tests were done to determine the origin of the contamination in the groundwater plumes in the
vicinity of Separator 3M.  U.S. Suppl. SOF ¶ 189.  And there were multiple other units nearby
that could have been the source.  *Id*.  Exxon's own expert Stephen Johnson stated that Separator
3M has not been identified as the source of the contamination, just that the unit is in the vicinity.
*Id*.  Moreover, Texas ultimately certified the clean closure of Separator 3M, and RCRA requires
that there be no groundwater contamination to address for clean closure certification.  *See* EPA,
Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and
Disposal Facilities, 52 Fed. Reg. 8704, 8705 (Mar. 19, 1987) ("Uncontaminated ground water is,
therefore a requirement for 'clean closure' under [RCRA] Part 265 (and Part 264) . . . .").

15

permanently with the contamination, and Louisiana similarly "closed out" its orders, finding that no further action would be required.  U.S. SOF ¶¶ 47, 49.

Exxon asserts that many of its response actions were labeled "interim" and, therefore, cannot be the final remedy for those units.  Exxon Mot. at 27.  But the mere fact that a response action was called "interim" is not determinative; courts still evaluate the factual circumstances of the response action.  *See, e.g., City of Moses Lake v. United States*, 416 F. Supp. 2d 1015, 1024-25 (E.D. Wash. 2005) (finding actions taken under "interim" proposed plan were remedial because the plan was "in response to a 'non-urgent' threat which is not 'time-sensitive'" and there was "time to undertake the procedural steps required for the remedial action"); *MPM Silicones, LLC v. Union Carbide Corp*., No. 1:11-cv-1542, 2016 WL 3962630, at *12 (N.D.N.Y July 7, 2016) (holding that "interim" corrective measures to contain contamination through installation of earthen cap, among others, were remedial because they "were not a response to an imminent public health hazard" and because 42 U.S.C. § 9601(24) lists capping at the source of contamination as an example of remedial action).

Exxon also claims that all of its response activities to date (and for the foreseeable future) are not permanent because no "final, site-wide remedy" has been selected.  Exxon Mot. at 21, 28.  Indeed, Exxon calls this the "dispositive" factor.  *Id*. at 28.  Neither CERCLA nor the NCP requires that a remedial action be a "site-wide" remedy.  It is not uncommon for there to be more than one record of decision specifying different remedies for different parts of a larger facility, or for a remedial action to address only one part of a site, as the *Boston & Maine Corp.* case cited by Exxon and discussed above illustrates.  2016 WL 5339573, at *1-5 (record of decision for only two areas in a 9,000-acre facility); *see also United States v. Manzo*, 182 F. Supp. 2d 385,

391 (D.N.J. 2000) (discussing records of decision "document[ing] EPA's selection of a remedial action" for each of three operable units within a Site).

Exxon does not attempt to discuss what final site-wide remedy would be appropriate for Baton Rouge.  At Baytown, however, Exxon presumes that the FOAs will provide the "final, site-wide remedy."  This is factually inaccurate for three reasons.  First, Exxon applied for two separate FOAs; even under Exxon's theory, there will not be a *single* site-wide remedy where, as Exxon argued and this Court accepted in Phase I of this litigation, the facility boundary encompasses both the refinery and chemical plant (and adjacent waterbodies).  *See* U.S. Ex. 27, Wozniak Expert Report at Figure BT-9 (showing the areas covered by the FOAs).  Second, the FOAs are not "site-wide."  As depicted in Mr. Wozniak's Figure BT-9, several units at issue in this litigation are outside the boundaries of the FOAs, such as Mitchell Point (SWMU 60), the Main Office Building (SWMU 62), and the South Landfarm, not to mention the Houston Ship Channel and other waterbodies.  *Id.*  And third, the permanent remedy has already been performed at several of the units within the FOA boundaries, namely Separators 3M and 10, the Outfall Canals, and the Velasco Street Ditch; unless Exxon starts using them again as hazardous waste units, there will be no hazardous substances to remedy when the FOA terminates.  Moreover, the response actions that Exxon will conduct at the conclusion of the FOA are the same kinds of actions Exxon would have had to conduct already but for the FOA; again, the FOA merely functions to delay some of the response actions.  The existence or non-existence of a FOA thus has no bearing on whether Exxon's actions provide permanent remedies or not.

### b.  Exxon Was Not Responding to an Imminent Threat.

As explained in the United States' Motion, there is no indication that any of Exxon's actions to close units under RCRA in the 1980s-90s or to address groundwater contamination in

the Shallow Fill Zone were taken in response to any imminent threats.  U.S. Mot. at 15-17.  As

Mr. Johnson testified, the determination that these units posed any threat was a legal or

regulatory one—not one presented by the facts.

> Q:  If it had been known for some time that Separator 3M had this contamination
>     in it, then what triggered going through this process?
>
> A:  Well, Congress, in the – in the HSWA amendments had identified conditions
>     like Separator 3M as ones that posed a unacceptable threat to human health
>     and the environment and established then requirements to – that – that such
>     units had to be closed or upgraded, to use a simple term, and were based on
>     that circumstance and the threats that were posed as Congress identified.
>
>     Then Exxon took the work to – chose to go the route of closing the unit rather
>     than upgrading it to provide the protection needed to reduce the threat posed
>     by the – the waste that were present in the unit.

U.S. Ex. 39, S. Johnson Dep. Vol. I at 186:5-21.

Mr. Wozniak found that there were similarly no imminent risks at any of the remaining

units at issue in this case.  U.S. Ex. 27, Wozniak Report at 86-87 (Baytown SWMU

investigation), 88 (Mitchell Point or SWMU 60 and the Main Office Building or SWMU 62), 91

(Waste Management Area-1), 93 (Tank Farm 3000 Plume Area), 95 (Refinery Groundwater

Plumes), 98 (FOAs), 107 (Baton Rouge SWMU Investigation), 111 (Maryland Tank Farm).

Exxon does not assert that any contaminated groundwater is used for consumption. There is no

evidence that contaminants from either Site have migrated to adjacent waterbodies, such as the

Mississippi River at Baton Rouge and the Houston Ship Channel at Baytown.  U.S. SOF ¶ 189-

84.[7]  Similarly, there is no evidence that any contaminants migrated offsite, posing a risk to

anyone in the surrounding community; Mr. Johnson explicitly opined that "it is not foreseeable"

---

[7] At Baytown, in particular, the fact that Exxon has established the refinery FOA and is close to
establishing a chemical plant FOA demonstrates that contamination in those areas is unlikely to
reach adjacent water bodies, or else Texas would not approve the FOAs.

that any of the contaminants "would have affected any offsite landowners' property" when explaining why, in his view, Exxon did not have to notify the public of the ongoing response actions.  U.S. Ex. 16, S. Johnson Report at 26.  Mr. Johnson further opined that the likelihood of risks to workers was low within the Sites when explaining why Exxon did not have to engage in public participation with its workers.  U.S. Ex. 40, S. Johnson Dep. Vol. II at 602:13-08:9.  And Exxon employees wear protective gear as a matter of course, thus reducing any risk of exposure. U.S. Suppl. SOF ¶ 188.

Courts have found response actions at industrial sites to be remedial—even where hazardous substances were released into the ground—focusing not just on the existence of a release but also on whether the circumstances indicated that the released substances posed an imminent threat to public health or the environment.  In *Angus Chem. Co. v. Mallinckrodt Group*, for example, the court found there was "no immediate threat to the public" posed by a leaking 2-nitropopane tank at an industrial complex even though the chemical had been released into the soil and the tank had caught fire during preliminary repairs.  No. 3:95-cv-0295, 1997 U.S. Dist. LEXIS 5242, *27-29 (W.D. La. Feb. 10, 1997).  The court thus concluded that a response action consisting of investigating and ultimately removing contaminated soil and groundwater beneath the tank was a remedial action.  *Id.*  Here, similarly, notwithstanding the release of hazardous substances, Exxon has provided no evidence that the released substances posed any imminent threat.

> c. **Mr. Johnson's opinions do not establish that Exxon conducted a removal action at each Site.**

The preceding facts do not support a finding that Exxon conducted a single removal action at each Site.  Exxon's arguments do not overcome these deficiencies.  Specifically, Mr. Johnson's opinion that all of Exxon's actions were removal actions should be given no weight,

particularly in light of these facts.  He was, again, relying on a standard that Exxon's lawyers

instructed him to apply—a standard that, moreover, has been adopted in only a few cases.  U.S.

Ex. 16, S. Johnson Report at 11-15 ("This section describes the standards and concepts

established by courts for distinguishing removal and remedial actions that I've been asked to

apply for this case . . . .").  Mr. Johnson particularly tries to analogize Exxon's response actions

to cases where the United States has argued that EPA's response activities prior to a record of

decision setting forth a remedy were removal actions.  *Id.* at 14 (citing *United States v. R.A.*

*Corbett Transp., Inc.*, 785 F. Supp. 81, 81-82 (E.D. Tex. 1990); Exxon Ex. 16, U.S. Mot. Summ.

J. in *United States v. Mountain Metals Co.* (N.D. Ala. June 13, 2000)).  Those cases are,

however, distinguishable.  Again, Exxon did not set out to conduct a cleanup under CERCLA;

thus, this case cannot be compared to one in which EPA, after a decisionmaking process,

documented why removal authority was needed to conduct certain investigations or other

response activities before issuing a record of decision selecting the ultimate remedy.  If anything,

the States' approval of Exxon's plans to close the RCRA units and address the groundwater

contamination at the Shallow Fill Zone are akin to records of decision—which would make the

response actions Exxon completed at those cleanup units akin to the implementation of a remedy

*after* an EPA record of decision, i.e., a remedial action.  And Exxon is entitled to none of the

deference courts may afford EPA when that agency cleans up contamination using taxpayer

funds and seeks to recover its costs from the responsible parties.

Moreover, Mr. Johnson's analysis did not include consideration of the concept of time

sensitivity, even though he acknowledged that the concept appears in EPA guidance on

distinguishing between non-time-critical removal actions and remedial actions, *see* U.S. Ex. 112,

EPA, Use of Non-Time-Critical Removal Authority in Superfund Response Actions (Feb. 14,

2000).  U.S. Ex. 39, S. Johnson Dep. Vol. I at 279:10-17; U.S. Ex. 16, S. Johnson Report at 11.
When asked at his deposition whether there was any time sensitivity within the meaning of
EPA's guidance at the Sites, he admitted that, with "one possible exception," *there was no time
sensitivity at either Site*.  U.S. Ex. 39, S. Johnson Dep. Vol. I at 222:5-21.[8]  And as noted above,
Mr. Johnson simply adopted the cases and legal briefs provided to him by Exxon's lawyers
rather than applying his own experience to arrive at his opinions, *see* U.S. Mot. at 14-15.  U.S.
Ex. 40, S. Johnson Dep. Vol. II at 489:16-490:10.  In addition, Mr. Johnson's boilerplate analysis
of why each response action was a removal action repeatedly suggested that the mere presence of
a hazardous substance that poses a threat of release warrants a removal action.  U.S. Ex. 16, S.
Johnson Report at 32, 39, 45 (just a few examples where Mr. Johnson opined that a response
action at a cleanup unit was a removal action because it addressed a "threat of a release or
potential release").  This is contrary to the legal and regulatory definitions of removal and
remedial actions, because both definitions include actions taken to address threats of releases of
hazardous substances.  *Compare* 42 U.S.C. § 9601(23) *with id*. § 9601(24); *see* 40 C.F.R. §
300.5; *see also Angus Chem. Co.*, 1997 U.S. Dist. LEXIS 5242 at *27-29.  Mr. Johnson himself
acknowledged at his deposition that whether a removal action is warranted "depend[s] on the
circumstances" such as risk of exposure to a receptor.  U.S. Ex. 39, S. Johnson Dep. Vol. I at
174:4-22.

 In conclusion, Exxon has not demonstrated that it conducted a single, continuous removal
action at each Site.

---

[8] The "one possible exception" was the Tank Farm 3000 Plume Area at Baytown, although Mr.
Johnson could not recall in any detail why Exxon took steps to recover the free hydrocarbon
product there.  U.S. Ex. 39, S. Johnson Dep. Vol. I at 222:5-21.  More importantly, he did not
suggest that there was any risk the hydrocarbons were migrating or exposing anyone.

**B.**     **Exxon has not established that all of its response actions were conducted consistent with the National Contingency Plan.**

Exxon has the burden of proving that its response actions were conducted "consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).  For the reasons stated in the United States' Motion, Exxon's response actions at the following units were not conducted consistent with the NCP requirements applicable to remedial actions: (a) the South Landfarm, Upper and Lower Outfall Canals, and Velasco Street Ditch at Baytown; and (b) the Shallow Fill Zone and Rice Paddy Landfarm at Baton Rouge.  U.S Mot. at 23-26.

Mr. Wozniak did not conduct a separate analysis of whether those response actions were conducted consistent with the removal requirements of the NCP because, in his opinion, there was no question that they were remedial in nature.  Similarly, Mr. Johnson did not conduct an analysis of whether any of Exxon's response actions were consistent with the remedial provisions of the NCP.  Both experts, however, evaluated whether Exxon's actions were consistent with the NCP's public participation requirements, which apply in some fashion regardless of whether Exxon conducted non-time-critical removal actions (as Exxon contends) or remedial actions.[9]  *See* 40 C.F.R. § 300.700(c)(6) (stating that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning selection of the response action . . ." and listing other public participation NCP regulations that may also apply depending on the nature of the response action, including 40 C.F.R. §§ 300.155, 300.415(n), 300.430(c), 300.430(f)(2), (3), and (6), 300.435(c)).

