**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

———————————————————

EXXON MOBIL CORPORATION,          )
                                  )
          Plaintiff,              )
     v.                           )     4:10-CV-02386 (LHR)
                                  )     4:11-CV-01814 (LHR)
UNITED STATES OF AMERICA,         )
                                  )
          Defendant.              )
———————————————————)


**DEFENDANT UNITED STATES OF AMERICA'S REPLY IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT ON PHASE TWO ISSUES**


RYAN K. PATRICK
  *United States Attorney*

JIMMY A. RODRIGUEZ
  *Assistant United States Attorney*
  Southern District No. 572175
  Texas Bar No. 24037378
  1000 Louisiana, Suite 2300
  Houston, TX 77002
  (717) 567-9532
  jimmy.rodriguez2@usdoj.gov

JEFFREY H. WOOD
  *Acting Assistant Attorney General*
  Environment and Natural Resources Division
  United States Department of Justice

MICHAEL D. ROWE (Attorney-in-Charge)
ERICA M. ZILIOLI
JUSTIN D. HEMINGER
BRIAN H. LYNK
STEPHANIE J. TALBERT
  *Trial Attorneys*
  Environmental Defense Section
  P.O. Box 7611
  Washington, D.C.  20044
  (202) 514-3144
  michael.rowe@usdoj.gov

  *Counsel for Defendant United States*

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities .............................................................................................iii

Glossary ............................................................................................................. vii

ARGUMENT ........................................................................................................ 1

    I.      THE FACILITY OPERATIONS AREAS COSTS ARE NOT
           RECOVERABLE. ................................................................................ 1

    II.     EXXON DID NOT CONDUCT A SINGLE THIRTY-YEAR REMOVAL
           ACTION AT EACH SITE, NOR WERE ITS ACTIONS CONSISTENT
           WITH THE NCP. .............................................................................. 2

           A.    Facts are relevant to determining the number and nature of
                 response actions. ................................................................... 3

           B.    There is no requirement that remedial actions be site-wide. ...................... 5

           C.    Considering the presence or absence of imminent risk as a
                 distinguishing factor between removal and remedial actions has
                 regulatory support. ................................................................ 6

           D.    The technical solution used in a response action does not determine
                 whether the response is a removal or remedial action. ............................... 7

           E.    The undisputed facts support application of the CERCLA section
                 9613(g)(2) time-bar. ............................................................... 8

            F.    The United States applied the proper standard in concluding that
                 some of Exxon's response actions were not consistent with the
                 NCP. ........................................................................................ 9

    III.    EXXON'S CLAIM SHOULD NOT INCLUDE PREVIOUSLY
           REIMBURSED COSTS OR COSTS FOR WHICH IT LACKS
           ADEQUATE EVIDENCE. ................................................................. 12

           A.    The Court should equitably account for Exxon's prior insurance
                 settlements. ........................................................................... 12

           B.    Exxon has failed to accurately account for many of its past costs............ 15

                1.    The NCP requires Exxon to accurately account for its costs........ 15

2.      Exxon cannot substitute computer screenshots for invoices......... 17

3.      Exxon's internal accounting records cannot substitute for
        invoices and proof of payment....................................................... 19

4.      The NACC damages database may be admissible but is
        unreliable...................................................................................... 20

5.      Exxon cannot save its costs by challenging the United
        States' expert................................................................................ 21

IV.     THE COURT SHOULD ALLOCATE ONLY A SMALL SHARE OF
        SOME OF EXXON'S COSTS TO THE UNITED STATES............................... 22

        A.      The United States is not responsible for cleanup costs at the Old
                Silt Pond, Rice Paddy Landfarm, and Tank Farm 3000 Area. ................. 22

                1.      Old Silt Pond and Rice Paddy Landfarm....................................... 22

                2.      Tank Farm 3000 Area ................................................................. 25

        B.      The United States' proposed allocation is based on relevant facts
                and sound analysis. ...................................................................... 28

                1.      The Court has already rejected Exxon's counter-factual
                        history of World War II business practices.................................... 28

                2.      Exxon's refining operations arguments are inconsistent
                        with historical fact...................................................................... 33

                3.      Exxon's remaining arguments are not persuasive ....................... 40

                4.      The Government's proposals are equitable.................................. 44

V.      EXXON HAS NOT IDENTIFIED SUFFICIENT FACTS ON WHICH
        THE COURT COULD ALLOCATE FUTURE COSTS. .................................... 45

Conclusion ............................................................................................... 49

# TABLE OF AUTHORITIES

## CASES

*Amoco Oil Co. v. Borden, Inc.*,
   889 F.2d 664 (5th Cir. 1989) ...................................................... 45

*Appleton Papers, Inc. v. George A. Whiting Paper Co.*,
   955 F. Supp. 2d 947 (E.D. Wis. 2013)...................................................... 13

*Bell Petroleum Servs. v. Sequa Corp.*,
   3 F.3d 889 (5th Cir. 1993) ...................................................... 45

*Bernstein v. Bankert*,
   733 F.3d 190 (7th Cir. 2013) ...................................................... 9

*Board of County Commissioners of La Plata, Colorado v. Brown Group Retail, Inc.*,
   768 F. Supp. 2d 1092 (D. Colo. 2011)...................................................... 48

*California Dep't of Toxic Substances v. Alco Pac., Inc.*,
   308 F. Supp. 2d 1124 (C.D. Cal. 2004) ...................................................... 4

*California Dep't of Toxic Substances v. J&S Chrome Plating Co.*,
   Civ. No. 14-2613, 2015 WL 12645742 (C.D. Cal. 2015)...................................................... 5, 6

*Colorado v. Sunoco, Inc.*,
   337 F.3d 1233 (10th Cir. 2003) ...................................................... 3

*Davis v. Chevron U.S.A., Inc.*,
   14 F.3d 1082 (5th Cir. 1994) ...................................................... 27

*Elite Operations, Inc. v. Union Pac. R.R. Co.*,
   Civ. No. H-13-3461, 2015 WL 5474434 (S.D. Tex. Sept. 17, 2015)...................................................... 1

*Exxon Mobil Corp. v. United States*,
   108 F. Supp. 3d 486 (S.D. Tex. 2015) ...................................................... 30, 31

*Friedland v. TIC-The Indus. Co.*,
   566 F.3d 1203 (10th Cir. 2009) ...................................................... 13

*Geraghty & Miller, Inc. v. Conoco Inc.*,
   234 F.3d 917 (5th Cir. 2000) ...................................................... 4

*Halliburton Energy Servs. v. NL Indus.*,
   648 F. Supp. 2d 840 (S.D. Tex. 2009) ...................................................... 20, 21

*In re Taira Lynne Marine Ltd. No. 5, LLC,*
   444 F.3d 371 (5th Cir. 2006) ............................................................ 1

*Lichter v. United States,*
   334 U.S 742 (1948) ........................................................................ 30

*Lockeed Martin Corp. v. United* States,
   35 F. Supp. 3d 92 (D.D.C. 2014),
   *aff'd,* 833 F.3d 225 (D.C. Cir. 2016) ................................ 31, 43, 44, 48

*NCR Corp. v. George A. Whiting Paper Co.,*
   768 F.3d 682 (7th Cir. 2014) ...................................................... 13, 14

*New York State Electric & Gas Corp. v. FirstEnergy Corp.,*
   808 F. Supp. 2d 417, 446-52 (N.D.N.Y. 2011) ......................... 47, 48

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.,*
   766 F.3d 212 (2d Cir. 2014) ........................................................... 13

*N. States Power Co. v. City of Ashland, Wis.,*
   No. 12-cv-602, 2015 WL 1745880 (W.D. Wis. Apr. 16, 2015) ............... 26

*Shell Oil Co. v. United States,*
   130 Fed. Cl. 8 (Fed. Cl. 2017) ....................................................... 42

*TDY Holdings, LLC v. United States,*
   872 F.3d 1004 (9th Cir. 2017) ...................................................... 43

*Tosco Corp. v. Koch Indus., Inc.,*
   216 F.3d 886 (10th Cir. 2000) ...................................................... 49

*United States v. Ambroid Co.,*
   34 F. Supp. 2d 86 (D. Mass. 1999) .............................................. 4, 9

*United States v. Manzo,*
   182 F. Supp. 2d 385 (D.N.J. 2000) ................................................. 9

*United States v. R.A. Corbett,*
   785 F. Supp. 81 (E.D. Tex. 1990) .................................................... 4

*United States v. Shell Oil Co.,*
   294 F.3d 1045 (9th Cir. 2002) ............................................ 29, 30, 31

*United States v. Socony-Vacuum Oil. Co.,*
   310 U.S. 150 (1940) .................................................................. 29, 30

*United States v. W.R. Grace & Co.*,
   429 F.3d 1224 (9th Cir. 2005) ................................................................... 3

*United States v. W.R. Grace & Co.-Conn.*,
   280 F. Supp. 2d 1149 (D. Mont. 2003)................................................... 16

*United States v. Walker*,
   410 F.3d 754 (5th Cir. 2005) ................................................................. 21

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*,
   No. 1:10-cv-044, 2013 WL 1182985 (N.D. Ind. Mar. 21, 2013) ............ 9

*Vine Street LLC v. Keeling ex. rel. Estate of Keeling*,
   460 F. Supp. 2d 728 (E.D. Tex. 2006),
   *rev'd on other grounds*, 776 F.3d 312 (5th Cir. 2015)......................... 49

*Yankee Gas Servs. Co. v. UGI Utilities, Inc.*,
   852 F. Supp. 2d 229 (D. Conn. 2012).................................................... 49

**STATUTES**

42 U.S.C. § 9601(24) ..................................................................................... 8

42 U.S.C. § 9607(a)(4)(A)-(B) ...................................................................... 10

42 U.S.C. § 9607(a)(4)(B) ......................................................................... 1, 16

42 U.S.C. § 9613(g)(2)(B) ........................................................................... 6, 8

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 803(16)............................................................................. 20, 21

Fed. R. Evid. 807 ......................................................................................... 21

Fed. R. Evid. 901(a) .................................................................................... 21

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 300.5 ........................................................................................... 8

40 C.F.R. § 300.160(a)(1).......................................................................... 15, 16

40 C.F.R. § 300.415(b)(2)............................................................................... 6

40 C.F.R. § 300.415(e).................................................................................... 7

40 C.F.R. § 300.415(e)(4) ................................................................................................. 8

40 C.F.R. § 300.415(e)(6) ................................................................................................. 8

40 C.F.R. § 300.430 ........................................................................................................ 10

40 C.F.R. § 300.700(c)(4) ............................................................................................... 10

40 C.F.R. § 300.700(c)(3)(i) ........................................................................................... 11

**FEDERAL REGISTER**

55 Fed. Reg. 8666 (Mar. 8, 1990) .................................................................................. 11

# GLOSSARY

| | |
|---|---|
| Avgas | Aviation gasoline |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-75 |
| EPA | United States Environmental Protection Agency |
| Exxon Mot. / Motion | Exxon Mobil Corporation's Consolidated Motion for Partial Summary Judgment as to Phase 2 Cost and Allocation Issues (Dec. 15, 2017), Dkt. No. 200 in 4:10-cv-02386 |
| Exxon Opp. / Opposition | Exxon Mobil Corporation's Response in Opposition to the United States' Motion for Partial Summary Judgment on Phase Two Issues (Mar. 23, 2018), Dkt. No. 209 in 4:10-cv-02386 |
| Exxon PF | Exxon Mobil Corporation's Proposed Findings of Undisputed Material Facts (Dec. 15, 2017), Dkt. No. 200-4 in 4:10-cv-02386 |
| Exxon Resp. to U.S. SOF | Exxon Mobil Corporation's Response to United States' Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment on Phase Two Issues (Mar. 23, 2018), Dkt. No. 209-1 in 4:10-cv-02386 |
| FOA | Facility Operations Area |
| NACC | North American Coverage Case |
| NCP | National Contingency Plan |
| Phase I Decision | *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015) |
| RCRA | Resource Conversation and Recovery Act, 42 U.S.C. §§ 6901-92k |
| Site(s) | The refinery(ies), Government plant(s), and other nearby areas or surface waters (as defined by this Court in the Phase I Decision) |
| SWMU | Solid Waste Management Unit |
| U.S. Mot. / Motion | United States' Memorandum in Support of Motion for Partial Summary Judgment on Phase Two Issues (Dec. 15, 2017), Dkt. No. 202-1 in 4:10-cv-02386 |
| U.S. Opp. / Opposition | United States' Opposition to Plaintiff ExxonMobil Corp.'s Consolidated Motion for Partial Summary Judgment as to Phase 2 Cost and Allocation Issues (Mar. 23, 2018), Dkt. No. 212 in 4:10-cv-02386 |

U.S. Phase I SJ Mot.    United States' Memorandum in Support of Motion for Partial Summary Judgment (Sep. 30, 2013), Dkt. No. 103-1 in 4:10-cv-02386

U.S. Phase I Opp.    United States' Memorandum in Opposition to Exxon Mobil Corporation's Motions for Partial Summary Judgment (Dec. 20, 2013), Dkt. No. 118 in 4:10-cv-02386

U.S. Phase I SOF    United States' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment (Sep. 30, 2013), Dkt. No. 103-2 in 4:10-cv-02386

U.S. Phase I Resp. to Exxon Second Set of PF    United States' Responses to Plaintiff's Second Set of Proposed Findings of Material Fact (Jan. 23, 2014), Dkt. No. 123-1 in 4:10-cv-02386

U.S. Resp. to Exxon PF    United States' Responses to Plaintiff's Proposed Findings of Undisputed Material Fact (Mar. 23, 2018), Dkt. No. 212-2 in 4:10-cv-02386

U.S. Resp. to Exxon Opp. PF    United States' Responses to Plaintiff's Proposed Findings of Undisputed Material Fact in Support of Its Response in Opposition to the United States' Motion for Partial Summary Judgment on Phase Two Issues (May 18, 2018), attached

U.S. SOF    United States' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment on Phase Two Issues (Dec. 15, 2017), Dkt. No. 202-2 in 4:10-cv-02386

U.S. Suppl. SOF    United States' Supplemental Statement of Undisputed Facts in Opposition to Plaintiff ExxonMobil Corp.'s Consolidated Motion for Partial Summary judgment as to Phase 2 Cost and Allocation Issues (Mar. 23, 2018), Dkt. No. 212-1 in 4:10-cv-02386

U.S. 2d Suppl. SOF    United States' Second Supplemental Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment on Phase Two Issues (May 18, 2018), attached

## ARGUMENT

The United States responds to the arguments in Exxon's Opposition as follows.