---

[9]  Response actions evaluated against the 1982 NCP did not have to demonstrate meaningful public participation, as that version of the NCP did not contain such requirements.  This was the case for Separators 3M and 10 at Baytown.

Whether characterized as removal actions or remedial actions, Exxon's response actions at the following units did not follow the NCP's public participation provisions: (1) Velasco Street Ditch,[10] SWMU Investigation, Tank Farm 3000 Plume Area,[11] and Refinery Groundwater Plumes[12] at Baytown; and (2) SWMU Investigation and Maryland Tank Farm at Baton Rouge. Mr. Wozniak concluded that Exxon had provided no public participation with respect to these units (and Exxon has not alleged any facts to the contrary).  U.S. Ex. 27, Wozniak Report at 84, 86-88, 94-95, 97, 103-04, 108, 112.  Thus, this Court should deny Exxon's Motion and enter judgment in favor of the United States as to Exxon's claims to recover its costs to address these six units.  *See, e.g.*, *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514-15 (10th Cir. 1991) (citations omitted) (holding that failure to substantially comply with public participation requirements of NCP bars CERCLA cost recovery).

Once again, Mr. Johnson's opinions on this matter should be disregarded.  He was instructed to apply select courts' rulings in his analysis of whether Exxon acted consistent with

---

[10] Exxon alleges that it provided notice and sought public comment on the Velasco Street Ditch.  Exxon Mot. at 41 & n.41 (citing Exxon PF ¶ 548).  But the only document cited in PF ¶ 584, A005595-605, concerned the Outfall Canals; it does not mention the Velasco Street Ditch.  Thus, Exxon has not presented undisputed evidence of public comment for the Velasco Street Ditch.

[11] Exxon alleges that it provided notice and sought public comment on the Tank Farm 3000 Plume Area.  Exxon Mot. at 41 & n.41 (citing Exxon PF ¶ 655).  But the only evidence Exxon cites is Mr. Johnson's "understanding" that notice and comment took place and a document, A010322-24, that makes no mention of public comment at the Tank Farm 3000 Plume Area.  Exxon PF ¶ 655; *see also* U.S. Resp. to Exxon PF ¶ 655.  Mr. Johnson lacks personal knowledge of the events, and anything Exxon told him is hearsay.  Thus, Exxon has not presented undisputed evidence that the notice and public comment actually took place.

[12] Exxon alleges that it provided notice and sought public comment on the Refinery Groundwater Plumes.  Exxon Mot. at 41 & n. 41 (citing Exxon PF ¶ 637).  But the only evidence Exxon cites is Mr. Johnson's "understanding" that notice and comment took place.  Exxon PF ¶ 637; *see also* U.S. Resp. to Exxon PF ¶ 637.  Mr. Johnson lacks personal knowledge of the events, and anything Exxon told him is hearsay.  Thus, Exxon has not presented undisputed evidence that the notice and public comment actually took place.

the public participation requirements.  U.S. Ex. 16, S. Johnson Report at 24 ("To assess whether Exxon substantially complied with the public information and community relations requirements that potentially applied to its removal actions at the Complexes, I have been asked to perform my analysis using two different approaches.").  Under both "approaches," Mr. Johnson's ultimate opinion was the same: the oversight of the States of Louisiana and Texas was sufficient for Exxon to satisfy the public participation requirements.  But this is essentially a predetermined conclusion, because both of his approaches begin with the premise that oversight by state or federal regulators is sufficient.  And, it is not a surprise that Exxon chose these particular standards for Mr. Johnson to apply because, as explained above, Exxon did not conduct any public participation for the vast majority of its response actions.

Under the first approach Mr. Johnson applied, a central issue is whether "foreseeably affected parties" were given a meaningful opportunity to participate in the response actions.  *Id.* at 24-25.  The NCP's definition of "community relations" states that the "public" includes "citizens directly affected by the site, other interested citizens or parties, organized groups, elected officials, and potentially responsible parties (PRPs)."  40 C.F.R. § 300.5.  Mr. Johnson conceded at his deposition that this definition would generally apply to private party cleanups.  U.S. Ex. 40, S. Johnson Dep. Vol. II at 521:16-26:3.  Yet in his expert report, Mr. Johnson opined that the *only* foreseeably affected parties at Baytown and Baton Rouge *were the state agencies*.  U.S. Ex. 16, S. Johnson Report at 26.  After finding that it was unlikely any contamination from the Sites would affect nearby property owners (a conclusion that is actually supported by the absence of evidence of any offsite migration of contaminants), Mr. Johnson ignored virtually all other categories of individuals and entities in the "public."

24

For instance, Mr. Johnson excused Exxon for not notifying the United States (the potentially responsible party Exxon has sued) on the basis that the States were aware of Exxon's response actions and shared a similar interest as the United States.  *Id*. at 27.  Whether the States and United States have a mutual interest in seeing contamination addressed is irrelevant; Mr. Johnson presented no evidence that Exxon or the States ever *notified* the United States, let alone kept the United States apprised of the numerous response actions being conducted at each Site over three decades.

Mr. Johnson's conclusion also ignores other members of the "public" who could be foreseeably affected parties, such as Exxon employees and people who recreate in the adjacent waterbodies, claiming that he did not believe they would "have an interest" in Exxon's activities. U.S. Ex. 40, S. Johnson Dep. Vol. II at 601:4-13, 602:13-05:5.  But that is not the standard for whether individuals or entities should be notified and given an opportunity to comment on environmental cleanups.  And in fact, organized groups and citizens *are* interested in contaminants at the Baytown and Baton Rouge Sites, as evidenced by Clean Air Act citizen suits filed against Exxon with respect to both Sites.  *See generally Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp*., 4:10-cv-4969 (S.D. Tex.); *La. Envtl. Action Network v. Exxon Mobil Corp*., 3:16-cv-00144 (M.D. La.).

Under Mr. Johnson's second approach, the *only* question is whether there was "state agency oversight and approval" of the response actions.  U.S. Ex. 16, S. Johnson Report at 28. He concluded (and the United States does not dispute) that there was.  *Id*.  But this approach is not the proper interpretation of the extensive and detailed public participation requirements set forth in the NCP applicable to private party cleanups.  *See, e.g.,* 40 C.F.R. § 300.700(c)(6); *Union Pacific R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 837-39 (8th Cir. 2000) (citations

omitted) (holding that providing opportunity for public comment *after* response action had been selected did not satisfy NCP public participation requirements particularly where potentially responsible party disputed necessity of all of the costs); *Tinney*, 933 F.2d at 1515 (holding that the NCP requires "at a minimum, that a private party attempting to act 'consistent with the national contingency plan' provide an opportunity for public comment on its selection of the response action for the site"); *see also* U.S. Mot. at 24 (citations omitted).  Thus, Exxon has failed to demonstrate that its costs were incurred consistent with the NCP's public participation units at four cleanup units at Baytown and two cleanup units at Baton Rouge.  As a result, Exxon cannot recover its costs for these units.

In sum, Exxon has failed to demonstrate that it conducted a single continuous removal action at each Site or that all of its response actions were consistent with the NCP.

## III.   EXXON HAS FAILED TO SUBSTANTIATE AND ACCURATELY ACCOUNT FOR COSTS IT SEEKS TO RECOVER FROM THE UNITED STATES.

Exxon asks the Court to bless $100 million in costs.  In its brief, Exxon breaks these costs down between the two Sites.  But as Table 8 to Exxon's brief reveals, the costs further break out into four distinct categories: (1) $77 million in past costs that Exxon claims to have incurred at the two Sites through December 31, 2014; (2) $10 million in interest on those past costs; (3) $12.75 million for five years' worth of estimated "run rate" (future) costs; and (4) $250,000 in "consultant investigation costs."  Exxon Mot. Table 8.  Each of these cost categories raises different factual and legal issues.

The parties' discovery and summary judgment briefing have focused on Exxon's claim for $77 million in past costs—approximately $51 million at Baytown and $26 million at Baton Rouge.  As we explain in Argument Point III.A., however, Exxon has failed to prove that those past costs are accurately accounted for as a matter of law.  In Argument Point III.B., we explain

why Exxon has also failed to meet its summary judgment burden as to the $23 million it seeks

for the other three categories of costs (interest, "run rate" costs, and consultant investigation

costs).  Finally, in Argument Point III.C., we explain that Exxon has failed to offer the Court any

method to prevent double recovery of previously-recovered insurance settlements for Exxon's

cleanup costs at Baytown and Baton Rouge.  Thus, as we argued in the United States' summary

judgment brief (at 27–30), the Court should deduct the prior insurance recoveries from Exxon's

response costs before allocating any remaining recoverable costs between the parties.

**A.**   **Exxon is not entitled to judgment as a matter of law on its $77 million in claimed past costs.**

Exxon argues that the Court should hold that it has accurately accounted for every single

claimed cost item at the two Sites, but this argument fails for three reasons.   First, Exxon cannot

satisfy the NCP's accurate accounting requirement for cost items that it admittedly lacks basic

documentation to support.  Second, Exxon cannot use records from its accounting systems and

the North American Coverage Case (NACC) litigation database to substitute for invoices and

proof of payment.  Third, Exxon's brief raises disputed material facts about its costs that cannot

be resolved at this stage.  Thus, the Court should deny Exxon's motion for summary judgment on

the NCP accurate accounting issue as to Exxon's claimed $77 million in past costs.

As we urged in our summary judgment brief (at 31, 43), the Court also should grant

partial summary judgment to the United States on the NCP accurate accounting issue.

Specifically, the Court should: (1) interpret the NCP's accurate accounting provision to require

Exxon to prove each cost item with an invoice and proof of payment, or their equivalent; (2)

deduct the $6.7 million in costs for which Exxon has no invoice and no proof of payment; and

(3) direct the parties to work together to determine what costs remain in dispute after the Court's

summary judgment decision.

1.    **Exxon cannot satisfy the NCP's accurate accounting requirement with inadequate cost documentation.**

For many cost items, Exxon concedes it lacks basic documentation, such as an invoice and proof of payment.  Exxon Mot. at 45.  In the face of this evidentiary gap, Exxon's argument that 100% of its costs are accurately accounted for under the NCP is unpersuasive.

Invoking the statement in the *Grace* case that the NCP's accurate accounting provision is "flexible," Exxon claims to have "far surpassed" and "easily met" the accurate accounting requirement with the "copious" documentation it has submitted.  Exxon Mot. at 45–46.  But Exxon never explains what the NCP actually requires in practical terms.  Instead, Exxon quotes the language in *Grace* that no documentation is required "beyond what is sufficient to persuade the court that the costs have been proven by a preponderance of the evidence."  Exxon Mot. at 46 (quoting *United States v. W.R. Grace*, 280 F. Supp. 2d 1149, 1179–80 (D. Mont. 2003)).  In contrast to Exxon's vague "sufficient to persuade" standard, the United States advanced a workable approach in its summary judgment brief: the Court should require Exxon to prove each cost item with an invoice and proof of payment, or with other documentation that provides equivalent support.  U.S. Mot. at 33–37.

And *Grace* offers more guidance than Exxon acknowledges.  "*Grace* concluded . . . that detailed cost summaries, vendor invoices, payment vouchers, and contractor bills provided sufficient proof."  *City of Wichita, Kansas v. Trustees of APCO Oil Corp.*, 306 F. Supp. 2d 1040, 1093 (D. Kan. 2003).  Other courts similarly have looked to invoices and proof of payment records as evidence that satisfies the NCP's accurate accounting requirement.  Thus, plaintiffs in CERCLA cases regularly produce their third-party vendor invoices, which the court then examines to determine whether the costs are accurate and recoverable.  *See* U.S. Mot. at 34 (citing cases); *see also City of Wichita*, 306 F. Supp. 2d at 1093 ("CDM's bills are documented

on numerous multi-page invoices that sufficiently describe the work being billed."); *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1115 (E.D. Mo. 2016) (plaintiffs' costs were insufficiently documented because they failed to provide evidence to sufficiently address gaps in the contractor invoices).  Even Exxon's expert, Steven Johnson, testified that when he analyzed Exxon's costs to determine if they were necessary costs of response and if they were reasonable, he only reviewed costs for which Exxon had an invoice.  U.S. Resp. to Exxon PF ¶ 797.

Granted, courts have not "required the presence of any particular document or type of document in their analysis of response cost documentation."  *Grace*, 280 F. Supp. at 1181.  But invoices and proof of payment records frequently are the best evidence to prove costs.  That makes sense because invoices are a universal document used in countless transactions every day—particularly when a vendor is selling services or goods.  The same goes for proof of payment, such as checks and wire transfers, which are universally used in commercial transactions.

Another way for the Court to decide what evidence Exxon must produce to prove its costs is to ask what documentation Exxon had when it paid the claimed costs.  This is consistent with the NCP requirement that "[d]uring all phases of response," Exxon must "complete and maintain documentation . . . to form the basis for cost recovery."  40 C.F.R. § 300.160(a)(1).  Similarly, *Grace* recognizes that "the type of documentation the plaintiff's accounting system maintains" is one factor in deciding what documentation the CERCLA plaintiff must present.  *Grace* 280 F. Supp. 2d at 1181.  Here, Exxon does not dispute that at one time it had invoices and proof of payment for the costs that it seeks.  Multiple Exxon employees agreed that the company required an invoice before it would pay a third-party vendor.  U.S. SOF ¶ 80; Exxon

PF ¶ 819.  Yet Exxon has failed to retain these invoices and other cost documentation, or has chosen not to produce them in these cases.  Either way, it has not complied with the NCP's requirement to maintain complete documentation.