## I.   THE FACILITY OPERATIONS AREAS COSTS ARE NOT RECOVERABLE.

Exxon asserts that its claimed costs are all "necessary costs of response" pursuant to 42 U.S.C. § 9607(a)(4)(B).  Exxon Opp. at 18.  As previously explained, the Facility Operations Areas (FOAs) enable Exxon to postpone, not conduct, cleanups (which Exxon does not dispute). U.S. Mot. at 8-9; U.S. Opp. at 4-5; Exxon Resp. to U.S. SOF ¶ 42.  Exxon makes only two arguments as to why costs associated with the FOAs were nonetheless necessary costs of response, but neither meets Exxon's burden of establishing this prima facie element of its claim.

First, Exxon asserts that the primary purpose of establishing the FOAs was cost savings. Exxon Opp. at 44; Exxon Resp. to U.S. SOF ¶ 37.  Specifically, Exxon could "hypothetically . . . put those savings into a savings account, and then potentially fund a long-deferred cleanup activity from the interest on those savings."  Exxon Resp. to U.S. SOF ¶ 37.  Engaging in a costly application process that might save Exxon money in the long run has no bearing, however, on whether the FOA-related costs are "necessary costs of response," i.e., costs that must be expended *in order to address hazardous substances*.  *See, e.g., In re Taira Lynne Marine Ltd. No. 5, LLC*, 444 F.3d 371, 381-82 (5th Cir. 2006) (citation omitted) (response costs must have been incurred "to contain a release threatening the public health or the environment"); *Elite Operations, Inc. v. Union Pac. R.R. Co.*, Civ. No. H-13-3461, 2015 WL 5474434, at *8 (S.D. Tex. Sept. 17, 2015) (environmental investigation costs were not necessary to "contain a threat to the public health or the environment caused by a release"); *see also* U.S. Mot. at 9.

Second, Exxon states that "most" of the costs were incurred to conduct investigations "required" by Texas.  Exxon Opp. at 44.  The FOA investigations were only "required" to demonstrate eligibility for the FOA program.  U.S. Mot. at 8-9; U.S. Opp. at 5.  Even if Exxon

were correct that some of the $8 million in FOA costs to date were for investigations that would have to be conducted in the absence of the FOAs, Exxon has not met its burden of establishing which costs, specifically, were "necessary" to address contamination as opposed to "necessary" to succeed in its application to Texas.  U.S. Opp. at 5; U.S. SOF ¶ 43.  Because of how Exxon has categorized its costs, it is also not possible to determine whether Exxon in fact charged the costs for any such investigations to the FOA cost category as opposed to other categories like Refinery Groundwater or Former Ordnance Works Site Cleanup (both of which encompass areas within FOA boundaries).  See U.S. Ex. 11, Ficca Suppl. Report Attach. 3, Schedule B-1 (Jan. 2017) (summary chart); U.S. Ex. 10, Ficca Suppl. Report Attach. 3, Schedule B-2 (Jan. 2017) (listing "Facility Operating Areas (FOA)" costs under "Area Descriptions" entitled "Refinery Groundwater" and "Former Ordnance Works Site Cleanup" for numerous cost IDs). [1]

In the alternative, the United States should not be allocated any share of FOA costs for the reasons previously explained, *see* U.S. Mot. at 46.  Exxon contends that its FOA claim is justified because Exxon would not seek in allocation a share of future costs to clean up non-wartime units within the FOAs.  Exxon Opp. at 45; Exxon Resp. to U.S. SOF ¶ 44.  Even if that is true, Exxon has not proposed to prorate its $8 million in FOA application costs to account for non-wartime units.  For this additional reason, the United States should not bear any FOA costs.

## II.  EXXON DID NOT CONDUCT A SINGLE THIRTY-YEAR REMOVAL ACTION AT EACH SITE, NOR WERE ITS ACTIONS CONSISTENT WITH THE NCP.

Exxon characterizes the entire 30-plus-year history of its work at each Site as a single, continuous removal action that will not end for years, and possibly decades, to come, conducted

---

[1] Upon examination of the evidence identified by Exxon in its Opposition regarding the nature of the sludge excavated from the Lower Outfall Canal, the United States will not pursue its argument as to the lack of necessity of those costs.

consistent with the National Contingency Plan ("NCP").  Exxon Opp. at 14, 18.  As explained

previously, these cases are different from one in which EPA or another federal agency exercising

response authority under CERCLA made a considered decision to conduct either a removal or a

remedial action under the NCP based on the factual circumstances.  U.S. Mot. at 10-11; U.S.

Opp. at 6.  Exxon's cleanup actions were performed under legal regimes other than CERCLA,

and its decisions concerning what actions to take did not follow either the removal decision

process or that for remedial action.   Exxon's after-the-fact characterization of its response

actions for purposes of this litigation should not be afforded any deference that EPA or another

agency might enjoy.  *See United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1243-45 (9th Cir.

2005); *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1243 (10th Cir. 2003).

The United States has demonstrated that Exxon's characterizations are contrary to the

pertinent case law, statutes, regulations, and guidance, and will not repeat those arguments.[2]  But

several mischaracterizations and unfounded claims in Exxon's Opposition warrant a response.

## A.   Facts are relevant to determining the number and nature of response actions.

Exxon claims that both the number and nature of response actions at a site present

questions of law, not questions of fact.  In neither case is Exxon correct.  First, Exxon claims that

as a matter of law "there can be only one removal action per site, and the specific facts related to

a site are irrelevant unless special circumstances justify an exception" to this supposed rule.

Exxon Opp. at 16.  The Court need not decide whether there can only be one *removal* action per

site, because the cleanups that are the subject of the United States' Motion were in the nature of

---

[2] For example, there is ample evidence that Exxon conducted multiple—not one—response
actions at each Site.  U.S. Mot. at 11-13; U.S. Opp. at  7-13.  The United States has also
presented ample evidence that some of the response actions Exxon conducted, specifically at the
eight units that are the subject of the United States' Motion, more closely resembled remedial
actions than removal actions.  U.S. Mot. at 13-18; U.S. Opp. at 13-21.

*remedial* actions.  U.S. Mot. at 13-18; U.S. Opp. at 13-21.  But if the Court reaches the question, it is not well-established that there can be only one removal action per site, as shown by the cases that Exxon itself cites.  *Compare* Exxon Opp. at 14, 17 *with* U.S. Opp. at 11-12.  In *United States v. R.A. Corbett*, 785 F. Supp. 81 (E.D. Tex. 1990), where EPA conducted "three major response activities" at a site, the court recognized that multiple "removal *actions* under the meaning of CERCLA" had occurred.  *Id.* at 82 (emphasis added).  The remaining cases Exxon cites (all of which are outside this Circuit) are distinguishable.[3]  And contrary to Exxon's suggestion, Exxon Opp. at 14, the United States has *not* taken the position that there can be only one removal action per site as a matter of law.  Where warranted by the facts, the United States has argued that a single removal action was conducted at a site.  U.S. Opp. at 13.  But the facts here show that Exxon conducted multiple response actions at each Site.  U.S. Mot. at 11-13; U.S. Opp. at 7-13.

Exxon's bold assertion that the facts of each site are "irrelevant" to determining the nature of a response action, Exxon Opp. at 16, is similarly unfounded.  The Fifth Circuit has held that the question of whether a response action is a removal action or remedial action is a question of law.  *Geraghty & Miller, Inc. v. Conoco Inc*., 234 F.3d 917, 925-26 (5th Cir. 2000).  But the court also noted that analyzing this issue is a "highly fact-specific" inquiry.  *Id.* at 926.  Exxon claims that courts have delineated "special circumstances" where facts are relevant, but provides no explanation of those circumstances or whether those circumstances are or are not present

---

[3] In *California Department of Toxic Substances v. Alco Pac., Inc.*, the court found that response activities performed within a small (one-acre) site should be treated as one removal action for statute of limitations purposes.  308 F. Supp. 2d 1124, 1126, 1131-32 (C.D. Cal. 2004).  The court declined to follow one of the statute of limitations cases that the United States has cited here (*United States v. Ambroid Co.*, 34 F. Supp. 2d 86 (D. Mass. 1999)), but did not address or was decided prior to the others.  *Compare* 308 F. Supp. 2d at 1132-33, *with* U.S. Mot. at 19. Nothing in *Alco* suggests that the site at issue was comparable to Exxon's Baytown or Baton Rouge complexes or that the cleanup process in *Alco* was conducted in a manner similar to Exxon's response actions.  As to the remaining cases Exxon cites, see U.S. Opp. at 11-12.

here.  In this case, the facts concerning Exxon's response actions at the Baytown and Baton Rouge Sites establish that many of Exxon's multiple response actions at each site were remedial in nature.  U.S. Mot. at 11-18; U.S. Opp. at 7-21 (discussing Separator 3M, Separator 10, the Upper and Lower Outfall Canals, the Velasco Street Ditch, and the South Landfarm at Baytown and the Shallow Fill Zone, Old Silt Pond, and Rice Paddy Landfarm at Baton Rouge).

**B.    There is no requirement that remedial actions be site-wide.**

Exxon's position on which factors the Court should evaluate in determining whether Exxon's response actions were removal or remedial actions is internally inconsistent.  Exxon at times advocates a bright-line test, asserting that those response actions could not be remedial actions because they were not "site-wide" remedies.  Exxon Opp. at 7.  Yet Exxon also asserts that no one factor is determinative, and seemingly criticizes the United States for focusing on the absence of imminent threat and the permanent nature of the response actions.  *Id.* at 8-10.

Contrary to Exxon's argument, the governing principles in CERCLA, the National Contingency Plan ("NCP"), the majority of case law, and EPA guidance do not provide bright-line rules for distinguishing between removal and remedial actions.  *Id.* at 6-7.  Instead, those principles evaluate multiple factors, considering whether the response action is intended to address an imminent risk or provide a permanent remedy as well as the cost, complexity, and duration of the response action.  U.S. Mot. at 14-15.  Nowhere in any of these sources or any case Exxon has cited is there a requirement that a remedial action must be site-wide, or that a response action addressing only a portion of a site must be a removal action.  U.S. Opp. at 16-17.

In an attempt to support its argument that a remedial action must be site-wide, Exxon cites a single, unpublished district court case, *California Department of Toxic Substances v. J&S Chrome Plating Co.,* Civ. No. 14-2613, 2015 WL 12645742, at *1 (C.D. Cal. 2015).  In that

case, the court held that the statute of limitations for a remedial action was not triggered by the state agency's response activities to implement a Removal Action Plan for seven months because the Remedial Action Plan that was then adopted set forth the permanent remedy.  *Id*. at *3-4. Whether a remedial action needed to be site-wide was not at issue; the focus was on when the statute of limitations in 42 U.S.C. § 9613(g)(2)(B) was triggered.  The court even stressed that the overlapping statutory definitions of removal and remedial actions should be construed in favor of a government seeking cost recovery "especially when a party attempts to assert a statute of limitations defense against a government entity."  *Id*. at *3.  No such rule of construction applies to Exxon's claims here.  *J&S Chrome Plating* thus does not support Exxon's position.

### C. Considering the presence or absence of imminent risk as a distinguishing factor between removal and remedial actions has regulatory support.

Exxon's argument that the United States has no statutory or regulatory basis for focusing on the presence or absence of an imminent threat, Exxon Opp. at 9-10, misses the mark.  In distinguishing between removal and remedial actions, numerous courts consider whether a response action was directed at an imminent threat to a receptor.  U.S. Mot. at 14-15; U.S. Opp. at 19.  There is also regulatory support for looking at the presence or absence of imminent risk as a distinguishing factor.  For example, the NCP lists several factors that "shall be considered in determining the appropriateness of a removal action."   40 C.F.R. § 300.415(b)(2).  Those factors include actual or potential exposure to nearby people or animals; actual or potential drinking water contamination; threats of fire or explosion; and multiple other factors suggesting that a removal action may be appropriate if there is an imminent threat to a receptor.  *Id*.

Other parts of the NCP detailing steps for agencies and private parties to follow to determine whether a removal or remedial action should be taken and how to conduct each type of response action echo this theme.  For example, the first step after discovery of a release is to

conduct a preliminary assessment to evaluate whether a removal action may be required, looking at the factors in section 300.415(b)(2).  *Id.* § 300.405.  If a removal action may be required, "a removal site evaluation shall, if appropriate, be *promptly* undertaken pursuant to § 300.410."  *Id.* § 300.405(f)(1) (emphasis added).  And other "actions shall, as appropriate, begin *as soon as possible* to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare . . . ."  *Id.* § 300.415(b)(3) (emphasis added).