When asked about missing documentation, Exxon's accounting expert, Paul Ficca, noted that some of Exxon's costs are "pretty old."  U.S. Resp. to Exxon PF ¶ 827.  The premise of this statement is that some of Exxon's undocumented costs are so old that the company should be excused from providing proper documentation.  The passage of time is not, however, a reason to excuse compliance with Section 107(a)(4)(B) of CERCLA, which requires Exxon to prove its costs are consistent with the NCP, no matter how old they are.  Put differently, the United States should not be penalized for Exxon's failure to maintain documentation as required by the NCP.

Likewise, Exxon implies that its documentation burden under the NCP should be reduced for small cost items, such as for invoices below $50.  Exxon Mot. at 52 n.50.  In theory, materiality could be an appropriate factor in deciding what documentation a CERCLA plaintiff must produce.  But there are two problems with that approach here.  First, Exxon has not followed any materiality principle in documenting its claimed costs.  Some of the largest single cost items are ones for which Exxon has failed to provide an invoice and proof of payment.  U.S. Resp. to Exxon PF ¶ 827.  Second, Exxon has submitted well in excess of 14,000 individual cost items for the Baytown and Baton Rouge Sites, and thousands of these cost items are for small amounts.  *Id*.  For example, in one category of Baytown costs, Exxon has 6,050 cost items with an average of $672 per item, which adds up to a claim of roughly $4 million.  *Id*.  To require Exxon to only provide adequate documentation for costs that exceed some materiality threshold—for example $1,000—would excuse Exxon from its burden of proof for costs that could quickly add up to millions of dollars.

To the extent that Exxon has not accurately accounted for a cost item with adequate documentation, the Court should exclude that cost from Exxon's claim.  *See* U.S. Mot. at 36–37 (citing cases); *see also ITT Indus., Inc. v. Borgwarner, Inc.*, 700 F. Supp. 2d 848, 880–81 (W.D. Mich. 2010) (excluding costs where the costs in plaintiffs' invoices either were not related to the CERCLA cleanup or were so vague as to prevent plaintiffs' expert from determining whether they related to the CERCLA cleanup); *Pneumo Abex Corp. v. Bessemer & Lake Erie R. Co., Inc.*, 936 F. Supp. 1250, 1255-67 (E.D. Va. 1996) (conducting "extensive review of Plaintiffs' documentation of costs," including review of invoices, and then reducing plaintiffs' costs from $7.28 million to $6.83 million).

### 2. Exxon cannot use accounting system records and the NACC damages database to substitute for the documentary evidence needed to prove its costs.

Exxon concedes that for approximately 10% of its costs, it has no invoices and no proof of payment documentation.  Exxon Mot. at 47.  Exxon argues that this "small subset of costs" are nonetheless accurately accounted for and substantiated because Exxon has reliable accounting system records that prove those costs. Id. at 47–50.  This argument is incorrect.

First, rather than affecting only a "small subset," Exxon's lack of cost documentation affects roughly 30% of its costs.  Even the 10% that Exxon concedes are undocumented works out to $6.7 million, as calculated by the United States' accounting expert, EJ Janik.  U.S. SOF ¶ 107.  What is more, the 10% figure is only costs for which Exxon lacks *both* an invoice and proof of payment.  The percentage is substantially higher when you count all costs for which Exxon: (1) lacks an invoice; (2) lacks proof of payment; *or* (3) lacks both an invoice and proof of payment.  Mr. Janik places that figure at $23.6 million, or roughly 30% of the $77 million in past costs that Exxon claims.  U.S. Resp. to Exxon PF ¶ 799.  In other words, for 30% of its costs, Exxon cannot provide complete cost documentation.

31

Second, Exxon claims to be using "accounting records" to prove costs for which it lacks complete documentation.  Exxon Mot. at 47.  For more than $23.2 million of these undocumented costs, however, Exxon is actually using information from its NACC damages database, which is *not* an accounting system.  U.S. Resp. to Exxon PF ¶ 807.  This includes $2.34 million in costs for which Exxon has no support other than information from the NACC database.  *Id*.  As we argued in our summary judgment brief, the NACC litigation database is unauthenticated and inadmissible.  U.S. Mot. at 39–40.  Far from showing why the NACC litigation database should be admitted into evidence, Exxon's brief confirms that the database was developed for litigation and thus does not qualify for the business records exception to the hearsay rule.  Exxon Mot. at 48 ("As a result of this litigation, Exxon generated some additional cost records for Baytown and Baton Rouge.").

Third, Exxon has not cited a single case that supports its argument that an accounting record, by itself, is sufficient evidence to accurately account for a cost under the NCP.  As we discussed above in Argument Point III.A. and in our summary judgment brief (U.S. Mot. at 32–37), the case law does not support Exxon's position.

Fourth, Exxon has not demonstrated that the accounting system records it is using (the non-NACC records) are reliable enough to substitute for actual documentation of the costs it seeks.  The material facts submitted by the United States show that Exxon's accounting system records are incomplete at best and, in a number of instances, erroneous.  U.S. SOF ¶¶ 89–91; *id*. ¶¶ 92–96.  The accounting system records that Exxon is relying on are missing basic accounting information for many costs, such as the invoice number, invoice date, or vendor name.  *Id*. ¶¶ 90–91.  The United States' expert, EJ Janik, found that these problems were "pervasive across the board" and not isolated to a single accounting system or to a single year.  U.S. Resp. to

Exxon PF ¶ 814.  As Mr. Janik explained, "If all of that [information] was missing in the accounting record, then that's a question of internal controls and reliability."  *Id*.

Exxon argues that "Mr. Ficca compared the accounting records to available invoices and proof of payment records and found no unexplained discrepancies."  Exxon Mot. at 49.  But this statement fails to acknowledge the $575,118.84 in erroneous charges that the United States discovered—costs that Mr. Ficca was more than willing to vouch for because "the information came from [Exxon's] Everest" accounting system.  U.S. SOF ¶ 93.  Before he was confronted with invoices showing that the costs were erroneous, Mr. Ficca expressed full confidence in Exxon's accounting records: "I don't see any reason to believe that this report from Everest is inaccurate."  *Id*.  Mr. Ficca's assumption that Exxon has produced flawless accounting records cannot, however, be similarly tested for the millions of dollars for which Exxon has failed to produce adequate cost documentation.[13]

Exxon has offered several reasons why its accounting records are supposedly reliable, but none establishes that the specific costs that Exxon seeks are accurately accounted for as a matter of law.  For instance, Exxon claims that its accounting systems are reliable because it maintains external controls and auditing systems, submits to regulation by several federal agencies, undergoes an annual audit by PricewaterhouseCoopers, and employs "various internal measures to ensure that invoices were correctly paid and posted to the proper cost code."  Exxon Mot. at 50.  Exxon also stresses that "courts have generally found SAP-based accounting systems to be reliable."  *Id*.  All of this may be true on a generic, company-wide basis.  But Exxon has not

---

[13] To this day, Exxon continues to claim costs that rely on accounting system records with obviously erroneous information.  For instance, Exxon's accounting records include cost items with vendor names such as "Booked incorrectly C1," "Keepsake," and "Defaultacctclearing."  U.S. Resp. to Exxon PF ¶ 809.  The NACC damages database is no better.  Vendor names include "No Vendor Number 19952" and "No Vendor Number 3016."  *Id*.

established that its accounting systems are reliable enough that the specific costs that it is

claiming in these cases are presumptively accurate and substantiated.  U.S. Resp. to Exxon PF ¶¶

815–18.  For instance, Mr. Janik considered Exxon's internal control procedures and concluded

that Exxon inconsistently followed at least one of those controls for the specific cost items

Exxon is seeking (requiring two individuals to approve an invoice for payment with an approval

stamp on the invoice).  *Id*. ¶ 820.

Fifth and finally, Mr. Ficca's opinion about Exxon's $77 million in past costs rests on a

sizable collection of Excel spreadsheets that purport to summarize evidence that Mr. Ficca is

relying on to support the costs (the Cost Summaries).  U.S. SOF ¶ 103.  That is, Mr. Ficca is not

directly relying on Exxon's accounting system records—instead, he is relying on Excel

spreadsheets his firm created that purport to combine these records with information from many

other sources.  For the reasons we explained in our summary judgment brief, the Cost

Summaries are inadmissible.  U.S. Mot. at 40–42.  In its brief, Exxon does not explain how the

Cost Summaries are admissible under Federal Rule of Evidence 1006.

### 3.    Exxon is relying on disputed material facts to support its costs.

Exxon begins its argument about costs with four factual statements seeking to prove that

it has "far surpassed what is required by the [NCP's] 'accurate accounting' standard."  Exxon

Mot. at 45.  The United States disputes each of the four statements.  The Court thus should deny

Exxon summary judgment on all of its costs on that basis and order the parties to confer to

determine what costs remain in dispute.

Exxon's first disputed statement has already been discussed—that "[e]very single one of

Exxon's claimed costs is documented by an internal accounting record generated in Exxon's

accounting system, and, in most costs, other supplementary documentation."  Exxon Mot. at 45.

As explained above, however, for more than $23.2 million in costs (roughly 30% of its claim),

Exxon is relying on information from its NACC damages database, which is not an internal accounting record generated from Exxon's accounting system.  *See* Argument Point III.A.2.  The same defect is present in Exxon's third disputed statement—that "approximately 90% of Exxon's claimed costs at Baytown and Baton Rouge are supported by an accounting record and at least one other document (i.e., either an invoice or a proof of payment record)."  Exxon Mot. at 45.

Moreover, Exxon's 90% support figure does not tell the full story.  Mr. Janik agrees that Exxon has *either* an invoice, *or* proof of payment, *or* both an invoice and proof of payment for 90% of its costs.  U.S. Resp. to Exxon PF ¶ 829.  But he also has concluded that Exxon has no invoices to support $21.2 million (27%) of its past costs.  *Id.*  In other words, Exxon is missing a critical piece of evidence for almost one third of its costs.

Exxon's second disputed statement is that "[i]n fact, 82% of Exxon's claimed costs at Baytown, and 80% of Exxon's claimed costs at Baton Rouge, are supported by an invoice, proof of payment, *and* an accounting record."  Exxon Mot. at 45.  These percentages come from a chart that Exxon's expert, Mr. Ficca, prepared.  *See id.*, Figure 3.  But the United States' expert, EJ Janik, has concluded that the percentages of costs supported by all three of these items (invoice, proof of payment, and accounting or NACC damages database record) are lower—63% at Baytown and 77% at Baton Rouge.  U.S. Resp. to Exxon PF ¶¶ 829, 833.

One reason for the wide disparity in percentages at Baytown has to do with what the experts consider to be an "invoice."  Mr. Ficca has relied on computer screenshots (an image capturing a computer screen) from Exxon's electronic invoicing and payment system called the "Evaluated Receipt settlement" (ERS) program.  Mr. Ficca has concluded that these ERS program screenshots are "invoices" that support $8.6 million in costs at Baytown.  *See* Exxon Mot. at 51 n.49; U.S. Resp. to Exxon PF ¶ 802.  Yet Mr. Ficca conceded that these ERS program

screenshots fail to describe the goods and services provided by the vendor.  U.S. Resp. to Exxon PF ¶ 802.  And he explained that before Exxon employees approved any payment to a vendor from the ERS program, they would review other information besides the screenshots.  *Id*.  Mr. Ficca believed that these other documents, such as purchase orders, would contain more details about the costs in the ERS program, but he could not recall whether Exxon has produced those purchase orders in these cases.  *Id*.  The United States is not aware that Exxon has produced these documents or others that would provide necessary information about the ERS-based costs.

In contrast, Mr. Janik concluded that the ERS program screenshots are an inadequate substitute for an actual third-party invoice to support Exxon's costs because they are missing information that he would typically expect to see in a vendor invoice.  U.S. Resp. to Exxon PF ¶ 802.  Thus, Mr. Janik has treated the ERS-related costs as lacking invoices to support them.  *Id*.

Exxon's fourth disputed statement is that "[f]or only approximately 10% of all claimed costs, Exxon is relying on an internal accounting record as evidence that the cost was incurred and paid for in relation to a response action" and that it "has ample evidence demonstrating that these accounting records are reliable and can be used to prove this small additional subset of costs."  Exxon Mot. at 45.  Mr. Janik has concluded that 8% of Exxon's costs fall into this category, although he also has identified 2% of costs for which he could not locate any support.  U.S. Resp. to Exxon PF ¶ 831.  Moreover, some of this category of costs is supported by information from the NACC damages database, not an internal accounting record.  Finally, as discussed above, Exxon's accounting records are unreliable and cannot be used to prove its costs.  *See* Argument Point III.A.2.

In summary, the United States disputes each of Exxon's four primary factual statements about its costs.  Because the material facts are disputed, summary judgment is inappropriate.  *See*

*Steadfast Ins. Co. v. United States*, No. CV 06-4686, 2009 WL 10670875, at *9 (C.D. Cal. Sept. 30, 2009) (denying plaintiff summary judgment on NCP consistency because the plaintiff "has failed to adequately make out the money trail").  Thus, as we urged in the United States' summary judgment brief (at 31, 43), the Court should interpret the NCP's accurate accounting provision to require Exxon to prove each cost item with an invoice and proof of payment, or their equivalent, grant the United States partial summary judgment by excluding the $6.8 million in costs for which Exxon has no invoices and no proof of payment support, and order Exxon and the United States and their respective experts to work together to determine which costs remain in dispute after the Court's Phase II ruling.