In contrast, if a removal is not required, *e.g.*, there has been an actual or threatened release of hazardous substances but the section 300.415(b)(2) factors are not present, the remedial process need not start "promptly" or "as soon as possible."  *Id.* § 300.405(f)(2) ("[A] remedial site evaluation shall, if appropriate, be undertaken by the lead agency pursuant to § 300.420.").  The steps involved in a remedial action are also more complex and may take more time than a removal action.  *Id.* §§ 300.420, 300.430, 300.435.  Moreover, during the remedial action process, the agency must continue to evaluate whether there is a "potential need" to take a removal action to address a particular threat.  *See, e.g., id.* § 300.420(c)(1)(ii), (c)(2).[4]

**D.    The technical solution used in a response action does not determine whether the response is a removal or remedial action.**

Exxon faults the United States for not "compar[ing] Exxon's actions to the examples listed in guidance of removal actions" set forth in 40 C.F.R. § 300.415(e).  Exxon Opp. at 8.  Applying Exxon's suggested analysis to a specific action reveals that this exercise is not helpful

---

[4] Consistent with its regulations, and contrary to Exxon's assertion, Exxon Opp. at 9, EPA's guidance also addresses the concept of time sensitivity.  EPA's guidance distinguishing between *non-time-critical* removal actions and remedial actions states that the issue is whether there is "a threat to human health or the environment that, though not time-critical, is nonetheless sufficiently serious that the added time needed to comply with remedial requirements . . . would be unacceptable."  U.S. Ex. 112, EPA, Use of Non-Time-Critical Removal Authority in Superfund Response Actions 5 & n.6 (Feb. 14, 2000); U.S. Mot. at 14

in distinguishing between removal and remedial actions.  For example, actions taken by Exxon at these Sites—excavating or capping contaminated soils—are listed as both remedial actions and removal actions.  *Compare* 40 C.F.R. § 300.415(e)(4) & (6) (listing capping and excavation of contaminated soils as examples of technologies that may be used in removal actions) *with* 40 C.F.R. § 300.5 & 42 U.S.C. § 9601(24) (listing capping and excavation of contaminated soils as examples in the *definition* of remedial action).

Ultimately it is the context within which a particular action is taken that determines whether it is a removal or remedial action.[5]  For example, excavating highly contaminated soil located in a neighborhood that is leaching hazardous substances into groundwater, posing a risk of exposure to residents, could be an appropriate removal action to prevent further leaching.  But excavating an identical area of highly contaminated soil located in the middle of a highly regulated industrial site that poses no such risks to groundwater or people would be an appropriate remedial action as it provides the permanent remedy.  The mere presence of highly contaminated soils and the choice of technology are not determinative of whether that action is removal or remedial in nature.

### E.     The undisputed facts support application of the CERCLA section 9613(g)(2) time-bar.

The United States' Motion established that claims for the costs incurred at eight of Exxon's cleanup units (five at Baytown and three at Baton Rouge) are time-barred when applying the statute of limitations for remedial actions under 42 U.S.C. § 9613(g)(2)(B), which is

---

[5] In his deposition, Mr. Wozniak provided a helpful illustration of how these principles apply in practice.  Specifically, he explained why it was important to look beyond the fact that a cap was used to close the South Landfarm to the circumstances of why the closure was conducted to determine that the response action was remedial in nature, not removal.  U.S. Ex. 47, Alborz Wozniak Dep. 182:10-184:22 (May 24, 2017).

the applicable limitations period under the facts of this case.  *See* U.S. Mot. at 18-21.  Even if the

Court were to find that the response actions at these units were removal actions, the costs for five

(three at Baytown and two at Baton Rouge) would still be time-barred.  *Id.* at 21.  Exxon's

opposition fails to distinguish the case law supporting the United States' position.  *See* Exxon

Opp. at 14-16 & nn.11-13.  In particular, its suggestion that courts can find multiple statute of

limitations triggers in appropriate factual circumstances *only* for remedial actions but not for

removal actions (Exxon Opp. at 15) is contrary to case law.  *See Bernstein v. Bankert*, 733 F.3d

190, 215 (7th Cir. 2013) (two removals treated as separate for statute of limitations purposes);

*Ambroid Co.,* 34 F. Supp. 2d at 88 (same); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No.

1:10-cv-044, 2013 WL 1182985, at *12 (N.D. Ind. Mar. 21, 2013) (treating *United States v.*

*Manzo*, 182 F. Supp. 2d 385 (D.N.J. 2000) as authority for the proposition that "separate actions

for multiple *removal or* remedial actions" can be available "under the right circumstances")

(emphasis added).  Even if there was such a bright-line legal distinction, it would not save Exxon

from a finding of untimeliness, because the facts demonstrate that the response activities at these

eight units were in the nature of remedial action.  *See* U.S. Mot. at 13-17.  Finally, Exxon's

attempt to evade altogether any application of a statute of limitations by relying on a theory of a

"single continuous removal action" (Exxon Opp. at 14-17) is unavailing for the reasons

discussed above.

> ### F.     The United States applied the proper standard in concluding that some of Exxon's response actions were not consistent with the NCP.

Exxon argues that the United States unfairly "compared Exxon's work to that which

would be required of an EPA-led cleanup, and treated immaterial deviations from that standard

as a failure to comply with the NCP" rather than applying the "substantial compliance" standard.

Exxon Opp. at 20.  Exxon also argues that the United States "selectively showcases" four criteria in its NCP consistency analysis.  Exxon Opp. at 18.  Neither argument has merit.

Contrary to Exxon's suggestion, Congress did impose a higher bar on private parties. CERCLA provides that a private party may only recover costs incurred "*consistent with* the [NCP]" while governmental entities have the lower burden of showing that their costs were incurred "*not inconsistent with* the [NCP]".  42 U.S.C. § 9607(a)(4)(A)-(B) (emphasis added). This is in keeping with the CERCLA goals of facilitating cleanups and ensuring that polluters, not taxpayers, bear the costs.  Exxon is not entitled to the lower standard afforded to EPA.

Exxon's suggestion that the United States did not apply the substantial compliance standard is also unfounded.  The NCP specifically identifies a subset of NCP requirements that applies to private party response actions where the private party must demonstrate NCP consistency for cost recovery purposes, 40 C.F.R. § 300.700(c)(4).  For example, the NCP outlines the steps a private party should follow to conduct a remedial investigation/feasibility study ("RI/FS").  40 C.F.R. § 300.430.  An immaterial deviation might be that an RI/FS fails to adequately address some of the evaluation criteria that section 300.430(e)(9) says should be considered in an analysis of alternative remedies.  An immaterial deviation is *not*, as at the Velasco Street Ditch, the failure to complete an RI/FS (or its equivalent) altogether.  U.S. Mot. at 25.  To interpret "substantial" compliance as "no" compliance is contrary to the higher bar that Congress set for private parties seeking to recover their costs. [6]

The United States' arguments that Exxon's actions at the South Landfarm, Outfall Canals, Velasco Street Ditch, Shallow Fill Zone, and Rice Paddy Landfarm were not consistent

---

[6] Exxon's claim that the United States failed to consider state oversight, Exxon Opp. at 22-23, is inapposite.  State requirements may or may not satisfy the NCP.  For example, state oversight is insufficient to satisfy the NCP's public participation requirements.  *See* U.S. Opp. at 23-26.

with the NCP are based on non-trivial deficiencies with respect to applicable NCP requirements. Mr. Wozniak conservatively analyzed Exxon's actions and expressly did not require that Exxon adhere to every single NCP requirement.  U.S. Ex. 27, Alborz Wozniak Rebuttal Report 63-65 (Feb. 15, 2017).  This was particularly challenging because Exxon did not conduct these cleanups under CERCLA.  Mr. Wozniak took great pains to determine if Exxon's actions could be construed as equivalent to NCP steps.  *Id*. at 64-65.  His evenhanded analysis is demonstrated by his conclusions that Exxon substantially complied with the NCP when it conducted several other RCRA unit closures even though Exxon had not conducted those cleanups under CERCLA or the NCP.  *Id*. at 77-80, 105-06.

Finally, Exxon's argument that the United States improperly focused on four criteria in its NCP consistency analysis, Exxon Opp. at 18, ignores the fact that these four overarching criteria come *directly from the NCP*.  Specifically, the NCP provides that a private party response action is considered consistent with the NCP if "the action, when evaluated as a whole, is in substantial compliance with the applicable [technical] requirements . . . ,  and results in a CERCLA-quality cleanup."  40 C.F.R. § 300.700(c)(3)(i).  The preamble to the 1990 NCP stated that a "CERCLA-quality cleanup" must: (1) satisfy the basic remedy selection requirements of CERCLA (cost effective, protective of human health and the environment, and provide a permanent solution; (2) attain applicable and relevant and appropriate requirements or ARARs; and (3) provide for meaningful public participation.  55 Fed. Reg. 8666, 8793 (Mar. 8, 1990).  Thus, the United States' analysis, and the opinions of its expert, Mr. Wozniak, properly

examined not only Exxon's substantial compliance with the technical requirements of the NCP

but also Exxon's compliance with the three sub-components of a CERCLA-quality cleanup.[7]

## III.    EXXON'S CLAIM SHOULD NOT INCLUDE PREVIOUSLY REIMBURSED COSTS OR COSTS FOR WHICH IT LACKS ADEQUATE EVIDENCE.

Before the Court allocates Exxon's past costs, it should address two cost-related issues.

U.S. Mot. at 27.  *First*, the Court should equitably account for prior insurance settlements that

reimbursed Exxon for some of the costs it seeks here.  *Second*, the Court should exclude costs for

which Exxon lacks sufficient evidence to satisfy the NCP's accurate accounting provision.

### A.    The Court should equitably account for Exxon's prior insurance settlements.

Courts widely recognize that preventing a party from obtaining two recoveries for the

same costs is a significant equitable factor under CERCLA.  U.S. Mot. at 27–28.  Exxon does not

contest this is an appropriate equitable factor, or dispute that it has recovered insurance proceeds

for millions of dollars of its past costs at the Baytown and Baton Rouge Sites—costs that it again

seeks to recover in this case.  Exxon Opp. at 27.  Instead, Exxon presents three flawed arguments

for why the Court should either deduct nothing from Exxon's claim, or much less than Exxon's

own internal allocation of the insurance proceeds would suggest.

*First*, Exxon claims that it is "well-established" that no insurance offset is appropriate

unless the insurance recovery and the CERCLA recovery would exceed 100% of the plaintiff's

response costs.  Exxon Opp. at 26–27.  Exxon labels this the "traditional method" but fails to

acknowledge the cases the United States cited where courts used a different method to offset

---

[7] Exxon's claim that it should not be held to a CERCLA-quality cleanup for actions taken under the 1985 NCP, Exxon Opp. at 19, misses the mark.  Mr. Wozniak concluded that Exxon failed to substantially comply with the 1985 technical requirements at each cleanup unit where, he opined, Exxon's actions were not consistent with the NCP.  U.S. Mot. at 23-26; U.S. Ex. 27, Wozniak Report at 85, 102-03, 105-06; U.S. Ex. 47, Alborz Wozniak Dep. 80:9-16 (May 24, 2017).

insurance recoveries in a CERCLA equitable allocation.  U.S. Mot. at 28–29.  For example,

Exxon ignores the Tenth Circuit decision upholding the district court's decision to credit more

than $20 million in insurance proceeds against a CERCLA contribution claim.  *See Friedland v.*

*TIC-The Indus. Co.*, 566 F.3d 1203, 1205–11 (10th Cir. 2009).  And Exxon fails to acknowledge

the Second Circuit's decision upholding the district court's decision to reduce a CERCLA

recovery by $20 million in insurance proceeds.  *New York State Elec. & Gas Corp. v.*

*FirstEnergy Corp.*, 766 F.3d 212, 237–38 (2d Cir. 2014).

Instead, Exxon relies on *Appleton Papers, Inc. v. George A. Whiting Paper Co.*, 955 F.

Supp. 2d 947 (E.D. Wis. 2013), but that decision is not as helpful as Exxon suggests.  *Appleton*

*Papers* assumed that double recovery could only occur if the contribution plaintiff recovers more

than 100% of its costs.  *Id*. at 954.  That makes little sense because CERCLA Section 113(f) is

supposed to allow a contribution plaintiff to recover costs to the extent necessary to ensure that

that plaintiff does not pay more than its own equitable share.  If the contribution plaintiff were

allowed to recover up to 100% of its costs from insurance and the contribution defendant, then it

may ultimately recover so much that it is not out of pocket any costs—in other words, it would

have paid *less* than its equitable share.  Put differently, deducting an insurance recovery before

allocating the remaining costs between a contribution plaintiff and defendant ensures that both

PRPs share in the benefit of that recovery according to their respective equitable shares.

Exxon also cites (Exxon Opp. at 47) the Seventh Circuit's decision affirming *Appleton*

*Papers*, but that court stressed that "any level of double recovery is inequitable in CERCLA

contribution actions" and "ignoring insurance settlements when it would lead to double recovery

is inconsistent with the statute's purpose."  *NCR Corp. v. George A. Whiting Paper Co.*, 768

F.3d 682, 708 (7th Cir. 2014).  Since there is no "bright-line rule for how a court should treat

insurance settlements," the Seventh Circuit concluded only that the district court did not abuse its discretion by leaving the insurance proceeds with the PRP. *Id.*

*Second*, Exxon argues that the United States miscalculated the amount of costs that Exxon recovered in the North American Coverage Case (NACC) litigation. Exxon Opp. at 27–28. As the United States noted, Exxon's contemporaneous internal allocation of its $269 million in settlement proceeds attributed $8.65 million to Baytown costs and $11.25 million to Baton Rouge costs. U.S. Mot. at 28–29. Exxon now submits a new analysis suggesting that much less should be deducted in the CERCLA case, based on the assumption that the insurance settlements should only cover specific past costs that Exxon is seeking to recover from the United States. Exxon Opp. Table 16 at 1. But Exxon previously undercut its assumption by claiming the "documents produced demonstrated that Exxon (or its insurers) did *not* allocate settlement monies for specific payment of any or all of the claimed environmental cleanup costs for the Baytown and Baton Rouge sites." U.S. Ex. 152, Exxon Responses to U.S. Second Set of Phase II Discovery, Response to Request for Production No. 1 at 11 (emphasis added).[8]

*Third*, Exxon argues (Exxon Opp. at 28–29) that the collateral source rule bars an insurance offset argument, directing the Court to cases involving contract disputes. But this is a CERCLA case, and Exxon fails to acknowledge that courts in CERCLA cases routinely hold that the collateral source rule does not apply. In *NCR*—a case that Exxon itself cites one page earlier (Exxon Opp. at 27)—the Seventh Circuit expressed that very point: "[T]he collateral source rule does not apply in CERCLA § 113(f) contribution actions." 768 F.3d at 707.