      **B.**    **Exxon is not entitled to an award of interest, five-year "run rate" costs, or consultant investigation costs.**

      In addition to $77 million in past response costs, Exxon seeks another $23 million that falls into three other categories: interest, five-year "run rate" costs, and consultant investigation costs.  Exxon Mot., Table 8.  Exxon's brief fails to offer a legal argument to support these costs, and Exxon is not entitled to summary judgment on any of these costs.

               **1.**    **Any award of prejudgment interest is premature.**

      Exxon seeks $10,131,873 in interest on its past costs at Baytown and Baton Rouge. Exxon's entire argument for prejudgment interest is a single-sentence footnote that cites Section 107(a) of CERCLA.  Exxon Mot. at 46 n.47 (citing 42 U.S.C. § 9607(a)).

      Exxon's request for an award of prejudgment interest is premature.  Section 107(a) provides that "[t]he amounts recoverable in an action under this section shall include interest *on the amounts recoverable* under" Section 107(a)(4)(B), among other provisions.  42 U.S.C. § 9607(a) (emphasis added).  Until the Court determines what allocated amounts Exxon can recover from the United States, it is too early to consider prejudgment interest.  *See Bancamerica*

*Commercial Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 802 (10th Cir. 1996) ("[B]ecause interest determinations are compounded calculations, it may be impossible for parties to provide accurate calculations prior to the court's allocation of response cost liability. In such instances, parties may submit their interest calculations to the court subsequent to that finding.").

Moreover, Mr. Ficca has failed to adequately disclose how he calculated interest. U.S. Resp. to Exxon PF ¶¶ 785, 792. The scant explanation he does offer is internally inconsistent and in some instances may overestimate or underestimate interest. *Id.* Thus, the Court should deny Exxon's request for interest, but allow Exxon to resubmit an interest calculation after the Court resolves the cost and allocation issues.

## 2. The five-year "run rate" costs are just estimated future costs.

Exxon decided to cut off its past costs at the end of 2014, but it also seeks to recover $12.75 million for what it describes as five-year "run rate" costs for the period from 2015 through 2019. Exxon Mot., Table 8. These "run rate" costs are just another term for estimated future costs. The Court should deny Exxon's claim for future costs.

The United States does not dispute that since 2014, Exxon has incurred, and is likely to continue incurring, additional costs at Baytown and Baton Rouge. U.S. Resp. to Exxon PF ¶¶ 786, 793. But Exxon has submitted only vague and speculative evidence of what those future costs are. *Id.* Thus, Exxon has not shown that the claimed $12.75 million are necessary costs of response, or that they are, or will be, incurred consistent with the National Contingency Plan. *Id.* In addition, Exxon has failed to identify the cleanup unit or units to which these costs are related, so the Court cannot allocate the costs between Exxon and the United States. *Id.* And Exxon has failed to submit any documentation to substantiate and accurately account for these costs. *Id.* Finally, Exxon acknowledges that its run rate costs are just estimates of projected future costs, which makes them speculative. Exxon PF ¶¶ 786, 793; U.S. Resp. to Exxon PF ¶¶ 786, 793. To

illustrate the uncertain nature of these costs, Exxon admits that its projection for Baytown costs in 2018 and 2019 was too high by $500,000 per year.  Exxon PF ¶ 786.

Although the Court therefore should not award Exxon $12.75 million in "run rate" costs, the Court may properly enter a declaratory judgment that the United States is liable for its share of Exxon's future costs at cleanup units where, in Phase II, the Court equitably allocates a share of responsibility to the United States.  *See* Phase I Decision at 535–36.  The declaratory judgment should state that Exxon may recover the United States' equitable share of future costs (costs incurred after December 31, 2014) if it can prove: (1) that the costs are necessary costs of response incurred consistent with the National Contingency Plan; and (2) that the costs were incurred at a cleanup unit where the United States is liable and where the Court has allocated an equitable share to the United States.

### 3.   The consultant investigation costs are unsupported.

The Court should also reject Exxon's claim for $250,000 that it characterizes as "consultant investigation costs."  Exxon Mot., Table 8.  Exxon has failed to produce any invoice, proof of payment, or other competent documentation to support these costs.  U.S. Resp. to Exxon PF ¶¶ 787, 794.  The Court should reject Exxon's claim that the United States should reimburse Exxon for some of Mr. Gravel's costs.

### C.   Exxon has not proposed any method for the Court to prevent a double recovery from its insurance recoveries.

As the Court recognized in its Phase I Decision, one equitable factor that courts consider in a CERCLA allocation is "[t]he potential for windfall double recoveries by a plaintiff."  Phase I Decision at 535 (international citation and quotations omitted).  The United States demonstrated in its summary judgment brief that Exxon has already recovered some of its Baytown and Baton Rouge response costs through insurance settlements.  U.S. Mot. at 27–30.  The United States also

offered a method for the Court to prevent Exxon from obtaining an inequitable double recovery of its response costs.  *Id*.  In its summary judgment brief, Exxon has not acknowledged the insurance settlements, let alone offered the Court any alternative method for preventing a double recovery.  The Court therefore should adopt the United States' method.

## IV.   THE COURT SHOULD DECLINE TO ADOPT EXXON'S ALLOCATION METHOD.

As discussed in the preceding sections, Exxon has failed to meet its burden of demonstrating that its response costs at Baytown and Baton Rouge were necessary and incurred consistent with the National Contingency Plan, and has further failed to properly document its costs.  Even if Exxon had demonstrated that it had incurred recoverable costs, moreover, as we argue in the following section, Exxon's proposed method of allocating those costs is flawed in multiple respects.  The Court should therefore decline to adopt Exxon's allocation methodology, and should instead allocate any recoverable costs as set forth in the United States' Motion for Summary Judgment.

Analyzing allocation issues requires a common frame of reference, which the United States sought to supply by adopting the three-step process proposed by Exxon's allocation expert:

1.   *Assign Costs to Years*:  Determine what portion of Exxon's recoverable costs were incurred during the period of federal involvement at each Site.  *See* U.S. Mot. at 54, 56-58.

2.  *Identify Costs Subject to Allocation*: Determine what portion of costs incurred during the period of federal involvement are associated with wartime products for which the United States is at least partly responsible.  *See* U.S. Mot. at 54, 58-64.

3.  *Allocate Costs*:  Assign shares of the costs that remain after Step 2 to the parties in accordance with equitable principles.  *See* U.S. Mot. at 54, 64-68.

U.S. Ex. 25, Richard White Supplemental Report at 11 (Jan. 10, 2017) ("White Suppl."); *see*

U.S. Mot. at 54 n.28 (adopting Mr. White's terminology).[14]  Using this analysis, the United

States should be allocated no more than 2% of any recoverable costs at Baytown, and no more

than 1% of any recoverable costs at Baton Rouge.  U.S. Mot. at 68; *see generally id.* at 53-68.

Exxon proposes much larger figures, basing its proposed allocation on a production-

based, waste-load adjusted method for assigning costs to years; an assignment of waste

associated with *all* wartime production (including commercial products), to the United States (a

factor Exxon does not discuss in detail);[15] and the discredited proposition that the United States

effectively commandeered and ran both refineries during World War II.  Exxon then adds a free-

standing "delay factor" adjustment based on the consequences of the United States' purported

denial of resources for environmental projects during the War.

As we argue in point IV.A, Exxon's use of "waste reduction multipliers" eliminates

production that would otherwise "count" against its production-based assignment of costs to

years, but does so without evidentiary support.  In points IV.B and IV. C, we address Exxon's

argument that the United States should pay for all wartime waste, and the recycled argument that

the federal government "took over" and ran both refineries during World War II.  Finally, in

---

[14] Step 1 has also been referred to as an "intra-class" allocation, and Exxon's opening brief refers to it as the "intra-allocation."  U.S. Ex. 25, White Suppl. at 11; Exxon Mot. at 55.  Step 3 has also been referred to as an "inter-class" allocation, and Exxon's opening brief refers to it as the "inter-allocation."  U.S. Ex. 25, White Suppl. at 11; Exxon Mot. at 56.

[15] The only references to this second step of Mr. White's original analysis – i.e., the identification of costs subject to allocation – either assume, without explanation, that Exxon's position is correct, Exxon Mot. at 56 ("Mr. White has attributed 100% of the responsibility to the government . . .), or refer to the inquiry only obliquely.  *Id.* at 70 (suggesting, incorrectly, that all products other than Aviation Gasoline are mere byproducts and that "many, if not most" of these were also devoted to wartime production).

point IV.D we demonstrate that Exxon's "delay factor" is based on a misinterpretation of the available evidence.[16]

### A.    Exxon improperly assigns costs to years using unsupported "waste reduction" adjustments to post-war production

Exxon asks the Court to assign costs to years using a "production based" method, arguing that this approach is "the correct" method. Exxon Mot. at 53-54, 55, 57,  60-61; Exxon Ex. 1, White Dec. ¶¶ 12-15; U.S. Ex. 25, White Suppl. at 11-17.  Exxon considers total production (and, hence, waste generation) over the entire history of each Site, then assigns the majority of response costs to the period of federal involvement based on "waste reduction" factors that, in theory, reflect improvements in waste management after World War II.  Exxon Mot. at 55-56. Put simply, Exxon's position is that the United States should be responsible for the majority of the costs of cleanup at both Sites because, in Exxon's view, production continued but waste generation plummeted after the period of federal involvement.

As already noted (U.S. Mot. at 56-57), there is nothing inherently wrong with a production based/waste adjusted allocation, as long as the inputs (i.e., the figures used for production and waste reduction) are themselves reliable.  *See* U.S. Ex. 20, Dr. James Kittrell Rebuttal Report 30 (Nov. 16, 1012) ("Kittrell 2012 Rebuttal Report"); U.S. Ex. 17, Dr. James

---

[16] A fourth question remains regarding the application of the "share" that emerges from the three-step inquiry to the actual clean-up costs Exxon claims.  Several large Exxon cost groups involve wastes that have little or no connection to Federal activity.  U.S. Mem. at 55-56; U.S. Ex 22, Low Suppl. at 20-24 & Attach. 2-3. The inquiry remains even if the Court precludes recovery of some Exxon cost groups (U.S. Mot. at 5-26), because units that contain wartime wastes may nevertheless be dominated by materials deposited long after any federal involvement (*see, e.g.,* U.S. Ex. 24, Low 2012 Report at 18-19 (South Landfarm), and because some units – even upland units at Baytown – involve costs that have yet to be incurred.  Because this brief responds to specific arguments Exxon has made in favor of Mr. White's analysis, the Government reserves further argument on the point.

Kittrell Rebuttal to the Supplemental Report of Mr. Gregory G. Kipp at 3-6 (Jan. 2017) ("Kittrell 2017 Report").  Here, the parties agree that the crude oil capacity of each refinery is a valid surrogate for production and, in the first instance, waste generation.  Exxon, however, uses unreliable "waste reduction" adjustments to that basic figure, to significant effect.  Exxon's allocation expert acknowledges that his use of waste reduction factors at Baytown operates as a switch, "turning off" waste production after World War II and effectively removing decades of ever-increasing production from Exxon's side of the allocation ledger.  U.S. Ex. 236, White 2017 Dep. at 70-72; *see* U.S. Ex. 25, White Suppl. at 18-26.

The flaws in Exxon's analysis are discussed in detail in the following sections; however, the susceptibility of Exxon's model to manipulation is readily illustrated by comparing Exxon's results to a reasonable alternative.  Taking a more reasonable reduction multiplier from among those already provided,[17] and rounding the 43% reduction in "total oil losses" refinery-wide up to 50% to allow for uncertainty, permits a rough comparison to Exxon's proposed assignment of costs to years.[18]

---

[17] U.S. Mot. at 57 n.31 (second example).  The figures are reported in Baytown's refinery-wide leak detection and repair program, and have been corrected to omit oil recovered by preventing evaporation, which Exxon concedes is not relevant.  U.S. 246, Jere Johnson Dep. 317-19 (May 2, 2013) ("J. Johnson 2013 Dep."); s*ee* U.S. Suppl. SOF ¶¶ 368-69.

[18] The illustration depicts Exxon's position (red trace, dark gray bars for crude that "counts" for assigning costs to years), and compares them to a 50% refinery wide reduction commencing in 1945 (blue trace, pale green bars).   Both results implicitly assume that waste reductions were obtained simultaneously at every waste-producing operation in the refinery, and were maintained consistently over time.



Yet Exxon makes no credible defense of either the chosen surrogates or the choice to multiply them to produce an improbably large reduction.  Mr. White's "production based" allocation is not really based on crude capacity at all.  The figures are present in his calculations, but his extraordinary waste reduction factors prevent their having any meaningful impact on his results. The proposed reduction factors are dominant, and support for them is therefore crucial. [19]

---

[19] Exxon proposes multiple reduction multipliers, but Mr. White's allocation effectively responds primarily to the first two multipliers at each Site, which operate to reduce actual crude throughput by more than 97% at Baytown by 1959, and by more than 99% at Baton Rouge by 1972.  The following treatment focuses on the two critical elements at each refinery.