---

[8] Exxon also seeks to reduce its $269 million in insurance recoveries by deducting $69 million in attorney's fees it allegedly incurred in the NACC litigation. Exxon Opp., Table 16. Exxon cites no authority for this request, and in *Friedland*, the Tenth Circuit rejected a similar attempt by a PRP to re-allocate its insurance settlement to cover defense costs. 566 F.3d at 1210.

In sum, preventing double recovery is an appropriate equitable factor here, and the Court has discretion to decide how best to account for Exxon's $269 million in insurance settlements. The United States has proposed a reasonable offset of an allocated portion of these insurance proceeds based on Exxon's internal documents. Thus, the Court should offset Exxon's claimed past costs by $8.65 million at Baytown and $11.25 million at Baton Rouge.

### B.   Exxon has failed to accurately account for many of its past costs.

The NCP requires Exxon to accurately account for its costs with sufficient admissible evidence. U.S. Mot. at 30–31. Based on Exxon's opposition brief, it appears that the parties are in general agreement about many of the material facts. But the parties have a fundamental disagreement about what the NCP accurate accounting provision requires. The Court should resolve that dispute by providing the parties with guidance on the accurate accounting requirement, including by specifying what evidence Exxon may use to prove its costs. The Court should thus grant the United States partial summary by deducting the $6.7 million for which Exxon has no invoices and no proof of payment, and leave the parties to apply the Court's rulings to resolve any disagreements about Exxon's remaining costs.

### 1.   The NCP requires Exxon to accurately account for its costs.

To recover its past costs, Exxon must satisfy two NCP requirements: (1) to "complete and maintain documentation . . . to form the basis for cost recovery" and (2) to produce documentation that, "[i]n general, . . . shall be sufficient to provide . . . accurate accounting of . . . private party costs incurred for response actions." 40 C.F.R. § 300.160(a)(1).[9] Exxon insists (Exxon Opp. at 31) that it has "far surpassed that standard," but it has set the bar artificially low.

---

[9] In contrast to private parties, CERCLA authorizes EPA to recover all response costs that are "not inconsistent" with the NCP, and EPA has well-established procedures for documenting its costs that are not at issue here. U.S. Mem. at 32 n.21, 33 n.22.

Exxon admits (Exxon Opp. at 31) that for slightly less than 10% of its $77 million in past costs, it has no invoice or proof of payment.[10]  Despite failing to maintain these basic, routine commercial documents, Exxon tries to flip the burden of proof by criticizing the United States for failing to identify "material errors" in Exxon's claim.  *Id*. at 31.  To the contrary, it is Exxon's burden to substantiate its costs with sufficient evidence.  42 U.S.C. § 9607(a)(4)(B); 40 C.F.R. § 300.160(a)(1).  Where Exxon has offered only minimal evidence to support millions of dollars in costs, it is virtually impossible for the United States or the Court to determine whether those costs are accurate and whether they constitute recoverable response costs under CERCLA.

Despite missing critical evidence, Exxon argues that it can accurately account for every penny of its $77 million in past costs, stressing that the NCP's requirement is "flexible."  Exxon Opp. at 31.  That should mean, as *Grace* says, that no one type of document is always required and that ordinary "civil evidentiary standards" apply when deciding what evidence is required.  *United States v. W.R. Grace & Co.-Conn.*, 280 F. Supp. 2d 1149, 1180 (D. Mont. 2003).  But Exxon bends that flexible standard so that virtually *any* documentation Exxon offers is sufficient.  Exxon Opp. at 37–39.  Under Exxon's reading of the NCP, all of its costs are equally accurate and substantiated, regardless of whether they are supported by an invoice, proof of payment, and an accounting record, or supported by a single line of information downloaded from the NACC damages database (which is not even an accounting system).  Exxon cites no case holding that the NCP's accurate accounting requirement is so toothless.

Exxon complains that the United States asked the Court to require Exxon to provide an invoice and proof of payment for every cost.  Exxon Opp. at 29.  The United States' Motion

---

[10] The United States' expert, EJ Janik, has calculated this figure to be $6.7 million, which is approximately 8% of Exxon's costs.  U.S. Mot. at 42–43.

actually said that "invoices and proof of payment would provide the evidence needed to prove the costs that Exxon has paid to contractors," and therefore "the Court should hold that Exxon must produce both types of evidence, *or produce other documentation that provides equivalent support* for Exxon's costs."  U.S. Mot. at 36 (emphasis added).  We further cited to cases and testimony establishing that invoices and proof of payment are standard evidence to support CERCLA past costs, and demonstrated that where a plaintiff fails to provide sufficient evidence, courts deduct unsupported costs from a contribution claim.  U.S. Mot. at 32–37; U.S. Opp. at 28–29, 31.  Exxon criticizes the United States' position, Exxon Opp. at 37–39, yet it fails to explain why the cases that the United States cited do not support that position.

If Exxon were missing just a handful of invoices, or a few canceled checks, then it would be easy for the parties to resolve this issue.  But, in the United States' view, Exxon has failed to properly document roughly one-third of its past costs (about $23 million), including $6.7 million for which it has produced *no* invoices and *no* proof of payment—8% of its total past costs claim.  U.S. Mot. at 31.  The parties have conflicting views on the legal consequences of this missing evidence, so the Court should provide the parties with guidance about what the NCP requires.

### 2.    Exxon cannot substitute computer screenshots for invoices.

Exxon misunderstands the United States' position regarding Exxon's reliance on screenshots from the Evaluated Receipt Settlement (ERS) system.  Exxon Opp. at 32–33.  The United States' position is not that the ERS *system* cannot provide sufficient evidence to support Exxon's costs, but rather that the ERS *screenshots* that Exxon has produced do not provide sufficient information to substitute for third-party vendor invoices.  U.S. Opp. at 35–36.

Exxon's expert, Paul S. Ficca, treats the ERS screenshots as invoices, but a quick review of a sample ERS screenshot confirms that they are not.  U.S. Ex. 228, Baytown ERS Screenshot; U.S. Resp. to Exxon PF ¶ 802.  As the United States' accounting expert, EJ Janik, explained,

"The [ERS] screenshots are missing information that I would typically expect to see included in a vendor invoice from an unrelated third party, such as a description of the goods or services provided and locations of such, the hourly rates charged for services, a description of costs, a reference to the contract or purchase order, and other relevant invoice information."  U.S. Ex. 2, Janik Decl. ¶ 19.  Mr. Janik acknowledges that Exxon may have this information stored in another part of the ERS system, but the screenshots that Exxon has produced "lack sufficient relevant information to allow an accountant or another third party to verify the transaction."  *Id*. ¶ 20; *id*. ¶¶ 18–22; U.S. Resp. to Exxon PF ¶¶ 802–06.

To bolster the use of ERS screenshots, Exxon quotes selective testimony from its fact witness, AJ Gravel.  Exxon Opp. at 32 n. 34.  Under further questioning, however, Mr. Gravel conceded that an ERS screenshot did not identify the work performed and that other documentation would provide information missing in the screenshot.  U.S. Resp. to Exxon PF ¶ 806.  Again, Exxon tries to shift the burden to the United States by arguing (at 32) that Mr. Janik did not identify any ERS-supported costs that he believes are suspect.  But Mr. Janik's role is not to guess what issues he would uncover if Exxon had produced sufficient evidence from the ERS system.  His job is to review what Exxon has produced, which is inadequate.

Again, if Exxon had used ERS screenshots to support a modest set of costs, this would be a minor issue.  But Exxon is relying on ERS screenshots with minimal information for more than $8.6 million in costs.  The Court should hold that these screenshots, by themselves, cannot substitute for traditional paper invoices.  To be clear, we are not asking the Court to deduct all $8.6 million in ERS-supported costs.  At this stage, all the United States requests is that the Court clarify for the parties whether ERS screenshots are adequate evidence and then order the parties to attempt to seek agreement on how that impacts Exxon's past costs claim.

3.      **Exxon's internal accounting records cannot substitute for invoices and proof of payment.**

Exxon argues that its accounting system records are so accurate and reliable that they can prove its costs without invoices and proof of payment, and contends that it is "facially ludicrous" for the United States to suggest that the accounting records of "the number four company on the Fortune 500" are unreliable. Exxon Opp. at 33. The United States, however, made no such blanket suggestion in its brief. All the United States has done is show that the limited accounting system records that Exxon has submitted *in this case* are unreliable, for two reasons.

*First*, those records are incomplete. Exxon chalks this up to minor variances between the four accounting systems it has used. Exxon Opp. at 33. But the information missing from the accounting system records is fundamental data that should be stored by any financial recordkeeping system (for example, vendor name, invoice number, and invoice date). U.S. SOF ¶ 91; U.S. Resp. to Exxon PF ¶ 809. And cost items that are missing information can easily be compared to cost items that have the information in the same accounting system.

Mr. Ficca did eliminate more than three hundred cost items from Exxon's claim where he had no invoice and the accounting records were missing the invoice number and vendor name. U.S. SOF ¶ 97. But he declined to exclude other cost items where the accounting system failed to produce complete information. U.S. SOF ¶ 98. Similarly, Exxon inaccurately states that "Exxon removed from its claim any cost items for which Exxon was unable to locate *either* an invoice number *or* a vendor name in the accounting record." Exxon Opp. at 33. Exxon only removed items where *both* pieces of information are missing. U.S. SOF ¶ 97.

*Second*, the accounting records Exxon submitted in this case contain errors. The United States has pointed to three such errors amounting to $575,118.84. U.S. Mot. at 38. Exxon claims (Exxon Opp. at 34) that these errors are "irrelevant" because it removed them from its

claim.  But the United States highlighted these errors because they demonstrate that the accounting records that Exxon submitted in this case are erroneous and unreliable.  Even if Exxon no longer seeks to recover those three cost items, the accounting records that are before the Court still contain those errors.  And Exxon's accounting records and NACC damages database records contain additional errors.  For example, vendor names in Exxon's accounting records include "Booked incorrectly C1," "Keepsake," and "Defaultacctclearing."  U.S. Resp. to Exxon PF ¶ 809.  Likewise, the NACC damages database contains erroneous vendor information, such as "NO Vendor Number 19952" and "No Vendor Number 3016."  *Id.*

In sum, the accounting records that Exxon has provided in this case are missing basic financial information and contain errors, rendering them inaccurate and unreliable.  Yet Exxon is seeking $6.7 million based on those accounting records (or a NACC damages database record).  The Court should grant summary judgment and exclude those amounts at the specific cleanup units identified in the United States' Motion.  U.S. Mot. at 42–43.

## 4. The NACC damages database may be admissible but is unreliable.

Exxon has not established that the NACC damages database was admissible, and that the database would not qualify under the hearsay exception for business records because Exxon developed the database for the NACC litigation.  U.S. Mem. at 39–40.  Exxon responds by arguing that the database should be admissible under Federal Rule of Evidence 803(16) (the ancient document exceptions) or 807 (the residual exception).

The NACC damages database may be admissible under the ancient documents exception, which applies to a "statement in a document that was prepared before January 1, 1998, and whose authenticity is established."  Fed. R. Evid. 803(16); *see Halliburton Energy Servs. v. NL*

*Indus.*, 648 F. Supp. 2d 840, 870 n.25 (S.D. Tex. 2009).[11]  Authenticity "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims," Fed. R. Evid. 901(a).  Exxon relies on the February 1999 deposition of its employee, Dick Cureton, in the NACC litigation to authenticate the database.  The United States accepts Mr. Cureton's testimony that the database was developed by a subgroup within Exxon's legal department for purposes of litigation.  U.S. Resp. to Exxon Opp. PF ¶ 33.

It remains unclear whether the NACC damages database should qualify as a "statement … that was prepared before January 1, 1998."  Fed. R. Evid. 803(16).  Exxon notes that the costs it seeks to use the database to prove in this case apparently were entered before February 1999.  We agree.  But Mr. Cureton also testified that Exxon was continuing to update the database and working to make the database more accurate.  U.S. Resp. to Exxon Opp. PF ¶ 34.  In other words, the database was not a static creation as of January 1, 1998 (and it is unlikely Exxon would have entered all 1997 costs into the database before January 1, 1998).  *Id.*  But even if the NACC damages database is admissible, Exxon developed it for litigation, so it is not the type of evidence that is sufficient to support its costs in this case.

### 5.     Exxon cannot save its costs by challenging the United States' expert.

Exxon incorrectly claims that "[i]n essence, the Government's only support for its demand for invoices and proof of payment records for every single cost item is the opinion of its own expert, Mr. Janik," ignoring the multiple cases the United States cited on this topic.  Exxon Opp. at 38; compare U.S. Mot. at 33–37.  Exxon also tries to question Mr. Janik's qualifications because, notwithstanding his forensic accounting experience, he has not previously worked with

---

[11] Since Fed. R. Evid. 803(16) may apply, we take no position on whether Fed. R. Evid. 807 could apply except to note that it is "to be used only rarely, in truly exceptional cases."  *United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005) (citations and quotations omitted).

the NCP's accurate accounting provision.  But Exxon's accounting expert, Mr. Ficca, shares this lack of experience.  U.S. Ex. 30, Ficca Dep. Vol. I, 29:10–32:16 (Nov. 28, 2016).