### 1. Exxon's Baytown waste reduction factors are not based on meaningful data.

At Baytown, Exxon applies a 70% waste-reduction factor derived from a single data point pertaining to reduction in sludge deposition in Separator 10 (a component of the wastewater treatment system), claiming that this single figure represents "a *complex-wide* measure of improved waste reduction or efficiency."  U.S. Ex. 26, Expert Report of Richard White (Jun. 18, 2012) ("White 2012") at 59 (emphasis added), *see id.* at 53.  This figure is then multiplied by a further 90% reduction factor derived from the installation of 3 small pre-separators which seem to have been effective primarily at recapturing oil that had previously evaporated.  Combined, the net effect of these two waste reduction factors reduces the crude capacity used to assign cost to years by more than 97% after 1959.  Notwithstanding that the refinery continued to process crude oil for many years thereafter, Exxon is thus effectively relieved of responsibility for costs associated with cleaning up all waste generated during that time, based on an argument that there was a very large reduction in actual waste output after 1959.  Neither Exxon's evidence nor its analysis, however, demonstrate that this dramatic decline in waste output actually occurred.

### a. Exxon has failed to support its 70% waste reduction figure.

At Baytown, Exxon proposes global application of a claimed 70% reduction in the generation of sludge in the bottom of Separator 10 which, shortly after the War, became the refinery's primary oil-water separator.  U.S. Ex. 26, White 2012 at 49 n.120; U.S. Suppl. SOF ¶¶ 214-15.  Exxon makes no meaningful effort to explain the selection of this 70% multiplier, (White 2012 at 53-54), which is not clearly supported by the underlying data.  *See* U.S. Suppl. SOF ¶¶ 216-34; U.S. Ex. 17, Kittrell 2017 Report at 13-14.

A reduction in separator sludge is not useful even when evaluating the costs associated with the closure of Separator 10 itself.  U.S. SOF ¶¶ 235-46.  Still less has Exxon explained why an extrapolation from a supposed 70% reduction in waste at a single separator to a *refinery-wide* 70% reduction in waste is justified, or why reductions in this tiny portion of the refinery's waste solids should serve as a preferred surrogate for broader waste reduction efforts elsewhere in the refinery.  U.S. Ex. 23, Low Rebuttal at 9-12 (Beginning "Secondly, even if this multiplier was valid . . .").  Large portions of Exxon's claimed alleged response costs at Baytown were incurred cleaning up contaminants from sources *completely separate* from the refinery's wastewater system.[20]  There is simply no connection between the amount of waste in these areas and any improvements that might have occurred in the refinery wastewater system in general, much less sludge deposition rates in Separator 10 in particular.  U.S. Suppl. SOF ¶¶ 278-80; *see* U.S. Ex. 254, Peter Gagnon Dep. 346-47 (Apr. 12, 2013) (confirming the absence of a connection between SWMU 60 and Plume Area 1).  Application of the 70% reduction factor to costs incurred cleaning up wastes that had no connection to Separator 10 or the wastewater system (and, hence, would not have benefited from any reduction in sludge deposition at Separator 10) is arbitrary.

An inappropriate site-wide application of the Separator 10 waste-reduction figure would have significant effects.  Collectively, the costs associated with the major groundwater plume areas at Baytown make up over 40% of Exxon's past costs.  U.S. Suppl. SOF ¶¶ 281-82.

---

[20] The most dramatic example is a large group of expenditures on cleaning up groundwater that, for the most part, have no interface with the refinery wastewater system.  U.S. Suppl. SOF ¶¶ 247-58, 270-74.  There are similar problems with Mitchell Point (SWMU 60), a mixed use unit in which contamination appears to be primarily, if not exclusively, attributable to leaks from underground pipelines or from the landfarming of 8000 cubic yards of "oily wastes" disposed of in the area after 1957.  U.S. Suppl. SOF ¶¶ 275-80.

Combined with the clean-up costs for Separator 10 and South Landfarm, costs that are not related to sludge deposition rates make up approximately two-thirds of the total costs incurred to date at Baytown.  U.S. SOF ¶¶ 283-84.[21]

>   **b.    Exxon's 90% reduction factor at Baytown measures air pollution.**

Exxon further increases the share of costs assigned to the period of federal involvement by multiplying the unsupported 70% waste reduction by a second, equally unjustified 90% waste reduction figure.  During the 1950's, Exxon re-worked the Baytown wastewater regime, re-routing sewers to bring most flows to Separator 10 and eliminating oil-water separators elsewhere in the refinery.  Engineers added small, covered pre-separators to each of three major waste streams being directed into what was now truly becoming the "master" separator.  Reports at the time suggest that these units reduced oil in the now consolidated inflows into Separator 10 by 90%.  U.S. Suppl. SOF ¶¶ 285-86.  Exxon argues that this second development justifies an *additional* refinery-wide 90% reduction multiplier, phased in as each pre-separator is installed, and fully in place by 1959.  U. S. Ex. 26, White 2012 at 59.

Exxon fails, however, to explain its conclusion that this reduction in oil inflows correlates with the deposition of sludge in Separator 10, or with any other waste said to relate to Exxon's costs.  In fact, the changes are likely irrelevant.  At the time the pre-separators were installed, Baytown was losing large amounts of oil to evaporation – so much that containing evaporative

---

[21] There are other examples within Exxon's costs.  Mr. Low, for example, points out that the Velasco Street Ditch ($1.8 million) is upstream from the separators, and the Upper and Lower Outfall Canals ($10.5 million) are below the main separator, where separator effluent would be relevant, but sludge generation would not be, at least in any direct sense.  U.S. Ex. 23, Low Rebuttal at 9-10.  Further, some of Exxon's costs are not attributable to any particular issue or system (e.g., the "SWMUs Investigation" group ($4.9 million)).  Exxon Ex. 3, Att. D, Att. 3, Sch. A-C, Tab B-1.  These obviously do not respond to post-war reductions in sludge generation.

losses *in oil/water separators alone* accounted for about one quarter the reduction in oil losses accomplished refinery wide through 1951.  U.S. SOF ¶¶ 288-95.  Exxon Engineer Jere Johnson concedes that the pre-separators were designed (and functioned) primarily to recapture valuable oil, not to reduce pollution, and further agreed that much of the oil recovered by the pre-separators may have been "light materials" and that "even before the pre-separators, if that stuff had gone into Separator 10, it would have evaporated rather quickly anyway."  U.S. Ex. 255, J. Johnson 2013 Dep. at 283-84.

Thus, the primary benefit of the covered pre-separators likely related to their ability to collect material that had, as Mr. Johnson noted, evaporated from the surface of Baytown's multiple oil/water separators during World War II.  Because that is so, the 90% reduction in separator inflow probably relates primarily to reductions in what had been air emissions prior to installation of the pre-separators.  A reduction in air emissions would have little or no impact on sludge in the bottom of the separator, and therefore the 90% figure is unsuitable for quantifying anything regarding the costs Exxon has incurred in the present case.  At a minimum, one cannot say precisely how much of the 90% reduction of "easily separated" oil operates against evaporative loss, which would make Exxon's 90% factor unreliable even if it were meaningful.

Further, even if the 90% figure measured something of real use in the allocation analysis, Exxon again offers no justification for using this 90% figure refinery-wide.  As with the initial 70% factor, Exxon makes no attempt to explain why reducing the inflow of oil to Separator 10 by means of an additional mechanical device implies anything about waste reduction elsewhere in the refinery, or why, for example, main separator influent changes due to that device are a fair surrogate for the impact of pipe or tank leaks on refinery groundwater.

### 2.   Exxon's Baton Rouge surrogates share the same basic flaws.

At Baton Rouge, Exxon's reduction multipliers differ from those used at Baytown – but are no closer to passing reasonable tests for surrogacy.  The first waste reduction factor is based on a program designed to reduce slop oil in the refinery's oil/water separator by 1951, and accepts a prediction regarding future performance at face value, reducing crude capacity used in the allocation thereafter by 60.6%.  U.S. Ex. 26, White 2012 at 100.  The calculation simply substitutes lighter oils that float to the top of the separators (and that may evaporate) for the heavier materials that sink to the bottom (forming the sludge load at Baytown).  But in the Baton Rouge case, the oil that is not even fairly referred to as a waste, because there is no dispute that slop oils are recovered and reprocessed throughout the refinery.  Doing so in the separators is in keeping with their most basic function; doing otherwise in a refinery would be throwing money away.  *See* U.S. Ex. 20, Kittrell 2012 Rebuttal Report at 46-47.  There is no reason to believe that there is a quantifiable relationship in the post-war period between slop oil reduction and the wastes that led to the costs Exxon has incurred at Baton Rouge.  The critique of the 70% sludge multiplier at Baytown applies equally to the use of slop oil at Baton Rouge.  *Compare*, U.S. Ex. 26, White 2012 at 100 (equating the changes with a refinery-wide "percentage improvement in waste reduction).

Exxon's second waste reduction factor at Baton Rouge reduces crude capacity by an *additional* 98% based on a series of estimates from programs designed to improve effluent performance (sequential multipliers of 75%, 80% and a second 80%).  The net result, when combined with the initial 60% slop oil factor is a 99% reduction against actual crude capacity by 1972.  U.S. Ex 26, White 2012 at 101 n. 242; *id*. at Appendix K-6; *see* U.S. Suppl. SOF ¶ 310.  Again, Exxon uses improvements in oil content in the refinery's effluent as a waste-reduction

surrogate refinery-wide, without explaining the basis for doing so.[22]  U.S. Ex. 26, White 2012 at

100-01. Applied against the waste associated with the costs Exxon claims, use of this factor is

singularly inappropriate, because many of the improvements in effluent quality were achieved by

placing contaminants in the very units that Exxon has cleaned up at Baton Rouge.

Contaminants removed from wastewater must be accounted for, and at Baton Rouge many were

deposited in land-based impoundments and treatment units that dominate Exxon's costs.[23]

  Exxon's application of waste-reduction factors at Baton Rouge ignores the fact that the

cleanup in the Old Silt Pond and the Rice Paddy Landfill is driven by wastes placed in the units

during the 1970s and 1980s, long after the period of Federal involvement.  During the 1970s, for

example, Exxon was actively managing substantial amounts of hazardous materials at the Rice

Paddy Landfarm – material it would eventually have to deal with when it closed the unit.  U.S.

Suppl. SOF ¶¶ 336-42.  This appears to have been the peak period for work at this portion of the

site, something that ought to be accounted for by any reasonable method for allocating costs to

years.  The same may be said of the Old Silt Pond, which was used to impound or treat any

number of forms of contamination following the installation of the Wastewater Treatment Plant

atop the eastern two-thirds on the old unit in the mid-1970s.  U.S. Suppl. SOF ¶¶ 327-30.  Yet

---

[22] Had this case been about surface water quality, or if Exxon had sampled river sediments and found contaminants related to discharges of oil and grease that were effectively driving remedy costs, there might be reason to at least consider oil content in wastewater as a surrogate.  But that is not the case.  Mr. White's choice of this second factor is also curious, because similar data is available for Baytown, and if the surrogate were valid, there would seem to be no reason not to use the same sort of data at both refineries.  *See* U.S. Suppl. SOF ¶ 315.  No Exxon expert has explained the apparent discrepancy.  *See* U.S. Ex. 17, Kittrell 2017 Report at 14-15 ("Mr. Kipp's scientific logic for switching from one surrogate to another is not revealed in his report").

[23] The Old Silt Pond is a superlative example.  U.S. Suppl. SOF ¶¶ 317-33.  *See also* U.S. SOF ¶¶ 349 (referencing additional waste management units in the "Shallow Fill Zone" (which encompasses the Old Silt Pond and the Rice Paddy Landfill) beginning in the 1970s, most of which are plainly meant to improve effluent quality).

Exxon's allocation effectively assumes that the refinery produced almost no waste at all during this period, having already applied waste multipliers to reduce the crude capacity to less than 1% of the waste per barrel during World War II.

It is difficult to imagine an allocation technique that would be more *inequitable* on these facts.[24]  As Mr. Low observes in his Supplemental Report, Exxon's approach "produce[s] results that are substantially detached from the facts at the refinery over time, and that tend to greatly exaggerate the impact of WWII operations on any government involvement."  U.S. Ex. 22, Low Supplemental at 39; *see* U.S. Ex. 24, Low 2012 at 31-35; U.S. Ex. 23, Low Rebuttal at 12-14; U.S. Ex. 22, Low Supplemental at 23-24 (citing ". . . unsupported extrapolations that are substantially counter-factual to begin with, and which tend to produce an allocation that I believe an objective observer would find to be decidedly inequitable for the reasons stated"); *id*. at 37-39; U.S. Ex. 20, Kittrell 2012 Rebuttal Report at 46-48.

### 3.    Exxon compounds its errors by multiplying its baseless waste reduction factors.

In addition to the substantive problems with *each* of Exxon's proposed waste reduction factors, there are serious problems with Exxon's calculations.  Exxon treats the various reduction factors at each Site as if they were part of a treatment train making sequential improvements in a particular form of pollution, which they are not.  The proposed factors all measure different things – one a reduction in sludge deposition (at Baytown) or slop oil (at Baton Rouge), and the other a supposed improvement in overall effluent quality.  None of the component figures

---

[24] Not surprisingly, the United States' experts found application of Mr. White's method at Baton Rouge, and his failure to amend it once presented with the facts referenced here, indefensible, and addressed the issue in some detail throughout their work.  U.S. Ex. 24, Low 2012 at 31-35; U.S. Ex. 23, Low Rebuttal at 12-14; U.S. Ex. 22, Low Supplemental at 23-24; *Id.* at 37-39; U.S. Ex. 20, Kittrell 2012 Rebuttal Report at 46-48.

offered at either location is individually useful as a surrogate for waste associated with the years of federal involvement, and multiplying them together only compounds the problem. The result is an improbably large composite figure – Exxon calculates 97% post-war waste reduction at Baytown after 1959, and more than 99% at Baton Rouge after 1972.