Further, Exxon conflates Mr. Janik's expert opinions as an accountant with the United States' legal arguments based on the undisputed material facts.  Mr. Janik has testified about what evidence he, as an accountant, would want to see to accurately account for costs.  But for summary judgment purposes, Mr. Janik's opinions have focused on analyzing and categorizing the evidence that supports Exxon's costs.  The United States' *legal* argument is that the Court should require Exxon to prove each of its claimed costs with an invoice and proof of payment or equivalent support.  And on that issue, a number of the material facts are undisputed.  For example, Exxon does not dispute that for roughly 8% of its costs it has no invoice and no proof of payment; the only dispute concerns the legal significance of this fact.

## IV.    THE COURT SHOULD ALLOCATE ONLY A SMALL SHARE OF SOME OF EXXON'S COSTS TO THE UNITED STATES.

### A.    The United States is not responsible for cleanup costs at the Old Silt Pond, Rice Paddy Landfarm, and Tank Farm 3000 Area.

#### 1.    Old Silt Pond and Rice Paddy Landfarm

Exxon fails to meaningfully rebut the United States' argument that the United States is not responsible for costs incurred to address the Old Silt Pond and Rice Paddy Landfarm.  First, there is no reliable evidence in the aerial photography or elsewhere that the Old Silt Pond or the Rice Paddy Landfarm were used for waste disposal during World War II.  U.S. Mot. at 47-49; U.S. SOF ¶¶ 113-17; 127-33.[12]  Second, Exxon's claimed costs were incurred to address

---

[12] Exxon contends that the testimony of the United States' aerial photography expert, Mary Sitton, is not reliable or valid because she misstated when World War II began.  Exxon Resp. to U.S. SOF ¶ 127.  The United States relies on Ms. Sitton's testimony regarding *what she could see* in dated photographs taken during World War II, which is within her expertise, not  *(cont'd)*

impoundments built and used in portions of the Old Silt Pond and Rice Paddy Landfarm in the 1970s and 80s, and any contribution by the United States to waste below those impoundments would have been *de minimis*.  U.S. Mot. at 50-51; U.S. SOF ¶¶ 119-25; 134-38.

Exxon asserts that even though the Old Silt Pond itself was not operational prior to 1945, Callaghan's Bayou conveyed refinery wastewater from the Master Separator to the Mississippi River prior to that date, sending overflows of refinery waste into the area that subsequently became the Old Silt Pond.  Exxon Opp. at 48.  Exxon also contends that Callaghan's Bayou was "periodically dredged during World War II" and that the dredged material was placed in the footprints of what became the Old Silt Pond and Rice Paddy Landfarm.  *Id.* at 48-49.  But 1946 and 1948 reports by Exxon's Oil Conservation Department state that, rather than causing overflow into the Old Silt Pond area, spring and summer high water in Callaghan's Bayou deposited 80,000 cubic yards of oil laden silt *in the Bayou*, which then carried a large portion of the oil laden silt from the Master Separator "*to the river*."  A004035; A004039; *see also* U.S. Resp. to Exxon PF ¶ 512.  The reports further state that dredging of Callaghan's Bayou started around July 1, 1946, almost a full year after VJ Day.  U.S. Resp. to Exxon PF ¶ 515 (citing A004035).  *See also id.* ¶ 512.

Exxon further argues that a "separate, earthen drainage ditch" and a "diversion chamber/combined sewer overflow device" contributed wastes to the Old Silt Pond during World War II.  Exxon Opp. at 49.  But the earthen drainage ditch flowed *into* Callaghan's Bayou, not from the Bayou into the Old Silt Pond, U.S. Resp. to Exxon PF ¶ 513, and Exxon failed to

---

her understanding of the timing of World War II, which is not within her expertise.  Notably, Exxon does not challenge her qualifications within her expertise.

submit any evidence that the diversion chamber/combined sewer overflow device disposed of wastewater into the area that became the Old Silt Pond during World War II.  *Id.* ¶ 516.

With respect to the Rice Paddy Landfarm, Exxon argues that there is evidence that the unit was used as a landfill "since the early days of the refinery," but the cited report provides no basis for that conclusion, and the aerial photography shows no indication of use until after World War II.  U.S. SOF ¶¶ 127-33; U.S. Resp. to Exxon PF ¶ 518.  Exxon also contends that an impounding basin located southeast of the Rice Paddy Landfarm "discharged wastewaters during the wartime period that flowed onto portions of the Rice Paddy Landfarm."  Exxon Opp. at 49.  Yet the aerial photography fails to show any material flowing from an outfall to the south and entering the footprint of the Rice Paddy Landfarm prior to 1947, U.S. SOF ¶ 132, and actually suggests that the outfall may have been connected to a source other than or in addition to Exxon's impounding basin.  U.S. Resp. to Exxon PF ¶ 519.

Furthermore, Exxon does not dispute that there is no evidence of the volume of wastes sent from plancors in operation after World War II and during the Korean War that would allow the Court to determine a percentage of United States culpability during those years.  Such contribution is surely *de minimis*, however, compared to the refinery's contribution during the several decades that it used the Old Silt Pond and the Rice Paddy Landfarm for waste disposal.[13]  For the same reason, to the extent Exxon incurred costs to address contamination beneath impoundments containing 1970s and 80s-era contamination (which were the focus of Exxon's cleanup activities at the Old Silt Pond and Rice Paddy Landfarm), *see* U.S. SOF ¶¶ 125, 138, the

---

[13] This is so even if, as Exxon contends, Plancor 572 sent "a small amount of oil" to the Old Silt Pond during 1947 to 1955, in addition to the *de minimis* contributions of Plancors 152 and 1355 for some portion of time during that period.  *See* Exxon Resp. to U.S. SOF ¶ 146; U.S. Resp. to Exxon PF ¶ 286.

U.S. contribution would have been *de minimis*.  Thus, any contribution by the United States to these areas could not have been the "driver" of Exxon's cleanup costs.  Exxon Opp. at 49-50.

### 2.   Tank Farm 3000 Area

Exxon likewise fails to meaningfully rebut the United States' argument with respect to the Tank Farm 3000 Area—that Exxon's own investigation of the groundwater plume at the time of its discovery concludes that the contamination likely could be attributed to units built *after* the BOW ceased operation in 1945, or that Exxon continued to use for decades thereafter.  Instead, Exxon accuses the United States of attempting to mislead the Court, mischaracterizes the opinions of the United States' experts, and points to its own experts' unsupported conjecture.

First, Exxon's contention that the United States attempted to mislead the Court "by implying that the BOW was comprised of only the current Naphtha Rerun Unit" is patently false.  *See* Exxon Opp. at 47 n.48; *see also* U.S. SOF ¶ 156 ("A Naphtha Rerun Unit was *part of* the original Baytown Ordnance Works.") (emphasis added).  Instead, the United States' argument is that of the three units identified by Exxon's *own engineers* as likely sources of the contamination, only the Naphtha Rerun Unit was part of the original BOW.  Exxon continues to use that Unit today, and can point to no evidence that the Naphtha Rerun Unit contributed to the plume while the BOW was in operation.  U.S. SOF ¶ 157.  Indeed, the monitoring wells located near or in the Naphtha Rerun Unit did not show significant quantities of free product at the time the plumes were discovered in the early 1990s or afterwards. [14]  Thus, no evidence pinpoints the

---

[14] In 1993, the monitoring well located within the Naphtha Rerun Unit area (MW-33) reported only 0.08 feet of free product as compared to 6-7 feet in other wells located directly under the Linear Paraffins Unit and Paraxylene Extraction Unit.  *See* U.S. Ex. 92, Phase III Report at BAYTECH-00027113.  Since the 1993 Phase III Report, no free product has been observed in wells immediately surrounding the Naptha Rerun Unit (MW-15, MW-25, MW-27, MW-31, MW-35, and MW-56).  U.S. SOF ¶ 164.  MW-33 was plugged in the late 1990's and thus could not be sampled in later years.  U.S. Ex. 111, Preliminary Design Information for Full-Scale Hydrocarbon Recovery System, BAYTECH-00030347 at BAYTECH-00030359     *(cont'd)*

plume's source as the Naphtha Rerun Unit *during* its World War II usage as opposed to the subsequent decades of exclusive Exxon use.  *See generally* Exxon Resp. to U.S. SOF ¶ 161.

Second, Exxon mischaracterizes Mr. Low's and Mr. Kittrell's opinions with respect to the Tank Farm 3000 Area.  Mr. Low merely suggested that, *for purposes of allocation*, the BOW *could have* contributed to the plume.  U.S. Resp. to Exxon PF ¶ 505.  He did not concede that it had.[15]  And Dr. Kittrell affirmatively stated that "the contaminants discovered within [the] BOW plume were deposited well after the time of Federal involvement."  U.S. Resp. to Exxon PF ¶ 505; *see also* U.S. Ex. 21, Dr. James R. Kittrell Expert Report 6, 41, 45 (Aug.10, 2012) (explaining why plume contaminants are not likely war-era contaminants).

Finally, Mr. Gagnon and Mr. Gravel offer only unsupported conjecture that BOW operations contributed significantly to the plume.  In fact, contrary to Exxon's contention that Mr. Gagnon reviewed "the types of technical data that would be useful in specifically determining whether there were actual historical sources," Exxon Opp. at 46, Mr. Gagnon conceded in his deposition that there had been "limited to no forensic analysis [] conducted to determine the vintage of the contamination" and he thus had "limited data available to make any sort of claim as to the vintage of the contamination."  U.S. Ex. 254, Peter J. Gagnon Dep. Vol. II 375:21-376:1; 376:11-12 (April 12, 2013).

Mr. Gravel has not been offered and is not qualified as an expert regarding the source of any contamination at issue.  Instead, Mr. Gravel was "retained by Exxon Mobil Corporation to conduct historical research [and] perform related analysis."  Exxon Ex. 6, ¶ 3.  Thus, his

---

(showing MW-33 plugged).  MW-4 and MW-9, cited by Exxon, are plainly located under the Linear Paraffins Unit.  U.S. Ex. 92, Phase III Report at BAYTECH-00027113.

[15] Indeed, Mr. Low has been offered as an expert in CERCLA allocation, not as a hydrologist or geologist qualified to testify regarding the source of any contamination.

purported "analysis . . . to determine if the BOW operations were a source of the groundwater contamination at the Tank Farm 3000 Area" is of no value to the Court.  *See, e.g., N. States Power Co. v. City of Ashland, Wis.*, No. 12-cv-602, 2015 WL 1745880, *1-2 (W.D. Wis. Apr. 16, 2015) (expert with environmental studies degree and experience as a hydrologist working on remediation sites was qualified to offer expert testimony on contamination source).  To the extent Exxon contends that Mr. Gravel's analysis was historical in nature, Mr. Gravel is also not qualified as an expert historian.  *See* U.S. Phase I Opp. at 66-68.[16]

Moreover, as the United States explained in its opening brief, Mr. Gravel relies primarily on a 1998 letter in which Exxon states to the Texas Natural Resource Conservation Commission that the source of groundwater contamination at the Tank Farm 3000 is "believed to be historic," which merely meant that recent leaks were not believed to be significant contributors to the plume.  *See* U.S. Mot. at 52.  The rest of Mr. Gravel's "analysis" of the purported federal nexus to the Tank Farm 3000 plume is likewise unfounded.  Mr. Gravel *assumes*, based on the location of the plume under the former BOW area, and based on the location of three spent catalyst dumps "proximate to the BOW," that the BOW area was a "*possible* source of leaks, spills, and releases during the wartime period."  U.S. Ex. 13, A.J. Gravel Expert Report 122 (June 18, 2012) (emphasis added).  But these additional bases for Mr. Gravel's conclusions, speculative as they are, fail to establish a genuine issue of material fact that the United States significantly contributed to the plume such that the United States should be allocated a portion of the past costs.  *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994) ("a mere scintilla is not enough to defeat a motion for summary judgment").

---

[16] The United States plans to file a separate *Daubert* motion regarding Mr. Gravel's qualifications as a historian and contamination source expert.  *See* U.S. Phase I Opp. at 66-68.

In summary, Exxon cannot prove that the United States contributed significant waste to the Old Silt Pond, Rice Paddy Landfarm, and Tank Farm 3000 Area cleanup units.  Thus, the Court should assign a zero or otherwise *de minimis* share of their costs to the United States.

**B.      The United States' proposed allocation is based on relevant facts and sound analysis.**

Exxon's attempts to rebut the United States' proposed allocation center on two core themes.  First, Exxon clings to the claim that refiners worked only for the United States during World War II, insisting that this "fact" should inform every aspect of allocation.  *See, e.g.,* Exxon Opp. at 51-54, 63-69.  Second, Exxon argues that because government programs optimized avgas production across refineries, every other product made at the refineries during World War II is merely a "byproduct" that should be ignored for allocation purposes.  *See, e.g.,* Exxon Opp. at 51-54, 63-67.  The first contention repeats an argument that the Court disposed of in its June 2015 opinion.  The second is a self-serving attempt to exclude all wartime commercial production from the allocation, thereby unfairly saddling taxpayers with paying the costs of cleaning up wastes associated with that production.

**1.      The Court has already rejected Exxon's counter-factual history of World War II business practices.**

Exxon begins by revisiting its claims that the United States effectively nationalized the refining industry during World War II; that it consequently controlled the operation of individual refineries "by fiat" (Exxon Opp. at 52-54); and that everything else the refineries made (approximately two-thirds of the production at each refinery) is therefore fairly characterized as "an after-thought."  *Id.* at 54, 65.  *See* U.S. Mot. at 62; U.S. SOF ¶ 174.  The Court has *already rejected* the factual predicate for this argument, in the course of deciding that the United States did not "operate" the refineries, Phase I Decision at 495-98, 502-03, 521-30.  Further, Exxon's counsel and its allocation expert have separately conceded the accuracy of Judge Fletcher's

treatment of pertinent facts in *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049-50 (9th Cir.

2002) ("*Shell*"), a description utterly inconsistent with large portions of Exxon's opposition brief.