Exxon's expert apparently relies on the fact that the projects from which the waste multipliers are drawn are slightly separated in time; in effect, he assumes that because waste reduction projects occurred sequentially, the gains from those projects must be cumulative. U.S. Suppl. SOF ¶ 353. He offers no support for this conclusion. Exxon's attempt to control oil losses was planned over a five year period, and seems to have continued for several additional years. U.S. Ex. 238, J. Johnson 2012 at 111 (noting ongoing activity until at least 1957). If one chooses reductions associated with any one project as a refinery-wide surrogate for that period, other improvements during that period would logically be represented by that surrogate. Those other improvements might produce somewhat larger or smaller benefits on particular waste streams, but no surrogate is perfect. So why – assuming *arguendo* that the initial reductions in sludge or slop oil are valid as exemplars of the post-war efforts – are they not sufficient standing alone? And why not at least look for, and consider, alternative surrogates? The figures reported from the "*Humble Way*" newsletter in Part IV.A., *supra*, at least purport to measure gains relative to refinery-wide oil losses, and can readily be corrected to exclude gains relative to air pollution not relevant here. Why is the reduction in sludge production in Baytown's separator a better measure of overall refinery performance?

This is the method that effectively creates the "off" switch in Exxon's models – all meaningful contamination stops once Exxon begins cumulating waste reduction adjustments. Mr. White agrees that his first two factors at Baytown operate as a switch, *see* U.S. Ex. 267,

Richard White Dep. 70-73 (Apr. 13, 2017), but stands by his approach.  Yet surely he would

have to agree that individual improvements in waste handling *anywhere* in the refinery do not

generate unrelated improvements *everywhere* in the same refinery.  *See* U.S. Ex. 20, Kittrell

2012 Rebuttal Report at 48-50.

### 4.   Mr. Kipp's defense of Exxon's reduction multipliers is not persuasive, and his discussion of toxicity is not relevant.

Exxon's primary defense of its waste reduction figures is contained in the expert report of

Gregory Kipp, which was produced only toward the close of Phase II discovery.  Mr. Kipp

argues that Mr. White's waste reduction factors are "valid, appropriate and reasonable – often

conservative in magnitude and timing based on the historical data . . . ."  U.S. Suppl. SOF ¶¶

365-66.  As a threshold matter, given that Exxon retained Mr. Kipp specifically to evaluate waste

reduction factors, it is noteworthy that he never spoke to Mr. White.  U.S. Ex. 260, Gregory Kipp

Dep. Vol. II at 607 (May 12, 2017).  Further, although Mr. Kipp reported a number of additional

data points as part of his effort to support Mr. White's work, he expressly disclaimed any

intention that his quantitative measures be compared with Mr. White's reduction figures.  U.S.

Suppl. SOF ¶¶ 376-77.  Mr. Kipp's search for alternative metrics, moreover, led to a number of

problems, and his opinion is ultimately unpersuasive on its own terms.  *See* U.S. Suppl. SOF ¶¶

367-76.

Mr. Kipp also argues that the introduction of new production techniques during World

War II produced new, more toxic wastes, and that the changes are responsible for increased

clean-up costs at the Exxon refineries.  U.S. Suppl. SOF ¶ 380.  The "degree of toxicity," is, of

course, a "Gore factor," and can be used in allocation in appropriate cases.  Phase I Decision at

534.  In this instance, however, there is no indication that toxicity matters.

Exxon's argument concerning the relevance of toxicity boils down primarily to three propositions:

- A suggestion that "severe cracking" in fluid catalytic cracking ("FCC") units during wartime increased the production of polyaromatic hydrocarbons ("PAHs") that were bound up in a viscous, "nearly worthless" slurry oil that many ships and facilities could not burn, so that it had to be landfilled at the refineries; U.S. Ex. 248, Gregory Kipp Expert Report (June 23, 2016) ("Kipp Report 2016") at 8, 14, 36;[25]

- An argument that BTEX compounds were generated in quantity in the same catalytic cracking units, and were contained in aqueous wastes fed to refinery sewers and hence to the oil/water separators; U.S. Ex. 248, Kipp Report 2016 at 14; U.S. Ex. 245, Gregory Kipp Supplemental Expert Report at 25 (Dec. 6, 2016) ("Kipp Suppl. Report") (further suggesting that such wastes are a "key focus" of work on groundwater contamination); and

- An observation that FCC units produce phenolic compounds, soapy wastes that were discharged to plant sewers where they tended to create emulsions that reduced the efficiency of the separators; U.S. Ex. 245, Kipp Suppl. Report at 30.

In each instance, Mr. Kipp accurately describes the basic process chemistry and the generation of a waste product, implies impacts not present at the Exxon refineries, and fails to make the case that the changes have any material effect on Exxon's costs.  U.S. Suppl. SOF ¶¶ 380-86.

At Separator 10 at Baytown, for example, his arguments lead to essentially the same conclusion as do his initial arguments about Darcy's law.  U.S. Suppl. SOF ¶¶ 237-41, 383. There may have been, in theory, greater concentrations of BTEX chemicals from World War II in some portions of the underlying soil.  But there is no evidence that the presence of BTEX compounds had any impact on Exxon's closure costs.  *See* U.S. Suppl. SOF ¶ 238.  Again, every cubic yard of soil contaminated with a list of contaminants above action levels must be removed. Once above that level, there is no dispute that costs are driven simply by volume.[26]  Similarly,

---

[25] Mr. Kipp's contentions regarding "severe cracking" are disputed.  *See* U.S. Resp. to Exxon PF ¶¶ 117, 348, 362, 363.

[26] There is also no dispute that Exxon did not retain sampling data from the Separator 10 closure that might have allowed for further examination of the topic.  *See* U.S. Ex. 23, Low Rebuttal at

for groundwater plume areas other than the Northwest corner of Area 1-3 (where separator 2 was located), there is no apparent connection between the groundwater issues Exxon is addressing and to any of the toxic waste products Mr. Kipp identifies.  Groundwater contamination in many of those areas derives largely from leaks and spills, with the nature of the contamination controlled by what was stored in the leaking apparatus.  Mr. Kipp opines that Phenolic wastes likely traversed the entire wastewater system at Baytown and exited to the Ship Channel – in other words, they were not deposited in any land-based unit at Baytown – but he provides no information as to their subsequent fate.  U.S. Ex. 259, Gregory Kipp Dep. Vol. I at 335–38 (May 11, 2017).

Despite the technical nature of this material, handling of Mr. Kipp's toxicity-related arguments is straightforward when measured against the concept that the Gore factor relating to toxicity should be used to address.  This is not a case in which a particularly pernicious contaminant is driving the need to conduct a remedy, or is materially increasing the costs of conducting the required work.  None of Mr. Kipp's opinions connect to, for example, the necessary addition of a treatment device to address some waste specific to the production of aviation gasoline.  That being the case, Mr. Kipp's toxicity-related opinions should be disregarded in their entirety as irrelevant.

### 5.    A "Time of Use" allocation is the better approach.

Because there are no good figures that allow for reasonable estimates of refinery-wide performance improvements regarding waste generation, a time of use allocation is the most equitable solution available.  And Exxon's contention that the method ignores operational

---

10 (noting multiple contaminants, and the absence of data regarding which of these "drove" soil removal).

realities at the refineries is unwarranted.  U.S. Mot. at 58.  In fact, the approach Exxon denigrates

as unsophisticated is likely far closer to accurate in predicting the results of post-war waste

reduction efforts than Mr. White's own composite reduction figures, as can be seen by plotting

several of the data points Mr. Kipp located during his review, and comparing to the work of the

parties' respective allocation experts.



The upper traces here reflect the new data points unearthed in Mr. Kipp's work, accounting for

the corrections already discussed – the total number of leaks recorded at Baytown from both

corrosive and mechanical sources (32%, orange trace), and the reported results of the refinery's

global Leak Detection and Repair Effort, net of the evaporative component (43%, blue trace).[27]

---

[27] Measurements based on effluent improvements are not reasonable comparators because
effluent quality is not determinative of past costs at Baytown (and because they tend to

The solid red trace represents Mr. White's 70% reduction based on sludge deposition (separated from the additional 90% multiplier for the pre-separators), and is offered for comparison despite the Government's view that the figure is not a credible surrogate.  All of these figures, including an average of all four data points, demonstrate that the Government's time of use alternative produces figures that are consistent with the available data – and should be sufficient to establish that Exxon's proposed assignment of costs to years is entirely out of step with what actually occurred at Baytown after the War. [28]

**B.      The costs subject to allocation should exclude commercial production**.

As previously noted (*see supra* at 41), Exxon now largely omits what was previously "step 2" of its allocation analysis, and instead proceeds directly from assigning costs to the period of federal involvement to allocating those costs between the United States and Exxon. *See* Exxon Mot. at 55-56.  Exxon instead identifies several "key equitable factors," Exxon Mot. at 54, that, Exxon claims, support allocating the United States a substantial share of Exxon's response costs.  *See generally* Exxon Mot. at 66-74.  This approach inequitably ignores the fact that both Baytown and Baton Rouge produced a full slate of commercial products even during the period of peak federal involvement, and that the United States cannot reasonably be expected

---

substantially exacerbate past costs at Baton Rouge).  Nevertheless, the third trace here (dotted black) is a 50% reduction carried over from the earlier plot, and falls within less than 2% of Mr. Low's figure representing improvements in Baytown effluent by 1964.  *See* U.S. SOF ¶ 390 (88ppm/181ppm = .486 (48.6%)).

[28] The average figure is (32% + 43% + 52% + 70% = 197; 197/4 = 49.25%).  The United States has provided the Court with simplified worksheets that could be used to experiment with different allocation parameters discussed in its opening Brief.  U.S. Exs. 160, 161.  The discussion in the text explains why the Government did not include the means to evaluate variations on Mr. White's production/waste reduction approach.  The figures could certainly be added if the Court wishes, but the data, we submit, does not support the exercise.

to bear a share of costs associated with cleaning up waste generated by this commercial production.

Wartime purchase contracts required the government to pay "taxes, fees, or charges" incurred "by reason of" the production of aviation gasoline.  U.S. Mot. at 59.  Exxon interprets this provision to require the United States to pay not only its fair share of costs for cleaning up wastes generated by producing the avgas that was the subject of the contract, but *also* to pay costs associated with the 85% of refinery production that consisted of products other than avgas (including 60% of refinery production that was not considered a "war product" at all).  *See* U.S. Mot. at 60, 66.  Exxon's argument for this construction is based on the proposition that every barrel of crude run at the refinery had to be used to make avgas, and that Exxon and the United States considered the remaining refinery output to be merely "byproducts."  Exxon also appears to rely on this supposition independent of the contract, as a freestanding basis to tie the government to all wartime wastes.  Exxon Mot. at 69-70.

As a matter of practical refinery economics, it is impossible to make *any* product at a refinery without also making a full slate of other products – that is simply the way refineries work (as Exxon Engineer Jere Johnson confirms).[29]  Exxon does not appear to dispute this point, and there would be no basis to do so.[30]   *See* U.S. Ex. 246, J. Johnson 2013 Dep. at 359 ("as far

---

[29] It is not technically impossible to produce only a single product, except perhaps with regard to "straight run distillates" that emerge from the initial distillation step at a refinery and are not further processed.  *See Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 21, 27 (Fed. Cl. 2017) ("*Shell*").  But no refiner would ever deliberately fail to make a full slate of products from a barrel of oil.

[30] Several related Exxon arguments are, contrary to Exxon's suggestion, sharply disputed.  These include:  The contention that crude runs increased 30% during the war, (*compare* Exxon Mot. at 61 *and* Exxon PF ¶ 91 *with* U.S. Resp. to Exxon PF ¶ 91), and the idea that the entirety of every barrel of crude has to be processed to make the aviation gasoline.  *Compare* Exxon Mot. at 70 *and* Exxon PF ¶¶ 99-100 *with* U.S. Resp. to Exxon PF ¶¶ 99-100.

as I know, there was never a time when . . . [even] during the war that you just threw the . . . whatever's left from making gasoline and threw it away").  Thus, while it is true that Exxon's refineries would not produce avgas without also producing what Exxon dismisses as mere "byproducts," it is equally true that that Exxon would not produce, for example, home heating oil during World War II without also producing avgas.  Indeed, the historical use of the term "byproducts" varies greatly – products other than avgas were sometimes referred to as "byproducts," and avgas was sometimes described as a "byproduct" of refinery operations in general.  U.S. Suppl. SOF ¶¶ 402-04.  It is therefore unsurprising that, while the objective of both the United States and the refining industry during World War II was to make as much aviation gasoline as possible, wartime purchase contracts anticipated that refiners would make, and sell for their own account, a full slate of additional products.  *See* U.S. Mot. at 61.

Even accepting, *arguendo*, that everything other than aviation gasoline is a "byproduct," that characterization ought not control the Court's allocation.  As Exxon's Jere Johnson also observed:

> . . . byproducts is a – is a tricky term.  And in my definition a byproduct is anything that's not your main product from that particular unit.  So it's not to say they're useless, they're used somewhere else.  So what was a byproduct for one unit may be – is a primary feed for another unit.