U.S. Opp. at 62-63 & n. 35.

### a.     The United States did not coerce refiners.

Exxon first suggests that governmental crude oil rationing left refineries with little choice

but to maximize avgas production – implicitly assuming that refineries would otherwise have

resisted doing so.  *See* Exxon Opp. at 52-53.  Rationing was a response to wartime shortages, not

a means of coercion, and avgas purchasing arrangements were cooperative by design.  The

United States offered substantial inducements to maximize production, including accelerated

depreciation allowances on national defense projects and government ownership programs for

new facilities meant to protect industry from depression era fears of post-war excess capacity.

U.S. Ex. 163, Dr. Jay Brigham Expert Report 10, 16-18 (Aug. 10, 2012) ("Brigham 2012

Report").  The petroleum industry also benefitted from multi-year contracts with the Defense

Supplies Corporation; a program that reimbursed refiners directly for extraordinary production

costs; and what amounted to substantial, interest-free loans from the Defense Supplies

Corporation.  *Id.* at 19-23.  Subsidies were plentiful; coercion, though available, was vanishingly

rare.  Phase I Decision at 495 ("federal agencies relied almost exclusively on contracts"); *Shell*, 294

F.3d at 1050.

Exxon's recurring contention that the United States treated industry as if it were one vast

oil refinery, *e.g.*, Exxon Opp. at 52-53 & n.62, misunderstands the Planned Blending program.

Refiners had previously suffered criminal prosecution over their collusive response to "distress

gasoline" during the depression.  *See United States v. Socony-Vacuum Oil. Co.,* 310 U.S. 150

(1940).  Planned Blending reversed the usual rules, asking refiners to undertake otherwise

forbidden joint planning of avgas component exchanges to mitigate shortages and offering in

exchange antitrust "cover" in the form of Government orders and directives.  U.S. Ex. 302, A.J. Gravel Dep. 135 (Feb. 28, 2013) ("[I]t was the government that was gonna provide antitrust cover to the industry because they had just gone through the Madison case.").  There is no indication that the government was attempting to "coerce" refiners through their participation in a program set up and run largely in accordance with industry suggestions.  U.S. Ex. 8, Dr. Jay Brigham Rebuttal Report 19 (Nov. 16, 2012) ("Brigham Rebuttal Report") ("it seems that the PAW relied on the petroleum industry for information on scheduling crude runs"); U.S. Resp. to Exxon PF ¶ 77 (quoting J. Howard Marshall).

This government-industry cooperation facilitated the production of additional avgas, a profitable product sold under contracts designed to protect the industry from many of the vagaries of the wartime economy.  As the then-Secretary of War put it:  "If you are going to try to go to war, or to prepare for war, in a capitalist country . . . you have got to let business make money out of the process or business won't work."  U.S. Ex. 8, Brigham Rebuttal Report at 3 (citations omitted) (quoting Henry Stimson).  Indeed, government programs were so generous that some officials believed that industry was being coddled.  *Id*. (reporting the comments of Donald Nelson, who would become the head of the War Production Board).  There is thus every reason to believe that – even apart from wartime patriotism – refiners would have been eager to participate in this program.  And willing participation, along with industry profits, is precisely what history records.  *See, e.g.,* U.S. Resp. to Exxon PF ¶¶ 77-83; U.S. Ex. 163, Brigham 2012 Report at 4, 13 n.21, 15, 16 n.31; Phase I Decision at 523 ("The federal government's wartime influence over these refineries stemmed from its voluntary contractual relationships with Exxon's predecessors . . . Standard and Humble consistently made profits . . . "); *Id.* at 497 (quoting *Lichter v. United States*, 334 U.S 742, 767-68 (1948)); *Shell*, 294 F.3d at 1049-50

("Although the WPB, PAW, and other government agencies had the authority to require

production . . . in fact they relied almost exclusively on contractual agreements to ensure avgas

production . . . [t]he Oil Companies affirmatively sought contracts to sell avgas to the

government, and the contracts were profitable throughout the war.").

> **b.      The United States did not manage individual oil refineries.**

There is no credible basis for Exxon's contention that the United States effectively

commandeered individual refineries.  Exxon continues to misunderstand the difference between

management of the wartime economy and operation of individual industrial plants, despite the

Court's having called attention to the issue:

> *Bestfoods* clearly requires more than general influence over the economy or over a
> plant's operations, even if the result could increase waste production.  Under
> *Bestfoods,* operator liability requires the defendant to "manage, direct, or
> conduct" affairs leading to waste leakage . . .

Phase I Decision at 522; *Id.* at 519-20 (quoting *Lockheed Martin Corp. v. United States*,

35 F. Supp. 3d 92, 144-45 (D.D.C. 2014) ("[T]he Supreme Court's definition of operator

liability in *Bestfoods* is helpful in delineating the *types of control*, over which CERCLA

extends and thus which party should be *more* responsible as an equitable matter."), *aff'd,*

833 F.3d 225 (D.C. Cir. 2016).

Contrary to Exxon's claims, Exxon Opp. at 52-53, the Government's policy during the

war was expressly based on the idea that the United States would *not* become directly involved

in operating manufacturing facilities.  *See Lichter*, 334 U.S. at 754 ("[The Renegotiation Act]

sought to enable us to take the leading part in winning World War II on an unprecedented scale

of total global warfare *without abandoning our traditional faith in and reliance upon private

enterprise and individual initiative devoted to the public welfare*" (emphasis added)); *see also*

U.S. Ex. 8, Brigham Rebuttal Report at 3-9; U.S Ex. 171, Dr. Jay Brigham Expert Rebuttal and

Supplemental Report 9-11 (Feb. 23, 2015).  As Lincoln Gordon, who later became vice chairman

of the War Production Board, explained:

> . . . the philosophy of the War Production Board was hands off operations, not
> hands on.  The idea was that we would regulate what could be done in the flow of
> materials, the conservation of materials, but operations were for individual busin-
> esses to carry on, so I think hands on is a totally inappropriate term.

U.S. Ex. 8, Brigham Rebuttal Report at 4.  Contemporaneous histories are to the same effect, and

their analysis contrasts sharply with Exxon's argument:

> Granted, then, that there should be, in the event of another war, a single civilian
> oil agency, cloaked with adequate authority, what should be its relationship with
> the industry?  Should it use the cooperative system of World War II, or would it
> be more effective to do it next time *by official fiat*?

*Id.* at 6-7 (citing Frey, J. and H. Ide, A History of the Petroleum Administration for War

(GPO, 1946)) (emphasis added); *compare,* Exxon Opp. at 52 ("'control by fiat'").  The

fact that the United States adhered to this concept in practice and throughout the war is

amply established by the Court's prior opinion rejecting Exxon's argument for holding

the Government liable as an operator.  Phase I Decision at 495-96.

### c.      An exaggerated federal share is unwarranted.

Exxon effectively argues, without addressing the Court's Phase I decision, that the United

States should be treated *as a CERCLA operator of the refineries* for allocation purposes.  Exxon

does not explain why the Court, having explicitly assessed liability for sub-facilities in order to

inform its eventual allocation analysis, Phase I Decision at 520, should now abandon its findings.

Having determined that the United States is not liable as an operator at either refinery proper, the

Court should now allocate recoverable response costs accordingly, keeping in mind that nearly

all of Exxon's existing costs are attributable to refinery (not Plancor or BOW) operations, and

that Exxon presents no separate costs associated with the "government plants."

2.      **Exxon's refining operations arguments are inconsistent with historical fact.**

Exxon introduces its second major allocation theme – that wartime commercial products are merely a "byproduct" of avgas production – with the contention that the Government's experts "misunderstand how the refineries actually operated."  Exxon Opp. at 55.  To the contrary, the United States fully grasps – but has rebutted – Exxon's arguments that programs inclusive of rationing and planned blending amounted to a virtual nationalization of the two refineries.

a.      **Refiners retained authority over planning and scheduling.**

Mr. Lerman's opinions regarding planning and scheduling depend on the "compulsion" and "control" arguments discussed above (*see also* Exxon Mot. at 54, 56), recast as a discussion of refinery "planning and scheduling."  His report concludes that refiners were forced into submission during the war, but this conclusion is based on documents read out of context, and constitutes a historical opinion well beyond the scope of his expertise.  U.S. Ex. 295, David Lerman Expert Report 15-22 (Sept. 24, 2015) ("Lerman 2015 Report"); *see* Phase I Decision at 530 n.33.  As already discussed, Planned Blending was cooperative:  Refiners met monthly, and made their own plans collectively, the object being a voluntary exchange of blend stocks across refineries.  Phase I Decision at 495 (citation omitted); *see* U.S. Resp. to Exxon PF ¶ 59.  Further, Planned Blending optimized production across a *group* of refineries, regardless of the effect on any one installation.  *Id.*  (Instructions: "[s]ometimes . . . directed refiners to blend avgas in a way that would allow increases overall production even if that method would reduce an individual refineries' yield").

The use of scarce commodities to make avgas undoubtedly constrained the production of other products that might have been made from those commodities.  But that hardly suggests that

the refiners' role in "planning and scheduling" was displaced by the United States.  Consider, for example, "light gas oil," which undisputedly can be used to make avgas, or, alternatively, to make home heating oil or marine diesel fuel.  U.S. Ex. 295, Lerman 2015 Report at 11-12.  Mr. Lerman's table serves to make clear that there are *dozens* of products made from this and other crude fractions, all of which require planning and scheduling decisions relating to, for example, selecting a product mix and planning for seasonal variations.  *Id*. at 13-14.  Refiners plainly had plenty of decisions to make, and history confirms that the United States left them to refinery managers.  "Forensic waste expert" Gregory Kipp's[17] suggestion that "control" over production was "tantamount to . . . mandating the amount and toxicity of waste" generated at the refineries, Exxon Opp. at 55 (citation omitted), U.S. Resp. to Exxon PF ¶¶ 115-16, is equally unsupported, for much the same reason – the supposed government "control" of day-to-day operations simply did not exist, U.S. Opp. at 53-55.

### b.     Crude oil was required for all products.

The United States has argued that the Court should assign avgas a pro-rata share within the product slate when it decides what World War II costs will be allocated among the parties (Step 2).  U.S. Mot. at 58-61.  A pro-rata assignment is necessary because avgas purchase contracts provided an indemnity for charges incurred "by reason of" avgas production *only*, and avgas was a small portion of the product slate.  If the Court does not assign pro rata shares, taxpayers will be inappropriately assigned costs associated not only with avgas production but also with purely commercial production during the war.  Calculating such a share is, moreover,

---

[17]   Mr. Kipp's Vitae identifies him as a Geochemist and a Geological Engineer.  Although he has apparently performed forensic analyses seeking to "fingerprint" sources of waste in environmental media, there is no indication that he has done so in this case.  U.S. Ex. 248, Kipp Report 2016 at Vitae at 1.

feasible, as there is data in the record from which to calculate an avgas-to-commercial-product ratio.

Exxon seeks to rebut that argument by suggesting that the entire crude run had to be distilled solely to make avgas and that, therefore, the Court should assign all of the waste generated during World War II to avgas (and then assign 100% of that share to the Government per the parties' indemnity agreement). Exxon Opp. at 55; Exxon PF ¶¶ 99-101. Exxon offers opinions from two experts in an effort to support this argument. *Id.*; Exxon PF ¶ 99; U.S. Ex. 289, John Beath Expert Rebuttal Report 7 (Dec. 21, 2012) (indicating that all crude would have to be distilled regardless of the importation of avgas components); U.S. Ex. 295, Lerman 2015 Report at 2-3 (citing former Exxon expert Gary Baugher: "the only way Baytown and Baton Rouge could maximize the production of avgas was by processing all of the crude oil and other raw materials received . . ."); *Id.* at 23 ("a reduction in crude distillation rate would have reduced avgas production").

If Exxon means that that avgas volume was literally dependent on running the entirety of the crude charge, its analysis is faulty. [18] First, as Dr. Kittrell points out, Exxon's experts' opinions on this point would require a complex set of linear programming calculations – something neither Exxon expert claims to have done. U.S. Ex. 18, Dr. James R. Kittrell Expert

---

[18]  There are several technical anomalies in Exxon's suggestion that it was "necessary to process or 'crack' the crude," (Exxon Opp. at 55) but they pertain to issues that the United States believes are not in dispute. We therefore assume that the errors are an oversight, and clarify what we take to be Exxon's view as follows:  1) Exxon contends that all of the allotted crude at each refinery had to be distilled (not "cracked") in order to produce sufficient light gas oil (a "cut" from the distillation column) to make base stock in the FCC units, supplying a necessary avgas precursor; 2) Exxon therefore must also assume that *all* of the portion of the light gas oil suitable for use as an FCC feedstock was in fact used as such (FCC units are "Fluid Catalytic Crackers" which "crack" (break) long chains of hydrocarbon compounds in to shorter chains, producing the required base stock).  Both conditions are required to support an argument that the entire crude run was required to make avgas.