U.S. Ex. 246, J. Johnson 2013 Dep. at 360.[31]  Finally, there is at least anecdotal evidence suggesting that those who participated in the wartime arrangements would not have allocated

---

[31] Perhaps, as Exxon has contended, the United States should pay something for refinery operations associated with producing input streams for the Plancors and the BOW.  *See* U.S. Mot. at 63 (accounting for crude run to produce inputs).  But would Exxon suggest that – in the hypothetical absence of aviation gasoline production – the Government should pay nothing for wastes associated with inputs to the neighboring synthetic rubber plants because the inputs forwarded as part of the integrated arrangement emphasized in the Company's memorandum (Exxon Mot. at 58) are inconsequential byproducts?

costs as Exxon proposes.  This anecdotal evidence provides an interesting perspective,

particularly the comments of Chief Counsel J. Howard Marshall.  U.S. Suppl. SOF ¶¶ 407-08;

*see also* U.S. Ex. 20, Kittrell 2012 Rebuttal Report at 14-15, 19-23 (regarding refinery cost

allocating practices in general).

Exxon claims support for its theory that the United States should bear a share of costs

associated with all wartime refinery production (including Exxon's commercial products) from

several opinions, notably Judge Braden's recent opinion in *Shell*.[32]  Exxon Mot. at 70.[33]  Exxon's

broad assumption that the characterization of any substance as a byproduct controls the result

overlooks the enormous factual distinction between *Shell* and the present case.  In *Shell*, the

Court was being asked to allocate costs associated with acid that could no longer be used to

make alkylate for aviation gasoline – essentially a waste product, albeit one that could often be

used in its dilute state to make various other products (but could not be shipped elsewhere

because of wartime regulation of rail transportation).  *Shell*, 130 Fed. Cl. at 22, 25.  Although the

court in *Shell* referred to products other than "avgas" as by-products, Judge Braden appears to

characterize the spent acid separately as a waste (*id.* at 35, noting the expense of disposal), and to

have construed the additional uses of spent acid simply as a means to minimize waste volumes.

---

[32] The United States has appealed this decision.

[33]  Exxon also cites Judge Kelleher's opinion in *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018 (C.D. Cal. 1998), a decision overruled with regard to allocation by *United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002) (Fletcher, J.).  This is curious, given that the appellate court's treatment of the facts is quite different from that of the Court below, and that Exxon has indicated its agreement with Judge Fletcher's opinion for the Ninth Circuit.  U.S. Ex. 258, *Transcript of Proceedings, March 11, 2014* at 24-25; *see infra* at 62–63.  Exxon also relies on Judge Smith's decision in *Shell Oil Co. v. United States*, 86 Fed. Cl. 470 (Fed. Cl. 2009).  That opinion is part of a long series of decisions the lead ultimately to the Federal Circuit's decision in *Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014), and which, along the way, involved the recusal of Judge Smith on conflicts grounds.  *Shell Oil Co. v. United States*, 672 F.3d 1283 (Fed. Cir. 2012).

Exxon, on the other hand, asks this Court to apply a similar notion to a product slate that makes up fully 86% or refinery output at Baytown.  Crude oil and fractions thereof emerging from a distillation column are not wastes generated in the production of aviation gasoline in particular – they are the critical raw material for generating all products made by any oil refinery.

    In sum, the Court's use of the term "byproduct" in *Shell* hardly implies that the Court would apply the same analysis to the bulk of the product slate at both refineries during the war. Many byproducts are valuable; some, clearly, are not.  And in the present case, if we accept Exxon's usage of the term, "byproducts" make up most of what both refineries made and sold during World War II.

### C.    The Government's equitable share should be modest.

    Once the Court has assigned costs to the period when the United States was involved with the refineries and has decided what portion of those costs are fairly associated with products for which the parties share responsibility, the final step is to allocate any recoverable costs between Exxon and the United States.  Exxon argues for an inflated federal share despite the fact that the Court has opined that the United States was insufficiently involved to be considered a CERCLA operator at the only portions of either Site where Exxon has incurred significant environmental costs.[34]  Beyond matters already addressed, the supposed bases for this argument are:  1) that the government was deeply involved at both refineries, and that it required that refiners enter into aviation gasoline contracts, required the maximum production, "controlled all significant plant activities," and "effectively controlled waste generating operations" (Exxon

---

[34] *Compare* Exxon Mot. at 66-75 (closing with an apparent request for 100% based on the avgas contract); U.S. Ex. 25, White Suppl. at 150 (40% equitable share at Baytown) *with* Exxon Mot. at Ex. 3, Att. D, Att.3 Sch. A to C.xlsx, Tab B-1 (Baytown Cost Summary showing dominance of costs at refinery proper), *and* Phase I Decision at 521-30 (operator liability).

Mot. at 56, *see id.* at 66-67 ("hands-on, day-to-day control . . . draconian controls")); 2) that the government was aware the refinery operations would produce waste and acquiesced in processes that would do so (*id.* at 56, 69); and 3) that the contaminating activities were enormously valuable to national defense.  *Id.* at 72.  None of these factors supports a substantial allocation to the United States.

First, Exxon places greatest emphasis on the argument that the government "took over" the refineries, allegedly coercing industry through pervasive government control.  Exxon Mot. at 66-70.  The Court has, however, already rejected the factual predicate for this argument in its Phase I Decision.  Among other things, the Court concluded:

- Although "high-octane avgas was critical to the war effort . . ." and federal agencies "had the authority to require oil companies to produce," the same agencies "relied almost exclusively on contracts . . . to ensure avgas production, including long term contracts [and] low cost loans to companies to help them build avgas-producing plants."  Phase I Decision at 494-95.

- The Planned Blending Program allowed the Government to assist oil refineries in exchanging and blending components in order to maximize production and removed concerns about antitrust restrictions, allowing for "total cooperation" among refiners, but "did not . . . exercise direct control over the production of avgas components or waste disposal . . ."  *Id.* at 495.

- Although there were complaints about some terms, refiners entered into contracts to sell avgas to the Government, and those contracts were profitable.  *Id.* at 496.

- The Government "did not play a direct role in waste disposal" at either Exxon refinery during the war.  *Id.* at 502.

Equally importantly, Exxon's argument conflicts with its concession at oral argument that Judge Fletcher's description of the wartime economy in *United States v. Shell Oil Co.,* 294 F.3d at 1049-50 was accurate, and that Exxon regarded the opinion as "a very fair statement."  U.S.

Ex. 258, *Transcript of Proceedings, March 11, 2014* at 24-25.[35]  In that opinion, the Ninth

Circuit concluded that "the Oil Companies affirmatively sought contracts to sell avgas to the

government, and the contracts were profitable throughout the war," and that the government

agencies with the authority to require production "relied almost exclusively on contractual

agreements to ensure avgas production."  *Shell Oil,* 294 F.3d at 1050.  The court further found

that the "planned blending program" was one in which "the government *assisted* the refineries . .

. in exchanging and blending various avgas components" (emphasis supplied), and that the

government "usually accepted what was proposed by the refineries" – all propositions

inconsistent with heavy-handed government control. *Id.* Both this Court's prior findings and

Exxon's statement that it agrees with *Shell Oil*'s description of the wartime economy are

fundamentally at odds with Exxon's renewed argument that the Government commandeered

refineries.[36]

Second, the United States was generally aware that refining petroleum and making

aviation gasoline produced waste products.  Such general awareness does not, however, warrant

allocating the United States a substantial share of response costs in this case.  As the Court has

observed, wartime contracts did not specify waste disposal practices, and "[t]he government did

---

[35] Coincidentally, the United States asked Mr. White (the allocation expert) about precisely the same passage during a deposition conducted during Phase I discovery.  Mr. White also had no objection to Judge Fletcher's treatment.  U.S. Ex. 237, Richard White Dep. 403-07 (June 6, 2013) (". . . I think the general thrust is consistent with my understanding.").

[36] The argument for constant coercion is also inconsistent with the general understanding of historians about the contracting parties' relations at the time.  U.S. Ex. 8, Jay Brigham, A Rebuttal Report Regarding the ExxonMobil Facility at Baytown, Texas, etc. at 3-9 (November 16, 2012) (discussing numerous primary and secondary sources for the proposition that wartime efforts were consistently cooperative).  References to characterizations and branding efforts supplied by retained experts (Exxon Mot. at 69-70 (citing, *inter alia*, "root cause" analysis)) and selective quotations attributed to World War II actors (Exxon Mot. at 68) do not alter that fundamental reality.

not direct or order either Humble or Standard LA to dispose of the production waste in any particular way" – the Government was aware, but not deeply involved.  Phase I Decision at 502.  As for federal acquiescence in waste generation, it is not as though there were other options – the refineries were state of the art for their time, and ordinary waste production associated with those methods was unavoidable.[37]  Nor is this a case in which the waste at issue is associated with some particularly problematic compound that might justify the imposition of a more robust share on one actor at a multi-party CERCLA site.

Finally, and most importantly, the allocation of a disproportionate share to the federal government based on its awareness of waste generation is inconsistent with the Court's determination that the government did not operate either refinery.  The vast majority of Exxon's costs at each Site are connected with the actual refinery properties (as opposed to Plancors or the Baytown Ordnance Works), where – had the Court not chosen to define the Sites as it did – the Government would not be liable.  Phase I Decision at 516-20.  There are a great many buyers in the economy (even demanding ones) who are aware that the production of any number of products generates toxic or hazardous waste – a fact that does not, without more, expose them to liability.  If we ignore, for a moment, the Government's presence as an owner/operator at the Plancor Sites, the United States would occupy the same position with regard to the purchase of avgas.

Finally, there is the matter of the benefit to the national defense.  All products required to fight can be called "critical" in wartime, but there is no denying that the products produced as

---

[37] Exxon does tend to overlook, however, the Government's positive role as a regulatory entity in this regard – the Corps of Engineers certainly did not acquiesce when it found what it considered sloppy waste practices at Baton Rouge, and it followed up both during and after the War to see that the matter was satisfactorily resolved.  *See* Part IV.D, *infra*.

these facilities were important to the war effort.  That does not mean, however, that the government – which made a mutually beneficial arrangement with parties willing to contract, on which refiners typically made solid profits – should be allocated some "extra" portion of response costs merely because this arrangement succeeded.  The Court should treat the arrangement as what it was – a business transaction between large, capable parties under difficult circumstances not of their own making.  Again, the United States is prepared to pay a share for wastes associated with the avgas it purchased.  It should not be asked to pay more simply because it put the product to good use.

> **D.     The Court should disregard Exxon's "delay multipliers."**

In addition to the three basic allocation steps that make up Exxon's allocation proposal, Exxon suggests the addition of a set of free-standing multipliers explicitly intended to load additional costs on the United States based on its failure to allocate steel to certain environmental projects during World War II.  U.S. Ex. 26, White 2012 at 64 n.141.  Exxon advanced the issue as part of the Company's proposal that the Court adopt Mr. White's allocation method during the briefing of Motions for Partial Summary Judgement during Phase I.[38]  The Court addressed the issue briefly in its June 2015 opinion, reserving decision regarding any impact on allocation until Phase II.  Phase I Decision at 527-29, 534-35.  Exxon now returns to the issue, arguing: 1) that the Government's conduct during the war delayed waste improvements Exxon wanted to make; 2) that the Government's rationing programs somehow had a "chilling effect" on other requests for pollution control equipment (*see., e.g.*, U.S. Ex. 25, White Suppl. at 115, 123); 3) that Mr.

---

[38] Plaintiff Exxon Mobil Corporation's Motion for Partial Summary Judgment As To Phase 1 Liability and Allocation and Supporting Memorandum, Dkt. No. 102 at 53-54 (September 30, 2013); Plaintiff's Proposed Findings of Undisputed Material Facts, Dkt. No. 102-1 at 23-25 (Baytown).

White has reasonably accounted for the delay; and, for the first time, 4) that the delay also justifies an upward adjustment of the equitable share assigned to the government in the equitable allocation at Step 3. Exxon Mot. at 56 ("the other two equitable factors – relating to the Government's stringent policies prohibiting the installation of needed pollution control equipment during the wartime period . . . should act to enlarge the Government's degree of involvement beyond this 40% baseline factor").

### 1. Exxon's new proposal to adjust the Government's equitable share is unexplained.

Taking the last item first, this contention is new. The Government's understanding is that it is not a part of Mr. White's three basic steps,[39] and Mr. White appears satisfied that his method fully accounts for the supposed delay.[40] The delay factor calculations can be elusive, and it seems reasonably likely that statement in Exxon's brief is simply an error. If it is not, the United States can respond only that there appears to be no basis for such an adjustment even if one

---

[39] The delay factor loads an additional share on the United States by applying the World War II equitable share (40% in his most recent proposal) against a portion of additional post-war pollution Mr. White attributes to the "government imposed" delay. Thus, for example, at Baytown, he calculates a 40% differential for the years 1949-54, and applies the "level of involvement" (equitable share) he assigned for the World War II period to that differential. The United States bears a 16% share even during years prior to the Korean conflict when Federal involvement with the refinery proper is essentially nonexistent. (40% factor * 40% share = 16%). U.S. Ex. 26, White Suppl. at 138-43 (explanation); *Id.* at 143 (chart showing delay factor as the "difference" between actual and hypothetical projects; Text describing application of World War II share).

[40] Counsel's proposal would present an anomaly, increasing the equitable share assigned the United States in the delay calculations *and* in Mr. White's Step 3 – an approach that would further raise the federal allocation of all costs otherwise assigned to it during the period of federal involvement. For example, if the Court accepted Exxon's invitation and chose a 10% additional share, the delay factor for Baytown for the years in the example provided in the text would increase – (40% factor * 50% share = 20%); but the additional 10% would also be applied for the entire period of federal involvement.

accepts Mr. White's basic premise.  In any event, delay adjustments are completely unjustified on the record.