Report 22 (Part 5A, Paragraph f) (Sept. 22, 1016) ("Kittrell 2016 Rebuttal"); U.S. Ex. 291, Dr. James Kittrell Dep. Vol. II 459:23-461:21 (Mar. 31, 2017).  Second, although crude oil was in short supply relative to the *overall* demand for war products, it is undisputed that avgas production *in particular* was constrained by the ability to make the required high-octane blend stocks.  U.S. Ex. 295, Lerman 2015 Report at 13 (quoting Frey & Ide).  In simple terms, the refinery ran out of another component first, and so would have had as least some crude left over. That remaining crude oil would have been available to make other products such as marine diesel fuel or home heating oil.  Surviving records establish that such products were made in volume during the war.  *See, e.g.,* U.S. Ex. 299, Refinery Operations District 3 (Nov. 1944), at MAA_EM-002595 (reporting production of substantial quantities of navy diesel fuel); U.S. Ex. 300, Refinery Operations District 3 (Apr. 1945), at MAA_EM-002542 (same); U.S. Ex. 52; Data on War Products (June 2, 1943), at BAYHIS-00028171, 28185 (referencing production of heating oils).[19]

The more important point, however, is that – even if true – the fact that much or all of the crude had to be run to produce avgas does little to advance a rational allocation.  There is no dispute that distillation of the crude supply was the source of *everything* produced at the refineries – avgas and commercial products alike – and that *none* of those products could be made without generating waste.  And products other than avgas clearly dominate the product slate at both refineries.[20]  Consistent with this fact, as we have already demonstrated, important

_____

[19] An alternate reading of these opinions is that Exxon agrees that crude is run to make all products.  In that event, the company has consistently argued that everything other than avgas is an inconsequential "byproduct" that need not be considered in an allocation.  *See, e.g*., Exxon Opp. at 55; U.S. Ex. 295, Lerman 2015 Report at 5.  This position does not appear to require expert support.  *See* Exxon Mot. at 69-70; U.S. Opp. at 57-59.

[20] U.S. Mot. at 60 n.33 (citing PAW figures from Dr. Brigham's report establishing that avgas represented 14% of wartime production at Baytown, and about 19% at Baton Rouge).

officials during World War II saw avgas itself as a small, though important, "byproduct" of refining.  U.S. Opp. at 59; U.S. Suppl. SOF ¶¶ 402-04.

In sum, crude oil was required to make everything at the refineries.  The relevant question thus is not whether some particular amount of crude was or was not required to make one product or another.  Rather, it is how one ought to allocate environmental costs generated by a large group of co-products manufactured by a refiner from any given amount of crude.  Exxon argues that the Court should focus on the fact that aviation gasoline was important, and that – because all the crude had to be run anyway – the Court should simply ignore the 80% of refinery production in each case that was not avgas and decline to perform a cost allocation.

The equitable foundation for Exxon's argument is less than obvious.  Would Exxon agree that the United States owed nothing in contribution if it could establish that manufacturing commercial products to be sold in the domestic market required every barrel of crude to be run, so that the manufacture of aviation gasoline made no significant contribution even to that portion of Exxon's response costs already assigned to World War II in Step 1?  No doubt, Exxon would argue that the avgas was important, and that the refineries were optimized to make more of it.  But the refineries in these cases are very large industrial assets, each of which has operated continuously for nearly 100 years.  The allocation discussion relating to avgas bears on a commodity that made up less than 20% of the product slate on average for approximately four years in each case.  If Exxon's approach is valid, and if all of the refineries' crude would have been consumed in any event (and maintaining the parties mutual assumption that waste scales with the crude run), the manufacture of that product effectively added nothing of consequence to the waste load.  Why should Exxon recover?

### c. Imported components supplied half of World War II Avgas Production.

The remainder of Exxon's discussion of the Government's supposed misunderstandings of how refineries operate is addressed to the Government's contention that the assignment of costs to be allocated at Step 2 (generally a division between commercial and military production) should be modified slightly to reflect that fact that approximately one-half of the aviation gasoline made at each refinery is made from components not derived from the distillation of crude oil at the refineries.[21]

The United States' argument, based on research by Dr. Brigham and study of production data by Dr. Kittrell, is that allowance should be made for the fact that 50% of wartime avgas consisted of imported stocks, which produced waste at the exporting refineries.  *See* U.S. Mot. at 60 n.34.  Detailed records covering much of the war confirm that both refineries imported substantial quantities of blending stocks, and that approximately 50% of the avgas blends at each refinery were produced by blending imported materials.  U.S. 2d Suppl. SOF ¶¶ 409.  Because that is the case, an adjustment is required so that the waste associated with crude distilled at each refinery is allocated across the group of products or portions thereof to which it actually contributed.[22]

---

[21]  Although Exxon does not expressly identify it as such, this is an alternative argument – one that assumes the Court will divide costs between commercial and "government related" production as it decides "what costs will be allocated" at Step 2.  Should the Court accept Exxon's argument that all wartime wastes should be assigned to avgas (and it certainly should not), there would be no remaining costs to assign.

[22]  Mr. Lerman's suggestion that imports "do not translate into waste reductions when the refineries still had to process their entire crude allocations each month . . ." is beside the point.  Exxon Opp. at 58.  Again, there is no dispute the refineries ran their crude allotments month-over-month during the war.  This question is about what portion of the product slate was produced from that crude oil – and in this instance about one-half of the avgas was effectively produced without it.  Once a decision is made that an allocation of costs should be made *(cont'd)*

Exxon raises multiple objections to this approach, Exxon Opp. at 56-59, none of them substantive.  Briefly:

- Dr. Kittrell's assumption that avgas imports generated pursuant to the planned blending program were preferentially used to make avgas accords with pertinent historical treatments and with the realities of refinery engineering (U.S. 2d Suppl. SOF ¶¶ 411-13; *see* U.S. Ex. 18, Kittrell 2016 Rebuttal at 21-27 (providing a detailed analysis));

- The wastes generated by cracking FCC charge stocks, by on-site processing of natural gasoline, and by hydrogenation of codimer were inconsequential (U.S. 2d Suppl. SOF ¶¶ 414-19 (FCC stocks); U.S. 2d Suppl. SOF ¶¶ 420-29 (natural gasoline); U.S. 2d Suppl. SOF ¶¶ 430-36 (hydrogenation)); [23]

- Natural Gasoline, a valuable high-octane product, was piped to the Baytown refinery throughout much of the war, and blending of intermediate products derived from natural gasoline materially aided the refinery's efforts to increase the production of aviation gasoline (U.S. 2d Suppl. SOF ¶ 422); and

- Exxon's claim to credit for exported avgas components as refinery products is reasonable, but the Company's contention that it was a "net-exporter" is based on problematic calculations by Mr. Beath, who treats most imports as "on-site" feeds. Larger refineries in general, and the two at issue in particular, were substantial net importers of avgas components.  U.S. 2d Suppl. SOF ¶¶ 464-73.

The record thus demonstrates that substantial amounts of blend stocks were imported to both refineries during the war, and that these imported stocks were either blended directly (producing no waste), or were minimally processed on site (producing very limited wastes).  An equitable allocation should therefore account for the imports.  The United States' experts' calculations of the appropriate adjustment are based on reliable record-keeping during the war, and – in

---

across products (commercial production vs. war products) Exxon offers no sound argument that this factor should not be considered.

[23]  As to supposed toxicity and persistence of FCC related wastes (Exxon Opp. at 57 n.68; Exxon PF ¶ 362), see U.S. Opp. at 53-55; U.S. Suppl. SOF ¶¶ 377-83.  *See also,* U.S. Ex. 18, Kittrell 2016 Rebuttal at 31-32 (addressing toxicity and "severe cracking"); U.S. Ex. 290, Kittrell 2017 Dep. Vol. I at 213:7-215:19 (explaining fate of dissolved oil content and phenols in wastewater); U.S. Resp. to Exxon PF ¶ 362.

contractual terms – it cannot be said that there is waste at the refinery "by reason of" the simple blending of imported materials.  *See* U.S. Mot. at 59 (quoting avgas contract).

### 3.    Exxon's remaining arguments are not persuasive

When Exxon addresses the three-step allocation analysis, it argues for: 1) a "production based" method at Step 1 (Exxon Opp. at 61-63); 2) adoption of the supposed 97% reduction in wastes per barrel of crude run allegedly obtained beginning almost immediately after the war (*Id.* at 59-61); 3) treatment of everything else the refinery made as an inconsequential "byproduct" of avgas manufacture at Step 2 (*Id.* at 63-67), or, alternatively, findings determining that everything made during the war was a war product anyway (*Id.* at 68-69); and 4) rejection of all of the Government's allocation proposals (*Id.* 71-74).  We have addressed these issues in prior briefing, and they require only passing discussion here.

### a.    Allocation Steps One and Two

Exxon continues to advocate for a "production based" method at Step 1, noting a "significant amount of reliable data" and stressing "accuracy."  Exxon Opp. at 61, 62 n.77. There is nothing inherently wrong with a production-based method of assigning costs to years (although the United States notes that doing so would assign a much larger share to Exxon because of large post-war production increases.  U.S. Opp. at 56 (light grey bars)).  Exxon's argument that the data supporting its calculations is "reliable" collapses, however, when it comes to waste reduction factors – the real heart of Mr. White's work.  As the United States has already demonstrated, Exxon's calculation of enormous reduction factors, bolstered by the "delay factor," is wholly unsupported.  U.S. Opp. at 42-56, 65-67.

Mr. White contends that his production-based, waste- and delay-adjusted allocation method is the only proper approach, and called upon others to suggest alternative waste reduction factors if his are found wanting.  U.S. Ex. 236, Richard White Dep., Vol. I, 233:1-

236:22, 238:18-240:7, 250:9-253:5 (Apr. 13, 2017).  When the government offered several alternatives as a means to test Mr. White's conclusions, Exxon complained that the alternatives chosen were flawed.  Exxon Opp. at 63 n.78.  And to a degree, there is no dispute about that.  U.S. Mot at 58 n.32; U.S. Suppl. SOF ¶ 386.  The suggested alternatives are better-supported than Exxon's figures, but all efforts to assess the impact of various "waste reduction" efforts on the costs Exxon seeks in this case are inevitably based on limited data.  Mr. White acknowledges the problem, *see* U.S. Ex. 236, Richard White Dep. Vol. I 250:4-257:5 (Apr. 13, 2017), but he remains determined to avoid acknowledging that he cannot perform a reliable calculation trading production against waste reductions if his waste reduction figures are unreliable.  For Exxon, "second best" solutions simply do not exist.  U.S. Ex. 237, Richard White Dep. Vol. I 430:7-441:15 (June 6, 2013).[24]

---

[24]  Exxon complains that the United States does not account for the impacts of a sour water stripper installed to handle FCC output streams in 1952, and that the alleged operation of an effluent treatment unit ("EFU") beginning in the 1950s has not been accounted for.  Exxon Opp. at 61.  The presence of sour water stripping prior to 1952 is disputed, and has already been addressed.  U.S. Suppl. SOF ¶¶ 383; U.S. Resp. to Exxon PF ¶ 393.  Information on the EFU is limited, and its impact unclear.  Humble appears to have had some difficulties with the unit, and reports suggest that only three of the planned five filters were installed.  U.S. Ex. 278, 1952 Loss Committee Report, MIS-00031624 at 31635-36 (Apr. 4, 1952).  The EFU appears to have been intended to improve surface water quality, and clearly involved the use of filter cake that would become contaminated and be transported in rail cars to the "spent clay pile." *Id.* at 31634.  The most important impact of the unit, therefore, could well be the addition of large amounts of contaminated clays to the waste clay pile largely after the period of federal involvement – suggesting allocation equities for forthcoming costs related to that unit similar to those for the Old Silt Pond at Baton Rouge.  The emulsion-treating unit or ETU (Exxon PF ¶ 444) seems to be a different sort of device, aimed at breaking emulsions that would otherwise have traversed the plant outfall – but it too appears to have resulted in the capture and land disposal of oily wastes.  A002515 at 2566 ("solids collecting in the emulsion tanks have been washed in the silt washing unit and then dumped on the low land back of the levee").

More broadly, it is not clear why simply mentioning individual projects generically related to better effluent performance bolsters Exxon's case here – no means is offered to quantify the impact of the units on wastes, or to relate their impacts to other projects.  The benefit of the EFU, for example, may have been included in that 1952 LDAR report.  U.S. Mot. at 57 n.31.  *(cont'd)*

Moving to Step 2, Exxon repeats its "control" and "byproducts" arguments, which are said to justify what is now referred to as a "front-end" approach to identifying allocable costs – which, in turn, simply assigns all waste to avgas production. Exxon Opp. at 63-67. There is no new analysis here. *All* of the opinions relating to the long history of the *Shell* litigation continue to be distinguished by the fact that difference between spent alkylation acid – a waste necessarily initially associated with avgas production – and the entire remainder of a large slate of co-products (items deliberately produced and sold) at the refineries at issue. Exxon continues to deny that the difference exists, and does not address questions about why the Court should treat Shell as precedential (which it should not on these facts). The Company does argue in the alternative that virtually everything the refinery manufactured *during* the war – including products like commercial motor gasoline and home heating oil – was actually a war product. Exxon Opp. at 68-69. But that proposition is facially absurd. *See* U.S. Resp. to Exxon Opp. PF ¶ 8. [25]

Finally, Exxon's attempt to exaggerate the impact of the Plancors on refinery waste streams requires little comment. Mr. Low's updated work is painstaking, and accounts for the relevant waste streams, including those at the BOW. *Compare* Exxon Opp. at 70 *with* U.S. Ex.

---

Random references to particular projects do not resolve the enormous problems with Exxon's proposed waste reduction multipliers.

[25]   Exxon's additional suggestion that "all the wastes at the site . . . would have had to be cleaned up anyway" (Exxon Opp. at 66) seeks to equate Judge Branden's January, 2017 opinion regarding "substantial causation" with what has sometimes been referred to as the "stand alone" method of allocation in CERCLA parlance. First, the *Shell* opinion is addressed to a very specific causation requirement not present here, and the Court's calculations suggest that the question regarded disputed cleanup costs potentially amounting to $723,578 against a total of over $64 million. *Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 37 (Fed. Cl. 2017). Such would certainly not be the case when 80% of the products being produced for sale are not subject to the avgas contract in question. Second, the problem with stand-alone analysis is that it works both ways – by Exxon's reasoning the United States should be excused if commercial production is sufficient to account for the waste in the absence of avgas production.

22, Low Suppl. at 4-5, 7-14.  And given that Exxon's own proposed finding regarding Naptha confirms that over 90% of the Naptha cycled through the BOW was returned to the refinery, the Court should not condone the contention that 30% of the crude run should be attributed to Naptha production (even as the same crude was also being used to make other products).  Exxon PF ¶ 232 (91% return).