### 2.      No adjustments for delay are warranted.

Exxon's arguments for the delay allowance actually described in Mr. White's reports are based upon counter-factual allegations, self-serving extrapolation, and multiple unfounded assumptions.  The Court should reject Exxon's arguments, and should make no allowance for the supposed delay.

### a.      Baton Rouge

First, the basic assumption on which the argument rests – that Exxon's predecessors would have made improvements that would have reduced pollution during World War II but for the lack of supplies controlled by the United States – is vastly overstated.  Taking Baton Rouge as Exxon's best case – the postponement of the master separator there at least arguably had some impact on discharges – the evidence confirms what the Court has already observed: that Exxon's predecessor Standard Oil had been aware of problems with contaminated wastewater for more than a decade before the onset of World War II;[41] that the problems were regarded as serious at the time (U.S. Phase I SOF ¶ 244); that Standard conducted several studies and surveys during the 1930s to evaluate possible solutions, and drew up engineering estimates for a master separator in Callaghan Bayou (*Id*. ¶¶ 239-43); and that the Company took no action to ameliorate the problem prior to the War.  *See* Phase I Decision at 502 ("Standard LA had first considered a Master Separator several years before the War began, but had not built it").  Apart from one indication that Standard eventually authorized the separator early in World War II but could not

---

[41] U.S. Phase I SOF ¶ 238; *see* U.S. Ex. 256, Master Separator in Callaghan Bayou, BRHIS-00014109 at 14110-11 (September 10, 1946).

obtain approval for the required materials (U.S. Ex. 256, Master Separator, BRHIS-00014109 at 1), most of the Company's efforts during the period seem to have been influenced primarily by federal regulatory attention, balanced against the costs of making the necessary changes.

After the Corps of Engineers made an inspection in January 1944, noting poor industrial practices and "oil in considerable quantity escaping into the Mississippi River," and threatening legal action (U.S. Phase I SOF ¶¶ 246-47), Standard formed its Oil Conservation Department "in the hope that the master separator would not be necessary" (*id.* ¶ 277), and submitted all available plans for mitigation projects in July 1944.  Contrary to Exxon's suggestion that it had to "settle for" the silt treating unit (Exxon Mot. at 63), internal documents suggest that Standard preferred the silt treatment unit ultimately approved to the Master Separator, noting that, although both were very desirable, the "mud washing and emulsion treating facilities. . . could be installed more quickly" and for a "smaller investment."  U.S. Phase I SOF ¶ 272.  The Corps agreed, and Standard obtained approval for the Silt Treating Unit in August 1944, with the long delayed master separator postponed until after the War.  *Id.* ¶¶ 260, 273-76.  The initial pace of work on the separator immediately following the War appears to have been driven by attention from, and commitments made to, the Corps – including a number that Standard was unable or unwilling to keep.  *See generally id.* ¶¶ 245-82; 292-93 (chronology of events).[42]

This does not mean that Exxon's predecessors were unconcerned with pollution – but it does mean that they were not sufficiently concerned to have addressed a long-standing problem during the pre-war years.  The evidence also supports a reasonable inference that post-war work

---

[42] A similar approach can be seen in the Baytown refinery's request for resources to construct a sewer pump-out system at Plancor 485, with a justification referencing State regulations that "are quite stringent with regard to petroleum of chemical pollution of waterways" and noting "severe penalties for violation."  U.S. Phase I SOF ¶¶ 207-11.

might not have been undertaken promptly had the Corps not made a follow-up inspection in March 1946, and obtained a commitment from Standard to have "all reasonably objectionable pollutants under control by April 1, 1947."  U.S. Phase I SOF ¶ 277; U.S. Ex. 256, Master Separator in Callaghan Bayou, at 2 (Sept. 10, 1946) at BRHIS-00014109, 14110.

Second, Exxon's further assertion, based on work by Mr. Kipp, that "delays were necessary before installation of the Master Separator . . . to allow for the systematic introduction of appropriate control processes in a timely manner" is specious.  Beyond a vague suggestion that a small or moderately sized unit "would have been ineffective at separating the various waste streams and providing processes to break emulsions," Mr. Kipp does not explain the basis for his belief that it would be "technically impossible" to implement post war changes in an "efficient manner after WWII concluded without the conduct of the systematic program" actually undertaken.  U.S. Ex. 264, Kipp Suppl. Report at 31; Exxon Mot. at 73-74.  Nowhere in the documentation before, during or after World War II is there so much as a suggestion that the many other projects undertaken at the refinery (*see* U.S. Ex. 242, *Operation of the Oil Conservation Department*, BRHIS-00013937 at 13952) had to be accomplished in any particular order, or that the Master Separator, the "most important" unit, had to await the completion of other projects in order to be undertaken in an "efficient manner."  The documents establish that Standard initially committed to resolve issues at the outfall by April of 1947, could have installed a Master Separator based on the original plan (albeit at greater expense) by 1948, and planned to install the revised "earthen unit" sooner – either by the April 1, 1947 date promised to the Corps, or at least sometime before 1948.

Finally, there is the fact that the benefits of the Master Separator, once installed, were primarily seen in the Refinery's effluent figures, and consistently generated additional disposal

of sludges in, for example, the Old Silt Pond.  U.S. Suppl. SOF ¶ 323, *see* U.S. Ex. 23, Low

Rebuttal at 19 n.48; U.S. Ex. 13, Gravel 2012 at 198.  This case, particularly at Baton Rouge, is

largely about costs incurred to address those land-side silts and sludges, in riparian areas along

the Mississippi.[43]

Even a cursory examination of the facts demonstrates that it took Standard two decades to

progress from early recognition of issues at Callaghan Bayou in 1931 to an operating Master

Separator in 1952.  The dominant reasons for the lengthy gestation period for the project are

budget, design, contracting, and construction issues, and the impact of the wartime denial of

resources had no significant impact.  Given that observation, together with the fact that earlier

installation would likely have *increased* contamination in the areas on which Exxon has

expended costs at issue, the delay factor at Baton Rouge is unwarranted.

### b.      Baytown

The rationale for Mr. White's delay calculation at Baytown is even more strained,

beginning with his speculation that several of the largest, most important corporations in the

country, which Exxon represents as crucial to the war effort, refrained from asking for resources

for pollution-related projects on the assumption that that they would all be denied by federal

authorities entirely focused on the war effort.  U.S. Ex. 25, White Suppl. at 115.  The record,

once again, contradicts this speculation.  The evidence demonstrates that Exxon applied for steel

and other resources for multiple projects, and that the Government sometimes approved such

---

[43] Exxon, of course, seeks future costs.  But the uncertainties about whether World War II
practices impact a hypothetical response to, for example, Ship Channel sediments at Baytown are
vastly multiplied along the banks of a River that has seen large flooding events over the years,
and which, during the period in question, regularly removed 80,000 cubic yards of silt containing
8-12,000 barrels of oil from Callaghan Bayou in early summer.  U.S. Ex. 256, Master Separator
in Callaghan Bayou, BRHIS-00014109.

requests – granting a request for example, for the pollution-related Silt Treating Unit at Baton

Rouge.  Exxon concedes that Baytown made several requests, obtaining approval for new acid

reconcentration facilities and for modified sewer lines related to the Refinery's West Ditch, but

not for temporary acid burning facilities.  U.S. Phase I SOF ¶¶ 212-27 (chronology of events);

*see* U.S. Ex. 25, White Suppl. at 122 n.218 (citing unsuccessful applications, but also

establishing that requests were routinely made).  Indeed, though anecdotal, there is at least one

comment made by the Assistant Deputy Petroleum Administrator that suggests that Humble, in

particular, was not shy about advocating for whatever sort of relief it thought necessary and

appropriate:

> The matter is further complicated by the fact that the Humble Co. *(I am tempted to say "as usual")* claims that unless large quantities of residual fuel oil are moved from their refineries they man have to shut down war production.  *I am not a bit worried about that because there is plenty of storage available in the Gulf Coast*, and until the total storage approaches the danger mark of fullness I think we should produce maximum 100 octane gasoline.

U.S. Ex. 257, Correspondence from Bruce Brown, BAYC-00089412 (September 14, 1943)

(emphasis added); *compare* U.S. Ex. 258, *Transcript of Proceedings* at 48 (March 11, 2014)

(Phase I Oral Argument on Cross Motions for Summary Judgment), *and see* U.S. Ex. 251,

Address by Interior Secretary Harold Ickes to the American Petroleum Institute, MISC-

00064144 at 64147 (referring to the oil industry as "a bunch of tough hombres" and disclaiming

any interest in dictatorial power); *id.* at 64148 (celebrating a successful arrangement between "a

bunch of fire-eating eye-clawing oil men, on the one hand, and a group of . . . stubborn,

unreasonable government bureaucrats, on the other").

    The unsupported inference that companies held back from requesting needed materials

matters.  Mr. White's delay calculations at Baytown effectively assume that Exxon would have

conducted the *entire postwar program* undertaken from 1947-52 during World War II had it not

been for the Company's being discouraged because the Government declined to allow steel to be allocated to a temporary back-up facility that was completely unrelated to post-war efforts to avoid oil losses and improve effluent performance. This assumption, already problematic, is implicitly held to be justified despite the approval of the more consequential acid reconcentration facilities and suggestions in the denial that the temporary project were probably not needed. U.S. Phase I SOF ¶¶ 218-21. There is no evidence that even suggests that Exxon considered the sorts of systemic improvements undertaken after Exxon conducted a survey of Baytown in 1947 at any earlier time (*see* Exxon Proposed Findings, No. 200-4 ¶ 375). Yet the Company is asking the Court to assume: 1) that Exxon was greatly concerned with pollution before and during the war; 2) that it had, or would have made, an extensive plan to deal with the perceived problems in the midst of the war were it not for government-created delays; and that, therefore, 3) the Government should pay a substantial additional portion of Exxon's environmental costs. This chain of inferences has no material support in the record.

## V.   THE COURT SHOULD REJECT EXXON'S UNSUPPORTED REQUEST FOR AN EXPANSIVE DECLARATORY JUDGMENT.

In a single footnote, Exxon asks the Court for a sweeping declaratory judgment for future costs that Exxon may incur to address "the onshore SWMUs," "other areas of contamination," and "offshore adjacent water bodies" at both Sites. Exxon Mot. at 55 n.54. What Exxon calls the "onshore SWMUs" appear to be the cleanup units that the parties have briefed in this Phase II summary judgment stage. The United States agrees that the Court may properly enter a declaratory judgment on future costs for any of these cleanup units, if the Court first holds that: (1) Exxon has incurred necessary costs of response consistent with the National Contingency Plan; (2) Exxon's recovery is not barred by CERCLA's statute of limitations; and (3) the United States is responsible for an equitable share of Exxon's past costs at that unit. The Court's

declaratory judgment should provide that Exxon and the United States are liable for their respective shares of responsibility for Exxon's future costs at cleanup units where, in Phase II, the Court equitably allocates a share of responsibility to the United States. *See* Phase I Decision at 535–36. If the Court enters a declaratory judgment, it should provide that on an annual basis, Exxon may recover the United States' equitable share of Exxon's future costs (costs incurred on or after January 1, 2015) if Exxon proves that (1) the costs are necessary costs of response incurred consistent with the NCP, and (2) the costs were incurred at a cleanup unit where the United States is liable and where the Court has allocated an equitable share to the United States.

For the reasons stated in our summary judgment brief, however, the Court should deny Exxon's request for a declaratory judgment as to all other onshore and offshore areas of contamination, including the water bodies. U.S. Mot. at 68-74. Exxon has not incurred any costs to address contamination in the water bodies, nor has there been any discovery showing the relative responsibility of the United States for any such contamination (or Exxon's for that matter). U.S. SOF ¶¶ 176-87. Indeed, Exxon's proposed facts fail to allege that Exxon has incurred *any past* costs to address the water bodies or any facts that would support an allocation to the United States. *See* Exxon PF ¶¶ 789 (past costs for Baytown water bodies not listed), 790 (citing Mitchell Bay shoreline work only), 796 (past costs for Baton Rouge water bodies not listed). Likewise, Exxon has not submitted competent, admissible evidence to prove that it has incurred any past or future necessary costs of response at "other areas of contamination," such as SWMU 47 (the Waste Clay Pile), nor have the parties briefed whether the United States should be responsible for any such costs. U.S. Resp. to Exxon PF ¶¶ 786, 790, 793. Thus, the Court should defer any declaratory judgment or allocation of alleged future costs for the other areas of

contamination and the water bodies until such costs are actually incurred and sufficient facts are established to support an equitable allocation.

## CONCLUSION

For the foregoing reasons, the Court should deny summary judgment to Exxon.

Respectfully submitted,

Dated: March 23, 2018

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

 /s/ *Erica Zilioli*
Michael D. Rowe (Attorney-in-Charge)
Erica M. Zilioli
Justin D. Heminger
Brian H. Lynk
Stephanie J. Talbert
Trial Attorneys
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, DC  20044
(202) 514-3144
michael.rowe@usdoj.gov

RYAN K. PATRICK
United States Attorney

Jimmy A. Rodriguez
Assistant United States Attorney
Southern District No. 572175
Texas Bar No. 24037378
1000 Louisiana, Suite 2300
Houston, TX 77002
(717) 567-9532
jimmy.rodriguez2@usdoj.gov

*Counsel for Defendant United States*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2018, I filed the foregoing using the Court's CM/ECF

system, which will electronically serve all counsel of record registered to use the CM/ECF

system.

/s/ *Erica Zilioli*