### b.      Step 3 and "Degree of Involvement"

Exxon's critique of the Government's suggestions for Step 3 – the equitable allocation that examines each parties' involvement with the Site – are of a piece with the remainder of Exxon's positions.  Exxon again suggests federal "control" of refinery operations should be the deciding factor, notwithstanding its concession that Judge Fletcher's opinion in *Shell* provides "a very fair statement" of how the war was fought.  Reference to *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92 (D.C. Cir. 2014), as a comparator for an equitable federal share, Exxon Opp. at 72 (29%), is inappropriate.  In *Lockheed*, the United States conceded "owner" liability based on equipment ownership, but escaped "operator" liability despite Lockeed's attempt to rely on *FMC*.  *Id*. at 135, 148-50.  The *Lockheed* court did assign federal shares of 20-30% independent of contractual considerations, *Id*. at 153, but it arrived at that result on the basis of a detailed inquiry regarding the "parties respective *control* over the disposal operations . . . [considered to be] the paramount equitable consideration," *Id.* at 135 –  not because of Lockeed's arguments about military products that it was "required" to manufacture.  *Id.* at 149-50.

*TDY Holdings,LLC v. United States*, 872 F.3d 1004 (9th Cir. 2017) is similarly unhelpful. Although the Ninth Circuit reversed a decision that assigned the United States a null share, the Court of Appeals also opined that the district court retained broad discretion on remand and – in the case of the concurring opinion – that a share quite close to zero would likely be affirmed.  *Id.* at 1011.  And Judge Huvelle has provided a persuasive rebuttal to any notion that monopsonistic

market power or strict product specifications are weighty factors, albeit in her discussion of operator liability.  *Compare,* Exxon Opp. at 73 (citing *TDY Holdings* – government "mandate" for aircraft production) *with Lockheed*, 35 F. Supp. 3d at 149 ("LPC's argument, taken to its logical conclusion, would render the government an operator for practically *any military output contract.*" (emphasis in original)).

Exxon is unhappy with the Government's attempts to find a fair estimate relating to war products, but has offered no remotely credible counter-proposal.  *Compare* U.S. Mot. at 65-67 *with* U.S. Resp. to Exxon Opp. PF ¶ 8.  And it misunderstands the Government's third alternative – which reflects the additional crude runs to manufacture *all* war products, not just avgas, and does not depend on the amount of crude that had to be run to make only avgas. Exxon's proposed allocation is "production based" *because* the Company contends that waste generally scales with the crude run, an undisputed proposition.  But if that is the case, and if the question being asked is about the impact of the war on refinery waste production, it remains unclear why Exxon objects to making a calculation that evaluates differential crude runs before and during the war.

### 4.    The Government's proposals are equitable.

The case before the Court involves a large group of costs incurred almost exclusively on parcels where the Court has held that the United States would not be liable absent ownership and operation of adjacent plants within the CERCLA "facility" defined in Phase I.  There are no cost groups specific to the "government plants," and the impact those plants on refinery waste loads was clearly modest.  The Court ought to decline Exxon's invitation to disregard those basic facts and to do "alternative" equity in keeping with the Company's preference that virtually all meaningful waste disposal be assigned to the wartime era, and that the Government then be assigned to pay for most or all of it.

## V.    EXXON HAS NOT IDENTIFIED SUFFICIENT FACTS ON WHICH THE COURT COULD ALLOCATE FUTURE COSTS.

Exxon has failed to identify key facts to support traditional allocation factors for costs it contends it *might* incur for the water bodies and sediments adjacent to the Baytown and Baton Rouge Sites. [26]  Exxon offers no more conclusive evidence relevant to future costs at the water bodies than it did in Phase I, despite claiming that "extensive discovery related to allocation and costs, including future response activities, has been conducted."  Exxon Opp. at 77.

With respect to Baytown, Exxon offers the shoreline pore water studies discussed in the United States' Motion (and in Phase I), along with the unsupported opinion of its cost expert, Mr. Ficca, and the unsupported statement of its employee, Mr. Paredes.  *See* Exxon Opp. at 77 n.96; U.S. Resp. to Exxon PF ¶¶ 697, 790-91.  Notably, Exxon does not contend that it has conducted comprehensive studies of the existence, type, source, magnitude, or geographic extent of any contamination in Mitchell Bay, the Houston Ship Channel, Black Duck Bay, and Scott's Bay, or that such studies are required by any government agency.  *See* Exxon Opp. at 76-80. [27]  In

---

[26] While courts certainly have "considerable latitude" in determining an equitable allocation, courts  typically consider:

> the amount of hazardous substances involved; the degree of toxicity or hazard of the materials involved; the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the substances; the degree of care exercised by the parties with respect to the substances involved; and the degree of cooperation of the parties with government officials to prevent any harm to public health or the environment.

*Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672-73 (5th Cir. 1989) (quotation and citation omitted); *see also Bell Petroleum Servs. v. Sequa Corp.*, 3 F.3d 889, 899-900, 901 n.12 (5th Cir. 1993); U.S. SOF ¶ 176 (listing additional information used to allocate costs for water bodies and underlying sediments).

[27] On May 15, 2018, Exxon produced a proposed Interim Response Action Plan to the United States, which had been submitted by Exxon to the TCEQ on March 27, 2018.  The Plan does not change the United States' argument because it is limited to the shoreline area between Docks 6 and 7 in Mitchell Bay and does not address broader contamination in the Bay, if any.  *(cont'd)*

fact, with the exception of the shoreline studies, Exxon has not offered any studies of contamination *in* the water bodies or underlying sediments at issue. *See* U.S. Phase I Resp. to Exxon Second Set of PF (Docket No. 72-1) ¶¶ 69-73.[28]  And the shoreline reports do not include any study of contamination beyond the shoreline. *See id.* at ¶ 69 and n.3 below. [29]

Furthermore, Exxon has not established a connection between any contamination in the water bodies and the production of war products during World War II and the Korean War. *See* Exxon Opp. at 77 (arguing simply that the Government's share for such unknown future costs at the water bodies be the same as its share for known costs units elsewhere on the Sites).  Exxon stated in its proposed facts that SWMUs 59 and 69 are responsible for the Mitchell Bay shoreline contamination, but Exxon has failed to establish Government responsibility for those SWMUs. *See* Exxon Resp. to U.S. SOF ¶ 180 (contending without support that contamination is associated with SWMUs 59 and 69); U.S. Resp. to Exxon PF ¶¶ 477, 485 (disputing or partially disputing a federal nexus to SWMUs 59 and 69 and disputing showing of response costs and Government

---

U.S. Ex. 288, Interim Response Action Plan, Mitchell Bay Sediment Remediation, March 27, 2018, BAYTECH-00206436 at 206436, 206441.

[28] The cited U.S. Phase I Responses to Exxon's Second Set of Proposed Findings discuss several of the documents cited in Exxon's PF ¶ 697.  The others cited and not previously discussed do not show contamination in the water bodies. *See, e.g.*, A004668 at 4694-96 (discussing *potential* migration pathways).

[29] Exxon contends that it conducted "an extensive ecological risk assessment of the Houston Ship Channel" based "in part" on the shoreline studies, but the cited report does not identify any other studies nor does Exxon. *See* Exxon Resp. to U.S. SOF ¶ 181 (citing A008076-8107); *see, e.g.*, A008093-94 (discussing the collection of sediment pore water samples from the potential zone of groundwater discharge); A008084 (identifying the potential zone of groundwater discharge as "1,500 linear feet of the [Houston Ship Channel] adjacent to the western boundary of the [Refinery] and south of Dock 1.").  Exxon's newly-produced Interim Plan for the shoreline indicates that the shoreline contamination is "generally immobile unless the sediments are disturbed."  U.S. Ex. 288, Exxon Interim Response Action Plan at BAYTECH-00206442.

responsibility); U.S. Phase I Resp. to Exxon Second Set of PF ¶ 69 (disputing evidence offered to support connection to SWMU 59).

There is even less evidence to support Exxon's claim for unknown future costs with respect to Baton Rouge.  Exxon offers four items—an unsupported declaration by Michael Pisani, an employee of one of Exxon's consultants, a 1986 Hydrogeologic Investigation, a 1987 Corrective Action Order, and a 1996 Shallow Fill Zone Technical Report.  *See* Exxon Opp. at 77 n.96 (citing Exxon PF ¶ 713); Exxon Resp. to U.S. SOF ¶¶ 184, 185 (unsupported statement that Exxon has incurred past costs and may incur costs for Monte Sano Bayou).  As with the Baytown documents, the Baton Rouge reports do not contain comprehensive studies of the existence, type, source, magnitude, or geographic extent of any contamination in the Monte Sano Bayou or Mississippi River, or require such studies.  A003890; A008321; A003895-12.  None of the Baton Rouge reports even conclude that contamination has migrated from the Site into the water bodies or underlying sediments.  *See id.*; *see, e.g.*, A003898 ("There is no evidence of vertical or horizontal migration of affected materials[.]").  Furthermore, the reports do not establish a connection between any contamination in the water bodies or sediments and the production of war products.  *See id.*

Such information matters for purposes of allocation.  Without knowledge of the specific type of contamination, its location and extent, and its source, the United States' relative responsibility to Exxon, which has been discharging into the water bodies for decades, cannot be established.[30]  In such circumstances, other courts have declined to allocate unknown future costs under a declaratory judgment, or allowed the parties to re-litigate the allocation with new

---

[30] *See* U.S. Ex. 23, Mathew Low Expert Rebuttal Report 30-31 (Nov. 2012) (discussing the lack of relevant discharge data).

facts and evidence.  U.S. Mot. at 70.  The cases Exxon cites do not contradict this sensible

approach because they involve reasonably foreseeable future costs for specific cost components

rather than wholly speculative future costs like those at issue here.  Exxon Opp. at 79 & n.99

(citing cases).

New York State Electric & Gas Corp. v. FirstEnergy Corp., for example, involved sixteen

specific sites associated with manufactured gas plant operations which were covered, or expected

to be covered, by a Consent Order with the New York Department of Environmental

Conservation that required a specific process for investigating and remediating contamination at

the sites.  808 F. Supp. 2d 417, 446-52 (N.D.N.Y. 2011), vacated on other grounds, 766 F.3d

212 (2d Cir. 2014).  With the exception of one site—the Corning site—the liable party "ha[d]

incurred substantial costs in responding to the release of hazardous substances."  Id. at 446.

Although the liable party had spent less than $600 on the Corning site as of the date of the

decision, both the liable party and the State expected to find hazardous substances at the site

"given the nature of the [manufactured gas plant operations] conducted there."  Id. at 446 n.12,

452.  Thus, unlike the presence of contamination and the likelihood of future required action to

address the water bodies at issue here, the presence of contamination and the likelihood of future

required action was not wholly speculative at any of the sixteen sites at issue in NYSEG.

Likewise, in Board of County Commissioners of La Plata, Colorado v. Brown Group

Retail, Inc., a private party cleaned up contamination at a specific property under the supervision

of the Colorado Department of Public Health and the Environment.  768 F. Supp. 2d 1092, 1097,

1105-06 (D. Colo. 2011).  The court allocated future costs under a declaratory judgment, id. at

1122-23, but also explained that "La Plata's proposed remediation plans are limited to the

Property.  La Plata is not proposing any remediation at offsite properties."  *Id.* at 1107.[31]

There is no merit to Exxon's contention that withholding a declaratory judgment for

unknown future costs would result in "massive and wasteful" re-litigation.  Exxon Opp. at 78.

The only issue that would be litigated in the future—if costs are actually incurred to address the

water bodies—would be the United States' contribution to the contamination that drives those

future costs, which has not yet been litigated.  Given the complete lack of information regarding

the extent and source of any contamination in the waters at issue, this Court should reject

Exxon's request to enter a declaratory judgment allocating unknown future costs at this time.[32]

## CONCLUSION

For the foregoing reasons, the Court should grant the United States summary judgment.

---

[31] *See also Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 897 (10th Cir. 2000) (affirming the district court's allocation of future costs where only the "exact amount," rather than whether the costs would be incurred at all and which party was responsible for the contamination, was unknown); *Lockheed*, 35 F. Supp. 3d at 97-98, 153, 162 (allocating future costs for specific facilities); *Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 852 F. Supp. 2d 229, 250 (D. Conn. 2012) (allocating future response costs that "have been or will be incurred at [the property]"); *Vine Street LLC v. Keeling ex. rel. Estate of Keeling*, 460 F. Supp. 2d 728, 767 (E.D. Tex. 2006), *rev'd on other grounds*, 776 F.3d 312 (5th Cir. 2015) (allocating future costs "for the contamination at issue" but declining to enter a declaratory judgment for future costs that could arise under facts that had not yet occurred); U.S. Mot. at 70-71 (discussing allocation of future costs in *Boeing Co.*).

[32] For similar reasons, the Court should also reject Exxon's attempt at an even broader declaratory judgment allocating future costs for unspecified "other areas of contamination" in addition to the water bodies.  *See* U.S. Opp. at 72-73.

Respectfully submitted,

Dated: May 18, 2018          JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

 /s/ *Erica Zilioli*
Michael D. Rowe (Attorney-in-Charge)
Erica M. Zilioli
Justin D. Heminger
Brian H. Lynk
Stephanie J. Talbert
Trial Attorneys
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, DC  20044
(202) 514-3144
michael.rowe@usdoj.gov

RYAN K. PATRICK
United States Attorney

Jimmy A. Rodriguez
Assistant United States Attorney
Southern District No. 572175
Texas Bar No. 24037378
1000 Louisiana, Suite 2300
Houston, TX 77002
(717) 567-9532
jimmy.rodriguez2@usdoj.gov

*Counsel for Defendant United States*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2018, I filed the foregoing Reply and accompanying documents using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

/s/ *Erica Zilioli*